**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**LETICIA FRANCINE STIDHUM,**

                               **Plaintiff,**

               **-against-**

**161-10 HILLSIDE AUTO AVE, LLC d/b/a**
**HILLSIDE AUTO OUTLET, HILLSIDE AUTO**
**MALL INC d/b/a HILLSIDE AUTO MALL,**
**ISHAQUE THANWALLA, JORY BARON,**
**RONALD M BARON, and ANDRIS GUZMAN,**

                             **Defendants.**
-------------------------------------------------------------------X

**Case No.: 1:21-cv-7163 (HG) (LB)**

**DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

        Defendants 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet"), Hillside Auto Mall Inc d/b/a Hillside Auto Mall ("Hillside Auto Mall") (Hillside Auto Outlet and Hillside Auto Mall collectively hereinafter the "Corporate Defendants"), Ishaque Thanwalla ("Thanwalla"), Jory Baron ("Jory"), Ronald M Baron ("Baron"), and Andris Guzman ("Guzman") (Thanwalla, Jory, Baron, and Guzman collectively hereinafter the "Individual Defendants") (the Corporate Defendants and the Individual Defendants collectively hereinafter the "Defendants"), by their attorneys, Milman Labuda Law Group PLLC, pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (hereinafter "Local Civil Rule" or "LCR") and ¶¶ IV(A)(4) and IV(B)(7) of this Court's Individual Practices (hereinafter the "Practices") hereby respectfully submit this Rule 56.1 Statement of Undisputed Facts in Support of their Motion for Summary Judgment (hereinafter "SOUF"), as to which Defendants contend there is no genuine issue to be tried.

**Hillside Auto Outlet**

1. 161-10 Hillside Ave Auto, LLC ("Hillside Auto Outlet") is a domestic limited liability company formed on June 12, 2017 under the laws of the State of New York that does business as Hillside Auto Outlet and is authorized to do business in the State of New York. Kataev Decl. ¶ 3, Ex. A; Jennings Dep. 14:14-24, 17:7-8, 19:2-9; Thanwalla Dep. 17:3-18:11, 27:7-28:3; Guzman Dep. 50:10-14.

2. Hillside Auto Outlet is a used car dealership located at 16110 Hillside Avenue, Jamaica, NY 11432. Kataev Decl. ¶ 3, Ex. A; Jennings Dep. 15:9-12; Plaintiff Dep. 31:2-14.

3. Hillside Auto Outlet's members are Josh Aaronson ("Aaronson"), Jory Baron ("Baron"), The Estate of David Baron ("Estate"), and Ishaque Thanwalla ("Thanwalla"), all of whom own equal membership interests of twenty-five percent (25%). Kataev Decl. ¶ 4, Ex. B; Baron Dep. 31:2-17, 37:18-38:2, 43:20-44:7, 52:2-6; Thanwalla Dep. 17:3-18:11, 27:7-28:3, 18:12-22, 19:14-20:14, 61:14-15; Guzman Dep. 70:5-71:2, 74:23-25; Jennings Dep. 21:2-6.

4. At all relevant times, Thanwalla ran the day-to-day operations at Hillside Auto Outlet and served as its general manger. Thanwalla Dep. 17:3-18:11, 27:7-28:3; Baron Dep. 38:3-6, Jennings Dep. 25:2-5, Baron Dep. 52:2-6.

5. Thanwalla, but none of the other members, had the power to hire and fire employees, set the schedules and wages of employees, and to discipline employees. Thanwalla Dep. 68:10-17; Baron Dep. 38:7-16; Jennings Dep. 33:24-34:5, 56:20-57:4.

6. The only responsibility Thanwalla did not have that the remaining members had was the ability to sign checks at the dealership, which the remaining members did on a weekly basis. Jennings Dep. 37:9-22.

2

7. David Baron passed away in May 2021 and his estate currently owns his twenty-five (25%) membership interest. Thanwalla Dep. 18:23-24; Baron Dep. 45:18-20; Guzman Dep. 74:17-22.

8. When David Baron was alive, he had no responsibilities at Hillside Auto Outlet. Thanwalla Dep. 61:17-20; Baron Dep. 45:13-17, 45:21-46:2; Jennings Dep. 36:18-22.

9. Jory Baron had no power to hire or fire employees, nor did he set employees' schedules or compensation. Baron Dep. 38:25-40:12; 42:2-12; Plaintiff Dep. 58:12-15, 60:13-61:7.

10. Jory Baron did not know basic information about employees' identities, schedules, compensation, and hiring processes, including that of the Plaintiff because he did not deal with that aspect of the dealership. Baron Dep. 34:7-16, 38:17-24, 40:13-23, 41:9-25, 48:17-49:6, 50:17-25, 54:13-55:18 (did not know of Plaintiff until after she quit and complained and later sued), 81:13-24, Plaintiff Dep. 59:4-13.

11. Jory Baron's role was limited to financial aspects of the dealership, such as signing checks and ascertaining the financial health of the dealership; he had no interactions with or responsibilities in connection with Plaintiff's employment. Baron Dep. 31:18-32:5, 32:12-33:10, 40:24-41:8, 51:2-25; Jennings Dep. 37:9-14; Thanwalla Dep. 61:21-25, Plaintiff Dep. 58:16-21.

12. Aaronson had no responsibilities at Hillside Auto Outlet other than occasionally joining telephone calls with Baron and Thanwalla to discuss various issues at the dealership unrelated to Plaintiff's employment. Thanwalla Dep. 62:2-3; Baron Dep. 44:14-24, 44:25-45:12.

13. Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019. Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.

14. Guzman did not have the power to hire, fire, or discipline employees in either of his roles at Hillside Auto Outlet.  Guzman Dep. 68:16-69:12, 79:24-80:4; Plaintiff Dep. 57:25-58:11, 95:15-96:3; Thanwalla Dep. 152:18-153:24; Guzman Decl.

15. His main responsibility as a sales manager was to ensure that all deals were processed; his responsibilities as a general sales manager included being involved in finance, which required him to work with banks, get customers approved for loans, and running credit for customers (which he also did as a sales manager).  Guzman Dep. 51:18-53:7; Guzman Decl.

16. Serge Zanan ("Zanan") is a finance manager at Hillside Auto Outlet since November 2018.  Thanwalla Dep. 55:8-13, 210:15-212:19.

17. Louis is another finance manager at Hillside Auto Outlet.  Thanwalla Dep. 55:14-15.

**Hillside Auto Mall**

18. Hillside Auto Mall, Inc. is a domestic business corporation formed on December 5, 2005 under the laws of the State of New York that does business as Hillside Auto Mall and is authorized to do business in the State of New York.  Kataev Decl. ¶ 5, Ex. C;

19. Hillside Auto Mall is a used car dealership located at 15001 Hillside Avenue, Jamaica, NY 11432.  Kataev Decl. ¶ 5, Ex. C; Jennings Dep. 15:5-8.

20. Hillside Auto Mall is owned by Ronald Baron, Aaronson, Raymond Phelan ("Phelan"), and the Estate of David Baron.  Kataev Decl. ¶ 4, Ex. B; Thanwalla Dep. 21:6-20, Jennings Dep. 21:2-6, 36:10-17.

21. Phelan was the general manager at Hillside Auto Mall.  Jennings Dep. 37:23-38:8.

**Plaintiff's Role, Duties, Compensation, & The Vehicle Sale Process During Her Employment with Hillside Auto Outlet**

22. Plaintiff worked only for Hillside Auto Outlet; she never worked for Hillside Auto Mall.  Thanwalla Dep. 35:6-22; Plaintiff Dep. 34:7-35:3

4

23. Plaintiff worked at Hillside Auto Outlet as a salesperson and her sole responsibility was selling cars. Plaintiff Dep. 36:12-20; Thanwalla Dep. 81:23-82:4; Guzman Dep. 80:4-12.

24. She applied for the position with Hillside Auto Outlet on Craigslist, spoke with Thanwalla the following day, and came for an interview with him and a manager named Jeanique that same day; she was hired by Thanwalla on the spot. Plaintiff Dep. 55:21-57:24; Thanwalla Dep. 28:4-17, 55:3-7.

25. Plaintiff commenced employment with Hillside Auto Outlet on May 22, 2018 and was employed for approximately eight (8) months. Plaintiff Dep. 213:8-16, Thanwalla Dep. 69:6-18.

26. Plaintiff worked every day except Wednesday and alternated Sundays off. Plaintiff Dep. 37:14-19.

27. Plaintiff's responsibilities included showing customers vehicles, meeting and greeting customers, and taking a credit application and documentation from the customer in anticipation of making a sale. Thanwalla Dep. 82:5-12.

28. Plaintiff was supervised by Thanwalla, Jeanique, and Guzman, until Jeanique separated from employment in August 2018. Plaintiff Dep. 36:21-37:2, 59:21-60:12, 64:15-20, Thanwalla Dep. 55:3-7, 56:25-57:6; Guzman Dep. 80:16-24.

29. Plaintiff was not supervised by nor had any interactions with Jory Baron and David Baron. Thanwalla Dep. 61:17-62:3, 152:18-153:24; Baron Dep. 31:18-32:5, 32:12-33:10, 34:7-16, 38:17-41:25, 42:2-12, 44:14-45:17, 45:21-46:2, 48:17-49:6, 50:17-51:25, 54:13-55:18, 81:13-24; Jennings Dep. 36:18-22, 37:9-14; Plaintiff Dep. 57:25-58:21, 59:4-13, 60:13-61:7, 95:15-96:3; Guzman Dep. 51:18-53:7, 68:16-69:12, 79:24-80:4.

30. Thanwalla trained Plaintiff on how to: (i) sell cars, how to meet and greet; (ii) take a credit application; and (iii) use VIN Solutions, a lead management system. Thanwalla Dep. 82:16-21.

31. Jeanique and Guzman were both assistant managers at the time.  Thanwalla Dep. 57:7-23.

32. Hillside Auto Outlet typically employed two assistant managers and two finance managers. Thanwalla Dep. 86:21-87:12.

33. Plaintiff's compensation structure at Hillside Auto Outlet consisted of a $300.00 weekly salary, $150.00 flat commission for each car sold (even if it was sold at a loss), and – from time to time – a bonus of five percent (5%) of the profit from the sale of any vehicle which was sold that made in excess of $3,000.00 in profit.  Plaintiff Dep. 37:3-13, 39:2-7, 42:23-43:14, 163:20-164:18, 164:23-166:20; Thanwalla Dep. 28:21-29:15, 60:3-13, 164:8-19.

34. There were various other bonuses offered from time to time on a daily, weekly, or monthly bonus: (i) one bonus was for cars sold after remaining on the lot for more than sixty (60) days; (ii) another was for cars sold after remaining on the lot for more than ninety (90) days; and (iii) another was for selling three (3) cars in one (1) day.  Thanwalla Dep. 29:16-30:11, 30:12-31:13, 57:24-59:23, 60:14-22, 138:2-24.

35. These bonuses operated the same way throughout Plaintiff's employment and did not change in any way when Jeanique left Hillside Auto Outlet.  Thanwalla Dep. 59:24-60:2, 60:23-61:11.

36. Plaintiff received a form utilized at the dealership to keep track of the vehicles she sold in order to ensure she was properly paid; she discarded the form once she was satisfied that she was properly paid.  Plaintiff Dep. 40:19-42:22; Thanwalla Dep. 115:8-116:17.

37. Plaintiff was paid weekly, and verified she was properly paid each week by reviewing a form that was turned into the sales manager which was then provided to payroll.  Plaintiff Dep. 38:5-13; Thanwalla Dep. 115:8-116:20.

38. Although she claims she stopped receiving additional commissions of five percent (5%) for any vehicle that grossed in excess of $3,000.00 in profit after Jeanique left, she continued her employment with the dealership.  <u>Plaintiff Dep. 43:15-44:12.</u>[1]

39. Although aware of dealership certification programs for salespersons like herself, Plaintiff never took any such courses to advance in her career.  <u>Plaintiff Dep. 31:2-11.</u>

**The Sales Process**

40. Dealertrack is a dealership management system used by Hillside Auto Outlet; it stores customer information that is sensitive, which is why access to it is limited, and serves as a liaison with banks that provide financing for vehicles.  <u>Thanwalla Dep. 54:11-19, 145:6-146:19; Baron Dep. 53:9-18; Guzman Dep. 62:7-63:15, 84:9-86:6; Guzman Decl.</u>

41. Only managers had access to Dealertrack; because salespeople were not authorized to have access to Dealertrack, they did not have authority to run credit for customers on Dealertrack as that was the responsibility of a manager.  <u>Thanwalla Dep. 54:20-55:2, 62:4-22, 62:23-63:4, 146:20-147:19, 149:2-14, 151:17-152:8, 207:13-208:23; Guzman Dep. 62:7-63:15, 84:9-86:6, 88:24-90:13, 101:22-102:25, Jennings Dep. 67:14-22; Plaintiff Dep. 46:19-25, 47:2-10.</u>

42. The purchase of a vehicle is the second biggest purchase one can make after buying a house and there is a lot involved in obtaining a vehicle.  <u>Guzman Dep. 55:2-62:2.</u>

43. Every sale of a vehicle is different and there are so many factors and variables that go into buying a car; that is why you can never measure how long it will take for each customer to purchase a vehicle.  <u>Guzman Dep. 55:2-62:2; Thanwalla Dep. 145:6-146:19 (no two deals are the same in a dealership); Guzman Decl.</u>

---

[1] Plaintiff's pay stubs demonstrate that she was paid bonuses throughout her tenure at Hillside Auto Outlet, including after Jeanique left in August 2018 and in the seven (7) final weeks of her employment in November and December 2018.  <u>See</u> ¶ 104, *infra*, with chart.

44. A customer has to find a vehicle they like and often check different options before settling on one choice; then the salesperson has to ascertain whether a customer wishes to pay in cash or finance to determine the next steps.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

45. If a customer wishes to finance a vehicle, he or she has to complete an application; once a customer completes a credit application, he or she has to provide all the information that is required to complete a vehicle purchase in order to receive approval from a bank to lend the customer money to purchase the vehicle.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

46. Like all salespeople, Plaintiff was required to go to managers to submit credit applications for customers seeking financing to purchase a vehicle; the credit application process required Plaintiff to complete an application with the customer, whether handwritten or electronically, and have it signed by the customer when completed.  Plaintiff Dep. 62:7-63:5; Thanwalla Dep. 82:22-83:16; Guzman Decl.

47. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could.  Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17-155:25; Guzman Decl.

48. Although it was often the sales manager or general manager's duty to do so, sometimes the finance manager – such as Zanan – handled the process of qualifying a customer for financing.  Plaintiff Dep. 67:4-17; Thanwalla Dep. 147:20-148:10; Zanan Decl. ¶¶ 6-7; Guzman Decl.

49. There were often delays associated with qualifying a customer for financing, regardless of whether Plaintiff went to Thanwalla, Jeanique, Zanan *or* Guzman.  Plaintiff Dep. 64:21-65:12, 66:19-22; Thanwalla Dep. 140:24-145:5; Guzman Decl.

50. Plaintiff acknowledged that even without these delays, there was no guarantee she would make a sale because a customer could decide he or she no longer wanted a vehicle once qualified, or refuse to close on the deal because the monthly payment or down-payment required by the bank could be too high.  Plaintiff Dep. 45:22-25, 237:23-239:5, 239:14-21, 239:6-13.

51. After Jeanique's employment ended in August 2018 (before Plaintiff informed management about her pregnancy in late November 2018), Plaintiff would go to Thanwalla to handle the process of qualifying a customer for financing more often because he was quicker than Guzman.  Plaintiff Dep. 64:9-14.

52. Each customer goes through different verification processes; before anything is submitted to a bank, the customer's identity must be verified (usually by verifying the customer's driver's license is valid) and pay stubs must be obtained.  Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24; Thanwalla Dep. 220:20-221:14; Guzman Decl.

53. Often, customers do not have pay stubs with them or at all; once pay stubs are provided, there is a verification process to determine whether the pay stubs are legitimate because there is a lot of fraud involved and this is a big concern for dealerships and banks.  Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24; Thanwalla Dep. 50:5-51:15, 220:20-221:14; Jennings Dep. 78:18-79:22; Guzman Decl.

54. When pay stubs are provided, the sales manager has to contact the employer to verify they are legitimate, which is occasioned by delays if employers do not respond.  Guzman Dep. 56:19-57:9 ("we will have to verify to see if the pay stubs are legitimate"); Guzman Decl.

55. In addition, banks often require additional documentation after an application is submitted, all of which must be inputted into the system.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

56. After the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the circumstances.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

57. Sometimes, customers have fraud alerts on their credit profiles which cause delays due to extra verification requirements; when that happens, customers receive calls from the bank to make sure that they are, in fact, the ones seeking to obtain vehicle financings.  Guzman Dep. 55:2-62:2.

58. Other times, when information with the credit agencies do not match those the customer provides, additional verification is required by the credit bureaus, which can take one or two days to update.  Guzman Dep. 55:2-62:2; Guzman Decl.

59. Dealerships do not control the process when it comes to obtaining financing, and there are a lot of variables that come into play during the purchase of a vehicle, all of which is entirely up to the banks which make the ultimate decision on financing.  Guzman Dep. 55:2-62:2.

60. Once a customer's credit is successfully run, all documentation is provided, and everything is verified, the information gets sent to the bank for review and approval.[2]  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22, Plaintiff Dep. 174:11-21; Baron Dep. 52:7-16; Guzman Decl.

61. Upon receipt, banks often request additional information. Guzman Dep. 55:2-62:2.

---

[2] Plaintiff's complaint about waiting times deals with the credit application process before information gets submitted to lenders.  Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3, 78:23-79:13, 80:9-18, 82:9-83:1.

62. Once a bank approves a deal, the customer has to speak with a finance manager; at that time, the finance manager provides the customer with numbers related to monthly payments, total cost, interest, and related information. Guzman Dep. 55:2-62:2; Guzman Decl.

63. The customer may decide, based on this information, that he or she is no longer interested in purchasing the vehicle or cannot afford it. Guzman Dep. 55:2-62:2; Guzman Decl.

64. Other times, a customer may decide to buy a different car that is less expensive for a lower payment. Guzman Dep. 55:2-62:2; Guzman Decl.

65. There is also a requirement for every customer to purchase insurance for the vehicle he or she wishes to buy; often, customers have to wait before they have the funds to pay the insurance company before they can insure the vehicle. Guzman Dep. 55:2-62:2; Guzman Decl.

66. Other times, a customer is required to have a co-signer in order to get a deal approved by a bank, which adds to further delays. Guzman Dep. 55:2-62:2; Guzman Decl.

67. Finally, everything has to be in compliance with DMV regulations in order to ensure the vehicle may be sold, which requires the proper documentation in order to register a vehicle, after which a customer can sign all the relevant paperwork. Guzman Dep. 55:2-62:2; Guzman Decl.

68. All of the foregoing issues are outside of the dealership's control; it could take three (3) to six (6) hours or sometimes even days for a customer to purchase a vehicle. Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24, 181:18-182:9; Thanwalla Dep. 220:20-221:14; Zanan Decl. ¶ 19; Guzman Decl.

69. If a customer was forced to wait, the only reason for that would be based on circumstances outside of the dealership's control such as the failure of a customer to provide necessary information to the lender or because the lender requested additional documentation or simply because the dealership had to wait for the lender's response. Plaintiff Dep. 179:19-180:5.

70. Guzman wishes that the process was quicker because the dealership is in the business of selling cars and desires to make money; however, a dealership cannot guess or foresee who will come through its doors and what their situation is.  Guzman Dep. 55:2-62:2; Guzman Decl.

71. Plaintiff handled the qualification process and credit application, but never submitted any applications to chosen lenders, which finance managers did.  Plaintiff Dep. 176:13-22.

**Plaintiff Was Unable to Close Deals for Reasons Unrelated to Wait Times**

72. Plaintiff was sometimes unable to sell a vehicle to customers even if their creditworthiness was ascertained; this occurred once in December 2018, after she announced her pregnancy in late November 2019.  Plaintiff Dep. 201:202-9, 204:14-206:7.

73. In December 2018, Plaintiff was assigned a lead who visited the dealership on December 10 and did not purchase a vehicle because he was not able to put any money down until February; that customer did not leave because of the amount of time to check his creditworthiness as that had already been completed.  Plaintiff Dep. 189:23-191:10.

74. In another instance, although Plaintiff was able to successfully pull the credit for a customer on November 26, 2018 with the help of a manager – just three days after she announced her pregnancy – she was unable to make a sale because the customer was involved in a bankruptcy and needed permission from the trustee to make a deal.  Plaintiff Dep. 199:22-201:21.

75. Plaintiff was also unable to sell another vehicle to another customer because Plaintiff was unable to find the car that customer wanted.  Plaintiff Dep. 197:7-199:21.

76. In another instance, Plaintiff was unable to sell a vehicle to a customer who was to purchase the vehicle with cash, and did not need financing.  Plaintiff Dep. 211:12-212:23.

12

**Hillside Auto Outlet Prohibits Discrimination**

77. During Plaintiff's employment, Hillside Auto Outlet distributed a written policy regarding discrimination and placed posters in the lunchroom concerning discrimination.  Thanwalla Dep. 63:5-64:2, 64:17-65:6; Baron Dep. 49:7-21, 82:24-83:9; Guzman Dep. 77:12-78:2, 78:9-15; Jennings Dep. 43:18-44:13.

78. Plaintiff received Hillside Auto Outlet's discrimination policy.  Plaintiff Dep. 108:2-7.

**Facts Surrounding Plaintiff's Discrimination Claim**

79. Plaintiff was one of many female salespersons at Hillside Auto Outlet.  Thanwalla Dep. 231:21-232:7.

80. Plaintiff announced her pregnancy on November 23, 2018 to most of the employees at Hillside Auto Outlet, including Guzman; she is unsure whether Thanwalla was there during the announcement. Plaintiff Dep. 69:17-71:2, 200:22-24.

81. Thanwalla went on vacation in December 2018.  Plaintiff Dep. 249:25-250:2, Thanwalla Dep. 64:3-16, 65:7-16.

82. Ali Raskesnia ("Ali") was brought on by Thanwalla as a sales manager in mid-November 2018 to early December 2018 and was being trained to handle the dealership while Thanwalla was not at the dealership.  Plaintiff Dep. 155:12-16, 249:18-24; Thanwalla Dep. 131:5-19; Jennings Dep. 73:2-7.

83. Plaintiff complained that Guzman did not provide her with the Dealertrack password when Thanwalla left for vacation.  Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3.

84. But Guzman did not have the ability to change the password for Dealertrack.  Plaintiff Dep. 91:10-92:6, 94:15-95:2; Guzman Dep. 90:14-19.

13

85. But Plaintiff does not specifically know why Guzman made her wait longer to process her customers applications; critically, she did not know whether it was something personal or due to her pregnancy. Plaintiff Dep. 107:4-12.

86. Guzman would frequently keep customers waiting longer than necessary *before* Plaintiff announced her pregnancy. Plaintiff Dep. 78:23-79:13, 80:9-18, 82:9-83:1, 97:7-19, 100:13-24; Kataev Decl. ¶ 7, Ex. E at ¶¶ 36-38 ("Indeed, *prior to December 2018*, STIDHUM was given special trust on the basis of her exemplary work performance. Specifically, THANWALLA gave STIDHUM his password to the 'Dealertrack' program used by Hillside Auto so that she could help run the credit histories of Hillside Auto customers and pre-fill their automobile purchase financing applications. *This became necessary because Guzman, whose job in the Finance Department which was running the credit histories of Hillside Auto customers and pre-filling their automobile purchase financing applications, would frequently keep customers waiting longer than necessary, creating poor customer impressions of Hillside Auto's service*") (emphasis added).

87. Plaintiff conceded that "it didn't add up" or make sense as to why Guzman made her wait longer, and that Thanwalla nor Zanan ever took long to qualify customers for financing. Id.; Plaintiff Dep. 69:4-9.

88. Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation. Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D.

14

89. Plaintiff went to Zanan instead of Guzman while Thanwalla was on vacation, but Zanan told her he was busy, could not do it right then, to give it to Guzman, and that she had to wait for Guzman.  Plaintiff Dep. 87:25-88:10; Guzman Dep. 107:11-18.

90. Plaintiff confronted Guzman about the longer wait times multiple times, once even referencing her pregnancy, but he told her that she has to wait and that there are other people here; Guzman did not say anything about Plaintiff's pregnancy during these conversations.  Plaintiff Dep. 78:2-16, 86:12-24, 96:4-14, 96:15-19.

91. Although Plaintiff asserts that she announced her pregnancy to everyone at the dealership in late November 2018, Guzman has no recollection or knowledge of this, did not know Plaintiff was pregnant until he learned of this lawsuit, and would have treated her the same in any event. Plaintiff Dep. 69:17-71:7; Guzman Dep. 87:6-17, 103:20-105:9; Guzman Decl.

92. Guzman treated Plaintiff fairly, like everybody else, and never prioritized any salesperson over another; he worked on a first come, first serve basis with no preference.  Guzman Dep. 105:15-17, 105:18-106:6; Jennings Dep. 79:23-80:4; Guzman Decl.

93. Plaintiff previously had at least two (2) interpersonal conflicts with Guzman prior to her pregnancy, but cannot recall the nature or circumstances of either.  Plaintiff Dep. 71:8-73:5.

94. Guzman never made any comments to Plaintiff about her pregnancy, and the two did not have any interpersonal conflicts after Plaintiff announced her pregnancy.  Plaintiff Dep. 73:6-74:2.

95. It would not make sense for Guzman to take more time than necessary to ascertain whether customers qualified for financing, as he and everyone at the dealership, except porters, received a commission for every sale.  Plaintiff Dep. 82:9-83:1, 88:11-19, 107:4-12; Thanwalla Dep. 96:12-99:4, 102:5-19; Zanan Decl. ¶¶ 15-17; Guzman Decl.

15

96. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions.  Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.

97. Plaintiff also confronted Thanwalla about the waiting times with Guzman both during and upon his return from vacation, but Thanwalla told Plaintiff he will discuss this with her later. Plaintiff Dep. 90:5-91:6, 96:20-97:6.

98. Hillside Auto Outlet never received any complaints about discrimination, including pregnancy discrimination, except from Plaintiff, which stunned him.  Thanwalla Dep. 232:8-233:8.

99. Plaintiff is "lawsuit happy" because her step-father previously filed a lawsuit and secured millions.  Thanwalla Dep. 233:9-24; Plaintiff Dep. 146:21-147:4.

100.    She filed a wage-and-hour action against the Defendants.  Plaintiff Dep. 7:9-19.

101.    Plaintiff never complained of discrimination.  Thanwalla Dep. 232:8-233:8.

**Plaintiff Suffered No Adverse Employment Action Related to Her Pregnancy**

102.    Throughout her employment, Plaintiff's job responsibilities and position always remained the same.  Plaintiff Dep. 74:13-15, 77:3-7; Thanwalla Dep. 83:17-20.

103.    Throughout her employment, Plaintiff's weekly salary of $300.00 and flat rate commission of $150.00 per vehicle remained the same, while bonuses fluctuated.  Plaintiff Dep. 75:8-18; Thanwalla Dep. 45:5-21.

104.    Although Plaintiff allegedly stopped receiving bonuses after Jeanique left in August 2019, this was months before Plaintiff announced her pregnancy in November 2019, and she acknowledges receiving a bonus in November 2019 after she announced her pregnancy.  Plaintiff Dep. 75:8-18, 75:19-77:2, Thanwalla Dep. 69:6-18.

16

105.  Plaintiff's pay is below.[3]  Kataev Decl. ¶ 8, Ex. F; Plaintiff Dep. 77:21-25, 213:20-227:2, Thanwalla Dep. 53:13-18, 158:7-10, 132:8-13, 160:16-163:15; Guzman Dep. 66:16-23.

| Week | Pay Date | Salary | Commission | Cars Sold | Approx. Bonus |
|---|---|---|---|---|---|
| 1 | 6/1/2018 | $300.00 | $780.00 | 5 | $780.00 - $750.00 = $30.00 |
| 2 | 6/8/2018 | $300.00 | $425.00 | 2 | $425.00 - $300.00 = $125.00 |
| 3 | 6/15/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 4 | 6/22/2018 | $300.00 | $660.00 | 4 | $660.00 - $600.00 = $60.00 |
| 5 | 6/29/2018 | $300.00 | $615.00 | 4 | $615.00 - $600.00 = $15.00 |
| 6 | 7/6/2018 | $300.00 | $655.00 | 4 | $655.00 - $600.00 = $55.00 |
| 7 | 7/13/2018 | $300.00 | $0.00 | 0 | $0.00 |
| 8 | 7/20/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 9 | 7/27/2018 | $300.00 | $1,400.00 | 9 | $1400.00 - $1350.00 = $50.00 |
| 10 | 8/3/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 11 | 8/10/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 12 | 8/17/2018 | $0.00 | $0.00 | 0 | $0.00 |
| 13 | 8/24/2018 | $300.00 | $1,450.00 | 9 | $1450.00 - $1350.00 = $100.00 |
| 14 | 8/31/2018 | $300.00 | $1,200.00 | 8 | $0.00 |
| 15 | 9/7/2018 | $300.00 | $150.00 | 1 | $0.00 |
| 16 | 9/14/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 17 | 9/21/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 18 | 9/28/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 19 | 10/5/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 20 | 10/12/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 21 | 10/19/2018 | $300.00 | $700.00 | 4 | $700.00 - $600.00 = $100.00 |
| 22 | 10/26/2018 | $300.00 | $800.00 | 5 | $800.00 - $750.00 = $50.00 |
| 23 | 11/2/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 24 | 11/9/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 25 | 11/16/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 26 | 11/23/2018 | $300.00 | $1,375.00 | 9 | $1375.00 - $1350.00 = $25.00 |
| 27 | *11/30/2018* | *$300.00* | *$450.00* | *3* | *$0.00* |
| 28 | *12/7/2018* | *$300.00* | *$1,600.00* | *4* | *$1600.00 - $600.00 = $1000.00* |
| 29 | *12/14/2018* | *$300.00* | *$825.00* | *5* | *$825.00 - $750.00 = $75.00* |
| 30 | *12/21/2018* | *$300.00* | *$625.00* | *4* | *$625.00 - $600.00 = $25.00* |
| 31 | *12/28/2018* | *$300.00* | *$500.00* | *3* | *$500.00 - $450.00 = $50.00* |
| 32 | *1/4/2019* | *$300.00* | *$350.00* | *2* | *$350.00 - $300.00 = $50.00* |
| 33 | *1/11/2019* | *$300.00* | *$825.00* | *5* | *$825.00 - $750.00 = $75.00* |
| 34 | *1/18/2019* | *$300.00* | *$350.00* | *2* | *$350.00 - $300.00 = $50.00* |
|  | **AVERAGE** | **$300.00** | **$705.44** | **4.32** | **$56.91** |
|  | **TOTAL** | **$10,200.00** | **$23,985.00** | **4.30** | **$1,935.00** |

[3] Because commissions for vehicles sold were $150.00 per vehicle, the remainder is apportioned to a bonus.  Thanwalla Dep. 110:22-112:8, 164:20-165:11. The post-pregnancy period is *italicized*.

17

106.     Plaintiff does not have any documents that she believes suggest discrimination, but claims that her paystubs show a decrease in pay of $400.00 to $500.00 per week and allegedly demonstrate a drastic decrease in her pay as a result of waiting longer for Guzman to process credit applications beginning when she purportedly told Guzman she was pregnant in November 2019. Plaintiff Dep. 101:4-23, 144:24-145:2, 235:7-236:23.

107.     However, as demonstrated above, Plaintiff's compensation remained on par in her final weeks of employment with her average compensation.  Kataev Decl. ¶ 8, Ex. F; Plaintiff Dep. 213:20-227:2.

108.     In fact, Plaintiff's average weekly commission before her pregnancy was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential.  Id.

109.     This differential is attributed to the winter slow season because Hillside Auto Outlet was less busy between September and March.  Thanwalla Dep. 34:12-14.

110.     Plaintiff's best week at Hillside Auto Outlet was for the pay period of November 27, 2018 though December 3, 2018, when she earned $1,600 in commissions and bonuses, which was after she announced her pregnancy.  Plaintiff Dep. 224:6-11, 227:3-15.

111.     Plaintiff claims she sent emails and texts about the alleged discrimination that she endured, but did not keep records of them because she gets new phones pretty often as she likes to have the newest phone and it "probably just got deleted from changing phones or whatever the case may be." Plaintiff Dep. 141:13-142:8, 145:18-146:15.

112.     None of the text messages exchanged between the parties reference any claims of pregnancy discrimination except ten days after she voluntarily quit.  Kataev Decl. ¶ 6, Ex. D.

113.     The only other events or circumstances giving rise to Plaintiff's belief that she was discriminated against was, according to her, more than one instance where she had to say something to Guzman about her customers waiting and "stuff like that."  Plaintiff Dep. 101:25-102:6.

114.     Plaintiff was treated more favorably than other salespeople because she was provided special access to Dealertrack and received a bonus for selling approximately over twenty (20) vehicles that no one else received right after announcing her pregnancy.  Plaintiff Dep. 105:7-18.

115.     After Plaintiff announced her pregnancy, no employee was treated more favorably than her.  Plaintiff Dep. 105:19-107:3.

116.     Plaintiff's employment with Hillside Auto Outlet ended in January 2019 when she voluntarily quit.  Plaintiff Dep. 36:6-11, 44:16-18.

117.     Plaintiff concedes she was not constructively discharged.  Plaintiff Dep. 230:22-24, 231:22-232:9.

118.     Prior to her quitting, Plaintiff was allegedly promised a promotion to a manager position by Thanwalla.  Plaintiff Dep. 90:5-91:6, 93:2-94:14.

119.     Plaintiff asked about the promotion, but Thanwalla told her he will discuss this with her later.  Plaintiff Dep. 90:5-91:6.

120.     Because Thanwalla was not prepared to discuss a promotion then and there, Plaintiff decided to quit.  Plaintiff Dep. 90:5-91:6.

121.     Specifically, Plaintiff quit because she did not want to wait for Thanwalla to make a decision about her promotion, as she felt that it was obvious she was not getting a promotion. Plaintiff Dep. 231:7-21.

122.    With respect to the promotion, Plaintiff felt that it "was kind of clear as day" that "if he wanted to give [her] that position, he would have given it to [her] at that point."  Plaintiff Dep. 92:7-25, 95:3-7.

123.    Thanwalla never told Plaintiff that he would not give her the promotion; he just wanted to discuss it another time.  Plaintiff Dep. 95:8-10.

124.    Plaintiff did not feel the need to follow up about her promotion despite Thanwalla's request to discuss it later, and only raised an issue concerning her final compensation after quitting.  Plaintiff Dep. 108:10-109:3.

125.    Approximately ten (10) days after Plaintiff quit, Plaintiff contacted Jory Baron by text complaining about her pay and spoke to him by phone.  Baron Dep. 54:18-55:18, 55:23-25.

126.    Plaintiff told Baron during their conversation that she quit because of her pay – not because of pregnancy discrimination – and wanted to make sure she got paid for the deals she believed she was owed money on.  Baron Dep. 64:16-65:7.

127.    Jory Baron told her he would speak to Thanwalla and that, if she was owed anything, she would get paid.  Baron Dep. 60:19-63:12, 63:18-64:15, 65:8-15

128.    After speaking to Thanwalla, Baron called Plaintiff back but she was unable to answer; Baron then offered to speak with her when he was available and she said never mind, and that she planned to go a different route.  Baron Dep. 60:19-63:12, 63:18-64:15, 65:16-66:5, 66:23-67:13, 70:10-71:2, 88:8-16.

129.    Thanwalla informed Baron that Plaintiff quit and that there was no money owed to her, and Thanwalla agreed to ascertain whether she is owed money for any pending deals, to which Thanwalla agreed, but stated that at that time, to his knowledge, there was no money owed to her.  Baron Dep. 68:15-69:13, 69:21-70:9.

20

130.     In the same vein, Plaintiff acknowledged that the dealership would not want her out because of her pregnancy, but that Guzman did because "it was more of a personal thing against me while being pregnant."  <u>Plaintiff Dep. 99:7-25.</u>

131.     Plaintiff could not specify how Guzman played any role as a decision-maker at the dealership and described it as a "team effort" because he "would definitely be involved in … decisions," yet acknowledged that Thanwalla was the one who made decisions.  <u>Plaintiff Dep. 110:17-111:4.</u>

132.     Guzman was never disciplined while at work, did his job the right way, and viewed as a professional who helped everybody out and jumped in to get the job done.  <u>Guzman Dep. 107:24-108:4; Jennings Dep. 60:19-61:2.</u>

133.     Plaintiff and Thanwalla had a good working relationship; they respected each other and were close.  <u>Thanwalla Dep. 85:2-15.</u>

134.     Plaintiff never complained about her pay to Thanwalla; in fact, she told him that she made more money at Hillside Auto Outlet than she ever made in her life.  <u>Thanwalla Dep. 84:19-25.</u>

**Plaintiff's Alleged Damages**

135.     Plaintiff obtained employment elsewhere almost immediately after quitting at Hillside Auto Outlet; in fact, she had her next job at NYC Motor Cars lined up by Ali, one of the managers that worked with Plaintiff at Hillside Auto Outlet, and worked at several other dealerships thereafter, ultimately leaving the workforce due to the birth of her second child.  <u>Plaintiff Dep. 48:6-18, 48:17-50:4, 50:23-51:9, 51:12-17, 51:18-25, 52:4-10, 51:20-25, 52:11-12, 52:15-25, 53:2-25, 54:7-14, 54:2-7, 54:18-55:2, 98:8-16, 114:8-16, 126:18-131:11; Thanwalla Dep. 69:14-70:3, 84:5-18.</u>

136.     Plaintiff's circumstances got better within a few months of her quitting employment with Hillside Auto Outlet.  Plaintiff Dep. 114:17-18.

137.     Specifically, the volume of Plaintiff's sales at NYC Motor Cars made things better for Plaintiff.  Plaintiff Dep. 114:19-115:15.

138.     Plaintiff is seeking more than $2 million dollars in damages, but is unsure about the basis for seeking these damages.  Plaintiff Dep. 111:5-15, 153:21-154:5.

139.     Plaintiff did not seek any medical treatment or hospitalization concerning her alleged emotional injuries.  Plaintiff Dep. 112:25-113:9.

140.     She has since recovered from any alleged emotional injuries, and any symptoms or injuries allegedly suffered have now been resolved.  Plaintiff Dep. 113:10-114:7.

**Hillside Auto Outlet and Hillside Auto Mall are Not Joint Employers**

141.     Hillside Auto Outlet and Hillside Auto Mall operate as two (2) separate automobile dealerships.  Thanwalla Dep. 218:12-219:7; Baron Dep. 47:9-48:16.

142.     The two dealerships are located several blocks away from each other.  Kataev Decl. Exs. A & C; Thanwalla Dep. 22:3-8; Baron Dep. 46:24-47:8; Guzman Dep. 63:16-19.

143.     Plaintiff worked at Hillside Auto Outlet, and never worked at Hillside Auto Mall. Thanwalla Dep. 35:6-22; Plaintiff Dep. 34:7-35:3.

144.     Plaintiff was not sure whether the two dealerships were joint employers.  Plaintiff Dep. 35:18-36:5.

145.     Plaintiff merely included Hillside Auto Mall as a Defendant solely because both dealerships were "kind of run by the same people."  Plaintiff Dep. 35:9-17.

22

146.     However, this is untrue, as Thanwalla ran Hillside Auto Outlet and had no duties with Hillside Auto Mall, while Phelan ran Hillside Auto Mall, and had no duties with Hillside Auto Outlet.  <u>Jennings Dep. 25:2-5, 38:9-11, 42:3-10.</u>

147.     Hillside Auto Mall had no control over Plaintiff's daily employment activities. <u>Jennings Dep. 30:12-21, 32:24-33:11, 36:23-37:8, 42:3-10, 50:23-25, 51:9-14.</u>

148.     Thanwalla set the pay plans at Hillside Auto Outlet, while Phelan set the pay plans at Hillside Auto Mall.  <u>Jennings Dep. 42:3-10.</u>

149.     Thanwalla handled employee scheduling at Hillside Auto Outlet, while Phelan handled employee scheduling at Hillside Auto Mall.  <u>Jennings Dep. 50:23-25, 51:9-14.</u>

150.     Jory Baron, an owner of Hillside Auto Outlet, had no duties with Hillside Auto Mall.  <u>Baron Dep. 83:10-16; Jennings Dep. 36:23-37:8.</u>

151.     The pay plans for salespersons at Hillside Auto Outlet and Hillside Auto Mall were different from each other.  <u>Jennings Dep. 30:12-21, 32:24-33:11.</u>

152.     Deana Jennings ("Jennings") has been controller of Hillside Auto Mall since she was hired by Aaronson in 2008.  <u>Jennings Dep. 13:23-14:13, 15:13-15, 16:10-17:2.</u>

153.     Aaronson informed Jennings that he was opening up another store in 2018 and asked her to serve as a controller at Hillside Auto Outlet part-time until a full-time controller for that dealership was found.  <u>Jennings Dep. 20:7-20; 17:3-8.</u>

154.     While Jennings mostly continued to work for both dealerships from Hillside Auto Mall Mondays through Fridays from 10:00 AM until 5:00 PM, she would sometimes work on site at Hillside Auto Outlet.  <u>Jennings Dep. 14:6-10, 16:13-17:2, 17:9-24, 19:10-17.</u>

155.     From 2018 until 2020, Jennings worked at both Hillside Auto Outlet part-time and Hillside Auto Mall full-time concurrently until a full-time controller was found for Hillside Auto Outlet.  Thanwalla Dep. 39:13-40:3, 40:11-23, 42:17-22; Jennings Dep. 16:7-9, 20:21-25, 35:18-36:9; Guzman Dep. 72:23-73:10.

156.     Jennings held the same position as a controller at both dealerships, and her duties at both dealerships - maintaining the books, payroll, bills, sales tax, and some DMV related work – were the same, except that Jennings did not do any DMV related work for Hillside Auto Outlet.  Jennings Dep. 15:16-16:6, 17:25-18:5, 19:18-20:2, 21:20-25.

157.     Hillside Auto Outlet's current controller since 2020, Susan Zhivo, does not work at Hillside Auto Mall.  Thanwalla Dep. 41:14-42:16; 219:8-13.

158.     Other than Jennings, no other employee has worked at both Hillside Auto Outlet and Hillside Auto Mall.  Jennings Dep. 55:10-13.

159.     It is common for dealerships to purchase vehicles from other dealerships in order to sell a particular vehicle to a customer that it does not have in stock; Hillside Auto Outlet purchased vehicles from both Hillside Auto Mall and other dealerships in order to do so, with no preference for Hillside Auto Mall.  Baron Dep. 47:9-48:16; Guzman Dep. 63:20-64:14, 64:21-65:15; Jennings Dep. 55:14-56:3; Plaintiff Dep. 34:10-35:14, Thanwalla Dep. 23:8-24:2, 24:9-27:6, 26:11-20; Guzman Decl.

160.     When asked at her deposition about criminal convictions, Plaintiff initially testified that she was solely convicted for a marijuana related offense, until she was presented with evidence of her conviction for uttering forged instruments – a crime of dishonesty.  Plaintiff Dep. 20:21-24:14; Kataev Decl. ¶ 9, Ex. G.

Dated: Lake Success, New York
      June 28, 2023

**MILMAN LABUDA LAW GROUP, PLLC.**

_____/s_____
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Defendants*