UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
**LETICIA FRANCINE STIDHUM,**

                            Case No.: 1:21-cv-7163 (OEM) (LB)

                **Plaintiff,**

      -against-

**161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,**

                **Defendants.**
-----------------------------------------------------------------X

### DEFENDANTS' REPLY STATEMENT OF MATERIAL FACTS IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet"), Hillside Auto Mall Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall"), Isaque Thanwalla ("Mr. Thanwalla"), Jory Baron ("Jory Baron"), Ronald M. Baron ("Ronald Baron") and Andris Guzman ("Mr. Guzman") (collectively, the "Defendants"), hereby set forth, pursuant to Rule 56.1 of the Local Civil Rules for the Eastern District of New York, the following Reply Statement of Material Facts as to which they contend no genuine issues exists to be tried by a jury:

### ADDITIONAL MATERIAL FACTS

A. **Each of the members of Hillside Auto Outlet, Josh Aaronson, Jory Baron, The Estate of David Baron, and Ishaque Thanwalla, had the power to hire and fire at Hillside Auto Outlet.**

1. The role of hiring and hiring at Hillside Auto Outlet was Ishaque Thanwalla's. (Baron Dep. 37:22-38:16). Jory Baron had no authority to hire or fire any employee. (Baron Dep. 38:25-40:12). Jory Baron never hired or fired anyone at Hillside Auto Outlet. (Baron Dep. 42:1-

42:12). Hiring and firing was the responsibility of the general manager. (Guzman Dep. 68:19-69:15).

B. **Between late December 2018 and early January 2019, Ishaque Thanwalla was in Pakistan. During this period of time, Andris Guzman assisted Thanwalla in running the day-to-day operations at Hillside Auto, being the financial manager on site.**

2. Ishaque Thanwalla was in Pakistan between on or about December 20th or 21st, 2018 and January 6th or 7th, 2019. (Thanwalla Dep. 65:7-65:16). At all relevant times, Thanwalla ran the day-to-day operations at Hillside Auto Outlet and served as its general manager. (Thanwalla Dep. 17:3-18:11, 27:7-28:3; Baron Dep. 38:3-38:6, Jennings Dep. 25:2-5, Baron Dep. 52:2-6).

C. **Jory Baron was present at the dealership a couple of months each month. As a result, he knew of the Plaintiff, including her identity, her schedule and compensation at the time when she reached out to him in January 2019.**

3. Jory Baron's visitation to the dealership would "vary every so often." (Baron Dep. 51:2-51:10). Jory Baron did not know basic information about employees' identities, schedules, compensation, and hiring processes, including that of the Plaintiff because he did not deal with that aspect of the dealership. (Baron Dep. 34:7-16, 38:17-24, 40:13-23, 41:9-25, 48:17-49:6, 50:17-25, 54:13-55:18 (did not know of Plaintiff until after she quit and complained and later sued), 81:13-24, Plaintiff Dep. 59:4-13).

D. **When there was an issue that goes beyond the responsibilities of Isaac or Jay, she would report to Jory Baron "Only when there was an issue."**

4. Jory Baron communicated to Plaintiff that if there were any problems or issues, she would have had to follow up with Thanwalla, and that Jory Baron had no role in helping resolve any issues. (Baron Dep. 69:2-7).

E. **Guzman was a sales manager at Hillside Auto Outlet from Plaintiff's hiring through July or August 2018.**

5. Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019. (Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.)

F. **Thereafter, from September 2018 through Plaintiff's termination in January 2019, Guzman was the financial manager.**

6. As a general manager, Guzman worked with banks and helped obtain loans for customers. (Guzman Dep. 52:4-14). Guzman would work with the finance manager in facilitating the deal with the customer. (Guzman 59:6-21).

G. **As the financial manager, Guzman was part of the "team effort" and was "involved [in employment] decisions "even while not having the sole authority to hire, fire or discipline. For instance, Plaintiff was hired only after the general manager, Ishaque Thanwalla conferred with the financial manager Jeanique.**

7. The general manager was in charge of hiring and firing employees. (Guzman Dep. 68:19-25). The sales manager had no power to hire, fire or discipline any employees. (Guzman Dep. 69:2-12).

H. **Guzman was not the general sales manager.**

8. Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019. (Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.). His main responsibility as a sales manager was to ensure that all deals were processed; his responsibilities as a general sales manager included being involved in finance, which required him to work with banks, get customers approved for loans, and running credit for customers (which he also did as a sales manager). (Guzman Dep. 51:18-53:7; Guzman Decl.)

I. **The general manager was Ishaque Thanwalla.**

9. Admit.

J. **At all relevant times, Deanna Jennings worked concurrently for Hillside Auto Outlet and Hillside Auto Mall.**

10. Deanna Jennings worked at Hillside Auto Outlet. (Guzman Dep. 72:23-73:2).

K. **At the time, Aaronson said he "was opening another store and he wanted me to be controller until they found a full-time person for the position."**

11. Deanna Jennings was the controller for Hillside Auto Outlet when it opened. (Jennings Dep. 20:21-25).

L. **Plaintiff, a saleswoman, is expressly given authorization to access to Dealertrack by general manager Ishaque Thanwalla.**

12. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

M. **Plaintiff was given Ishaque Thanwalla's username and password to run and read credit between August 2018 and December 2018.**

13. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

N. **Plaintiff states that 40 to 50 percent of the time, she can get customers in and out of the door within an hour or less; therefore, the time it takes a customer to purchase a vehicle is predictable.**

14. Every single deal is different. No two customers are the same in the car sales business. (Thanwalla 146:6-19). Further, after the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the circumstances. (Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.)

O. **Between August and December 2018, Plaintiff was given express authorization to run, read, and pre-approve the credit applications with DealerTrack.**

15. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

P. **For the period of time between late December 2018 and January 2019 up until Thanwalla's return from Pakistan, Plaintiff Leticia Stidhum's only point of contact upon completion of the credit application was Andris Guzman. At that time, Jeanique**

**had departed from Hillside Auto Outlet, Thanwalla was overseas, and Zanan did not typically run the credit.**

16. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

Q. **In 2018 prior to Thanwalla's trip to Pakistan in late December 2018, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away between late December 2018 and January 2019, Guzman was the only one who was responsible for running the credit.**

17. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

R. **Prior to Thanwalla's trip overseas, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away in December 2018 and January 2019, Guzman was the only one who was responsible for running the credit.**

18. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

S. **Serge Zanan qualified a customer only very rarely.**

19. Serge Zanan ("Zanan") is a finance manager at Hillside Auto Outlet since November 2018.

(Thanwalla Dep. 55:8-13, 210:15-212:19). Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

T. **In August 2018, Thanwalla taught Plaintiff how to run and read credit and expressly gave her access to DealerTrack.**

20. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

U. **"[F]or the most part" because the sales procedure is to "get [the] ID, the most recent two paystubs, and that proof of address if needed," the verification process is instantaneous and conducted not by any employee of Hillside Auto Outlet but by the banks.**

21. "[W]e check the credit, and we check to see if there are any additional verifications. There are times that you are going to see, you are going to see more recently, that there are a lot of fraud alerts and if there is a fraud alert, that means that extra verification that we have to do and put that in place. (Guzman Dep. 57:16-23). deler

V. **The sales manager did not have to contact the employer to verify that the paystubs are legitimate. Instead, the sales manager simply deploys a heuristic to quickly determine by sight whether the paystubs are legitimate to upload for the banks.**

22. Every single deal is different. No two customers are the same in the car sales business. (Thanwalla 146:6-19)

W. **The dealerships' determination would never take twenty to thirty minutes or hours. Rather, the determination is for the most part instantaneous.**

23. After the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the

circumstances. Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

### X. Fraud alerts on Hillside Auto Outlet customer's profile occurred rarely.

24. Fraud is frequent and the dealership deals with identifying fraud in a multifaceted way. (Guzman Dep. 57:2-23).

### Y. Additional verification on the part of credit bureaus occurred rarely and does not require one or two days to update.

25. After the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the circumstances. (Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.). Sometimes, customers have fraud alerts on their credit profiles which cause delays due to extra verification requirements; when that happens, customers receive calls from the bank to make sure that they are, in fact, the ones seeking to obtain vehicle financings. (Guzman Dep. 55:2-62:2). Other times, when information with the credit agencies do not match those the customer provides, additional verification is required by the credit bureaus, which can take one or two days to update. (Guzman Dep. 55:2-62:2; Guzman Decl.). Dealerships do not control the process. (Guzman Dep. 55:2-62:2; Guzman Decl.).

### Z. Guzman intentionally delayed the credit applications of Plaintiff's customers despite Plaintiff asking Guzman multiple times about the status of the credit applications after her pregnancy announcement in late November 2018 and Ishaque Thanwalla's trip to Pakistan in late December 2018.

26. It would not make sense for Guzman to take more time than necessary to ascertain qualified for financing, as he and everyone at the dealership, except porters, received a commission

for every sale. (Plaintiff Dep. 82:9-83:1, 88:11-19, 107:4-12; Thanwalla Dep. 96:12-99:4, 102:5-19; Zanan Decl. ¶¶ 15-17; Guzman Decl.)

**AA. How quickly Guzman chooses to run the credit is squarely within his—and by extension—the dealership's control.**

27. All of the foregoing issues are outside of the dealership's control; it could take three (3) to six (6) hours or sometimes even days for a customer to purchase a vehicle. (Guzman Dep. 55:2- 62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24, 181:18-182:9; Thanwalla Dep. 220:20-221:14; Zanan Decl. ¶ 19; Guzman Decl.)

**BB. Car insurance is mandatory in New York. Thus, regardless of whether customers are paying in cash or through finance, customers who have funds to purchase a vehicle secure enough funds to purchase car insurance in addition to the car purchase.**

28. There is also a requirement for every customer to purchase insurance for the vehicle he or she wishes to buy; often, customers have to wait before they have the funds to pay the insurance company before they can insure the vehicle. (Guzman Dep. 55:2-62:2; Guzman Decl.)

**CC. Of the two to three people who Plaintiff was seeing daily, on average two customers walked out (roughly 2/3 of the customers) walked out due to the longer wait time caused by Guzman's targeted and intentional delay in running and reading the credit applications.**

29. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**DD. At Hillside Auto Outlet, Plaintiff was the only female salesperson for the first four months of her employment.**

30. Plaintiff was one of many female salespersons at Hillside Auto Outlet. (Thanwalla Dep. 231:21-232:7).

**EE. Thereafter she was one of two female salespeople at Hillside Auto Outlet.**

31. Plaintiff was one of many female salespersons at Hillside Auto Outlet. (Thanwalla Dep. 231:21-232:7).

**FF. Thanwalla knew of Stidhum's pregnancy.**

32. Plaintiff announced her pregnancy on November 23, 2018 to most of the employees at Hillside Auto Outlet, including Guzman; she is unsure whether Thanwalla was there during the announcement. (Plaintiff Dep. 69:17-71:2, 200:22-24). Thanwalla was unaware of any pregnancy, announcement, or such. (Thanwalla Dep. 128:20-129:16).

**GG. Guzman had access to the Dealertrack password.**

33. Admit.

**HH. Guzman refused to provide Plaintiff Leticia Stidhum with the Dealertrack password.**

34. Plaintiff complained that Guzman did not provide her with the Dealertrack password when Thanwalla left for vacation. (Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3). But Guzman did not have the ability to change the password for Dealertrack. (Plaintiff Dep. 91:10-92:6, 94:15-95:2; Guzman Dep. 90:14-19). Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

**II. Plaintiff was the top salesperson at the dealership up and until November 2018.**

35. There were always three top people at the dealership. (Thanwalla Dep. 160:16-161:5). Otherwise, she was a good salesperson. (Jennings Dep. 56:15-17, Guzman Dep. 86:19-25). Additionally, after announcing her pregnancy, Plaintiff was almost always one of the commission-earners in the Dealership on a weekly basis.

| Pay Cycle | Plaintiff's Commission Earned | Comparators Who Earned More | Total Salespersons |
|---|---|---|---|
| November 27, 2018-December 3, 2018 | $1,600.00 (Bates Stamped No. D1269) | N/A | 8 |
| December 4, 2018-December 10, 2018 | $825.00 (Bates Stamped No. D1299) | Comparator 1: $975.00 (Bates Stamped No. D1304) | 10 |
| December 11, 2018-December 17, 2018 | $625.00 (Bates Stamped No. D1331) | Comparator 1: $715.00 (Bates Stamped No. D1335)<br><br>Comparator 2: $1,105.00 (Bates Stamped No. D1336)<br><br>Comparator 3: $875.00 (Bates Stamped No. D1338) | 10 |
| December 18, 2018-December 24, 2018 | $500.00 (Bates Stamped No. D1361) | Comparator 1: $545.00 (Bates Stamped No. D1364) | 8 |
| December 25, 2018-December 31, 2018 | $325.00 (Bates Stamped No. D1389) | Comparator 1: $1,365.00 (Bates Stamped No. D1393)<br><br>Comparator 2: $700.00 (Bates Stamped No. D1394)<br><br>Comparator 3: $500.00 (Bates Stamped No. D1396)<br><br>Comparator 4: $345.00 (Bates Stamped No. D1391) | 8 |
| January 1, 2019-January 7, 2019 | $825.00 (Bates Stamped No. D1418) | Comparator 1: $1,105.00 (Bates Stamped No. D1422)<br><br>Comparator 2: $1,175.00 (Bates Stamped No. D1424) | 9 |

**JJ.  Over time, between July or August 2018 to December 2018, Guzman "learned how**

**to navigate through it a little quicker." Between late December 2018 through the end of Plaintiff's employment in January 2019, Guzman intentionally delayed the credit applications of Leticia Stidhum's customers despite Leticia Stidhum inquiring about the status of the credit applications multiple times. Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer.**

36. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

KK. **Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer.**

37. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

LL. **While previously, the wait time was around 20 minutes to handle these applications, the wait time increased to 40-60 minutes, or longer. This lead to customers walking out.**

38. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

MM. **This happened "only right after I announced my pregnancy, that would be the first reason why, and not to mention, like I said before, he was my point of contact once Jay was fired so I can tell the difference in, you know, from that time and after I**

**announced my pregnancy. It wasn't [like] I had customers waiting so long after Jay quit. From that time after my pregnancy, I know it's clear as day that that's what was going on. I was a top saleswoman at a point and I went from being the top salesperson to being the one with the least cars out."**

39. Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation. (Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D).

NN. **A text message sent Thanwalla from Stidhum reads, in relevant part: "and for you to call me your daughter and say you love/ me and all this bull shit knowing wtf I been going thru this past month you been gone/ not making shit because your team fucking sucks I work 60 hours a week for 7/ months straight no days off n december i slacked because you left and everything went to shift from there."**

40. Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation. (Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D).

OO. **Plaintiff lost many customers to Guzman's deliberate delay, including a "couple of customers" who explicitly stated that it was due to the wait time.**

41. Nobody was aware of the fact that Plaintiff complained about a longer wait time than usual. (Jennings Dep. 80:16-19). Further, only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**PP.  DMV Clerk Lilly was disciplined while pregnant and departed and she stormed out upset at Hillside Auto Outlet's treatment of her within a week of Plaintiff's start at Hillside Auto Outlet.**

42. Lilly clerk left the position as a DMV Clerk from Hillside Auto Outlet on her own accord because she was unsatisfied with Thanwalla's disciplining of her work as her work involved very sensitive information. (Thanwalla Dep. 71:21-73:5). Lilly never complained that she was terminated for being pregnant. (Thanwalla Dep. 73:6-8). She started her position pregnant. (Thanwalla Dep. 73:9-14).

Dated: Lake Success, NY
       March 27, 2024

                                          **MILMAN LABUDA LAW GROUP PLLC**

By:  */s/ Joseph M. Labuda, Esq.*
       Joseph M. Labuda, Esq.
       Matthew A. Brown, Esq.
       *Attorneys for Defendants*
       3000 Marcus Avenue, Suite 3W8
       Lake Success, New York 11042
       (516) 328-8899