# In the Matter of

Case No.: 1:21-cv-7163 (HG)(LB)

STIDHUM

v.

161-10 HILLSIDE AUTO AVE, LLC, et al.

---

## Examination of Leticia Francine Stidhum

*Friday, February 17, 2023*

---

## CONDENSED



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Case No.: 1:21-cv-7163 (HG)(LB)
----------------------------------------X

LETICIA FRANCINE STIDHUM,

        Plaintiff,

   -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
Hillside Auto Outlet, HILLSIDE AUTO
MALL INC. d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON,
RONALD M. BARON, and ANDRIS GUZMAN,

        Defendants.
----------------------------------------X
      February 17, 2023
      9:23 a.m.


      Examination before Trial of PLAINTIFF,
LETICIA FRANCINE STIDHUM, held pursuant to
Notice, held via Zoom conference, before
Ruthayn Shalom, a Notary Public of the State of
New York.

---

**2**

2  A P P E A R A N C E S :
3      TROY LAW, PLLC
      Attorneys for Plaintiff
4      4125 Kissena Boulevard, Suite 103
      Flushing, New York 11355
5      BY: TIFFANY TROY, ESQ.
      troylaw2troypllc.com
6
7
8      MILMAN LABUDA LAW GROUP, PLLC
      Attorneys for Defendants
9      3000 Marcus Avenue, Suite 3W8
      Lake Success, New York 11042
10     BY: EMANUEL KATAEV, ESQ.
      emanuel@mllaborlaw.com
11
12
   ALSO PRESENT:
13   Ishaque Thanwalla
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

2      IT IS HEREBY STIPULATED AND AGREED, by
3  and between the attorneys for the respective
4  parties hereto, that this examination may be
5  sworn to before any Notary Public.
6
7      IT IS FURTHER STIPULATED AND AGREED that
8  the sealing and filing of the said examination
9  shall be waived.
10
11     IT IS FURTHER STIPULATED AND AGREED that
12  all objections to questions except as to form
13  shall be reserved for trial.
14
15
16
17
18
19
20
21
22
23
24
25

---

**4**

1          L. Stidhum
2   L E T I C I A  F R A N C I N E  S T I D H U M,
3  a Plaintiff, having been first duly sworn by
4  Ruthayn Shalom, a Notary Public of the State of
5  New York, and stating her address as 2815 Murray
6  Street, Flushing, New York, 11354, was examined
7  and testified as follows:
8      MR. KATAEV:  Before we begin, Counsel, we
9  are going to agree to the usual federal stips;
10  is that right?
11      MS. TROY:  Agreed.
12      MR. KATAEV:  For the record that is
13  filing, seal and certification is waived.
14  Objections except as to form are reserved for
15  trial.  The examination may be sworn to before
16  any notary public.  A copy of the transcript
17  will be sent to the attorney representing the
18  witness, correct?
19      MS. TROY:  Correct.  So we are clear,
20  pursuant to Federal Rules of Civil Procedure
21  30E, I'm going to ask that you provide a copy
22  of the transcript to review it and list any
23  changes to be made.
24      MR. KATAEV:  No problem.
25  EXAMINATION BY

                1 (Pages 1 to 4)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**5**

```
1              L. Stidhum
2  MR. KATAEV:
3      Q   Good morning.  My name is Emanuel Kataev.
4  I'm the attorney for the Defendants in this case
5  which are 161-10 Hillside Auto Ave., LLC, Hillside
6  Auto Mall, Inc., Ishaque Thanwalla, Andris Guzman,
7  Jory Baron, and Ronald M. Baron.  From here on in I
8  will refer to 161-10 Hillside Auto Ave. as Hillside
9  Auto Outlet, okay?  I need a yes or no, please.
10     A   Yes.
11     Q   I will refer to Hillside Auto Mall, Inc.
12 as Hillside Auto Mall, okay?
13     A   Yes.
14     MS. TROY:  If you're referring to the
15 corporation as the corporate entity, if you
16 could say the entire name so there is no
17 confusion.
18     MR. KATAEV:  No, that's exactly what I'm
19 not doing.  I will be referring to it according
20 to the short name that I provided.
21     MS. TROY:  To the extent that the witness
22 has any confusion, I suggest that, you know,
23 you read out the whole name.
24     MR. KATAEV:  You will have that with Rule
25 30E so you will be good to go.  Hillside Auto
```

**6**

```
1              L. Stidhum
2  Outlet is 161-10, Hillside Auto Mall is
3  Hillside Auto Mall.  I will decide how I ask
4  the questions.
5  BY MR. KATAEV:
6      Q   Jory Baron, I will refer to him as Jory,
7  okay?
8      A   Yes.
9      Q   Ishaque Thanwalla I will refer to as
10 Isaac, okay?
11     A   Yes.
12     Q   Andris Guzman I will refer to as Andris,
13 okay?
14     A   Yes.
15     Q   Ronald M. Baron I will refer to as
16 Mr. Baron or Ronald, okay?
17     A   Yes.
18     MS. TROY:  Excuse me, if both Jory and
19 Ronald are Mr. Barons, I would suggest that you
20 use the full name and not Mr. Baron.
21     MR. KATAEV:  I will primarily use Ronald.
22 I will decide how I ask the question.
23 BY MR. KATAEV:
24     Q   I will be asking you and you will be
25 answering questions today about yourself, the
```

**7**

```
1              L. Stidhum
2  Defendants, your complaint and other related
3  subjects; do you understand?
4      A   Yes.
5      Q   Your testimony today is subject to the
6  same oath and the same penalty of perjury as if you
7  were testifying in court; do you understand that?
8      A   Yes.
9      Q   We are here today concerning your
10 discrimination case, today?
11     A   Correct.
12     Q   You filed a separate wage and hour action
13 as well, correct?
14     A   Yes.
15     MR. KATAEV:  To the extent that any
16 questions are asked or overlap into the other
17 case, Defendants are nonetheless -- reserve the
18 right to conduct a separate deposition in that
19 actions.
20 BY MR. KATAEV:
21     Q   Have you ever been deposed before,
22 Ms. Stidhum?
23     A   No.
24     Q   This is your first time?
25     A   Yes.
```

**8**

```
1              L. Stidhum
2      Q   I'm going to go over some of the basic
3  ground rules for a deposition so we can have a
4  smooth and easygoing deposition, okay?
5      A   Okay.
6      Q   First, keep your voice loud and clear for
7  the court reporter.  Second, please answer in words.
8  The court reporter cannot take down body gestures or
9  mumbling.  Third, allow me to complete my question
10 before you answer and I will give you the same
11 courtesy so as to help the court reporter to not
12 have to write down what two people are saying at the
13 same time.  Do you understand these ground rules so
14 far?
15     A   Yes.
16     Q   Fourth, if you don't understand a question
17 tell me and I will rephrase it.  However, if you
18 answer I will assume that you understood the
19 question, okay?
20     A   Okay, yes.
21     Q   I'm looking for your best recollection of
22 events today.  I realize we are going to be speaking
23 about events that occurred in May of 2018 through
24 January of '19 and sometimes beyond.  I don't want
25 you to guess at answers, however, I'm still entitled
```

2  (Pages 5 to 8)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

9

L. Stidhum
1
2   to your best recollection of events, okay?
3       A   Okay.
4       Q   You can take a break any time for any
5   reason except if there is a question pending.  You
6   need to answer that question before we take the
7   break, okay?
8       A   Okay.
9       Q   Do you understand these ground rules?
10      A   Yes.
11      Q   Have you consumed any drugs, alcohol or
12  medication within the last 24 hours that would
13  affect your ability to provide truthful testimony
14  today?
15      A   No.
16      Q   Is there any reason you can think of as to
17  why you cannot provide truthful answers to my
18  questions today?
19      A   No.
20      Q   Did you prepare for today's deposition?
21      A   Yes.
22      Q   How did you prepare?
23          MS. TROY:  Objection to the extent that it
24      calls for any attorney/client communication.
25      Q   Don't tell me anything that you said to

10

L. Stidhum
1
2   your attorney or anything that your attorney said to
3   you, but the fact of the conversation is
4   permissible.  You can tell me you did speak without
5   telling me what you said.
6           How did you prepare for the
7   deposition with that qualification?
8       A   Last week we met for two to three hours.
9       Q   In person?
10      A   Yes.
11      Q   Other than meeting in person for two to
12  three hours, did you prepare in any way for your
13  deposition?
14      A   No.
15      Q   During your meeting last week, did you
16  review my documents?
17      A   Yes.
18      Q   Which documents did you review, and again
19  same qualification, don't tell me anything that you
20  said or anything that your attorney said to you.
21      A   The documents you provided pretty much and
22  like a spread of what was -- what I was -- the
23  decrease in pay, I should say.
24      Q   The damage calculation, correct?
25      A   Yes.

11

L. Stidhum
1
2       Q   And also the almost 2,000 pages of
3   documents mostly consisting of leads information,
4   right?
5       A   Yes.
6       Q   Other than those two sets of documents,
7   did you review anything else?
8       A   No.
9       Q   Did you review the complaint?
10      A   I'm sorry?
11      Q   Did you review the complaint in
12  preparation for the deposition?
13      A   No.
14      Q   Did you ever sign any affidavit,
15  statement, declaration or any other document under
16  oath or affirmation concerning your employment with
17  the dealership Hillside Auto Outlet?
18          MS. TROY:  Which case are you talking
19      about?
20          MR. KATAEV:  This case.
21      A   Yes.
22      Q   Do you recall what that was?
23      A   The interrogatories.
24      Q   Okay.  Other than that, do you remember
25  signing anything else?

12

L. Stidhum
1
2       A   No.
3       Q   Did you speak with or obtain statements
4   from any other employees at Hillside Auto Outlet?
5           MS. TROY:  Which case are you talking
6       about?
7           MR. KATAEV:  Any case.
8       A   No.
9       Q   Same question for Hillside Auto Mall?
10          MS. TROY:  Again, now you're trying to
11      split up the two companies.  Both companies are
12      sued.
13          MR. KATAEV:  I'm not trying to split up
14      anything.  I'm asking a question.
15  BY MR. KATAEV:
16      Q   The question is and I will repeat it:  Did
17  you speak to or obtain any statements from any
18  employees at Hillside Auto Mall?
19          MS. TROY:  Does that include coworkers
20      meaning the coplaintiff in the State court
21      case?
22          MR. KATAEV:  I don't know.  She has to
23      tell me.
24          MS. TROY:  You need to be clear in your
25      question.

3  (Pages 9 to 12)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

13

L. Stidhum

1
2    MR. KATAEV: I think you need to look at
3    Rule 30 and read it carefully. It says all you
4    do is say, Objection, and the grounds therefor.
5    If you continue with the speaking objections --
6        MS. TROY: Objection. Ambiguous.
7        MR. KATAEV: -- I'm going to call the
8    court and I don't want to do that. I'm going
9    to repeat the question.
10   BY MR. KATAEV:
11       Q   Did you speak to or obtain statements from
12   any other employees at Hillside Auto Mall?
13       A   Yes.
14       Q   Who did you obtain statements from?
15       A   David, I mean -- but are we talking about
16   Hillside Auto Outlet and Auto Mall as one? It's
17   kind of confusing.
18       MS. TROY: I'm going to ask that you use
19   the full name of the company, sir. I think
20   it's getting confusing.
21       MR. KATAEV: It's not confusing.
22       161-10 is Hillside Auto Outlet.
23   Hillside Auto Mall is Hillside Auto Mall. Please
24   stop violating Rule 30.
25

14

L. Stidhum

1
2    BY MR. KATAEV:
3        Q   The question is: Who is David?
4        A   David Manrique.
5        Q   Are you saying that David Manrique is an
6    employee of Hillside Auto Mall?
7        A   No.
8        Q   You can clarify. Go ahead.
9        A   So if we are talking about Hillside Auto
10   Mall specifically, then no.
11       Q   When I asked you earlier, did you obtain
12   any statements from other employees at Hillside Auto
13   Outlet, do you want to clarify your answer?
14       A   David Manrique.
15       Q   Other than David Manrique, did anyone else
16   provide any statements?
17       A   No.
18       Q   What statement did David Manrique provide
19   you?
20       A   It's not a statement. It was more a
21   conversation we had.
22       Q   Was it written down in any way?
23       A   No.
24       Q   Was it a text message or email?
25       A   No.

15

L. Stidhum

1
2        Q   He didn't sign something swearing under
3    penalty of perjury, XYZ?
4        A   No.
5        Q   What did you and David discuss?
6        A   Just, like, the status of the case.
7        Q   That's because David Manrique is a
8    coplaintiff with you in a State court wage and hour
9    action, correct?
10       A   Correct.
11       Q   Against the same defendants here, correct?
12       A   Right.
13       Q   Other than your attorney, did you speak
14   with anyone else about your deposition today?
15       A   No.
16       Q   Did you tell anyone you would be doing a
17   deposition today?
18       A   No.
19       Q   You said you didn't review the complaint
20   in preparation for the deposition. Did you review
21   the complaint in general ever?
22       A   Yes. When it was first submitted. It was
23   quite some time ago.
24       Q   You verified its contents before it was
25   filed, correct?

16

L. Stidhum

1
2        A   Yes.
3        Q   Have you had any conversations with anyone
4    other than your attorneys in preparation for during
5    your deposition?
6        A   No.
7        Q   Have you had any conversation with anybody
8    else other than your attorneys and David Manrique
9    about your case against the dealership?
10       A   No.
11       Q   What is every name that you ever used or
12   gone by, other than Leticia Francine Stidhum?
13       A   Letty.
14       Q   L-e-t-t-y?
15       A   Yes.
16       Q   Any other names?
17       A   No.
18       Q   The current address that you provided at
19   the beginning of the deposition, do you rent or own?
20       A   Rent.
21       Q   Who do you live with?
22       A   My mother and stepfather and my two
23   children.
24       Q   How old are your children?
25       A   One and three.

4  (Pages 13 to 16)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

17

L. Stidhum
1
2    Q   What is your birthdate?
3    A   My birthdate?
4    Q   Correct.
5    A   ████████████
6        MS. TROY:  I'm going to ask that
7    everything except the birth year be marked as
8    confidential.
9        MR. KATAEV:  We have a confidentiality
10   agreement in this case?
11       MS. TROY:  I don't believe so, but I'm
12   going ask that any filings to court have her --
13   again, everything other than her birth year
14   redacted consistent with the local rules of the
15   Eastern District of New York and on the
16   transcript itself, everything other than the
17   birth year be marked as confidential.
18       MR. KATAEV:  I don't believe that's the
19   way it works.  The rule provides if you file
20   something publicly, you redact that
21   information.  It doesn't entitle you to mark it
22   confidential, it just gets redacted.  We will
23   follow the rule.
24   BY MR. KATAEV:
25       Q   Were you born in the United States,

18

L. Stidhum
1
2    Ms. Stidhum?
3        A   Yes.
4        Q   When is the last time you left the
5    country?
6        A   September of 2020.
7        Q   Prior to that time and focusing on the
8    timeframe of March 2018 until January of '19, did
9    you leave the United States of America?
10       A   No.
11       Q   Same question, did you leave the State of
12   New York?
13       A   Could you clarify the timeframe again?
14       Q   Sure, no problem.  The timeframe again,
15   May 2018 through January of '19.
16       A   I don't believe so.  Again, it was a long
17   time ago so I don't want to answer dishonestly.
18       Q   Are you currently married?
19       A   No.
20       Q   Were you ever married?
21       A   No.
22       Q   Your children currently live with you?
23       A   Yes.
24       Q   You've lived in New York all your life?
25       A   No.

19

L. Stidhum
1
2    Q   Where did you live prior to living in
3    New York?
4        MS. TROY:  Objection as to timeframe.
5    Could you clarify what timeframe you're talking
6    about.
7        MR. KATAEV:  Her whole life, her whole
8    life.
9        A   Florida.
10       Q   Were you born in Florida?
11       A   Yes.
12       Q   When did you move to New York?
13       A   I have been back and forth pretty much my
14   whole life.  I did some school there, some school
15   here.  So it's kind of a hard question.
16       Q   Understood.  When is the last time you
17   went to Florida and came back to New York,
18   timeframe?
19       A   Like to live?
20       Q   Yes.
21       A   I want to say June of 2018 or -- no, June
22   of 2017.
23       Q   Is when you left to Florida?
24       A   When I came back to New York.
25       Q   After returning from Florida in June of

20

L. Stidhum
1
2    '17, when is the next time you went back to Florida,
3    if ever?
4        A   For vacation only pretty much.
5        Q   When was that?
6        A   I don't remember exactly.
7        Q   Month and year?
8        A   I have gone back quite a couple of times.
9    Honestly, I don't remember.
10       MR. KATAEV:  We will follow up in writing
11   with an interrogatory about -- to the extent
12   you were in Florida at any point in time for
13   the period of May 2018 until January of '19, we
14   would want to know what dates you were in
15   Florida, but we will follow up in writing.  You
16   don't have to answer now.
17       (Counsel Request.)
18       A   These times I didn't go to Florida.
19       Q   You know that for a fact?
20   ██████████████████████████████████████████

5  (Pages 17 to 20)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023



6 (Pages 21 to 24)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

25

L. Stidhum

1    L. Stidhum
2  extent that you did not produce a document that
3  is part of the document production request, I
4  don't think you're entitled to use it.
5      MR. KATAEV:  You're wrong.  I objected and
6  you didn't follow up in a motion to compel and
7  you were denied your motion to compel in that
8  regard.
9      Can we proceed?
10     MS. TROY:  I understand that you're trying
11 to --
12     MR. KATAEV:  We are not here to discuss
13 your objections.  This is my deposition.  I
14 want to move on.  Can we move on?
15     MS. TROY:  I understand.  I'm going to
16 make a quick record.  I'm going to make it
17 clear to the record that I requested this as
18 part of the document request.  Mr. Kataev did
19 not produce the document as part of the
20 document production request.
21     MR. KATAEV:  That's correct.  I objected
22 and you failed to follow up in a motion to
23 compel and you already lost your motion to
24 compel in that regard.  We are moving on.
25     MS. TROY:  That is incorrect.

---

26

1    L. Stidhum
2      MR. KATAEV:  You can take it up with the
3  court.  I'm going to proceed with my
4  deposition.
5  BY MR. KATAEV:
6      Q   Ms. Stidhum, other than this lawsuit and a
7  State court wage and hour lawsuit with Mr. Manrique,
8  have you ever been a party to any other lawsuit as a
9  plaintiff or defendant?
10     A   No.
11     Q   These are the only two lawsuits you have
12 ever been a part of?
13     A   Yes.
14     Q   Have you ever filed a complaint against
15 any of your employers with any administrative agency
16 ever?
17     A   Yes.
18     Q   Which agency did you file a complaint
19 with?
20         MS. TROY:  If she knows.
21         MR. KATAEV:  Don't coach the witness.  You
22 either say, Objection, and the grounds they are
23 for or nothing.  Do not say, If she knows.
24 You're coaching her to say, I don't know, I
25 don't abide by that.  I'm going to call the

---

27

1    L. Stidhum
2  court.  It's not proper conduct.
3  BY MR. KATAEV:
4      Q   Please answer the question.
5      A   If I'm not mistaken, the EEOC.
6      Q   Other than the EEOC, did you ever file a
7  complaint with any other administrative agency?
8      A   No.
9      Q   Thank you.  Just for the record, the
10 complaint you filed with the EEOC relates to the
11 same defendants here, correct?
12     A   Yes.
13         MS. TROY:  Objection.  It's not a
14 complaint.
15         MR. KATAEV:  It's just, Objection to form.
16 You don't say, It's not a complaint.  Stop with
17 the speaking objections, okay?
18 BY MR. KATAEV:
19     Q   Have you ever filed for unemployment?
20     A   Yes.
21     Q   Against which employer did you file an
22 unemployment claim for?
23     A   Luxury Motor Club.
24     Q   That's after your left your employment
25 with the defendants, correct?

---

28

1    L. Stidhum
2      A   Right.
3      Q   Have you ever filed a claim for workers'
4  compensation?
5      A   No.
6      Q   Have you ever applied for food stamps?
7      A   Yes.
8      Q   When was the most recent time?
9      A   Currently I have them.
10     Q   For the record, to apply for food stamps,
11 you have to provide information about your income,
12 correct?
13     A   Correct.
14     Q   You provided that information about your
15 income, correct?
16     A   Right.
17     Q   Did you ever apply for Medicare or
18 Medicaid?
19     A   Yes.
20     Q   You currently have that as well, right?
21     A   Right.
22     Q   In order to obtain Medicare/Medicaid, you
23 also have to provide information about your income,
24 correct?
25     A   Yes.

---

7  (Pages 25 to 28)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

29

L. Stidhum
1
2    Q   You did provide that information, correct?
3    A   Yes.
4    Q   Have you ever applied for childcare
5    assistance?
6    A   I'm not sure.
7        MR. KATAEV:  We will follow up in writing.
8        (Counsel Request.)
9    BY MR. KATAEV:
10   Q   What about housing assistance?
11   A   Yes.
12   Q   You currently have that as well?
13   A   Yes.
14   Q   Again, you have to provide information
15   about your income for that, right?
16   A   Yes.
17   Q   You did provide that information, correct?
18   A   Correct.
19   Q   To the extent that food assistance is
20   different from food stamps, did you ever apply for
21   that benefit?
22   A   I don't think so.
23   Q   What about educational assistance?
24   A   No, I don't think so.
25   Q   Did you attend high school?

30

L. Stidhum
1
2    A   Yes.
3    Q   Where?
4    A   Florida.
5    Q   Name?
6    A   Gateway High School, but that's not where
7    I graduated from.
8    Q   Where did you graduate?
9    A   Alco.  I got my GED.
10   Q   Which schools, if any, did you attend here
11   in New York for high school?
12   A   Flushing High School and Benjamin Cardozo.
13   Q   You didn't get a high school diploma, you
14   got a GED, correct?
15   A   Correct.
16   Q   Did you ever attend any college?
17   A   No.
18   Q   Did you have gap in your education during
19   high school?
20   A   No.
21   Q   There is no graduate or professional
22   school, correct?
23   A   No.
24   Q   What about vocational school?
25   A   No.

31

L. Stidhum
1
2    Q   Are you familiar with dealership
3    certification programs?
4    A   Not really.
5    Q   Are you aware, for example, that if you
6    sell Ford vehicles that Ford offers certification
7    programs for salespeople?
8    A   Yes.
9    Q   Have you ever taken any of those kind of
10   courses?
11   A   No.
12   Q   Were those offered to you at any of the
13   dealerships you worked for?
14   A   No, I mostly worked for used car lots.
15   Q   Used car lots generally don't offer those?
16   A   No.
17   Q   After you got your GED in Florida, is that
18   the first time you started working?
19   A   I'm not sure.
20   Q   Do you recall whether you ever worked
21   during high school?
22   A   I don't believe so.  No, I didn't.
23   Q   After you got your GED, where was the
24   first place you remember working?
25   A   McDonald's.

32

L. Stidhum
1
2    Q   Do you remember the month and year you
3    started there?
4    A   No idea.
5    Q   After you worked at McDonald's, where did
6    you work?
7    A   I can't remember that far back.  I want to
8    say it might have been Dollar Tree.
9    Q   The McDonald's that you worked at, was it
10   in Florida or New York?
11   A   Florida.
12   Q   What about Dollar Tree?
13   A   New York.
14   Q   Do you remember the month and year you
15   started at Dollar Tree?
16   A   I don't.
17   Q   Did you get fired from McDonald's?
18   A   No, I quit.
19   Q   Why?
20   A   I was being young and stupid kind of.
21   Q   Understood.  What about Dollar Tree?
22   A   I quit there too actually.
23   Q   Where did you work after Dollar Tree?
24   A   That's when I got the interview with Isaac
25   after that.  No, I'm sorry, that's not true.  I

8  (Pages 29 to 32)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

33

1              L. Stidhum
2   actually worked at Marco LaGuardia Hotel.
3      Q   Hotel?
4      A   Yes.
5      Q   What position did you work?
6      A   Housekeeping.
7      Q   That was at the airport?
8      A   No.  That's right here off of Main Street,
9   Northern Boulevard.
10     Q   Is that close to where you lived at the
11  time?
12     A   Yes.
13     Q   Is that close to where you live now?
14     A   Pretty much.  Ten-minute drive.
15     Q   Do you remember the month and year you
16  started working at the hotel?
17     A   I don't.  I didn't stay there very long.
18     Q   After the hotel is when you first started
19  working for Hillside Auto Outlet, correct?
20     A   Correct.
21     Q   You started working at Hillside Auto
22  Outlet in May of '18, correct?
23     A   Yes.
24     Q   Hillside Auto Outlet was the first -- was
25  the first automobile business that you ever worked

---

34

1              L. Stidhum
2   in, correct?
3      A   Yes.
4      Q   Therefore, you had no experience in the
5   automobile industry prior to that time, correct?
6      A   Correct.
7      Q   You worked at Hillside Auto Outlet from
8   May of '18 until January of '19, correct?
9      A   Right.
10     Q   Although you are also suing Hillside Auto
11  Mall, you never directly worked at Hillside Auto
12  Mall as an employee, correct?
13     A   I kind of need that question clarified
14  because I have sold cars at Hillside Auto Mall.
15     Q   Let me try.  I'm going to give you a very
16  long question of what I understand to be the case
17  and you will confirm what's accurate and what's not,
18  okay?
19     A   Okay.
20     Q   You came to work as a salesperson for
21  Hillside Auto Outlet and worked at Hillside Auto
22  Outlet and was paid by Hillside Auto Outlet from May
23  of '18 until January of '19.  However, during the
24  time that you worked at Hillside Auto Outlet, you
25  sometimes sold vehicles that were kept or maintained

---

35

1              L. Stidhum
2   by Hillside Auto Mall; is that correct?
3      A   Yes.
4      Q   During the time you worked at Hillside
5   Auto Outlet, you sometimes sold vehicles located at
6   other dealerships unrelated to Hillside Auto Outlet
7   or Hillside Auto Mall, correct?
8      A   Yes.
9      Q   You're not alleging that those other
10  dealerships that you sold vehicles for are also an
11  employer here, correct?
12     A   Right, because from my understanding
13  Hillside Auto Outlet and Mall were kind of run by
14  the same people.
15     Q   That's the reason you included Hillside
16  Auto Mall in this case, correct?
17     A   Right.
18     Q   Because, as your understanding, they are
19  what we call in legal parlance, joint employers,
20  correct?
21     A   I'm sorry, one more time.
22         MR. KATAEV:  Read it back.
23  (Whereupon, the referred to question was read back
24         by the reporter.)
25         MS. TROY:  Objection to the extent it

---

36

1              L. Stidhum
2   calls for a legal conclusion.
3   BY MR. KATAEV:
4      Q   You can answer.  Go ahead.
5      A   I'm not sure.
6      Q   Okay, that's fine.  Your employment with
7   Hillside Auto Outlet ended in January of '19,
8   correct?
9      A   Correct.
10     Q   That's because you quit, correct?
11     A   Yes.
12     Q   During the time you worked at Hillside
13  Auto Outlet, your sole position or job title was
14  salesperson, correct?
15     A   Right.
16     Q   Your primary responsibility was selling
17  cars, correct?
18     A   Right.
19     Q   Any other responsibilities that you had?
20     A   Um, not necessarily responsibilities, no.
21     Q   Who were your supervisors while you worked
22  at Hillside Auto Outlet?
23     A   Isaac was one, Jay or Jenneque, she was
24  another for a short period of time, a couple of
25  months.  Andris Guzman and that was about it as far

---

9  (Pages 33 to 36)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

37

L. Stidhum
1
2   as supervisors, yes.
3       Q   Can you describe basically what your
4   compensation structure was there?
5       A   So in the beginning when I was first hired
6   after interviewing with Isaac and speaking with
7   Jenneque, I was told I would be paid $300 weekly,
8   $150 flat, and after anything over $3,000 I would
9   receive 5 percent, and it's reflected on my
10  paystubs for the first couple of months up until Jay
11  was fired or quit. I don't know what happened in
12  that situation.  Then, I started just receiving the
13  $150 flat.
14      Q   Let's say the schedule that you worked was
15  generally Monday to Friday, correct?
16      A   No.
17      Q   What was your schedule like?
18      A   So I had Wednesdays off and we would work
19  alternating Sundays.
20      Q   You either worked five days a week or six
21  days?
22      A   Correct.
23      Q   And so do you know what the actual work
24  week was? Did they do it Monday through Sunday or
25  did they do it Saturday through Friday?

38

L. Stidhum
1
2       A   I have no idea.  I know that I received my
3   check Thursdays.
4       Q   The check that you received on Thursdays
5   was for the entire prior week, correct, whatever the
6   week was?
7       A   Yes.
8       Q   How did you go about verifying that you
9   got paid properly on any given week?
10      A   So weekly we would get a form that has
11  like three pieces together, so -- for copies, and we
12  would have to turn it into the sales manager and
13  they would give it to the girl who does the payroll.
14      Q   Who was that?
15      A   There was a couple.  From the beginning,
16  it was -- I can't remember who it was in the
17  beginning.  I know it ended with Denise doing my
18  payroll, Denise and Iris.  There was a couple of
19  people in between.
20      Q   Does Dianna Jennings ring a bell?
21      A   No.
22      Q   Dina Jennings?
23      A   Dina, I didn't really meet because she was
24  hardly ever there.  I've probably seen her three or
25  four times.

39

L. Stidhum
1
2       Q   Let's break down the compensation.  $300 a
3   week is the flat $300 a week, right?
4       A   Salary.
5       Q   The $150 per car is for every car you
6   sold, correct?
7       A   Yes.
8       Q   In order for the car to be considered
9   sold, it had to be delivered, right?
10      A   Right.
11      Q   Which means the customer took possession
12  of the vehicle and all the funds had been received
13  from the bank and all of that, right?
14      A   I mean yes and no because there would be
15  times that I would still get paid on all the cars
16  even if it was not funded.  It's a yes-and-no
17  answer.
18      Q   In terms of getting paid for vehicles that
19  were not funded, did it sometimes happen that you
20  did not get paid on a vehicle that hasn't been
21  funded yet?
22      A   One more time.
23      Q   Was it sometimes the case that a vehicle
24  was not funded and you didn't get paid on it?
25      A   Yes.  That happened a couple of times but

40

L. Stidhum
1
2   relatively quickly with the funding, they would do a
3   pretty good job of that.
4       Q   They would like to take care of you while
5   you worked there, correct?
6           MS. TROY:  Objection to form.
7       Q   You can answer.
8       A   I guess.
9       Q   When they paid you for a vehicle that
10  hasn't been funded yet, they did so in their
11  discretion, correct?
12      A   It would be something that I wasn't aware
13  of.  It might have happened, it might have happened.
14  I'm not sure.  I'm not looking at the back end of
15  the dealership.
16      Q   You don't care whether it's funded or not,
17  you want to get your commission, right?
18      A   Of course.
19      Q   How would you keep track of the vehicles
20  that you sold in any given week?
21      A   With that same form.  I would do that
22  monthly.
23      Q   Did you ever take pictures of that form on
24  your cellphone?
25      A   No, because I would have the copies so it

10  (Pages 37 to 40)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

41

L. Stidhum
1
2  wasn't something that I really needed to take
3  pictures of.
4       Q   Have you produced those copies in this
5  case?
6       A   No, because I don't think anybody plans to
7  be mistreated or anything like that to hold on to
8  stuff like that.
9       Q   What you're saying is you never held on to
10  those documents?
11      A   No.  After I would get paid, I would
12  discard them.
13      Q   The reason you discarded them was because
14  you were satisfied that you were properly paid,
15  correct?
16      A   I don't know how to answer that question.
17      Q   Answer to the best of your ability.
18      A   I mean, if I'm getting paid on the deal
19  there is no reason for me to hold on to it.
20      Q   You threw it out because you were
21  satisfied that you were properly paid, right?
22         MS. TROY:  Objection.  Argumentative.
23      Q   You can answer.
24         MS. TROY:  Objection.  Asked and answered.
25      Q   I would like to hear the answer.

42

L. Stidhum
1
2         MS. TROY:  Because you don't like the
3  answer doesn't mean you can ask it again.  The
4  witness can answer again.
5  BY MR. KATAEV:
6       Q   Go ahead.
7       A   I'm sorry.
8       Q   The reason why you threw out the document
9  was because you were satisfied that you were paid
10  properly, correct?
11      A   Yes, up until I was owed money.  Up until
12  I was shorted on my commissions.
13      Q   How did you come to be aware that you were
14  owed money or that you were short on the
15  commissions?
16      A   Because I know what I'm owed to start.  I
17  would know how many cars I would sell weekly and
18  what I'm owed weekly.  Again, I was getting paid
19  that $150 flat so it wasn't something that -- it
20  wasn't a mystery to solve.  Of course I know what
21  I'm looking forward to expecting especially upon
22  leaving somewhere.
23      Q   Going through the 5 percent bonus, can you
24  explain that in your own words?
25      A   It wasn't a 5 percent bonus.  It was

43

L. Stidhum
1
2  anything paid over -- any deal that made over $3,000
3  because at 5 percent, $3,000 would be $150.
4  Anything that made over that, I was receiving that
5  extra compensation up until Jay was fired and it
6  does reflect it on my paystubs.
7       Q   Jay is the person that you referred to as
8  Jenneque, correct?
9       A   Yes.
10      Q   So when you say $3,000, you're saying
11  that's what the vehicle sold for?
12      A   No.  That's what the deal made.
13      Q   The gross profit?
14      A   Right.
15      Q   When is it that Jay was no longer at the
16  company?
17      A   I'm not quite sure.  It had to be at the
18  end of July or sometime in August.  It was sometime
19  in the summer I remember.
20      Q   At some point after July or August of
21  2018, you no longer got that 5 percent, correct?
22      A   Correct.
23      Q   You continued your employment with the
24  dealership, correct?
25      A   Yes.

44

L. Stidhum
1
2       Q   Did anyone inform you they are no longer
3  offering the 5 percent in July or August?
4       A   No.
5       Q   Did you come to anyone and say, What
6  happened to the 5 percent?
7       A   I did mention it and it was kind of
8  brushed off.
9       Q   Who did you mention it to?
10      A   Isaac.
11      Q   What did Isaac say to you?
12      A   I don't recall.
13         MR. KATAEV:  Off the record.
14  (Whereupon, an off-the-record discussion was held.)
15  BY MR. KATAEV:
16      Q   You testified that you quit in January of
17  '19, right?
18      A   Correct.
19      Q   What was the reason that you quit?
20      A   It was a combination of things between the
21  pregnancy discrimination, being owed money and not
22  paid it.  It was a couple of things.  Also, I was
23  promised a position that I guess I wasn't receiving
24  due to my pregnancy, so like I said, it was a
25  combination of things.

11  (Pages 41 to 44)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

45

L. Stidhum
1
2    Q   We are going to get into the pregnancy
3    discrimination position you talked about a little
4    later.  I want to focus on the compensation aspect
5    and I have some more granular questions about your
6    decision to quit related to those financial aspects
7    so I'm going to focus in on that for now.
8    A   Okay.
9    Q   Did you quit because you stopped receiving
10   the 5 percent?
11   A   No.
12   Q   Did you quit because of waiting times?
13   A   Yes.  That's what one of the factors.
14   Q   Tell me about the waiting times?
15   A   So like I mentioned a couple of times, I
16   did have my own access to Dealertrack and once Isaac
17   did go on vacation, the password was changed and
18   Guzman was the supervising manager at the time and
19   he refused to give it to me.  So that did increase
20   my waiting times because I was not able to qualify
21   my customers on my own and they would leave.
22   Q   Assuming you were able to qualify your
23   customers, that doesn't necessarily mean you would
24   make the sale, correct?
25   A   Right.

46

L. Stidhum
1
2    Q   It only increased the chances of making
3    the sale, correct?
4    A   Not necessarily increases it, but it gives
5    me the opportunity to see who I'm wasting time on
6    and who I'm not wasting time on.  We were in Jamaica
7    so we would get a lot of customers that did not
8    qualify.
9        Me having my own access to Isaac's
10   Dealertrack would give me the ability to qualify my
11   customers on my own rather than waste time on
12   somebody and wait on Andris or Isaac or whoever to
13   check the credit.
14   MR. KATAEV:  Can I have the last question
15       and answer read back?
16   (Whereupon, the referred to testimony was read back
17       by the reporter.)
18   BY MR. KATAEV:
19   Q   You acknowledge, however, that you were
20   the only salesperson that had access to Dealertrack
21   to qualify individuals, correct?
22   A   Yes.
23   Q   All the other salespeople did not have
24   that ability that you did for some time, correct?
25   A   That I know of at least.

47

L. Stidhum
1
2    Q   Generally, it was the responsibility of an
3    F&I manager or someone else in the dealership, other
4    than a salesperson, to qualify individuals, correct?
5    A   Not just an F&I.  The general manager or
6    sales manager, I don't know their titles exactly,
7    but they have access as well.
8    Q   Those individuals are not salespeople,
9    correct?
10   A   Right.
11   Q   You say that you obtained access to
12   Dealertrack, right?
13   A   I was given it, yes.
14   Q   Who gave it to you?
15   A   Isaac.
16   Q   How did he give it to you?
17   A   Honestly, I don't remember because, like I
18   said, the password would be changed after a certain
19   period of time because it's sensitive information.
20   They would change the password, but he would put it
21   on a sticky note or he would come to my desk and
22   type in the password himself.  He was the only one
23   giving me the password.
24   Q   The username for the Dealertrack account,
25   whose was it?

48

L. Stidhum
1
2    A   It was Isaac's.  I never had anybody
3    else's.
4    Q   You didn't have your own, correct?
5    A   I did not.
6    Q   After you quit working at Hillside Auto
7    Outlet, where did you work next?
8    A   NYC Motor Cars.
9    Q   Where is that?
10   A   Queens Boulevard.
11   Q   Did you start working there in January of
12   '19 or some other point?
13   A   I'm not sure if I waited until the start
14   of February or not, so I'm not 100 percent sure.  It
15   was definitely early that year.
16   Q   In January or February of '19, correct?
17   A   Probably more towards the end of January
18   or beginning of February.
19   Q   In order to begin a job there, you had to
20   fill out an employment application?
21   A   I actually did not.
22   Q   1,000 percent sure you didn't?
23   A   An application?
24   MS. TROY:  Objection as to form.
25   Q   You can answer.

12  (Pages 45 to 48)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

49

L. Stidhum
1
2    MS. TROY:  What do you mean by
3    1,000 percent sure?  Objection to form.
4    MR. KATAEV:  I'm not going to qualify that
5    with a response.  You can answer the question.
6    MS. TROY:  Rephrase your question, sir.
7    BY MR. KATAEV:
8    Q   Please answer the question as asked.
9    A   Repeat it.
10   Q   Are you 1,000 percent sure you did not
11   fill out any employment application at NYC Motor
12   Cars?
13   A   I don't remember filling one out.  I was
14   brought there by a sales manager that Isaac had
15   working with him.
16   Q   Who was that?
17   A   Ali.
18   Q   When you say you can't remember, you can't
19   remember one way or the other, correct?
20   A   What do you mean?
21   Q   You can't remember whether you did fill
22   out an employment application or not?
23   A   Right.  I was brought there by someone
24   else.  He was kind of like, You don't have to be
25   interviewed, you don't have to do this, just come.

50

L. Stidhum
1
2    Q   Do you know Ali's full name?
3    A   I'm not sure how to spell it.  Ali
4    Raskesnia, something like that.
5    Q   When you started working at NYC Motor
6    Cars, it was a new dealership?
7    A   Not that I know of.
8    Q   Was your compensation structure there the
9    same as it was at Hillside Auto Outlet?
10   A   No.
11   Q   What was the compensation structure there?
12   A   The commission was doubled.
13   Q   In other words, it was $300 per car?
14   A   Yes.
15   Q   It was the same $300 weekly draw?
16   A   Yes.  Not draw, it was salary.
17   Q   Thank you for clarifying.  There was no
18   5 percent bonus?
19   A   No, but I did have a monthly bonus
20   structure.
21   Q   Based on volume, correct?
22   A   Correct.
23   Q   When did you stop working at NYC Motor
24   Cars?
25   A   When I gave birth.

51

L. Stidhum
1
2    Q   When was that?
3    A   In July.  I stayed, like, a week up until
4    I gave birth so maybe July of 20-something.
5    Q   2020?
6    A   2019.
7    Q   I see what you're saying.  20-something
8    meaning the day?
9    A   Yes.
10   Q   Congratulations by the way.
11   A   Thanks.
12   Q   You were there at NYC Motor Cars for
13   approximately six months, correct?
14   A   Right, and I did go back.
15   Q   When did you return?
16   A   I want to say like October, September,
17   October around there.
18   Q   Are you still employed there?
19   A   No, I'm not.
20   Q   When did you cease working there?
21   A   About a month or two after I actually left
22   because the store was completely different,
23   employees were different, it was not doing the
24   volume it was and I became a BDC manager at Luxury
25   Motor Club.

52

L. Stidhum
1
2    Q   Business development center?
3    A   Yes.
4    Q   You ceased working at NYC Motor Cars in or
5    about November or December of 2019, correct?
6    A   Yes.
7    Q   You quit?
8    A   I'm sorry?
9    Q   You quit?
10   A   Yes, I did.
11   Q   You went to Luxury?
12   A   Motor Club.
13   Q   Where is that?
14   A   In Franklin Square.
15   Q   How did you obtain the position there?
16   A   Probably on Indeed or something.  Some
17   type of employment ad.
18   Q   When did you start there?
19   A   Mid November of 2019.
20   Q   Are you still working there?
21   A   No, I'm not.
22   Q   When did you stop working there?
23   A   When Covid hit.  March, early March.  I
24   got Covid really bad.  I decided to leave and not
25   get my kids sick.

13  (Pages 49 to 52)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

53

L. Stidhum
1
2    Q   Did you return to the workforce after
3  March 2020?
4    A   I did.
5    Q   When was that?
6    A   Actually, the owner of NYC Motor Cars
7  called me that he was opening a new store so I don't
8  remember the exact time, but he told me he was
9  opening a new store and he wanted me to run the
10  store that I worked at on Queens Boulevard. I don't
11  remember the exact month and date.
12    Q   If I understand correctly, the owner of
13  NYC Motor Cars was opening a new store and needed
14  your help with his existing store at NYC Motor Cars?
15    A   Correct.
16    Q   Did you go back to NYC Motor Cars?
17    A   I did as a sales manager.
18    Q   Do you remember what month in 2020 it was?
19    A   I don't. It was probably maybe late
20  April, early May, around there.
21    Q   That's fine. Are you still there?
22    A   No, I'm not.
23    Q   When did you stop work there?
24    A   I don't remember the exact timeframe. I'm
25  not sure. I was trying to think.

54

L. Stidhum
1
2    Q   Where are you working now?
3    A   I'm not working.
4    Q   When did you stop working?
5    A   I gave birth last year. I took off pretty
6  much since January of last year.
7    Q   January of 2022?
8    A   Right. I did work at a dealership for a
9  couple of weeks. It didn't work out. It was super
10  slow.
11    Q   Which dealership was that?
12    A   Great Neck Motor Sports.
13    Q   Is that on Great Neck Road?
14    A   Yes.
15        MR. KATAEV:  Off the record.
16  (Whereupon, an off-the-record discussion was held.)
17  BY MR. KATAEV:
18    Q   Other than the last job at NYC Motor Cars
19  as a sales manager and the job at Great Neck Motor
20  Sports, did you work anywhere else after April of
21  2020?
22    A   Yes, I did. NY Luxury Motors, but again
23  it was a bad situation there. It was in a bad spot
24  and the dealership wasn't getting any traffic at
25  all, so I decided to leave and look for other

55

L. Stidhum
1
2  employment elsewhere.
3    Q   Were you fired from any of these jobs we
4  talked about today?
5    A   No, I was not.
6    Q   At any of these jobs, did you ever fill
7  out any employment application?
8    A   For Luxury Motor Club, I definitely did.
9  Great Neck, I definitely did. The only one I can't
10  recall is NYC Motor Cars because Ali was the one who
11  brought me there, I don't remember. Everywhere else
12  I did fill out an employment application.
13    Q   Whenever you filled out an employment
14  application, you did list Hillside Auto Outlet as a
15  past experience, correct?
16    A   Of course.
17    Q   The only reason there are gaps in your
18  work experience is because of the birth of your two
19  children, correct?
20    A   Right, and Covid.
21    Q   When you applied for a position at
22  Hillside Auto Outlet it was for a salesperson,
23  correct?
24    A   Right.
25    Q   How was it you learned about the position?

56

L. Stidhum
1
2    A   I believe it was Craigslist and I got a
3  call the next day.
4    Q   You called based on the Craigslist ad?
5    A   No. I sent in my application and got a
6  phonecall the next day. Not my application, my
7  resume.
8    Q   When you got the call the next day, do you
9  remember who it was?
10    A   Isaac.
11    Q   To the best of your recollection, how did
12  the conversation go?
13    A   I don't remember. He told me to come in,
14  if I can come in the same day and I was kind of
15  bummed about losing my job -- not losing my job,
16  leaving my job at the hotel and I wanted to get a
17  job so bad, so I went the same day that he called
18  and got the job.
19    Q   You met with Isaac in person that day?
20    A   Yes.
21    Q   What do you recall about your conversation
22  with Isaac in person that day?
23    A   Honestly, I don't remember. I remember
24  him saying that he was willing to give me a shot and
25  to wait for his partner and then I spoke with Jay.

14  (Pages 53 to 56)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

57

L. Stidhum

1  
2    Q   When you refer to his partner, that was
3  Jenneque?
4    A   Yes.
5    Q   You also spoke with Jenneque that day?
6    A   Yes, I did.
7    Q   You got the job the same day?
8    A   Right.
9    Q   An interview took place at the dealership,
10 correct?
11   A   Yes.
12   Q   At Hillside Auto Outlet, correct?
13   A   Yes.
14   Q   What is your understanding as to the basis
15 for which you got hired?
16   A   What do you mean by that?
17   Q   Why do you believe you were hired?
18   A   I'm not sure.
19   Q   As far as you understood it, Isaac and/or
20 Jenneque together made a decision to hire you,
21 correct?
22   A   I mean, Isaac already told me he was
23 willing to give me a shot and it was more like a
24 meeting Jay type of thing.
25   Q   At the time you were hired, Andris Guzman

---

58

L. Stidhum

1  
2  was not an employee of the dealership yet, correct?
3    A   He was.
4    Q   He did not participate in the decision to
5  hire you, as far as you know, correct?
6    A   No, he did not.
7    Q   You know that for a fact or it's as far as
8  you know?
9    A   It's as far as I know.
10   Q   He did not interview you, correct?
11   A   No.
12   Q   At the time that you were hired, Jory did
13 not participate in the decision to hire you,
14 correct?
15   A   No.
16   Q   Jory was not present daily at the
17 dealership, correct?
18   A   Yes.
19   Q   Was Jory ever present at the dealership?
20   A   He was.  He would pop in a couple of times
21 a month.
22   Q   Same question for Ron:  As far as you
23 know, he did not participate in the decision to hire
24 you, correct?
25   A   No.

---

59

L. Stidhum

1  
2    Q   Was Ronald ever present at the dealership?
3    A   Again, same thing.  Yes, here and there.
4    Q   During the times that Jory and/or Ron
5  would visit the dealership, did you interact with
6  either of them?
7    A   Yes.
8    Q   What was the nature of your interaction
9  with them?
10   A   It was more of how we were doing, how
11 things were going.
12   Q   Pleasantries?
13   A   Pretty much.
14   Q   Do you recall receiving a written offer of
15 employment when you were hired?
16   A   No, I did not.
17   Q   Did you start work the same day you were
18 hired?
19   A   I'm not 100 percent sure.  I want to say
20 yes, but I'm not sure.
21   Q   To whom did you report as soon as you
22 started working?
23   A   What do you mean to who did I report?
24   Q   As a salesperson, you reported to someone
25 higher, correct?

---

60

L. Stidhum

1  
2    A   Right.  Mostly I would go to Isaac or Jay,
3  when I first started there at least.
4    Q   You did not report to Andris Guzman at the
5  time, correct?
6    A   Not that I can really recall.  Up until
7  Jay leaving, he didn't do too much.
8    Q   Jay left in July or August of?
9    A   2018.
10   Q   After July or August of 2018 is when you
11 started reporting to Andris Guzman; is that right?
12   A   Correct.
13   Q   You never reported to Jory, correct?
14   A   Not on that aspect.  Only when there was
15 an issue.
16   Q   Give me an example.
17   A   Like, when I was missing some of my car
18 pay, I did reach out to him, I called him and sent
19 him a text message as well.
20   Q   That was in January of '19 before you
21 quit, correct?
22   A   Correct.
23   Q   Other than that --
24   A   No, I'm sorry.  It was probably after I
25 quit, once I didn't receive the compensation after

---

15  (Pages 57 to 60)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

61

L. Stidhum

1    telling Isaac.
2        Q   In January of '19, correct?
3        A   Right.
4        Q   Other than that, you never interacted with
5    him other than pleasantries, correct?
6        A   For Jory, yes, that's pretty much it.
7        Q   What about Ronald, you never reported to
8    him, correct?
9        A   Right.
10       Q   You had no interactions with him other
11   than pleasantries, correct?
12       A   And about the bonus situation.
13       Q   When did you reach out to Ron about the
14   bonus situation?
15       A   I didn't reach out to him.  He was in the
16   store.  He came in, asked how everyone was doing, he
17   looked really happy.  I mentioned -- I don't know
18   how I worded it, but I mentioned I was pissed
19   because I didn't get the bonus and I was only a
20   couple of cars away, and that I was really hoping to
21   get it because I was pregnant and stuff.  That's
22   when whatever conversation happened between him and
23   Isaac happened.  I don't know what happened after
24   that.
25

62

L. Stidhum

1        Q   Do you remember when that was, month and
2    year?
3        A   Early December or the last two days of
4    November, something like that.  It had to be the end
5    of November or early December.
6        Q   After Jenneque left, you started reporting
7    to Andris Guzman.  What was the nature of the
8    working relationship?  What did you report to him
9    on?
10       A   So up until I got my own access --
11   actually, I feel like it was right about the same
12   time because Jay was pretty quick with what she
13   would do.  For the first couple of days, I had to go
14   to him, give him the application, have him run the
15   credit and let me know if the customer qualified or
16   whatever the case may be.  That was pretty much it
17   up until I got my own access, then we really didn't
18   have to do too much communicating.
19       Q   From the first time you started working at
20   the dealership initially in order to get financing,
21   you would have to go to Jay in order to run credit
22   and apply for financing, correct?
23       A   Right.  I mean, I was new to the business
24   so I don't know much about those things up until I
25

63

L. Stidhum

1    was taught it.
2        Q   Fair enough.  When Jay left, you continued
3    doing that with Andris, correct?
4        A   Right.
5        Q   Let's set aside for now the Dealertrack.
6    I have some questions about this process before you
7    got the Dealertrack access.
8            When you worked with Jay to get these
9    financing applications in, was Jay the exclusive,
10   only person that did this?
11       A   No.
12       Q   Sometimes you worked with others, correct?
13       A   Yes.  Isaac would do it as well.
14       Q   Other than Isaac and Jay, was there anyone
15   else that did it?
16       A   Later on there was a finance manager hired
17   after Jay left.
18       Q   Who was that?
19       A   Serge.
20       Q   Serge came on after?
21       A   Yes.
22       Q   After Jay left?
23       A   Yes.
24       Q   In the beginning, it was Isaac or Jay and
25

64

L. Stidhum

1    that's it, correct?
2        A   Correct.
3        Q   How did you go about deciding who to go
4    to?
5        A   Whoever was less busy.  I was always
6    trying to grab whoever I could.  Whoever was less
7    busy is who I would go it.
8        Q   After Jay left, you had the option of
9    Andris or Isaac, correct?
10       A   Right, and I would choose Isaac more of
11   the time because he was quicker.  Andris was getting
12   trained to do that part.  Once Jay left, he was kind
13   of taking over her position.
14       Q   Jay left in August or July of '18.  Do you
15   remember in relation to that when Serge started?
16       A   It had to be like end of August because I
17   remember there was a couple of people that came to
18   interview and stuff so it had to be after but I'm
19   not sure exact dates.
20       Q   Whenever you went to Isaac or Jay in the
21   beginning to run financing applications for
22   customers of the dealership, prospective customers
23   of the dealership, there would sometimes be delays
24   caused because the banks wanted more information,
25

16  (Pages 61 to 64)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

65

L. Stidhum

1       L. Stidhum
2   correct?
3       A   Yes and no.
4       Q   Explain.
5       A   I mean, when it comes to any delays in
6   banks, it would be because of a document that they
7   needed, but for the most part, you would have all
8   the documents.  It was in our sales procedure to get
9   ID, the most recent two paystubs and that proof of
10  address if needed.  It's kind of hard to answer that
11  question because, for the most part, they would have
12  everything needed.
13      Q   To the extent a customer did not have
14  something that was needed, that would delay the
15  process, correct?
16      A   Yes.
17      Q   Is it not true that sometimes individuals
18  are self-employed and don't necessarily have things
19  like paystubs?
20      A   Of course.
21          MS. TROY:  Objection.  Argumentive.
22      Q   You can answer.
23      A   I mean, yeah.
24      Q   In those situations when you submit the
25  applications there would be a delay, correct?

66

1       L. Stidhum
2       A   Yes.
3       Q   The only way to prevent the delay from
4   being further delayed is to obtain whatever the
5   document is and submit it to the bank, correct?
6          MS. TROY:  Objection to form.
7       Q   You can answer.
8       A   One more time, your question.
9          MR. KATAEV:  Read it back.
10  (Whereupon, the referred to question was read back
11          by the reporter.)
12      A   Yes.
13      Q   Sometimes the customer would not have that
14  information handy the same day, correct?
15      A   Yes.
16      Q   Sometimes the customer would never return
17  with the information at all, correct?
18      A   Correct.
19      Q   This rings true from the beginning when
20  you worked with Jay and Isaac, to the end when you
21  were working with Andris, Isaac and Serge, correct?
22      A   Right.
23      Q   Towards the end of your employment
24  relationship with Hillside Auto Outlet, you had the
25  ability to go to either Isaac, Andris or Serge to

67

1       L. Stidhum
2   run financing applications, correct?
3       A   Correct.
4       Q   You're telling me that Andris was the
5   individual who caused you purposefully to wait
6   longer than everyone else, correct?
7       A   I'm sorry.  I got to run back a little
8   bit.  Serge would not run credit.  He would if he
9   was not busy, but for the most part, it was the
10  sales manager or the general manager's job to run
11  the credit and follow up with the customer prior to
12  giving it to the finance manager to not waste his
13  time.
14          So, yeah, Serge did not run the
15  credit.  It was mostly up to Isaac and Guzman to run
16  the credit because Serge would really just submit
17  the deal to the banks.
18      Q   Understood.  What you're saying generally
19  is that, in terms of who you could go to after Jay
20  left, it was really just Isaac and/or Andris,
21  correct?
22      A   Yes.
23      Q   It was very rare that Serge would run the
24  credit?
25      A   Yes.

68

1       L. Stidhum
2       Q   Okay.
3          MR. KATAEV:  Can we have the original
4   question read back?
5          MS. TROY:  For the record, Mr. Kataev has
6   been coughing throughout this morning.
7          MR. KATAEV:  It's a moot point.  You don't
8   need to make these stupid things on the record.
9          MS. TROY:  I don't appreciate you calling
10  my stuff stupid.
11          MR. KATAEV:  You achieved what you wanted.
12  We are in a remote deposition.  What is the
13  point?  Don't interrupt the deposition.
14          MS. TROY:  I was concerned for my client
15  and my health, and it was perfectly valid
16  because you told me you'd be asymptomatic by
17  Friday.
18          MR. KATAEV:  I said other than a minor
19  cough, but it's a moot point.  Please don't
20  interrupt my deposition.
21  (Whereupon, the referred to question was read back
22          by the reporter.)
23      A   Yes.  Isaac left probably the first week
24  of December, something like that so yes, that's
25  partially the reason why I had extended wait times

The Little Reporting Company
646.650.5055 | www.littlereporting.com

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

69

L. Stidhum
1
2  because he did not want to give me the access I had
3  before.
4      Q   Isaac never caused you to wait longer like
5  Andris did, correct?
6      A   Correct.
7      Q   Neither did Serge in the rare circumstance
8  when you would go to him, correct?
9      A   Correct.
10     Q   Your complaint says that the only
11  reason -- withdrawn.
12         Your complaint says that Andris only
13  caused you to wait longer to run the financing
14  applications after you had disclosed to him and
15  others that you were pregnant, correct?
16     A   That's how it seemed, yes.
17     Q   When you disclosed to individuals that you
18  were pregnant, you did so at the dealership,
19  correct?
20     A   Yes.
21     Q   Who was present when you told everyone the
22  great news?
23     A   I mean, all the salespeople were present.
24  I was a few minutes late, I remember that because I
25  came in and everyone was there and I was waving my

70

L. Stidhum
1
2  sonogram picture around.  I don't remember if Isaac
3  was there when I got there and said it or not, but I
4  know definitely Guzman was there and I did tell
5  Isaac later that day when he came in for sure.
6      Q   I want to understand.  When you first said
7  it, who was immediately in your circle or presence?
8      A   Guzman was there because he would sit at
9  the podium so he was front and center.  David was
10  there, I remember Sean being there, he was another
11  salesperson, the other David, I don't remember his
12  last name, I believe it starts with a P.  I don't
13  believe Serge was there just yet.  He usually came a
14  little later.  I'm not sure if Isaac was there yet
15  but I know that same day I did show him the
16  sonogram.
17     Q   When you made that announcement, did
18  Andris say anything to you?
19     A   I don't recall.
20     Q   Do you recall him saying congratulations?
21     A   I don't.
22     Q   Do you recall anyone else saying
23  congratulations?
24     A   Yes.  The other salespeople were looking
25  at it together.  Everybody was, like, excited for

71

L. Stidhum
1
2  me, I guess I could say.
3      Q   Did Andris make any statements at all
4  during that conversation?
5      A   I honestly don't think so.  He didn't have
6  much personality, I want to say.  I don't feel like
7  he said anything to me.
8      Q   Prior to the time that you announced your
9  pregnancy to him and to the others, did you and
10  Andris have any interpersonal conflicts with each
11  other?
12     A   Honestly, yes, we did, but it was -- we
13  kept it professional.  We worked in a professional
14  environment.  We kept it professional.
15     Q   What was the nature of the interpersonal
16  conflict that you had?
17     A   Honestly, I don't remember.
18     Q   It was all work-related, of course?
19     A   Yes.
20     Q   Maybe you had some disagreement or
21  argument about something relating to a sale,
22  correct?
23     A   Yes, definitely work-related.  Nothing
24  personal, I don't think.
25     Q   Did any of your interpersonal conflicts

72

L. Stidhum
1
2  with each other rise to a level at any point before
3  you announced your pregnancy where someone else had
4  to get involved and mediate you two?
5      A   Not that I recall, no.
6      Q   Whatever happened between you two, you
7  sort of water-under-the-bridge type of thing?
8      A   Pretty much.
9      Q   How many times did that happen prior to
10  the time that you announced your pregnancy?
11         MS. TROY:  Objection to form.  Ambiguous.
12     Q   You can answer the question.
13     A   Honestly, I don't remember.  It's probably
14  once or twice.  Nothing like crazy where we hated
15  each other and couldn't speak.  It was nothing like
16  that.
17     Q   You had two little squibbles here and
18  there?
19     A   Yes.
20     Q   Do you recall whether those two incidents
21  were close in time to the time that you learned were
22  pregnant?
23     A   I don't remember, no.
24     Q   It could have been at the beginning, it
25  could have been at the middle, or it could have been

18  (Pages 69 to 72)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

73

L. Stidhum
1
2  towards the end when you learned you were pregnant?
3      A   As far as after my pregnancy announcement,
4  I definitely remember what transpired.  In those
5  little hiccups we had, I don't remember when, no.
6      Q   Andris was one who never directly made any
7  comments to you about your pregnancy, correct?
8      A   Not that I remember, no.
9      Q   In terms of the two incidents you had
10  prior to the time you learned you were pregnant, did
11  you have similar incidents after the fact?
12      MS. TROY:  Objection.  Ambiguous.
13      Q   You can answer.
14      A   I don't recall.
15      Q   One way or the other, correct?
16      MS. TROY:  Objection.  Ambiguous.
17      Q   You can answer.
18      A   I don't know what you mean by, One way or
19  the other.
20      Q   It could have happened that you two had a
21  little argument or it could not have happened, you
22  don't remember either way?
23      A   Honestly after announcing my pregnancy,
24  there wasn't much arguing.  It was more like I was
25  doing a lot of crying and upset, so I can't really

74

L. Stidhum
1
2  say that yes one way or the other.
3      Q   When you say you cried, did you cry
4  physically in front of Guzman?
5      A   Absolutely.  Multiple times, and in front
6  of Isaac as well.
7      Q   When you cried in front of Guzman, what
8  happened?
9      A   Nothing, absolutely nothing.  He would
10  have no emotion.
11      Q   Did he ask why you were crying?
12      A   No.
13      Q   Your job responsibilities at the
14  dealership never changed, correct?
15      A   No.
16      Q   Are you currently living with the father
17  of your children?
18      A   No.
19      Q   The father of your children is not in any
20  way related to Hillside Auto Outlet, correct?
21      A   No.
22      MS. TROY:  We are going to strike any
23  irrelevant questions and answers after the
24  deposition.
25      MR. KATAEV:  Feel free to make that motion

75

L. Stidhum
1
2  whenever you're ready, but don't do it during
3  the deposition.
4  BY MR. KATAEV:
5      Q   You never had any relationship with Andris
6  Guzman outside of work, correct?
7      A   Absolutely not.
8      Q   The compensation rate that you had, other
9  than the 5 percent bonus after Jay left, remained
10  the same, correct?
11      A   I'm sorry, what was that?
12      Q   The compensation structure that you
13  outlined to me, other than the 5 percent bonus going
14  away after Jay left, remained the same, correct?
15      A   Yes.
16      Q   You sold a car, you got an extra $150,
17  correct?
18      A   Yes.
19      Q   That bonus was not discretionary, correct?
20      A   No.  It took me months to get it.
21      MS. TROY:  I don't think she understood
22  your question honestly.
23      Q   When you say it took you months to get it,
24  what did you mean?
25      A   It took me months to get a bonus in

76

L. Stidhum
1
2  general.
3      Q   Right.  The 5 percent type of bonus,
4  right?
5      A   No.  That wasn't a bonus.  That was
6  something promised upon being hired.  The bonus was
7  something that came of the blue because I was, like,
8  at 20 cars in the middle of the month and he was
9  like, If you hit 30, I will give you an extra
10  thousand.
11      Q   When you say it took you months to get it,
12  you mean it was only offered to you after working
13  months at the dealership?
14      A   Correct.
15      Q   Your duties remained the same from May of
16  '18 until January of '19, correct?
17      A   Yes.
18      Q   Your pay remained the same except for the
19  5 percent issue from May of '18 to January of '19,
20  correct?
21      MS. TROY:  Objection.  Asked and answered.
22  She may answer again.
23      A   Yes.
24      Q   The 5 percent change occurred prior to
25  your pregnancy, correct?

19  (Pages 73 to 76)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

77

L. Stidhum
1
2     A   Yes.
3     Q   Your position remained the same from May
4  of '18 until January of '19, correct?
5        MS. TROY:  Objection to form.  Asked and
6     answered twice, but she may answer again.
7     A   Yes.
8     Q   Were you ever disciplined at Hillside Auto
9  Outlet for any work-related issue?
10    A   No, not that I recall.
11    Q   Were you ever suspended from work?
12    A   No, I was not.
13    Q   Did you ever receive a performance
14 evaluation?
15    A   No.
16    Q   What was the most number of cars that you
17 sold in a given week?
18    A   I want to say like seven to -- honestly, I
19 don't recall but the records will show exactly, but
20 I know it was definitely more than seven.
21    Q   In your understanding, were you in any way
22 the top salesperson at the dealership?
23    A   I was.
24    Q   At all times?
25    A   Yes, up until December of 2018.

78

L. Stidhum
1
2     Q   When Andris started making you wait longer
3  in December of '18, did you confront him about it?
4     A   Yes, I did.  I did ask him why is he
5  making my customers wait longer.  I would constantly
6  press the issue of, What's going on with this
7  customer, or he would constantly tell me, You have
8  to wait, you have to wait, there's other people
9  here, and I'm like, it wasn't like this.  These
10 people are getting antsy and it happened on multiple
11 occasions that I would have these conversations with
12 him.
13    Q   He never said anything to you about your
14 pregnancy during those conversations, correct?
15    A   I mean, not that I can recall.  What is
16 there to say?
17    Q   To your knowledge, is Andris Guzman
18 married?
19    A   I have no idea.
20    Q   To your knowledge, does Andris Guzman have
21 children?
22    A   No clue.
23    Q   What basis do you have to believe that
24 Andris Guzman made you wait longer solely because of
25 your pregnancy?

79

L. Stidhum
1
2     A   It happened only right after I announced
3  my pregnancy, that would be the first reason why,
4  and not to mention, like I said before, he was my
5  point of contact once Jay was fired so I can tell
6  the difference in, you know, from that time and
7  after I announced my pregnancy.
8        It wasn't -- I had customers waiting
9  so long after Jay quit.  From that time after my
10 pregnancy, I know it's clear as day that that's what
11 was going on.  I was a top saleswoman at a point and
12 I went from being the top salesperson to being the
13 one with the least cars out.  It doesn't add up.
14    Q   Isn't it true that December is a slow time
15 of the month for selling cars because it's cold out?
16    A   I wouldn't say because it's cold out.  I
17 honestly believe we sold a lot of cars, anywhere
18 between 45 to 60 cars a month.  Sometimes even
19 exceeded 65 cars, so it's kind of hard to say
20 because if I'm not mistaken, yes, November we sold
21 the most cars but the month prior to that we
22 probably sold the same amount of cars in that store
23 as December.
24    Q   How would you know or keep track of the
25 number of cars sold in total through the dealership?

80

L. Stidhum
1
2     A   We had a board in Serge's office that we
3  would keep track of how many sales everybody had.
4  So each salesperson's name would be up there and we
5  would put like a tally mark and keep track of all
6  the sales.  I always wanted to make sure I was
7  number one so I would always be the one keeping
8  track of that board.
9     Q   It's true, isn't it, that prior to your
10 pregnancy, Andris Guzman would frequently keep
11 customers waiting longer than necessary, correct?
12    A   I don't believe that to be correct.  Isaac
13 was every involved and it felt like it was something
14 he did once he saw that Isaac wasn't looking over.
15 He would always be very active in our daily routine.
16 He would ask us, What's going on with this customer,
17 greet the customers and do things like that.  I
18 can't say that that's entirely true, no.
19    Q   I will place up on the screen what will be
20 marked as Defendant's Exhibit 2.  I will represent
21 to you, Ms. Stidhum, that this is the complaint that
22 was filed in this case.  I'm going to scroll up to
23 show the header of page six for your esteemed
24 counsel's edification.
25 (Defendant's Exhibit B, Marked for Identification.)

20  (Pages 77 to 80)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

81

L. Stidhum

1  BY MR. KATAEV:
2
3      Q   I want to focus your attention on the
4  following paragraphs.
5      A   Can I review the entirety of the document
6  before answering anything?
7      Q   You know what, we can take a break for you
8  to do it.  Your esteemed lawyer has a copy of the
9  complaint, I'm sure.  So we are going to take a
10  quick break.  It's 11:14.  We will get back on at
11  11:30.
12     A   Okay.
13     Q   That way you will be ready to answer any
14  questions.  I will tell you that my questions, for
15  the record, are solely at this point related to
16  paragraphs 35 through 38, okay?
17     A   All right.
18     Q   I will leave it up on the screen for you.
19        MR. KATAEV:  We are going to take a break.
20  Off the record.  Back at 11:30.
21  (Whereupon, an off-the-record discussion was held.)
22  BY MR. KATAEV:
23     Q   Back on the record.  Ms. Stidhum, welcome
24  back.  I want to ask you before we get back into the
25  questions, during the break, did you have an

82

L. Stidhum

1
2  opportunity to review the complaint in full?
3      A   Not in full.  I skimmed through it.
4      Q   During this break and the break before
5  that, without divulging any of the actual
6  conversations you had, did you discuss your
7  testimony with your counsel?
8      A   No.
9      Q   Okay.  My question was:  Isn't it true
10  that even prior to the time that you disclosed your
11  pregnancy, Andris Guzman would take a long time with
12  prefilling financing applications for customers?
13     A   So yes, that is partially true, that's why
14  I said that before.  He was just getting into Jay's
15  role at the dealership so he was still kind learning
16  the ropes so that's why Isaac saw I was pretty fast
17  with the computer.  He sat down with me in his
18  office and showed me how to run credit.
19        You're transferring information from
20  paper to the computer, so he did give me my access
21  at that point, but of course over time, we are
22  talking four months later that we went back to this.
23  Of course over time, Guzman learned how to navigate
24  through it a little quicker but at the time I
25  announced my pregnancy, it doesn't make sense why he

83

L. Stidhum

1
2  would backtrack, if you get what I'm saying.
3      Q   I understand that.  That's a fair
4  explanation.  It's true, is it not, that throughout
5  the time once Guzman learned how to do everything
6  properly, he generally would take 20 minutes to
7  handle these applications?
8      A   More or less.
9      Q   Your complaint is that after you disclosed
10  your pregnancy, it would take anywhere from 40 to 60
11  minutes, correct?
12     A   Right or longer.
13     Q   You allege in your complaint that as a
14  result of the longer wait times that we just
15  discussed, most of your customers would walk out and
16  not complete their purchase, correct?
17     A   Yes.
18     Q   How do you know that it's because of the
19  wait times that they decided to walk out?
20     A   Generally, we are the ones who would go
21  back to them and tell them, You don't qualify, or
22  You need X amount of dollars down or you can't get
23  this car, you would need that car.  It would be a
24  conversation between the sales manager and the
25  salesperson.

84

L. Stidhum

1
2         They wouldn't really want to jump
3  into the deal unless they had to, so it's like, I
4  wouldn't get to speak to my sales manager or if I'm
5  like, Hey, hold on, my sales manager got something,
6  at this point, they are frustrated, they are walking
7  out the door.
8      Q   Did any customers actually tell you, We
9  don't want to purchase anything from you because it
10  took you to long to get back to us?
11     A   Yes, it happened a couple of times.
12     Q   Do you remember the names of any of those
13  individuals?
14     A   I don't.  I have gone through hundreds,
15  maybe thousands of customers, I don't.
16     Q   Are you familiar with the lead management
17  system at the dealership?
18     A   Lead management system?  The CRM that was
19  used?
20     Q   CRM meaning customer relationship
21  management, right?
22     A   Yes.
23     Q   You're familiar with that program?
24     A   Yes.
25     Q   That program is used to track every single

21  (Pages 81 to 84)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

85

L. Stidhum
1
2 potential customer that comes in and whether or not
3 it results in a sale, correct?
4     A  Not necessarily correct.  The business
5 development center would focus on their appointments
6 because that's what they're paid on.  They are not
7 paid on walk-in customers, so any walk-in customers
8 are not all accounted for.  I can't say that's
9 completely true.
10     Q  How many walk-in customers in a month do
11 you think come in that are not accounted for?
12     A  Honestly, Saturdays or the weekend were
13 our busiest time because we on a main strip,
14 Hillside has a bunch of dealerships.  I would say
15 it's like a 40/60 or 50/50 because that weekend
16 volume is equivalent to the whole week's worth of
17 volume.  I can't really say how many customers.
18         It was almost equal because of where
19 we were.  Location is everything in this business.
20 We had dealerships in front of us, beside us, down
21 the street from us.  We would have customers leaving
22 one spot to come to us that didn't have an
23 appointment.  I can't put a number on it.
24     Q  Your testimony today is that walk-ins were
25 not accounted for in the CRM system?

86

L. Stidhum
1
2     A  Not every single one.  Sometimes they
3 would log them in, sometimes I would not see them
4 logged in.
5     Q  What be the reason for not logging someone
6 in versus logging them in?
7     A  I can't say.  I didn't work in that
8 department.  I would say it's laziness.
9     Q  Are you speaking from your subsequent
10 experience as a BDC manager?
11     A  Yes.
12     Q  Paragraph 53 of the complaint, you said in
13 December and January of '18 and '19, you would
14 constantly call Guzman to ask how long customers
15 would wait; do you see that?
16     A  Yes.
17     Q  When you say call, do you mean physically
18 with the cellphone?
19     A  No.  I mean call over to him.  He was at a
20 podium.  Our desks were diagonal from each other.
21     Q  What would happen when you would ask
22 Guzman how long?
23     A  He would tell me I would have to wait,
24 that there are other customers here.
25     Q  Did you observe at the same time that this

87

L. Stidhum
1
2 was happening that Andris Guzman would help a
3 different salespeople out and provide information?
4     A  Yes.  There was multiple occasions where I
5 would see that a customer came in after my customer
6 and he still hasn't touched the application or the
7 folder was still sitting up top.
8     Q  With which salespeople did that occur with
9 that you can recall?
10     A  It happened with Sean because me and Sean
11 were kind of, I wouldn't say on the same level.  He
12 was a little bit of my competition at a point.  And
13 David Parsons, and David Manrique also witnessed it
14 because he was selling more cars than me, and he was
15 kind of not the best salesperson, I would say.  He
16 was always second-to-last or last.  It was something
17 that everybody kind of witnessed.
18     Q  During this time, Isaac was out on a
19 month-long vacation?
20     A  Correct.
21     Q  That's the reason why you couldn't go to
22 Isaac to assist you with certain applications,
23 correct?
24     A  Yes.
25     Q  Did you attempt to go to Serge to run

88

L. Stidhum
1
2 applications instead of with Andris Guzman?
3     A  Yes, I did.  It's -- kind of plays each
4 other hand in hand because Guzman's job was to run
5 the credit and if Serge was overwhelmed, he would
6 submit the application.  So whatever credit that
7 Guzman did run was already at Serge, and he's like,
8 I'm busy, I can't do this right now, you have to
9 give it to Guzman, you have to wait on Guzman, so
10 that's what I had to do.
11     Q  Whenever a sale was made, you would
12 receive a commission, correct?
13     A  Yes.
14     Q  To your knowledge, similarly, Serge would
15 also receive a commission, right?
16     A  Yes.
17     Q  To your knowledge, what about Guzman, was
18 he not also entitled to a commission?
19     A  He was.
20     Q  Is it your testimony that Andris Guzman
21 purposely made you wait such that he suffered and
22 didn't get commissions on sales?
23         MS. TROY:  Objection.  Argumentative.
24     Q  You can answer.
25     A  Honestly, it's hard to answer that because

22  (Pages 85 to 88)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

89

1          L. Stidhum
2    it's, like, I can't really understand why he would
3    put himself in that position either because one
4    person wins, we all win.  He didn't really care.  He
5    took on whoever he felt he wanted to take on first.
6        Q   Do you believe that he prioritized other
7    salespeople over yours because he felt that those
8    customers that those salespeople had were more
9    qualified?
10       A   It's hard to answer that question.  There
11   is no way to qualify a customer by looking at them.
12   If he's not running my credit, how is he going to
13   make that argument?
14       Q   Isn't it true that sometimes people who
15   work at dealerships stereotype customers and make
16   assumptions about their creditworthiness by looking
17   at them?
18       A   As being in a sales manager position, I
19   learned that that's not the way to properly manage.
20   I have seen people come in raggedy with 800 credit
21   scores and $10,000 to put down on a car, and some
22   people that dressed flashy and don't have anything
23   or don't even have a piece of credit.  I can't make
24   that argument because, as a sales manager in
25   previous dealerships, I would never do that.

90

1          L. Stidhum
2        Q   You have seen other people make those
3    stereotypes, correct?
4        A   Again, I can't really say yes or no.
5        Q   Fair enough.  You spoke with Isaac when he
6    returned from vacation in January of '19?
7        A   Yes.
8        Q   What was your conversation with him?  What
9    did you say to him and what did he say to you?
10       A   I told him what was going on.  I showed
11   him the amounts of cars I have out and he didn't
12   really understand what was going on either.  And I
13   was promised that when he would return that I was
14   going to be promoted to sales manager, so I was
15   trying to hang in there.
16           So when he came, I did ask him, I was
17   like, Look, if you have no desire promoting me as
18   sales manager, then I don't really feel that I want
19   to work here anymore unless you're going to give me
20   more of my commission and not put me as a sales
21   manager, and he kind of didn't have any answer for
22   it, he said we would talk about it later.
23           At that point, I was tired of being
24   given the runaround and not making money.  As a
25   pregnant woman and being 19 years old, it's hard to

91

1          L. Stidhum
2    be put in that position and not be scared.  Like, I
3    was 19 years old having my first kid and I'm getting
4    played at this place I thought I was going to grow
5    with.  I can't really -- it didn't make sense for me
6    to stay there any longer at that point.
7        Q   To your knowledge, is Andris Guzman still
8    employed at this dealership?
9        A   I have no idea.  I don't speak to them.
10       Q   To clarify, your testimony as to the basis
11   for your belief that Andris Guzman made you wait
12   longer solely because of your pregnancy was just
13   because it happened that you waited longer after you
14   disclosed your pregnancy than before, correct?
15       A   I'm sorry, one more time.
16           MR. KATAEV:  Read it back, please.
17       (Whereupon, the referred to question was read back
18               by the reporter.)
19           MS. TROY:  Objection to form.
20   BY MR. KATAEV:
21       Q   You can answer.
22       A   That's not correct.  There is more to it.
23   It wasn't just the longer wait period.  He obviously
24   had Isaac's access to Dealertrack as well and he
25   refused to give me the password.  Like, he didn't

92

1          L. Stidhum
2    feel the need to, and not to mention the decrease in
3    my sales played a part in Isaac not wanting to
4    promote me to sales manager as well.  It goes hand
5    in hand as to why I believe it was pregnancy
6    discrimination.
7        Q   You're alleging, as far as I understand,
8    that Andris Guzman was the only person who
9    discriminated against you based on your pregnancy,
10   correct?
11           MS. TROY:  Objection.  Calls for a legal
12   conclusion.
13       A   Not really.  I do believe Isaac kind of
14   discriminated against me as well by not promoting
15   me.  It is what it is at that point, but he did not
16   do anything to fix the issue.  He did not -- the
17   promotion can be taken away from anyone so I can't
18   hold it to that, but I do believe it had something
19   to do with my pregnancy as well because it was
20   something I was promised and was working towards
21   getting.
22           I texted him while he was on
23   vacation.  He responded but told me he would handle
24   it at a later time which I get it, you're on
25   vacation with your family.

23  (Pages 89 to 92)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

93

L. Stidhum

1
2  Q   With respect to the promotion, when was
3  the first time that was a discussion?
4      A   It was sometime in November.  We were
5  talking about it because he was preparing for us for
6  his vacation for a month.  He was kind of the dad of
7  the dealership so he was watching over everything,
8  he made sure everything stayed afloat.
9          It was definitely sometime in
10  November and he told me when he got back, we would
11  discuss it and go over what exactly was going to
12  happen at that point, but this is way before the
13  pregnancy discrimination and everything.
14  Q   This is before the pregnancy announcement?
15      A   Right.
16  Q   Who was the sales manager at that time?
17      A   It was -- at that time, it was kind of
18  weird because Guzman was the sales manager slash
19  finance or whatever, he was kind of doing both.
20  It's a hard question to answer because then he
21  brought in Ali while he was gone.  It was just a
22  mess.  I can't really answer that question
23  truthfully.  It was Guzman and Ali for a short
24  period of time.
25  Q   And so the discussion was that when Isaac

94

L. Stidhum

1
2  returned in January of '19, there would be
3  discussion about who is going to fill the role of
4  sales manager, correct?
5      A   Pretty much.
6  Q   Was the discussion that you would
7  definitely become sales manager?
8      A   Yes.  It wasn't a discussion of who would
9  fill the role.  It was him telling me he was going
10  to make me the sales manager and that was pretty
11  much his purpose of showing me how to run credit and
12  read credit because he was the one that told me how
13  to do both.  It's a whole bunch of numbers and
14  lines.  It's not something that you can understand.
15  Q   When Isaac returned in January of '19,
16  what was the next discussion had about the sales
17  manager position?
18      A   I told him if he had no desire to promote
19  me, then I wanted a raise or I would leave because I
20  was offered that position by Ali making double the
21  commission.
22  Q   What did he say in response?
23      A   I don't recall.  I remember him saying we
24  will talk about more at a later time.  I was fed up
25  at that point because how much more time do you want

95

L. Stidhum

1
2  me to waste not making money.
3  Q   The truth is you didn't wait for a
4  decision, correct?
5      A   It felt like his answer was kind of clear
6  as day.  If he wanted to give me that position, he
7  would have given it to me at that point.
8  Q   He didn't expressly tell you, I'm not
9  giving you the position, correct?
10      A   I don't recall.
11  MR. KATAEV:  Off the record.
12  (Whereupon, an off-the-record discussion was held.)
13  BY MR. KATAEV:
14  Q   We are going to continue.
15          Andris Guzman did not have any
16  authority to discipline you in any way, correct?
17      A   Not that I know of.
18  Q   Andris Guzman did not have the power to
19  fire you, correct?
20      A   Not that I know of.
21  Q   Andris Guzman did not have the power to
22  change your pay, correct?
23      A   No.
24  Q   Andris Guzman did not have the power to
25  change the terms and conditions of your employment,

96

L. Stidhum

1
2  correct?
3      A   No.
4  Q   Okay.  Did you ever tell Andris Guzman, I
5  think you're doing this because I'm pregnant?
6      A   I want to say yes, if I'm remembering
7  correctly.  I do believe I made that statement, yes.
8  Q   What was his response?
9      A   Honestly, he was a very unemotional
10  person.  Like, he would look at you with blank eyes.
11  I don't believe I got any response out of him.
12  Q   That's the way he was towards everybody,
13  correct?
14      A   Yes, for the most part.
15  Q   Was anyone else present when you
16  confronted him?
17      A   I don't recall.
18  Q   Did you confront him at the podium?
19      A   Most likely.
20  Q   Did you complain to Isaac that you felt
21  that the actions being taken against you were
22  because of your pregnancy?
23      A   I'm not sure if I used the words to my
24  pregnancy, but I told him that ever since I
25  announced it, that this -- XY and Z has been

24  (Pages 93 to 96)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

97

L. Stidhum

1  happening.
2  Q  What was his response?
3  A  Honestly, I don't remember.  I feel like
4  it was more of, We will talk when I get back, and no
5  talk happened.
6  Q  What about the fact that you had to wait
7  longer for applications to be done makes you believe
8  it was discriminatory?
9  A  I'm sorry, one more time.
10  Q  What about the fact that you had to wait
11  longer for certain customer applications made you
12  believe it was discriminatory?
13  A  Like I said before, I worked with him for
14  months now and I have seen, you know, his growth in
15  the business, I have seen when he was not very good
16  and very, very slow.  Like, I watched him grow in
17  the business so for him to backtrack after my
18  announcement it doesn't really make any sense.
19  Q  Did anyone at Hillside Auto Outlet make
20  any statements to you that you believe suggest
21  discrimination?
22  A  Yes.  Ali and David and actually, I did
23  have somebody working there at the time who was a
24  friend of mine who would always try to calm me down
25

98

L. Stidhum

1  when I would get upset or cry about the situation.
2  And she was like, Yeah, ever since this happened and
3  ever since you announced your pregnancy, this has
4  been going on.
5  Q  What is that person's name?
6  A  Brianna.
7  Q  What did Ali say to you that made you
8  believe it was a suggestion of discrimination?
9  A  He was kind of telling me about this
10  position he was offering so I didn't have to deal
11  with this.
12  Q  Other than that, anything else?
13  A  Not that I can recall.  It was more him
14  telling me that I wouldn't have to deal with these
15  types of things.
16  Q  What about David Manrique?
17  A  He told me that it's clear, because I
18  mean, his numbers were where my numbers usually were
19  so it's clear what was going on.  He actually
20  thought that it may be a strategy to get me out
21  sooner because they knew I would not be able to work
22  at a certain point.
23  Q  Why do you believe the dealership cared
24  that you wouldn't be able to work at a certain
25

99

L. Stidhum

1  point?
2  A  I was bringing in the most numbers.  We
3  hit milestones that they never hit before me working
4  there.  They sold more cars than they sold prior to
5  me working there.
6  Q  As a business, wouldn't the dealership
7  want to maximize the amount of sales before you
8  left?
9  MS. TROY:  Objection.  Argumentative.
10  Q  You can answer.
11  MS. TROY:  Rephrase your question.
12  Q  I'm not rephrasing.  You can answer.
13  A  One more time.
14  MR. KATAEV:  Read it back.
15  (Whereupon, the referred to question was read back
16  by the reporter.)
17  A  Of course.  I would believe that too but
18  again, it's not something that was done by the whole
19  dealership.  It was something done by an individual,
20  so I mean, it was more of a personal thing against
21  me while being pregnant.
22  Q  And personal on whose part, Andris
23  Guzman's, right?
24  A  Right, and also not to mention there was
25

100

L. Stidhum

1  somebody who was working there that was pregnant in
2  the DMV department and she was pregnant and she was
3  probably there not even a week after -- let me
4  rephrase that.
5  She left maybe a week or even sooner
6  than a week of me working there, after me working
7  there, and I remember her storming out upset, so I
8  have reason to believe this might be a strategy used
9  to get out pregnant women.
10  Q  What was that employee's name?
11  A  Lily.  I don't remember her last name.
12  Q  What about Brianna, did she make any
13  statements that you believe suggested
14  discrimination?
15  A  Brianna was more a comforting friend,
16  like, I think this is going on because you're
17  pregnant.  Maybe they want to get somebody else in
18  to fill your place and stuff like that.
19  Q  You realize that one you gave birth and
20  went out on leave, the dealership would hire a
21  salesperson to take your place during that time?
22  A  Of course.  That's why it doesn't make
23  sense to me why things would go this way.
24  Q  You're saying that Andris Guzman was
25

25 (Pages 97 to 100)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

101

L. Stidhum
1
2   behind all of this?
3       A   Yes, and partially Isaac as well.
4       Q   Are there any documents that you believe
5   suggest discrimination?
6       A   I mean, it's more verbal so I can't say
7   documents besides my paystub that show the decrease
8   in pay of four to $500 a week.
9       Q   Any other documents?
10      A   Not that I can think of.
11      Q   Why do you believe the paystubs suggest
12  discrimination?
13      A   It shows a drastic decrease in my pay.
14      Q   You're saying that your paystubs show
15  consistent amounts and they don't fluctuate up and
16  down?
17      A   Not necessarily consistent, that's not
18  what I said.  It's within those timeframes I did --
19  my pay did drop.  Of course the first couple of
20  months I was still getting the hang of things and
21  learning the ropes.  In between that time, I was
22  capitalizing at being a salesperson.  It was most
23  money I ever made at that time.
24      Q   We are going to get into the paystubs.
25          Was there any other event or

102

L. Stidhum
1
2   circumstance that you believe was discriminatory?
3       A   There was more than one instance where I
4   had to say something to Guzman about my customers'
5   waiting and stuff like that.  This is years ago, so
6   I can't say word for word.
7       Q   I understand.  Other than what you
8   testified about so far, can you identify all the
9   other times that you claim you were discriminated
10  against?
11          MS. TROY:  Excuse me, sorry.
12          MR. KATAEV:  Read it back, please.
13      (Whereupon, the referred to question was read back
14          by the reporter.)
15      A   Again, it wasn't something -- it was more
16  work-related than anything.  The longer wait times
17  is not something that I can pinpoint.
18      Q   Is it fair to say that the complaint lists
19  all instances of discrimination against you?
20      A   No.
21      Q   Same question with respect to your
22  interrogatory responses?
23      A   I'm sorry.
24      Q   Fair to say that your interrogatory
25  responses list all instances of discrimination

103

L. Stidhum
1
2   against you?
3       A   No, because I mean, it's a general period
4   so I can't say that everything is written there.
5       Q   Do you believe that you were treated less
6   favorably than other employees?
7       A   At that point, yes.
8       Q   That's even though you were given special
9   access to Dealertrack that no other salesperson was?
10          MS. TROY:  Objection.  Argumentative.
11      Q   You can answer.
12      A   Repeat the question.
13      (Whereupon, the referred to question was read back
14          by the reporter.)
15      A   So I mean, of course up until my
16  announcement, yes.  It's not just that Dealertrack
17  was taken away.  It was the decrease in my pay.
18          MR. KATAEV:  Let the record reflect that
19  every time Plaintiff's counsel has objected, I
20  observe a lot of glances towards the screen and
21  other indications that there is something going
22  on.
23          MS. TROY:  Objection to that whole line.
24          MR. KATAEV:  If it's found that
25  Plaintiff's counsel is coaching the witness by

104

L. Stidhum
1
2   typing instructions or answers on the screen
3   during the deposition, an appropriate motion
4   will be made to sanction Plaintiff and her
5   counsel.  I'm warning you if that's what you're
6   doing, please stop.  I will obtain the forensic
7   evidence to prove it.
8           MS. TROY:  I'm going to object to that
9   whole line of instruction.  Completely
10  inappropriate.
11          MR. KATAEV:  I will be making an
12  appropriate application for forensic evidence.
13  The judge will not be pleased by what is found
14  on that computer because nothing you delete
15  from there is actually deleted.  I'm just
16  letting you know.
17          MS. TROY:  Again, I object to that whole
18  line.
19          MR. KATAEV:  Okay.
20          My client has observed this multiple
21  times and has noted it in notes to me, and I have
22  observed it myself just now.  I'm warning you,
23  Counsel, if you're typing notes to her on the
24  screen, stop doing that.  It's not allowed.
25          MS. TROY:  I'm not doing that.

26  (Pages 101 to 104)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

105

L. Stidhum
1       MR. KATAEV:  Good.
2               Read back the last question.
3       (Whereupon, the referred to question was read back
4               by the reporter.)
5    BY MR. KATAEV:
6       Q   You admit, however, that when you were
7    provided access to Dealertrack you were the only
8    salesperson that was provided that, correct?
9       A   Yes.
10      Q   In that regard, you were treated more
11   favorably, correct?
12      A   Right.
13      Q   Can you identify any other ways in which
14   you were treated more favorably at the dealership
15   while you worked there?
16      A   I mean, I guess the fact of me getting the
17   $1,000 bonus and no one received any bonus.
18      Q   Can you identify all the employees that
19   you believe were treated more favorably than you?
20      A   I mean, are we speaking after my
21   announcement or prior to my announcement?
22      Q   After the announcement.
23      A   After the announcement, I can't really say
24   anybody was treated more favorably.  I can say that

106

L. Stidhum
1    they were taken -- their customers were taken or
2    tended to a little more promptly.  I can't say
3    favorably because still nobody did get Dealertrack
4    access or bonuses or anything like that.
5       Q   With respect to that answer, that's solely
6    in relation to Andris Guzman processing the
7    financing application, correct?
8       A   Right.
9       Q   It's not the case with Serge, after
10   disclosing your pregnancy, Serge processed all the
11   applications whether it came from you or someone
12   else the same way, correct?
13      A   Pretty much.  He took them as they went.
14      Q   Was there anyone else that took longer to
15   process the financing applications with you than
16   with anyone else?
17      A   No.
18      Q   That's the only way any employee was
19   treated more favorably than you, correct?
20      A   Yes.
21      Q   What is your understanding as to why all
22   the other employees were being treated more
23   favorably than you?
24      A   Again, I didn't say I was being treated

107

L. Stidhum
1    favorably.  I said that he would take them or tend
2    to them more promptly.
3       Q   Why do you believe he did that?
4       A   Again, because I don't know if it had
5    something to do personal or if it was with my
6    pregnancy.  It's not something that I can really
7    answer.  I don't know why he would do that.  If one
8    of us makes a sale, we all get a commission.  It's
9    not something I can really understand either.  I
10   don't know if he wanted me out of the store because
11   I pregnant.  I don't know.
12      Q   Fair enough.  Do you know the educational
13   background of Andris Guzman?
14      A   No.  I don't know anything personal.
15      Q   Do you know Andris Guzman's work
16   experience with dealerships?
17      A   No, I do not.
18      Q   Do you know if he had any work experience
19   working for any other dealership?
20      A   I remember being told he worked at Major
21   World or something.  That's about it.
22      Q   Do you have any knowledge about Hillside
23   Auto Outlet's policy against discrimination?
24      A   No.

108

L. Stidhum
1       Q   Did you ever sign any document
2    acknowledging receipt of a policy against
3    discrimination?
4       A   I believe so.  We had an employee packet.
5    I'm pretty sure it was in there somewhere that I
6    didn't really see.
7       Q   Do you still have a copy of it?
8       A   No, we weren't given a copy of it.
9       Q   Fair to say that when you had a
10   conversation with Isaac about the fact that you felt
11   your pregnancy was playing a role in what was going
12   on, you never really followed up and you decided to
13   quit, correct?
14      MS. TROY:  Objection to form.
15      Q   You can answer.
16      A   The question one more time.
17   (Whereupon, the referred to question was read back
18              by the reporter.)
19      A   I mean, at that point I wouldn't think I
20   had to follow up with something when somebody tells
21   me, We are going to speak about this later or, Come
22   Monday, we are going to have a conversation.  It
23   wasn't something I felt the need to follow up on.
24   No, I did not follow up with it.  I only asked later

27  (Pages 105 to 108)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

109

L. Stidhum
1
2  on about my commission I was owed on cars that I did
3  not get paid on.
4      Q  Understood.  Your complaint alleges that
5  you were discriminated against on the basis of your
6  sex or gender, correct?
7          MS. TROY:  Objection.  She can answer if
8      she understand.
9      A  Yes, I don't get it.
10     Q  In your complaint, you say you were
11 discriminated against, right?
12     A  Yes.
13     Q  What is the basis upon which you're saying
14 you were discriminated against, on what grounds?
15     A  My pregnancy.
16     Q  Are you also saying you were discriminated
17 against because of your sex or gender?
18     A  I mean, doesn't that play hand in hand
19 that only women can get pregnant?
20     Q  I'm asking you:  Is that reason why you're
21 saying you were discriminated against?
22         MS. TROY:  Objection.  She can answer.
23     A  I guess.
24     Q  Are you also alleging that you were
25 discriminated against based on disability?

110

L. Stidhum
1
2      A  I don't think being pregnant is a
3  disability, is it?
4          MS. TROY:  Objection.  Also calls for
5      legal conclusion.
6      Q  I can't answer your question, Ms. Stidhum,
7  but I will take the answer from what you provided,
8  okay?
9      A  Okay.
10     Q  Do you claim that you were discriminated
11 against on any other basis?
12     A  No.
13     Q  At the time you left, with respect to your
14 pregnancy, were you showing?
15     A  No.  I was not even three months, I
16 believe.
17     Q  You acknowledge that Andris Guzman was not
18 a decision-maker at the dealership, correct?
19     A  Yes and no.  I mean, he played a part in
20 making decisions at some points.
21     Q  The question is how?
22     A  I mean, it was kind of -- it's kind of
23 hard to say.  It was a team effort.  It would be
24 something that was a conversation between whoever it
25 was between, whether it was just management, he

111

L. Stidhum
1
2  would definitely be involved in those decisions.
3  For the most part, yes, Isaac was the one who made
4  decisions.
5      Q  In your complaint, you seek damages of an
6  amount over two million dollars, right?
7      A  Yes.
8          MS. TROY:  Objection.
9      Q  You're generally seeking over two million
10 dollars for this case, correct?
11     A  Yes.
12     Q  What is the basis for you seeking those
13 damages?
14     A  I'm not sure.  That's something to discuss
15 with my attorney.
16     Q  Can you describe any injuries that you
17 sustained as a result of any unlawful
18 discrimination?
19     A  I mean, besides being depressed, upset,
20 stressed, scared even because I mean -- this is
21 something that Isaac told me that stuck with me when
22 I told him I was leaving.  He told me the grass
23 wasn't always greener on the other side.  For the
24 first couple of months it wasn't and I was
25 definitely scared.  Those are some of the feelings I

112

L. Stidhum
1
2  felt.
3      Q  Other than being depressed, upset,
4  stressed and scared, did you suffer any other
5  emotional injuries as a result of any
6  discrimination?
7      A  No, not that I can think of.
8      Q  Would you say you suffered any
9  psychological injuries as a result of the alleged
10 discrimination?
11     A  I'm not sure, but I did experience a lot
12 of anxiety.  I don't want to say one hundred percent
13 it was from this.  It could have been a combination
14 of being pregnant and worried, but I did suffer from
15 a lot of anxiety.
16     Q  Did you suffer any physical injuries as a
17 result of the alleged discrimination?
18     A  No.
19     Q  For the emotional injuries that we had
20 just discussed, what were your symptoms, if any?
21     A  I'm sorry?
22     Q  What were your symptoms, if any, for the
23 emotional injuries we just discussed?
24     A  The same ones; stress, depressed, scared.
25     Q  Did you seek any medical treatment or

28  (Pages 109 to 112)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

113

```
 1                 L. Stidhum
 2    other healthcare for any of these injuries?
 3        A   No.
 4        Q   Were you ever hospitalized for these
 5    injuries?
 6        A   No.
 7        Q   Did you ever take any medication for any
 8    of these injuries?
 9        A   Being pregnant I can't so, no.
10        Q   How are you now?
11           MS. TROY:  Objection.  How is this
12    relevant?  She can answer the question.  It's
13    not relevant and it's going against your seven
14    hours.
15           MR. KATAEV:  Just say, Objection,
16    relevance.
17    BY MR. KATAEV:
18        Q   Please answer the question.
19        A   How am I now?
20        Q   Correct.
21        A   What does that mean?
22        Q   How are you now in terms of your emotional
23    state and the injuries you just talked about?
24        A   Based on that it's been years now, of
25    course I have recovered.  It's been years, I got to
```

114

```
 1                 L. Stidhum
 2    experience a lot of great positions.  Everything
 3    happens for good reasons.
 4        Q   Okay.  Is fair to say that whatever the
 5    symptoms or injuries we talked about have now been
 6    resolved?
 7        A   Yes.
 8        Q   None of these symptoms or injuries that we
 9    discussed prevented you from working or seeking
10    work?
11        A   Partially.  Even though I was able to get
12    a job immediately after, it wasn't all peaches and
13    cream in the beginning.  I was very stressed out, I
14    was very worried about what's going to happen and
15    like I said, the grass wasn't greener in the
16    beginning but of course they got better.
17        Q   They got better after a few months?
18        A   Maybe a few months, we will say.
19        Q   What made it better after a couple of
20    months?
21           MS. TROY:  Objection as to form.
22        A   Volume, of course, that was my main thing.
23    This whole thing started from my decrease in pay.  I
24    was stressed out about money, I had bills to pay.
25    The volume of the dealership increased definitely
```

115

```
 1                 L. Stidhum
 2    helped me deal with everything that was going on.
 3        Q   When you refer to volume you mean money,
 4    correct?
 5        A   The volume of customers and cars sold,
 6    yes.
 7        Q   The fact that you made more money
 8    alleviated the emotional injuries, correct?
 9           MS. TROY:  Objection.  Argumentative.  You
10    can answer.
11        A   Yes.  I wouldn't say that making money, it
12    was a weight off my back not having to worry about
13    how I was going to provide for this child I was
14    bringing into this world, yes, but I wouldn't say
15    alleviated everything, no.
16        Q   Do you receive child support?
17        A   No.
18        Q   Have you taken any steps to obtain child
19    support?
20        A   No.
21           MS. TROY:  Objection.  How is that
22    relevant?
23           MR. KATAEV:  It's relevant.
24           MS. TROY:  It's not relevant.
25           MR. KATAEV:  Are you instructing her not
```

116

```
 1                 L. Stidhum
 2    to answer?
 3           MS. TROY:  She may answer.
 4           MR. KATAEV:  Your objection is noted.
 5    BY MR. KATAEV:
 6        Q   What was the answer to have you taken any
 7    steps to obtain child support?
 8           MS. TROY:  She said, No.
 9        A   No.
10        Q   Why is that?
11        A   Because I --
12           MS. TROY:  Objection as to relevance.  She
13    may answer.
14        A   I haven't felt the need to.  My child's
15    father helps.
16        Q   How does your child's father help?
17        A   He does what he has to do for our child.
18        Q   He provides financially for the child,
19    correct?
20        A   Yes.
21        Q   Okay.  I understand now.
22           Prior to you working at Hillside Auto
23    Outlet, have you ever sought any treatment from any
24    mental healthcare professionals?
25        A   No.
```

29 (Pages 113 to 116)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

117

L. Stidhum
1
2    Q   Prior to your working at Hillside Auto
3  Outlet, have you ever experienced any depression,
4  being upset, stressed or being scared or having
5  anxiety?
6    A   No.
7    Q   Do you use any social media websites?
8    A   Yes.
9    Q   Do you use Facebook?
10   A   Not anymore.
11   Q   What about Instagram?
12   A   Yes.
13   Q   What about LinkedIn?
14   A   I have an account but I don't really use
15  it.
16   Q   Twitter?
17   A   No.
18   Q   Snapchat?
19   A   Yes.
20   Q   With respect to these websites, have you
21  ever posted anything about this lawsuit on any of
22  those four websites that you use; Facebook,
23  Instagram, LinkedIn or Twitter?
24   A   I don't want to say no because I might
25  have early on.

118

L. Stidhum
1
2    Q   What is an example of something you may
3  have posted on any of those websites?
4    A   Or maybe I haven't.  Honestly, I'm not
5  sure.
6    Q   Did you ever post anything on Facebook
7  about the fact that you are available to sell
8  someone a car at Hillside Auto Outlet?
9    MS. TROY:  Again, sorry.
10   MR. KATAEV:  Read it back.
11  (Whereupon, the referred to question was read back
12       by the reporter.)
13   A   Are we talking after or prior to me
14  leaving?
15   Q   During the time you worked there.
16   A   Probably.  I would always try to advertise
17  as best I could.
18   Q   After you left, did you ever post anything
19  about your working experience at Hillside Auto on
20  any of those sites?
21   A   I don't believe so.
22   Q   Isn't it true you made a Facebook post
23  about the fact that you're seeking two million
24  dollars against Hillside Auto on Facebook?
25   MS. TROY:  Objection.  Argumentative.  She

119

L. Stidhum
1
2  may answer.
3    A   I don't recall.
4    Q   Isn't it true that you posted something
5  like that and later deleted it?
6    A   Can you give me a timeframe?
7    Q   Some time after you left and filed the
8  original lawsuit?
9    A   Are we talking closer to the time we left
10  or recent?
11   Q   I'm not sure.  Any time after you left?
12   A   I don't recall.
13   Q   One way or the other, correct?
14   MS. TROY:  Sorry?
15   Q   You don't recall one way or the other,
16  correct?
17   A   No.
18   Q   Are you claiming that you're entitled to
19  backpay in this case?
20   MS. TROY:  Objection.  Calls for a legal
21  conclusion.  She can answer if she understands.
22   MR. KATAEV:  Please don't coach the
23  witness with, If she understands.  This is the
24  second time you have done that.
25

120

L. Stidhum
1
2  BY MR. KATAEV:
3    Q   You can answer the question.
4    A   Honestly, I'm not sure.  I don't know if
5  it was recorded, the customers that I knew that I
6  didn't get paid on, I don't remember.  This is going
7  years back now.
8    Q   I'm going to explain what backpay is in
9  order to help you understand the question so you can
10  answer it, okay?
11   A   Uh-huh.
12   Q   Backpay is an amount of money that you
13  would be entitled to if you continued working at
14  Hillside Auto and didn't have to leave.  It is
15  something that you get to claim, but it's subject to
16  mitigation if your new job that you worked at right
17  after you started paid less than what you received
18  at Hillside.
19       With that basic explanation --
20   MS. TROY:  The explanation is incorrect.
21   Q   With that basic explanation and subject to
22  any objection that she puts, are you claiming
23  backpay in this case; yes or no?
24   MS. TROY:  Objection.  The instruction as
25  to backpay is incorrect.  She can answer based

30  (Pages 117 to 120)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

121

L. Stidhum
1
2    on your incorrect definition.
3    BY MR. KATAEV:
4        Q    Subject to that objection, you can answer.
5        A    Honestly, I'm not entirely sure because
6    you did say if I was making less at my next job?
7        Q    Correct.
8        A    I don't understand.
9        Q    After you left Hillside Auto Outlet, you
10   went to work at NYC Motor Cars; yes or no?
11       A    Yes.
12       Q    The money that you made at NYC Motor Cars,
13   at least for the first few months, was less than
14   what you were making at Hillside Auto Outlet,
15   correct?
16       A    Yes.
17       Q    Are you claiming the difference for
18   backpay in this case?
19       A    I'm not sure.
20       Q    Is it true that you made less money at NYC
21   Motor Cars initially than when you worked at
22   Hillside Auto Outlet?
23       A    The first couple of weeks, yes.
24       Q    After the first couple of weeks you made
25   more than you ever made at Hillside Auto Outlet,

122

L. Stidhum
1
2    correct?
3        A    Yes.
4        Q    Did there come a time when you didn't make
5    as much as you made at Hillside Auto Outlet after
6    that?
7        A    I mean, up until Covid.
8        Q    When Covid hit, you weren't making
9    anything for some time, right?
10       A    Right.
11       Q    That was because of Covid?
12       A    Right.
13       Q    After you went back in the workforce after
14   Covid, did you ever make less money than you made at
15   Hillside Auto Outlet again?
16       A    No.  Roughly the same or more.
17       Q    Were there any benefits that you had at
18   Hillside Auto Outlet that you didn't have at any of
19   the subsequent dealerships you worked at?
20       A    No.
21       Q    Had everything worked out with Hillside
22   Auto Outlet and you would have continued working
23   there, how long did you assume you would stay at
24   that job?
25           MS. TROY:  Objection.  Purely

123

L. Stidhum
1
2    hypothetical.
3        Q    You can answer.
4        A    Realistically, prior to Isaac leaving, I
5    was pretty happy so who knows.  I probably would
6    have been there until this day.  I probably would
7    have been a finance manager, who knows.
8        Q    What was the longest time period you ever
9    held any prior job?
10           MS. TROY:  Do you have a timeframe,
11   Counselor?
12       Q    Ever in your whole life?
13       A    I want to say two-and-a-half years.
14       Q    That was with?
15       A    NYC Motor Cars.
16       Q    You're saying two-and-a-half years based
17   on your experience initially at Motor Cars and when
18   you returned?
19       A    Yes.
20       Q    You're combining those, right?
21       A    Yes, right.
22       Q    Sometime when you left your prior
23   employment that we discussed earlier in your
24   testimony, you would explain that you sort of saw
25   the writing on the wall with respect to something

124

L. Stidhum
1
2    and you would leave as a result of that, correct?
3           MS. TROY:  Objection.  Ambiguous.  I have
4    no idea what you're talking about.
5           MR. KATAEV:  Just, Objection and
6    ambiguous.  The rest is superfluous.
7    BY MR. KATAEV:
8        Q    You can answer the question.
9        A    Can you repeat it?
10       Q    You testified before about sometimes you
11   would be leaving a job because you saw the writing
12   on the wall with respect to something.  For example,
13   at Luxury Motor Cars, you saw there was really no
14   business and you left; do you remember that
15   testimony?
16       A    Yes.
17       Q    With respect to Hillside Auto Outlet in
18   January of 2019, did you see any such circumstances?
19           MS. TROY:  Objection to the term, Writing
20   on the wall.
21           MR. KATAEV:  That term is not in this
22   question.
23   BY MR. KATAEV:
24       Q    You can answer the question.
25       A    Again.  It's not -- the question is not

31  (Pages 121 to 124)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

125

L. Stidhum
1
2    clear. Can you rephrase it? I'm sorry.
3        Q   I'll start with an example. In January of
4    2019, prior to making your decision to quit, did you
5    notice, for example, there was less business like
6    you noticed at Luxury Motor Cars?
7        A   No, because there wasn't less business.
8        Q   Using that as an example, were there any
9    other circumstances at that time that led to your
10   decision to quit other than what we already
11   discussed?
12       A   No.
13       Q   It's fair to say that all the jobs you had
14   after you left Hillside Auto Outlet, at those jobs
15   you obtained income, correct?
16       A   Yes.
17       Q   What other income from any other source
18   did you obtain other than from those jobs that we
19   discussed?
20           MS. TROY: Objection. Ambiguous.
21       Q   You can answer.
22       A   Besides that employment, working -- I did
23   start doing -- being a broker but that was very
24   short-lived.
25       Q   Real estate broker?

126

L. Stidhum
1
2        A   No, automobile broker.
3        Q   Did you earn any income as an automobile
4    broker?
5        A   Nothing but a couple of thousand.
6        Q   Why was it short-lived?
7        A   It was during Covid. It was trial and
8    error, definitely error.
9        Q   You decided to stop working in that area?
10       A   Yes. It wasn't paying my bills.
11       Q   Any other source of income?
12           MS. TROY: Can we have one second? I will
13   bring her water.
14           MR. KATAEV: Yes, of course. Off the
15   record.
16   (Whereupon, an off-the-record discussion was held.)
17   BY MR. KATAEV:
18       Q   You testified that you're no longer
19   employed as of right now, correct?
20       A   Yes.
21       Q   That's because of the birth of your second
22   child, correct?
23       A   More or less.
24       Q   Have you made any effort since the birth
25   of your second child to enter back into the

127

L. Stidhum
1
2    workforce?
3        A   I have.
4        Q   What efforts did you make?
5            MS. TROY: Irrelevant. She can answer.
6        A   That was one of the places that I had
7    mentioned. I went to NYC Motor Cars -- I'm sorry,
8    NY Luxury Motors. It didn't work out. They had no
9    business at all, like not a single soul would walk
10   in for weeks at a time.
11       Q   Other than working there and giving that a
12   go, did you work anywhere else?
13       A   Another place I mentioned, Great Neck
14   Motors Sports.
15       Q   No other employers other than those two,
16   right?
17       A   No.
18       Q   Those are places where you worked. What
19   about places were you applied for a job?
20       A   I mean, there is quite a few. Whether or
21   not I would go on the interview is a different story
22   after doing my research about the places. Really
23   the only job offer that I turned down was Audi of
24   Queens, Queens Auto Mall, and I was also offered a
25   position at Baron Auto Emporium.

128

L. Stidhum
1
2        Q   With respect to each of these positions
3    that you were offered, why is it that you were --
4    withdrawn.
5            Why is it that you rejected the offer
6    of employment? Let's start with Audi of Queens.
7        A   It was going to be definitely a different
8    change of environment. New car stores is a lot
9    tougher. I sat there for a couple of hours and I
10   didn't see anybody come in. Coming from places that
11   have walk in traffic, that's alarming to me.
12           You spoke about those certifications.
13   There was going to be a whole lot of certifications
14   so I wouldn't have got to sell a car for a month or
15   two months until I completed those certifications.
16   In those luxury high-end stores, you have to
17   complete everything before you grab your first
18   customer. That's the reason I didn't take that job.
19           Queens Auto Mall didn't offer enough
20   money. I went in there for a BDC manager position
21   and the pay was super low, so I wasn't going to do
22   that. Baron Auto Emporium, I was in fear that I was
23   going to lose my job because it had the name Baron
24   in it. I don't know who the owners are. I was
25   offered the position multiple times and declined

The Little Reporting Company
646.650.5055 | www.littlereporting.com

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

129

L. Stidhum
1
2    because I didn't want to get fired later on.
3        Q    Who offered you the position at Baron?
4        A    I want to say Freddie, the GM.  David was
5    the one who told me about Freddie, they were
6    friends.  Prior to him telling me about it, I had
7    already went on the interview and he offered me the
8    position two or three times.  I just didn't want to
9    deal with having to get fired for any reason because
10   that did happen to David in the past.
11       Q    Where did that happen to David?
12       A    When he was working at North Shore Motors.
13   They ending up firing him after finding out about
14   this case.
15       Q    How do you know that?
16       A    That's what he told me.
17       Q    Do you know how he knows that?
18       A    Honestly, I didn't bother to ask.
19       Q    When was the last time you spoke to David?
20       A    Probably a couple of weeks ago.
21       Q    What is the nature of your relationship
22   with him?
23       A    We are -- I wouldn't say we are close, but
24   we are friends.
25       Q    Other than Audi of Queens, Queens Auto

130

L. Stidhum
1
2    Mall and Baron Auto Emporium did you submit your
3    resume or job applications for any other positions
4    elsewhere?
5        A    Yes.  A ton of places.
6        Q    Is there a centralized location from which
7    you did that on the internet or elsewhere?
8        A    Indeed.
9        Q    Is it only Indeed?
10       A    For the most part.  I might have submitted
11   a resume or two off the Craigslist, but pretty much
12   Indeed is the only place.
13       Q    Whenever you submitted something on Indeed
14   or Craigslist, you did that with the same email
15   address, correct?
16       A    More or less.
17       Q    What is the email address that you used
18   for Indeed?
19       A    Lsticia3@Gmail.
20       Q    That's the same email address you used for
21   Craigslist?
22       A    Yes.  I would say so, yes.
23       Q    You never looked into recruiters or
24   anything like that, right?
25       A    I don't think so, no.

131

L. Stidhum
1
2        Q    How much time have you spent on your job
3    search each day since you were ready to return to
4    work following the birth of your second child?
5            MS. TROY:  Objection as to relevance.  She
6        can answer.
7        A    When I get a few minutes, I will look and
8    see if there is anything intriguing.  I'm a numbers
9    person.  If it doesn't make sense, I would rather be
10   home with my children.  I can't put a timeframe on
11   it.
12       Q    How are you supporting yourself while
13   you're unemployed?
14       A    Right now, my mom is currently pretty much
15   supporting me and my kids.
16       Q    What does she do?
17       A    My mom, she sells Auto Trader.
18       Q    Was she involved in the automobile
19   business before you got involved with Hillside Auto
20   Outlet?
21       A    No.
22       Q    What did she do before Auto Trader?
23       A    She worked for Spectrum Communications.
24   She was a territory manager.
25       Q    She no longer works there?

132

L. Stidhum
1
2        A    No.
3        Q    You testified about taking some time off
4    for a vacation in September of 2020.  Do you recall
5    that?
6        A    Of 2020?
7        Q    I believe so.
8            MS. TROY:  Mischaracterizes witness
9        testimony but she can answer.
10       A    Are we talking when I said I went out of
11   the country?
12       Q    Yes.
13       A    That was actually of 2022, not of 2020.  I
14   went out of the country.  I went on a boat, on a
15   cruise to Bermuda.
16       Q    Since September of 2020 until now, have
17   you taken any vacations?
18       A    No.
19       Q    Prior to September of 2022, when did you
20   take your vacation prior to that time?
21           MS. TROY:  Objection as to relevance.  She
22       can answer.
23       A    I went to Florida in August.
24       Q    How long?
25       A    About two weeks.

33 (Pages 129 to 132)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

133

L. Stidhum

1
2     Q   Prior to that?
3     A   I think before that it would have been
4  like 2021.
5     Q   Do you remember what month?
6     A   I went to Puerto Rico in May for Mother's
7  Day.
8     Q   Prior to that?
9     A   Actually, in June of 2021 -- was it 2021?
10  Yes, in June of 2021, I went to California and also
11  in May of 2021, I went to Florida again.
12     Q   In May and June of 2021, you visited
13  Puerto Rico?
14     A   Yes.
15     Q   Florida and California, correct?
16     A   Yes.
17     Q   What part of California was it?
18        MS. TROY:  Objection as to relevance.
19     Where are we going with this?  She can answer.
20  BY MR. KATAEV:
21     Q   Go on.
22     A   We stayed in Los Angeles.
23     Q   Prior to those vacations in May and June
24  of 2021, when was your last vacation?
25        MS. TROY:  Objection as to relevance.  She

134

L. Stidhum

1
2  can answer.
3     A   Honestly, I don't remember.  I know I went
4  on another cruise but I don't remember the
5  timeframe.
6     Q   Did you travel during Covid between March
7  and December of 2020?
8     A   No.
9     Q   There was one other cruise prior to that
10  May or June of 2021 set of vacations.  During any of
11  those vacations, all of them, did you ever do job
12  search activity while on vacations?
13        MS. TROY:  Objection as to relevance.
14     Q   You can answer.
15     A   I don't remember honestly.
16     Q   Were you unavailable to work since the
17  termination of your employment, other than for the
18  birth of your second child?
19     A   One more time.
20     Q   Were you unavailable to work since you
21  left Hillside Auto Outlet, other than due to the
22  birth of your second child?
23     A   No.
24     Q   And first child.
25        Are you currently attending any

135

L. Stidhum

1
2  school or taking any classes?
3     A   No.
4     Q   Have you taken on any training courses or
5  anything like that?
6     A   No.
7     Q   Have you ever been self-employed?
8     A   Yes.
9     Q   Can you explain?
10     A   That's when I was doing the broker thing.
11     Q   Have you ever received any long-term or
12  short-term disability insurance benefits?
13     A   No.
14     Q   Did you apply after you gave birth for
15  short-term disability?
16     A   Is that the same thing as the paid family
17  leave or is that different?
18     Q   It's different, but tell me about that.
19     A   I received a paid family leave after my
20  first child was born.
21     Q   Did you apply for that after your second
22  child was born?
23     A   I did not.
24     Q   When you applied for it the first time,
25  when your first child was born, did you have to

136

L. Stidhum

1
2  provide information about your income?
3     A   That was all done by the dealership, by
4  Luxury Motor Cars.  I'm not sure exactly.  They
5  filled out everything and sent it in.
6     Q   Other than paid family leave, do you
7  recall whether short-term disability benefits were
8  applied for?
9     A   I don't believe so.
10     Q   You received paid family leave for
11  approximately 12 weeks, right?
12     A   I think so.
13     Q   It was a percentage of your actual income
14  at the dealership, correct?
15     A   I believe it was capped at $700.
16     Q   You received the full cap, right?
17     A   Yes.
18     Q   Have you received any Social Security
19  benefits including Social Security disability
20  insurance benefits since your termination?
21     A   No.
22     Q   Have you received any workers' comp.
23  benefits?
24     A   No.
25        MS. TROY:  Asked and answered.

34  (Pages 133 to 136)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

137

L. Stidhum
1
2      MR. KATAEV: No, I didn't ask her if she
3   received benefits. I asked her if she applied
4   for benefits, not if she received benefits.
5  BY MR. KATAEV:
6      Q   You testified that you received
7   unemployment insurance benefits, correct?
8      A   Yes.
9      Q   You only applied for unemployment
10  insurance benefits once, correct?
11      MS. TROY: Timeframe?
12      Q   In your whole life.
13      A   No.
14      Q   With respect to the testimony that you
15  previously provided about applying for unemployment
16  insurance benefits, what employer did you apply for
17  that from after being let go?
18      A   Luxury Motor Club was the first one.
19      Q   Okay.
20      A   Great Neck Motor Sports. I was there
21  while I was pregnant.
22      Q   Were those the only two?
23      A   If I'm not mistaken, yes. Wait, actually,
24  I believe NYC Motor Cars was in there too because
25  that was during the period of Covid. I'm not

138

L. Stidhum
1
2  100 percent sure but it might have been.
3      Q   Understood. Had you received an offer of
4   reinstatement from Hillside Auto Outlet, would you
5   have returned?
6      A   Possibly.
7      Q   Why would you return?
8      MS. TROY: Timeframe, but she can answer
9   the question.
10      A   Read it back.
11  (Whereupon, the referred to question was read back
12      by the reporter.)
13      A   If would all depend on the circumstances,
14  of course. If the offer was presented and it was a
15  decent one, possibly.
16      Q   You are aware that an offer of
17  reinstatement was made, correct?
18      A   When we were at the conference?
19      Q   That's correct.
20      A   Okay. I didn't completely understand the
21  question. I thought you meant at the time being.
22  At this point, yes, I would not accept it, but if it
23  was at the time of everything going on, possibly,
24  yes.
25      Q   You rejected the offer of reinstatement at

139

L. Stidhum
1
2  the conference, correct?
3      A   Yes.
4      Q   The conference that you attended with your
5   counsel, is that the first time you entered a
6   federal courtroom?
7      A   Yes.
8      Q   You testified previously that Ali, David
9   and Brianna made statements to you concerning the
10  alleged discrimination; do you recall that
11  testimony?
12      A   Yes.
13      Q   Other than those three individuals, did
14  you discuss the alleged discrimination with anyone
15  else?
16      A   Um, yes.
17      Q   Who?
18      A   Iris, which is Jay's sister. Are we
19  talking about the dealership or in general?
20      Q   In general anyone.
21      A   Family.
22      Q   Such as who?
23      A   My mother, my grandmother, my children's
24  father.
25      Q   Anyone else?

140

L. Stidhum
1
2      A   Not that I can recall.
3      Q   No one else at the dealership other than
4   Iris and the three people we discussed, right?
5      A   Yes, pretty much.
6      Q   What did you discuss with Iris?
7      A   I would kind of complain about what's
8   going on.
9      Q   Would it be fair to say you were venting
10  to her?
11      A   Yes.
12      MS. TROY: Objection to that
13   characterization.
14      Q   When did that discussion happen; month and
15  year?
16      A   I don't recall. It must have been around
17  December of 2018.
18      Q   Was that discussion held in person, by
19  phone or otherwise?
20      A   At the dealership.
21      Q   At the dealership in person, correct?
22      A   At the dealership in person.
23      Q   What did she say after you complained to
24  her about what happened?
25      A   I don't recall. I wouldn't put any words

35 (Pages 137 to 140)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

141

L. Stidhum
1
2  in anyone's mouth and I don't remember.
3      Q   That's fine.  Do you have any notes or
4  written records about any of the discussions that we
5  just talked about or in general about the alleged
6  discrimination?
7      A   No.
8      Q   Do you keep a journal or diary?
9      A   No.
10     Q   Did you write anything about the alleged
11  discrimination at all?
12     A   No.
13     Q   Did you email or text anyone about the
14  alleged discrimination?
15     A   Not that I kept records of.
16     Q   So you recall sending texts or emails but
17  you didn't keep them?
18     A   Right.
19     Q   When did you dispose of the emails or the
20  texts?
21     A   It wasn't so much as disposing them.  I do
22  get new phones pretty often, I like to have the
23  newest phone.  It probably just got deleted from
24  changing phones or whatever the case may be.  I
25  don't know.

142

L. Stidhum
1
2      Q   When was the last time you replaced your
3  phone?
4      A   Actually this past December.  I got
5  upgraded for Christmas.
6      Q   Someone gave it to you as a gift or you
7  bought it?
8      A   My mother got it for me as a gift.
9      Q   Who do you recall sending text messages or
10  emails to about the alleged discrimination?
11     A   Again, the same three people.  Those were
12  pretty much the only people that I spoke to about
13  the situation in general.
14     Q   Do you have any other notes or writings in
15  any format documenting the alleged discrimination?
16     A   No.
17        MR. KATAEV:  This is a good time for us to
18  stop and take lunch.  We will come back at 1:30
19  and we will start by doing exhibits, and I
20  think -- I'm hoping we will be done by 3:00,
21  but I can't promise.  That's my guesstimate,
22  okay.  I have -- I will have the exhibits
23  mostly up on the screen.
24        MS. TROY:  Whatever that has multiple
25  pages just send it to us, it may be easier so

143

L. Stidhum
1
2  we don't have to waste time.
3        MR. KATAEV:  I will try to work on that.
4  I will put them in the same Dropbox as the
5  settlement production and can you work off that
6  and I send you the link again.
7        MS. TROY:  Fine.
8        MR. KATAEV:  We are off the record.
9
10        (Luncheon recess:  12:58 p.m)
11           ***
12        (Afternoon session: 1:51 p.m.)
13
14  L E T I C I A   F R A N C I N E   S T I D H U M,
15  resumed, having been previously duly sworn, was
16  examined and testified further as follows:
17  EXAMINATION BY
18  MR. KATAEV: (Continued)
19  (Defendant's Exhibit C, Marked for Identification.)
20     Q   Defendant's Exhibit C.  This is
21  Plaintiff's Initial Disclosures.  I will represent
22  to you, Ms. Stidhum, that these were sent to us on
23  June 21st, 2022.  Do you recognize this document?
24     A   Yes.
25     Q   To your knowledge, what is this document?

144

L. Stidhum
1
2      A   There is a couple.  So honestly, when you
3  scroll down a little bit, I will be able to...
4      Q   I will represent to you in this document,
5  among other things, you identify witnesses; do you
6  see that?
7      A   Yes.
8      Q   You identify yourself, all employees,
9  David Manrique and the four individual Defendants,
10  right?
11     A   Yes.
12     Q   Why did you not list as witnesses the
13  other three people we discussed; Brianna, Iris and
14  Ali?
15     A   Honestly, those were conversations that
16  were brief and, you know, about the situation at the
17  time so I didn't really think that it would be very
18  useful just because there was no evidence behind it,
19  I guess you can say.
20        MS. TROY:  We will amend initial
21  disclosures and sned it to you.
22        MR. KATAEV:  Okay.
23  BY MR. KATAEV:
24     Q   In here, you identify no documents that
25  are relevant to the case, correct?

36 (Pages 141 to 144)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

145

L. Stidhum
1
2    A   Right, I didn't have anything.
3    Q   In terms of producing documents, you
4  reproduced the paystubs we produced to you and some
5  information about your sonogram, correct?
6    A   Right.
7    Q   At the end of this, you state that a
8  damage calculation will be provided, correct?
9    A   I'm sorry.
10    Q   At the end of this, you state a
11  computation of the damages will be provided,
12  correct?
13    A   Right.
14    Q   During the lunch break, without divulging
15  the actual conversation you had, did you discuss
16  your testimony with your attorney?
17    A   No.
18    Q   We were talking before about your
19  cellphone and how you like to have the latest model
20  and you most recently got one?
21    A   Right.
22       MS. TROY:  Um, objection.
23    Mischaracterizes witness testimony but fine.
24  BY MR. KATAEV:
25    Q   Whenever you obtained a new phone, you use

146

L. Stidhum
1
2  iCloud to restore the backup from your prior phone,
3  right?
4    A   Sometimes.  Once you lose certain access
5  or if you have a two-factor identification, you
6  can't get into the same iCloud account so that's
7  pretty much what happened to me.  I actually just
8  made a new one again.
9    Q   You still have the old phone in your
10  possession, correct?
11    A   No, I do not.
12    Q   What did you do with the old phone?
13    A   Honestly, I can't tell you what I did with
14  if. I don't know if that's the one I gave to my
15  great-grandmother.  I'm not sure.
16    Q   We talked earlier about a Facebook post
17  and I asked you questions about whether you posted
18  anything about securing or obtaining millions of
19  dollars in a lawsuit, correct?
20    A   Right.
21    Q   That post was not about your lawsuit
22  against Hillside Auto Outlet, that post was about
23  your mother's lawsuit, correct?
24    A   No, my stepfather.  If this -- I'm not
25  sure.  I don't know what post we are talking about

147

L. Stidhum
1
2  specifically.  Yes, my stepfather did obtain a
3  couple of million dollars working for the Department
4  of Sanitation.
5    Q   Were the attorneys representing your
6  father in that lawsuit the same attorneys
7  representing you here?
8    A   No.
9    Q   Was your mother ever involved in any
10  lawsuit?
11    A   No.
12    Q   Your mother didn't have any lawsuit
13  against Spectrum or Charter?
14    A   No.
15       MS. TROY:  Objection as to relevance.
16    Q   To your knowledge, did your mother ever
17  make any claim without filing a lawsuit against
18  Charter or Spectrum?
19    A   I don't believe so.
20    Q   Did the attorneys that -- did she hire
21  attorneys to pursue that claim?
22    A   She ended up not pursuing it.
23    Q   Did the attorneys that she consult with
24  include the current attorneys that you are utilizing
25  for this lawsuit?

148

L. Stidhum
1
2       MS. TROY:  Objection as to relevance.  You
3    may answer.
4    A   I believe she had a conference with them
5  just to see if there was anything, but I'm not sure.
6       MS. TROY:  Objection to the extent you're
7    prying into attorney/client privilege.
8    Q   Did you learn about this law firm through
9  your mother?
10    A   No.
11    Q   How did you learn about Troy Law?
12    A   Google.
13    Q   What did you search for?
14    A   I don't know.
15       MS. TROY:  Objection to form as to
16    relevance.  She may answer.
17    A   I don't remember honestly.  Attorneys near
18  me maybe.  There were a mile and a half away.
19    Q   You chose them because they were close by?
20    A   They were the first people I spoke to and
21  they made me feel comfortable.
22    Q   I'm going to place up on the screen what
23  has been marked as Defendant's Exhibit D.
24  (Defendant's Exhibit D, Marked for Identification.)
25

37  (Pages 145 to 148)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

149

L. Stidhum
1
2    BY MR. KATAEV:
3       Q   I will represent to you these are damage
4    calculations that were produced on January 30, 2023.
5    Do you recognize this document?
6       A   Yes.
7       Q   At the top left, your law firm's name and
8    address is listed, correct?
9       A   Yes.
10      Q   It's titled, Damages Calculations,
11   correct?
12      A   Yes.
13      Q   After that, there is a box where the case
14   name, case number and the forum that it's in is
15   listed, correct?
16          MS. TROY:  Objection.  The document speaks
17   for itself.  You don't need to waste time over
18   this.
19   BY MR. KATAEV:
20      Q   You can answer.
21          MS. TROY:  She can answer the question.
22   You're just wasting time.  Go ahead, answer the
23   question.
24      A   What is the question?  If I see it?  Yes,
25   I see it.

150

L. Stidhum
1
2       Q   It lists the case name and case number,
3    correct?
4       A   Yes.
5       Q   After that, it shows the time period of
6    December 1st of '18 through January 14th of '19,
7    correct?
8       A   Yes.
9       Q   The calculated total number of weeks for
10   that time period is listed as 6.43, right?
11      A   Yes.
12      Q   What you're saying is your total weekly
13   pay prior to any discrimination averaged $1,238.64,
14   correct?
15      A   Yes.
16      Q   That's based the on actual paystubs which
17   are listed below, which show all of your paystubs
18   from May of '18 until January of '19, correct?
19      A   Yes.
20      Q   Right here is the calculation of that
21   average and before you announced your pregnancy,
22   correct?
23      A   Yes.
24      Q   After that is the calculation of your
25   average after you announced your pregnancy, correct?

151

L. Stidhum
1
2       A   Yes.
3       Q   So taking the difference between those two
4    numbers, you came up --
5          MS. TROY:  Emanuel, this is not an
6    arithmetic test.
7          MR. KATAEV:  Tiffany, stop interrupting.
8          MS. TROY:  You're like, A minus B, is that
9    equal to C?
10         MR. KATAEV:  Stop interrupting my
11   deposition.  Stop.  All you have to say is
12   objection and grounds, that's it.
13         MS. TROY:  Objection.
14         MR. KATAEV:  Your objection is noted for
15   the record.  I'm going to proceed with my
16   deposition.
17   BY MR. KATAEV:
18      Q   The difference of $428.64 is what you
19   obtained when you subtract this $1,238.64 number
20   from the 810 number, correct?
21         MS. TROY:  Objection.  My client is not
22   going to be subject to an arithmetic test.  If
23   she knows how to do it by her brain --
24         MR. KATAEV:  I'm calling the court.  I'm
25   not dealing with this.  We are going to put

152

L. Stidhum
1
2    everything you said on the record and we are
3    calling the court.  You will not interrupt my
4    deposition.
5          MS. TROY:  You can tell the court that you
6    asked her --
7          MR. KATAEV:  You can tell the court
8    whatever you want.  This is ridiculous.
9          MS. TROY:  I will make the objections that
10   I need to make but I'm not going to interrupt
11   your deposition.  That's it.
12         MR. KATAEV:  Good.  Please don't do it
13   again.  Say, Objection, and the basis and move
14   on unless you're instructing her not to answer.
15   BY MR. KATAEV:
16      Q   Ms. Stidhum, the difference between
17   $1,238.64 and $810 is calculated as $428.64,
18   correct?
19      A   Yes.
20      Q   What happened is you take the $428.64, you
21   multiple that by the 6.43 weeks and you get a
22   shortfall of $2,755.54, correct?
23      A   Yes.
24      Q   You went over this chart with your
25   attorneys, correct?

38  (Pages 149 to 152)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

153

L. Stidhum
1
2      A   Yes.
3      Q   You listed this as your economic damages
4  in this place, this place and this place, correct?
5      MS. TROY:  Objection.  She did not herself
6  list it.
7      Q   By and through you, correct?
8      A   Yes.
9      Q   Now you have here $100,000 under the
10 compensatory damages; do you see that?
11     A   Yes.
12     Q   Unlike the damages that we just went over,
13 there is not calculation for the $100,000, correct?
14     A   Yes.
15     Q   Where is the calculation for the $100,000;
16 where is that number coming from?
17     A   Honestly, that's something that has to be
18 discussed with my attorney.
19     Q   The answer is you don't know?
20     A   I don't.
21     Q   Same question for the punitive damages,
22 two million dollars in these three places; do you
23 see that?
24     A   Yes.
25     Q   Where is that number coming from?

154

L. Stidhum
1
2      A   That's something to discuss with my
3  attorney.
4      Q   You don't know the answer, correct?
5      A   No.
6      Q   I'm placing up on the screen what will be
7  marked as Defendant's Exhibit E.  It's the Responses
8  to Defendants' Interrogatories.  Are you familiar
9  with this document?
10 (Defendant's Exhibit E, Marked for Identification.)
11     MS. TROY:  Scroll through the doc.
12     A   Yes.
13     MS. TROY:  Make it slightly bigger.  We
14 are having a hard time seeing it.  Too big.
15     MR. KATAEV:  I don't need commentary.
16 Thank you.
17 BY MR. KATAEV:
18     Q   In the first interrogatory that was asked
19 of you, we asked, Set forth with detail and with
20 specific numerical calculation all categories of
21 damages asserted by Plaintiff, correct?
22     A   Yes.
23     Q   In response, you directed us to the
24 damages calculations that we just reviewed, correct?
25     A   Right.

155

L. Stidhum
1
2      Q   But as we just went over, there are no
3  calculations for the compensatory damages or the
4  punitive damages, right?
5      A   Right.
6      MS. TROY:  Emanuel, that's factually
7  incorrect.
8      MR. KATAEV:  We can take it up after the
9  deposition.  Please don't interrupt unless you
10 have an objection.  Thank you.
11 BY MR. KATAEV:
12     Q   You identify over here, Ali in response to
13 Interrogatory Number 2 which requests the identity
14 of witnesses Ali Raskesnia.  R-a-s-k-e-s-n-i-a.
15     Do you see that?
16     A   Yes.
17     Q   This is the Ali with whom you went to NYC
18 Motor Cars, correct?
19     A   Correct.
20     Q   Iris Serrano is the Iris we discussed
21 earlier today, correct?
22     A   Yes.
23     Q   You say here that her address and phone
24 number are unknown.  Do you not maintain telephone
25 contact with this individual?

156

L. Stidhum
1
2      A   No.
3      Q   The last time you spoke to Iris was at the
4  dealership, correct?
5      A   Not at the dealership.  I do have her on
6  Snapchat so we spoke here and there but not much.
7      Q   On Snapchat you discussed this case?
8      A   No.  The only thing I did ask regarding
9  this case was if she knew the last name of Lily.
10     Q   Understood.  Did she give you the answer?
11     A   No, she wasn't sure what her last name
12 was.
13     Q   In response to Interrogatory Number 7,
14 which asks whether you ever complained to Hillside
15 Auto Outlet about discriminatory conduct and to
16 provide information about each such complaint.  Your
17 answer only provides information about your
18 conversation with Isaac and Jory, correct?
19     A   I'm sorry, one more time.
20 (Whereupon, the referred to question was read back
21     by the reporter.)
22     A   Right.
23     Q   You did not provide any information about
24 your alleged discussion with Ronald, correct?
25     A   Well, that wasn't a discussion about the

39 (Pages 153 to 156)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

| 157 |
|---|

L. Stidhum

1  discrimination -- the pregnancy discrimination.
2  That was more about me telling him about the bonus.
3  Q   Is it fair to say that the bonus has
4  nothing to do with your pregnancy?
5  A   No, because the bonus kind of played a
6  part in it.  My pregnancy was the reason for me kind
7  of pushing to get this bonus to begin with.
8  Q   Why did you not list your conversation
9  with Ronald in this response?
10  A   Honestly, it must have slipped my mind.
11  Like I said, it was more of a conversation about the
12  bonus and receiving that money for doing x amount of
13  cars rather than the initial complaint of what was
14  going on about the pregnancy discrimination.
15  MR. KATAEV:  I'm going to call for the
16  Plaintiff to supplement her response to
17  Interrogatory Number 7, and we will follow up
18  in writing.
19  (Counsel Request.)
20  BY MR. KATAEV:
21  Q   For clarification, some of the dealerships
22  that you worked at after Hillside Auto both had the
23  name Luxury in them but they were two separate
24  dealerships, correct?

| 158 |
|---|

L. Stidhum

1  A   Correct.
2  Q   They are two different locations?
3  A   Yes.  Two different locations, different
4  owners.
5  Q   In response to Interrogatory 19, you only
6  identify Queens Auto Mall incorrectly typed here as
7  hall.  You failed to include the other two that you
8  denied positions for, correct?
9  A   Right, because honestly, it wasn't fresh
10  in my mind.
11  MR. KATAEV:  We are going to call for
12  Plaintiff to supplement her response to this
13  interrogatory and we will follow up in writing.
14  (Counsel Request.)
15  BY MR. KATAEV:
16  Q   With respect to every position identified
17  in response to Interrogatory Number 14, is it
18  accurate to state that the pay you received at each
19  of these dealerships was better than what you
20  received at Hillside Auto Outlet?
21  A   Yes.
22  Q   If you have to give your best estimate as
23  to the annual amount of money you would earn at
24  Hillside Auto Outlet, how much would you say that

| 159 |
|---|

L. Stidhum

1  was?
2  A   Maybe like 60 or 70,000.  I'm not sure.  I
3  didn't work there a full year.
4  Q   When you applied for unemployment both
5  times, did you receive the unemployment for the full
6  six-month period both times?
7  A   I believe so.
8  Q   Do you recall whether it was the capped
9  amount?
10  A   I'm sorry.
11  Q   Do you recall whether it was the capped
12  amount?
13  A   The first time I received it, yes.  The
14  other two times, it was not.
15  Q   Has any injury or disability prevented you
16  from working during any period of time?
17  A   No.
18  Q   Have you ever filed for bankruptcy?
19  A   No.
20  Q   As far as you know, you were never
21  terminated from any job?
22  A   Correct.
23  Q   During the time that you worked at
24  Hillside Auto Outlet, there came a point in time

| 160 |
|---|

L. Stidhum

1  when you purchased a vehicle from the dealership,
2  correct?
3  A   One more time.
4  Q   When you worked at Hillside Auto Outlet,
5  you purchased a vehicle from the dealership,
6  correct?
7  A   Correct.
8  Q   What car did you purchase?
9  A   Infiniti Q50.
10  Q   Do you still have that car?
11  A   No, I do not.
12  Q   What did you do with the car?
13  MS. TROY:  Objection as to relevance.  She
14  can answer.
15  A   It got totaled.  I was rear-ended.
16  Q   I'm sorry.
17  Did you obtain the vehicle from
18  Hillside Auto Outlet on favorable terms?
19  A   On favorable terms, as in -- what do you
20  mean by that?
21  MS. TROY:  Objection to form.
22  Q   By whatever favorable terms means to you?
23  A   No.  After receiving the discovery, I was
24  charged like every other customer.  They made a

40  (Pages 157 to 160)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

161

L. Stidhum
1
2  couple of grand off of me.
3     Q   How much did you purchase the vehicle for?
4     A   I don't remember.
5     Q   Did you do financing?
6     A   Yes, I did.
7     Q   It was a used vehicle, correct?
8     A   Yes.
9        MS. TROY:  Objection as to relevance.
10    Q   Isn't it true that you complained to Isaac
11 that the reason why Andris took so long to process
12 employment applications -- I'm sorry, financing
13 applications for customers is because he sucks?
14    A   I don't remember.  This is --
15       MS. TROY:  Objection.  Argumentative.  She
16 can answer.
17       MR. KATAEV:  Please don't interrupt her
18 while she's answering.
19 BY MR. KATAEV:
20    Q   Repeat your answer.
21    A   I don't remember.
22       MR. KATAEV:  Let the record reflect that
23    the witness laughed at the question.
24       I have placed up on the screen what will
25    be marked as Defendants' Exhibit F.

162

L. Stidhum
1
2  (Defendant's Exhibit F, Marked for Identification.)
3  BY MR. KATAEV:
4     Q   For the record, these are monthly sheets
5  as to cars sold at the dealership using the CRM
6  system.  It's Bates-stamped D2 through D9.  This
7  particular set is for May of 2018.
8        Ms. Stidhum, do you recognize this
9  document?
10       MS. TROY:  Scroll through whatever pages
11    you're talking about.
12       MR. KATAEV:  Sure.  Let the record reflect
13    that these activities are designed to waste
14    time, to run the clock, as the Plaintiff has
15    repeatedly make reference to the time of the
16    deposition.
17       MS. TROY:  If you want to play it that
18    way, let the record reflect you said you wanted
19    to start at 9:00, you started at 9:30.  You
20    said you wanted a 30-minute lunch break, you
21    took a 45-minute lunch break.  You're asking
22    questions that are irrelevant to this case.
23       MR. KATAEV:  Anything else?
24       MS. TROY:  That's it for now.
25       MR. KATAEV:  Let the record reflect that,

163

L. Stidhum
1
2  at Plaintiff's request and insistence, we
3  scrolled through D2 through D9.
4  BY MR. KATAEV:
5     Q   Are you ready to answer some questions
6  about this exhibit?
7        MS. TROY:  Go back to the second page.
8  Okay.
9  BY MR. KATAEV:
10    Q   Ms. Stidhum, other than due to this
11 lawsuit and in the course of discovery, have you
12 ever seen this document while working at the
13 dealership?
14    A   No.
15    Q   Did you have access to the sold log
16 through the CRM system while you worked at the
17 dealership?
18    A   I'm not sure.  I didn't really use the
19 CRM.
20    Q   In this sheet, it says that you sold a car
21 to an individual named Robert Gantt on May 27, 2018;
22 do you see that?
23    A   Yes.
24    Q   It says it was sold for $12,600 and at the
25 front, it says negative 586 and at the back is 2011;

164

L. Stidhum
1
2  do you see that?
3     A   Yes.
4     Q   By the front, that refers to the gross
5  commissionable profit on the front end of the sale
6  for actual vehicle, correct?
7     A   Yes.
8     Q   On the back, that refers to any
9  aftermarket items sold, whether it's something for
10 the car or something like insurance or protection or
11 warranty and stuff like that, correct?
12    A   Yes.
13    Q   On this particular deal, it was sold at a
14 loss, correct?
15    A   Yes.
16    Q   You received $150 for selling this car,
17 correct?
18    A   Yes.
19    Q   But you didn't receive any bonus for this
20 particular car, correct?
21    A   When you say bonus, I'm not sure what you
22 mean by bonus.
23    Q   If I understand correctly for you to
24 receive that 5 percent bonus, this number on the
25 front end has to be $3,000 or $3,500 or more,

41  (Pages 161 to 164)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

165

L. Stidhum

1
2  correct?
3       MS. TROY:  Objection.  Mischaracterizes
4   witness testimony.
5       A   The total between the front and back would
6   have to equal that, yes.
7       Q   You have to add the two, correct?
8       A   Yes.
9       Q   The next car that's listed as sold by you
10  in May of 2018 is a vehicle sold to one Darell
11  Thomas on May 25th of 2018; do you see that?
12      A   Yes.
13      Q   But there is no information here about the
14  front or back or the sold amount, correct?
15      A   Right.
16      Q   The third vehicle listed that's sold by
17  you is to one John Collado, correct?
18      A   Yes.
19      Q   There was May 24th of 2018, correct?
20      A   Yes.
21      Q   On this particular sale the front and the
22  back had a profit of $1,628 and $1,857 respectively,
23  correct?
24      A   Yes.
25      Q   With the calculator I have on the screen

166

L. Stidhum

1
2  calculating the total between the two, that comes
3   out to $3,485, correct?
4       A   Right.
5       Q   What you're saying is your bonus would be
6   5 percent of that amount for a total of $174.25; is
7   that right?
8       A   Right.  It wouldn't be a bonus to the
9   $150.  It was just that $174.25 total.
10      Q   It would be $150 for making the sale plus
11  $174.25?
12      A   No.  That's what I'm trying to clarify.
13  It would be the $174.25.
14      Q   Whenever you made more, you get 5 percent
15  in lieu of the actual $150 commission?
16      A   Right.  If you do $3,000, that's
17  5 percent, it would be $150.
18      Q   For this particular deal, you do receive
19  $174.25 instead of $150, correct?
20      A   Yes.
21      Q   You know that because you referred to a
22  sheet that was given to you in triplicate and you
23  threw that sheet out after you confirmed that you
24  were paid the right amount, correct?
25      A   That's false actually.  I wouldn't receive

167

L. Stidhum

1
2  anything that showed the actual pay for the
3   5 percent.  It was just -- it would reflect on my
4   paystub.
5       Q   I see.  On that sheet, would it list the
6   front and back end gross commissionable profit?
7       A   No.  It would reflect on my paystub.
8       Q   How would you know whether you would be
9   entitled to a 5 percent bonus on top of -- in lieu
10  of $150 -- higher than $150?
11      A   I just started in the business so I kind
12  of took their word for it.  Jay was very honest with
13  us.  She would make sure that we were paid correctly
14  all the time.  After that, it's obvious -- you can
15  tell the difference between being paid $174.25 and
16  the flat $150.
17      Q   I see.  Could it be possible you didn't
18  sell any vehicles at a profit?
19      A   No, that's impossible because I remember
20  on multiple occasions where Serge would be excited
21  that I did a ten-pounder, which is a $10,000 deal
22  and I would still receive $150 flat.  That's
23  impossible.
24      Q   We just scrolled through all of the May of
25  2018 and they were only three or four cars sold.  Is

168

L. Stidhum

1
2  it accurate that you only sold four cars in May of
3   '18?
4       A   I don't believe that's accurate, but then
5   again, I did just start that month so it's a
6   possibility.  I know that this document I've looked
7   over it, I went and checked how many cars it showed
8   that I sold and it's not accurate at all.
9       Q   What makes you say it's not accurate?
10      A   Because even the amounts of cars sold is
11  not the right number.  None of it is the right
12  numbers.  If you look back at when I first received
13  the 1,000 pages, I went -- I calculated based on my
14  paystubs without the 5 percent how many cars did I
15  sell for each month and how many cars it shows on
16  that document you just showed me, which is only
17  input by BDC and it definitely is not accurate.
18      Q   At the top of page D2 next to the word,
19  Sold log, it has in parenthesis the number 46; do
20  you see that?
21      A   Yes.
22      Q   My understanding is this is listing the
23  total amount of cars sold in May of 2018, correct?
24      A   Correct.
25      Q   You're saying that this number is not

42  (Pages 165 to 168)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

169

L. Stidhum

1
2  accurate?
3      A   I can't say for May of 2018 because I just
4  started that month and it was towards the middle of
5  the month and I was not there for the full month,
6  but I can confirm that months moving on, those
7  numbers do not add up to the numbers I have based on
8  my paystubs.  Even in the mediation that we had, you
9  said that this might not be everything, so I know
10  for sure it is not.
11      Q   To your knowledge, how did the dealership
12  keep track of the total vehicles sold every month?
13      A   Like I stated before, we had a board in
14  the finance room where we would have the list of all
15  the salespeople and they would tally every time they
16  sold a car, and that's how we kept track of how many
17  cars we had for the month.  There was never a set
18  log that was written down by anyone or nothing like
19  that.
20      Q   At the end of the month before starting a
21  new month chart before erasing all the data for the
22  month, did anyone ever take a picture of the board?
23      A   Not to my knowledge.
24      Q   I'm going to mark what will be Defendant's
25  Exhibit G.

---

170

L. Stidhum

1
2  (Defendant's Exhibit G, Marked for Identification.)
3  BY MR. KATAEV:
4      Q   It is the same type of report for December
5  of 2018 from D62 through D67.  On this first page it
6  says the total sold in December '18 is 36 cars,
7  correct?
8      A   Yes.
9      Q   Is that accurate, to your knowledge?
10      A   Honestly, I'm not sure because, again,
11  like I said, I compared the documents and it doesn't
12  look like this log shows everything whether
13  it was a walk-in customer or a appointment.  It
14  doesn't look like it shows everything.
15      Q   Looking at page D65.  There are two cars
16  that you sold to two different people on the same
17  day, December 10th of 2018, correct?
18      A   Yes.
19      Q   How was it that you were able to sell two
20  cars in a single day?
21      A   I don't understand the question.  I have
22  sold six cars in a day.
23      Q   In this particular instance with respect
24  to Monica Hampton, for example, was Andris Guzman
25  the individual who helped you with the financing?

---

171

L. Stidhum

1
2      A   I don't recall.  It does say, Pending
3  delivery.  This doesn't mean that I sold them both
4  on the say same.
5      Q   What about Prince Henston, do you recall
6  whether Andris Guzman was the individual that helped
7  you with the financing aspect?
8      A   This is four years ago.  I don't know who
9  did what.
10      Q   The following page, D66, there are two
11  additional cars that were sold on or about
12  December 6 and 8, correct?
13      A   Right.
14      Q   Finally on the last page, D67, there is a
15  fifth car that was sold on December 1st of 2018,
16  correct?
17      A   Correct.
18      Q   It's fair to say you sold at least five
19  cars in December of 2018?
20      A   I guess so, based on this.
21      Q   Do you recall whether you sold more than
22  five cars in December of '18?
23      A   Again, I'm not sure because it was such a
24  long time ago.  I don't want to sit here and lie,
25  but I don't remember selling -- I remember that I

---

172

L. Stidhum

1
2  was very upset because I was probably selling one or
3  two cars a week so this may be accurate.
4      Q   Didn't you testify previously that you
5  typically sold seven cars a month?
6      A   No.  Seven cars a week.
7      Q   What was the least amount of cars you sold
8  prior to December of '18 prior to your recollection?
9      A   Again, it's a long time ago.  I'm not
10  going to give you fake numbers.  I know for sure it
11  was seven cars a week because if we do seven times
12  $150 plus that $300, I would receive a check for
13  $1,050 and that was usually my goal for the week so
14  that way I can bring home at least $800 to $900
15  bucks.
16      Q   I have placed up on the screen what will
17  be marked as Defendant's Exhibit H.
18  (Defendant's Exhibit H, Marked for Identification.)
19  BY MR. KATAEV:
20      Q   My question to you is:  Have you ever
21  seen --
22      MS. TROY:  Did you skip some numbers from
23  the exhibit?
24      MR. KATAEV:  No.
25      MS. TROY:  Okay, this is Exhibit H.

---

43 (Pages 169 to 172)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

173

L. Stidhum
1
2    MR. KATAEV:  Yes.
3    BY MR. KATAEV:
4        Q    Have you ever seen a document like this
5    before?  It's called cap sheet?
6        A    No.
7        MR. KATAEV:  Let's mark this as
8    Defendant's Exhibit I, I believe.
9    (Defendant's Exhibit I, Marked for Identification.)
10   BY MR. KATAEV:
11       Q    I will represent to you that this is a
12   declaration prepared by Serge and signed by him.
13   Have you ever seen this document before?
14       A    Yes, I did.
15       Q    Serge says here in Paragraph one that he
16   has served as an F&I representative since November
17   of 2018; do you see that?
18       A    Yes.
19       Q    Does that comport with your recollection
20   as to when he started working there?
21       A    I thought it was a little sooner after Jay
22   left.
23       Q    He says here in Paragraph six that
24   whenever the Plaintiff or any other salesperson
25   makes a sale, the customer's information is provided

174

L. Stidhum
1
2    to the sales manager or him, whoever is available
3    and has authorization to pull the prospective
4    customer's credit profile; do you see that?
5        A    Yes.
6        Q    That comports with your earlier testimony
7    that typically Andris would handle it but sometimes
8    he would, right?
9        A    Right.
10       Q    Paragraph seven says that once the credit
11   profile is pulled, the customer's application to
12   purchase a vehicle is submitted to chosen lenders;
13   do you see that?
14       A    Yes.
15       Q    Do you know what is meant by, Chosen
16   lenders?
17       A    Yes.  Qualifying, they have to qualify the
18   customer based on their credit history.
19       Q    There are different banks that accept
20   different types of customers with different types of
21   credit histories, correct?
22       A    Correct.
23       MS. TROY:  Can you speak slower?
24       MR. KATAEV:  Sure.
25       MS. TROY:  I'm having difficulty

175

L. Stidhum
1
2    following.
3    BY MR. KATAEV:
4        Q    In Paragraph eight, Serge declares that
5    the timeframe to receive any word back from a chosen
6    lender, which is also based on a customer's credit
7    worthiness, ranges from ten minutes to one hour; do
8    you see that?
9        A    Yes, I do.
10       Q    You have no reason to dispute that,
11   correct?
12       A    I mean --
13       MS. TROY:  Objection.  Argumentative.  She
14   can answer.
15       A    I mean, honestly, most approvals are
16   almost instant.  I can't agree as long as one hour.
17       Q    Has it ever been one hour since submitting
18   something to a chosen lender?
19       A    Honestly from my experiences, an hour, no.
20       Q    Your experience is limited to the time
21   when you had access to Dealertrack, correct?
22       A    Yes.
23       Q    You had access to Dealertrack since what
24   month in 2018?
25       A    I want to say towards the end -- after Jay

176

L. Stidhum
1
2    left but I don't know how soon after.
3        Q    That was somewhere in July or August of
4    '18, correct?
5        A    Yes.
6        Q    That was taken away from you in December
7    of '18, correct?
8        A    Yes.
9        Q    That's approximately two months, right?
10       MS. TROY:  Objection.  You need to do your
11   math properly.
12       A    It's four or five months.
13       Q    How many submissions did you make to
14   lenders in the four or five months that you had
15   Dealertrack access?
16       A    I didn't make submissions to lenders.  I
17   would run the credit and qualify them myself and
18   prefill the application, so that way when it got to
19   finance, whether it was Isaac or Serge, all they had
20   to do was read over it, make sure I didn't make a
21   mistake, check out their credit, submit the deal.
22   Everything would be done.
23       Q    When you submit the deal, that's when you
24   have to wait for the lender to get back, right?
25       A    Like I said, approvals are almost instant.

44  (Pages 173 to 176)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

177

L. Stidhum

1  Everything is done electronically.
2  Q   You're saying that every time you submit a
3  deal, a bank gets instantly every single time?
4       MS. TROY: Objection. Mischaracterizes
5  witness testimony. She can answer.
6  A   Again, I didn't submit it to the lender.
7  I only ran the credit, prefilled the application,
8  would give the folder to the finance. Most of the
9  time, I would stand right over him and wait and see
10 who is going to pick it up, yes. The approvals were
11 almost instant.
12 Q   Since you didn't submit it, you had no
13 independent knowledge as to how long it took,
14 correct?
15 A   That's incorrect. I had access to
16 Dealertrack so I was able to see when the deal got
17 approved or did not get approved.
18 Q   Is there any data as far as you know
19 that's kept in Dealertrack as to how long each deal
20 takes from submission to response?
21 A   No.
22 Q   Paragraph nine, Serge declares that this
23 timeframe of submission is completely outside the
24 control of himself or any sales manager who pulls a

---

178

L. Stidhum

1  credit profile and is further dependent on the
2  amount of verification requested by each chosen
3  lender, which is also completely outside the control
4  of himself or any sales manager; do you see that?
5  A   Yes.
6  Q   Do you agree that it's outside the control
7  of the sales manager, you know, the contents of this
8  paragraph?
9  A   Partially, because my argument was not
10 whether or not the lender is taking x amount of
11 time. It was about my customer's credit being ran
12 and qualifying the customers within a certain amount
13 of time so that's not properly worded.
14 Q   What you're saying is what took longer is
15 the part before this part?
16 A   Right.
17 Q   Okay. In order to complete the part
18 before this part, you have to obtain information
19 from the customer, correct?
20 A   Right.
21 Q   Sometimes the customer does not have all
22 of the information, correct?
23 A   Right.
24       MS. TROY: Objection. Asked and answered.

---

179

L. Stidhum

1  Q   It says in Paragraphs 12 through 14 the
2  following, During the time Plaintiff worked here, I
3  worked closely with her as well as all the other
4  salespersons. Everybody liked each other and
5  treated each other well. There was no animosity
6  amongst the salespeople, myself or nor sales
7  managers; is that true?
8  A   Right up until the announcement of my
9  pregnancy, of course.
10 Q   Of course. What about the fact that you
11 and Andris Guzman had two prior incidents where you
12 got into an argument before you announced your
13 pregnancy?
14 A   Again, we still we kept it very
15 professional. It's not somewhere where you're going
16 to be bickering back and forth in front of potential
17 customers.
18 Q   Number 19 says, if a customer was forced
19 to wait, the only reason for that would be based on
20 circumstances outside of the dealership's control
21 such as the failure of the customer to provide
22 necessary information to the lender or because the
23 lender requested additional documentation or simply
24 because the dealership had to wait for the lender's

(Note: line numbering shown above – lines 2–25)

---

180

L. Stidhum

1  response.
2       Do you have any reason to dispute
3  that statement?
4  A   No.
5  Q   Finally at the end it says, In the course
6  of the last four years working at the dealership,
7  customers have waited to obtain information
8  concerning approvals from 20 minutes until three
9  hours on average.
10      Do you have any reason to dispute
11 that statement?
12 A   I have never seen it go as long as three
13 hours, but...
14 Q   What is the longest you have seen a
15 customer wait to get a deal done?
16 A   Probably, like -- I'm talking about wait
17 times between him actually doing anything with my
18 customer. That's what I'm talking about. I'm not
19 talking about in general the total amount of buying
20 a car. It's two different things we are talking
21 about here. He's speaking about overall car
22 purchase.
23 Q   That's a fair distinction, but does the
24 customer know?

---

45 (Pages 177 to 180)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

181

```
1              L. Stidhum
2         MS. TROY:  Objection.  Argumentative.
3     A   I'm sorry.
4     Q   Does the customer know?
5     A   Does the customer know what?
6     Q   That there is a distinction between
7  waiting for their credit to be pulled versus
8  submitting it to the bank?
9     A   Absolutely.  When your credit is pulled
10 and you're qualified for a customer, you're told to
11 start working on insurance, which can take up to --
12 anywhere from ten minutes to an hour.  Yes, the
13 customer would know because immediately they are
14 like, are we approved, are we wasting our time.
15 Once I get the folder, I expect to respond to my
16 customers and say, we are going to get this done,
17 let's work on insurance.
18    Q   In general, the whole car-buying process
19 sometimes takes hours, right?
20    A   It can.
21        MS. TROY:  Objection.  Argumentative.  I'm
22    going to direct my client to please wait if I
23    have an objection or not because she's
24    immediately answering your question.
25
```

182

```
1              L. Stidhum
2  BY MR. KATAEV:
3     Q   You can answer now.
4     A   It can take up to -- it can take longer,
5  but for the most part, we work relatively quick.  So
6  I'm speaking based on my experience, we would move
7  pretty quickly because we were a store that would
8  get a lot of walk-in traffic.  I would want to grab
9  two or three customers at a time.
10    Q   What is the fastest that you ever
11 processed the deal for a transaction?
12        MS. TROY:  Objection.  Specify timeframe.
13    Q   Whenever you worked at Hillside Auto
14 Outlet.
15    A   I mean, getting them in and out the door,
16 probably within an hour or less.  I have had
17 instances where I have gotten people out and in
18 their car, registered and everything, in less than
19 an hour.
20    Q   How often does that happen?
21    A   I work relatively quick.  I would want to
22 say maybe 40 to 50 percent.  It's very rare I have
23 customers waiting for hours.
24    Q   Very impressive.  I don't think that's the
25 world's perception of how long it takes a car deal
```

183

```
1              L. Stidhum
2  to go through, but very impressive.
3        MS. TROY:  No need to do your commentary.
4     Ask your question.
5        MR. KATAEV:  Do you have an objection,
6     Counselor?
7        MS. TROY:  You were not asking a question.
8     You're making a commentary and talking to my
9     client.
10       MR. KATAEV:  Do you have an objection?
11       MS. TROY:  Again, you can tell the judge.
12    You're talking directly to my client and not
13    asking a question.
14       MR. KATAEV:  I'm making sanctions against
15    you for interrupting my deposition.
16       MS. TROY:  For telling you not to speak
17    directly to my client?
18       MR. KATAEV:  Anything other than object
19    and state the grounds.  Please stop
20    interrupting my deposition.
21       MS. TROY:  I'm objecting.  It's not a
22    question.  You're talking to my client.
23       MR. KATAEV:  Say, Objection, you're
24    talking to my client and shut up.
25       MS. TROY:  Let the record reflect you told
```

184

```
1              L. Stidhum
2  me to shut up.
3        MR. KATAEV:  You are interrupting my
4     deposition and I want you to stop.  I'm tired
5     of this problem with you.  Please conduct
6     yourself the way you're supposed to conduct
7     yourself at a deposition.
8        MS. TROY:  Telling another counselor to
9     shut up is not professional.
10       MR. KATAEV:  Okay.
11 BY MR. KATAEV:
12    Q   I'm placing up on the screen what has been
13 marked as Defendants's J.  I will represent to you
14 that this a document bearing Bates-stamp numbers
15 D151 through D157.
16 (Defendant's Exhibit J, Marked for Identification.)
17 BY MR. KATAEV:
18    Q   It concerns the lead for an individual
19 named Charles Clark.  Do you recognize that
20 individual?
21    A   No.
22    Q   On D151 it says here, Working with
23 Leticia; do you see that?
24    A   Yes.
25    Q   In status, there is multiple statuses
```

46  (Pages 181 to 184)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

185

1            L. Stidhum
2  listed but two of them are lost, correct?
3      A  Right.
4      Q  What does that mean to you that the status
5  of a lead is lost?
6      A  That they either didn't want to come in or
7  they purchased it elsewhere.  The lead was lost.
8      Q  Typically in this program, there is a log
9  of everything that happened with this lead, correct?
10     A  I guess, yes.
11     Q  Let's look at the log.  Starting from the
12 bottom of page D157, there is an inbound phonecall by
13 Aditia on March 17, 2021, correct?
14     A  Okay.
15     Q  You see that?
16     A  Yes.
17        MS. TROY:  Objection as to timeframe.
18     Objection to relevance.
19     Q  We will skip this one.
20        MR. KATAEV:  Let the record reflect that
21     for this particular lead, it's a customer that
22     returned after December 2018.  A lead was lost.
23     The information from December 2018 is not
24     listed.
25

186

1            L. Stidhum
2  BY MR. KATAEV:
3      Q  The next exhibit is Defendant's Exhibit J,
4  I believe and it's Bates-stamped D201 through D206.
5  For this particular lead, on D201, the manager is
6  listed as Andris Guzman, correct?
7      A  Yes.
8      Q  Going all the way to the bottom on
9  January 11th of 2019, Tiffany listed that this
10 customer is interested and will be here tomorrow any
11 time from 10:00 to 2:00?
12        MS. TROY:  Objection.  The document speaks
13     for itself.
14     A  Yes.
15     Q  On January 12th of 2019, there is a
16 listing that says the showroom visit started on
17 January 12th at 10:45 a.m. lasting six hours; do you
18 see that?
19     A  Yes.
20        MS. TROY:  Objection.  Document speaks for
21     itself.
22     Q  Is that common that a showroom visit can
23 last up to six hours without a sale being made?
24     A  BDC is in the back so they do not see what
25 is going on in the front so they have to come out,

187

1            L. Stidhum
2  grab the book where customers were logged and then
3  they can log them.
4        So realistically was that customer
5  there for six hours, absolutely not.  She ended up
6  logging it in after she saw what happened after she
7  was able to communicate with whatever salesperson
8  was working with them so that way she can log them
9  in.  That is not realistic.
10     Q  Do you have any recollection as to why
11 this particular lead was lost?
12     A  No, I do not.
13     Q  Let's go to Defendant's Exhibit K.  This
14 is Bates-stamped D249 and it ends with D254.
15 (Defendant's Exhibit K, Marked for Identification.)
16 BY MR. KATAEV:
17     Q  At the top of this on January 1, 2019, it
18 says that the customer is here now with Leticia,
19 correct?
20     A  Yes.
21     Q  Then it says the showroom visit started on
22 January 1st of '19 at 4:15 p.m. and lasted for
23 22 hours.
24     A  That goes to show it depends on when the
25 BDC rep decides to come and check on their customer

188

1            L. Stidhum
2  and log it in.
3      Q  It says here at 5:15, an hour after the
4  showroom visit started that, Going out under dad
5  Antonio Yanes; do you see that?
6      A  Okay.
7      Q  What does that mean to you?
8      A  He needed a cosigner and he did it under
9  his father.
10     Q  The customer left, as far as you could
11 tell from reading this document, without buying the
12 vehicle, correct?
13     A  It's hard to say because if it went out
14 under Antonio, there would be a new lead set up
15 under Antonio.
16     Q  Over here on January 8 of '19, it says
17 that you made an outbound phonecall to him, correct?
18     A  Yes.
19     Q  How is that tracked?  How did they know
20 you made an outbound phonecall?
21     A  I have no idea.  You can log a call and
22 then put whatever representative or who made that
23 contact so I don't remember this.
24     Q  It says here on January 26th that this
25 lead was lost, correct?

The Little Reporting Company
646.650.5055 | www.littlereporting.com

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

189

```
 1              L. Stidhum
 2      A   Yes.
 3      Q   There were emails sent just to try to
 4  bring the customer back in and none of that worked,
 5  correct?
 6          MS. TROY:  Objection.  Goes beyond what
 7      the witness would know.  She can answer.
 8      A   Then again, there is a note there that
 9  said that it went out under the dad.  If it says it
10  went out under the dad, that means the car was
11  delivered under the father's name.
12      Q   Are you saying that they marked the lead
13  as lost and that's incorrect?
14      A   Possibly, because it says it went out
15  under the dad.  If we are going to write that it
16  went out under the dad, that means he did not
17  qualify so his father purchased the vehicle for him.
18      Q   It's possible that he did, correct?
19      A   I'm sorry.
20      Q   It's possible that he did, correct?
21      A   I mean, it wouldn't be there in a note if
22  it wasn't true.
23      Q   Let's look at Defendant's Exhibit L.  This
24  is Bates-stamped D288 through D293.
25  (Defendant's Exhibit L, Marked for Identification.)
```

190

```
 1              L. Stidhum
 2  BY MR. KATAEV:
 3      Q   Starting from the bottom, there is a note
 4  here that on December 10th of '18, an appointment
 5  was set for December 10, right?
 6      A   Yes.
 7      Q   There is another text message here from
 8  one of the BDC people to come with proof of address
 9  and two recent paystubs if available, right?
10      A   Yes.
11          MS. TROY:  Objection.  Document speaks for
12      itself.
13      Q   On the same day later that day, it says
14  the customer was here with you, correct?
15      A   Yes.
16      Q   The next item in the log is outbound
17  phonecalls by you and two days later another by the
18  BDC rep, right?
19      A   Right.
20      Q   As far as you can tell from this document
21  so far, this customer did not purchase any vehicle,
22  correct?
23      A   Right.
24      Q   On December 15th based on a phonecall by
25  the BDC rep, the customer said he needed money down
```

191

```
 1              L. Stidhum
 2  and wouldn't be ready until February, correct?
 3      A   Yes.
 4      Q   At least this customer didn't leave
 5  because of your waiting to check creditworthiness,
 6  correct?
 7      A   From what we can tell at least.
 8      Q   The reason he knows he needs money down is
 9  because his credit was checked, correct?
10      A   Yes.
11      Q   This happened on December of 2018,
12  correct?
13      A   As it states.
14      Q   Was this a one-off to all the situations
15  that you experienced?
16          MS. TROY:  Objection.  Argumentative.
17      You can answer.
18      A   One more time.
19      Q   Is this a one-off to all the
20  discrimination you allege you suffered from the
21  waiting times?
22      A   I'm not understanding.
23      Q   You claimed the customers walked out
24  because they couldn't their credit checked, right?
25      A   Partially.  That's not exactly what I
```

192

```
 1              L. Stidhum
 2  said.
 3      Q   You testified it took too long for their
 4  credit to be checked such they would get frustrated
 5  and leave, right?
 6      A   Right.  I didn't state that for every
 7  single customer I sat with.
 8      Q   How many customers did it happen with?
 9      A   I don't remember.  It's four years later.
10      Q   This is very important because it's part
11  of your federal lawsuit in federal court with a
12  federal judge, and I would like to understand how
13  many customers on a ratio basis did this happen with
14  and how many did it not happen with?
15      A   Realistically, I would say I would sit
16  with about two, two to three people daily.  Out of
17  those two to three people, at least two of them were
18  walking out at this time because of the longer wait
19  periods.
20      Q   Every day two out of three people?
21      A   More or less.
22      Q   This is one of the three that didn't walk
23  out?
24      A   Possibly, but then again you did state
25  that I made a phonecall to him.  Can we go back to
```

48  (Pages 189 to 192)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

193

L. Stidhum

1
2  that?
3      Q   Sure.
4      A   It's possible that he did walk out because
5  that phonecall was regarding the results of the
6  credit being run finally.
7      Q   Here with Leticia, outbound phonecall two
8  days later, unable to leave message by the BDC rep.
9  Outbound text message, phonecall by BDC rep said he
10  needs money down and won't be ready until February
11  on December 15th.  December 31st, holding off until
12  February.  Lead lost January 16, 2018.
13      A   It's really hard to remember by customer
14  for something that happened four years ago
15  especially since I have been in the business a
16  couple of years and dealt with a bunch of customers.
17      Q   That's why we have records of these
18  things, correct?
19          MS. TROY:  Objection.  Argumentative.
20      Q   You can answer.
21      A   I mean if the stuff was accurate, I would
22  agree.
23      Q   You're saying this isn't accurate, that he
24  called and said --
25      A   I'm not saying that that isn't accurate.

194

L. Stidhum

1
2  I'm talking about the documents overall.
3      Q   Let's look at Defendant's Exhibit M.
4  Bates-stamped D397 through D402.  This is a bunch of
5  messages here between the customer and someone named
6  Tiffany, a BDC person about doing an application; do
7  you see that?
8  (Defendant's Exhibit M, Marked for Identification.)
9      A   Yes.
10      Q   What is that application referring to?
11      A   It's a prequalification application.
12      Q   Which is something that is designed to
13  assist customers with getting financing if they need
14  it, correct?
15      A   More or less.
16      Q   It's a process that's done in advance to
17  avoid having to do what have you complained about in
18  this case, correct?
19      A   Right.
20      Q   On January 5th of 2019, Brianna, one of
21  your witnesses, listed that the customer wants to
22  know how much she would put down as a down payment,
23  correct?
24      A   Right.
25      Q   The following day, Brianna set up an

195

L. Stidhum

1
2  appointment for the next Saturday, no money down and
3  has a trade-in, right?
4      A   Right.
5      Q   On January 12th, he was working with you
6  and he was greeted by Louis and Manuel, correct?
7          MS. TROY:  Objection.  Documents speak for
8  itself.
9      A   I don't remember who this was, but I
10  guess.
11      Q   After that, the lead is marked lost the
12  following month, correct?
13      A   That was marked lost by the system so what
14  that means is that after a certain amount of time
15  that the customer is not contacted for whatever the
16  case may be, that lead goes into a loss folder.  So
17  like it says there, it's by the system, not by a rep
18  or anybody's name.  There is no telling if that car
19  was sold or not.  I don't recall the name.
20      Q   We will ascertain whether it was sold and
21  we will provide evidence of that.
22          Going back to the January 6, 2019
23  phonecall with Brianna to the customer, when it
24  says, No money down and has a trade-in, what does
25  that mean to you?

196

L. Stidhum

1
2      A   They want to trade in their car.
3      Q   In that situation, is it the normal
4  process that there is no money down required?
5      A   One more time.
6      Q   In a situation where there is a trade-in,
7  is it normal that there is no money down required on
8  the financing?
9      A   In certain situations.  It all depends on
10  a person's credit.
11      Q   On January 5th of '19, before this
12  customer came in, he did the application necessary
13  to check for financing in advance, correct?
14          MS. TROY:  Objection.
15      A   Yes.
16      Q   So you didn't have to wait for anybody for
17  this customer, correct?
18      A   That's not true because this is the
19  prequalification application.  This is not an
20  application that does a hard inquiry on the credit
21  and shows exactly what the banks are looking for.
22  We still have to run the credit ourselves, we still
23  have to handwrite the application in order to do so,
24  so that's not accurate.
25      Q   The prequalification made it easier,

49 (Pages 193 to 196)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

197

1                    L. Stidhum
2    didn't it?
3          MS. TROY: Objection. Argumentative.
4      A   No. The prequalification doesn't make it
5    easier unless we have access to those applications
6    prior to them coming in.
7      Q   We are going to look at Defendant's
8    Exhibit N, I believe, which is Bates-stamped D522
9    through D527.  With this lead, Brianna set up an
10   appointment for the following day after January 4th
11   of '19, correct?
12   (Defendant's Exhibit N, Marked for Identification.)
13         MS. TROY: Objection. The document speaks
14   for itself.
15     A   Yes.
16     Q   On January 10th, this customer came in for
17   a showroom visit, correct?
18     A   Right.
19         MS. TROY: Objection. The document speaks
20   for itself.
21     Q   In this particular instance, the customer
22   left information on a car she was looking for and
23   asked the dealership to let her know if you find
24   that car, correct?
25         MS. TROY: Objection. The document speaks

198

1                    L. Stidhum
2    for itself.
3      A   Yes.
4      Q   Did you take any steps to find the car she
5    wanted?
6      A   Can we go back down to the dates?
7      Q   Sure.
8      A   That was towards the end of me leaving.
9    So again, I don't recall. I don't remember this
10   customer specifically, but I'm sure I did everything
11   I could to look and see, especially at that point
12   where I was at being at that time and that
13   dealership.
14     Q   This customer you didn't lose because of
15   waiting for financing, right?
16     A   No.
17     Q   You lost this customer because you
18   couldn't find the car she wanted, correct?
19     A   I wouldn't say I lost the customer.  If
20   I'm not mistaken, I was out of that dealership a day
21   or two later.
22     Q   On January 14th, three days later,
23   correct?
24     A   I guess so.
25     Q   It takes you an hour to sell a car,

199

1                    L. Stidhum
2    correct?
3      A   More or less.
4      Q   You had 36 hours to sell a car to this
5    individual customer, correct?
6      A   Yes.  If you see there, it says she wants
7    a E43 convertible or a 6 Series convertible.  We
8    never had those cars on our lot.  Not a convertible,
9    maybe an E class, maybe a 6 Series, yes, but
10   convertible, to my knowledge, we did not have
11   convertibles, either E43 or a 6 Series, on our lot.
12     Q   You could procure one, couldn't you?
13     A   I'm sorry?
14         MS. TROY: Objection. Argumentative.
15   Repeat your question since she didn't hear.
16     Q   You could procure one, couldn't you?
17         MS. TROY: Objection. Argumentative. She
18   can answer.
19     A   I'm sure I did look and I'm sure if I
20   would have found it, she would have been right back in
21   the store.
22     Q   Let's look at Defendant's O.  It's
23   Bates-stamped D536 through D543.  Towards the bottom
24   of this exhibit on November 24th of '18, it says
25   that this customer has a 2010 Pathfinder for trade

200

1                    L. Stidhum
2    and mentioned trouble with credit and set an
3    appointment for November 25th; do you see that?
4      A   Yes.
5      Q   On November 26th, it says that this
6    customer worked with you recently, filed for
7    bankruptcy, needs to bring back a letter from the
8    trustee as to the budget she's allowed monthly
9    towards vehicle.  Will follow up, correct?
10     A   Yes.
11     Q   Do you remember working with this
12   customer?
13     A   No.
14     Q   Do you recall whether the knowledge of the
15   bankruptcy in this note indicates whether the credit
16   check was done yet?
17     A   Of course it was.  How else would we have
18   known about the bankruptcy being active?
19     Q   With respect to this customer, performing
20   the credit check was not an issue, correct?
21     A   It looks like this was in November, so no.
22     Q   Isn't it true you announced your pregnancy
23   on November 23rd of '18?
24     A   I believe so.
25     Q   This happened after you announced your

The Little Reporting Company
646.650.5055 | www.littlereporting.com

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

201

```
1              L. Stidhum
2    pregnancy, correct?
3        A  Yes.
4        Q  Your argument that your pregnancy was the
5    reason why it took longer to check credit history is
6    inaccurate with respect to this customer, correct?
7        A  No, that's incorrect.  If you recall, I
8    did say that Isaac was the dad of the dealership and
9    when the dad left, everybody did as they pleased, so
10   there is that.
11       Q  As far as you know, Isaac was the one who
12   pulled the credit for this one?
13       A  I'm not sure.  What I'm saying is that,
14   yes, I announced my pregnancy on November 23rd.  I
15   only remember that because it's my mother's
16   birthday.  I remember announcing my pregnancy then,
17   but the discrimination did not happen until after
18   Isaac left because the dad of the dealership was no
19   longer watching.  There was no jumping in or trying
20   to stop things from happening.  That's what my point
21   is.
22       Q  It says here on December 27th, The
23   customer came for a second time and left very upset.
24   She's in the middle of a bankruptcy and we can't
25   help her; do you see that?
```

202

```
1              L. Stidhum
2        A  Yes.
3        Q  Isn't it true that sometimes you can't
4    help a customer even if you do the credit check?
5        MS. TROY:  Objection.  Argumentative.
6        A  Of course that's true, but again, I
7    mentioned that I might have sat with two or three or
8    maybe more customers a day.  That could have been
9    one of the very few that that happened with.
10       Q  Let's go to Defendant's Exhibit O,
11   Bates-stamped D633 through D636.
12   (Defendant's Exhibit O, Marked for Identification.)
13   BY MR. KATAEV:
14       Q  On this particular one it says, On
15   December 29 of 2018, Brianna found out that this
16   customer was interested in a RAV4 and will be in
17   today and if not with follow up; do you see that?
18       A  Yes.
19       Q  On January 4th, she reiterated the
20   interest in the RAV4 and set an appointment for the
21   following day, correct?
22       A  Yes.
23       Q  It says that on January 5th, the text
24   message by Brianna asked the customer to ask for you
25   when the customer arrives, correct?
```

203

```
1              L. Stidhum
2        MS. TROY:  Objection.  Document speaks for
3    itself.
4        A  Yes.
5        Q  On January 6th, there is a message by
6    Brianna saying the customer will call back if he's
7    still interested, correct?
8        A  Correct.
9        MS. TROY:  Objection.  The document speaks
10   for itself.
11       MR. KATAEV:  Your objection is noted.
12       Q  On March 28, this individual bought a
13   different car from somewhere else, correct?
14       A  I guess so.
15       MS. TROY:  Objection.  The document speaks
16   for itself.
17       Q  There is no indication there that there
18   were any issues with getting a credit check done,
19   correct?
20       A  It also doesn't indicate that the customer
21   ever came in.  Yes, he made the appointment, yes,
22   Brianna told him to ask for me.  It doesn't look
23   like he ever came in.
24   (Defendant's Exhibit P, Marked for Identification.)
25       MR. KATAEV:  Bates numbered to be D804 to
```

204

```
1              L. Stidhum
2    D806.  This will be P.
3    BY MR. KATAEV:
4        Q  This is a December 2018 lead, correct?
5        MS. TROY:  Same objection as before, which
6    is again, you're not having the client testify
7    on her personal knowledge.  You're having her
8    read off the document.
9        MR. KATAEV:  Your objection to noted.
10   BY MR. KATAEV:
11       Q  Leticia, is this correct that it's a
12   December 2018 lead?
13       A  Yes.
14       Q  It says here on December 20th of '18 that
15   the cosigner will do an application tomorrow,
16   correct?
17       A  Yes.
18       MS. TROY:  Objection.  The document speaks
19   for itself.  This is document is cut off.
20       MR. KATAEV:  It's right here.
21   BY MR. KATAEV:
22       Q  Based on this note, is it accurate to
23   state that the customer came in?
24       MS. TROY:  Objection.  You're not having
25   her testify on her personal knowledge.  You're
```

51 (Pages 201 to 204)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

205

L. Stidhum

1    having her read off the document.
2        Q   I'm asking her based on her personal
3    knowledge whether, based on this note, the customer
4    would have come in?
5        A   If the customer did come in?
6        Q   Yes.
7        A   Can you scroll down a little more?
8        Q   Did the customer come in?
9        A   Yes.
10       Q   It says here that the customer is coming
11   with his cosigner tomorrow.  Worked with Leticia
12   last night.  He was here, doesn't know specific
13   time; do you see that?
14       A   Yes.
15       Q   In order for all of this to have happened,
16   is it accurate to state that the financing was done
17   already?
18       A   Possible.
19       Q   You did not end up selling this car
20   because the lead was lost?
21       MS. TROY:  Objection.  The document speaks
22   for itself.
23       A   Again, that's a lost lead by the system
24   that was put in three months later which is the

206

L. Stidhum

1    general timeframe of a lost lead when not contacted,
2    so I can't say it was not sold because he did
3    mention bringing in a cosigner so I can't confirm or
4    deny that.
5        Q   You don't know if it was sold or not?
6        A   I do not.
7        Q   This is Defendant's Exhibit Q.
8    Bates-stamped D812 to D814.
9    (Defendant's Exhibit Q, Marked for Identification.)
10   BY MR. KATAEV:
11       Q   At the bottom over here it says that this
12   individual came in with approval from Capital One,
13   correct?
14       MS. TROY:  Same objection.  You're not
15   having her testify on her personal knowledge.
16   You're having her read off the document.
17       A   Yes.  It does state that, but it doesn't
18   necessarily mean they are approved.
19       Q   You have a note over here, Bonus all
20   capital S's; do you see that?
21       A   Yes.
22       Q   Why did you write this note?
23       A   I have no idea.  I don't remember.
24       Q   This note was written about almost four

207

L. Stidhum

1    hours after the showroom visit started?
2        A   I don't recall.  It's four years ago.
3        Q   It says here on January 2 of '19 that
4    Brianna noted that she's happy with the purchase?
5        A   Okay.
6        Q   And that means that you were able to make
7    a sale on this vehicle, correct?
8        A   Right.
9        Q   Isaac was not here at this time, correct?
10       A   Right.
11       Q   Andris was the one who did the financing,
12   correct?
13       A   I can't answer that question because it
14   could have been Serge or Andris.
15       Q   Defendant's Exhibit R.  Bates-stamped D815
16   through D820.
17   (Defendant's Exhibit R, Marked for Identification.)
18       MS. TROY:  Same objection.  You're not
19   having her testify on her personal knowledge.
20   You're having her read off the document.
21       MR. KATAEV:  You're only repeating
22   yourself to waste time.  Make a blanket
23   objection.
24       MS. TROY:  I'm going to make a blanket

208

L. Stidhum

1    objection which is the whole set of documents
2    from I think Exhibit C onwards.  You're
3    basically having her read off the document.  A
4    lot of the times you're not even asking her to
5    testify on her personal knowledge.  So that's
6    not an appropriate objection.  The document
7    speaks for itself.
8        MR. KATAEV:  It is an inappropriate
9    objection and is a violation of Rule 30 and you
10   have been warned multiple times not to do that.
11       MS. TROY:  You asked me to make a blanket
12   objection so I did.
13       MR. KATAEV:  That's it, stop.
14       MS. TROY:  I did.
15       MR. KATAEV:  Stop already.
16       MS. TROY:  I did what you asked me to.  I
17   don't know want you want to me to do.  You
18   asked me to do something and I do it and then
19   you're like, Stop.
20       MR. KATAEV:  Please stop.
21   BY MR. KATAEV:
22       Q   Look at D818 in this particular exhibit.
23   There is a note here from Brianna that the customer
24   is waiting to see if Uber is going to hire him; do

52 (Pages 205 to 208)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

209

L. Stidhum

1
2 you see that?
3     A   Yes.
4     Q   In this particular instance no credit
5 check was probably performed because he was waiting
6 to see if he was going to be hired, correct?
7     A   That's not entirely true.
8     Q   As far as you know, the credit was done on
9 this particular customer?
10     A   I'm not saying it was or was not done
11 because there is no telling on this document.  I
12 can't really tell.
13     Q   That's fine.  This is Defendant's
14 Exhibit S, bearing Bates-stamped numbers D842 to
15 D847.
16 (Defendant's Exhibit S, Marked for Identification.)
17     MS. TROY:  Same objections as the
18 uniformed one, blanket one.
19     Q   This customer visited the showroom on
20 December 12th of 2018, correct?
21     A   Yes.
22     Q   This lead was subsequently marked lost,
23 correct?
24     A   Again, it's by the system three months
25 later, which is uniform for that CRM to do.  It does

210

L. Stidhum

1
2 that.  If it has not been contacted within three
3 months as it shows on every one you mentioned that
4 shows lost by the system, it's uniform.
5     Q   Isn't it true that if a vehicle is sold
6 it's marked in the CRM system?
7     MS. TROY:  Objection.  Argumentative.  She
8 can answer.
9     A   Again, it's if they do it.  It's not a yes
10 or no.  If they do it.
11     Q   If they fail to do it, isn't it true they
12 won't get paid a commission?
13     A   I don't believe that is entirely true
14 because they do not get paid on shows that are
15 walk-ins, so I can't say that's entirely true.
16     MR. KATAEV:  Off the record for a minute.
17 (Whereupon, an off-the-record discussion was held.)
18 BY MR. KATAEV:
19     Q   During the course of your employment with
20 Hillside Auto Outlet, there came an occasion where
21 you brought another employee on to work with us,
22 correct?
23     A   Yes.
24     Q   That individual's name is Brianna,
25 correct?

211

L. Stidhum

1
2     A   Yes.
3     Q   Brianna is a childhood friend of yours,
4 correct?
5     A   Yes.
6     Q   She continued working at the dealership
7 after you left, correct?
8     A   Right.
9     Q   To your knowledge, is she still working at
10 the dealership?
11     A   No.  Not that I know of.
12     Q   This is Defendant's Exhibit T.  1165
13 through 1167.
14 (Defendant's Exhibit T, Marked for Identification.)
15     MS. TROY:  Also just the blanket objection
16 applies to Exhibit T.
17 BY MR. KATAEV:
18     Q   For this particular lead, this customer
19 was noted by Tiffany from BDC as a cash buy,
20 correct?
21     A   Yes.
22     Q   For a cash buy, that means there will be
23 no financing, correct?
24     A   Correct.
25     Q   There is showroom visit on December 8th,

212

L. Stidhum

1
2 correct?
3     A   Right.
4     Q   You followed up with a phonecall two days
5 later, correct?
6     A   Right.
7     Q   You follow up again two days after that,
8 correct?
9     A   Right.
10     Q   You were not able to sell the vehicle,
11 correct?
12     A   Right.
13     Q   Andris Guzman did not play any role in
14 that because there was no financing, correct?
15     A   Just because it's not noted there doesn't
16 mean he did not because Serge was in the back office
17 so he probably prepared the buyer's order but the
18 first point of contact would have been Guzman.
19     Q   For what?
20     A   Because he's the sales manager so he's
21 going to want to know what's going on, what the
22 customer is asking for, how much he's looking to pay
23 and so on.
24     Q   Going to Defendant's Exhibit U.  It's a
25 document Bates-stamped 1186.  I will represent to

53 (Pages 209 to 212)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

213

L. Stidhum

1  you that this is from the payroll company and it
2  lists your hire date and termination date; do you
3  see that?
4      A   Yes.
5  (Defendant's Exhibit U, Marked for Identification.)
6  BY MR. KATAEV:
7      Q   To your knowledge, is this accurate you
8  were hired on May 22nd of 2018?
9      A   Yes.
10     Q   And you were separated from employment on
11 January 14th of 2019, correct?
12     A   Yes.
13     Q   That means you were employed with the
14 dealership for approximately eight months, correct?
15     A   Right.
16     Q   I will represent to you that we are
17 looking at your first paystub, which will be part of
18 this exhibit D1187.
19         I have D1186 through D1250 will be
20 marked as Defendant's Exhibit V.
21 (Defendant's Exhibit V, Marked for Identification.)
22 BY MR. KATAEV:
23     Q   This pay period starts on May 22nd until
24 May 28th of 2018, correct?

*Note: lines 1-25 numbering continues as printed.*

---

214

L. Stidhum

1      A   Right.
2      Q   This pay period you only received the $300
3  weekly salary, correct?
4      A   That's incorrect.  It shows the $780 in
5  commissions.  We were paid in two separate checks.
6  You get a salary check every week of $300 and
7  commission was separated to reduce the amount of
8  taxes taken out.
9      Q   On this particular case, your first week
10 you sold approximately five cars, correct?
11     A   I think it averages out to 5.2 cars
12 because that's when I was receiving the 5 percent.
13     Q   Right.  The following week, you only sold
14 approximately two cars, correct?
15         MS. TROY:  Can you break that down,
16     Emanuel?
17     A   That looks like it might have been
18 two-and-a-half cars because if another salesperson
19 had to help out, you would split the deal with the
20 other salespeople, so I mean, it could have been
21 carrying over from the 5 percent.
22     Q   Approximately two to three cars in this
23 one, right?
24     A   It might been two.  It could have been

---

215

L. Stidhum

1  that 5 percent carrying over.
2      Q   For the third week it was just two cars,
3  correct?
4      A   Right.
5      Q   In the week of June 12 to June 18, it was
6  no cars, correct?
7          MS. TROY:  Emanuel, you're scrolling
8      really fast.  Could you show us the two
9      paystubs corresponding?
10 BY MR. KATAEV:
11     Q   I will represent to you that I see one
12 paystub and it's June 12th to June 18th and the one
13 before is for the week prior and the one after is
14 for the week after.  This is D1193.
15         MS. TROY:  You're saying there is only one
16     for that week?
17 BY MR. KATAEV:
18     Q   You know what, I want to do this on the
19 record.  If you go to the week prior, it shows
20 year-to-date of $1,505.  If you go to the week after
21 if shows $2,165.
22     A   That paystub must just not be in there.
23     Q   Maybe it's later on in the production but
24 we will see.

---

216

L. Stidhum

1          Based on the difference in the gross
2  for commissions and the total being $660, you sold
3  approximately four cars, correct?
4      A   One more time.
5          MS. TROY:  How did you come up with your
6      numbers?
7  BY MR. KATAEV:
8      Q   You look at D1193, which is the week from
9  June 12th, it shows a gross year-to-date of $2,165,
10 if you go to the week prior, it's $1,505.  You get
11 $660.
12         MS. TROY:  What is your question?
13     Q   $660 and you divide that by $150, I get
14 4.4 cars.  You sold approximately four cars,
15 correct?
16     A   Yes.
17     Q   In the following week with the commission
18 being $615, you also sold approximately four cars,
19 correct?
20     A   Yes.
21     Q   In the week after that, $655, again
22 approximately four cars, correct?
23     A   It's hard to say because it's confusing
24 with that 5 percent.

---

54  (Pages 213 to 216)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

217

```
1                L. Stidhum
2     Q   Four to five, right?
3     A   Yes.
4     Q   Going into the week of July 3rd through
5  July 9 from the prior week that we just went over,
6  your gross remains the same and you didn't receive
7  any commission check.  So you didn't sell any cars
8  that week?
9        MS. TROY:  Slow down a little bit.  In the
10  July 3 to the July 9 for 1198 is your question?
11        MR. KATAEV:  That's correct.
12  BY MR. KATAEV:
13     Q   I'm showing the week before had the same
14  gross and I'm showing going back to the same paystub
15  it's the same gross and this is the following week.
16  So is it accurate to say that you sold no cars the
17  week of July 2018, the first week?
18        MS. TROY:  Could you show me the two pages
19  again with the two numbers?
20        MR. KATAEV:  Yes, of course.
21        MS. TROY:  What number are you talking
22  about?
23        MR. KATAEV:  D1198 is the benchmark.  The
24  gross is listed as $3,435 year to date.  If you
25  go back to $1,197 to the week prior, it remains
```

218

```
1                L. Stidhum
2  the same, it's $3,435 year to date.  If you go
3  to D1199, which is the one after, it's the
4  following week.
5  BY MR. KATAEV:
6     Q   Based on those three paystubs from D1197
7  to D1199, is it fair to say that you did not sell
8  any vehicles that week?
9     A   I don't recall.  I'm trying to think back.
10  Maybe I was on vacation or something.
11        MR. KATAEV:  Off the record.
12  (Whereupon, an off-the-record discussion was held.)
13  BY MR. KATAEV:
14     Q   We have reviewed the pages bearing
15  Bates-stamped numbers D1197 through D1200, which is
16  a comparison of two weeks worth of regular pay of
17  $300 a week and commissions for those two weeks.
18  And my question is:  Based on our review of the
19  record of the paystub for July 3rd through July 9th
20  bearing Bates-stamped D1198, you did not sell any
21  cars during that week, correct?
22     A   I did not say that I did not sell any
23  cars.  I was not paid any commission.  Sometimes you
24  wouldn't get paid on all your cars if the deal was
25  not funded.  Sometimes the deals were funded and I
```

219

```
1                L. Stidhum
2  would still receive pay on it.  I'm not sure what
3  happened there.
4     Q   In the following week, you received $900
5  in commissions and that means you sold at least --
6     A   Six cars.
7     Q   Correct?
8     A   I don't know if it was all for that week
9  or if there were was some carried over.  $900 would
10  be for six cars.
11     Q   The following week you made $1,400 which
12  means you sold at least nine cars, correct?
13     A   Right.  So there is definitely a
14  possibility they were carried over from previous
15  weeks or I had a really great week.
16     Q   This is your best week so far, two months
17  into your employment?
18     A   I don't remember.
19     Q   I will represent to you that this is the
20  first four-figure week you had.  The following week
21  after you made the $1,400, you made $450 and that
22  means you sold at least three cars, correct?
23     A   Right.
24     Q   The week after that $300 which means at
25  least two cars, correct?
```

220

```
1                L. Stidhum
2     A   Right.
3     Q   The week after that you top your prior
4  record and made $1,450 which is a least nine cars,
5  correct?
6     A   Right.
7        MS. TROY:  Could you do the division for
8  us?
9     A   It's a little over nine cars.
10     Q   $1,450 divided by $150 is 9.67.
11     A   It might have been a split deal in there.
12  That looks like it was after the time that I stopped
13  receiving the 5 percent.
14     Q   This is for the week ending August 20th
15  from August 14th with a pay date of August 24th.  I
16  will represent to you that your complaint states
17  that Jay stopped working on August 24.
18     A   Okay.  It might have been part of it.
19  Again, this is a long time ago.  I don't recall
20  exact dates of which she left or was fired.
21     Q   My question is basically:  Did you sell at
22  least nine cars this week?
23     A   Yes.
24     Q   We are moving now into the next week and
25  here you sold -- you have $1,200 in commissions
```

55 (Pages 217 to 220)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

221

L. Stidhum
1
2  which means you sold at least eight cars, correct?
3      A   Right.  It could have been cars carrying
4  over.
5      Q   I understand.  This following week the
6  commission was only $150, which means you sold only
7  one car?
8      A   Possibly.
9      Q   The following week, $450, which means only
10  three cars?
11      A   Again possibly.
12      Q   The following week, again just three cars
13  which is $450, correct?
14      A   Yes.
15      Q   And now the next week, which we are
16  looking at September 18 to September 24, it's $750
17  which is five cars, correct?
18      A   Yes.
19      Q   Again, $750 for the following week is five
20  cars, correct?
21      A   Yes.
22      Q   And this particular week $900 is seven
23  cars, correct?
24      A   Which one are you talking about?  What
25  number are you talking about?

222

L. Stidhum
1
2      MS. TROY:  Could you do your calculation
3  on the screen.
4      Q   We are up to D1223 for the period starting
5  and ending December 2nd through 8th of 2018, and
6  $900 divided by $150 is six.  You sold at least six
7  cars that week, correct?
8      A   Correct.
9      Q   The following week is $700.  Divide that
10  by $150, you sold at least four cars, correct?
11      A   Right.
12      Q   The following week is $800, which means
13  you sold at least five cars, correct?
14      A   I'm sorry.
15      Q   Five cars.
16      MS. TROY:  Put your calculator on the
17  screen.  It's easier.  You're saying $800.  How
18  many cars?
19      A   Five and change.
20      Q   You sold at least five cars that week.
21      A   Again, it might be carried over.  It's
22  hard to say.
23      Q   Okay.  The next week we are approaching
24  the end of October of '18 is $1,050.  When you
25  divide that by $150, it equals exactly seven.  You

223

L. Stidhum
1
2  sold at least seven cars that week, correct?
3      A   Yes.
4      Q   The following week, again, I have $1,050
5  which means you sold at least seven cars the next
6  week?
7      MS. TROY:  Emanuel, instead of at least,
8  do the -- at least seven cars.
9      A   Yes.
10      Q   The same for the following week, which is
11  Bates-stamped D1230, correct?
12      A   Right.
13      Q   I have the first week of November from the
14  6th to the 12th with Bates-stamp D1232 and $900,
15  which means you sold at least six cars, correct?
16      A   Right.
17      Q   And here we have $1,375 for the middle
18  week of November from the 13th to the 19th.  That
19  means you sold at least nine cars, correct?
20      A   Right.
21      Q   Then during the almost last week of
22  November, the 20th to 26th, I have $450 which means
23  three cars, correct?
24      A   Right.
25      Q   And then during the last week of November,

224

L. Stidhum
1
2  I think following Thanksgiving, I have $1,600 which
3  is your best week ever so far and that means you
4  sold at least ten cars, correct?
5      A   Yes.
6      Q   Now we are entering into the first week of
7  December 2018.  By the way, your best week after the
8  $1,600 was for the pay period November 27th to
9  December 3rd after you announced your pregnancy,
10  correct?
11      A   Yes.
12      Q   The following week you made $825, which is
13  at least five cars, correct?
14      A   Right.
15      Q   The second week in December you made $625,
16  which means at least four cars, correct?
17      A   Right.
18      Q   And then $500 for the third week in
19  December, which is approximately three cars,
20  correct?
21      A   Right.
22      Q   The final week in December you didn't sell
23  any cars, correct?
24      A   It looks like I sold two.
25      Q   I apologize, I saw zero.  I didn't see the

56  (Pages 221 to 224)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

225

L. Stidhum
1
2      $350. Withdrawn.
3              For the final week during the
4      Christmas holiday season from December 25th to
5      December 31st, you sold at least two cars, correct?
6          A   Right.
7          Q   Finally in January of '19, you sold at
8      least five cars based on your commission of $825,
9      correct?
10         A   Right.
11         Q   The second week of January, you have $350
12     in commissions which means you sold at least two
13     cars, correct?
14         A   Right.
15         Q   And then you no longer sold anymore
16     vehicles because you quit, correct?
17         A   Correct.
18         Q   Okay.
19         MS. TROY:  With the qualification that
20     it's for the Defendants.
21         MR. KATAEV:  What does that mean?
22         MS. TROY:  Like, she sold cars at other
23     places, just not at the Defendants'.  You said
24     she no longer sold any cars.
25         MR. KATAEV:  Right, only for defendants.

226

L. Stidhum
1
2          Skipping a bunch of exhibits, I want to
3      see if I want to do any of the others.  We can
4      take a quick break.  It's 3:59.  Let's
5      reconvene at 4:05.
6          (Whereupon, a short recess was taken.)
7      BY MR. KATAEV:
8          Q   I have placed up on the screen what will
9      be marked as Defendant's Exhibit W.
10         A   Before we move on to this, you caught me
11     in a little bit of confusion.  You said my best week
12     was $1,600 in the first week of December.  If you
13     recall, that was $1,000 of that was a bonus from
14     November.
15         Q   Okay.
16         A   It was really four cars for that first
17     week and that was definitely cars rolling over from
18     November because if we go back to the other document
19     where the sold log was, I didn't sell a car until
20     the 6th or something like that.
21         Q   Okay.  You want to supplement your answer
22     just to explain that?  That's okay, I understand
23     that.
24         A   Of course.  It looks like I sold
25     20-something cars for that month, when there is no

227

L. Stidhum
1
2      way I sold that many in three days.
3          Q   What is the most cars you ever sold in a
4      month?
5          A   30.  33, actually but not at this
6      dealership.  When I went to NYC Motor Cars.
7          Q   I'm saying at this dealership?
8          A   27, I believe or 28.
9          Q   Do you remember what month that was?
10         A   That was in the month of November.  That's
11     why I received that $1,000 bonus on December 3rd.
12         Q   The $1,600 that you received was a $1,000
13     bonus and the $600 was for at least four cars,
14     correct?
15         A   Correct.
16         Q   Thank you for clarifying your answer.
17             Going back to Exhibit W, I will
18     represent to you this is an April 28, 2022 order
19     from Judge Pamela J. Chen.  She's the judge that I
20     will represent to you was the prior judge assigned
21     to this case, and the order says here on April 1st,
22     2022, this Court ordered Plaintiff to notify the
23     Court by filing a letter on the docket within seven
24     days of the Second Circuit issuing a decision in
25     Case Number 21-1653.

228

L. Stidhum
1
2          It says Second Circuit issued its
3      decision on April 12, 2022.  As of today, April 28,
4      2022, Plaintiff has not filed a letter on the docket
5      to notify the Court.  Accordingly, on or before
6      May 4th, 2022, Plaintiff shall file a letter on her
7      docket with the proposed next step of how this case
8      should proceed.
9          Do you see that?
10         A   Yes.
11         MR. KATAEV:  Off the record.
12     (Whereupon, an off-the-record discussion was held.)
13         MR. KATAEV:  Back on the record.  I was
14     about to ask some questions about this, but
15     Plaintiff wanted to make some objections.  Go
16     ahead.
17         MS. TROY:  The same objection as before.
18     The same blanket objection applies to this
19     exhibit.
20     BY MR. KATAEV:
21         Q   Just a question I have about this,
22     Ms. Stidhum, are you aware that there was an appeal
23     of a prior case?
24         A   Yes.
25         Q   You're aware that the prior case that was

57  (Pages 225 to 228)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

229

L. Stidhum
1
2  filed was dismissed, correct?
3      A   Yes.
4      Q   You're aware it was dismissed because it
5  didn't remain with the EEOC for the statutory period
6  of time?
7      A   Yes.
8      Q   You're aware that your law firm decided to
9  appeal that decision?
10     A   Yes, I am.
11     Q   Are you aware --
12         MS. TROY:  I'm going to make sure to
13     direct my client to not divulge any
14     communication she may have had with her
15     attorney as part of any response.
16  BY MR. KATAEV:
17     Q   For this whole line of questioning, don't
18  tell me anything that you said to your attorneys or
19  your attorneys said to you.
20         You're aware that because there was
21  an appeal filed with the Second Circuit, that there
22  was something scheduled that was called a Camp
23  conference?
24     A   I'm not sure.
25     Q   Just to explain what a Camp conference is,

230

L. Stidhum
1
2  it's a conference designed for the purpose of
3  discussing settlement over the phone.
4      A   Okay, yes.
5      Q   Are you aware that that Camp conference
6  was held?
7      A   Yes.
8      Q   Did you participate in that conference?
9      A   I don't believe so.  This is not the one
10  we are talking about that was in person, correct?
11     Q   It's not, that's correct.
12     A   So no.
13     Q   You were not present, correct?
14     A   No.
15     Q   Are you aware of what transpired at this
16  conference without telling me what was said?
17     A   Yes.
18         MR. KATAEV:  Go off the record.
19  (Whereupon, an off-the-record discussion was held.)
20  BY MR. KATAEV:
21     Q   Just some general questions.
22         When you quit, you're not alleging
23  that you were constructively discharged, correct?
24     A   No.
25         MS. TROY:  Objection.  Calls for legal

231

L. Stidhum
1
2  conclusion.  I don't know if she knows what
3  you're asking.
4  BY MR. KATAEV:
5      Q   I will give some more layman's terms
6  question.
7          The reason why you quit was because
8  you were not willing to wait until Isaac dealt with
9  the issues that you were raising to his attention,
10  correct?
11     A   That's not true, because I indeed did wait
12  for Isaac and we did have an in-person conversation
13  prior to me making my final decision.
14     Q   The reason why you quit is because you did
15  not want to wait any further after having that
16  discussion, correct?
17     A   I mean, at that point it was very, you
18  know, obvious that I wasn't getting the promotion I
19  wanted or was promised, not wanted I should say, or
20  any type of raise or anything like that, so yes, I
21  did quit because of that.
22     Q   You're not saying it was intolerable to
23  work at Hillside Auto Outlet based on those
24  conditions, correct?
25     A   I mean, it was because who wants to sit in

232

L. Stidhum
1
2  a place for ten hours a day pregnant, tired and not
3  make any money.
4      Q   And the reason why you found it
5  intolerable to work there is because you were not
6  making money?
7      A   And because of the way I was being
8  treated.  I would be blatantly ignored when I had a
9  customer.
10     Q   And the only person that was ignoring you
11  was Andris Guzman, correct?
12     A   Which was my point of contact at the time
13  of Isaac's vacation, yes.
14     Q   You testified earlier that with respect to
15  your workweek, you were off on Wednesdays and every
16  other Sunday, correct?
17     A   Yes.
18     Q   What time would you come in every morning
19  and what time would you leave every evening?
20     A   10:00 to 8:00, sometimes 9:00, 10:00 p.m.
21  Depends on the workday, how many customers we have.
22     Q   You had at least a one-hour lunch break,
23  correct?
24     A   Not necessarily.  We would eat as we went.
25  There was no set time or timeframe to eat.

58  (Pages 229 to 232)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

233

L. Stidhum
1
2      Q   Would you eat together with other
3  salespeople or did you eat on your own?
4      A   Depends.  If we both didn't have a
5  customer at the time, we would go grab lunch
6  together.  We didn't have a designated area to eat
7  so we would eat right at our desk.
8      Q   Did you go to restaurants and sit there
9  and eat?
10     A   Never.
11     Q   Never?
12     A   Never.  Picked up food and come back.
13     Q   You had the option of staying at the
14 restaurant if you wanted, correct?
15     A   Not really.  It was kind of eat and go
16 type of place.  Eat and get back to work.
17     Q   When you went to get lunch, how did you
18 pay for lunch?
19     A   I mean, with my money earned there, cash,
20 credit, whatever.
21     Q   Sometimes you used cash, sometimes you
22 used credit?
23     A   Yes.
24     Q   Did you ever have a charge back?
25     A   A charge back?

234

L. Stidhum
1
2      MS. TROY:  Explain that.
3      Q   Dealership parlance.
4      A   I know what a charge back is.  If a car
5  was returned, they would take my commission back.  I
6  never dealt with a charge back, not that I remember
7  at least.
8      Q   Are you aware of any vehicles you sold
9  being returned for any reason?
10     A   Not that I can remember.
11     MS. TROY:  Again, qualifying this is
12 during Hillside?
13     MR. KATAEV:  Yes.
14 BY MR. KATAEV:
15     Q   Would you be surprised to learn there were
16 vehicles that were charged back that were not taken
17 from you?
18     A   Yes.
19     MR. KATAEV:  Off the record.
20 (Whereupon, an off-the-record discussion was held.)
21 BY MR. KATAEV:
22     Q   Are you aware that Defendants filed a
23 motion to dismiss this case?
24     A   Yes.
25     Q   Are you in receipt of a copy of the

235

L. Stidhum
1
2  decision from Judge Gonzalez denying the motion to
3  dismiss?
4      A   Yes.
5      Q   You read it, correct?
6      A   Yes.
7      Q   I'm going to place up on the screen what
8  will be marked as Defendant's Exhibit X.
9  (Defendant's Exhibit X, Marked for Identification.)
10 BY MR. KATAEV:
11     Q   I will represent to you that this is the
12 decision by Judge Gonzalez and I want to point you
13 to a particular paragraph and ask you some questions
14 about it, okay?
15     A   Okay.
16     Q   Look at page seven.  It says, Plaintiff's
17 allegations that she was deprived access to the
18 Dealertrack program and "could no longer run
19 customer credit scores or prefill financing
20 applications," are not enough to constitute adverse
21 actions because as Plaintiff herself described, she
22 was given unique access and received a benefit that
23 none of her colleagues received.
24        You see that?
25     A   Yes.

236

L. Stidhum
1
2      Q   It says in the next sentence, However, the
3  Court finds that a decrease in Plaintiff's take-home
4  pay can constitute an adverse action.
5        Do you see that?
6      A   Yes.
7      Q   You're saying that your decrease in
8  take-home pay occurred because you had to wait
9  longer for Andris to check customer's credit
10 histories, correct?
11     A   Correct.
12     Q   But I have shown you multiple examples
13 where you lost sales for reasons other than that,
14 correct?
15     A   You have showed me examples that don't
16 really apply to this because you showed me a cash
17 deal, which obviously there is no need to run
18 anybody's credit and you showed me two examples of
19 customers needing cosigners and then there is no
20 more notes after, and then it will say that the lead
21 was lost three months later because nobody wrote
22 anything so I can't agree to that.  That is not
23 correct.
24     Q   It says here, Plaintiff has plausibly
25 alleged that Defendants decreased her bonus by

59 (Pages 233 to 236)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

237

1          L. Stidhum
2    increasing the average wait time for her customers
3    after she announced her pregnancy without doing the
4    same to the customer's of her nonpregnant coworkers
5    thereby decreasing the number of sales she was able
6    to make.
7          Do you see that?
8       A   Yes.
9       Q   How is it that the Defendants increased
10   the average wait time for your customers?
11      A   Again, by making them wait to run their
12   credit, by prioritizing other customers even though
13   they came afterwards, after me having no Dealertrack
14   access.
15      Q   During your employment with Hillside Auto
16   Outlet, did you physically witness new customers
17   coming in, being checked before your customers that
18   were already waiting?
19      A   Yes.  That's how I knew that my customers
20   were being pushed to the side and taken -- I'm
21   sorry, not taken, other customers were being
22   prioritized.
23      Q   You acknowledge either way that even if
24   Andris Guzman quickly processed the applications,
25   you would still have to face the hurdle of closing

238

1          L. Stidhum
2    the sale based on whatever the numbers were and so
3    on and so forth, correct?
4       A   That's not my original complaint.
5       Q   I'm asking you even if Andris complied
6    with your request to more quickly do it, there was a
7    greater potential that you would still not be able
8    to close the sale for a variety of different
9    reasons, correct?
10         MS. TROY:  Objection.  Argumentative.  She
11   may answer.
12      A   I'm sorry, one more time.
13         MR. KATAEV:  Read it read.
14   (Whereupon, the referred to question was read back
15         by the reporter.)
16         MS. TROY:  Objection.  Calls for
17   conjecture.  She may answer.
18      A   I don't know how to answer that question
19   properly because if that was the case then it would
20   be the same as before pretty much, before I even had
21   Dealertrack access.  I'm not really sure how to
22   answer that question.
23      Q   Even after Andris would give you the
24   numbers, there was a potential the customer would
25   say, You know what, I don't want to buy this

239

1          L. Stidhum
2    vehicle, correct?
3       A   Of course, but that would have been the
4    case the whole time regardless.  That's not what the
5    complaint is.
6       Q   Even after Andris provided you the
7    numbers, the numbers could be such that the monthly
8    payment that would be required by the bank could be
9    too high, correct?
10      A   Yes.
11      Q   The down payment amount required by the
12   bank could also be too high, correct?
13      A   Yes.
14      Q   Even if Andris timely provided you the
15   numbers, it didn't necessary mean you would close
16   the sale, correct?
17      A   It's partially correct.
18      Q   It only increased your chance at making
19   the sale, but it didn't in any way guarantee you
20   would make the sale, correct?
21      A   Correct.
22      Q   Okay.  I have a couple more exhibits.  Let
23   me see if I need them.
24         MS. TROY:  Emanuel, we are sitting at the
25   4:30 mark.

240

1          L. Stidhum
2          MR. KATAEV:  We are almost done.
3          MS. TROY:  This has never been produced to
4    us as any document production.
5          MR. KATAEV:  It has been produced to the
6    judge in this case.  Please stop interrupting
7    my deposition.
8          MS. TROY:  I'm 1,000 percent --
9          MR. KATAEV:  Stop interrupting my
10   deposition.
11         MS. TROY:  I'm going to note my objection.
12   This has never been produced before.
13         MR. KATAEV:  Your objection is noted.  It
14   has been produced to the court.  Stop.
15         MS. TROY:  I'm 1,000 percent sure it was
16   not produced.
17         MR. KATAEV:  Are you willing to bet
18   $10,000 on it?
19         MS. TROY:  The Dropbox is only the
20   documents.  This is no audio file.
21         MR. KATAEV:  Stop interrupting my
22   deposition.
23         MS. TROY:  Go ahead.  I'm noting my
24   objection.
25   (Defendant's Exhibit Y, Marked for Identification.)

60  (Pages 237 to 240)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

241

                    L. Stidhum
1
2    BY MR. KATAEV:
3        Q   Defendants are producing Exhibit Y and
4    it's an audio recording, which I'm going to play.
5    It's approximately three minutes long.  I would like
6    the witness to listen and I will ask some questions
7    afterwards.
8            Are you ready?
9        A   Yes.
10       Q   Thank you.
11           (Audio is played.)
12           MS. TROY:  Let the record reflect that
13       this was not produced as part of the document
14       production response.  Instead Mr. Kataev
15       recorded me without my consent and subsequently
16       other courts have found that he should not be
17       able to record such conversations.
18   BY MR. KATAEV:
19       Q   Okay.  I have some questions about this
20   recording, Ms. Stidhum.  Were you ever apprized of
21   the fact that your attorney and I had what's called
22   a telephonic meet and confer?
23       A   Yes.
24       Q   Were you aware that this was the tenor of
25   the communications that were had?

242

                    L. Stidhum
1
2        A   No.
3        Q   Do you believe the way the attorneys are
4    acting in this phonecall are acting professional?
5            MS. TROY:  I'm going to object.
6        A   Can I object?  Can I object?
7        Q   No, you can't object.  Your attorney can
8    object and you can answer the question.  Please go
9    ahead and make your objection.
10           MS. TROY:  Repeat your question.  What is
11       your question?
12   BY MR. KATAEV:
13       Q   From what you hear on this phonecall, do
14   you believe the way the attorneys are acting on this
15   phonecall are acting professional?
16           MS. TROY:  How is this relevant?
17           MR. KATAEV:  Are you objecting because of
18       relevance, Counselor?
19           MS. TROY:  I'm objecting.
20           MR. KATAEV:  Your objection is noted.
21       Please answer the question.
22           MS. TROY:  Great.  We will make a motion
23       to strike and potentially move for costs
24       afterward.
25

243

                    L. Stidhum
1
2    BY MR. KATAEV:
3        Q   Please answer the question.
4        A   I'm not sure.  I don't know the nature.  I
5    know that things can get heated.
6        Q   Are you aware that interrogatory number 9
7    is not something that Defendants were compelled to
8    provide?
9        A   Can I know what an interrogatory is?  I
10   don't know what it is.
11       Q   Withdrawn.
12           I believe I have two or three more
13   exhibits.
14           MS. TROY:  You had a couple of exhibits
15       30 minutes ago.
16           MR. KATAEV:  Well, now I have a couple of
17       exhibits 30 minutes later.
18           MS. TROY:  For the record, it's now 4:40.
19       We were supposed to start at 9:00.  He wasn't
20       ready to start at 9:00.
21           MR. KATAEV:  Based on testimonial time.
22       Enough with this.
23           I'm placing up on the screen what will be
24       marked as Defendant's Exhibit Z.
25   (Defendant's Exhibit Z, Marked for Identification.)

244

                    L. Stidhum
1
2    BY MR. KATAEV:
3        Q   I will represent to you that this is a
4    December 6, 2022 order from Judge Mann, who
5    previously presided as the magistrate judge in this
6    case.  You can read the whole thing but my focus
7    will be on this aspect right here.  Let me know when
8    you're done reading it.
9            (Witness perusing document.)
10           MS. TROY:  I would like to note for the
11       record that this does not reflect our
12       correction to some of the misrepresentations
13       made by Defendants' counsel.
14       A   I'm finished.
15       Q   Do you see this part of this order that
16   Judge Mann notes that Plaintiff's counsel persisted
17   in engaging in gratuitous and ad hominem attacks on
18   me, Defense counsel?
19       A   Yes.
20       Q   Are you aware that your attorney spends
21   time on your case engaging in personal attacks
22   against unnecessarily?
23       A   No.
24       Q   You should be aware of that.
25           MS. TROY:  We are going to motion to

                              61  (Pages 241 to 244)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

245

L. Stidhum
1
2   strike that after this deposition.
3          MR. KATAEV:  Make the motion after.
4   Please don't interrupt my deposition.
5   BY MR. KATAEV:
6       Q   I'm placing up on the screen what will be
7   marked as Defendant's Exhibit AA.  I will represent
8   to you this is a December 22, 2022 decision by
9   Magistrate Judge Mann who previously presided over
10  this case.  It's resolving a letter motion filed by
11  your law firm that's representing you.
12         MS. TROY:  Scroll through the entirety of
13  the document.  It's 10 pages.
14         MR. KATAEV:  You have the document.  I'm
15  going to focus on what I need to ask.
16         MS. TROY:  She's entitled to review the
17  entirety of the document.
18         MR. KATAEV:  That's fine.  I would like to
19  finish asking the question before I do that.
20         MS. TROY:  She can review the entirety of
21  the document.
22         MR. KATAEV:  Stop interrupting my
23  deposition.  I'm asking a question.  Please do
24  not interrupt me.  You've interrupted me three
25  times during this question.  Make your

246

L. Stidhum
1
2   objection after I'm done speaking.  Wait until
3   I'm done.  Have some manners.
4          MS. TROY:  I'm asking that she be --
5          MR. KATAEV:  Stop.  Stop.  I want to ask
6   my question.  Stop interrupting my deposition.
7          MS. TROY:  My request was noted.  To the
8   extent you ignore it, it's also noted for the
9   record.
10         MR. KATAEV:  It's not being ignored.  I
11  would like to ask my question.  Please stop
12  interrupting my deposition.
13         MS. TROY:  Again, my request was noted.
14         MR. KATAEV:  Stop interrupting my
15  deposition.  When I finish asking my question,
16  I will give you an opportunity to make an
17  objection.  Stop interrupting my deposition.
18  BY MR. KATAEV:
19      Q   As I was saying, I'm presenting to you
20  Defendant's Exhibit AA which is a Memorandum
21  of Order by Judge Mann, the previous judge in this
22  case, and in this decision she's resolving a letter
23  motion filed by your attorneys to compel Defendants
24  to provide supplemental responses to Plaintiff's
25  interrogatories and document demands.

247

L. Stidhum
1
2       Do you see that?
3   A   Yes.
4       Q   Thank you.  If you would like to take a
5   second to read through this and tell me when to
6   scroll I will do so.
7          (Witness perusing document.)
8   A   Okay.
9       Q   I don't have any questions about this, but
10  at your counsel's request, we are going to waste our
11  time reviewing the entire document.
12         MS. TROY:  If you don't have any questions
13  about it, we don't need to waste our time going
14  through the document.
15         MR. KATAEV:  Thank you, I'm so glad we
16  were able to achieve that.
17  BY MR. KATAEV:
18      Q   I'm highlighting a portion --
19         MS. TROY:  If you have a question --
20         MR. KATAEV:  I said I don't have a
21  questions about this portion.
22  BY MR. KATAEV:
23      Q   Back on the record.  Page two of
24  Document 37.  This is Defendants' Exhibit AA and I'm
25  highlighting, Nevertheless Plaintiff's ad hominem

248

L. Stidhum
1
2   attacks are unwarranted; do you see that?
3   A   Yes.
4       Q   This is the second reference in which your
5   attorneys are being accused of making personal
6   attacks against me.
7          Are you aware of that?
8   A   No.
9       Q   It says in here that while the judge in
10  the Southern District of New York did, in fact,
11  criticize me for quote/unquote making frivolous
12  requests in that case, the firm, Troy Law PLLC,
13  which represents the Plaintiff in the instant action
14  has been sanctioned, punished in literally dozens of
15  cases, too numerous to recount in both this district
16  and the Southern District of New York.
17         Are you aware, Ms. Stidhum, that the
18  law firm that you hired has been sanctioned,
19  punished in dozens of cases too numerous recount?
20         MS. TROY:  I'm going to make my objection
21  to this question.  Irrelevant to the case and
22  we are going to motion to strike that question
23  and response and we are going to move for costs
24  and fees to that question.
25         MR. KATAEV:  Your objection is noted.

62  (Pages 245 to 248)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

249

L. Stidhum
1
2    BY MR. KATAEV:
3    Q   Please answer the question.
4    A   No.
5    Q   I have one final exhibit and this
6    deposition is over.
7         Ms. Stidhum, are you aware that there
8    was an appeal of the decision denying the motion to
9    dismiss?
10   A   Yes.
11   Q   Are you aware that that appeal has been
12   withdrawn?
13   A   Yes.
14      MR. KATAEV:  I believe I'm done.  I will
15   be right back.
16      (Short recess taken.)
17   BY MR. KATAEV:
18   Q   Ms. Stidhum, do you have a recollection as
19   to when Ali came to first work at Hillside Auto
20   Outlet?
21   A   I don't really remember.  It was between
22   sometime in mid November to early December.  Isaac
23   was trying to train him for when he leaves to work
24   of handle what he handles while he was on vacation.
25   Q   When did Isaac go on vacation?

250

L. Stidhum
1
2    A   Early December.  Maybe mid December.
3    Q   It wouldn't be outside the realm of reason
4    for Ali to have come to begin work in the beginning
5    of December, correct?
6       MS. TROY:  Objection as to form.  She may
7    answer.
8    A   I'm sorry.  I don't understand.  I don't
9    understand.
10   Q   You wouldn't find it hard to believe that
11   Ali began working in the beginning of December 2018,
12   correct?
13   A   No.  That's what I just stated.
14   Q   Okay.  You disclosed to everyone that you
15   were pregnant in late November of 2018, correct?
16   A   Correct.
17   Q   The conversation about a sales manager
18   promotion happened after Ali started working there,
19   correct?
20   A   That's incorrect.  That happened prior.
21   Q   That conversation happened between
22   yourself, Ali and Isaac; did it not?
23   A   No.
24   Q   You're saying that Isaac had an
25   independent conversation with you first without Ali

251

L. Stidhum
1
2    present?
3    A   Ali was never in the equation when we had
4    that managerial talk.
5       MR. KATAEV:  Give me one second.
6       Last question.
7       MS. TROY:  You have like five last
8    questions already.
9       MR. KATAEV:  Congratulations for noting
10   that.
11   BY MR. KATAEV:
12   Q   If the first conversation you had about
13   the promotion occurred with Ali present, then it
14   is --
15      MS. TROY:  Objection.  Mischaracterizes
16   witness testimony.  You can continue to ask
17   your question.
18      MR. KATAEV:  You can't object in the
19   middle of my question.  I'm going to rephrase
20   the question.
21   BY MR. KATAEV:
22   Q   If it is, in fact, true that your
23   conversation with Isaac about a promotion occurred
24   with Ali present, then it is true that that
25   conversation occurred after you told everyone you're

252

L. Stidhum
1
2    pregnant, correct?
3       MS. TROY:  Objection.  Mischaracterizes
4    witness testimony.  That's not what she said.
5    A   I just said Ali was not present for that
6    conversation at all.  In fact, I thought that the
7    month of November me exceeding expectations of every
8    other month was going to push me into that position
9    even more because it was already a conversation
10   prior to me doing the max cars I ever did at that
11   dealership.
12      MR. KATAEV:  Thank you for your time
13   today.  I have no further questions.
14
15      (Time noted: 4:57 p.m.)
16   _____
17      LETICIA F. STIDHUM
18
19   Subscribed and sworn to before me this _____ day
20   of _____ 2023.
21   _____, Notary Public.
22
23
24
25

63 (Pages 249 to 252)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

253

```
 1                    L. Stidhum
 2              I N D E X
 3   WITNESS
 4   LETICIA FRANCINE STIDHUM
 5
 6   EXAMINATION BY                          PAGE
 7   MR. KATAEV                                 4
 8
 9   COUNSEL REQUESTS                         PAGE
10   Dates in Florida                          20
     Childcare assistance                      29
11   Response to Interrogatory 7              157
     Response to Interrogatory 19             158
12
13           E X H I B I T S
14
     DEFENDANT'S      DESCRIPTION          PAGE
15
16   Exhibit A        Kissimmee Police       21
                      Department record
17   Exhibit 2        Complaint              81
     Exhibit C        Plaintiff's Initial   143
18                    Disclosures
     Exhibit D        Damage calculations   148
19   Exhibit E        Response to           154
                      Interrogatories
20   Exhibit F        Monthly sheets        162
     Exhibit G        Monthly sheets        170
21   Exhibit H        Cap sheet             172
     Exhibit I        Declaration of        173
22                    Serge
     Exhibit J        Bates-stamped         184
23                    D151-D157
     Exhibit K        Bates-stamped         187
24                    D249-254
     Exhibit L        Bates-stamped         190
25                    D288-D293
```

---

254

```
 1                    L. Stidhum
 2
 3         E X H I B I T S (Continued)
 4
     DEFENDANT'S       DESCRIPTION          PAGE
 5
 6   Exhibit M        Bates-stamped         194
                      D397-D402
 7   Exhibit N        Bates-stamped         197
                      D522-D527
 8   Exhibit O        Bates-stamped         202
                      D633-D636
 9   Exhibit P        Bates-stamped         203
                      D804-D806
10   Exhibit Q        Bates-stamped         206
                      D812-D814
11   Exhibit R        Bates-stamped         207
                      D815-D820
12   Exhibit S        Bates-stamped         209
                      D842-D847
13   Exhibit T        Bates-stamped         211
                      D1165-D1167
14   Exhibit U        Bates-stamped 1186    213
     (TR      Exhibit V      Bates-stamped
15                    D1186-D1250
     Exhibit X        Decision by Judge     235
16                    Gonzalez
     Exhibit Y        Audio recording       241
17   Exhibit Z        Order by Judge Mann   244
18
19   Attorney Kataev has retained all exhibits.
20
21
22
23
24
25
```

---

255

```
 2        C E R T I F I C A T I O N
 3
 4        I, RUTHAYN SHALOM, a Court Reporter
 5   and Notary Public within and for the State
 6   of New York, do hereby certify:
 7        That the witness whose deposition
 8   is hereinbefore set forth, was duly sworn
 9   by me, and that the within transcript is a
10   true record of the testimony given by such
11   witness.
12        I further certify that I am not
13   related to any of the parties to this action
14   by blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto
17   set my hand this 6th day of March, 2023.
18
19
20        Ruthayn Shalom
21           RUTHAYN SHALOM
22
23
24
25
```

---

256

```
 2              ERRATA SHEET
 3
 4   NAME OF CASE: STIDHUM v HILLSIDE AUTO et al.
     DATE OF DEPOSITION: February 17, 2023
 5   NAME OF DEPONENT: Leticia Stidhum
     PAGE  LINE(S)       CHANGE           REASON
 6   ____/_____/_____/_____
 7   ____/_____/_____/_____
 8   ____/_____/_____/_____
 9   ____/_____/_____/_____
10   ____/_____/_____/_____
11   ____/_____/_____/_____
12   ____/_____/_____/_____
13   ____/_____/_____/_____
14   ____/_____/_____/_____
15   ____/_____/_____/_____
16   ____/_____/_____/_____
17   ____/_____/_____/_____
18
                    _____
                     LETICIA F. STIDHUM
19
     Subscribed and sworn to before me
20   this _____ day of _____, 2023
                    _____, Notary Public.
21
22              _____
23        MY COMMISSION EXPIRES:
24
25
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

257

**A**

**a.m** 1:12 186:17
**AA** 245:7 246:20 247:24
**abide** 26:25
**ability** 9:13 41:17 46:10,24 66:25
**able** 45:20,22 98:22 98:25 114:11 144:3 170:19 177:17 187:7 207:7 212:10 237:5 238:7 241:17 247:16
**absolutely** 74:5,9 75:7 181:9 187:5
**accept** 138:22 174:19
**access** 45:16 46:9,20 47:7,11 62:11,18 63:8 69:2 82:20 91:24 103:9 105:8 106:5 146:4 163:15 175:21,23 176:15 177:16 197:5 235:17,22 237:14 238:21
**account** 47:24 117:14 146:6
**accounted** 85:8,11,25
**accurate** 34:17 158:19 168:2,4,8,9 168:17 169:2 170:9 172:3 193:21,23,25 196:24 204:22 205:17 213:8 217:16
**accused** 248:5
**achieve** 247:16
**achieved** 68:11
**acknowledge** 46:19 110:17 237:23
**acknowledging** 108:3
**acting** 242:4,4,14,15
**action** 7:12 15:9 236:4 248:13 255:13

**actions** 7:19 96:21 235:21
**active** 80:15 200:18
**activities** 162:13
**activity** 134:12
**actual** 21:6 37:23 82:5 136:13 145:15 150:16 164:6 166:15 167:2
**ad** 52:17 56:4 244:17 247:25
**add** 79:13 165:7 169:7
**additional** 171:11 179:24
**address** 4:5 16:18 65:10 130:15,17,20 149:8 155:23 190:8
**Aditia** 185:13
**administrative** 26:15 27:7
**admit** 105:7
**advance** 194:16 196:13
**adverse** 235:20 236:4
**advertise** 118:16
**affect** 9:13
**affidavit** 11:14
**affirmation** 11:16
**afloat** 93:8
**aftermarket** 164:9
**Afternoon** 143:12
**afterward** 242:24
**against-** 1:5
**agency** 26:15,18 27:7
**ago** 15:23 18:17 24:8 102:5 129:20 171:8 171:24 172:9 193:14 207:3 220:19 243:15
**agree** 4:9 175:16 178:7 193:22 236:22
**Agreed** 3:2,7,11 4:11
**agreement** 17:10

**ahead** 14:8 23:7 24:15 36:4 42:6 149:22 228:16 240:23 242:9
**airport** 33:7
**al** 256:4
**alarming** 128:11
**Alco** 30:9
**alcohol** 9:11
**Ali** 49:17 50:3 55:10 93:21,23 94:20 97:23 98:8 139:8 144:14 155:12,14 155:17 249:19 250:4,11,18,22,25 251:3,13,24 252:5
**Ali's** 50:2
**allegations** 235:17
**allege** 83:13 191:20
**alleged** 112:9,17 139:10,14 141:5,10 141:14 142:10,15 156:24 236:25
**alleges** 109:4
**alleging** 35:9 92:7 109:24 230:22
**alleviated** 115:8,15
**allow** 8:9
**allowed** 104:24 200:8
**alternating** 37:19
**ambiguous** 13:6 72:11 73:12,16 124:3,6 125:20
**amend** 144:20
**America** 18:9
**amount** 79:22 83:22 99:8 111:6 120:12 157:13 158:24 159:10,13 165:14 166:6,24 168:23 172:7 178:3,11,13 180:20 195:14 214:8 239:11
**amounts** 90:11 101:15 168:10

**and/or** 57:19 59:4 67:20
**Andris** 1:9 5:6 6:12 6:12 36:25 46:12 57:25 60:4,11 62:8 63:4 64:10,12 66:21 66:25 67:4,20 69:5 69:12 70:18 71:3,10 73:6 75:5 78:2,17 78:20,24 80:10 82:11 87:2 88:2,20 91:7,11 92:8 95:15 95:18,21,24 96:4 99:23 100:25 106:7 107:14,16 110:17 161:11 170:24 171:6 174:7 179:12 186:6 207:12,15 212:13 232:11 236:9 237:24 238:5 238:23 239:6,14
**Angeles** 133:22
**animosity** 179:6
**announced** 71:8 72:3 72:10 79:2,7 82:25 96:25 98:4 150:21 150:25 179:13 200:22,25 201:14 224:9 237:3
**announcement** 70:17 73:3 93:14 97:19 103:16 105:22,22 105:23,24 179:9
**announcing** 73:23 201:16
**annual** 158:24
**answer** 8:7,10,18 9:6 14:13 18:17 20:16 23:5,6,7,22 24:10 27:4 36:4 39:17 40:7 41:16,17,23,25 42:3,4 46:15 48:25 49:5,8 65:10,22 66:7 72:12 73:13,17 76:22 77:6 81:13

Case 1:21-cv-07163-OEM-LB Document 106-2 Filed 03/27/24 Page 67 of 102 PageID #: 2654

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

258

88:24,25 89:10
90:21 91:21 93:20
93:22 95:5 99:11,13
103:11 106:6 107:8
108:16 109:7,22
110:6,7 113:12,18
115:10 116:2,3,6,13
119:2,21 120:3,10
120:25 121:4 123:3
124:8,24 125:21
127:5 131:6 132:9
132:22 133:19
134:2,14 138:8
148:3,16 149:20,21
149:22 152:14
153:19 154:4
156:10,17 160:15
161:16,20 163:5
175:14 177:6 182:3
189:7 191:17
193:20 199:18
207:14 210:8
226:21 227:16
238:11,17,18,22
242:8,21 243:3
249:3 250:7
**answered** 41:24
76:21 77:6 136:25
178:25
**answering** 6:25 81:6
161:18 181:24
**answers** 8:25 9:17
74:23 104:2
**Antonio** 188:5,14,15
**antsy** 78:10
**anxiety** 112:12,15
117:5
**anybody** 16:7 41:6
48:2 105:25 128:10
196:16
**anybody's** 195:18
236:18
**anymore** 90:19
117:10 225:15
**anyone's** 141:2

**apologize** 224:25
**appeal** 228:22 229:9
229:21 249:8,11
**application** 48:20,23
49:11,22 55:7,12,14
56:5,6 62:15 87:6
88:6 104:12 106:8
174:11 176:18
177:8 194:6,10,11
196:12,19,20,23
204:15
**applications** 63:10
64:22 65:25 67:2
69:14 82:12 83:7
87:22 88:2 97:8,12
106:12,16 130:3
161:12,13 197:5
235:20 237:24
**applied** 28:6 29:4
55:21 127:19
135:24 136:8 137:3
137:9 159:5
**applies** 211:16
228:18
**apply** 28:10,17 29:20
62:23 135:14,21
137:16 236:16
**applying** 137:15
**appointment** 85:23
170:13 190:4 195:2
197:10 200:3
202:20 203:21
**appointments** 85:5
**appreciate** 68:9
**apprized** 241:20
**approaching** 222:23
**appropriate** 104:3,12
208:7
**approval** 206:13
**approvals** 175:15
176:25 177:11
180:9
**approved** 177:18,18
181:14 206:19
**approximately** 51:13

136:11 176:9
213:15 214:11,15
214:23 216:4,15,19
216:23 224:19
241:5
**April** 53:20 54:20
227:18,21 228:3,3
**area** 126:9 233:6
**arguing** 73:24
**argument** 71:21
73:21 89:13,24
178:10 179:13
201:4
**Argumentative**
41:22 88:23 99:10
103:10 115:9
161:15 175:13
181:2,21 191:16
193:19 197:3
199:14,17 202:5
210:7 238:10
**Argumentive** 65:21
118:25
**arithmetic** 151:6,22
**arrest** 24:6,7
**arrested** 20:21 23:9
23:15
**arrives** 202:25
**ascertain** 195:20
**aside** 63:6
**asked** 7:16 14:11
21:25 41:24 49:8
61:17 76:21 77:5
108:25 136:25
137:3 146:17 152:6
154:18,19 178:25
197:23 202:24
208:12,17,19
**asking** 6:24 12:14
23:22 109:20
162:21 183:7,13
205:3 208:5 212:22
231:3 238:5 245:19
245:23 246:4,15
**asks** 156:14

**aspect** 45:4 60:14
171:7 244:7
**aspects** 45:6
**asserted** 154:21
**assigned** 227:20
**assist** 87:22 194:13
**assistance** 29:5,10,19
29:23 253:10
**assume** 8:18 122:23
**Assuming** 45:22
**assumptions** 89:16
**asymptomatic** 68:16
**attacks** 244:17,21
248:2,6
**attempt** 87:25
**attend** 29:25 30:10
30:16
**attended** 139:4
**attending** 134:25
**attention** 81:3 231:9
**attorney** 4:17 5:4
10:2,2,20 15:13
111:15 145:16
153:18 154:3
229:15 241:21
242:7 244:20
254:19
**attorney/client** 9:24
148:7
**attorneys** 2:3,8 3:3
16:4,8 147:5,6,20
147:21,23,24
148:17 152:25
229:18,19 242:3,14
246:23 248:5
**Audi** 127:23 128:6
129:25
**audio** 240:20 241:4
241:11 254:16
**August** 43:18,20 44:3
60:8,10 64:15,17
132:23 176:3
220:14,15,15,17
**authority** 95:16
**authorization** 174:3

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

259

**Auto** 1:7,7,7,8 5:5,6,8
5:9,11,12,25 6:2,3
11:17 12:4,9,18
13:12,16,16,22,23
13:23 14:6,9,12
33:19,21,24 34:7,10
34:11,14,21,21,22
34:24 35:2,5,6,7,13
35:16 36:7,13,22
48:6 50:9 55:14,22
57:12 66:24 74:20
77:8 97:20 107:24
116:22 117:2 118:8
118:19,24 120:14
121:9,14,22,25
122:5,15,18,22
124:17 125:14
127:24,25 128:19
128:22 129:25
130:2 131:17,19,22
134:21 138:4
146:22 156:15
157:23 158:7,21,25
159:25 160:5,19
182:13 210:20
231:23 237:15
249:19 256:4
**automobile** 33:25
34:5 126:2,3 131:18
**available** 118:7 174:2
190:9
**Ave** 1:7 5:5,8
**Avenue** 2:9
**average** 150:21,25
180:10 237:2,10
**averaged** 150:13
**averages** 214:12
**avoid** 194:17
**aware** 31:5 40:12
42:13 138:16
228:22,25 229:4,8
229:11,20 230:5,15
234:8,22 241:24
243:6 244:20,24
248:7,17 249:7,11

**B**

**B** 80:25 151:8 253:13
254:3
**back** 19:13,17,24
20:2,8 22:14 24:19
24:22 32:7 35:22,23
40:14 46:15,16
51:14 53:16 66:9,10
67:7 68:4,21 81:10
81:20,23,24,24
82:22 83:21 84:10
91:16,17 93:10 97:5
99:15,16 102:12,13
103:13 105:3,4
108:18 115:12
118:10,11 120:7
122:13 126:25
138:10,11 142:18
156:20 163:7,25
164:8 165:5,14,22
167:6 168:12 175:5
176:24 177:4
179:17 186:24
189:4 192:25
195:22 198:6
199:20 200:7 203:6
212:16 217:14,25
218:9 226:18
227:17 228:13
233:12,16,24,25
234:4,5,6,16 238:14
247:23 249:15
**background** 107:14
**backpay** 119:19
120:8,12,23,25
121:18
**backtrack** 83:2 97:18
**backup** 146:2
**bad** 52:24 54:23,23
56:17
**bank** 39:13 66:5
177:4 181:8 239:8
239:12
**bankruptcy** 159:19
200:7,15,18 201:24

**banks** 64:25 65:6
67:17 174:19
196:21
**Baron** 1:8,9 5:7,7 6:6
6:15,16,20 127:25
128:22,23 129:3
130:2
**Barons** 6:19
**based** 50:21 56:4
92:9 109:25 113:24
120:25 123:16
150:16 168:13
169:7 171:20
174:18 175:6
179:20 182:6
190:24 204:22
205:3,4 216:2 218:6
218:18 225:8
231:23 238:2
243:21
**basic** 8:2 120:19,21
**basically** 37:3 208:4
220:21
**basis** 57:14 78:23
91:10 109:5,13
110:11 111:12
152:13 192:13
**Bates** 203:25
**Bates-stamp** 184:14
223:14
**Bates-stamped** 162:6
186:4 187:14
189:24 194:4 197:8
199:23 202:11
206:9 207:16
209:14 212:25
218:15,20 223:11
253:22,23,24 254:6
254:7,8,9,10,11,12
254:13,14,14
**BDC** 51:24 86:10
128:20 168:17
186:24 187:25
190:8,18,25 193:8,9
194:6 211:19

**bearing** 184:14
209:14 218:14,20
**began** 250:11
**beginning** 16:19 37:5
38:15,17 48:18
63:25 64:22 66:19
72:24 114:13,16
250:4,11
**belief** 91:11
**believe** 17:11,18
18:16 31:22 56:2
57:17 70:12,13
78:23 79:17 80:12
89:6 92:5,13,18
96:7,11 97:8,13,21
98:9,24 99:18 100:9
100:14 101:4,11
102:2 103:5 105:20
107:4 108:5 110:16
118:21 132:7 136:9
136:15 137:24
147:19 148:4 159:8
168:4 173:8 186:4
197:8 200:24
210:13 227:8 230:9
242:3,14 243:12
249:14 250:10
**bell** 38:20
**benchmark** 217:23
**benefit** 29:21 235:22
**benefits** 122:17
135:12 136:7,19,20
136:23 137:3,4,4,7
137:10,16
**Benjamin** 30:12
**Bermuda** 132:15
**best** 8:21 9:2 41:17
56:11 87:15 118:17
158:23 219:16
224:3,7 226:11
**bet** 240:17
**better** 114:16,17,19
158:20
**beyond** 8:24 189:6
**bickering** 179:17

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

260

**big** 154:14
**bigger** 154:13
**bills** 114:24 126:10
**birth** 17:7,13,17
    50:25 51:4 54:5
    55:18 100:20
    126:21,24 131:4
    134:18,22 135:14
**birthdate** 17:2,3
**birthday** 201:16
**bit** 67:8 87:12 144:3
    217:9 226:11
**blank** 96:10
**blanket** 207:23,25
    208:12 209:18
    211:15 228:18
**blatantly** 232:8
**blood** 255:14
**blue** 76:7
**board** 80:2,8 169:13
    169:22
**boat** 132:14
**body** 8:8
**bonus** 42:23,25 50:18
    50:19 61:13,15,20
    75:9,13,19,25 76:3
    76:5,6 105:18,18
    157:3,4,6,8,13
    164:19,21,22,24
    166:5,8 167:9
    206:20 226:13
    227:11,13 236:25
**bonuses** 106:5
**book** 187:2
**born** 17:25 19:10
    135:20,22,25
**bother** 129:18
**bottom** 185:12 186:8
    190:3 199:23
    206:12
**bought** 142:7 203:12
**Boulevard** 2:4 33:9
    48:10 53:10
**box** 149:13
**brain** 151:23

**break** 9:4,7 22:17,23
    24:13,15 39:2 81:7
    81:10,19,25 82:4,4
    145:14 162:20,21
    214:16 226:4
    232:22
**Brianna** 98:7 100:13
    100:16 139:9
    144:13 194:20,25
    195:23 197:9
    202:15,24 203:6,22
    207:5 208:24
    210:24 211:3
**brief** 144:16
**bring** 126:13 172:14
    189:4 200:7
**bringing** 99:3 115:14
    206:4
**broker** 125:23,25
    126:2,4 135:10
**brought** 49:14,23
    55:11 93:21 210:21
**brushed** 44:8
**bucks** 172:15
**budget** 200:8
**bummed** 56:15
**bunch** 85:14 94:13
    193:16 194:4 226:2
**busiest** 85:13
**business** 33:25 52:2
    62:24 85:4,19 97:16
    97:18 99:7 124:14
    125:5,7 127:9
    131:19 167:11
    193:15
**busy** 64:6,8 67:9 88:8
**buy** 211:19,22 238:25
**buyer's** 212:17
**buying** 180:20
    188:11

**C**

**C** 2:2 4:2,2 143:14,14
    143:19,20 151:9
    208:3 253:17 255:2

255:2
**calculated** 150:9
    152:17 168:13
**calculating** 166:2
**calculation** 10:24
    145:8 150:20,24
    153:13,15 154:20
    222:2
**calculations** 149:4,10
    154:24 155:3
    253:18
**calculator** 165:25
    222:16
**California** 133:10,15
    133:17
**call** 13:7 26:25 35:19
    56:3,8 86:14,17,19
    157:16 158:12
    188:21 203:6
**called** 53:7 56:4,17
    60:18 173:5 193:24
    229:22 241:21
**calling** 68:9 151:24
    152:3
**calls** 9:24 23:4,20
    24:24 36:2 92:11
    110:4 119:20
    230:25 238:16
**calm** 97:25
**Camp** 229:22,25
    230:5
**cap** 136:16 173:5
    253:21
**capital** 206:13,21
**capitalizing** 101:22
**capped** 136:15 159:9
    159:12
**car** 31:14,15 39:5,5,8
    50:13 60:17 75:16
    83:23,23 89:21
    118:8 128:8,14
    160:9,11,13 163:20
    164:10,16,20 165:9
    169:16 171:15
    180:21,22 182:18

182:25 189:10
    195:18 196:2
    197:22,24 198:4,18
    198:25 199:4
    203:13 205:20
    221:7 226:19 234:4
**car-buying** 181:18
**Cardozo** 30:12
**care** 40:4,16 89:4
**cared** 98:24
**carefully** 13:3
**carried** 219:9,14
    222:21
**carrying** 214:22
    215:2 221:3
**cars** 34:14 36:17
    39:15 42:17 48:8
    49:12 50:6,24 51:12
    52:4 53:6,13,14,16
    54:18 55:10 61:21
    76:8 77:16 79:13,15
    79:17,18,19,21,22
    79:25 87:14 90:11
    99:5 109:2 115:5
    121:10,12,21
    123:15,17 124:13
    125:6 127:7 136:4
    137:24 155:18
    157:14 162:5
    167:25 168:2,7,10
    168:14,15,23
    169:17 170:6,15,20
    170:22 171:11,19
    171:22 172:3,5,6,7
    172:11 199:8
    214:11,12,15,19,23
    215:3,7 216:4,15,15
    216:19,23 217:7,16
    218:21,23,24 219:6
    219:10,12,22,25
    220:4,9,22 221:2,3
    221:10,12,17,20,23
    222:7,10,13,15,18
    222:20 223:2,5,8,15
    223:19,23 224:4,13

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

261

224:16,19,23 225:5
225:8,13,22,24
226:16,17,25 227:3
227:6,13 252:10
**case** 1:2 5:4 7:10,17
11:18,20 12:5,7,21
15:6 16:9 17:10
23:23 34:16 35:16
39:23 41:5 62:17
80:22 106:10
111:10 119:19
120:23 121:18
129:14 141:24
144:25 149:13,14
150:2,2 156:7,9
162:22 194:18
195:16 214:10
227:21,25 228:7,23
228:25 234:23
238:19 239:4 240:6
244:6,21 245:10
246:22 248:12,21
256:4
**cases** 248:15,19
**cash** 211:19,22
233:19,21 236:16
**categories** 154:20
**caught** 226:10
**caused** 64:25 67:5
69:4,13
**caution** 24:23
**cease** 51:20
**ceased** 52:4
**cellphone** 40:24
86:18 145:19
**center** 52:2 70:9 85:5
**centralized** 130:6
**certain** 47:18 87:22
97:12 98:23,25
146:4 178:13
195:14 196:9
**certification** 4:13
31:3,6
**certifications** 128:12
128:13,15

**certify** 255:6,12
**chance** 239:18
**chances** 46:2
**change** 47:20 76:24
95:22,25 128:8
222:19 256:5
**changed** 45:17 47:18
74:14
**changes** 4:23
**changing** 141:24
**characterization**
140:13
**charge** 21:6 24:10
233:24,25 234:4,6
**charged** 21:8 160:25
234:16
**charges** 21:4,12
**Charles** 184:19
**chart** 152:24 169:21
**Charter** 147:13,18
**check** 38:3,4 46:13
172:12 176:21
187:25 191:5
196:13 200:16,20
201:5 202:4 203:18
209:5 214:7 217:7
236:9
**checked** 168:7 191:9
191:24 192:4
237:17
**checks** 214:6
**Chen** 227:19
**child** 115:13,16,18
116:7,17,18 126:22
126:25 131:4
134:18,22,24
135:20,22,25
**child's** 116:14,16
**childcare** 29:4
253:10
**childhood** 211:3
**children** 16:23,24
18:22 55:19 74:17
74:19 78:21 131:10
**children's** 139:23

**choose** 64:11
**chose** 148:19
**chosen** 174:12,15
175:5,18 178:3
**Christmas** 142:5
225:4
**circle** 70:7
**Circuit** 227:24 228:2
229:21
**circumstance** 69:7
102:2
**circumstances**
124:18 125:9
138:13 179:21
**Civil** 4:20
**claim** 27:22 28:3
102:9 110:10
120:15 147:17,21
**claimed** 191:23
**claiming** 119:18
120:22 121:17
**clarification** 157:22
**clarified** 34:13
**clarify** 14:8,13 18:13
19:5 24:5 91:10
166:12
**clarifying** 50:17
227:16
**Clark** 184:19
**class** 199:9
**classes** 135:2
**clear** 4:19 8:6 12:24
25:17 79:10 95:5
98:18,20 125:2
**client** 68:14 104:20
151:21 181:22
183:9,12,17,22,24
204:6 229:13
**clock** 162:14
**close** 33:10,13 72:21
129:23 148:19
238:8 239:15
**closely** 179:4
**closer** 119:9
**closing** 237:25

**Club** 27:23 51:25
52:12 55:8 137:18
**clue** 78:22
**coach** 26:21 119:22
**coaching** 26:24
103:25
**cold** 79:15,16
**Collado** 165:17
**colleagues** 235:23
**college** 30:16
**combination** 44:20
44:25 112:13
**combining** 123:20
**come** 42:13 44:5
47:21 49:25 56:13
56:14 85:11,22
89:20 108:22 122:4
128:10 142:18
185:6 186:25
187:25 190:8 205:5
205:6,9 216:6
232:18 233:12
250:4
**comes** 65:5 85:2
166:2
**comfortable** 148:21
**comforting** 100:16
**coming** 128:10
153:16,25 197:6
205:11 237:17
**commentary** 154:15
183:3,8
**comments** 73:7
**commission** 40:17
50:12 88:12,15,18
90:20 94:21 107:9
109:2 166:15
210:12 214:8
216:18 217:7
218:23 221:6 225:8
234:5 256:23
**commissionable**
164:5 167:6
**commissions** 42:12
42:15 88:22 214:6

Case 1:21-cv-07163-OEM-LB Document 106-2 Filed 03/27/24 Page 71 of 102 PageID #: 2658

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

262

216:3 218:17 219:5
220:25 225:12
**common** 186:22
**communicate** 187:7
**communicating**
62:19
**communication** 9:24
229:14
**communications**
131:23 241:25
**comp** 136:22
**companies** 12:11,11
**company** 13:19 43:16
213:2
**compared** 170:11
**comparison** 218:16
**compel** 25:6,7,23,24
246:23
**compelled** 243:7
**compensation** 28:4
37:4 39:2 43:5 45:4
50:8,11 60:25 75:8
75:12
**compensatory**
153:10 155:3
**competition** 87:12
**complain** 96:20
140:7
**complained** 140:23
156:14 161:10
194:17
**complaint** 7:2 11:9
11:11 15:19,21
26:14,18 27:7,10,14
27:16 69:10,12
80:21 81:9 82:2
83:9,13 86:12
102:18 109:4,10
111:5 156:16
157:14 220:16
238:4 239:5 253:17
**complete** 8:9 83:16
128:17 178:18
**completed** 128:15
**completely** 51:22

85:9 104:9 138:20
177:24 178:4
**complied** 238:5
**comport** 173:19
**comports** 174:6
**computation** 145:11
**computer** 82:17,20
104:14
**concerned** 68:14
**concerning** 7:9 11:16
139:9 180:9
**concerns** 184:18
**conclusion** 23:5 36:2
92:12 110:5 119:21
231:2
**conditions** 95:25
231:24
**conduct** 7:18 27:2
156:15 184:5,6
**confer** 241:22
**conference** 1:18
138:18 139:2,4
148:4 229:23,25
230:2,5,8,16
**confidential** 17:8,17
17:22
**confidentiality** 17:9
**confirm** 34:17 169:6
206:4
**confirmed** 166:23
**confirming** 24:18
**conflict** 71:16
**conflicts** 71:10,25
**confront** 78:3 96:18
**confronted** 96:16
**confusing** 13:17,20
13:21 216:24
**confusion** 5:17,22
226:11
**congratulations**
51:10 70:20,23
251:9
**conjecture** 238:17
**consent** 241:15
**considered** 39:8

**consistent** 17:14
101:15,17
**consisting** 11:3
**constantly** 78:5,7
86:14
**constitute** 235:20
236:4
**constructively**
230:23
**consult** 147:23
**consumed** 9:11
**contact** 79:5 155:25
188:23 212:18
232:12
**contacted** 195:15
206:2 210:2
**contents** 15:24 178:8
**continue** 13:5 95:14
251:16
**continued** 43:23 63:3
120:13 122:22
143:18 211:6 254:3
**control** 177:25 178:4
178:7 179:21
**conversation** 10:3
14:21 16:7 56:12,21
61:23 71:4 83:24
90:8 108:11,23
110:24 145:15
156:18 157:9,12
231:12 250:17,21
250:25 251:12,23
251:25 252:6,9
**conversations** 16:3
78:11,14 82:6
144:15 241:17
**convertible** 199:7,7,8
199:10
**convertibles** 199:11
**convicted** 20:23
**conviction** 24:6,7
**convictions** 21:12
**copies** 38:11 40:25
41:4
**coplaintiff** 12:20 15:8

**copy** 4:16,21 81:8
108:8,9 234:25
**corporate** 5:15
**corporation** 5:15
**correct** 4:18,19 7:11
7:13 10:24 15:9,10
15:11,25 17:4 23:10
23:12,25 25:21
27:11,25 28:12,13
28:15,24 29:2,17,18
30:14,15,22 33:19
33:20,22 34:2,5,6,8
34:12 35:2,7,11,16
35:20 36:8,9,10,14
36:17 37:15,22 38:5
39:6 40:5,11 41:15
42:10 43:8,21,22,24
44:18 45:24 46:3,21
46:24 47:4,9 48:4
48:16 49:19 50:21
50:22 51:13 52:5
53:15 55:15,19,23
57:10,12,21 58:2,5
58:10,14,17,24
59:25 60:5,12,13,21
60:22 61:3,6,9,12
62:23 63:4,13 64:2
64:3,10 65:2,15,25
66:5,14,17,18,21
67:2,3,6,21 69:5,6,8
69:9,15,19 71:22
73:7,15 74:14,20
75:6,10,14,17,19
76:14,16,20,25 77:4
78:14 80:11,12
83:11,16 85:3,4
87:20,23 88:12 90:3
91:14,22 92:10 94:4
95:4,9,16,19,22
96:2,13 105:9,12
106:8,13,20 108:14
109:6 110:18
111:10 113:20
115:4,8 116:19
119:13,16 121:7,15

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

263

122:2 124:2 125:15
126:19,22 130:15
133:15 136:14
137:7,10 138:17,19
139:2 140:21
144:25 145:5,8,12
146:10,19,23 149:8
149:11,15 150:3,7
150:14,18,22,25
151:20 152:18,22
152:25 153:4,7,13
154:4,21,24 155:18
155:19,21 156:4,18
156:24 157:25
158:2,9 159:23
160:3,7,8 161:7
164:6,11,14,17,20
165:2,7,14,17,19,23
166:3,19,24 168:23
168:24 170:7,17
171:12,16,17
174:21,22 175:11
175:21 176:4,7
177:15 178:20,23
185:2,9,13 186:6
187:19 188:12,17
188:25 189:5,18,20
190:14,22 191:2,6,9
191:12 193:18
194:14,18,23 195:6
195:12 196:13,17
197:11,17,24
198:18,23 199:2,5
200:9,20 201:2,6
202:21,25 203:7,8
203:13,19 204:4,11
204:16 206:14
207:8,10,13 209:6
209:20,23 210:22
210:25 211:4,7,20
211:23,24 212:2,5,8
212:11,14 213:12
213:15,25 214:4,11
214:15 215:4,7
216:4,16,20,23

217:11 218:21
219:7,12,22,25
220:5 221:2,13,17
221:20,23 222:7,8
222:10,13 223:2,11
223:15,19,23 224:4
224:10,13,16,20,23
225:5,9,13,16,17
227:14,15 229:2
230:10,11,13,23
231:10,16,24
232:11,16,23
233:14 235:5
236:10,11,14,23
238:3,9 239:2,9,12
239:16,17,20,21
250:5,12,15,16,19
252:2
**correction** 244:12
**correctly** 53:12 96:7
164:23 167:13
**corresponding**
215:10
**cosigner** 188:8
204:15 205:12
206:4
**cosigners** 236:19
**costs** 242:23 248:23
**cough** 68:19
**coughing** 68:6
**counsel** 4:8 20:17
24:18 29:8 82:7
103:19,25 104:5,23
139:5 157:20
158:15 244:13,16
244:18 253:9
**counsel's** 80:24
247:10
**counselor** 24:13
123:11 183:6 184:8
242:18
**country** 18:5 132:11
132:14
**couple** 20:8 36:24
37:10 38:15,18

39:25 44:22 45:15
54:9 58:20 61:21
62:14 64:18 84:11
101:19 111:24
114:19 121:23,24
126:5 128:9 129:20
144:2 147:3 161:2
193:16 239:22
243:14,16
**course** 40:18 42:20
55:16 65:20 71:18
82:21,23 99:18
100:23 101:19
103:15 113:25
114:16,22 126:14
138:14 163:11
179:10,11 180:6
200:17 202:6
210:19 217:20
226:24 239:3
**courses** 31:10 135:4
**court** 1:1 7:7 8:7,8,11
12:20 13:8 15:8
17:12 26:3,7 27:2
151:24 152:3,5,7
192:11 227:22,23
228:5 236:3 240:14
255:4
**courtesy** 8:11 22:10
**courtroom** 139:6
**courts** 241:16
**Covid** 52:23,24 55:20
122:7,8,11,14 126:7
134:6 137:25
**coworkers** 12:19
237:4
**Craigslist** 56:2,4
130:11,14,21
**crazy** 72:14
**cream** 114:13
**credit** 46:13 62:16,22
67:8,11,15,16,24
82:18 88:5,6 89:12
89:20,23 94:11,12
174:4,10,18,21

175:6 176:17,21
177:8 178:2,12
181:7,9 191:9,24
192:4 193:6 196:10
196:20,22 200:2,15
200:20 201:5,12
202:4 203:18 209:4
209:8 233:20,22
235:19 236:9,18
237:12
**creditworthiness**
89:16 191:5
**cried** 74:3,7
**crime** 20:23
**criticize** 248:11
**CRM** 84:18,20 85:25
162:5 163:16,19
209:25 210:6
**cruise** 132:15 134:4,9
**cry** 74:3 98:2
**crying** 73:25 74:11
**current** 16:18 147:24
**currently** 18:18,22
28:9,20 29:12 74:16
131:14 134:25
**customer** 39:11
62:16 65:13 66:13
66:16 67:11 78:7
80:16 84:20 85:2
87:5,5 89:11 97:12
128:18 160:25
170:13 174:18
178:20,22 179:19
179:22 180:16,19
180:25 181:4,5,10
181:13 185:21
186:10 187:4,18,25
188:10 189:4
190:14,21,25 191:4
192:7 193:13 194:5
194:21 195:15,23
196:12,17 197:16
197:21 198:10,14
198:17,19 199:5,25
200:6,12,19 201:6

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

264

201:23 202:4,16,24
202:25 203:6,20
204:23 205:4,6,9,11
208:24 209:9,19
211:18 212:22
232:9 233:5 235:19
238:24
**customer's** 173:25
174:4,11 175:6
178:12 236:9 237:4
**customers** 45:21,23
46:7,11 64:23,23
78:5 79:8 80:11,17
82:12 83:15 84:8,15
85:7,7,10,17,21
86:14,24 89:8,15
106:2 115:5 120:5
161:13 174:20
178:13 179:18
180:8 181:16 182:9
182:23 187:2
191:23 192:8,13
193:16 194:13
202:8 232:21
236:19 237:2,10,12
237:16,17,19,21
**customers'** 102:4
**cut** 204:19

**D**

**D** 4:2 143:14 148:23
148:24 253:2,18
**d/b/a** 1:7,8
**D1165-D1167** 254:13
**D1186** 213:20
**D1186-D1250** 254:15
**D1187** 213:19
**D1193** 215:15 216:9
**D1197** 218:6,15
**D1198** 217:23 218:20
**D1199** 218:3,7
**D1200** 218:15
**D1223** 222:4
**D1230** 223:11
**D1232** 223:14

**D1250** 213:20
**D151** 184:15,22
**D151-D157** 253:23
**D157** 184:15 185:12
**D2** 162:6 163:3
168:18
**D201** 186:4,5
**D206** 186:4
**D249** 187:14
**D249-254** 253:24
**D254** 187:14
**D288** 189:24
**D288-D293** 253:25
**D293** 189:24
**D397** 194:4
**D397-D402** 254:6
**D402** 194:4
**D522** 197:8
**D522-D527** 254:7
**D527** 197:9
**D536** 199:23
**D543** 199:23
**D62** 170:5
**D633** 202:11
**D633-D636** 254:8
**D636** 202:11
**D65** 170:15
**D66** 171:10
**D67** 170:5 171:14
**D804** 203:25
**D804-D806** 254:9
**D806** 204:2
**D812** 206:9
**D812-D814** 254:10
**D814** 206:9
**D815** 207:16
**D815-D820** 254:11
**D818** 208:23
**D820** 207:17
**D842** 209:14
**D842-D847** 254:12
**D847** 209:15
**D9** 162:6 163:3
**dad** 93:6 188:4 189:9
189:10,15,16 201:8

201:9,18
**daily** 58:16 80:15
192:16
**damage** 10:24 145:8
149:3 253:18
**damages** 111:5,13
145:11 149:10
153:3,10,12,21
154:21,24 155:3,4
**Darell** 165:10
**data** 169:21 177:19
**date** 53:11 213:3,3
217:24 218:2
220:15 256:4
**dates** 20:14 64:20
198:6 220:20
253:10
**David** 13:15 14:3,4,5
14:14,15,18 15:5,7
16:8 70:9,11 87:13
87:13 97:23 98:17
129:4,10,11,19
139:8 144:9
**day** 51:8 56:3,6,8,14
56:17,19,22 57:5,7
59:17 66:14 70:5,15
79:10 95:6 123:6
131:3 133:7 170:17
170:20,22 190:13
190:13 192:20
194:25 197:10
198:20 202:8,21
232:2 252:19
255:17 256:20
**days** 37:20,21 62:4
62:14 190:17 193:8
198:22 212:4,7
227:2,24
**deal** 41:18 43:2,12
67:17 84:3 98:11,15
115:2 129:9 164:13
166:18 167:21
176:21,23 177:4,17
177:20 180:16
182:11,25 214:20

218:24 220:11
236:17
**dealership** 11:17
16:9 31:2 40:15
43:24 47:3 50:6
54:8,11,24 57:9
58:2,17,19 59:2,5
62:21 64:23,24
69:18 74:14 76:13
77:22 79:25 82:15
84:17 91:8 93:7
98:24 99:7,20
100:21 105:15
107:20 110:18
114:25 136:3,14
139:19 140:3,20,21
140:22 156:4,5
160:2,6 162:5
163:13,17 169:11
179:25 180:7
197:23 198:13,20
201:8,18 211:6,10
213:15 227:6,7
234:3 252:11
**dealership's** 179:21
**dealerships** 31:13
35:6,10 85:14,20
89:15,25 107:17
122:19 157:22,25
158:20
**Dealertrack** 45:16
46:10,20 47:12,24
63:6,8 91:24 103:9
103:16 105:8 106:4
175:21,23 176:15
177:17,20 235:18
237:13 238:21
**dealing** 151:25
**deals** 218:25
**dealt** 193:16 231:8
234:6
**December** 23:15 52:5
62:4,6 68:24 77:25
78:3 79:14,23 86:13
134:7 140:17 142:4

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

265

150:6 170:4,6,17
171:12,15,19,22
172:8 176:6 185:22
185:23 190:4,5,24
191:11 193:11,11
201:22 202:15
204:4,12,14 209:20
211:25 222:5 224:7
224:9,15,19,22
225:4,5 226:12
227:11 244:4 245:8
249:22 250:2,2,5,11
**decent** 138:15
**decide** 6:3,22
**decided** 52:24 54:25
83:19 108:13 126:9
229:8
**decides** 187:25
**deciding** 64:4
**decision** 45:6 57:20
58:4,13,23 95:4
125:4,10 227:24
228:3 229:9 231:13
235:2,12 245:8
246:22 249:8
254:15
**decision-maker**
110:18
**decisions** 110:20
111:2,4
**declaration** 11:15
173:12 253:21
**declares** 175:4
177:23
**declined** 128:25
**decrease** 10:23 92:2
101:7,13 103:17
114:23 236:3,7
**decreased** 236:25
**decreasing** 237:5
**defendant** 26:9
**Defendant's** 21:15,17
80:20,25 143:19,20
148:23,24 154:7,10
162:2 169:24 170:2

172:17,18 173:8,9
184:16 186:3
187:13,15 189:23
189:25 194:3,8
197:7,12 199:22
202:10,12 203:24
206:8,10 207:16,18
209:13,16 211:12
211:14 212:24
213:6,21,22 226:9
235:8,9 240:25
243:24,25 245:7
246:20 253:14
254:4
**defendants** 1:10 2:8
5:4 7:2,17 15:11
27:11,25 144:9
225:20,25 234:22
236:25 237:9 241:3
243:7 246:23
**Defendants'** 154:8
161:25 225:23
244:13 247:24
**Defendants's** 184:13
**Defense** 244:18
**definitely** 48:15 55:8
55:9 70:4 71:23
73:4 77:20 93:9
94:7 111:2,25
114:25 126:8 128:7
168:17 219:13
226:17
**definition** 121:2
**delay** 65:14,25 66:3
**delayed** 66:4
**delays** 64:24 65:5
**delete** 104:14
**deleted** 104:15 119:5
141:23
**delivered** 39:9
189:11
**delivery** 171:3
**demands** 246:25
**denied** 25:7 158:9
**Denise** 38:17,18

**deny** 206:5
**denying** 235:2 249:8
**department** 21:21
86:8 100:3 147:3
253:16
**depend** 138:13
**dependent** 178:2
**depends** 187:24
196:9 232:21 233:4
**DEPONENT** 256:5
**deposed** 7:21
**deposition** 7:18 8:3,4
9:20 10:7,13 11:12
15:14,17,20 16:5,19
21:24 22:9 25:13
26:4 68:12,13,20
74:24 75:3 104:3
151:11,16 152:4,11
155:9 162:16
183:15,20 184:4,7
240:7,10,22 245:2,4
245:23 246:6,12,15
246:17 249:6 255:7
256:4
**depressed** 111:19
112:3,24
**depression** 117:3
**deprived** 235:17
**describe** 37:3 111:16
**described** 235:21
**Description** 22:25
253:14 254:4
**designated** 233:6
**designed** 162:13
194:12 230:2
**desire** 90:17 94:18
**desk** 47:21 233:7
**desks** 86:20
**detail** 21:3 154:19
**development** 52:2
85:5
**diagonal** 86:20
**Dianna** 38:20
**diary** 141:8
**difference** 79:6

121:17 151:3,18
152:16 167:15
216:2
**different** 29:20 51:22
51:23 87:3 127:21
128:7 135:17,18
158:3,4,4 170:16
174:19,20,20
180:21 203:13
238:8
**difficulty** 174:25
**Dina** 38:22,23
**diploma** 30:13
**direct** 23:21 181:22
229:13
**directed** 154:23
**directly** 34:11 73:6
183:12,17
**disability** 109:25
110:3 135:12,15
136:7,19 159:16
**disagreement** 71:20
**discard** 41:12
**discarded** 41:13
**discharged** 230:23
**discipline** 95:16
**disciplined** 77:8
**disclosed** 69:14,17
82:10 83:9 91:14
250:14
**disclosing** 106:11
**disclosures** 143:21
144:21 253:18
**discovery** 22:22
160:24 163:11
**discretion** 40:11
**discretionary** 75:19
**discriminated** 92:9
92:14 102:9 109:5
109:11,14,16,21,25
110:10
**discrimination** 7:10
44:21 45:3 92:6
93:13 97:22 98:9
100:15 101:5,12

Case 1:21-cv-07163-OEM-LB Document 106-2 Filed 03/27/24 Page 75 of 102 PageID #: 2662
STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

266

102:19,25 107:24
108:4 111:18 112:6
112:10,17 139:10
139:14 141:6,11,14
142:10,15 150:13
157:2,2,15 191:20
201:17
**discriminatory** 97:9
97:13 102:2 156:15
**discuss** 15:5 25:12
82:6 93:11 111:14
139:14 140:6
145:15 154:2
**discussed** 83:15
112:20,23 114:9
123:23 125:11,19
140:4 144:13
153:18 155:20
156:7
**discussing** 230:3
**discussion** 44:14
54:16 81:21 93:3,25
94:3,6,8,16 95:12
126:16 140:14,18
156:24,25 210:17
218:12 228:12
230:19 231:16
234:20
**discussions** 141:4
**dishonestly** 18:17
**dismiss** 234:23 235:3
249:9
**dismissed** 229:2,4
**dispose** 141:19
**disposing** 141:21
**dispute** 175:10 180:3
180:11
**distinction** 180:24
181:6
**district** 1:1,1 17:15
248:10,15,16
**divide** 216:14 222:9
222:25
**divided** 220:10 222:6
**division** 220:7

**divulge** 229:13
**divulging** 82:5
145:14
**DMV** 100:3
**doc** 154:11
**docket** 227:23 228:4
228:7
**document** 11:15
21:15,20,23,24 22:2
22:5,6,17,18,21
23:14 24:24 25:2,3
25:18,19,20 42:8
65:6 66:5 81:5
108:2 143:23,25
144:4 149:5,16
154:9 162:9 163:12
168:6,16 173:4,13
184:14 186:12,20
188:11 190:11,20
197:13,19,25 203:2
203:9,15 204:8,18
204:19 205:2,22
206:17 207:21
208:4,7 209:11
212:25 226:18
240:4 241:13 244:9
245:13,14,17,21
246:25 247:7,11,14
247:24
**documentation**
179:24
**documenting** 142:15
**documents** 10:16,18
10:21 11:3,6 24:25
41:10 65:8 101:4,7
101:9 144:24 145:3
170:11 194:2 195:7
208:2 240:20
**doing** 5:19 15:16
38:17 51:23 59:10
61:17 63:4 73:25
93:19 96:5 104:6,24
104:25 125:23
127:22 135:10
142:19 157:13

180:18 194:6 237:3
252:10
**Dollar** 32:8,12,15,21
32:23
**dollars** 83:22 111:6
111:10 118:24
146:19 147:3
153:22
**door** 84:7 182:15
**double** 94:20
**doubled** 50:12
**dozens** 248:14,19
**drastic** 101:13
**draw** 50:15,16
**dressed** 89:22
**drive** 33:14
**drop** 101:19
**Dropbox** 143:4
240:19
**drugs** 9:11
**due** 44:24 134:21
163:10
**duly** 4:3 143:15
255:8
**duties** 76:15

**E**
**E** 2:2,2 4:2,2 143:14
143:14 154:7,10
199:9 253:2,13,19
254:3 255:2
**E43** 199:7,11
**earlier** 14:11 123:23
146:16 155:21
174:6 232:14
**early** 48:15 52:23
53:20 62:4,6 117:25
249:22 250:2
**earn** 126:3 158:24
**earned** 233:19
**easier** 142:25 196:25
197:5 222:17
**Eastern** 1:1 17:15
**easygoing** 8:4
**eat** 232:24,25 233:2,3

233:6,7,9,15,16
**economic** 153:3
**edification** 80:24
**education** 30:18
**educational** 29:23
107:13
**EEOC** 27:5,6,10
229:5
**effort** 110:23 126:24
**efforts** 127:4
**eight** 175:4 213:15
221:2
**either** 26:22 37:20
59:6 66:25 73:22
89:3 90:12 107:10
185:6 199:11
237:23
**electronically** 177:2
**else's** 48:3
**email** 14:24 22:5,8
130:14,17,20
141:13
**emails** 141:16,19
142:10 189:3
**Emanuel** 2:10 5:3
24:23 151:5 155:6
214:17 215:8 223:7
239:24
**emanuel@mllabor...**
2:10
**emotion** 74:10
**emotional** 112:5,19
112:23 113:22
115:8
**employed** 51:18 91:8
126:19 213:14
**employee** 14:6 34:12
58:2 106:19 108:5
210:21
**employee's** 100:11
**employees** 12:4,18
13:12 14:12 51:23
103:6 105:19
106:23 144:8
**employer** 27:21

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

267

35:11 137:16
**employers** 26:15
35:19 127:15
**employment** 11:16
27:24 36:6 43:23
48:20 49:11,22
52:17 55:2,7,12,13
59:15 66:23 95:25
123:23 125:22
128:6 134:17
161:12 210:19
213:11 219:17
237:15
**Emporium** 127:25
128:22 130:2
**ended** 36:7 38:17
147:22 187:5
**ends** 187:14
**engaging** 244:17,21
**enter** 126:25
**entered** 139:5
**entering** 224:6
**entire** 5:16 38:5
247:11
**entirely** 80:18 121:5
209:7 210:13,15
**entirety** 81:5 245:12
245:17,20
**entitle** 17:21
**entitled** 8:25 25:4
88:18 119:18
120:13 167:9
245:16
**entity** 5:15
**environment** 71:14
128:8
**equal** 85:18 151:9
165:6
**equals** 222:25
**equation** 251:3
**equivalent** 85:16
**erasing** 169:21
**ERRATA** 256:2
**error** 126:8,8
**especially** 42:21

193:15 198:11
**ESQ** 2:5,10
**estate** 125:25
**esteemed** 80:23 81:8
**estimate** 158:23
**et** 256:4
**evaluation** 77:14
**evening** 232:19
**event** 101:25
**events** 8:22,23 9:2
**everybody** 70:25
80:3 87:17 96:12
179:5 201:9
**evidence** 104:7,12
144:18 195:21
**exact** 53:8,11,24
64:20 220:20
**exactly** 5:18 20:6
21:6 47:6 77:19
93:11 136:4 191:25
196:21 222:25
**examination** 1:16 3:4
3:8 4:15,25 143:17
253:6
**examined** 4:6 143:16
**example** 31:5 60:16
118:2 124:12 125:3
125:5,8 170:24
**examples** 236:12,15
236:18
**exceeded** 79:19
**exceeding** 252:7
**excited** 70:25 167:20
**exclusive** 63:10
**Excuse** 6:18 102:11
**exhibit** 21:16,17 22:3
22:14 80:20,25
143:19,20 148:23
148:24 154:7,10
161:25 162:2 163:6
169:25 170:2
172:17,18,23,25
173:8,9 184:16
186:3,3 187:13,15
189:23,25 194:3,8

197:8,12 199:24
202:10,12 203:24
206:8,10 207:16,18
208:3,23 209:14,16
211:12,14,16
212:24 213:6,19,21
213:22 226:9
227:17 228:19
235:8,9 240:25
241:3 243:24,25
245:7 246:20
247:24 249:5
253:16,17,17,18,19
253:20,20,21,21,22
253:23,24 254:6,7,8
254:9,10,11,12,13
254:14,14,15,16,17
254:19
**exhibits** 142:19,22
226:2 239:22
243:13,14,17
254:19
**existing** 53:14
**expect** 181:15
**expectations** 252:7
**expecting** 42:21
**experience** 34:4
55:15,18 86:10
107:17,19 112:11
114:2 118:19
123:17 175:20
182:6
**experienced** 117:3
191:15
**experiences** 175:19
**EXPIRES** 256:23
**explain** 42:24 65:4
120:8 123:24 135:9
226:22 229:25
234:2
**explanation** 83:4
120:19,20,21
**expressly** 95:8
**extended** 68:25
**extent** 5:21 7:15 9:23
20:11 23:6,22 25:2

29:19 35:25 65:13
148:6 246:8
**extra** 43:5 75:16 76:9
**eyes** 96:10

**F**

**F** 4:2 143:14 161:25
162:2 252:17
253:20 255:2
256:18
**F&I** 47:3,5 173:16
**face** 237:25
**Facebook** 117:9,22
118:6,22,24 146:16
**fact** 10:3 20:19 58:7
73:11 97:7,11
105:17 108:11
115:7 118:7,23
179:11 241:21
248:10 251:22
252:6
**factors** 45:13
**facts** 23:23
**factually** 155:6
**fail** 210:11
**failed** 25:22 158:8
**failure** 179:22
**fair** 63:3 83:3 90:5
102:18,24 107:13
108:10 114:4
125:13 140:9 157:4
171:18 180:24
218:7
**fake** 172:10
**false** 166:25
**familiar** 31:2 84:16
84:23 154:8
**family** 92:25 135:16
135:19 136:6,10
139:21
**far** 8:14 32:7 36:25
57:19 58:5,7,9,22
73:3 92:7 102:8
159:21 177:19
188:10 190:20,21

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

268

201:11 209:8
219:16 224:3
**fast** 82:16 215:9
**fastest** 182:10
**father** 74:16,19
116:15,16 139:24
147:6 188:9 189:17
**father's** 189:11
**favorable** 160:19,20
160:23
**favorably** 103:6
105:12,15,20,25
106:4,20,24 107:2
**fear** 128:22
**February** 1:12 48:14
48:16,18 191:2
193:10,12 256:4
**fed** 94:24
**federal** 4:9,20 139:6
192:11,11,12
**feel** 62:12 71:6 74:25
90:18 92:2 97:4
148:21
**feelings** 111:25
**fees** 248:24
**felt** 80:13 89:5,7 95:5
96:20 108:11,24
112:2 116:14
**fifth** 23:24 24:3,11
171:15
**file** 17:19 26:18 27:6
27:21 228:6 240:20
**filed** 7:12 15:25
26:14 27:10,19 28:3
80:22 119:7 159:19
200:6 228:4 229:2
229:21 234:22
245:10 246:23
**filing** 3:8 4:13 147:17
227:23
**filings** 17:12
**fill** 48:20 49:11,21
55:6,12 94:3,9
100:19
**filled** 55:13 136:5

**filling** 49:13
**final** 224:22 225:3
231:13 249:5
**finally** 171:14 180:6
193:6 225:7
**finance** 63:17 67:12
93:19 123:7 169:14
176:19 177:9
**financial** 45:6
**financially** 116:18
**financing** 62:21,23
63:10 64:22 67:2
69:13 82:12 106:8
106:16 161:5,12
170:25 171:7
194:13 196:8,13
198:15 205:17
207:12 211:23
212:14 235:19
**find** 197:23 198:4,18
250:10
**finding** 129:13
**finds** 236:3
**fine** 36:6 53:21 141:3
143:7 145:23
209:13 245:18
**finish** 245:19 246:15
**finished** 244:14
**fire** 95:19
**fired** 32:17 37:11
43:5 55:3 79:5
129:2,9 220:20
**firing** 129:13
**firm** 148:8 229:8
245:11 248:12,18
**firm's** 149:7
**first** 4:3 7:24 8:6
15:22 31:18,24
33:18,24,25 37:5,10
60:3 62:14,20 68:23
70:6 79:3 89:5 91:3
93:3 101:19 111:24
121:13,23,24
128:17 134:24
135:20,24,25

137:18 139:5
148:20 154:18
159:14 168:12
170:5 212:18
213:18 214:10
217:17 219:20
223:13 224:6
226:12,16 249:19
250:25 251:12
**five** 37:20 171:18,22
176:12,14 214:11
217:2 221:17,19
222:13,15,19,20
224:13 225:8 251:7
**fix** 92:16
**flashy** 89:22
**flat** 37:8,13 39:3
42:19 167:16,22
**Florida** 19:9,10,17,23
19:25 20:2,12,15,18
30:4 31:17 32:10,11
132:23 133:11,15
253:10
**fluctuate** 101:15
**Flushing** 2:4 4:6
30:12
**focus** 45:4,7 81:3
85:5 244:6 245:15
**focusing** 18:7
**folder** 87:7 177:9
181:15 195:16
**follow** 17:23 20:10,15
25:6,22 29:7 67:11
108:21,24,25
157:18 158:14
200:9 202:17 212:7
**followed** 108:13
212:4
**following** 81:4 131:4
171:10 175:2 179:3
194:25 195:12
197:10 202:21
214:14 216:18
217:15 218:4 219:4
219:11,20 221:5,9

221:12,19 222:9,12
223:4,10 224:2,12
**follows** 4:7 143:16
**food** 28:6,10 29:19,20
233:12
**forced** 179:19
**Ford** 31:6,6
**forensic** 104:6,12
**forged** 23:2,3,16
**form** 3:12 4:14 27:15
38:10 40:6,21,23
48:24 49:3 66:6
72:11 77:5 91:19
108:15 114:21
148:15 160:22
250:6
**format** 142:15
**forth** 19:13 154:19
179:17 238:3 255:8
**forum** 149:14
**forward** 42:21
**found** 103:24 104:13
199:20 202:15
232:4 241:16
**four** 38:25 82:22
101:8 117:22 144:9
167:25 168:2 171:8
176:12,14 180:7
192:9 193:14
206:25 207:3 216:4
216:15,19,23 217:2
222:10 224:16
226:16 227:13
**four-figure** 219:20
**Fourth** 8:16
**Francine** 1:3,17
16:12 253:4
**Franklin** 52:14
**Freddie** 129:4,5
**free** 74:25
**frequently** 80:10
**fresh** 158:10
**Friday** 37:15,25
68:17
**friend** 97:25 100:16

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

269

211:3
**friends** 129:6,24
**frivolous** 248:11
**front** 70:9 74:4,5,7
 85:20 163:25 164:4
 164:5,25 165:5,14
 165:21 167:6
 179:17 186:25
**frustrated** 84:6 192:4
**full** 6:20 13:19 50:2
 82:2,3 136:16 159:4
 159:6 169:5
**funded** 39:16,19,21
 39:24 40:10,16
 218:25,25
**funding** 40:2
**funds** 39:12
**further** 3:7,11 66:4
 143:16 178:2
 231:15 252:13
 255:12

**G**

**G** 169:25 170:2
 253:20
**Gantt** 163:21
**gap** 30:18
**gaps** 55:17
**Gateway** 30:6
**GED** 30:9,14 31:17
 31:23
**gender** 109:6,17
**general** 15:21 47:5
 67:10 76:2 103:3
 139:19,20 141:5
 142:13 180:20
 181:18 206:2
 230:21
**generally** 31:15
 37:15 47:2 67:18
 83:6,20 111:9
**gestures** 8:8
**getting** 13:20 39:18
 41:18 42:18 54:24
 64:12 78:10 82:14

91:3 92:21 101:20
 105:17 182:15
 194:13 203:18
 231:18
**gift** 142:6,8
**girl** 38:13
**give** 8:10 34:15 38:13
 45:19 46:10 47:16
 56:24 57:23 60:16
 62:15 69:2 76:9
 82:20 88:9 90:19
 91:25 95:6 119:6
 156:10 158:23
 172:10 177:9 231:5
 238:23 246:16
 251:5
**given** 38:9 40:20
 47:13 77:17 90:24
 95:7 103:8 108:9
 166:22 235:22
 255:10
**gives** 46:4
**giving** 47:23 67:12
 95:9 127:11
**glad** 247:15
**glances** 103:20
**GM** 129:4
**go** 5:25 8:2 14:8
 20:18 23:7 24:15
 36:4 38:8 42:6
 45:17 51:14 53:16
 56:12 60:2 62:14,22
 64:4,4,8 66:25
 67:19 69:8 83:20
 87:21,25 93:11
 100:24 127:12,21
 133:21 137:17
 149:22 163:7
 180:13 183:2
 187:13 192:25
 198:6 202:10
 215:20,21 216:11
 217:25 218:2
 226:18 228:15
 230:18 233:5,8,15

240:23 242:8
 249:25
**goal** 172:13
**goes** 92:4 187:24
 189:6 195:16
**going** 4:9,21 8:2,22
 13:7,8,18 17:6,12
 21:3,14,22 22:16,22
 23:21 24:23 25:15
 25:16 26:3,25 34:15
 42:23 45:2,7 49:4
 59:11 74:22 75:13
 78:6 79:11 80:16,22
 81:9,19 89:12 90:10
 90:12,14,19 91:4
 93:11 94:3,9 95:14
 98:5,20 100:17
 101:24 103:21
 104:8 108:12,22,23
 113:13 114:14
 115:2,13 120:6,8
 128:7,13,21,23
 133:19 138:23
 140:8 148:22
 151:15,22,25
 152:10 157:15,16
 158:12 169:24
 172:10 177:11
 179:16 181:16,22
 186:8,25 188:4
 189:15 195:22
 197:7 207:25
 208:25 209:6
 212:21,21,24 217:4
 217:14 227:17
 229:12 235:7
 240:11 241:4 242:5
 244:25 245:15
 247:10,13 248:20
 248:22,23 251:19
 252:8
**Gonzalez** 235:2,12
 254:16
**good** 5:3,25 40:3
 97:16 105:2 114:3

142:17 152:12
**Google** 148:12
**gotten** 182:17
**grab** 64:7 128:17
 182:8 187:2 233:5
**graduate** 30:8,21
**graduated** 30:7
**grand** 161:2
**grandmother** 139:23
**granular** 45:5
**grass** 111:22 114:15
**gratuitous** 244:17
**great** 54:12,13,19
 55:9 69:22 114:2
 127:13 137:20
 219:15 242:22
**great-grandmother**
 146:15
**greater** 238:7
**greener** 111:23
 114:15
**greet** 80:17
**greeted** 195:6
**gross** 43:13 164:4
 167:6 216:2,10
 217:6,14,15,24
**ground** 8:3,13 9:9
**grounds** 13:4 26:22
 109:14 151:12
 183:19
**GROUP** 2:8
**grow** 91:4 97:17
**growth** 97:15
**guarantee** 239:19
**guess** 8:25 40:8 44:23
 71:2 105:17 109:23
 144:19 171:20
 185:10 195:10
 198:24 203:14
**guesstimate** 142:21
**Guzman** 1:9 5:6 6:12
 36:25 45:18 57:25
 60:4,11 62:8 67:15
 70:4,8 74:4,7 75:6
 78:17,20,24 80:10

Case 1:21-cv-07163-OEM-LB   Document 106-2   Filed 03/27/24   Page 79 of 102 PageID #: 2666

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

270

82:11,23 83:5 86:14
86:22 87:2 88:2,7,9
88:9,17,20 91:7,11
92:8 93:18,23 95:15
95:18,21,24 96:4
100:25 102:4 106:7
107:14 110:17
170:24 171:6
179:12 186:6
212:13,18 232:11
237:24
**Guzman's** 88:4 99:24
107:16

**H**

**H** 4:2 143:14 172:17
172:18,25 253:13
253:21 254:3
**half** 148:18
**hall** 158:8
**Hampton** 170:24
**hand** 88:4,4 92:4,5
109:18,18 255:17
**handle** 83:7 92:23
174:7 249:24
**handles** 249:24
**handwrite** 196:23
**handy** 66:14
**hang** 90:15 101:20
**happen** 20:25 39:19
72:9 86:21 93:12
114:14 129:10,11
140:14 182:20
192:8,13,14 201:17
**happened** 37:11
39:25 40:13,13 44:6
61:23,24,24 72:6
73:20,21 74:8 78:10
79:2 84:11 87:10
91:13 97:6 98:3
140:24 146:7
152:20 185:9 187:6
191:11 193:14
200:25 202:9
205:16 219:3

250:18,20,21
**happening** 87:2 97:2
201:20
**happens** 114:3
**happy** 61:18 123:5
207:5
**hard** 19:15 65:10
79:19 88:25 89:10
90:25 93:20 110:23
154:14 188:13
193:13 196:20
216:24 222:22
250:10
**hated** 72:14
**header** 80:23
**health** 68:15
**healthcare** 113:2
116:24
**hear** 41:25 199:15
242:13
**heated** 243:5
**held** 1:17,18 41:9
44:14 54:16 81:21
95:12 123:9 126:16
140:18 210:17
218:12 228:12
230:6,19 234:20
**help** 8:11 53:14 87:2
116:16 120:9
201:25 202:4
214:20
**helped** 115:2 170:25
171:6
**helps** 116:15
**Henston** 171:5
**hereinbefore** 255:8
**hereto** 3:4
**hereunto** 255:16
**Hey** 84:5
**HG** 1:2
**hiccups** 73:5
**high** 29:25 30:6,11,12
30:13,19 31:21
239:9,12
**high-end** 128:16

**higher** 59:25 167:10
**highlighting** 247:18
247:25
**Hillside** 1:7,7,7,8 5:5
5:5,8,8,11,12,25 6:2
6:3 11:17 12:4,9,18
13:12,16,22,23,23
14:6,9,12 33:19,21
33:24 34:7,10,11,14
34:21,21,22,24 35:2
35:4,6,7,13,15 36:7
36:12,22 48:6 50:9
55:14,22 57:12
66:24 74:20 77:8
85:14 97:20 107:23
116:22 117:2 118:8
118:19,24 120:14
120:18 121:9,14,22
121:25 122:5,15,18
122:21 124:17
125:14 131:19
134:21 138:4
146:22 156:14
157:23 158:21,25
159:25 160:5,19
182:13 210:20
231:23 234:12
237:15 249:19
256:4
**hire** 57:20 58:5,13,23
100:21 147:20
208:25 213:3
**hired** 37:5 57:15,17
57:25 58:12 59:15
59:18 63:17 76:6
209:6 213:9 248:18
**histories** 174:21
236:10
**history** 174:18 201:5
**hit** 52:23 76:9 99:4,4
122:8
**hold** 41:7,19 84:5
92:18
**holding** 193:11
**holiday** 225:4

**home** 131:10 172:14
**hominem** 244:17
247:25
**honest** 167:12
**honestly** 20:9 24:8
47:17 56:23 71:5,12
71:17 72:13 73:23
75:22 77:18 79:17
85:12 88:25 96:9
97:4 118:4 120:4
121:5 129:18 134:3
134:15 144:2,15
146:13 148:17
153:17 157:11
158:10 170:10
175:15,19
**hoping** 61:21 142:20
**hospitalized** 113:4
**hotel** 33:2,3,16,18
56:16
**hour** 7:12 15:8 26:7
175:7,16,17,19
181:12 182:16,19
188:3 198:25
**hours** 9:12 10:8,12
113:14 128:9
180:10,14 181:19
182:23 186:17,23
187:5,23 199:4
207:2 232:2
**Housekeeping** 33:6
**housing** 29:10
**hundred** 112:12
**hundreds** 84:14
**hurdle** 237:25
**hypothetical** 123:2

**I**

**iCloud** 146:2,6
**ID** 65:9
**idea** 32:4 38:2 78:19
91:9 124:4 188:21
206:24
**identification** 21:17
80:25 143:19 146:5

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

271

148:24 154:10
162:2 170:2 172:18
173:9 184:16
187:15 189:25
194:8 197:12
202:12 203:24
206:10 207:18
209:16 211:14
213:6,22 235:9
240:25 243:25
**identified** 158:17
**identify** 102:8 105:14
105:19 144:5,8,24
155:12 158:7
**identity** 155:13
**ignore** 246:8
**ignored** 232:8 246:10
**ignoring** 232:10
**immediately** 70:7
114:12 181:13,24
**important** 192:10
**impossible** 167:19,23
**impressive** 182:24
183:2
**in-person** 231:12
**inaccurate** 201:6
**inappropriate**
104:10 208:9
**inbound** 185:12
**incidents** 72:20 73:9
73:11 179:12
**include** 12:19 147:24
158:8
**included** 35:15
**including** 136:19
**income** 28:11,15,23
29:15 125:15,17
126:3,11 136:2,13
**incorrect** 25:25
120:20,25 121:2
155:7 177:16
189:13 201:7 214:5
250:20
**incorrectly** 158:7
**increase** 45:19

**increased** 46:2
114:25 237:9
239:18
**increases** 46:4
**increasing** 237:2
**independent** 177:14
250:25
**indicate** 203:20
**indicates** 200:15
**indication** 203:17
**indications** 103:21
**individual** 67:5 99:20
144:9 155:25
163:21 170:25
171:6 184:18,20
199:5 203:12
206:13
**individual's** 210:24
**individuals** 46:21
47:4,8 65:17 69:17
84:13 139:13
**industry** 34:5
**Infiniti** 160:10
**inform** 44:2
**information** 11:3
17:21 28:11,14,23
29:2,14,17 47:19
64:25 66:14,17
82:19 87:3 136:2
145:5 156:16,17,23
165:13 173:25
178:19,23 179:23
180:8 185:23
197:22
**initial** 143:21 144:20
157:14 253:17
**initially** 62:21 121:21
123:17
**injuries** 111:16 112:5
112:9,16,19,23
113:2,5,8,23 114:5
114:8 115:8
**injury** 159:16
**input** 168:17
**inquiry** 196:20

**insistence** 163:2
**Instagram** 117:11,23
**instance** 102:3
170:23 197:21
209:4
**instances** 102:19,25
182:17
**instant** 175:16
176:25 177:12
248:13
**instantly** 177:4
**instructing** 115:25
152:14
**instruction** 104:9
120:24
**instructions** 104:2
**instruments** 23:2,3
23:16
**insurance** 135:12
136:20 137:7,10,16
164:10 181:11,17
**intend** 24:25
**interact** 59:5
**interacted** 61:5
**interaction** 59:8
**interactions** 61:11
**interest** 202:20
**interested** 186:10
202:16 203:7
255:15
**internet** 130:7
**interpersonal** 71:10
71:15,25
**interrogatories** 11:23
154:8 246:25
253:19
**interrogatory** 20:11
102:22,24 154:18
155:13 156:13
157:18 158:6,14,18
243:6,9 253:11,11
**interrupt** 68:13,20
152:3,10 155:9
161:17 245:4,24
**interrupted** 245:24

**interrupting** 151:7
151:10 183:15,20
184:3 240:6,9,21
245:22 246:6,12,14
246:17
**interview** 32:24 57:9
58:10 64:19 127:21
129:7
**interviewed** 49:25
**interviewing** 37:6
**intolerable** 231:22
232:5
**intriguing** 131:8
**involved** 72:4 80:13
111:2 131:18,19
147:9
**Iris** 38:18 139:18
140:4,6 144:13
155:20,20 156:3
**irrelevant** 74:23
127:5 162:22
248:21
**Isaac** 6:10 32:24
36:23 37:6 44:10,11
45:16 46:12 47:15
49:14 56:10,19,22
57:19,22 60:2 61:2
61:24 63:14,15,25
64:10,11,21 66:20
66:21,25 67:15,20
68:23 69:4 70:2,5
70:14 74:6 80:12,14
82:16 87:18,22 90:5
92:3,13 93:25 94:15
96:20 101:3 108:11
111:3,21 123:4
156:18 161:10
176:19 201:8,11,18
207:10 231:8,12
249:22,25 250:22
250:24 251:23
**Isaac's** 46:9 48:2
91:24 232:13
**Ishaque** 1:8 2:13 5:6
6:9

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

272

**issue** 60:15 76:19
  77:9 78:6 92:16
  200:20
**issued** 228:2
**issues** 203:18 231:9
**issuing** 227:24
**item** 190:16
**items** 164:9

─────────────

**J**

**J** 184:13,16 186:3
  227:19 253:22
**Jamaica** 46:6
**January** 8:24 18:8,15
  20:13 34:8,23 36:7
  44:16 48:11,16,17
  54:6,7 60:20 61:3
  76:16,19 77:4 86:13
  90:6 94:2,15 124:18
  125:3 149:4 150:6
  150:18 186:9,15,17
  187:17,22 188:16
  188:24 193:12
  194:20 195:5,22
  196:11 197:10,16
  198:22 202:19,23
  203:5 207:4 213:12
  225:7,11
**Jay** 36:23 37:10 43:5
  43:7,15 56:25 57:24
  60:2,7,8 62:13,22
  63:3,9,10,15,18,23
  63:25 64:9,13,15,21
  66:20 67:19 75:9,14
  79:5,9 167:12
  173:21 175:25
  220:17
**Jay's** 82:14 139:18
**Jenneque** 36:23 37:7
  43:8 57:3,5,20 62:7
**Jennings** 38:20,22
**job** 36:13 40:3 48:19
  54:18,19 56:15,15
  56:16,17,18 57:7
  67:10 74:13 88:4

114:12 120:16
  121:6 122:24 123:9
  124:11 127:19,23
  128:18,23 130:3
  131:2 134:11
  159:22
**jobs** 55:3,6 125:13,14
  125:18
**John** 165:17
**joint** 35:19
**Jory** 1:8 5:7 6:6,6,18
  58:12,16,19 59:4
  60:13 61:7 156:18
**journal** 141:8
**judge** 104:13 183:11
  192:12 227:19,19
  227:20 235:2,12
  240:6 244:4,5,16
  245:9 246:21,21
  248:9 254:15,17
**July** 43:18,20 44:3
  51:3,4 60:8,10
  64:15 176:3 217:4,5
  217:10,10,17
  218:19,19
**jump** 84:2
**jumping** 201:19
**June** 19:21,21,25
  133:9,10,12,23
  134:10 143:23
  215:6,6,13,13
  216:10

─────────────

**K**

**K** 187:13,15 253:23
**Kataev** 2:10 4:8,12
  4:24 5:2,3,18,24 6:5
  6:21,23 7:15,20
  11:20 12:7,13,15,22
  13:2,7,10,21 14:2
  17:9,18,24 19:7
  20:10 21:14,18,25
  22:7,13,20,24 23:24
  24:2,4,12,15,22
  25:5,12,18,21 26:2

26:5,21 27:3,15,18
  29:7,9 35:22 36:3
  42:5 44:13,15 46:14
  46:18 49:4,7 54:15
  54:17 66:9 68:3,5,7
  68:11,18 74:25 75:4
  81:2,19,22 91:16,20
  95:11,13 99:15
  102:12 103:18,24
  104:11,19 105:2,6
  113:15,17 115:23
  115:25 116:4,5
  118:10 119:22
  120:2 121:3 124:5,7
  124:21,23 126:14
  126:17 133:20
  137:2,5 142:17
  143:3,8,18 144:22
  144:23 145:24
  149:2,19 151:7,10
  151:14,17,24 152:7
  152:12,15 154:15
  154:17 155:8,11
  157:16,21 158:12
  158:16 161:17,19
  161:22 162:3,12,23
  162:25 163:4,9
  170:3 172:19,24
  173:2,3,7,10 174:24
  175:3 182:2 183:5
  183:10,14,18,23
  184:3,10,11,17
  185:20 186:2
  187:16 190:2
  202:13 203:11,25
  204:3,9,10,20,21
  206:11 207:22
  208:9,14,16,21,22
  210:16,18 211:17
  213:7,23 215:11,18
  216:8 217:11,12,20
  217:23 218:5,11,13
  225:21,25 226:7
  228:11,13,20
  229:16 230:18,20

231:4 234:13,14,19
  234:21 235:10
  238:13 240:2,5,9,13
  240:17,21 241:2,14
  241:18 242:12,17
  242:20 243:2,16,21
  244:2 245:3,5,14,18
  245:22 246:5,10,14
  246:18 247:15,17
  247:20,22 248:25
  249:2,14,17 251:5,9
  251:11,18,21
  252:12 253:7
  254:19
**keep** 8:6 40:19 79:24
  80:3,5,10 141:8,17
  169:12
**keeping** 80:7
**kept** 34:25 71:13,14
  141:15 169:16
  177:20 179:15
**kid** 91:3
**kids** 52:25 131:15
**kind** 13:17 19:15
  24:9 31:9 32:20
  34:13 35:13 44:7
  49:24 56:14 64:13
  65:10 79:19 82:15
  87:11,15,17 88:3
  90:21 92:13 93:6,17
  93:19 95:5 98:10
  110:22,22 140:7
  157:6,7 167:11
  233:15 249:23
**Kissena** 2:4
**Kissimmee** 21:21
  253:16
**knew** 98:22 120:5
  156:9 237:19
**know** 5:22 12:22
  20:14,19 21:6 24:10
  26:24 37:11,23 38:2
  38:17 41:16 42:16
  42:17,20 46:25 47:6
  50:2,7 58:5,7,8,9,23

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

273

61:18,24 62:16,25
70:4,15 73:18 77:20
79:6,10,24 81:7
83:18 95:17,20
97:15 104:16 107:5
107:8,11,12,13,15
107:16,19 120:4
128:24 129:15,17
134:3 141:25
144:16 146:14,25
148:14 153:19
154:4 159:21
166:21 167:8 168:6
169:9 171:8 172:10
174:15 176:2
177:19 178:8
180:25 181:4,5,13
188:19 189:7
194:22 197:23
201:11 205:13
206:6 208:18 209:8
211:11 212:21
215:19 219:8 231:2
231:18 234:4
238:18,25 243:4,5,9
243:10 244:7
**knowledge** 78:17,20
88:14,17 91:7
107:23 143:25
147:16 169:11,23
170:9 177:14
199:10 200:14
204:7,25 205:4
206:16 207:20
208:6 211:9 213:8
**known** 200:18
**knows** 23:6 26:20,23
123:5,7 129:17
151:23 191:8 231:2

—————

**L**

**L** 4:1,2 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1

20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1,14
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1

174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1,23,25 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
253:24 254:1
**L-e-t-t-y** 16:14
**LABUDA** 2:8
**LaGuardia** 33:2
**Lake** 2:9
**lasted** 187:22
**lasting** 186:17
**late** 53:19 69:24
250:15
**latest** 145:19
**laughed** 161:23
**law** 2:3,8 148:8,11
149:7 229:8 245:11
248:12,18
**lawsuit** 26:6,7,8
117:21 119:8
146:19,21,23 147:6
147:10,12,17,25

163:11 192:11
**lawsuits** 26:11
**lawyer** 81:8
**layman's** 231:5
**laziness** 86:8
**LB** 1:2
**lead** 84:16,18 184:18
185:5,7,9,21,22
186:5 187:11
188:14,25 189:12
193:12 195:11,16
197:9 204:4,12
205:21,24 206:2
209:22 211:18
236:20
**leads** 11:3
**learn** 148:8,11
234:15
**learned** 55:25 72:21
73:2,10 82:23 83:5
89:19
**learning** 82:15
101:21
**leave** 18:9,11 45:21
52:24 54:25 81:18
94:19 100:21
120:14 124:2
135:17,19 136:6,10
191:4 192:5 193:8
232:19
**leaves** 249:23
**leaving** 42:22 56:16
60:7 85:21 111:22
118:14 123:4
124:11 198:8
**led** 125:9
**left** 18:4 19:23 24:18
27:24 51:21 60:8
62:7 63:3,18,23
64:9,13,15 67:20
68:23 75:9,14 99:9
100:6 110:13
118:18 119:7,9,11
121:9 123:22
124:14 125:14

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

274

134:21 149:7
173:22 176:2
188:10 197:22
201:9,18,23 211:7
220:20
**legal** 23:4 35:19 36:2
92:11 110:5 119:20
230:25
**lender** 175:6,18
176:24 177:7 178:4
178:11 179:23,24
**lender's** 179:25
**lenders** 174:12,16
176:14,16
**let's** 24:16 37:14 39:2
63:6 128:6 173:7
181:17 185:11
187:13 189:23
194:3 199:22
202:10 226:4
**Leticia** 1:3,17 16:12
184:23 187:18
193:7 204:11
205:12 252:17
253:4 256:5,18
**letter** 200:7 227:23
228:4,6 245:10
246:22
**letting** 104:16
**Letty** 16:13
**level** 72:2 87:11
**lie** 171:24
**lieu** 166:15 167:9
**life** 18:24 19:7,8,14
123:12 137:12
**liked** 179:5
**Lily** 100:12 156:9
**limited** 175:20
**line** 103:23 104:9,18
229:17
**LINE(S)** 256:5
**lines** 94:14
**link** 143:6
**LinkedIn** 117:13,23
**list** 4:22 55:14 102:25

144:12 153:6 157:9
167:5 169:14
**listed** 149:8,15
150:10,17 153:3
165:9,16 185:2,24
186:6,9 194:21
217:24
**listen** 241:6
**listing** 168:22 186:16
**lists** 102:18 150:2
213:3
**literally** 248:14
**little** 45:3 67:7 70:14
72:17 73:5,21 82:24
87:12 106:3 144:3
173:21 205:8 217:9
220:9 226:11
**live** 16:21 18:22 19:2
19:19 33:13
**lived** 18:24 33:10
**living** 19:2 74:16
**LLC** 1:7 5:5
**local** 17:14
**located** 35:5
**location** 85:19 130:6
**locations** 158:3,4
**log** 86:3 163:15
168:19 169:18
170:12 185:8,11
187:3,8 188:2,21
190:16 226:19
**logged** 86:4 187:2
**logging** 86:5,6 187:6
**long** 18:16 24:8 33:17
34:16 79:9 82:11
84:10 86:14,22
122:23 132:24
161:11 171:24
172:9 175:16
177:14,20 180:13
182:25 192:3
220:19 241:5
**long-term** 135:11
**longer** 43:15,21 44:2
67:6 69:4,13 78:2,5

78:24 80:11 83:12
83:14 91:6,12,13,23
97:8,12 102:16
106:15 126:18
131:25 178:15
182:4 192:18 201:5
201:19 225:15,24
235:18 236:9
**longest** 123:8 180:15
**look** 13:2 54:25 90:17
96:10 131:7 168:12
170:12,14 185:11
189:23 194:3 197:7
198:11 199:19,22
203:22 208:23
216:9 235:16
**looked** 61:18 130:23
168:6
**looking** 8:21 40:14
42:21 70:24 80:14
89:11,16 170:15
196:21 197:22
212:22 213:18
221:16
**looks** 200:21 214:18
220:12 224:24
226:24
**Los** 133:22
**lose** 128:23 146:4
198:14
**losing** 56:15,15
**loss** 164:14 195:16
**lost** 25:23 185:2,5,7
185:22 187:11
188:25 189:13
193:12 195:11,13
198:17,19 205:21
205:24 206:2
209:22 210:4
236:13,21
**lot** 46:7 73:25 79:17
103:20 112:11,15
114:2 128:8,13
182:8 199:8,11
208:5

**lots** 31:14,15
**loud** 8:6
**Louis** 195:6
**low** 128:21
**Lsticia3@Gmail**
130:19
**lunch** 142:18 145:14
162:20,21 232:22
233:5,17,18
**Luncheon** 143:10
**luxury** 27:23 51:24
52:11 54:22 55:8
124:13 125:6 127:8
128:16 136:4
137:18 157:24

---

**M**

**M** 1:9 4:2 5:7 6:15
143:14 194:3,8
254:6
**magistrate** 244:5
245:9
**main** 33:8 85:13
114:22
**maintain** 155:24
**maintained** 34:25
**Major** 107:21
**making** 46:2 78:2,5
90:24 94:20 95:2
104:11 110:20
115:11 121:6,14
122:8 125:4 166:10
183:8,14 231:13
232:6 237:11
239:18 248:5,11
**Mall** 1:8,8 5:6,11,12
6:2,3 12:9,18 13:12
13:16,23,23 14:6,10
34:11,12,14 35:2,7
35:13,16 127:24
128:19 130:2 158:7
**manage** 89:19
**management** 84:16
84:18,21 110:25
**manager** 38:12 45:18

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

275

47:3,5,6 49:14
51:24 53:17 54:19
63:17 67:10,12
83:24 84:4,5 86:10
89:18,24 90:14,18
90:21 92:4 93:16,18
94:4,7,10,17 123:7
128:20 131:24
174:2 177:25 178:5
178:8 186:5 212:20
250:17
**manager's** 67:10
**managerial** 251:4
**managers** 179:8
**Mann** 244:4,16 245:9
246:21 254:17
**manners** 246:3
**Manrique** 14:4,5,14
14:15,18 15:7 16:8
26:7 87:13 98:17
144:9
**Manuel** 195:6
**March** 18:8 52:23,23
53:3 134:6 185:13
203:12 255:17
**Marco** 33:2
**Marcus** 2:9
**marijuana** 21:5,7
24:7
**marijuana-related**
23:10
**mark** 17:21 21:15
80:5 169:24 173:7
239:25
**marked** 17:7,17
21:17 80:20,25
143:19 148:23,24
154:7,10 161:25
162:2 170:2 172:17
172:18 173:9
184:13,16 187:15
189:12,25 194:8
195:11,13 197:12
202:12 203:24
206:10 207:18

209:16,22 210:6
211:14 213:6,21,22
226:9 235:8,9
240:25 243:24,25
245:7
**marriage** 255:14
**married** 18:18,20
78:18
**math** 176:11
**matter** 21:19 22:9
255:15
**max** 252:10
**maximize** 99:8
**McDonald's** 31:25
32:5,9,17
**mean** 13:15 23:2
39:14 41:18 42:3
45:23 49:2,20 57:16
57:22 59:23 62:24
65:5,23 69:23 73:18
75:24 76:12 78:15
86:17,19 98:19
99:21 101:6 103:3
103:15 105:17,21
108:20 109:18
110:19,22 111:19
111:20 113:21
115:3 122:7 127:20
160:21 164:22
171:3 175:12,15
182:15 185:4 188:7
189:21 193:21
195:25 206:19
212:16 214:21
225:21 231:17,25
233:19 239:15
**meaning** 12:20 51:8
84:20
**means** 39:11 160:23
189:10,16 195:14
207:7 211:22
213:14 219:5,12,22
219:24 221:2,6,9
222:12 223:5,15,19
223:22 224:3,16

225:12
**meant** 138:21 174:15
**media** 117:7
**mediate** 72:4
**mediation** 169:8
**Medicaid** 28:18
**medical** 112:25
**Medicare** 28:17
**Medicare/Medicaid**
28:22
**medication** 9:12
113:7
**meet** 24:16 38:23
241:22
**meeting** 10:11,15
24:19 57:24
**Memorandum**
246:20
**mental** 116:24
**mention** 44:7,9 79:4
92:2 99:25 206:4
**mentioned** 45:15
61:18,19 127:7,13
200:2 202:7 210:3
**mess** 93:22
**message** 14:24 60:19
190:7 193:8,9
202:24 203:5
**messages** 142:9 194:5
**met** 10:8 56:19
**mid** 52:19 249:22
250:2
**middle** 72:25 76:8
169:4 201:24
223:17 251:19
**mile** 148:18
**milestones** 99:4
**million** 111:6,9
118:23 147:3
153:22
**millions** 146:18
**MILMAN** 2:8
**mind** 23:2 157:11
158:11
**mine** 97:25

**minor** 68:18
**minus** 151:8
**minute** 210:16
**minutes** 69:24 83:6
83:11 131:7 175:7
180:9 181:12 241:5
243:15,17
**Mischaracterizes**
132:8 145:23 165:3
177:5 251:15 252:3
**misrepresentations**
244:12
**missing** 60:17
**mistake** 176:21
**mistaken** 27:5 79:20
137:23 198:20
**mistreated** 41:7
**mitigation** 120:16
**model** 145:19
**mom** 131:14,17
**Monday** 37:15,24
108:23
**money** 42:11,14
44:21 90:24 95:2
101:23 114:24
115:3,7,11 120:12
121:12,20 122:14
128:20 157:13
158:24 190:25
191:8 193:10 195:2
195:24 196:4,7
232:3,6 233:19
**Monica** 170:24
**month** 20:7 32:2,14
33:15 51:21 53:11
53:18 58:21 62:2
76:8 79:15,18,21
85:10 93:6 128:14
133:5 140:14 168:5
168:15 169:4,5,5,12
169:17,20,21,22
172:5 175:24
195:12 226:25
227:4,9,10 252:7,8
**month-long** 87:19

Case 1:21-cv-07163-OEM-LB   Document 106-2   Filed 03/27/24   Page 85 of 102 PageID #: 2672

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

276

**monthly** 40:22 50:19
162:4 200:8 239:7
253:20,20
**months** 36:25 37:10
51:13 75:20,23,25
76:11,13 82:22
97:15 101:20
110:15 111:24
114:17,18,20
121:13 128:15
169:6 176:9,12,14
205:25 209:24
210:3 213:15
219:16 236:21
**moot** 68:7,19
**morning** 5:3 68:6
232:18
**mother** 16:22 139:23
142:8 147:9,12,16
148:9
**mother's** 133:6
146:23 201:15
**motion** 25:6,7,22,23
74:25 104:3 234:23
235:2 242:22
244:25 245:3,10
246:23 248:22
249:8
**Motor** 27:23 48:8
49:11 50:5,23 51:12
51:25 52:4,12 53:6
53:13,14,16 54:12
54:18,19 55:8,10
121:10,12,21
123:15,17 124:13
125:6 127:7 136:4
137:18,20,24
155:18 227:6
**Motors** 54:22 127:8
127:14 129:12
**mouth** 141:2
**move** 19:12 25:14,14
152:13 182:6
226:10 242:23
248:23

**moving** 25:24 169:6
220:24
**multiple** 74:5 78:10
87:4 104:20 128:25
142:24 152:21
167:20 184:25
208:11 236:12
**mumbling** 8:9
**Murray** 4:5
**mystery** 42:20

---

**N**

**N** 2:2 4:2,2 143:14,14
197:8,12 253:2
254:7 255:2
**name** 5:3,16,20,23
6:20 13:19 16:11
21:6 30:5 50:2
70:12 80:4 98:6
100:11,12 128:23
149:7,14 150:2
156:9,11 157:24
189:11 195:18,19
210:24 256:4,5
**named** 163:21 184:19
194:5
**names** 16:16 84:12
**nature** 59:8 62:8
71:15 129:21 243:4
**navigate** 82:23
**near** 148:17
**necessarily** 36:20
45:23 46:4 65:18
85:4 101:17 206:19
232:24
**necessary** 80:11
179:23 196:12
239:15
**Neck** 54:12,13,19
55:9 127:13 137:20
**need** 5:9 9:6 12:24
13:2 34:13 68:8
83:22,23 92:2
108:24 116:14
149:17 152:10

154:15 176:10
183:3 194:13
236:17 239:23
245:15 247:13
**needed** 41:2 53:13
65:7,10,12,14 188:8
190:25
**needing** 236:19
**needs** 191:8 193:10
200:7
**negative** 163:25
**Neither** 69:7
**never** 21:23,25 22:4,5
34:11 41:9 48:2
60:13 61:5,8 66:16
69:4 73:6 74:14
75:5 78:13 89:25
99:4 108:13 130:23
159:21 169:17
180:13 199:8
233:10,11,12 234:6
240:3,12 251:3
**Nevertheless** 247:25
**new** 1:1,20 2:4,9 4:5
4:6 17:15 18:12,24
19:3,12,17,24 30:11
32:10,13 50:6 53:7
53:9,13 62:24
120:16 128:8
141:22 145:25
146:8 169:21
188:14 237:16
248:10,16 255:6
**newest** 141:23
**news** 69:22
**night** 205:13
**nine** 177:23 219:12
220:4,9,22 223:19
**nonpregnant** 237:4
**normal** 196:3,7
**North** 129:12
**Northern** 33:9
**notary** 1:19 3:5 4:4
4:16 252:21 255:5
256:20

**note** 47:21 189:8,21
190:3 200:15
204:22 205:4
206:20,23,25
208:24 240:11
244:10
**noted** 104:21 116:4
151:14 203:11
204:9 207:5 211:19
212:15 240:13
242:20 246:7,8,13
248:25 252:15
**notes** 104:21,23
141:3 142:14
236:20 244:16
**notice** 1:18 125:5
**noticed** 125:6
**notify** 227:22 228:5
**noting** 240:23 251:9
**November** 52:5,19
62:5,6 79:20 93:4
93:10 173:16
199:24 200:3,5,21
200:23 201:14
223:13,18,22,25
224:8 226:14,18
227:10 249:22
250:15 252:7
**number** 77:16 79:25
80:7 85:23 149:14
150:2,9 151:19,20
153:16,25 155:13
155:24 156:13
157:18 158:18
164:24 168:11,19
168:25 179:19
217:21 221:25
227:25 237:5 243:6
**numbered** 203:25
**numbers** 94:13 98:19
98:19 99:3 131:8
151:4 168:12 169:7
169:7 172:10,22
184:14 209:14
216:7 217:19

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

277

218:15 238:2,24
239:7,7,15
**numerical** 154:20
**numerous** 248:15,19
**NY** 54:22 127:8
**NYC** 48:8 49:11 50:5
50:23 51:12 52:4
53:6,13,14,16 54:18
55:10 121:10,12,20
123:15 127:7
137:24 155:17
227:6

**O**

**O** 199:22 202:10,12
254:8 255:2
**oath** 7:6 11:16
**object** 21:22 104:8,17
183:18 242:5,6,6,7
242:8 251:18
**objected** 25:5,21
103:19
**objecting** 183:21
242:17,19
**objection** 9:23 13:4,6
19:4 23:20 26:22
27:13,15 35:25 40:6
41:22,24 48:24 49:3
65:21 66:6 72:11
73:12,16 76:21 77:5
88:23 91:19 92:11
99:10 103:10,23
108:15 109:7,22
110:4 111:8 113:11
113:15 114:21
115:9,21 116:4,12
118:25 119:20
120:22,24 121:4
122:25 124:3,5,19
125:20 131:5
132:21 133:18,25
134:13 140:12
145:22 147:15
148:2,6,15 149:16
151:12,13,14,21

152:13 153:5
155:10 160:14,22
161:9,15 165:3
175:13 176:10
177:5 178:25 181:2
181:21,23 182:12
183:5,10,23 185:17
185:18 186:12,20
189:6 190:11
191:16 193:19
195:7 196:14 197:3
197:13,19,25
199:14,17 202:5
203:2,9,11,15 204:5
204:9,18,24 205:22
206:15 207:19,24
208:2,7,10,13 210:7
211:15 228:17,18
230:25 238:10,16
240:11,13,24 242:9
242:20 246:2,17
248:20,25 250:6
251:15 252:3
**objections** 3:12 4:14
13:5 23:4 25:13
27:17 152:9 209:17
228:15
**observe** 86:25 103:20
**observed** 104:20,22
**obtain** 12:3,17 13:11
13:14 14:11 28:22
52:15 66:4 104:6
115:18 116:7
125:18 147:2
160:18 178:19
180:8
**obtained** 47:11
125:15 145:25
151:19
**obtaining** 146:18
**obvious** 167:14
231:18
**obviously** 91:23
236:17
**occasion** 210:20

**occasions** 78:11 87:4
167:20
**occur** 87:8
**occurred** 8:23 76:24
236:8 251:13,23,25
**October** 51:16,17
222:24
**off-the-record** 44:14
54:16 81:21 95:12
126:16 210:17
218:12 228:12
230:19 234:20
**offense** 23:10
**offer** 31:15 59:14
127:23 128:5,19
138:3,14,16,25
**offered** 31:12 76:12
94:20 127:24 128:3
128:25 129:3,7
**offering** 44:3 98:11
**offers** 31:6
**office** 80:2 82:18
212:16
**okay** 5:9,12 6:7,10,13
6:16 8:4,5,19,20 9:2
9:3,7,8 11:24 27:17
34:18,19 36:6 45:8
68:2 81:12,16 82:9
96:4 104:19 110:8,9
114:4 116:21
120:10 137:19
138:20 142:22
144:22 163:8
172:25 178:18
184:10 185:14
188:6 207:6 220:18
222:23 225:18
226:15,21,22 230:4
235:14,15 239:22
241:19 247:8
250:14
**old** 16:24 90:25 91:3
146:9,12
**once** 45:16 60:25
64:13 72:14 79:5

80:14 83:5 137:10
146:4 174:10
181:15
**one-hour** 232:22
**one-off** 191:14,19
**ones** 83:20 112:24
**onwards** 208:3
**opening** 53:7,9,13
**opportunity** 46:5
82:2 246:16
**option** 64:9 233:13
**order** 28:22 39:8
48:19 62:21,22
120:9 178:18
196:23 205:16
212:17 227:18,21
244:4,15 246:21
254:17
**ordered** 227:22
**original** 68:3 119:8
238:4
**outbound** 188:17,20
190:16 193:7,9
**outcome** 255:15
**Outlet** 1:7 5:9 6:2
11:17 12:4 13:16,22
14:13 33:19,22,24
34:7,21,22,22,24
35:5,6,13 36:7,13
36:22 48:7 50:9
55:14,22 57:12
66:24 74:20 77:9
97:20 116:23 117:3
118:8 121:9,14,22
121:25 122:5,15,18
122:22 124:17
125:14 131:20
134:21 138:4
146:22 156:15
158:21,25 159:25
160:5,19 182:14
210:20 231:23
237:16 249:20
**Outlet's** 107:24
**outlined** 75:13

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

278

outside 75:6 177:24
178:4,7 179:21
250:3
overall 180:22 194:2
overlap 7:16
overwhelmed 88:5
owed 42:11,14,16,18
44:21 109:2
owner 53:6,12
owners 128:24 158:5

_____

**P**

P 2:2,2 70:12 203:24
204:2 254:9
p.m 143:10,12 187:22
232:20 252:15
packet 108:5
page 80:23 163:7
168:18 170:5,15
171:10,14 185:12
235:16 247:23
253:6,9,14 254:4
256:5
pages 11:2 142:25
162:10 168:13
217:18 218:14
245:13
paid 34:22 37:7 38:9
39:15,18,20,24 40:9
41:11,14,18,21 42:9
42:18 43:2 44:22
85:6,7 109:3 120:6
120:17 135:16,19
136:6,10 166:24
167:13,15 210:12
210:14 214:6
218:23,24
Pamela 227:19
paper 82:20
paragraph 86:12
173:15,23 174:10
175:4 177:23 178:9
235:13
paragraphs 81:4,16
179:2

parenthesis 168:19
parlance 35:19 234:3
Parsons 87:13
part 25:3,18,19 26:12
64:13 65:7,11 67:9
92:3 96:14 99:23
110:19 111:3
130:10 133:17
157:7 178:16,16,18
178:19 182:5
192:10 213:18
220:18 229:15
241:13 244:15
partially 68:25 82:13
101:3 114:11
178:10 191:25
239:17
participate 58:4,13
58:23 230:8
particular 162:7
164:13,20 165:21
166:18 170:23
185:21 186:5
187:11 197:21
202:14 208:23
209:4,9 211:18
214:10 221:22
235:13
parties 3:4 255:13
partner 56:25 57:2
party 26:8
password 45:17
47:18,20,22,23
91:25
Pathfinder 199:25
pay 10:23 60:18
76:18 95:22 101:8
101:13,19 103:17
114:23,24 128:21
150:13 158:19
167:2 212:22
213:24 214:3
218:16 219:2
220:15 224:8
233:18 236:4,8

paying 126:10
payment 194:22
239:8,11
payroll 38:13,18
213:2
paystub 101:7 167:4
167:7 213:18
215:13,23 217:14
218:19
paystubs 37:10 43:6
65:9,19 101:11,14
101:24 145:4
150:16,17 168:14
169:8 190:9 215:10
218:6
peaches 114:12
penalty 7:6 15:3
pending 9:5 171:2
people 8:12 35:14
38:19 64:18 78:8,10
89:14,20,22 90:2
140:4 142:11,12
144:13 148:20
170:16 182:17
190:8 192:16,17,20
percent 37:9 42:23
42:25 43:3,21 44:3
44:6 45:10 48:14,22
49:3,10 50:18 59:19
75:9,13 76:3,19,24
112:12 138:2
164:24 166:6,14,17
167:3,9 168:14
182:22 214:13,22
215:2 216:25
220:13 240:8,15
percentage 136:13
perception 182:25
perfectly 68:15
performance 77:13
performed 209:5
performing 200:19
period 20:13 36:24
47:19 91:23 93:24
103:3 123:8 137:25

150:5,10 159:7,17
213:24 214:3 222:4
224:8 229:5
periods 192:19
perjury 7:6 15:3
permissible 10:4
persisted 244:16
person 10:9,11 43:7
56:19,22 63:11 89:4
92:8 96:10 131:9
140:18,21,22 194:6
230:10 232:10
person's 98:6 196:10
personal 71:24 99:21
99:23 107:6,15
204:7,25 205:3
206:16 207:20
208:6 244:21 248:5
personality 71:6
perusing 244:9 247:7
phone 140:19 141:23
142:3 145:25 146:2
146:9,12 155:23
230:3
phonecall 56:6
185:12 188:17,20
190:24 192:25
193:5,7,9 195:23
212:4 242:4,13,15
phonecalls 190:17
phones 141:22,24
physical 112:16
physically 74:4 86:17
237:16
pick 177:11
Picked 233:12
picture 70:2 169:22
pictures 40:23 41:3
piece 89:23
pieces 38:11
pinpoint 102:17
pissed 61:19
place 31:24 57:9
80:19 91:4 100:19
100:22 127:13

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

279

130:12 148:22
153:4,4,4 232:2
233:16 235:7
**placed** 161:24 172:16
226:8
**places** 127:6,18,19,22
128:10 130:5
153:22 225:23
**placing** 154:6 184:12
243:23 245:6
**plaintiff** 1:4,16 2:3
4:3 24:3,18 26:9
104:4 154:21
157:17 158:13
162:14 173:24
179:3 227:22 228:4
228:6,15 235:21
236:24 248:13
**Plaintiff's** 24:17
103:19,25 143:21
163:2 235:16 236:3
244:16 246:24
247:25 253:17
**plans** 41:6
**plausibly** 236:24
**play** 109:18 162:17
212:13 241:4
**played** 91:4 92:3
110:19 157:6
241:11
**playing** 108:12
**plays** 88:3
**pleading** 23:24 24:11
**pleasantries** 59:12
61:6,12
**please** 5:9 8:7 13:23
27:4 49:8 68:19
91:16 102:12 104:6
113:18 119:22
152:12 155:9
161:17 181:22
183:19 184:5
208:21 240:6 242:8
242:21 243:3 245:4
245:23 246:11

249:3
**pleased** 104:13 201:9
**pled** 24:3
**PLLC** 2:3,8 248:12
**plus** 166:10 172:12
**podium** 70:9 86:20
96:18
**point** 20:12 43:20
48:12 68:7,13,19
72:2 79:5,11 81:15
82:21 84:6 87:12
90:23 91:6 92:15
93:12 94:25 95:7
98:23 99:2 103:7
108:20 138:22
159:25 198:11
201:20 212:18
231:17 232:12
235:12
**points** 110:20
**Police** 21:21 253:16
**policy** 107:24 108:3
**pop** 58:20
**portion** 247:18,21
**position** 33:5 36:13
44:23 45:3 52:15
55:21,25 64:14 77:3
89:3,18 91:2 94:17
94:20 95:6,9 98:11
127:25 128:20,25
129:3,8 158:17
252:8
**positions** 114:2 128:2
130:3 158:9
**positive** 20:20
**possession** 39:11
146:10
**possibility** 168:6
219:14
**possible** 167:17
189:18,20 193:4
205:19
**possibly** 138:6,15,23
189:14 192:24
221:8,11

**post** 118:6,18,22
146:16,21,22,25
**posted** 117:21 118:3
119:4 146:17
**potential** 85:2 179:17
238:7,24
**potentially** 242:23
**power** 95:18,21,24
**prefill** 176:18 235:19
**prefilled** 177:8
**prefilling** 82:12
**pregnancy** 44:21,24
45:2 71:9 72:3,10
73:3,7,23 76:25
78:14,25 79:3,7,10
80:10 82:11,25
83:10 91:12,14 92:5
92:9,19 93:13,14
96:22,24 98:4
106:11 107:7
108:12 109:15
110:14 150:21,25
157:2,5,7,15 179:10
179:14 200:22
201:2,4,14,16 224:9
237:3
**pregnant** 61:22 69:15
69:18 72:22 73:2,10
90:25 96:5 99:22
100:2,3,10,18
107:12 109:19
110:2 112:14 113:9
137:21 232:2
250:15 252:2
**preparation** 11:12
15:20 16:4
**prepare** 9:20,22 10:6
10:12
**prepared** 173:12
212:17
**preparing** 93:5
**prequalification**
194:11 196:19,25
197:4
**presence** 70:7

**present** 2:12 21:14
58:16,19 59:2 69:21
69:23 96:15 230:13
251:2,13,24 252:5
**presented** 21:23
138:14
**presenting** 246:19
**presided** 244:5 245:9
**press** 78:6
**pretty** 10:21 19:13
20:4 33:14 40:3
54:5 59:13 61:7
62:13,17 72:8 82:16
94:5,10 106:14
108:6 123:5 130:11
131:14 140:5
141:22 142:12
146:7 182:7 238:20
**prevent** 66:3
**prevented** 114:9
159:16
**previous** 89:25
219:14 246:21
**previously** 137:15
139:8 143:15 172:4
244:5 245:9
**primarily** 6:21
**primary** 36:16
**Prince** 171:5
**prior** 18:7 19:2 21:24
34:5 38:5 67:11
71:8 72:9 73:10
76:24 79:21 80:9
82:10 99:5 105:22
116:22 117:2
118:13 123:4,9,22
125:4 129:6 132:19
132:20 133:2,8,23
134:9 146:2 150:13
172:8,8 179:12
197:6 215:14,20
216:11 217:5,25
220:3 227:20
228:23,25 231:13
250:20 252:10

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

280

prioritized 89:6
  237:22
prioritizing 237:12
privilege 148:7
probably 38:24 48:17
  52:16 53:19 60:24
  68:23 72:13 79:22
  100:4 118:16 123:5
  123:6 129:20
  141:23 172:2
  180:17 182:16
  209:5 212:17
problem 4:24 18:14
  22:7 184:5
procedure 4:20 65:8
proceed 25:9 26:3
  151:15 228:8
process 63:7 65:15
  106:16 161:11
  181:18 194:16
  196:4
processed 106:11
  182:11 237:24
processing 106:7
procure 199:12,16
produce 25:2,19
produced 41:4 145:4
  149:4 240:3,5,12,14
  240:16 241:13
producing 145:3
  241:3
production 24:24
  25:3,20 143:5
  215:24 240:4
  241:14
professional 30:21
  71:13,13,14 179:16
  184:9 242:4,15
professionals 116:24
profile 174:4,11
  178:2
profit 43:13 164:5
  165:22 167:6,18
program 84:23,25
  185:8 235:18

programs 31:3,7
promise 142:21
promised 44:23 76:6
  90:13 92:20 231:19
promote 92:4 94:18
promoted 90:14
promoting 90:17
  92:14
promotion 92:17
  93:2 231:18 250:18
  251:13,23
promptly 106:3
  107:3
proof 65:9 190:8
proper 27:2
properly 38:9 41:14
  41:21 42:10 83:6
  89:19 176:11
  178:14 238:19
proposed 228:7
prospective 64:23
  174:3
protection 164:10
prove 104:7
provide 4:21 9:13,17
  14:16,18 28:11,23
  29:2,14,17 87:3
  115:13 136:2
  156:16,23 179:22
  195:21 243:8
  246:24
provided 5:20 10:21
  16:18 28:14 105:8,9
  110:7 137:15 145:8
  145:11 173:25
  239:6,14
provides 17:19
  116:18 156:17
prying 148:7
psychological 112:9
public 1:19 3:5 4:4
  4:16 21:20 22:2
  23:14 252:21 255:5
  256:20
publicly 17:20

Puerto 133:6,13
pull 174:3
pulled 174:11 181:7
  181:9 201:12
pulls 177:25
punished 248:14,19
punitive 153:21
  155:4
purchase 83:16 84:9
  160:9 161:3 174:12
  180:23 190:21
  207:5
purchased 160:2,6
  185:7 189:17
Purely 122:25
purpose 94:11 230:2
purposefully 67:5
purposely 88:21
pursuant 1:17 4:20
pursue 147:21
pursuing 147:22
push 252:8
pushed 24:9 237:20
pushing 157:8
put 47:20 80:5 85:23
  89:3,21 90:20 91:2
  131:10 140:25
  143:4 151:25
  188:22 194:22
  205:25 222:16
puts 120:22
Putting 22:14

_____
        Q
_____
Q50 160:10
qualification 10:7,19
  225:19
qualified 62:16 89:9
  181:10
qualify 45:20,22 46:8
  46:10,21 47:4 49:4
  83:21 89:11 174:17
  176:17 189:17
qualifying 174:17
  178:13 234:11

Queens 48:10 53:10
  127:24,24 128:6,19
  129:25,25 158:7
question 6:22 8:9,16
  8:19 9:5,6 12:9,14
  12:16,25 13:9 14:3
  18:11 19:15 23:6,7
  23:8,18 27:4 34:13
  34:16 35:23 41:16
  46:14 49:5,6,8
  58:22 65:11 66:8,10
  68:4,21 72:12 75:22
  82:9 89:10 91:17
  93:20,22 99:12,16
  102:13,21 103:12
  103:13 105:3,4
  108:17,18 110:6,21
  113:12,18 118:11
  120:3,9 124:8,22,24
  124:25 138:9,11,21
  149:21,23,24
  153:21 156:20
  161:23 170:21
  172:20 181:24
  183:4,7,13,22
  199:15 207:14
  216:13 217:10
  218:18 220:21
  228:21 231:6
  238:14,18,22 242:8
  242:10,11,21 243:3
  245:19,23,25 246:6
  246:11,15 247:19
  248:21,22,24 249:3
  251:6,17,19,20
questioning 229:17
questions 3:12 6:4,25
  7:16 9:18 22:15,19
  22:22 23:23 45:5
  63:7 74:23 81:14,14
  81:25 146:17
  162:22 163:5
  228:14 230:21
  235:13 241:6,19
  247:9,12,21 251:8

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

281

252:13
**quick** 22:16 25:16
  62:13 81:10 182:5
  182:21 226:4
**quicker** 64:12 82:24
**quickly** 40:2 182:7
  237:24 238:6
**quit** 32:18,22 36:10
  37:11 44:16,19 45:6
  45:9,12 48:6 52:7,9
  60:21,25 79:9
  108:14 125:4,10
  225:16 230:22
  231:7,14,21
**quite** 15:23 20:8
  43:17 127:20
**quote/unquote**
  248:11

**R**

**R** 2:2 4:2 143:14
  207:16,18 254:11
  255:2
**R-a-s-k-e-s-n-i-a**
  155:14
**raggedy** 89:20
**raise** 94:19 231:20
**raising** 231:9
**ran** 177:8 178:12
**ranges** 175:7
**rare** 67:23 69:7
  182:22
**Raskesnia** 50:4
  155:14
**rate** 75:8
**ratio** 192:13
**RAV4** 202:16,20
**reach** 60:18 61:14,16
**read** 5:23 13:3 35:22
  35:23 46:15,16 66:9
  66:10 68:4,21 91:16
  91:17 94:12 99:15
  99:16 102:12,13
  103:13 105:3,4
  108:18 118:10,11

138:10,11 156:20
  176:20 204:8 205:2
  206:17 207:21
  208:4 235:5 238:13
  238:13,14 244:6
  247:5
**reading** 188:11 244:8
**ready** 75:2 81:13
  131:3 163:5 191:2
  193:10 241:8
  243:20
**Real** 125:25
**realistic** 187:9
**realistically** 123:4
  187:4 192:15
**realize** 8:22 100:20
**really** 24:9 31:4
  38:23 41:2 52:24
  60:6 61:18,21 62:18
  67:16,20 73:25 84:2
  85:17 89:2,4 90:4
  90:12,18 91:5 92:13
  93:22 97:19 105:24
  107:7,10 108:7,13
  117:14 124:13
  127:22 144:17
  163:18 193:13
  209:12 215:9
  219:15 226:16
  233:15 236:16
  238:21 249:21
**realm** 250:3
**rear-ended** 160:16
**reason** 9:5,16 35:15
  41:13,19 42:8 44:19
  55:17 68:25 69:11
  79:3 86:5 87:21
  100:9 109:20
  128:18 129:9 157:7
  161:11 175:10
  179:20 180:3,11
  191:8 201:5 231:7
  231:14 232:4 234:9
  250:3 256:5
**reasons** 114:3 236:13

238:9
**recall** 11:22 31:20
  44:12 55:10 56:21
  59:14 60:6 70:19,20
  70:22 72:5,20 73:14
  77:10,19 78:15 87:9
  94:23 95:10 96:17
  98:14 119:3,12,15
  132:4 136:7 139:10
  140:2,16,25 141:16
  142:9 159:9,12
  171:2,5,21 195:19
  198:9 200:14 201:7
  207:3 218:9 220:19
  226:13
**receipt** 108:3 234:25
**receive** 37:9 60:25
  77:13 88:12,15
  115:16 159:6
  164:19,24 166:18
  166:25 167:22
  172:12 175:5 217:6
  219:2
**received** 38:2,4 39:12
  105:18 120:17
  135:11,19 136:10
  136:16,18,22 137:3
  137:4,6 138:3
  158:19,21 159:14
  164:16 168:12
  214:3 219:4 227:11
  227:12 235:22,23
**receiving** 37:12 43:4
  44:23 45:9 59:14
  157:13 160:24
  214:13 220:13
**recess** 24:21 143:10
  226:6 249:16
**recognize** 143:23
  149:5 162:8 184:19
**recollection** 8:21 9:2
  56:11 172:8 173:19
  187:10 249:18
**reconvene** 226:5
**record** 4:12 21:20

22:11,12 23:14 24:2
  24:17 25:16,17 27:9
  28:10 44:13 54:15
  68:5,8 81:15,20,23
  95:11 103:18
  126:15 143:8
  151:15 152:2
  161:22 162:4,12,18
  162:25 183:25
  185:20 210:16
  215:20 218:11,19
  220:4 228:11,13
  230:18 234:19
  241:12,17 243:18
  244:11 246:9
  247:23 253:16
  255:10
**recorded** 120:5
  241:15
**recording** 241:4,20
  254:16
**records** 77:19 141:4
  141:15 193:17
**recount** 248:15,19
**recovered** 113:25
**recruiters** 130:23
**redact** 17:20
**redacted** 17:14,22
**reduce** 214:8
**refer** 5:8,11 6:6,9,12
  6:15 57:2 115:3
**reference** 162:15
  248:4
**referred** 35:23 43:7
  46:16 66:10 68:21
  91:17 99:16 102:13
  103:13 105:4
  108:18 118:11
  138:11 156:20
  166:21 238:14
**referring** 5:14,19
  194:10
**refers** 164:4,8
**reflect** 22:11 24:2,17
  43:6 103:18 161:22

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

282

162:12,18,25 167:3
167:7 183:25
185:20 241:12
244:11
**reflected** 37:9
**refused** 45:19 91:25
**regard** 25:8,24
105:11
**regarding** 156:8
193:5
**regardless** 239:4
**registered** 182:18
**regular** 218:16
**reinstatement** 138:4
138:17,25
**reiterated** 202:19
**rejected** 128:5
138:25
**related** 7:2 45:6
74:20 81:15 255:13
**relates** 27:10
**relating** 71:21
**relation** 64:16 106:7
**relationship** 62:9
66:24 75:5 84:20
129:21
**relatively** 40:2 182:5
182:21
**relevance** 113:16
116:12 131:5
132:21 133:18,25
134:13 147:15
148:2,16 160:14
161:9 185:18
242:18
**relevant** 113:12,13
115:22,23,24
144:25 242:16
**remain** 229:5
**remained** 75:9,14
76:15,18 77:3
**remains** 217:6,25
**remember** 11:24
20:6,9 21:4 31:24
32:2,7,14 33:15

38:16 43:19 47:17
49:13,18,19,21 53:8
53:11,18,24 55:11
56:9,13,23,23 62:2
64:16,18 69:24 70:2
70:10,11 71:17
72:13,23 73:4,5,8
73:22 84:12 94:23
97:4 100:8,12
107:21 120:6
124:14 133:5 134:3
134:4,15 141:2
148:17 161:4,14,21
167:19 171:25,25
188:23 192:9
193:13 195:9 198:9
200:11 201:15,16
206:24 219:18
227:9 234:6,10
249:21
**remembering** 96:6
**remote** 68:12
**rent** 16:19,20
**rep** 187:25 190:18,25
193:8,9 195:17
**repeat** 12:16 13:9
23:8 49:9 103:12
124:9 161:20
199:15 242:10
**repeatedly** 162:15
**repeating** 207:22
**rephrase** 8:17 49:6
99:12 100:5 125:2
251:19
**rephrasing** 99:13
**replaced** 142:2
**report** 59:21,23 60:4
62:9 170:4
**reported** 59:24 60:13
61:8
**reporter** 8:7,8,11
35:24 46:17 66:11
68:22 91:18 99:17
102:14 103:14
105:5 108:19

118:12 138:12
156:21 238:15
255:4
**reporting** 60:11 62:7
**represent** 21:19
80:20 143:21 144:4
149:3 173:11
184:13 212:25
213:17 215:12
219:19 220:16
227:18,20 235:11
244:3 245:7
**representative**
173:16 188:22
**representing** 4:17
147:5,7 245:11
**represents** 248:13
**reproduced** 145:4
**request** 20:17 24:24
25:3,18,20 29:8
157:20 158:15
163:2 238:6 246:7
246:13 247:10
**requested** 25:17
178:3 179:24
**requests** 155:13
248:12 253:9
**required** 196:4,7
239:8,11
**research** 127:22
**reserve** 7:17
**reserved** 3:13 4:14
**resolved** 114:6
**resolving** 245:10
246:22
**respect** 93:2 102:21
106:6 110:13
117:20 123:25
124:12,17 128:2
137:14 158:17
170:23 200:19
201:6 232:14
**respective** 3:3
**respectively** 165:22
**respond** 181:15

**responded** 92:23
**response** 49:5 94:22
96:8,11 97:3 154:23
155:12 156:13
157:10,17 158:6,13
158:18 177:21
180:2 229:15
241:14 248:23
253:11,11,19
**responses** 102:22,25
154:7 246:24
**responsibilities** 36:19
36:20 74:13
**responsibility** 36:16
47:2
**rest** 124:6
**restaurant** 233:14
**restaurants** 233:8
**restore** 146:2
**result** 83:14 111:17
112:5,9,17 124:2
**results** 85:3 193:5
**resume** 56:7 130:3,11
**resumed** 143:15
**retained** 254:19
**return** 51:15 53:2
66:16 90:13 131:3
138:7
**returned** 90:6 94:2
94:15 123:18 138:5
185:22 234:5,9
**returning** 19:25
24:19
**review** 4:22 10:16,18
11:7,9,11 15:19,20
22:18 81:5 82:2
218:18 245:16,20
**reviewed** 154:24
218:14
**reviewing** 247:11
**Rico** 133:6,13
**ridiculous** 152:8
**right** 4:10 7:18 11:4
15:12 22:20 23:11
23:13 28:2,16,20,21

Case 1:21-cv-07163-OEM-LB  Document 106-2  Filed 03/27/24  Page 92 of 102 PageID #: 2679

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

283

29:15 33:8 34:9
35:12,17 36:15,18
39:3,9,10,13 40:17
41:21 43:14 44:17
45:25 47:10,12
49:23 51:14 54:8
55:20,24 57:8 60:2
60:11 61:4,10 62:12
62:24 63:5 64:11
66:22 76:3,4 79:2
81:17 83:12 84:21
88:8,15 93:15 99:24
99:25 105:13 106:9
109:11 111:6
120:16 122:9,10,12
123:20,21 126:19
127:16 130:24
131:14 136:11,16
140:4 141:18
144:10 145:2,6,13
145:21 146:3,20
150:10,20 154:25
155:4,5 156:22
158:10 165:15
166:4,7,8,16,24
168:11,11 171:13
174:8,9 176:9,24
177:10 178:17,21
178:24 179:9
181:19 185:3 190:5
190:9,18,19,23
191:24 192:5,6
194:19,24 195:3,4
197:18 198:15
199:20 204:20
207:9,11 211:8
212:3,6,9,12 213:16
214:2,14,24 215:5
217:2 219:13,23
220:2,6 221:3
222:11 223:12,16
223:20,24 224:14
224:17,21 225:6,10
225:14,25 233:7
244:7 249:15

ring 38:20
rings 66:19
rise 72:2
Road 54:13
Robert 163:21
role 82:15 94:3,9
108:12 212:13
rolling 226:17
Ron 58:22 59:4 61:14
Ronald 1:9 5:7 6:15
6:16,19,21 59:2
61:8 156:24 157:10
room 169:14
ropes 82:16 101:21
Roughly 122:16
routine 80:15
rule 5:24 13:3,24
17:19,23 208:10
rules 4:20 8:3,13 9:9
17:14
run 35:13 53:9 62:15
62:22 64:22 67:2,7
67:8,10,14,15,23
69:13 82:18 87:25
88:4,7 94:11 162:14
176:17 193:6
196:22 235:18
236:17 237:11
runaround 90:24
running 89:12
Ruthayn 1:19 4:4
255:4,21

_____
S
S 2:2 4:2 143:14
209:14,16 253:13
254:3,12
S's 206:21
salary 39:4 50:16
214:4,7
sale 45:24 46:3 71:21
85:3 88:11 107:9
164:5 165:21
166:10 173:25
186:23 207:8 238:2

238:8 239:16,19,20
sales 38:12 47:6
49:14 53:17 54:19
65:8 67:10 80:3,6
83:24 84:4,5 88:22
89:18,24 90:14,18
90:20 92:3,4 93:16
93:18 94:4,7,10,16
99:8 174:2 177:25
178:5,8 179:7
212:20 236:13
237:5 250:17
salespeople 31:7
46:23 47:8 69:23
70:24 87:3,8 89:7,8
169:15 179:7
214:21 233:3
salesperson 34:20
36:14 46:20 47:4
55:22 59:24 70:11
77:22 79:12 83:25
87:15 100:22
101:22 103:9 105:9
173:24 187:7
214:19
salesperson's 80:4
salespersons 179:5
saleswoman 79:11
sanction 104:4
sanctioned 248:14,18
sanctions 183:14
Sanitation 147:4
sat 82:17 128:9 192:7
202:7
satisfied 41:14,21
42:9
Saturday 37:25
195:2
Saturdays 85:12
saw 80:14 82:16
123:24 124:11,13
187:6 224:25
saying 8:12 14:5 41:9
43:10 51:7 56:24
67:18 70:20,22 83:2

94:23 100:25
101:14 109:13,16
109:21 123:16
150:12 166:5
168:25 177:3
178:15 189:12
193:23,25 201:13
203:6 209:10
215:16 222:17
227:7 231:22 236:7
246:19 250:24
says 13:3 22:25 23:15
69:10,12 163:20,24
163:25 170:6
173:15,23 174:10
179:2,19 180:6
184:22 186:16
187:18,21 188:3,16
188:24 189:9,14
190:13 195:17,24
199:6,24 200:5
201:22 202:14,23
204:14 205:11
206:12 207:4
227:21 228:2
235:16 236:2,24
248:9
scared 91:2 111:20
111:25 112:4,24
117:4
schedule 37:14,17
scheduled 229:22
school 19:14,14
29:25 30:6,11,12,13
30:19,22,24 31:21
135:2
schools 30:10
scores 89:21 235:19
screen 80:19 81:18
103:20 104:2,24
142:23 148:22
154:6 161:24
165:25 172:16
184:12 222:3,17
226:8 235:7 243:23

Case 1:21-cv-07163-OEM-LB   Document 106-2   Filed 03/27/24   Page 93 of 102 PageID #: 2680
STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023
284

245:6
**scroll** 80:22 144:3
 154:11 162:10
 205:8 245:12 247:6
**scrolled** 163:3 167:24
**scrolling** 215:8
**seal** 4:13
**sealing** 3:8
**Sean** 70:10 87:10,10
**search** 131:3 134:12
 148:13
**season** 225:4
**second** 8:7 119:24
 126:12,21,25 131:4
 134:18,22 135:21
 163:7 201:23
 224:15 225:11
 227:24 228:2
 229:21 247:5 248:4
 251:5
**second-to-last** 87:16
**securing** 146:18
**Security** 136:18,19
**see** 23:16 46:5 51:7
 86:3,15 87:5 108:7
 124:18 128:10
 131:8 144:6 148:5
 149:24,25 153:10
 153:23 155:15
 163:22 164:2
 165:11 167:5,17
 168:20 173:17
 174:4,13 175:8
 177:10,17 178:5
 184:23 185:15
 186:18,24 188:5
 194:7 198:11 199:6
 200:3 201:25
 202:17 205:14
 206:21 208:25
 209:2,6 213:4
 215:12,25 224:25
 226:3 228:9 235:24
 236:5 237:7 239:23
 244:15 247:2 248:2

**seeing** 154:14
**seek** 111:5 112:25
**seeking** 111:9,12
 114:9 118:23
**seen** 22:5,17 38:24
 89:20 90:2 97:15,16
 163:12 172:21
 173:4,13 180:13,15
**self-employed** 65:18
 135:7
**self-incrimination**
 23:21
**sell** 31:6 42:17 118:7
 128:14 167:18
 168:15 170:19
 198:25 199:4
 212:10 217:7 218:7
 218:20,22 220:21
 224:22 226:19
**selling** 36:16 79:15
 87:14 164:16
 171:25 172:2
 205:20
**sells** 131:17
**send** 142:25 143:6
**sending** 141:16 142:9
**sense** 82:25 91:5
 97:19 100:24 131:9
**sensitive** 47:19
**sent** 4:17 22:11 56:5
 60:18 136:5 143:22
 189:3
**sentence** 236:2
**separate** 7:12,18 24:6
 157:24 214:6
**separated** 213:11
 214:8
**September** 18:6
 51:16 132:4,16,19
 221:16,16
**Serge** 63:20,21 64:16
 66:21,25 67:8,14,16
 67:23 69:7 70:13
 87:25 88:5,7,14
 106:10,11 167:20

173:12,15 175:4
 176:19 177:23
 207:15 212:16
 253:22
**Serge's** 80:2
**Series** 199:7,9,11
**Serrano** 155:20
**served** 173:16
**session** 143:12
**set** 63:6 134:10
 154:19 162:7
 169:17 188:14
 190:5 194:25 197:9
 200:2 202:20 208:2
 232:25 255:8,17
**sets** 11:6
**settlement** 143:5
 230:3
**seven** 77:18,20
 113:13 172:5,6,11
 172:11 174:10
 221:22 222:25
 223:2,5,8 227:23
 235:16
**sex** 109:6,17
**Shalom** 1:19 4:4
 255:4,21
**sheet** 163:20 166:22
 166:23 167:5 173:5
 253:21 256:2
**sheets** 162:4 253:20
 253:20
**Shore** 129:12
**short** 5:20 24:21
 36:24 42:14 93:23
 226:6 249:16
**short-lived** 125:24
 126:6
**short-term** 135:12,15
 136:7
**shorted** 42:12
**shortfall** 152:22
**shot** 56:24 57:23
**show** 70:15 77:19
 80:23 101:7,14

150:17 187:24
 215:9 217:18
**showed** 82:18 90:10
 167:2 168:7,16
 236:15,16,18
**showing** 94:11
 110:14 217:13,14
**shown** 236:12
**showroom** 186:16,22
 187:21 188:4
 197:17 207:2
 209:19 211:25
**shows** 101:13 150:5
 168:15 170:12,14
 196:21 210:3,4,14
 214:5 215:20,22
 216:10
**shut** 183:24 184:2,9
**sick** 52:25
**side** 111:23 237:20
**sign** 11:14 15:2 108:2
**signed** 173:12
**signing** 11:25
**similar** 73:11
**similarly** 88:14
**simply** 179:24
**single** 84:25 86:2
 127:9 170:20 177:4
 192:7
**sir** 13:19 22:4 49:6
**sister** 139:18
**sit** 70:8 171:24
 192:15 231:25
 233:8
**sites** 118:20
**sitting** 87:7 239:24
**situation** 37:12 54:23
 61:13,15 98:2
 142:13 144:16
 196:3,6
**situations** 65:24
 191:14 196:9
**six** 37:20 51:13 80:23
 170:22 173:23
 186:17,23 187:5

Case 1:21-cv-07163-OEM-LB Document 106-2 Filed 03/27/24 Page 94 of 102 PageID #: 2681

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

285

219:6,10 222:6,6 223:15
**six-month** 159:7
**skimmed** 82:3
**skip** 172:22 185:19
**Skipping** 226:2
**slash** 93:18
**slightly** 154:13
**slipped** 157:11
**slow** 54:10 79:14 97:17 217:9
**slower** 174:23
**smooth** 8:4
**Snapchat** 117:18,23 156:6,7
**sned** 144:21
**social** 117:7 136:18 136:19
**sold** 34:14,25 35:5,10 39:6,9 40:20 43:11 75:16 77:17 79:17 79:20,22,25 99:5,5 115:5 162:5 163:15 163:20,24 164:9,13 165:9,10,14,16 167:25 168:2,8,10 168:19,23 169:12 169:16 170:6,16,22 171:3,11,15,18,21 172:5,7 195:19,20 206:3,6 210:5 214:11,14 216:3,15 216:19 217:16 219:5,12,22 220:25 221:2,6 222:6,10,13 222:20 223:2,5,15 223:19 224:4,24 225:5,7,12,15,22,24 226:19,24 227:2,3 234:8
**sole** 36:13
**solely** 78:24 81:15 91:12 106:6
**solve** 42:20
**somebody** 46:12

97:24 100:2,18 108:21
**sonogram** 70:2,16 145:5
**soon** 59:21 176:2
**sooner** 98:22 100:6 173:21
**sorry** 11:10 23:8 32:25 35:21 42:7 52:8 60:24 67:7 75:11 91:15 97:10 102:11,23 112:21 118:9 119:14 125:2 127:7 145:9 156:19 159:11 160:17 161:12 181:3 189:19 199:13 222:14 237:21 238:12 250:8
**sort** 72:7 123:24
**sought** 116:23
**soul** 127:9
**source** 125:17 126:11
**Southern** 248:10,16
**speak** 10:4 12:3,17 13:11 15:13 72:15 84:4 91:9 108:22 174:23 183:16 195:7
**speaking** 8:22 13:5 27:17 37:6 86:9 105:21 180:22 182:6 246:2
**speaks** 149:16 186:12 186:20 190:11 197:13,19,25 203:2 203:9,15 204:18 205:22 208:8
**special** 103:8
**specific** 154:20 205:13
**specifically** 14:10 21:5 147:2 198:10
**Specify** 182:12
**Spectrum** 131:23

147:13,18
**spell** 50:3
**spends** 244:20
**spent** 131:2
**split** 12:11,13 214:20 220:11
**spoke** 56:25 57:5 90:5 128:12 129:19 142:12 148:20 156:3,6
**Sports** 54:12,20 127:14 137:20
**spot** 54:23 85:22
**spread** 10:22
**Square** 52:14
**squibbles** 72:17
**stamps** 28:6,10 29:20
**stand** 177:10
**start** 42:16 48:11,13 52:18 59:17 125:3 125:23 128:6 142:19 162:19 168:5 181:11 243:19,20
**started** 31:18 32:3,15 33:16,18,21 37:12 50:5 59:22 60:3,11 62:7,20 64:16 78:2 114:23 120:17 162:19 167:11 169:4 173:20 186:16 187:21 188:4 207:2 250:18
**starting** 169:20 185:11 190:3 222:4
**starts** 70:12 213:24
**state** 1:19 4:4 12:20 15:8 18:11 26:7 113:23 145:7,10 158:19 183:19 192:6,24 204:23 205:17 206:18 255:5
**stated** 169:13 250:13
**statement** 11:15

14:18,20 96:7 180:4 180:12
**statements** 12:3,17 13:11,14 14:12,16 71:3 97:21 100:14 139:9
**states** 1:1 17:25 18:9 191:13 220:16
**stating** 4:5
**status** 15:6 184:25 185:4
**statuses** 184:25
**statutory** 229:5
**stay** 33:17 91:6 122:23
**stayed** 51:3 93:8 133:22
**staying** 233:13
**step** 228:7
**stepfather** 16:22 146:24 147:2
**steps** 115:18 116:7 198:4
**stereotype** 89:15
**stereotypes** 90:3
**sticky** 47:21
**Stidhum** 1:3,17 4:1 5:1 6:1 7:1,22 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 16:12 17:1 18:1,2 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 26:6 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

286

74:1 75:1 76:1 77:1
78:1 79:1 80:1,21
81:1,23 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1,6 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1,22
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
152:16 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1,8 163:1
163:10 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1

211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
228:22 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1,20
242:1 243:1 244:1
245:1 246:1 247:1
248:1,17 249:1,7,18
250:1 251:1 252:1
252:17 253:1,4
254:1 256:4,5,18
**stips** 4:9
**STIPULATED** 3:2,7
3:11
**stop** 13:24 27:16
50:23 52:22 53:23
54:4 104:6,24 126:9
142:18 151:7,10,11
183:19 184:4
201:20 208:14,16
208:20,21 240:6,9
240:14,21 245:22
246:5,5,6,11,14,17
**stopped** 45:9 220:12
220:17
**store** 51:22 53:7,9,10
53:13,14 61:17
79:22 107:11 182:7
199:21
**stores** 128:8,16
**storming** 100:8
**story** 127:21
**strategy** 98:21 100:9
**street** 4:6 33:8 85:21
**stress** 112:24
**stressed** 111:20 112:4
114:13,24 117:4
**strike** 74:22 242:23
245:2 248:22

**strip** 85:13
**structure** 37:4 50:8
50:11,20 75:12
**stuck** 111:21
**stuff** 41:8 61:22
64:19 68:10 100:19
102:5 164:11
193:21
**stupid** 32:20 68:8,10
**subject** 7:5 120:15,21
121:4 151:22
**subjects** 7:3
**submission** 177:21
177:24
**submissions** 176:13
176:16
**submit** 65:24 66:5
67:16 88:6 130:2
176:21,23 177:3,7
177:13
**submitted** 15:22
130:10,13 174:12
**submitting** 175:17
181:8
**Subscribed** 252:19
256:19
**subsequent** 86:9
122:19
**subsequently** 209:22
241:15
**subtract** 151:19
**Success** 2:9
**sucks** 161:13
**sued** 12:12
**suffer** 112:4,14,16
**suffered** 88:21 112:8
191:20
**suggest** 5:22 6:19
97:21 101:5,11
**suggested** 100:14
**suggestion** 98:9
**suing** 34:10
**Suite** 2:4,9
**summer** 43:19
**Sunday** 37:24 232:16

**Sundays** 37:19
**super** 54:9 128:21
**superfluous** 124:6
**supervising** 45:18
**supervisors** 36:21
37:2
**supplement** 157:17
158:13 226:21
**supplemental** 246:24
**support** 115:16,19
116:7
**supporting** 131:12,15
**supposed** 184:6
243:19
**sure** 18:14 22:7 24:9
29:6 31:19 36:5
40:14 43:17 48:13
48:14,22 49:3,10
50:3 53:25 57:18
59:19,20 64:20 70:5
70:14 80:6 81:9
93:8 96:23 108:6
111:14 112:11
118:5 119:11 120:4
121:5,19 136:4
138:2 146:15,25
148:5 156:11 159:3
162:12 163:18
164:21 167:13
169:10 170:10
171:23 172:10
174:24 176:20
193:3 198:7,10
199:19,19 201:13
219:2 229:12,24
238:21 240:15
243:4
**surprised** 234:15
**suspended** 77:11
**sustained** 111:17
**swearing** 15:2
**sworn** 3:5 4:3,15
143:15 252:19
255:8 256:19
**symptoms** 112:20,22

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

287

114:5,8
**system** 84:17,18
85:25 162:6 163:16
195:13,17 205:24
209:24 210:4,6

**T**

**T** 4:2,2 143:14,14
211:12,14,16
253:13 254:3,13
255:2,2
**take** 8:8 9:4,6 22:23
24:11,12,15 26:2
40:4,23 41:2 81:7,9
81:19 82:11 83:6,10
89:5 100:22 107:2
110:7 113:7 128:18
132:20 142:18
152:20 155:8
169:22 181:11
182:4,4 198:4 226:4
234:5 247:4
**take-home** 236:3,8
**taken** 24:21 31:9
92:17 96:21 103:17
106:2,2 115:18
116:6 132:17 135:4
176:6 214:9 226:6
234:16 237:20,21
249:16
**takes** 177:21 181:19
182:25 198:25
**talk** 90:22 94:24 97:5
97:6 251:4
**talked** 45:3 55:4
113:23 114:5 141:5
146:16
**talking** 11:18 12:5
13:15 14:9 19:5
82:22 93:5 118:13
119:9 124:4 132:10
139:19 145:18
146:25 162:11
180:17,19,20,21
183:8,12,22,24

194:2 217:21
221:24,25 230:10
**tally** 80:5 169:15
**taught** 63:2
**taxes** 214:9
**team** 110:23
**telephone** 155:24
**telephonic** 241:22
**tell** 8:17 9:25 10:4,19
12:23 15:16 45:14
70:4 78:7 79:5
81:14 83:21 84:8
86:23 95:8 96:4
135:18 146:13
152:5,7 167:15
183:11 188:11
190:20 191:7
209:12 229:18
247:5
**telling** 10:5 61:2 67:4
94:9 98:10,15 129:6
157:3 183:16 184:8
195:18 209:11
230:16
**tells** 108:21
**ten** 175:7 181:12
224:4 232:2
**Ten-minute** 33:14
**ten-pounder** 167:21
**tend** 107:2
**tended** 106:3
**tenor** 241:24
**term** 124:19,21
**terminated** 159:22
**termination** 134:17
136:20 213:3
**terms** 39:18 67:19
73:9 95:25 113:22
145:3 160:19,20,23
231:5
**territory** 131:24
**test** 151:6,22
**testified** 4:7 44:16
102:8 124:10
126:18 132:3 137:6

139:8 143:16 192:3
232:14
**testify** 172:4 204:6,25
206:16 207:20
208:6
**testifying** 7:7
**testimonial** 243:21
**testimony** 7:5 9:13
46:16 82:7 85:24
88:20 91:10 123:24
124:15 132:9
137:14 139:11
145:16,23 165:4
174:6 177:6 251:16
252:4 255:10
**text** 14:24 60:19
141:13 142:9 190:7
193:9 202:23
**texted** 92:22
**texts** 141:16,20
**Thank** 27:9 50:17
154:16 155:10
227:16 241:10
247:4,15 252:12
**Thanks** 51:11
**Thanksgiving** 224:2
**Thanwalla** 1:8 2:13
5:6 6:9
**therefor** 13:4
**thing** 57:24 59:3 72:7
99:21 114:22,23
135:10,16 156:8
244:6
**things** 44:20,22,25
59:11 62:25 65:18
68:8 80:17 98:16
100:24 101:20
144:5 180:21
193:18 201:20
243:5
**think** 9:16 13:2,19
25:4 29:22,24 41:6
53:25 71:5,24 75:21
85:11 96:5 100:17
101:10 108:20

110:2 112:7 130:25
133:3 136:12
142:20 144:17
182:24 208:3
214:12 218:9 224:2
**third** 8:9 165:16
215:3 224:18
**Thomas** 165:11
**thought** 91:4 98:21
138:21 173:21
252:6
**thousand** 76:10
126:5
**thousands** 84:15
**three** 10:8,12 16:25
38:11,24 110:15
129:8 139:13 140:4
142:11 144:13
153:22 167:25
180:9,13 182:9
192:16,17,20,22
198:22 202:7
205:25 209:24
210:2 214:23 218:6
219:22 221:10,12
223:23 224:19
227:2 236:21 241:5
243:12 245:24
**threw** 41:20 42:8
166:23
**Thursdays** 38:3,4
**Tiffany** 2:5 151:7
186:9 194:6 211:19
**time** 7:24 8:13 9:4
15:23 18:4,7,17
19:16 20:2,12 21:2
24:8 28:8 31:18
33:11 34:5,24 35:4
35:21 36:12,24
39:22 45:18 46:5,6
46:11,24 47:19 53:8
57:25 58:12 60:5
62:13,20 64:12 66:8
67:13 71:8 72:10,21
72:21 73:10 79:6,9

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

288

79:14 82:10,11,21
82:23,24 83:5 85:13
86:25 87:18 91:15
92:24 93:3,16,17,24
94:24,25 97:10,24
99:14 100:22
101:21,23 103:19
108:17 110:13
118:15 119:7,9,11
119:24 122:4,9
123:8 125:9 127:10
129:19 131:2 132:3
132:20 134:19
135:24 138:21,23
139:5 142:2,17
143:2 144:17
149:17,22 150:5,10
154:14 156:3,19
159:14,17,24,25
160:4 162:14,15
167:14 169:15
171:24 172:9
175:20 177:3,4,10
178:12,14 179:3
181:14 182:9
186:11 191:18
192:18 195:14
196:5 198:12
201:23 205:14
207:10,23 216:5
220:12,19 229:6
232:12,18,19,25
233:5 237:2,10
238:12 239:4
243:21 244:21
247:11,13 252:12
252:15
**timeframe** 18:8,13
18:14 19:4,5,18
53:24 119:6 123:10
131:10 134:5
137:11 138:8 175:5
177:24 182:12
185:17 206:2
232:25

**timeframes** 101:18
**timely** 239:14
**times** 20:8,18 38:25
39:15,25 45:12,14
45:15,20 58:20 59:4
68:25 72:9 74:5
77:24 83:14,19
84:11 102:9,16
104:21 128:25
129:8 159:6,7,15
172:11 180:18
191:21 208:5,11
245:25
**tired** 90:23 184:4
232:2
**title** 36:13
**titled** 149:10
**titles** 47:6
**today** 6:25 7:5,9,10
8:22 9:14,18 15:14
15:17 55:4 85:24
155:21 202:17
228:3 252:13
**today's** 9:20
**told** 23:9 37:7 53:8
56:13 57:22 68:16
69:21 90:10 92:23
93:10 94:12,18
96:24 98:18 107:21
111:21,22,22 129:5
129:16 181:10
183:25 203:22
251:25
**tomorrow** 186:10
204:15 205:12
**ton** 130:5
**top** 22:3,25 77:22
79:11,12 87:7 149:7
167:9 168:18
187:17 220:3
**total** 79:25 150:9,12
165:5 166:2,6,9
168:23 169:12
170:6 180:20 216:3
**totaled** 160:16

**touched** 87:6
**tougher** 128:9
**TR** 254:14
**track** 40:19 79:24
80:3,5,8 84:25
169:12,16
**tracked** 188:19
**trade** 196:2 199:25
**trade-in** 195:3,24
196:6
**Trader** 131:17,22
**traffic** 54:24 128:11
182:8
**train** 249:23
**trained** 64:13
**training** 135:4
**transaction** 182:11
**transcript** 4:16,22
17:16 255:9
**transferring** 82:19
**transpired** 73:4
230:15
**travel** 134:6
**treated** 103:5 105:11
105:15,20,25
106:20,23,25 179:6
232:8
**treatment** 112:25
116:23
**Tree** 32:8,12,15,21
32:23
**trial** 1:16 3:13 4:15
126:7
**triplicate** 166:22
**trouble** 200:2
**Troy** 2:3,5 4:11,19
5:14,21 6:18 9:23
11:18 12:5,10,19,24
13:6,18 17:6,11
19:4 21:22 22:4,16
23:4,20,25 24:14,23
25:10,15,25 26:20
27:13 35:25 40:6
41:22,24 42:2 48:24
49:2,6 65:21 66:6

68:5,9,14 72:11
73:12,16 74:22
75:21 76:21 77:5
88:23 91:19 92:11
99:10,12 102:11
103:10,23 104:8,17
104:25 108:15
109:7,22 110:4
111:8 113:11
114:21 115:9,21,24
116:3,8,12 118:9,25
119:14,20 120:20
120:24 122:25
123:10 124:3,19
125:20 126:12
127:5 131:5 132:8
132:21 133:18,25
134:13 136:25
137:11 138:8
140:12 142:24
143:7 144:20
145:22 147:15
148:2,6,11,15
149:16,21 151:5,8
151:13,21 152:5,9
153:5 154:11,13
155:6 160:14,22
161:9,15 162:10,17
162:24 163:7 165:3
172:22,25 174:23
174:25 175:13
176:10 177:5
178:25 181:2,21
182:12 183:3,7,11
183:16,21,25 184:8
185:17 186:12,20
189:6 190:11
191:16 193:19
195:7 196:14 197:3
197:13,19,25
199:14,17 202:5
203:2,9,15 204:5,18
204:24 205:22
206:15 207:19,25
208:12,15,17

Case 1:21-cv-07163-OEM-LB   Document 106-2   Filed 03/27/24   Page 98 of 102 PageID #: 2685

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

289

209:17 210:7
211:15 214:16
215:8,16 216:6,13
217:9,18,21 220:7
222:2,16 223:7
225:19,22 228:17
229:12 230:25
234:2,11 238:10,16
239:24 240:3,8,11
240:15,19,23
241:12 242:5,10,16
242:19,22 243:14
243:18 244:10,25
245:12,16,20 246:4
246:7,13 247:12,19
248:12,20 250:6
251:7,15 252:3
**troylaw2troypllc.c...**
2:5
**true** 32:25 65:17
66:19 79:14 80:9,18
82:9,13 83:4 85:9
89:14 118:22 119:4
121:20 161:10
179:8 189:22
196:18 200:22
202:3,6 209:7 210:5
210:11,13,15
231:11 251:22,24
255:10
**trustee** 200:8
**truth** 95:3
**truthful** 9:13,17
**truthfully** 93:23
**truthfulness** 21:9
**try** 34:15 97:25
118:16 143:3 189:3
**trying** 12:10,13 25:10
53:25 64:7 90:15
166:12 201:19
218:9 249:23
**turn** 38:12
**turned** 127:23
**twice** 72:14 77:6
**Twitter** 117:16

**two** 8:12 10:8,11 11:6
12:11 16:22 26:11
51:21 55:18 62:4
65:9 72:4,6,17,20
73:9,20 111:6,9
118:23 127:15
128:15 129:8
130:11 132:25
137:22 151:3
153:22 157:24
158:3,4,8 159:15
165:7 166:2 170:15
170:16,19 171:10
172:3 176:9 179:12
180:21 182:9 185:2
190:9,17 192:16,16
192:17,17,20 193:7
198:21 202:7 212:4
212:7 214:6,15,23
214:25 215:3,9
217:18,19 218:16
218:17 219:16,25
224:24 225:5,12
236:18 243:12
247:23
**two-and-a-half**
123:13,16 214:19
**two-factor** 146:5
**type** 47:22 52:17
57:24 72:7 76:3
170:4 231:20
233:16
**typed** 158:7
**types** 98:16 174:20
174:20
**typically** 172:5 174:7
185:8
**typing** 104:2,23

**U**

**U** 4:2 143:14 212:24
213:6 254:14
**Uber** 208:25
**Uh-huh** 120:11
**Um** 36:20 139:16

145:22
**unable** 193:8
**unavailable** 134:16
134:20
**underlying** 23:23
**understand** 7:3,7
8:13,16 9:9 25:10
25:15 34:16 53:12
70:6 83:3 89:2
90:12 92:7 94:14
102:7 107:10 109:8
116:21 120:9 121:8
138:20 164:23
170:21 192:12
221:5 226:22 250:8
250:9
**understanding** 35:12
35:18 57:14 77:21
106:22 168:22
191:22
**understands** 119:21
119:23
**understood** 8:18
19:16 32:21 57:19
67:18 75:21 109:4
138:3 156:10
**unemotional** 96:9
**unemployed** 131:13
**unemployment** 27:19
27:22 137:7,9,15
159:5,6
**uniform** 209:25
210:4
**uniformed** 209:18
**unique** 235:22
**United** 1:1 17:25
18:9
**unknown** 155:24
**unlawful** 111:17
**unnecessarily** 244:22
**unrelated** 35:6
**unwarranted** 248:2
**upgraded** 142:5
**upset** 73:25 98:2
100:8 111:19 112:3

117:4 172:2 201:23
**use** 6:20,21 13:18
24:25 25:4 117:7,9
117:14,22 145:25
163:18
**useful** 144:18
**username** 47:24
**usual** 4:9
**usually** 70:13 98:19
172:13
**utilizing** 147:24
**uttering** 22:25 23:3
23:16

**V**

**v** 213:21,22 254:14
256:4
**vacation** 20:4 45:17
87:19 90:6 92:23,25
93:6 132:4,20
133:24 238:10
232:13 249:24,25
**vacations** 132:17
133:23 134:10,11
134:12
**valid** 68:15
**variety** 238:8
**vehicle** 39:12,20,23
40:9 43:11 160:2,6
160:18 161:3,7
164:6 165:10,16
174:12 188:12
189:17 190:21
200:9 207:8 210:5
212:10 239:2
**vehicles** 31:6 34:25
35:5,10 39:18 40:19
167:18 169:12
218:8 225:16 234:8
234:16
**venting** 140:9
**verbal** 101:6
**verification** 178:3
**verified** 15:24
**verifying** 38:8

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

290

**versus** 86:6 181:7
**violating** 13:24
**violation** 208:10
**visit** 59:5 186:16,22
  187:21 188:4
  197:17 207:2
  211:25
**visited** 133:12 209:19
**vocational** 30:24
**voice** 8:6
**volume** 50:21 51:24
  85:16,17 114:22,25
  115:3,5

_____

**W**

**W** 226:9 227:17
**wage** 7:12 15:8 26:7
**wait** 46:12 56:25 67:5
  68:25 69:4,13 78:2
  78:5,8,8,24 83:14
  83:19 86:15,23 88:9
  88:21 91:11,23 95:3
  97:7,11 102:16
  137:23 176:24
  177:10 179:20,25
  180:16,17 181:22
  192:18 196:16
  231:8,11,15 236:8
  237:2,10,11 246:2
**waited** 48:13 91:13
  180:8
**waiting** 45:12,14,20
  79:8 80:11 102:5
  181:7 182:23 191:5
  191:21 198:15
  208:25 209:5
  237:18
**waived** 3:9 4:13
**walk** 83:15,19 127:9
  128:11 192:22
  193:4
**walk-in** 85:7,7,10
  170:13 182:8
**walk-ins** 85:24
  210:15

**walked** 191:23
**walking** 84:6 192:18
**wall** 123:25 124:12
  124:20
**want** 8:24 13:8 14:13
  18:17 19:21 20:14
  24:12 25:14 32:7
  40:17 45:4 51:16
  59:19 69:2 70:6
  71:6 77:18 81:3,24
  84:2,9 90:18 94:25
  96:6 99:8 100:18
  112:12 117:24
  123:13 129:2,4,8
  152:8 162:17
  171:24 175:25
  182:8,21 184:4
  185:6 196:2 208:18
  208:18 212:21
  215:19 226:2,3,21
  231:15 235:12
  238:25 246:5
**wanted** 53:9 56:16
  64:25 68:11 80:6
  89:5 94:19 95:6
  107:11 162:18,20
  198:5,18 228:15
  231:19,19 233:14
**wanting** 92:3
**wants** 194:21 199:6
  231:25
**warned** 208:11
**warning** 104:5,22
**warranty** 164:11
**wasn't** 40:12 41:2
  42:19,20,25 44:23
  54:24 73:24 76:5
  78:9 79:8 80:14
  91:23 94:8 102:15
  108:24 111:23,24
  114:12,15 125:7
  126:10 128:21
  141:21 156:11,25
  158:10 189:22
  231:18 243:19

**waste** 46:11 67:12
  95:2 143:2 149:17
  162:13 207:23
  247:10,13
**wasting** 46:5,6
  149:22 181:14
**watched** 97:17
**watching** 93:7 201:19
**water** 126:13
**water-under-the-b...**
  72:7
**waving** 69:25
**way** 10:12 14:22
  17:19 49:19 51:10
  66:3 73:15,18,22
  74:2,20 77:21 81:13
  89:11,19 93:12
  95:16 96:12 100:24
  106:13,19 119:13
  119:15 162:18
  172:14 176:18
  184:6 186:8 187:8
  224:7 227:2 232:7
  237:23 239:19
  242:3,14 255:14
**ways** 105:14
**websites** 117:7,20,22
  118:3
**Wednesdays** 37:18
  232:15
**week** 10:8,15 37:20
  37:24 38:5,6,9 39:3
  39:3 40:20 51:3
  68:23 77:17 100:4,6
  100:7 101:8 172:3,6
  172:11,13 214:7,10
  214:14 215:3,6,14
  215:15,17,20,21
  216:9,11,18,22
  217:4,5,8,13,15,17
  217:17,25 218:4,8
  218:17,21 219:4,8
  219:11,15,16,20,20
  219:24 220:3,14,22
  220:24 221:5,9,12

  221:15,19,22 222:7
  222:9,12,20,23
  223:2,4,6,10,13,18
  223:21,25 224:3,6,7
  224:12,15,18,22
  225:3,11 226:11,12
  226:17
**week's** 85:16
**weekend** 85:12,15
**weekly** 37:7 38:10
  42:17,18 50:15
  150:12 214:4
**weeks** 54:9 121:23,24
  127:10 129:20
  132:25 136:11
  150:9 152:21
  218:16,17 219:15
**weight** 115:12
**weird** 93:18
**welcome** 81:23
**went** 19:17 20:2
  52:11 56:17 64:21
  79:12 82:22 100:21
  106:14 121:10
  122:13 127:7
  128:20 129:7
  132:10,14,14,23
  133:6,10,11 134:3
  152:24 153:12
  155:2,17 168:7,13
  188:13 189:9,10,14
  189:16 217:5 227:6
  232:24 233:17
**weren't** 108:9 122:8
**WHEREOF** 255:16
**willing** 56:24 57:23
  231:8 240:17
**win** 89:4
**wins** 89:4
**withdrawn** 69:11
  128:4 225:2 243:11
  249:12
**witness** 4:18 5:21
  23:5 26:21 42:4
  103:25 119:23

Case 1:21-cv-07163-OEM-LB   Document 106-2   Filed 03/27/24   Page 100 of 102 PageID #: 2687
STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023
291

132:8 145:23
161:23 165:4 177:6
189:7 237:16 241:6
244:9 247:7 251:16
252:4 253:3 255:7
255:11,16
**witnessed** 87:13,17
**witnesses** 144:5,12
155:14 194:21
**woman** 90:25
**women** 100:10
109:19
**word** 102:6,6 167:12
168:18 175:5
**worded** 61:19 178:14
**words** 8:7 42:24
50:13 96:23 140:25
**work** 32:6,23 33:5
34:20 37:18,23 48:7
53:23 54:8,9,20
55:18 59:17 75:6
77:11 86:7 89:15
90:19 98:22,25
107:16,19 114:10
121:10 127:8,12
131:4 134:16,20
143:3,5 159:4
181:17 182:5,21
210:21 231:23
232:5 233:16
249:19 250:4
**work-related** 71:18
71:23 77:9 102:16
**workday** 232:21
**worked** 31:13,14,20
32:5,9 33:2,25 34:7
34:11,21,24 35:4
36:12,21 37:14,20
40:5 53:10 63:9,13
66:20 71:13 97:14
105:16 107:21
118:15 120:16
121:21 122:19,21
127:18 131:23
157:23 159:24

160:5 163:16 179:3
179:4 182:13 189:4
200:6 205:12
**workers'** 28:3 136:22
**workforce** 53:2
122:13 127:2
**working** 31:18,24
33:16,19,21 48:6,11
49:15 50:5,23 51:20
52:4,20,22 54:2,3,4
59:22 62:9,20 66:21
76:12 92:20 97:24
99:4,6 100:2,7,7
107:20 114:9
116:22 117:2
118:19 120:13
122:22 125:22
126:9 127:11
129:12 147:3
159:17 163:12
173:20 180:7
181:11 184:22
187:8 195:5 200:11
211:6,9 220:17
250:11,18
**works** 17:19 131:25
**workweek** 232:15
**world** 107:22 115:14
**world's** 182:25
**worried** 112:14
114:14
**worry** 115:12
**worth** 85:16 218:16
**worthiness** 175:7
**wouldn't** 79:16 84:2
84:4 87:11 98:15,25
99:7 108:20 115:11
115:14 128:14
129:23 140:25
166:8,25 189:21
191:2 198:19
218:24 250:3,10
**write** 8:12 141:10
189:15 206:23
**writing** 20:10,15 29:7

123:25 124:11,19
157:19 158:14
**writings** 142:14
**written** 14:22 59:14
103:4 141:4 169:18
206:25
**wrong** 25:5
**wrote** 236:21

**X**

**x** 1:2,11 83:22 157:13
178:11 235:8,9
253:2,13 254:3,15
**XX-XX-1998** 17:5
**XY** 96:25
**XYZ** 15:3

**Y**

**Y** 240:25 241:3
254:16
**Yanes** 188:5
**yeah** 65:23 67:14
98:3
**year** 17:7,13,17 20:7
32:2,14 33:15 48:15
54:5,6 62:3 140:15
159:4 217:24 218:2
**year-to-date** 215:21
216:10
**years** 90:25 91:3
102:5 113:24,25
120:7 123:13,16
171:8 180:7 192:9
193:14,16 207:3
**yes-and-no** 39:16
**York** 1:1,20 2:4,9 4:5
4:6 17:15 18:12,24
19:3,12,17,24 30:11
32:10,13 248:10,16
255:6
**young** 32:20

**Z**

**Z** 96:25 243:24,25
254:17

**zero** 224:25
**Zoom** 1:18

**0**

**1**

**1** 187:17
**1,000** 48:22 49:3,10
105:18 168:13
226:13 227:11,12
240:8,15
**1,050** 172:13 222:24
223:4
**1,197** 217:25
**1,200** 220:25
**1,238.64** 150:13
151:19 152:17
**1,375** 223:17
**1,400** 219:11,21
**1,450** 220:4,10
**1,505** 215:21 216:11
**1,600** 224:2,8 226:12
227:12
**1,628** 165:22
**1,857** 165:22
**1:21-cv-7163** 1:2
**1:30** 142:18
**1:51** 143:12
**10** 190:5 245:13
**10,000** 89:21 167:21
240:18
**10:00** 186:11 232:20
232:20
**10:05** 24:16,20,22
**10:45** 186:17
**100** 48:14 59:19
138:2
**100,000** 153:9,13,15
**103** 2:4
**10th** 170:17 190:4
197:16
**11:14** 81:10
**11:30** 81:11,20
**11042** 2:9
**11354** 4:6

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

292

**11355** 2:4
**1165** 211:12
**1167** 211:13
**1186** 212:25 254:14
**1198** 217:10
**11th** 186:9
**12** 136:11 179:2
215:6 228:3
**12,600** 163:24
**12:58** 143:10
**12th** 186:15,17 195:5
209:20 215:13
216:10 223:14
**13th** 223:18
**14** 158:18 179:2
**143** 253:17
**148** 253:18
**14th** 150:6 198:22
213:12 220:15
**150** 37:8,13 39:5
42:19 43:3 75:16
164:16 166:9,10,15
166:17,19 167:10
167:10,16,22
172:12 216:14
220:10 221:6 222:6
222:10,25
**154** 253:19
**157** 253:11
**158** 253:11
**15th** 190:24 193:11
**16** 193:12
**161-10** 1:7 5:5,8 6:2
13:22
**162** 253:20
**17** 1:12 20:2 185:13
256:4
**170** 253:20
**172** 253:21
**173** 253:21
**174.25** 166:6,9,11,13
166:19 167:15
**18** 33:22 34:8,23
64:15 76:16,19 77:4
78:3 86:13 150:6,18

168:3 170:6 171:22
172:8 176:4,7 190:4
199:24 200:23
204:14 215:6
221:16 222:24
**184** 253:22
**187** 253:23
**18th** 215:13
**19** 8:24 18:8,15 20:13
34:8,23 36:7 44:17
48:12,16 60:20 61:3
76:16,19 77:4 86:13
90:6,25 91:3 94:2
94:15 150:6,18
158:6 179:19
187:22 188:16
196:11 197:11
207:4 225:7 253:11
**190** 253:24
**194** 254:6
**197** 254:7
**19th** 223:18
**1st** 150:6 171:15
187:22 227:21

**2**

**2** 80:20 155:13 207:4
253:17
**2,000** 11:2
**2,165** 215:22 216:10
**2,755.54** 152:22
**2:00** 186:11
**20** 76:8 83:6 180:9
253:10
**20-something** 51:4,7
226:25
**2010** 199:25
**2011** 163:25
**2017** 19:22 21:2
23:12,15
**2018** 8:23 18:8,15
19:21 20:13 43:21
60:9,10 77:25
140:17 162:7
163:21 165:10,11

165:19 167:25
168:23 169:3 170:5
170:17 171:15,19
173:17 175:24
185:22,23 191:11
193:12 202:15
204:4,12 209:20
213:9,25 217:17
222:5 224:7 250:11
250:15
**2019** 51:6 52:5,19
124:18 125:4 186:9
186:15 187:17
194:20 195:22
213:12
**202** 254:8
**2020** 18:6 51:5 53:3
53:18 54:21 132:4,6
132:13,16 134:7
**2021** 133:4,9,9,10,11
133:12,24 134:10
185:13
**2022** 54:7 132:13,19
143:23 227:18,22
228:3,4,6 244:4
245:8
**2023** 1:12 149:4
252:20 255:17
256:4,20
**203** 254:9
**206** 254:10
**207** 254:11
**209** 254:12
**20th** 204:14 220:14
223:22
**21** 253:16
**21-1653** 227:25
**211** 254:13
**213** 254:14
**21st** 143:23
**22** 187:23 245:8
**22nd** 213:9,24
**235** 254:15
**23rd** 200:23 201:14
**24** 9:12 220:17

**221**:16
**241** 254:16
**244** 254:17
**24th** 165:19 199:24
220:15
**25th** 165:11 200:3
225:4
**26th** 188:24 200:5
223:22
**27** 163:21 227:8
**27th** 201:22 224:8
**28** 203:12 227:8,18
228:3
**2815** 4:5
**28th** 213:25
**29** 202:15 253:10
**2nd** 222:5

**3**

**3** 217:10
**3,000** 37:8 43:2,3,10
164:25 166:16
**3,435** 217:24 218:2
**3,485** 166:3
**3,500** 164:25
**3:00** 142:20
**3:59** 226:4
**30** 13:3,24 76:9 149:4
208:10 227:5
243:15,17
**30-minute** 162:20
**300** 37:7 39:2,3 50:13
50:15 172:12 214:3
214:7 218:17
219:24
**3000** 2:9
**30E** 4:21 5:25
**31st** 193:11 225:5
**33** 227:5
**35** 81:16
**350** 225:2,11
**36** 170:6 199:4
**37** 247:24
**38** 81:16
**3rd** 217:4 218:19

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

293

224:9 227:11
**3W8** 2:9

**4**

**4** 253:7
**4.4** 216:15
**4:05** 226:5
**4:15** 187:22
**4:30** 239:25
**4:40** 243:18
**4:57** 252:15
**40** 83:10 182:22
**40/60** 85:15
**4125** 2:4
**428.64** 151:18 152:17
  152:20
**45** 79:18
**45-minute** 162:21
**450** 219:21 221:9,13
  223:22
**46** 168:19
**4th** 197:10 202:19
  228:6

**5**

**5** 37:9 42:23,25 43:3
  43:21 44:3,6 45:10
  50:18 75:9,13 76:3
  76:19,24 164:24
  166:6,14,17 167:3,9
  168:14 214:13,22
  215:2 216:25
  220:13
**5.2** 214:12
**5:15** 188:3
**50** 182:22
**50/50** 85:15
**500** 101:8 224:18
**53** 86:12
**586** 163:25
**5th** 194:20 196:11
  202:23

**6**

**6** 171:12 195:22

199:7,9,11 244:4
**6.43** 150:10 152:21
**60** 79:18 83:10 159:3
**600** 227:13
**615** 216:19
**625** 224:15
**65** 79:19
**655** 216:22
**660** 216:3,12,14
**6th** 203:5 223:14
  226:20 255:17

**7**

**7** 156:13 157:18
  253:11
**70,000** 159:3
**700** 136:15 222:9
**750** 221:16,19
**780** 214:5

**8**

**8** 171:12 188:16
**8:00** 232:20
**800** 89:20 172:14
  222:12,17
**81** 253:17
**810** 151:20 152:17
**825** 224:12 225:8
**8th** 23:15 211:25
  222:5

**9**

**9** 217:5,10 243:6
**9.67** 220:10
**9:00** 162:19 232:20
  243:19,20
**9:23** 1:12
**9:30** 162:19
**900** 172:14 219:4,9
  221:22 222:6
  223:14
**9th** 218:19