1       UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF NEW YORK

3       ----------------------------------------X

4       LETICIA FRANCINE STIDHUM,

5                           Plaintiff,

6           -against-          CASE: 21-CV-07163

7       161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
          AUTO OUTLET, and HILLSIDE AUTO MALL INC
8       d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
          JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

9

10                           Defendants.

11      ----------------------------------------X

12                     February 24, 2023

13                     10:00 A.M.

14

15         VIRTUAL EXAMINATION BEFORE TRIAL of

16      ISHAQUE THANWALLA, via Zoom, a Defendant

17      herein, held at the above-mentioned time and

18      taken before Lynn Luckman, a Notary Public

19      and Shorthand Reporter within and for the

20      State of New York.

21

22

23            SANDY SAUNDERS REPORTING
          254 South Main Street, Suite 216
24           New City, New York 10956
             (845) 634-7561

25

Page 2

```
 1        A P P E A R A N C E S :
 2
 3
 4        TROY LAW, PLLC
 5        Attorneys for the Plaintiff
 6        41-25 Kissena Boulevard, Suite 103
 7        Flushing, NY 13555
 8        BY: Tiffany Troy, Esq.
 9
10        MILMAN LABUDA LAW GROUP, PLLC
11        3000 Marcus Avenue, Suite 3W8
12        Lake Success, NY 11042-1073
13        BY: Emanuel Kataev, Esq
14        emanuel@millaborlaw.com
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 FEDERAL STIPULATIONS
 2
 3             IT IS HEREBY STIPULATED AND AGREED by
 4        and between counsel for the respective parties
 5        hereto that all objections except as to the
 6        form shall be reserved to the time of trial.
 7             IT IS FURTHER STIPULATED AND AGREED
 8        that the sealing and filing of this deposition
 9        shall be hereby waived.
10             IT IS FURTHER STIPULATED AND AGREED
11        that this examination may be sworn to by the
12        witness being examined before a notary public
13        other than the notary public before whom
14        examination was begun examination was begun.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 Ishaque Thanwalla
 2             BY THE COURT REPORTER:
 3             The attorneys participating
 4             in this deposition
 5             acknowledge that I am not
 6             physically present in the
 7             deposition room and that I
 8             will be reporting this
 9             deposition remotely.  They
10             further acknowledge that, in
11             lieu of an oath administered
12             in person, I will administer
13             the oath remotely.  The
14             parties and their counsel
15             consent to this arrangement
16             and waive any objections to
17             this manner of reporting.
18                 MS. TROY:  I consent
19                 MR. KATAEV: I consent.
20
21
22             *    *    *
23
24
25
```

Page 5

```
 1        Ishaque Thanwalla
 2        I-S-H-A-Q-U-E T-H-A-N-W-A-L-L-A,
 3        a Defendant herein, after having been
 4        duly sworn by a Notary Public of the
 5        State of New York, was examined and
 6        testified as follows:
 7
 8        BY THE REPORTER:
 9            Q.  Please state your full name
10        for the record.
11            A.  Ishaque Thanwalla.
12            Q.  Please state your present
13        address for the record.
14            A.  Business address: 161-10
15        Hillside Avenue Jamaica, New York 11432.
16        Home address:  7 Poplar Court, Great
17        Neck, New York 11024.
18                THE COURT REPORTER:
19            Counsel, Mr. Kataev, will you
20            be purchasing a copy of this
21            transcript?
22                MR. KATAEV:  I will let
23            you know.  I will speak to my
24            client.
25                MS. TROY:  Let's deem
```

Page 6

Ishaque Thanwalla

1
2      marked Plaintiff's Exhibit 1.
3      (Plaintiff's Exhibit 1 deemed
4      marked for identification).
5  EXAMINATION BY
6  TIFFANY TROY:
7      Q. Mr. Thanwalla, was that your
8  business address or your home address?
9      A. That is my business address.
10     Q. Can you state your residence for
11  me as well?
12     A. 7 Poplar Court, Great Neck, New
13  York 11024.
14     Welcome today.
15     Q. Thank you for welcoming me
16  today. Have you ever been part of a
17  deposition before?
18     MR. KATAEV: Objection to
19     the form. You can answer.
20     A. Yes.
21     Q. Do you know what a deposition
22  is?
23     A. A deposition is when you ask
24  questions and I answer the questions.
25     Q. Correct. When was the last time

Page 7

Ishaque Thanwalla

1
2  that you had a deposition; you just
3  mentioned that you participated in a
4  deposition before?
5      MR. KATAEV: Objection to
6      the form. You can answer.
7      A. That was over 15 years ago.
8      Q. Do you recall for what?
9      A. Not really, I can't recall.
10     Q. Were you a party to a civil
11  action or was that something else?
12     A. I don't understand that
13  question. What do you mean by ''civil
14  action?'' I don't understand the law.
15     Q. By that, I mean was there a
16  plaintiff bringing an action against the
17  defendant, and if you were either a
18  plaintiff or a defendant in a civil action
19  as opposed to a criminal matter.
20     MR. KATAEV: Objection to
21     the form.
22     Q. Do you recall what the lawsuit
23  was about?
24     A. I can't, it was so long ago.
25     Q. Since that is the case, I'm

Page 8

Ishaque Thanwalla

1
2  going to briefly explain what a deposition
3  is and lay some ground rules going forward.
4      A. Okay.
5      Q. First, this deposition is for me
6  to ask you questions and for you to answer
7  my questions about the subject matter of
8  that lawsuit. There is a separate action
9  covering the wage and hours, and today we're
10  only going to focus mostly on the pregnancy
11  discrimination lawsuit; do you understand
12  that?
13     A. Yes, I understand.
14     Q. Since the court reporter has to
15  take down everything that you say, I ask
16  that you give only verbal responses, so no
17  shaking or nodding or any hand motions, no
18  gestures; do you understand that?
19     A. I represent to you that I have a
20  habit, and I may do it as this is just a
21  habit, but, I might shake my head back and
22  forth. (Indicating).
23     Q. That is not a problem as long as
24  there is a verbal response together with the
25  shaking or nodding of your head; there is no

Page 9

Ishaque Thanwalla

1
2  problem.
3      A. Okay.
4      Q. For the same reason, please
5  speak loudly and clearly when you answer a
6  question; do you understand?
7      A. Yes.
8      Q. The stenographer can only write
9  one person down speaking at a time.
10  Therefore, please do not start to answer a
11  question of mine before I finish asking that
12  question; likewise, I will not start a new
13  question until you have finished answering
14  my last question; do you understand?
15     A. Yes.
16     Q. If you need to take a break, for
17  example to get a drink of water or to use
18  the restroom, please let me know and I will
19  call for a recess; do you understand?
20     A. Yes.
21     Q. However, there can be no break
22  between one of my questions and your answer
23  to that question; do you understand that?
24     A. I don't understand the question.
25     Q. Let me repeat it. Even if you

Ishaque Thanwalla

1 are taking a break at any time, there is an
2 assumption that you will not be calling for
3 a break between one of my questions and
4 before you answer that question; do you
5 understand that?
6         A. I understand -- you mean if I
7 ask to take a break and there is a question,
8 that I have to complete an answer before I
9 ask for that break?
10        Q. Correct.
11        A. Right, correct.
12        Q. From time to time your attorney
13 may make objections to my question.
14 Generally, unless your attorney tells you
15 not to answer, you will still have to
16 respond; do you understand?
17        A. Not really. That's why I have
18 an attorney.
19        Q. Let me backtrack for a second.
20 From time to time as we are going along in
21 the deposition, your attorney may make some
22 objections to my questions saying
23 ''objection'' for blah blah blah reasons.''
24        A. Right.

Ishaque Thanwalla

1        Q. Generally unless your attorney
2 directs you not to answer, you still need to
3 respond; do you understand that instruction?
4        A. Not to answer? What's the
5 reason for him telling me not to answer a
6 question?
7            MR. KATAEV: She is saying
8               that if I tell you not to
9               answer, then we will deal
10              with that later.
11           THE WITNESS: Yes.
12        Q. Do you understand?
13        A. Yes.
14        Q. If you don't understand a
15 question, tell me and I will rephrase it so
16 that you can; do you understand that?
17        A. Yes.
18        Q. If you do not hear a question,
19 tell me and I will repeat it so that you
20 can; do you understand?
21        A. Yes.
22        Q. We are here together for facts
23 and not speculation. If you don't know the
24 answer to a question, say so; do you

Ishaque Thanwalla

1 understand that?
2        A. Yes.
3        Q. Before the deposition, you
4 mentioned that a deposition took place 15
5 years ago. Were you ever deposed at any
6 other time?
7        A. No.
8        Q. Do you understand that you have
9 taken an oath to tell the truth?
10        A. Yes.
11        Q. Do you understand that your oath
12 to tell the truth carries the same force and
13 effect as if you are testifying in Court
14 before a Judge?
15        A. Yes.
16        Q. Are you currently taking any
17 medications that could prevent you from
18 recalling the truth or testifying truthfully
19 today?
20        A. Not to my knowledge. I do take
21 a Sudafed for my sinuses.
22        Q. To your knowledge, it would not
23 affect your ability to tell the truth or
24 recall truthfully?

Ishaque Thanwalla

1        A. Best of my ability, I don't
2 think so, I don't think it's going to
3 affect.
4            MS. TROY: Please zoom in
5               a little bit for the court
6               reporter.
7           THE WITNESS: Okay.
8           MR. KATAEV: Let the
9               record reflect that the
10              plaintiff is present
11              virtually.
12        Q. Mr. Thanwalla, are you currently
13 under any physical or emotional condition
14 that could prevent you from recalling the
15 truth or testifying truthfully today?
16        A. No.
17        Q. Do you have a cell phone on or
18 near you?
19        A. Yes.
20        Q. Do you agree that during this
21 deposition today, except during the break,
22 you will not be using your cell phone?
23        A. Yes. That's why I just turned
24 it off.

Page 14

Ishaque Thanwalla

1
2       Q.  Do you understand that except
3   for the documents that I will be showing you
4   on the Zoom screen today, that you will not
5   be reviewing any other documents?
6       A.  I will not be reviewing any
7   other documents.  The only ones are the
8   documents that you provide, is that what you
9   are saying?
10      Q.  Correct.
11      A.  Okay.
12      Q.  I see that you have a notepad on
13  the desk.  I ask that during the pendency of
14  this deposition that you do not use that
15  notepad.
16          MR. KATAEV:  It was just
17          there, we are moving it.
18          (Indicating)
19      A.  Yes.
20      Q.  During this deposition, to make
21  things easier for ourselves, I'm going to be
22  referring to the company 161-10 Hillside
23  Auto Avenue, LLC, which is doing business as
24  Hillside Auto Outlet as Hillside Auto
25  Outlet; do you understand that?

Page 15

Ishaque Thanwalla

1
2       A.  Yes.
3       Q.  In the same vein, I'm going to
4   be referring to the corporate defendant
5   Hillside Auto Mall Inc., which is doing
6   business as Hillside Auto Mall; do you
7   understand that?
8       A.  Yes.
9       Q.  Do you own the residence that
10  you gave at the beginning of this
11  deposition?
12          MR. KATAEV:  Objection as
13          to relevancy. You can answer.
14      A.  No.
15      Q.  Have you lived anywhere else
16  within the past five years?
17      A.  Yes.
18      Q.  Starting from the most recent,
19  where have you lived besides the residence
20  that you gave at the beginning of this
21  deposition?
22      A.  In Bayside.
23      Q.  Prior to that, was that over 10
24  years?
25          MR. KATAEV:  Objection as

Page 16

Ishaque Thanwalla

1
2          to relevancy on that
3          question.  The witness can
4          answer.
5       Q.  Do you know?
6       A.  (No response)
7       Q.  Do you have the Bayside address?
8       A.  Correct.
9       Q.  Can you give that to me?
10      A.  1578 Waters Edge Drive,
11  Apartment 1, Bayside, NY 11360.
12      Q.  What is your highest level of
13  education?
14      A.  High school.
15      Q.  What school did you attend?
16      A.  Baf.  B-A-F High school.
17      Q.  Was that in the United States?
18      A.  No.
19      Q.  Where did you attend that high
20  school?
21      A.  That was in my country, which
22  was Pakistan that I was born in.
23      Q.  What year did you come to the
24  United States?
25      A.  I would say in the 80s, early

Page 17

Ishaque Thanwalla

1
2   80s, but I can't recall the year.
3       Q.  Are you familiar with the
4   Hillside Auto Outlet?
5          MR. KATAEV:  Objection to
6          the form.  You can answer.
7       A.  Yes.
8       Q.  How are you familiar with that
9   company?
10      A.  I run the place and I own 25
11  percentage in that company.
12      Q.  Since when have you run the
13  place?
14      A.  From the day we started.
15      Q.  What year?
16      A.  It was -- I can't -- I would say
17  2018, if I'm not wrong.
18      Q.  You mentioned that you owned
19  shares in the company, what percentage did
20  you own?  Q.  What was the question again?
21          MS. TROY:  Ms. Court
22          reporter, can you please read
23          back the last question?
24          (The reporter read back the
25

Page 18

```
 1                Ishaque Thanwalla
 2            last question)
 3            A.  I own 25 percent.
 4            Q.  Besides that, did that
 5   percentage ever change?
 6            A.  I don't understand your
 7   question.
 8            Q.  Did that 25 percent, was that
 9   the same percent from 2018 to the present
10   day?
11            A.  Yes.
12            Q.  Who else owns shares of Hillside
13   Auto Outlet?
14            A.  It is Jory, Josh and David.
15            Q.  By Josh, do you mean Josh
16   Aaronson.
17            A.  Yes.
18            Q.  By Jory, do you mean Jory Baron?
19            A.  Yes.
20            Q.  By David, do you mean David
21   Baron?
22            A.  Yes.
23            Q.  When did David Baron pass away?
24            A.  I think it was two years ago.
25            MR. KATAEV:  Objection.
```

Page 19

```
 1                Ishaque Thanwalla
 2            You are talking about facts
 3            not in evidence, but he
 4            answered.
 5            THE COURT REPORTER:  A lot
 6   of times I even asked him he
 7   said it's fine, I asked him
 8   ''do you want me to put in the
 9            objection before he answers
10            or after he answers'' and he
11            kept saying leave it alone.
12            So, he objects after the
13            question it answered.
14            Q.  What percentage did Jory Baron
15   own in Hillside Auto Outlet?
16            MR. KATAEV:  Objection to
17            the form.  You can answer.
18            A.  Twenty five percent.
19            Q.  How about Josh Aaronson?
20            MR. KATAEV:  Same
21            objection.  You can answer.
22            A.  Twenty five percent.
23            Q.  David Baron own the remaining 25
24   percent; is that correct?
25            A.  Yes.
```

Page 20

```
 1                Ishaque Thanwalla
 2            Q.  Was that the same from the start
 3   of the company from 2018 to the present day?
 4            A.  Didn't you already ask me that
 5   and I answered?
 6            MR. KATAEV:  Objection as
 7            to asked and answered. You
 8            may answer again.
 9            A.  Yes.
10            Q.  Specifically, I mean just not
11   your own shares, but the other people's
12   shares also represented 25 percent from 2018
13   to the present day; is that correct?
14            A.  Yes.
15            Q.  Are you currently employed?
16            A.  Well, what exactly do you mean,
17   do you mean if I own shares of my company
18   and I run the company?
19            Q.  I mean --
20            A.  So, what exactly do you mean,
21   define employed.  I am running my own
22   company that I own 25 percent of, is that
23   what you are referring to?
24            MS. TROY:  I will rephrase
25            the last question.
```

Page 21

```
 1                Ishaque Thanwalla
 2            A.  Please.
 3            Q.  Besides Hillside Auto Outlet, do
 4   you currently run any other company?
 5            A.  No.
 6            Q.  Are you familiar with a company
 7   Hillside Auto Mall?
 8            A.  I am.  Oh, what was the question
 9   again?  Am I aware of a company called
10   Hillside Auto Mall?
11            Q.  Familiar.
12            A.  Yes, I am familiar with it.
13            Q.  How are you familiar with it?
14            A.  The way I am familiar with that
15   is my partners may have a shareholder on
16   that company.
17            Q.  By that, do you mean Ronald
18   Baron, Josh Aaronson and Raymond Phelan. P-
19   H-E-L-A-N?
20            A.  Yes, possibly.
21            MR. KATAEV:  Objection to
22            the form of that question.
23            Q.  Do you have the address for
24   Hillside Auto Mall?
25            A.  The Mall?  I can't remember
```

Page 22

1         Ishaque Thanwalla
2 their address.
3      Q.  How about do you know how far it
4 is from Hillside Auto Outlet?
5         MR. KATAEV:  Objection to
6        the form as to relevancy, you
7        can answer.
8      A.  Approximately 10 or 11 blocks.
9      Q.  Are you familiar with Shylet S-
10 H-Y-L-E-T Motors?
11      A.  Yes.
12      Q.  How are you familiar with them?
13      A.  Yes, they are across the street
14 from me.
15      Q.  ''By me'' do you mean Hillside
16 Auto Outlet; correct?
17      A.  Yes.
18      Q.  How about Gateway Car
19 Dealership?
20      A.  They are on the -- they're close
21 to Hillside Auto Mall.
22      Q.  How about Best Auto Outlet?
23      A.  I'm confused with these
24 questions and why you are asking --
25      Q.  Please don't, please just answer

Page 23

1         Ishaque Thanwalla
2 my questions, don't question my question.
3        MR. KATAEV:  Objection as
4        to relevancy.  You can answer
5        the question.
6      A.  Best Auto Outlet is I think in
7 Suffolk County.
8      Q.  Did Hillside Auto Outlet
9 employees, meaning the car salespeople ever
10 sell cars from nearby auto outlets or
11 dealerships?
12      A.  Can you clarify that question?
13      Q.  The question is a yes or no
14 question.  My question is: have Hillside
15 Auto Outlet car salespeople ever sold cars
16 from other dealerships during their
17 employment with Hillside Auto Outlet?
18      A.  In our business, yes, you
19 mentioned a lot of dealerships names.  So,
20 the customer, so if a customer comes to us
21 and we don't have a car in our stock, so we
22 look at the sales, we look at anywhere if
23 they have a car available, and we call them
24 and request them and we can buy their car to
25 sell to our client.  Does that answer your

Page 24

1         Ishaque Thanwalla
2 question?
3      Q.  To your knowledge, do any of
4 your partners own shares in Shylet Motors?
5      A.  Not that I know of.
6      Q.  How about Gateway Car
7 Dealership?
8      A.  Not that I know of.
9      Q.  Have you ever spoken with
10 Hillside Auto Outlet employees concerning
11 where they should take the customers if the
12 customers did not like any cars in the lots
13 of Hillside Auto Outlet?
14      A.  Are you asking me -- let me
15 understand this question correctly.  Did I
16 ask if a car is not in stock, if we can go
17 to the car dealer across the street, did I
18 ask my salespeople to show them a car, is
19 that what you are asking?
20        MS. TROY:  You can answer
21        my question first based on
22        your understanding and then I
23        will follow-up with more
24        questions.
25      A.  That's what my understanding is,

Page 25

1         Ishaque Thanwalla
2 that's what you are asking me, and I don't
3 know the right way or the wrong way to
4 answer the question.
5      Q.  Again, I'm asking you to answer
6 the questions based on your understanding of
7 the question.
8      A.  This is my understanding --
9        MR. KATAEV:  Let me just
10        say this to help both of you
11        out.  You have to answer the
12        question, you cannot ask her
13        questions.  But, if in your
14        question it is based on your
15        understanding --
16        THE WITNESS:  My
17        understanding is that she's
18        mentioning if I don't have a
19        car, my salespeople can go
20        across the street and bring
21        the car to my lot and then
22        sell it?  Is that right?
23      Q.  Have you ever told any Hillside
24 Auto Outlet employees that you better not
25 sell the car from the other dealerships,

1          Ishaque Thanwalla
2  mostly you should do so and sell the car
3  from Hillside Auto Mall?
4        A.  Are you saying don't sell anyone
5  the car from the dealership across the
6  street but Hillside Auto Mall, is that what
7  you are asking me?
8        Q.  Yes.
9        A.  No.  Why would I hurt my own
10  sales?
11        Q.  Have you ever informed them
12  because Hillside Auto Mall is owned in part
13  by your partners, Hillside Auto Outlet, they
14  did not have the cars available that you
15  preferred, your preference was for them to
16  go to the Hillside Auto Mall?
17        A.  No.  We look for the inventory
18  wherever it's available and that's why we
19  sell the cars.  That is we pick up the car
20  and bring the car and sell it on our lot.
21        Q.  Have you ever told Hillside Auto
22  employees, Hillside Outlet Auto employees,
23  that you have a preference for them to sell
24  cars if a car is not available at Hillside
25  Auto Outlet for them to go to Hillside Auto

1          Ishaque Thanwalla
2  Mall?
3        MR. KATAEV:  Objection to
4  the form. Asked and answered,
5  you can answer again.
6        A.  No.
7        Q.  What are your responsibilities
8  as the owner, part-owner of Hillside Auto
9  Outlet?
10        A.  My title is general manager.
11  That consists of a lot of responsibilities:
12  hiring the employees, firing the employees,
13  making sure that the deals are done the
14  right way, making sure that the deals are
15  funded, making sure it is running smoothly,
16  the operations are running smoothly, making
17  sure the inventory is serviced, making sure
18  everything with the DMV is done correctly
19  and on time.  If it's not done correctly and
20  on time, I have to make sure that I have to
21  discipline the people who are in that
22  department.
23        I have to look into every department
24  and make sure everything is running smoothly
25  and in a timely fashion where it does not

1          Ishaque Thanwalla
2  affect the business licenses and compliance
3  as well.
4        Q.  You mentioned that part of your
5  responsibilities were to hire employees.  Do
6  you recall hiring Leticia Stidhum?
7        A.  Yes, very well.
8        Q.  Can you describe what the hiring
9  process was like?
10        A.  She came for an interview and
11  she sent a resume to Craig's list, if I can
12  recall that and she came in and interviewed
13  with me.  I like to give people an
14  opportunity when anyone walks in, if it's a
15  candidate that is intelligent enough to hold
16  a conversation right away, and then I hire
17  them.
18        Q.  Do you recall when you hired
19  her, the date?
20        A.  I can't recall that.
21        Q.  During that conversation, during
22  that hiring process that you just described,
23  did you tell her what her pay was going to
24  be?
25        A.  Yes, well, yes.  She is a

1          Ishaque Thanwalla
2  commission salesperson and her compensation
3  consisted of approximately $300 a week
4  salary, plus $150 commission, plus bonus,
5  also, if there was any individual car that
6  had a bonus.  We have many bonuses, we have
7  weekly bonuses, we have daily bonuses,
8  certain cars, it's old age and we have a
9  bonus.
10        Q.  To clarify, when you said plus
11  $150 commission, is that $150 per car
12  commission?
13        A.  It's called a flat commission
14  rate, yes.  Plus the salary, plus the
15  bonuses if there are any changes.
16        Q.  Can you describe for me what the
17  differences are between the monthly, weekly,
18  and daily bonuses?
19        A.  Okay, very simple.  Let's take
20  one step at a time.  So, you have a salary
21  as a side salary, correct?  If they sell a
22  car, they have $150 flat commission, and
23  let's putting that aside for a second.
24      Now, let me explain what the bonuses
25  are, so certain cars are old age, and as an

Ishaque Thanwalla

1  example, in this industry, if we have a car
2  for over 60 days we like to get rid of it as
3  fast as possible because it is costing us
4  and it is depreciating, the money is
5  depreciating. So, we may add another $20 or
6  $25 as a bonus.
7       Sometimes the car is 90 days old, it's a
8  90-day old unit, and we may put $50 or even
9  5 percent additional commission on that,
10  depending on the day.
11       Q.  Specifically, when we were
12  talking about Leticia, what was the bonuses
13  that were promised to her?
14       MR. KATAEV:  Objection to
15  the form. You can answer.
16       A.  There is no promises to begin
17  with, only thing we would tell you our
18  bonuses, our bonus structure changes daily,
19  weekly, and monthly.  So, whatever was in
20  that week, that is the bonus that she got.
21  If there's a 5 percent or $25 additional or
22  $50 additional, or maybe $500.  I can't
23  answer that question 100 percent.  To the
24  best of my ability, I have given you the

Ishaque Thanwalla

1  complete structure.  It could be 5 percent,
2  25 percent, it could be $5 -- I'm sorry, it
3  could be $50.  Maybe a bigger bonus for that
4  week based on the day, based on the time.
5  Every day they have new bonuses, not exactly
6  every day, but let's say on a Saturday just
7  to give you an example, you sell three cars
8  and deliver those cars.  You get additional
9  $100 bonus.  So, which we provide bonuses or
10  we will say ''it's three cars,'' and we're
11  going to ''give you additional 5 percent.''
12  It all depends.
13       Q.  So, let's break down the
14  conversation that happened during hiring;
15  did you talk at all about the schedule,
16  meaning the work schedule that Leticia would
17  be given as a commission salesperson?
18       A.  Yes.  She was to get a 40-hour
19  schedule.
20       Q.  Can you tell me what that
21  schedule is?
22       A.  How can I tell you?  I don't
23  have a schedule in front of me.
24       Q.  Did she regularly work a certain

Ishaque Thanwalla

1  number of days or did that change from week-
2  to-week?
3       A.  Some days she worked five days,
4  most of the time, but she usually would have
5  weekdays, Thursday, Tuesday, depending on
6  your schedule off, you would have a Sunday.
7  All of the schedules changed every week,
8  every industry, you have to come in the
9  beginning of a week, and you get the
10  schedule.
11       Q.  Can you tell me what time she
12  would be expected to arrive at work?
13       A.  About 10 o'clock.
14       Q.  How about what time would she be
15  expected to leave work?
16       A.  The work time would be our
17  business hours are between 10:00 and 7:00 or
18  10:00 to 8:00.  It also depends, if it's
19  wintertime or summertime.
20       Q.  Let's start from the wintertime,
21  what would that time be?
22       A.  About 10:00 to 7:00.
23       Q.  How about the summertime?
24       A.  Mostly it's 10 to 8:00 is the

Ishaque Thanwalla

1  schedule or the dealership opens hours, not
2  the schedule hours.  But the dealership is
3  open through 10:00 and 8:00.  So, maybe
4  Leticia would start at 12:00 to 8:00 or
5  10:00 to 6:00, something like that.  It all
6  depends.
7       Q.  How would you describe the foot
8  traffic at Hillside Auto Outlet, and in
9  terms of the timeframe, you can say
10  generally, or specifically, but I'm asking
11  about 2019.
12       A.  When you say ''foot traffic,'' can
13  you give me a little more elaboration?
14       Q.  Sure.  Would you describe your
15  store as a busy store and the timeframe is
16  2019?
17       A.  Which timeframe?
18       Q.  The year 2019.
19       A.  It is too long for me to
20  describe that.  Our business changes based
21  on the season.
22       Q.  So, why don't you just describe
23  for me generally what the business was like
24  based on the season.

Page 34

Ishaque Thanwalla

1
2      A. Okay. Giving you an example, it
3   would be busy traffic after March, it would
4   be busy; April, May, June, July August,
5   starting to go down; September goes down;
6   October, November is slow and December is
7   very slow, and January is slow. February is
8   slow and in March it starts to pick up.
9      Q. So, you would describe March
10  through August as the busy months?
11     A. Correct.
12     Q. September through February as
13  less than busy?
14     A. Less busy, you got it right.
15     Q. How many cars would Hillside
16  Auto Outlet sell on a monthly or weekly
17  basis, on a monthly or weekly basis between
18  March and August?
19        MR. KATAEV: Objection as
20        to compound. You can answer
21        the question.
22     A. March would be a busy month and
23  I can't really give you a number. So, I
24  would say 72 or 75 cars in March and April,
25  and somewhere around that neighborhood and

Page 35

Ishaque Thanwalla

1
2   October and November and December would slow
3   down to 30 or 50 cars a month.
4   It's not only our -- my dealership, it's 90
5   percent of the dealerships.
6      Q. Has Leticia ever worked a mixed
7   schedule, meaning a schedule that was not
8   fixed during her time at Hillside Auto?
9      A. What do you mean by ''mixed
10  schedule?'' It's confusing to me.
11        MS. TROY: Let me
12        rephrase it.
13        THE WITNESS: Thank you.
14     Q. When Leticia worked for Hillside
15  Auto Mall, she always reported to work at
16  10:00 a.m.?
17     A. She never worked for Auto Mall.
18     Q. I mean Hillside Outlet.
19     A. That is Outlet, not the Mall.
20  You just said ''Mall,'' that is why she has
21  never worked for the mall. She worked for
22  only Hillside Auto outlet.
23     Q. My question is: when Leticia
24  worked for Hillside Auto Outlet, did she
25  always start working at 10:00 a.m.?

Page 36

Ishaque Thanwalla

1
2      A. No, some days she worked late
3   and some days she was off. I think she chose
4   -- how can she be if she always started at
5   10:00 a.m.?
6      A. Is it fair to say that on days
7   that she worked, she would start working at
8   10:00?
9      A. I can't -- you are repeating
10  yourself on this question which is as I
11  said, based on her schedule. If her shift
12  started, let's say she started late, if her
13  shift started at 10 o'clock, she would start
14  at 10 o'clock and her shift says she was
15  supposed to start at 11:00 or 12:00, she
16  would start at 11:00 or 12:00.
17        MR. KATAEV: Objection to
18        that. It was asked and
19        answered already.
20     Q. Are you saying that there is a
21  10:00 a.m. shift and 11:00 a.m. shift and a
22  12:00 p.m. shift?
23        MR. KATAEV: Objection to
24        form. You can answer.
25     A. Correct.

Page 37

Ishaque Thanwalla

1
2      Q. Regardless of what time Leticia
3   started, what time would she end work?
4      A. She would end work when the
5   shift is finished.
6      Q. When would the shift be
7   finished; let's start from the 10:00 a.m.
8   shift?
9      A. When I gave you the answer for
10  my question, what time the operating hours
11  are, the hours are 7 in the wintertime and 8
12  in the summertime.
13        MR. KATAEV: Objection.
14        Asked and answered.
15     Q. During the workday, would she
16  have any break time?
17     A. Sure she did, she went out for
18  the break, always did. Her and David
19  Manrique.
20     Q. Was there a fixed time for
21  break?
22     A. Fixed time for break? This is
23  how the break works. It's an eight-hour
24  shift and they can either take a whole hour
25  or they can take two different breaks, 25 or

Page 38

Ishaque Thanwalla

1    Ishaque Thanwalla
2    15 minute breaks and one and one half hour
3    break. It depends on them.
4         Q.  Is that every workday?
5         A.  Every workday. Why would it be
6    different?
7         Q.  During that, and let's talk
8    about that for a second, is there a time
9    clock at Hillside Auto?
10        A.  No.
11        Q.  Was there a method by Hillside
12   Auto to keep track of the employee's
13   attendance?
14        A.  We used to keep track, yes. That
15   is how they got paid.
16        Q.  Can you describe how the
17   employee's time was kept track of?
18        A.  They came and signed-in and when
19   they went out for a break, they signed out
20   at the desk.
21        Q.  Do you still have those records?
22        A.  Unfortunately, we had a robbery.
23   There were a lot of records that were
24   missing, that was missing.
25        Q.  When did the robbery take place?

Page 39

Ishaque Thanwalla

1         A.  I can't recall the exact date.
2
3         Q.  Do you recall the year?
4         A.  Yes, it was 2019 or 2018.  I
5    have no idea, I have to look.
6         Q.  Was a police report filed in
7    conjunction with the robbery?
8         A.  Yes.
9         Q.  Besides the employee's
10   attendance records, what else was taken?
11        A.  Quite a few files that I can't
12   remember exactly what it was.
13        Q.  Are you familiar with an
14   individual by the name of Deana Jennings?
15        A.  Yes.
16        Q.  How are you familiar with her?
17        A.  She was the controller at the
18   time.
19        Q.  What is her role now?
20        A.  To make sure the payroll is
21   done, making sure the deals were funded,
22   making sure the accountings were good.
23        Q.  Was her role in 2018 and 2019
24   the same as her role is now?
25        A.  She's no longer working with me;

Page 40

Ishaque Thanwalla

1    Ishaque Thanwalla
2    I have a new controller and her name is
3    Susan.
4         Q.  When did Deana Jennings leave
5    work at Hillside Outlet?
6         A.  I can't recall the exact date.
7         Q.  What was Deana Jennings'
8    position before she left?
9         A.  I don't understand your
10   question.
11        Q.  Did she have a title, like for
12   instance, you are the general manager,
13   right?  Did she have a title?
14        A.  Yes, I answered that question to
15   you as her title was controller.
16        Q.  Was she employed by Hillside
17   Auto Outlet?
18        A.  Yes.
19        Q.  Was she also employed at the
20   same time at Hillside Auto Mall?
21             MR. KATAEV:  Objection to
22        the form.  You can answer.
23        A.  Yes.
24        Q.  What was her title at Hillside
25   Auto Mall?

Page 41

Ishaque Thanwalla

1    Ishaque Thanwalla
2         A.  I can't answer that question
3    because I don't know.  Anybody can have two
4    jobs, it's certainly not my place.  Certain
5    hours at my place and certain hours -- I
6    can't answer that, what she did over there.
7         Q.  To your knowledge, was she also
8    in charge of billing at Hillside Auto Mall?
9             MR. KATAEV:  Objection to the
10        form. You can answer.
11        A.  I can't answer that question., I
12   don't know.  I don't go there for me to see
13   what she does.
14        Q.  Right now you've stated that you
15   have a new controller and the name is Susan.
16   Do you have Susan's last name?
17        A.  Her last name is -- I can't
18   pronounce it, but I call her Susan ''Z''.  I
19   can get the name for you; she has been with
20   me since a long time.
21        Q.  Do you know how to spell her
22   last name even if you can't pronounce it.
23        A.  I can't, I will make a phone
24   call when you give me a break.
25             MS. TROY:  Understood.  We

1        Ishaque Thanwalla
2            will leave a blank space in
3            the record for the last name
4            for you to fill in
5            subsequently.  Thank you for
6            being helpful.
7
8            (insert)
9            THE WITNESS:  You're
10           always welcome.
11       Q.  Does she also work for Hillside
12   Auto Mall currently?
13       A.  No.
14       Q.  How do you know?
15       A.  How do I know?  Because she was
16   working for me full-time.
17       Q.  Are you telling me that Deana
18   Jennings did not work for you full-time
19   before?
20       A.  Not full-time.
21       Q.  What was her schedule?
22       A.  I can't recall.
23       Q.  Why did she leave work?
24       A.  I answered that question prior,
25   I can't recall.

1        Ishaque Thanwalla
2            MR. KATAEV:  Objection.
3            Asked and answered.
4            MR. KATAEV:  Can we take a
5            quick break so that I can
6            stop coughing so much?  We
7            can take that break whenever
8            you want.
9            MS. TROY:  We can take
10           that five-minute break right
11           now and come back at 10:51,
12           if that sounds good to you.
13           MR. KATAEV:  10:50 is
14           fine.
15           (A recess was taken from
16           10:47 a.m. until 10:51 a.m.)
17       Q.  Mr. Thanwalla, when is your
18   birthday?
19       A.  My birthday is ███████.
20       Q.  What are the last four digits of
21   your social security number?
22       A.  Why do you need my social
23   security?
24       Q.  For identification purposes.
25       A.  You have -- you will get a copy

1        Ishaque Thanwalla
2    of my driver's license.  That is my privacy
3    and I don't like to give it out while the
4    plaintiff is present on the iPhone.
5            MR. KATAEV:  I'm going to
6            object to this ongoing
7            embarrassment and for the
8            latest items, under Rule 50.
9        Q.  Do you have it?
10       A.  Do I have what?
11       Q.  Do you have your social security
12   number?
13   I just need the last four and we can
14   agree that is not going to be -- that it's
15   going to be marked it's not going to be
16   prejudicial and it's going to be marked as
17   confidential.
18           THE WITNESS:  I don't
19           remember it right now.
20           MS. TROY:  Fine, just
21           please fill it out
22           subsequently, and we agree
23           again, we will be marking
24           this as personal and
25           confidential in the

1        Ishaque Thanwalla
2            transcript.
3
4            (insert)
5        Q.  Back on the record now, Mr.
6    Thanwalla, did the pay structure that you
7    mentioned earlier ever change for Leticia
8    Stidhum?
9        A.  I answered that question, it's
10   bonuses and things that we give.  So, it's a
11   yes, it changes not just for Leticia, for
12   everyone.  It's based on the daily bonuses,
13   the weekly bonuses and the monthly bonuses.
14   I have answered your question more than
15   once.
16           MR. KATAEV:  Objection.
17           Asked and answered.
18       Q.  How about the $300 weekly plus
19   the $150 flat commission, did that ever
20   change?
21       A.  Not to my knowledge.
22       Q.  Were all of your car salesmen
23   paid $300 base weekly pay or did some get
24   more or less than that amount?
25           MR. KATAEV:  Objection

Page 46

Ishaque Thanwalla

1
2     irrelevant. You can answer.
3         A. Everybody is different, most of
4   them got paid $300.
5         Q. Did anyone, during Leticia's
6   employment, get paid $350 a week?
7         A. I can't remember, possible based
8   on seniority.
9         Q. How about $200 per week?
10        A. I can't answer that question, I
11  don't think so, but ---
12        Q. How about $500 per week?
13        A. You are repeating the question
14  again and again.  I said ''no,'' numerous
15  times. How many times do I have to say ''no?''
16        Q. By ''no'' do you mean that you did
17  not pay anyone $500 base weekly salary?
18            MR. KATAEV:  Objection as
19        asked and answered.
20            MS. TROY:  I am on the
21        last question in that line,
22        please answer to the best of
23        your ability.
24        A. I can't recall.
25        Q. How about $600 per week in base

Page 47

Ishaque Thanwalla

1
2   weekly salary; did anyone during Leticia's
3   employment get paid that amount?
4         A. I think the managers did.
5         Q. The managers got paid that base
6   weekly salary plus a commission; is that
7   correct?
8         A. Yes.
9            MR. KATAEV:  Objection as
10        to relevance. You can answer.
11        Q. You also mentioned the weekly
12  schedule, did the weekly schedule ever
13  change for Leticia between the start of her
14  employment until the end of her employment?
15        A. I answered that question
16  previously, every week or every two weeks
17  the schedule changed for everyone.
18            MR. KATAEV:  Objection as
19        to asked and answered.
20        Q. What were the store hours for
21  Hillside Outlet and the timeframe is 2018
22  and 2019?
23            MR. KATAEV:  Objection.
24        Asked and answered.  You can
25        answer.

Page 48

Ishaque Thanwalla

1
2         A. I have answered that question
3   previously to you that the winter hours,
4   about the winter hours and the summer hours.
5            MS. TROY:  You can answer
6        it again.
7         A. It is 10:00 to 7:00 in the
8   winter and the summertime mostly it is 10:00
9   to 8:00.
10        Q. If a customer came in before the
11  store closed, would the car salespeople have
12  to serve the customer even if it's around
13  the store closing time?
14        A. It's mostly the finance manager
15  would have to serve.  The salesmen did not -
16  - they did their jobs and they could leave
17  it to the finance manager, he stays because
18  they are managers and they have to finish
19  the job.
20        Q. Were there ever times when
21  Hillside Auto Outlet salespeople had to stay
22  after the store closing time?
23        A. Not have to stay, but they
24  stayed on their time. It was goodwill if
25  they wanted to, it's their choice to stay

Page 49

Ishaque Thanwalla

1
2   because it's their deal. If they want to
3   stay, they're welcome to stay, if they
4   weren't staying, they didn't have to stay.
5   We made sure that they got compensated.
6         Q. Typically, how long would they
7   stay after if there was a customer that came
8   in before the closing time?
9         A. What do you mean by ''before the
10  closing time?''  Right at closing time or
11  hours before closing time or two hours?  It
12  all depends on the deal, how long it takes
13  for the bank to reply back and give us an
14  answer.  You can stay between 30 to 70
15  minutes to reply back and sometimes it may
16  take longer than that.  It all depends, and
17  that's my answer for that question.  It's my
18  answer because it is industry -- it's the
19  auto industry and it works differently than
20  most of the other industries.
21     We cannot answer when the bank is going
22  to reply back and give us approval on the
23  documents.  All the documents on there are
24  there and there is a lot of puzzles that
25  need to be put together before we can say

Page 50

1          Ishaque Thanwalla
2    that they're going to stay longer or the
3    customer is going to come back tomorrow.
4    Does that answer your question?
5          Q.  Why don't you walk me through
6    the different pieces of the puzzle that need
7    to be put together?
8              MR. KATAEV:  Objection to
9              the form.  You can answer.
10         A.  The puzzle, to put it together,
11   the customer walks in and the salesman
12   approaches them and greets them, correct?
13   Show them a car, then they take a credit
14   application.  Once they take the credit
15   application, we will ask to have some
16   documentation, and we run the credit before
17   we have any documentation, meaning pay
18   stubs, bank statements, and utility bills.
19   It all depends, so we run the credit based
20   on that.  We will ask the salesman to get --
21   to collect all the documentation and they
22   try to get that, and it could take between
23   30 and 40 minutes.
24         From there, we put the deal into
25   finance, and once the papers are all

Page 51

1          Ishaque Thanwalla
2    together, sometimes we don't have the
3    paperwork together and we try to do it so
4    that we can upload the documentation.
5    Later, when the salesman is trying to get
6    that, they get the price, and then 40 or 50
7    minutes later, whatever time it takes.
8         So, once you get approval, we search the
9    numbers and give the numbers to the
10   customer, the sales price, the car payments,
11   if they want to buy any accessories.  Once
12   that is all done, the finance manager will
13   get the approval, the finance manager will
14   sign the contract and the guy would deliver
15   the car.
16         Q.  If the customer came in right
17   before the closing time, would sometimes
18   Hillside Auto Outlet car salespeople have to
19   stay until 9:00, 10:00 or 11 o'clock to
20   finish the deal?
21             MR. KATAEV:  Objection.
22             Asked and answered.  You can
23             answer that again.
24         A.  You have asked me that question
25   already.  When you say ''have to stay,'' I

Page 52

1          Ishaque Thanwalla
2    answered that question.  No, I said no.
3    Based on the salesperson, if they want to
4    stay on their own goodwill.  Are you going
5    to be repeating the same question a second
6    time?
7              MR. KATAEV:  Please answer
8              the question.
9              MS. TROY:  Please just
10             answer my questions, and
11             again, I appreciate your
12             various comments.  But, this
13             is not your deposition.  So,
14             please stop giving me
15             directions and just answer my
16             questions so that we can get
17             this done as soon as
18             possible.
19             MR. KATAEV:  How long?
20             MS. TROY:  Let's go off
21             the record.
22             (A discussion was held off
23             the record)
24         Q.  Were there times when Leticia
25   Stidhum stayed until 9:00 or 10 o'clock or

Page 53

1          Ishaque Thanwalla
2    11 o'clock on her ''own goodwill'' as you put
3    it?
4         A.  Would not even know, my store
5    was open 9:00 or 10:00 or 11:00, we may have
6    stayed to 8:00, or maybe 9 o'clock.
7         Q.  How about during the summertime,
8    were there times when Leticia had to stay
9    until 9:00 or 10:00 or 11:00 p.m.?
10        A.  I answered that question for the
11   summertime.  I said 8 o'clock up to 9
12   o'clock.  I did not say 7 to 8 o'clock.
13        Q.  How would you describe Leticia
14   as a car saleswoman at Hillside Auto Outlet?
15             MR. KATAEV:  Objection.
16             Vague, but you can answer.
17        A.  I hired her, I trained her.  She
18   was a very good salesperson.
19        Q.  Do you recall of the 70 to 75
20   cars that Hillside Auto Outlet sold overall
21   for the months, how many cars would Leticia
22   sell when she was employed?
23        A.  I answered that, but I would say
24   between 20 and 25, sometimes 15.  It
25   depended on her month and her ability.

Page 54

Ishaque Thanwalla

1
2    Q.  How about for the months of
3  September through February, obviously she
4  did not work there until February during the
5  less busy months, as you called it, how many
6  of the 40 to 50 cars that would be sold by
7  Hillside Auto Outlet overall would be sold
8  by Leticia?
9        A.  I answered that question.
10  Between 15 and 25.
11        Q.  Are you familiar with the
12  software called DealerTrak?
13        A.  (No response)
14             MR. KATAEV:  If you can
15             answer the question.
16        A.  Yes.
17        Q.  How are you familiar with it?
18        A.  It's a dealer deal management
19  system.
20        Q.  At Hillside Auto Outlet between
21  2018 and 2019, who had the username of the
22  DealerTrak system?
23        A.  To the best of my knowledge, it
24  was me, it was Jeanique J-E-A-N-I-Q-U-E.  I
25  believe that was -- also, Serge, and I would

Page 55

Ishaque Thanwalla

1
2  say Louis.
3        Q.  Who is Jeanique?
4        A.  Jeanique was my manager.
5        Q.  From what date to what date?
6        A.  I can't recall. I don't know
7  exactly.
8        Q.  Who is Serge?
9        A.  Finance manager.
10        Q.  Again, from what date to what
11  date?
12        A.  He's still working and I don't
13  know when he started.
14        Q.  Who is Louis?
15        A.  Finance manager.
16        Q.  Between 2018 and 2019, did
17  anyone else have a username in the
18  DealerTrak system?
19        A.  Maybe we can run the DealerTrak
20  and find out.
21        Q.  Do you know an individual by the
22  name of Andris Guzman?
23        A.  Yes.
24        Q.  Who is he?
25        A.  Manager.

Page 56

Ishaque Thanwalla

1
2        Q.  When did he start working for
3  Hillside Auto Outlet?
4        A.  I can't recall the date that he
5  started, neither can I recall the date that
6  he finished.
7        Q.  Do you recall the year?
8        A.  2018/2019/maybe 2020.  I don't
9  know when he left.
10        Q.  When you say 2018/2019 or 2020,
11  do you mean the year he started or finished
12  or both?
13        A.  I said 2018/2019 or 2020.  I
14  don't know when he left, started in 2018.
15        Q.  When he started in 2018, was he
16  the manager?
17        A.  He was my assistant.
18        Q.  When did he become the manager?
19        A.  He was my assistant manager,
20  that's what I meant.
21        Q.  Did his position ever change
22  from the time when he began in 2018 as the
23  assistant manager?
24        A.  Not that I can recall.
25        Q.  Earlier you mentioned that you

Page 57

Ishaque Thanwalla

1
2  do not recall when Jeanique left Hillside
3  Auto Outlet; do you recall what year?
4        A.  It was 2018, if I'm not wrong.
5        Q.  Do you recall what month?
6        A.  No.
7        Q.  Was there a point when Andris
8  Guzman was employed as assistant manager to
9  Jeanique's position?
10        A.  Not that I can recall, Jeanique
11  was assistant too because I have to have two
12  managers because of the hourly schedule.
13  So, one had to cover the time in the
14  afternoon, and it was me who put out the
15  hours from the morning until late, again.
16  I'm going to -- I go in as early as possible
17  and I come out mostly the last person.
18        Q.  Is it fair to say that Andris
19  Guzman took Jeanique's position after she
20  left Hillside Auto Outlet?
21        A.  No.  He had the same rank as
22  Jeanique.  How can he take her place? They
23  were both my assistants.
24        Q.  Before Jeanique left Hillside
25  Auto Outlet, were car salesmen promised

1          Ishaque Thanwalla
2    commissions on top of the amount that you
3    just mentioned, the 300 weekly plus the $150
4    flat rate.
5          A.   When you say "on top of," let me
6    just answer your question.  I have answered
7    that question, that nobody was promised, and
8    every day there is a different bonus up to 5
9    percent on a car.  That can change daily, on
10   a daily basis on a car on a weekly or a
11   monthly basis.  So, yes there were bonuses
12   that we put out and nobody was promised
13   anything but $150.
14          MR. KATAEV:  Objection to
15          the form of that.
16      Q.  Do you agree that 5 percent of
17   the $3,000 is 150?
18          A.  Do I agree mathematically?  I
19   agree, but I don't know why you are asking
20   this question, who you are asking this
21   question to.
22      Q.  Between 2018 and when Leticia
23   began working at Hillside Auto Outlet until
24   in or around July or August of 2018, was
25   there in fact an incentive structure in

1          Ishaque Thanwalla
2    place whereby the car salesman were promised
3    a 5 percent for the sales made in excess of
4    $3,000?
5          A.  When you go back to your
6    question, please stop saying "promise,"
7    because I have not promised anything.  I
8    have answered that question numerous times.
9    So, it is a little bit annoying, forgive me
10   to say that, but you say "promise, promise,"
11   there is no promise.  I answered that
12   question maybe 7 times prior to that we have
13   a bonus structure in place.
14      You understand that or are you going to
15   go back and ask me the same question again
16   and again?  "Promise, promise," I never
17   promised any of my employees.  We do a bonus
18   program that we do every day and sometimes
19   we don't have it, sometimes we do.  Yes,
20   there is no promise, but there is a bonus
21   structure depending on the day and the month
22   and the week. Did that completely answer
23   your question?
24      Q.  In fact, did the bonus structure
25   stay the same in or around July or August --

1          Ishaque Thanwalla
2          A.  It still stays the same.
3      Q.  Did Hillside Auto Outlet in fact
4    pay a 5 percent bonus for sales done in
5    excess of $3,000 between 2018 and in or
6    around July or August of 2018?
7          A.  Let me answer your question.
8    You are asking me if they were paid beyond
9    above 5 percent over $3,000?
10      Let me answer that question as to no,
11   based on the bonus, sometimes we did and
12   sometimes we did not.  Does that answer your
13   question?
14      Q.  By that, let's go a step
15   further: between 2018 and July or August of
16   2019, did Hillside Auto Outlet in fact pay 5
17   percent that we were just mentioning?
18          A.  The answer is no, 5 percent was
19   the bonus subject to the car, subject to the
20   day, subject to the week, and it changed.
21   There was sometimes there was not until
22   today's date the same plan or structure.
23      Q.  Is it fair to say that when
24   Jeanique left, the 5 percent was no longer
25   paid to the car salespeople at Hillside Auto

1          Ishaque Thanwalla
2    Outlet?
3          A.  Jeanique had nothing to do with
4    taking the 5 percent.  It was my bonus and I
5    used to give it based again on the day and
6    the car and the week and the month.  It all
7    depended, so Jeanique had no power to give
8    anybody anything, nor could she promise
9    anything.  No, it was me who did, who ran
10   the dealership if that answers your question
11   again.
12      Q.  What was David Baron's position
13   at Hillside Auto Outlet?
14          A.  I answered that question
15   previously, he was a percentage owner.
16      Q.  What were his job
17   responsibilities at Hillside Auto Outlet.
18          MR. KATAEV:  Objection to
19          the form.  You can answer.
20          A.  He had no responsibilities.
21      Q.  How about Jory Baron, what were
22   his responsibilities as a percentage owner?
23          MR. KATAEV:  Objection to
24          the form.  You can answer.
25          A.  No responsibilities.

Ishaque Thanwalla

1
2     Q.  How about Josh Aaronson?
3     A.  No responsibilities.
4     Q.  We were talking about the
5  DealerTrak system; did you at any time
6  provide your username and password to
7  Leticia Stidhum?
8     A.  No, and I never will to any
9  employee.
10     Q.  Did you write a username and
11  password on a Post-It note and pass it on to
12  Leticia?
13        MR. KATAEV:  Objection
14        Asked and answered, but you
15        can answer.
16     A.  No.
17     Q.  Have you ever personally trained
18  Leticia on the DealerTrak system?
19     A.  No.
20     Q.  Did Andris Guzman have an
21  account in the DealerTrak system?
22     A.  Yes.
23     Q.  When Andris Guzman had left
24  Hillside Auto Outlet, was there a time when
25  you told Leticia Stidhum that as the top

Ishaque Thanwalla

1
2  saleswoman, you would prefer her to run the
3  DealerTrak system with her customers first?
4     A.  No.
5     Q.  Does Hillside Auto Outlet have
6  any written policies regarding
7  discrimination?
8     A.  Whatever policy we have, we take
9  a policy from corporate, and from the EDD we
10  have it posted for the people, equal
11  opportunity employment posters, the EDD
12  employment.  So, we do have posters posted
13  in the lunchroom where we eat lunch.
14     Q.  By ''corporate,'' what do you
15  mean?
16     A.  Meaning that we have posters for
17  the employment for them to read and know
18  what their rights are.
19     Q.  You said you had written
20  policies from corporate?
21     A.  Yes.  That is what corporate
22  gives us, and things, they were payroll
23  company is what I meant, actually.  Payroll
24  company provides ADP for us with all the
25  posters and everything.  Any updates come

Ishaque Thanwalla

1
2  in, we get it.
3     Q.  Have you ever traveled outside
4  the country in December of 2018?
5     A.  Yes.
6     Q.  Where did you travel to?
7     A.  Back home, Pakistan.
8     Q.  When did you travel outside of
9  the United States?
10     A.  In 2018; is that your question?
11     Q.  Correct.
12     A.  It's between, if I can recall, I
13  usually leave on the 20th or the 21st or the
14  22nd of December, and I usually come back
15  between the 5th or the 7th.  That is my
16  usual trip every year except last year.
17     Q.  Earlier you mentioned that the
18  posters would be posted in the lunchroom.
19  Can you describe where that was?
20     A.  Posted, I have described to you
21  the posters are posted in the lunchroom.
22  What don't you understand?
23     Q.  Where is the lunchroom within
24  Hillside Auto Outlet?
25     A.  There is a lunchroom right next

Ishaque Thanwalla

1
2  to the finance office, my office and the
3  hallway right outside there was a lunchroom.
4  They can sit down, there are tables and
5  stools and they can sit and eat their lunch
6  and the microwave.
7     Q.  Specifically in 2018, when did
8  you travel to Pakistan?
9     A.  I gave you an approximate which
10  I mentioned to you earlier. I gave you an
11  answer that it was about the 20th, the 21st,
12  and probably back by the 6th or 7th, the
13  5th, 6th or 7th. I am usually back then and
14  I can't recall the exact date. But I can
15  look into it and I can answer that question
16  specifically.
17        MR. KATAEV:  Can we take a
18        five-minute break whenever
19        you like?
20        MS. TROY:  We just took a
21        break. If you don't mind, I'm
22        going to go for a little bit
23        and then we will take that
24        break if it's not a problem.
25        MR. KATAEV:  Okay.

Ishaque Thanwalla

1
2   Q.  Did you speak with anyone in
3   preparation for today's deposition?
4       A.  Do you mean about the case?
5   Emmanuel, my attorney.
6       Q.  Besides your attorney, did you
7   speak with anyone else?
8       A.  No.
9           MS. TROY:  I'm going to
10          ask the reporter to leave a
11          blank space in the transcript
12          for the date when Mr.
13          Thanwalla traveled outside of
14          the United States as well as
15          a blank for the date when he
16          returned to the United
17          States.
18
19          (insert)
20
21          (insert)
22      Q.  Mr. Thanwalla, you traveled to
23  Pakistan; was that with a passport?
24      A.  How else could I travel?
25      Q.  In the weeks prior to your

Ishaque Thanwalla

1
2   traveling, were you out of Hillside Auto
3   Outlet?
4       A.  Can you repeat your question one
5   more time, please?  I didn't hear it right.
6       Q.  Sure.  I'm asking you if the
7   week before you traveled physically outside
8   of the United States, if you worked outside
9   of Hillside Auto Outlet, where you are not
10  working at Hillside Auto Outlet during the
11  week before.
12      A.  I worked until the last day
13  before I leave.  So, the answer to that is
14  no, I was working until the last day before
15  I left.
16      Q.  Until the last day before you
17  left, were you there from the start of the
18  day until the end of the day, every day, in
19  Hillside Auto Outlet?
20      A.  Before I left, was that the
21  question?
22      Q.  Right, before you left.
23      A.  Let's say if I left on a
24  Saturday, correct?  Yes, I would be working
25  Friday from the morning until evening, to

Ishaque Thanwalla

1
2   give you a complete understanding.  So, if I
3   was supposed to be leaving around on a
4   Saturday, yes, I would work Wednesday,
5   Thursday, Friday, and through the morning of
6   the day until Friday until Saturday, not for
7   the afternoon.  So, I would not come to work
8   on that day.  Does that answer your
9   question?
10      Q.  Was it your practice to
11  interview every single employee for Hillside
12  Auto Outlet?
13      A.  In my what?
14      Q.  In your practice.
15      A.  I do try my best to interview
16  everyone because I am the one who is hiring
17  and I am the only one who is firing.
18      Q.  I'm going to show you a document
19  on the screen.
20          MS. TROY:  Ms. Court
21          reporter, can you mark this
22          as Plaintiff's Exhibit 2?
23          (Plaintiff's Exhibit 2 marked
24          for identification)
25          The entire document will just be

Ishaque Thanwalla

1
2   marked as Plaintiff's Exhibit 2 and I
3   will be referring to different pages
4   when I speak to  Mr. Thanwalla.
5       Q.  Mr. Thanwalla, do you see a
6   document that was Defendant's Document
7   Production, D1186.  On it, it says the hire
8   date was May 22nd of 2018, and the
9   termination date was January 14th, 2019.
10  Does this refresh your recollection as to
11  when Leticia started?
12      A.  If the document says it, I am
13  looking at it most likely, yes.
14      Q.  How about the end date?
15      A.  The end date may be a little --
16  it says again, to the best of my
17  recollection, it looks like Leticia quit her
18  job, left to the other company.
19      Q.  Just to clarify, the document
20  says January 14th of, 2019. You are saying -
21  -
22      A.  Best of my ability.  I said I
23  can't recall, I still can't recall.  She
24  came to my office and she said she's going
25  to go with Ali to the other dealership and

Page 70

Ishaque Thanwalla

1    Ishaque Thanwalla
2    that was in the afternoon time when she
3    left.
4            MS. TROY:  We can now take
5        a short break for five
6        minutes and come back at
7        11:35.  It is now 11:30 per
8        Manuel's request.
9        (A recess was taken from
10       11:30 a.m. until 11:35 a.m.)
11           THE WITNESS:  Welcome
12       back.
13           MS. TROY:  No need to
14       welcome me back.  When we are
15       doing the deposition, if you
16       don't mind, please don't talk
17       to me.  The Troy's are
18       straightshooters and we don't
19       do that to anyone, we don't
20       welcome back anyone, we just
21       do our jobs.
22       Q.  Are you familiar with an
23   employee for Hillside Auto Outlet whose name
24   is Lilly?
25       A.  Yes.

Page 71

Ishaque Thanwalla

1        Q.  How are you familiar with her?
2        A.  She was my DMV clerk.
3        Q.  Do you remember from what date
4    to whay date she worked for Hillside Auto
5    Outlet?
6        A.  I cannot.
7        Q.  Do you recall from what year she
8    began working at Hillside Auto Outlet?
9        A.  Can you repeat the question one
10   more time?
11       Q.  Sure.  Do you recall what year
12   she began working at Hillside Auto Outlet?
13       A.  I believe it's 2018, if I'm not
14   wrong, but I may be wrong.
15       Q.  At the time when Lilly left
16   Hillside Auto Outlet, was she pregnant?
17       A.  Was she pregnant when she worked
18   for me?  She was pregnant when she left, she
19   was pregnant.
20       Q.  Did she quit or did she get
21   fired from Hillside Auto Outlet?
22       A.  Well, let me answer this
23   question in a way where everybody can
24   understand what happened.  When she left,

Page 72

Ishaque Thanwalla

1    she was doing the DMV paperwork, and the DMV
2    is a crucial business.  We have to register
3    the car within 5 days and it was a couple of
4    deals that were not registered.  I
5    disciplined her to say ''why aren't these
6    registered? There was no registration that
7    was performed.  What is the reason behind
8    it?''  She didn't like me disciplining her
9    because I don't want to lose my license to
10   do business.  So, she didn't like my
11   disciplining her and she left.
12       Q.  When she left, did she say
13   anything to you at the dealership?
14       A.  Not really, not that I can
15   recall.
16       Q.  Did Lilly leave upset?
17       A.  I cannot answer that question
18   because I don't--- I can't recall.  You
19   can't have anyone jeopardizing your license
20   in  your industry.  I won't have anybody
21   jeopardizing my license.  So, if I
22   discipline someone to tell them how to
23   perform their job the right way, how to
24   finish the job, it's nothing wrong with

Page 73

Ishaque Thanwalla

1    that.  I will tell them that they needed to
2    finish this for us to have our license in
3    place.  If they're not going to do that,
4    it's not fair to me.
5        Q.  Did Lilly complain that she was
6    getting fired because she was pregnant?
7        A.  Never.
8        Q.  Do you know how many months'
9    pregnant she was when she left?
10       A.  When she started, when I
11   answered the question, she was pregnant.
12   When she left, she was pregnant and I can't
13   answer that question.
14           MR. KATAEV:  Objection as
15       to relevance and to this
16       entire line of questioning.
17       She is not a plaintiff in
18       this case.
19       Q.  What is Lilly's last name?
20       A.  I can't recall because you can
21   see I can't remember Jeanique's last name
22   and I can't remember a lot of people's last
23   name.  I don't even remember Leticia's last
24   name.

Page 74

Ishaque Thanwalla

1  Ishaque Thanwalla
2      MS. TROY:  I'm going to
3  leave a blank in the
4  transcript for you to fill
5  that in.
6
7      (insert).
8  A.  --
9      MR. KATAEV:  There is no
10  question pending.
11      Q.  At the time of her termination,
12  what was Lilly's schedule?
13      MR. KATAEV:  Objection as
14  to relevance. You can answer.
15  A.  She was a part-timer, she worked
16  part-time for the DMV work.
17      Q.  At the time that she was fired,
18  how many months had she worked for Hillside
19  Auto Outlet?
20      MR. KATAEV:  Objection,
21  same objection.
22  A.  She was not fired, she quit on
23  her own.
24      Q.  At that time, how many months
25  had she worked for Hillside Auto Outlet?

Page 75

Ishaque Thanwalla

1  Ishaque Thanwalla
2      A.  I can't answer that question, I
3  cannot recall.  When she started, like I
4  said, she was pregnant and she left, she was
5  pregnant.
6      Q.  You mentioned disciplining her;
7  are there any records?
8      A.  There should be a record, like I
9  said, we had a robbery.
10      Q.  Your contention is that the
11  records were stolen?
12      A.  I am not -- I cannot answer that
13  question.
14      Q.  You cannot answer the question
15  because you don't know?
16      A.  I don't know.  Thank you.
17      Q.  Just to be clear, we are talking
18  about one robbery or multiple robberies?
19      A.  One robbery.
20      Q.  During that robbery, were any
21  electronics stolen?
22      A.  I think so, but I'm not sure.
23      Q.  In addition to the electronics,
24  were a few hundred dollars also stolen?
25      A.  I think so, but I'm not sure.  A

Page 76

Ishaque Thanwalla

1  Ishaque Thanwalla
2  lot of paperwork was gone and scattered.
3      Q.  At the time of the robbery or
4  soon thereafter, did you and Leticia
5  together review the surveillance?
6      A.  Yes.
7      Q.  Did Leticia identify the robber
8  as someone who worked for you?
9      A.  Yes.
10      Q.  Do you recall if the
11  surveillance video showed the robber taking
12  any documents?
13      A.  Robbers taking -- the robber,
14  the way I can describe it is when he was
15  inside, he did not get the caption that's
16  what he said when he was going out.
17      Q.  Do you still have surveillance
18  video?
19      A.  I think so, but I'm not sure.
20  Maybe, maybe, but I can't answer that
21  question.  I don't know if our surveillance
22  goes that far back.  I think you only keep
23  the records for 30 days,
24      Q.  At the time when you and Leticia
25  were reviewing the surveillance video, did

Page 77

Ishaque Thanwalla

1  Ishaque Thanwalla
2  you send a copy of that video to your
3  attorney?
4      A.  I think that she sent it to me,
5  probably.
6      Q.  What phone were you using at the
7  time; was it an iPhone, an Android, what was
8  it?
9      A.  A different phone than this
10  iPhone, yes.
11      Q.  You mentioned different phones,
12  how many times have you changed your phone
13  since the robbery?
14      A.  One or two times, if I can
15  recall.
16      Q.  Each time did you change to
17  another iPhone?
18      A.  Yes.
19      Q.  Did you back up your data using
20  the iCloud?
21      A.  I have no idea how to do that.
22      Q.  Did someone back it up for you?
23      A.  I can't answer that question
24  because I don't know.
25      Q.  Do you still have any text

Ishaque Thanwalla

1   messages that you had with Leticia?
2
3        A.  Yes.
4        Q.  Just to be clear, the text
5   messages that you have with her, was that on
6   a regular text message or was it on another
7   app?
8        A.  There were multiple apps, one
9   was the regular text message and one was
10  WhatsApp.
11       Q.  You texted with her on both the
12  regular text message, as well as the
13  WhatsApp?
14       A.  Yes.  When I am back home in
15  Pakistan, when I left, like I said the 20th
16  or the 21st of 2018 and I came back on
17  January 5th and 7th, she frequently texted
18  me on WhatsApp, I had communications with
19  her, as well as other employees on the
20  WhatsApp channel.
21       Q.  You don't have those text
22  messages?
23       A.  Yes, I do.
24       Q.  In addition to the regular text
25  messages and WhatsApp, do you have any other

Ishaque Thanwalla

1
2   records of your communications with Leticia
3   Stidhum?
4        A.  May be available on my email. I
5   can't recall. 100 percent.
6            MS. TROY:  Demand number 1
7        is for the text messages
8        between Ishaque Thanwalla and
9        Stidhum.
10           Demand number 2 is for the
11       WhatsApp messages between
12       Thanwalla and Leticia.
13           Demand number 3 is for
14       the email exchanges between
15       Ishaque Thanwalla and
16       Stidhum.  The timeframe is
17       between September of 2018 --
18       actually, let's backtrack.
19       It's from November of 2018
20       through January of 2019.
21       Q.  Mr. Thanwalla, what was your
22  phone number at the time?
23       A.  Same number as today. It is 661-
24  886-8012.
25       Q.  Who is your service provider?

Ishaque Thanwalla

1
2        A.  Verizon.
3        Q.  What'sApp, did you sign up using
4   your phone number?
5        A.  Correct.
6        Q.  The emails that you mentioned,
7   is that your work email or is that some
8   other email address?
9        A.  My work email.  To be clear, I
10  do have a Hillside Auto Outlet computer, and
11  it's I-S-H-A-Q-U-E@hillsideautooutlet.com.
12       Q.  Please if you don't mind, just
13  confirming that that is the correct email
14  address?
15           (The witness complies)
16           MR. KATAEV:  Let the
17       record reflect that
18       plaintiff's counsel typed in
19       I-S-H-A-Q-
20       E@hillsideoutlet.com on the
21       chat.
22           THE WITNESS:  Yes.
23       Q.  Besides using your work email,
24  did you communicate with Leticia using any
25  other email?

Ishaque Thanwalla

1
2        A.  No.
3        Q.  In the video that we were
4   talking about earlier, was that sent to you
5   from Leticia using text message, WhatsApp or
6   email?
7        A.  I can't answer that, I don't
8   recall that.  That's why I can't answer that
9   question.
10           MS. TROY:  Demand number 4
11       for the surveillance footage.
12           Demand number 5 is for the
13       police report, both of which
14       concerns the robbery that
15       took place at Hillside Auto
16       Outlet.  The witness does not
17       recall the timeframe, but the
18       year should be in the year of
19       2018.
20           MR. KATAEV:  Please
21       follow-up in writing with all
22       of your requests.  Thank you.
23       Q.  Before the break I showed you a
24  WhatsApp and the start date and the end date
25  of Leticia Stidhum.  What was Leticia

Ishaque Thanwalla
1
2 Stidhum's position at Hillside Auto Outlet?
3        A.  Her position was commission
4 salesperson.
5        Q.  As the commission salesperson,
6 what were her responsibilities?
7        A.  I answered that question prior,
8 but I will answer it again for you.  To show
9 customers the car, meet and greet, show them
10 the car and take a credit application and
11 take documentation.  That was her
12 responsibility.
13        Q.  Did she ever run the credit
14 herself?
15        A.  No.
16        Q.  Earlier you mentioned that you
17 trained her, what did you train her in?
18        A.  How to sell cars; how to meet
19 and greet; how to show them a car; how to
20 take a credit application; how to use a V-I-
21 N Solution.
22        Q.  Can you describe for me what you
23 mean by how to take credit?
24        A.  How to take a credit
25 application, you take the application

Ishaque Thanwalla
1
2 whether it's manual or you are welcome to
3 take an application on the Vin V-I-N
4 solutions that they did that sometimes.
5 Sometimes they do not, but if you take a
6 manual application, you use the block
7 letters so that you could read it and it's
8 legible.
9    So, you have first name, last name,
10 driver's license of customer to make sure
11 you are correctly doing it the right way,
12 date of birth, social security and their
13 employment information, their resident
14 information.  You take a simple credit
15 application and make sure that they sign the
16 credit application.
17        Q.  Was Leticia ever given
18 additional responsibilities apart from her
19 position as a commission salesperson?
20        A.  No.
21        Q.  Did you, at any point during
22 Leticia's employment with Hillside Auto
23 Outlet, did you ever talk to her about
24 promoting her to a sales manager position?
25        A.  Never.

Ishaque Thanwalla
1
2        Q.  Did you promise her any
3 promotion?
4        A.  Never.
5        Q.  Did you ever tell her that you
6 were traveling to Pakistan, so the
7 discussion about the promotion will wait
8 until you came back to the United States?
9        A.  I never discussed with her any
10 promotions.  What I can recall in her
11 deposition, she mentioned that I promised
12 her a promotion.  She had no right, maybe it
13 was at Ali, maybe he was playing with her
14 head.  No right to promotion, so that he
15 could recruit her if he had another job,
16 which he did.  You can see on the WhatsApp
17 she was going with Ali after the job, but I
18 never did.  He was playing with her mind.
19        Q.  Did Leticia ever complain to you
20 about her pay?
21        A.  Never.  She mentioned that she
22 always made more money than she ever made in
23 her life, so she was very happy.  You can
24 see the text messages and you would see the
25 WhatsApp messages.

Ishaque Thanwalla
1
2        Q.  How would you describe your
3 relationship with Leticia during her
4 employment at Hillside Auto Outlet?
5        A.  I treated every employee like my
6 family.  Like she mentioned, the dad of
7 Hillside Auto Outlet.  I was the dad of
8 Hillside Auto Outlet, she respected me and I
9 respected her.
10        Q.  Would it be fair to say that
11 your relationship was quite close?
12        A.  I have close relationships with
13 all my employees.  I am a very caring person
14 and I respect and I love.  That's the only
15 way that I treat my employees.
16        Q.  Earlier you mentioned that Ali
17 was promising her a promotion.  What do you
18 mean, can you describe exactly what you were
19 talking about?
20        A.  When Emanuel (indicating) was
21 taking the deposition from Leticia, she is
22 the one who answered that Ali promised her
23 the promotion, not me.  I never did, she
24 wasn't there to be promoted.  She needed a
25 lot more experience to be promoted as a

Page 86

Ishaque Thanwalla

1  sales manager, assistant sales manager to
2  me. Although, she was a good salesperson
3  and that's the best I can tell you.
4      Q. What is the difference between
5  an assistant manager and a sales manager, or
6  was that the same position?
7      A. It was the same position. It is
8  the same to me, my sales manager, because
9  the general manager to me, they are my
10  assistants. One thing I learned, I kept my
11  office right next to my manager so that I
12  could hear what was going on.
13      Q. To be clear, did you also
14  consider the finance manager as an assistant
15  manager?
16      A. Finance manager is my assistant
17  manager. But, they are recognized as the
18  ''finance manager'' because they are the ones
19  who are dealing with the banks.
20      Q. When you talked earlier that you
21  had two assistant managers, did you mean two
22  sales managers or one sales manager and one
23  finance manager?
24      A. Let me just answer that question

Page 87

Ishaque Thanwalla

1  the right way. That's so you do not re-
2  question me again. I had Jeanique as my
3  assistant manager, and I had Guzman as my
4  assistant manager, I had Serge as my finance
5  manager, and I have Louis as my finance
6  manager. Do you understand clearly?
7      Q. Do you not consider the finance
8  manager as the assistant manager?
9      A. They are assistants, it's --
10  they are different divisions, but they are
11  still assistants to me.
12      Q. Is it fair to say that Leticia
13  has left Hillside Auto Outlet, she left in
14  November of 2018, December of 2018, in that
15  timeframe?
16      A. I can't recall so I cannot
17  answer that question.
18      Q. You were saying that Ali
19  promised her the promotion. Was that
20  promotion at Hillside Auto Outlet?
21      A. You asked me, and it was in her
22  deposition that she said it. I am only
23  repeating what she answered the question
24  that Emanuel asked her that question. I am

Page 88

Ishaque Thanwalla

1  just going and referring to that. I am not
2  referring to anything else. Do you
3  understand?
4      Q. So, you don't have any personal
5  knowledge about any promotions whatsoever;
6  is that correct?
7      A. The last time that Emanuel was
8  taking the deposition from her.
9      Q. Have you ever been arrested for
10  any reason before?
11      A. Yes.
12      Q. What were you convicted of
13  before?
14      A. I was mixed up and it was
15  cleared and it was expunged. It was over 15
16  years ago.
17      Q. You mentioned it was over 15
18  years ago, was that the same as the
19  immigration case or different?
20      A. I can't recall honestly, I
21  cannot recall.
22      Q. Do you have any other names
23  besides Ishaque?
24      A. I use Isaac or Abraham, Isaac I-

Page 89

Ishaque Thanwalla

1  S-A-A-C or Ivraham I-V-R-A-H-A-M. I use
2  Abraham A-B-R-A-H-A-M on my business cards
3  just to clarify.
4      Q. Is Abraham the last name or is
5  that part of the first name?
6      A. I used Abraham, that was my
7  father's first name. I don't have a middle
8  initial except it's just Thanwalla.
9      Q. Please take a look at the screen
10  again and we're going to look at the sales
11  log.
12      THE WITNESS: This is --
13      MR. KATAEV: There is no
14  question pending.
15      Q. Mr. Thanwalla, on the screen
16  here we are still on Plaintiff's Exhibit 2.
17  Do you see documents identified as D002 to
18  D067; is that the sales log, if you
19  recognize this document?
20      A. Yes.
21      Q. Were you the one who created
22  this report?
23      A. This was created -- this report,
24  yes.

Page 90

Ishaque Thanwalla

1
2      Q.  To your knowledge, let's start
3  from page 1, to your knowledge, are the
4  number of cars sold on the sold log
5  accurate?
6      A.  Not to the best of my ability,
7  no.
8      Q.  To your knowledge, does this
9  understate the number of cars sold by the
10  company?
11          MR. KATAEV:  Objection to
12      the form.  You can answer.
13      A.  Sometimes they are correct and
14  sometimes they are not correct, because that
15  is called an ''manual entry.''  So, if my
16  assistant has manually entered it or my
17  salesperson like Leticia had entered it as
18  sold, she had permission in her own name.
19  I just want to add to my answer because the
20  only person that is salesperson is only
21  allowed to see her or his records only.
22  They cannot see anybody else's.  If they put
23  it in the -- if the customer came in, they
24  could say that ''the customer came in and is
25  present on the lot.  The customer sold -
-''

Page 91

Ishaque Thanwalla

1
2  they can push the button inside and say
3  ''sold.''  It's a salesperson can do that as
4  well as my assistant managers can do that,
5  which is my sales managers.
6      Q.  I'm going to show you a
7  different month for the sold log.  It is on
8  the screen.  My question for you remains the
9  same which is: whether or not the sold log
10  understates for each of the months that I
11  show you the true number of cars sold.
12      We're going to start from May of 2018
13  and we are still on page 2 of the exhibit
14  which also corresponds to defendant's
15  production 32.  This is from May of 2018.
16  The car sold are listed as 46.
17      A.  My answer is the same exact, and
18  I can't answer that.  It looks like 100
19  percent understated, that means 4 or 6 may
20  be understated or maybe it's incorrect.
21  Maybe it was sold, I can't answer based on
22  these records.
23      Q.  I am now showing you page 10 for
24  June of 2018; is your answer the same?
25      A.  Yes.

Page 92

Ishaque Thanwalla

1
2      Q.  For the record, we are on page
3  10, which corresponds to defendant's
4  document production 10.
5      Now we are on page 19 which corresponds
6  to defendant's document production number
7  19.  Same question for you, this shows the
8  sold log for the month of July of 2018.  Same
9  question.
10      A.  I would say so, yes. Whatever I
11  answered previously, this is the exact
12  number.  It could be more or less, it all
13  depends.  These were on this log and the
14  salesman can do it as well as the assistant
15  manager can do it.  That's why they are not
16  100 percent.
17      Q.  Now we are on page 28 of exhibit
18  2 which corresponds to defendant's
19  production 28.  My question for you is the
20  same, and it's for the month of August of
21  2018.
22      A.  My answer is the same.
23      Q.  We are on page 37 which
24  corresponds to defendant's document
25  production 37.  It is for the month of

Page 93

Ishaque Thanwalla

1
2  September of 2018, is your answer the same?
3      A.  Yes.
4      Q.  Page 45 now, which corresponds
5  to defendant's document production 45.  Is
6  your answer that it covers the month of
7  October of 2018, is your answer the same?
8      A.  Yes.
9      Q.  Page 52, which corresponds to
10  defendant's document production 52 and
11  covers the month of November of 2018; is
12  your answer the same answer?
13      A.  Yes.
14      Q.  We are on now page 62 which
15  covers the month of December of 2018.  It
16  also corresponds with defendant's document
17  production 62; is your answer the same?
18      A.  Yes.
19      Q.  Next, I'm going to show you
20  starting from page 1251 which is a list of
21  comparatorS. C-O-M-P-A-R-A-T-O-R-S.
22      We are on page 1251 which corresponds
23  with defendant's document production 1251.
24  My question to you is, can you describe for
25  me what the department code means?

Ishaque Thanwalla

1
2     A.  Department codes are the
3  department codes.
4     Q.  I'm asking about right here, the
5  ''department codes.''
6     A.  Okay.
7     Q.  For the record, I am just
8  highlighting the L-O-C/D-E-P-T.
9     A.  That is the department code, the
10  company code.  The company code may be
11  provided by an ADP company, local
12  department.
13     Q.  Do you know who this individual
14  is that is identified as individual 21?
15     A.  I don't know.  I don't
16  understand your question.  Please repeat it.
17     Q.  Do you know this individual that
18  was paid $2,500 per week, do you know who
19  that is?
20     A.  Who is paid LOC department, I
21  can't answer that because I can't recall who
22  it was.
23     Q.  Is it fair to say that no car
24  salesperson was paid $2,500 a week?
25     A.  No.

Ishaque Thanwalla

1
2     MS. TROY:  Can you read
3  back the last question and
4  answer?
5     (The reporter read back the
6  last question and answer)
7     A.  The question is no, yes.  The
8  question is fair.
9     Q.  We are now on page 1252 which
10  corresponds with defendant's document
11  production 1252.  I am going forward with
12  the page numbers and they correspond with
13  defendant's document production numbers.
14  So this individual has a department code of
15  7.  Do you know what that means?
16     A.  No.
17     Q.  This person was paid $650 on a
18  weekly basis, correct?
19     A.  I can't answer that question.
20  It could be anybody else and I can't answer
21  that.  I don't know the codes, and that is
22  what is paid, the payroll is paid to whom.
23     Q.  Is it fair to say that this
24  individual is not a car salesperson?
25     A.  I can't answer that question

Ishaque Thanwalla

1
2  because I don't know.
3     Q.  For the record, there is an
4  individual number 22 on page 1254.  I will
5  note for the record that the ''loc department
6  is 200,'' for the L-O-C/department, and there
7  is no individual that is regularly receiving
8  $350.  Do you know if this person is a car
9  salesperson?
10     A.  I can't answer that question, I
11  don't know.
12     Q.  Besides car salespeople, were
13  there any other individuals --
14     A.  Yes.
15     MS. TROY:  I did not
16  finish my question.
17     MR. KATAEV:  Please let
18  Ms. Troy finish her question
19  before you answer.
20     Q.  (Continuing) ---within the
21  Hillside Auto Outlet who were paid
22  commissions?
23     A.  Like I said, anybody else was
24  paid commissions besides the salesperson, is
25  that your question?

Ishaque Thanwalla

1
2     Q.  Correct.
3     A.  I don't understand your
4  question.
5     Q.  Were there any other positions
6  or individuals who were paid commission in
7  addition to the car salespeople?
8     A.  The finance manager, which is my
9  assistant, the sales manager, which is my
10  assistant, yes.
11     Q.  Anyone else?
12     A.  Not that I know, not to my
13  knowledge.
14     Q.  Were the porters paid any
15  commission?
16     A.  They got bonuses, but not --
17     Q.  How about the BDC employees did
18  they receive a commission?
19     A.  This is the Business Development
20  Center, is that's what you're referring to?
21     Q.  Yes, did they receive a
22  commission?
23     A.  BDC, the Business Development
24  Center, if that's what you are referring to?
25     Q.  Right.  Did they receive a

Ishaque Thanwalla

1
2  commission?
3      A. Yes.
4      Q. Did anyone else,  did the
5  finance and sales managers and members of
6  the BDC receive a commission?
7      A. I cannot answer that because I
8  don't remember everything, that is why.
9      Q. Were the BDC employees' base pay
10  similar to that of the salespeople meaning
11  300, around $300 base pay weekly salary plus
12  the commission or something else?
13      A. I understand that every
14  department has a manager, every department
15  has salespeople and they were all
16  commissioned salespersons.  One was a
17  salesperson, one was a telephone
18  salesperson.  The BDC, they answered the
19  phone and they worked the BDC phone, the
20  salespeople.  They brought the people in and
21  they got paid accordingly too.
22      Q. Are they also paid a $300 weekly
23  salary plus a flat commission, the 150 per
24  car, or was that arrangement different in
25  that department?

Ishaque Thanwalla

1
2      A. To my knowledge, the arrangement
3  was different, to the best of my ability and
4  the best of my knowledge.
5      Q. So, the individual identified as
6  2, he was paid $350 flat weekly for the
7  regular pay.  What position did this
8  individual have?
9      A. I can't answer that because I
10  don't know.  It could be sales or it could
11  be the BDC or finance, I can't answer that
12  question.
13      Q. We are now on page 1255 and the
14  individual is identified as number 23.  The
15  department as listed as 100.  Is it fair to
16  say that this individual does not work in
17  sales?
18      A. I cannot answer that question.
19  How would I know?  How would I know by
20  looking at the pay stub?
21      Q. Who directed the production of
22  these earning statements?
23      A. What do you mean by that
24  exactly? Please elaborate on the question.
25      Q. Earlier when I asked you if you

Ishaque Thanwalla

1
2  had a role in the preparation of this log
3  you mentioned that you directed that this
4  log be produced.  My question is similar,
5  but do you know who directed the production
6  of the earning statements?
7      A. I'm still confused by the
8  question. Let me understand this -- can you
9  tell me differently?  You were telling me
10  who made people's salary when they were
11  going to get paid, is that your question?
12      Q. Who had the earning statements
13  produced, meaning who asked for the earning
14  statements to be compiled and produced to us
15  and for the Judge?
16      Who requested it to be printed and
17  provided to the Judge and to us within the
18  Hillside Auto Outlet Company?
19      A. I did.
20      Q. When you asked for the earning
21  statements to be produced, did you list them
22  by position or did you have the earning
23  statements for all employees implemented?
24      A. To the best of my ability, I
25  think all employees.

Ishaque Thanwalla

1
2      MR. KATAEV:  I will just
3      represent for the record that
4      I believe following June 20
5      of '21 the initial conference
6      before Magistrate Judge Mann,
7      these are items were
8      requested for settlement
9      purposes as this was a
10      settlement conference.  I can
11      represent to you that we
12      worked off of the transcript
13      in order to prepare the
14      production.
15      Q. To clarify, Mr. Thanwalla,
16  during the conference it was asked for, the
17  comparator to Ms. Stidhum, correct?
18      To the best of your knowledge, were the
19  earnings records of only the sales
20  department produced or was it for all the
21  employees just so that we can get it clear
22  on the record?
23      MR. KATAEV:  Objection.
24      Asked and answered, but you
25      can answer the question.

Page 102

Ishaque Thanwalla

1
2    A.  If I am not wrong, I think to
3  the best of my ability,y it was all the
4  employees.
5        Q.  Looking at individual 23, it is
6  listed for $1,825 and the year to date for
7  2018 $150, is it accurate to say that no
8  cars salesperson worked at Hillside Auto
9  Outlet and did not receive a commission?
10        A.  I don't understand your
11  question.  Please, can you make it a little
12  bit more simple for me?
13        Q.  Sure.  Are there any non-
14  commission car salespeople at Hillside Auto
15  Outlet?
16        A.  No, there is nobody having to do
17  with the sales department -- all of the
18  people having to do with the sales
19  department have commission.
20        Q.  Is it accurate to say to the
21  extent that the pay stub reflected that this
22  individual did not receive any commission,
23  that individual was not a car
24  salesperson?
25        A.  I can't answer that question.

Page 103

Ishaque Thanwalla

1
2        Q.  Do you know who could?
3        A.  We have to look into it.
4        Q.  Who would you ask?
5        A.  You would ask the controller to
6  figure that out and ask them, the accountant
7  to look at it.
8        Q.  Turning your intention to
9  individual 7 on page 1256, it says that the
10  ''Reg'' is $200.  Do you know what position
11  that person was in?
12        A.  I don't know.
13        Q.  How about this individual
14  (indicating)
15        A.  Do not know.
16        Q.  That was page 1257 individual
17  number 24.
18        Besides the car salespeople, who else
19  was paid 2 paychecks by Hillside Auto Outlet
20  on a weekly basis?
21            MR. KATAEV:  Objection to
22            the form.  You can answer.
23        A.  I can't recall.  Maybe BDC and
24  finance, and the managers possibly.
25        Q.  In other words, all of the

Page 104

Ishaque Thanwalla

1
2  commission employees received 2 paychecks;
3  is that correct?
4        A.  Correct, and some got paid once
5  a month commission.
6        Q.  Is it fair to say that any
7  employees who did not receive two paychecks
8  were not car salespeople?
9        A.  Again, I don't understand your
10  question.  Can you repeat it one more time?
11            MS. TROY:  Sure.  Ms.
12            Reporter, can you read back
13            the last question for the
14            witness.
15            (The reporter read back the
16            last question)
17        A.  I cannot answer that question
18  because I don't know.  I can't recall,
19  actually.
20        Q.  The same question for the
21  individual on page 1258.  The REG wage
22  straight is set at $500.  Do you know who
23  this person is or what this person's
24  position is?
25        A.  I can't recall.

Page 105

Ishaque Thanwalla

1
2        Q.  Page 1259, individual 13.  The
3  regular weekly wage rate is $600; who is
4  this individual or what was this
5  individual's position?
6        A.  I can't recall.  I don't know
7  who.
8        Q.  Is there any individual for whom
9  you can tell what the position is by looking
10  at the pay stubs?
11        A.  No.  Everybody has a different
12  structure.
13        Q.  We're going to go through a
14  couple of other pages and my question for
15  you remains the same: that is, are you able
16  to identify the individual based on the pay
17  stub, what that individual's name is or
18  their position?
19        We are on page 1260 for individual 3 and
20  the regular rate is listed at $600.
21        A.  I can't answer that question
22  because I can't recall who that would be.
23  Same thing, same pay stub you are showing me
24  and I would say the same.
25            MS. TROY:  For the record,

Ishaque Thanwalla

1   Ishaque Thanwalla
2       that was page 1261 individual
3       25.
4       Q.  We are now on page 1262
5   individual 17.  Do you recognize this
6   individual or this person's position?
7       A.  No.
8       Q.  Did you say ''no'' for the last
9   question?
10      A.  I did.
11      Q.  Now we are on 1263, individual
12  number 26.  Do you recognize this individual
13  or this individual's position based on the
14  pay stub?
15      A.  No.
16      Q.  Page 1264 individual number 27,
17  do you recognize this individual or this
18  individual's position based upon the pay
19  stub?
20      A.  No.
21      Q.  There is an individual 28 on
22  page 1265, same question.
23      A.  No.
24      Q.  Page 1266 individual number 29,
25  same question.

Ishaque Thanwalla

1   Ishaque Thanwalla
2       A.  No.
3       Q.  Individual 20 on page 1267, same
4   question.
5       A.  No.
6       Q.  Individual 30 on page 1268, same
7   question.
8       A.  No.
9       MR. KATAEV:  Please let me
10      know when you are done with
11      this line of questioning so
12      we can take a break.
13      Q.  We are now on page 1277 and the
14  individual is 31.  Do you recognize this
15  individual or this person's position based
16  upon the pay stub?
17      A.  No.
18      Q.  We are on 1296 individual number
19  32, do you recognize this individual based
20  upon the pay stub?  For the record, it
21  appears that this individual was hired on
22  December 4th of 2018 and then paid $1,000
23  per week with no commission.
24      A.  No.
25      Q.  Was anyone paid $1,000 per week

Ishaque Thanwalla

1   Ishaque Thanwalla
2   salary in the month of December of 2018?
3       A.  Its same, it may be a draw, that
4   may be a draw, possibly.  It may be a draw
5   against commission, maybe, but I can't
6   recall.  I don't know who it is.
7       Q.  Did you hire anyone in December
8   of 2018?
9       A.  I hired a lot of people and I
10  can't answer who I hired.  I cannot say
11  anything.
12      Q.  Who was paid $1,000 per week
13  upon hire with no commission at Hillside
14  Auto Outlet?
15      MR. KATAEV:  Objection as
16      to relevance.  You can
17      answer.
18      A.  I answered ''no. I don't know.
19  I cannot recall.''
20      Q.  We are now on page 1320 for
21  individual number 34.  This individual was a
22  newly hired person in December of 2018 and
23  this individual was paid a regular weekly
24  rate of $900.  Do you know who this
25  individual is?

Ishaque Thanwalla

1   Ishaque Thanwalla
2       A.  By me looking at the pay stubs,
3   I can't recall who it is, what it is or what
4   department, even though you are showing me
5   the loc and department.  I don't know the
6   local department.  So, no.
7       Q.  We are now on page 3038 for
8   individual 18.  Do you know who this
9   individual is and what that person's
10  position is?
11      A.  No.
12      Q.  Would you be able to find out?
13      A.  I have to refer to my office and
14  find out, sure.
15      Q.  Would you be able to tell me
16  what that person's position is?
17      A.  When I look into it, I will be
18  able to answer the question.
19      MS. TROY:  All right.
20      Demand number 6 will be for
21      the name as well as the
22      position for each of the
23      individuals who the witness
24      identified as numbers 21, 22,
25      2, 23, 24, 4, 13, 3, 25, 17,

Page 110

Ishaque Thanwalla
1
2         26, 27, 28, 29, 20, 30, 31,
3         32, 33, 34, 18, 19, 35, 36,
4         38, 39, and 37.
5              I know that they are out of
6         order, but that is the order in
7         which the documents presented
8         themselves. My request is for
9         the positions as well as the
10        name for each of the individuals
11        that are listed here that you
12        produced, apparently as
13        comparator to the plaintiff.
14             MR. KATAEV:  Please put
15        all of your requests in
16        writing.  We object to any
17        characterization.
18             MS. TROY:  Manuel, based
19        upon your characterization of
20        the record -- let's just
21        continue.
22        Q.  Going to page 1269, Mr.
23   Thanwalla, do you see on page 69 for the
24   period of November 27th of 2018 through
25   December 3rd of 2018 there is a commission

Page 111

Ishaque Thanwalla
1
2   listed for $1,600?
3        A.  Okay.
4        Q.  Based on that $1,600 figure, how
5   many cars were sold?
6             MR. KATAEV:  Objection.
7             You can answer the question.
8        A.  150 divided by 1600.  Do you
9   have a calculator?
10        Q.  The formula is sufficient. Thank
11   you.
12        To your knowledge, is that always an
13   exact number?
14        A.  Like I said previously, there is
15   a flat rate commission and I answered that
16   prior.  I said there is a bonus, and the
17   bonus and commission.  So, maybe there is a
18   commission, there is a bonus in there, 5
19   percent bonus, it may be $50 bonus or $200
20   bonus.  I cannot answer that question
21   because the commission plus the weekly
22   bonus, a monthly bonus, I have no idea what
23   is involved.
24        Q.  What was the flat rate
25   commission, meaning the $150 per car versus

Page 112

Ishaque Thanwalla
1
2   what the bonus was at Hillside Auto Outlet?
3        A.  You can take 15, whatever the is
4   amount is, let's take 10 cars would be
5   $1,500.  Am I right?  It would be plus a
6   dollar bonus on top of that, and maybe that
7   was only 8 cars and the rest was bonus.  I
8   can't answer that.
9        Q.  My question is different.  My
10   question is: were there records kept as to
11   what portion of the commission is the flat
12   rate commission versus the bonus that you
13   were talking about?
14             MR. KATAEV:  Objection.
15             Asked and answered again.
16        A.  May be a portion, possible, but
17   I can't answer that
18        Q.  When you say that it ''may be a
19   portion,'' what did you mean?
20        A.  It may be possible, I may have a
21   record or I may not have a record.  That's
22   what I'm saying exactly.
23        Q.  Does Hillside Auto Outlet have
24   an obligation to keep all of the sales
25   records for a period of time pertaining to

Page 113

Ishaque Thanwalla
1
2   the Government regulations as to each car
3   sold?
4             MR. KATAEV:  Objection.
5             It calls for a legal
6             conclusion, but you can
7             answer.
8             MS. TROY:  Answer as to
9             the facts.
10        A.  As long as they paid minimum
11   wage, yes.
12             MR. KATAEV:  Objection to
13             the form of that last
14             question.
15        Q.  Were there records kept for each
16   car sold in terms of the prior that was
17   sold, the commission for each car?
18             MR. KATAEV:  Objection.
19             Asked and answered, but you
20             can answer it again.
21             MS. TROY:  He did not
22             answer the question, and
23             that's why I had to ask it
24             again.
25        A.  I can answer the question, yes.

Page 114

Ishaque Thanwalla

1
2   There is probably a way to look at it.
3       Q.  In other words there is a way to
4   assert the answer to the commission and the
5   wages that were given to car salespeople,
6   including Leticia Stidhum that would be more
7   precise than what we see on the pay stub
8   component, is that correct?
9       A.  Yes.  We have to calculate it to
10  make sure that at the end of the month to
11  finish the month, they paid more than the
12  minimum wage, we would have to be in
13  compliance.
14      Q.  Where are those records now?
15      A.  Probably at the dealership,
16  probably missing but I can't answer that due
17  to the robbery.
18      Q.  Those records that we we're
19  talking about in terms of the commissions,
20  the bonuses and the flat rate, is that kept
21  on paper or on the computer?
22      A.  It was kept on the paper.
23      Q.  Was it ever scanned onto the
24  computer?
25      A.  Not to my knowledge.

Page 115

Ishaque Thanwalla

1
2       Q.  Was it kept on the paper from
3   2018 to the present day; in other words, was
4   there ever a change to the electronic
5   system?
6       A.  No, we have not changed, we have
7   not updated to the electronic system.
8       Q.  Can you describe for me what
9   those records look like on the paper; what
10  type of information is contained therein?
11      A.  It would be a salesperson would
12  fill out the amounts of the cars that they
13  sold, the first name and last name of the
14  customer, as well as they would write down
15  how much bonus they have achieved, and they
16  kept a copy.  And we have a copy.  That copy
17  that would be made, so we verify, we make
18  sure that the bonuses were correct, make
19  sure that the deals were funded and we make
20  sure that everything was to the open ''T'' the
21  right way so that we can take care of the
22  employees that we have by looking at the pay
23  stubs.
24      Q.  Was that the same or different
25  from the triplicate copy that you were

Page 116

Ishaque Thanwalla

1
2   talking about?
3       A.  I don't understand the question,
4   please.
5       Q.  You mentioned that the paper
6   that you described with the salesperson
7   would fill out, the number of cars, the
8   customer information and the bonuses
9   achieved, et cetera, is that the same or
10  different than the documents that were in
11  triplicate that you mentioned before?
12          MR. KATAEV:  I am
13      confused.  Triplicate?  What
14      does that mean?
15          MS. TROY:  Three copies.
16      A.  You're talking about 1 copy, 2
17  copies, one is for them and one was for us.
18      Q.  Is that filled out on a weekly
19  basis or per-car sold?
20      A.  Weekly basis by the salesperson.
21      Q.  Who would verify if the
22  information is correct?
23      A.  The office manager.
24      Q.  Who was the office manager at
25  the time?

Page 117

Ishaque Thanwalla

1
2       A.  Deana was the controller and we
3   called the office manager or maybe Asha.  A-
4   S-H-A.
5       Q.  Who is Asha?
6       A.  Asha is the assistant to Deana.
7       Q.  Back for a second to the
8   controller, the office manager, is that the
9   same title?
10      A.  Correct, basically.
11      Q.  What was Asha's title?
12      A.  Asha would give paperwork when
13  it was done, give it to Deana so that Deana
14  could process it and she verified and Deana
15  verified it.
16      Q.  Is she the assistant office
17  manager, was she?
18      A.  Yes, you could call her
19  assistant office manager.
20      Q.  When you said that the documents
21  would be processed, what information would
22  be coded in from the paperwork?
23      A.  What do you mean by ''coded in''?
24      Q.  You said that the documents
25  would be processed, what did you mean?

Page 118

Ishaque Thanwalla

1
2     A. Meaning when she goes through to
3 make sure, to verify that the commission is
4 the same, that is the process. The
5 commission is not coded in. I said if you
6 write down the name and 150 flat, and then
7 there was any bonus on this, the customer on
8 this car, you write down the bonus and then
9 she verifies it and she processed it.
10     Q. When she processed it in order
11 for the amount to become an ATM check
12 amount, did she key in anything on the
13 computer?
14     A. I don't know that. I can't
15 answer that question.
16     MS. TROY: The next demand
17     is going to be demand number
18     7.
19     Before I get to that
20     actually, hold on. Mr.
21     Thanwall.
22     Q. Besides what you just
23 described to me, were there any other
24 documents kept as to the number of cars
25 sold, what the commission is, what

Page 119

Ishaque Thanwalla

1
2 the bonus is, et cetera for the car
3 salespeople at Hillside Auto Outlet?
4     A. Let me understand this question
5 correctly. You are saying did we have any
6 bonus structure?
7     Q. No.
8     A. What is the question? I'm
9 confused by your question.
10     Q. You mentioned that there was a
11 paper that Deana would process. Besides
12 that paper that Deana would process, were
13 there any other written records of the
14 number of cars sold and the bonus or
15 commissions earned by the car salespeople at
16 Hillside Auto Outlet?
17     A. I don't think so.
18     MS. TROY: Demand number 7
19     is for the written documents
20     containing the cars sold, the
21     name of the customer, the
22     bonus and commissions
23     received. It is for the car
24     salespeople at Hillside Auto
25     Outlet, and the timeframe is

Page 120

Ishaque Thanwalla

1
2     going to be from October of
3     2018 through February of
4     2019, and that includes,
5     obviously, the plaintiff as
6     well.
7     MR. KATAEV: Please
8     follow-up in writing.
9     MS. TROY: Just to be
10     clear, I believe these
11     documents were asked for and
12     directed to be produced by
13     the Court. To the extent
14     that the defendants state
15     that they don't have the
16     documents or that they are
17     looking for them, it's not
18     really so, just so that we
19     are clear.
20     Demand number 8 will be
21     for any electronic files or
22     inputs by the office manager
23     or her assistant regarding
24     the same.
25     MR. KATAEV: Please

Page 121

Ishaque Thanwalla

1
2     follow-up in writing.
3     Currently note whether it has
4     been previously required to
5     produce.
6     MS. TROY: We can now take
7     that lunch break. Is 30
8     minutes good for everyone?
9     MR. KATAEV: 45 minutes
10     would be fine.
11     MS. TROY: Fine, let's
12     come back at 1:25.
13     (A recess was taken from
14     12:50 p.m. until 1:33 p.m.)
15     Q. Mr. Thanwalla, do you have your
16 phone with you?
17     A. Yes.
18     Q. Could you go to your text
19 messages that you had with Miss Stidhum?
20     A. Can I go to those text messages?
21 It's in another office, a different office.
22     MR. KATAEV: I will get
23     it.
24     (Mr. Manuel Kataev left the
25     room and handed documents to

Page 122

Ishaque Thanwalla

1
2      the witness)
3         MS. TROY:  Just pull up
4      the text messages that you
5      have with Leticia Stidhum.
6      (The plaintiff Leticia
7      Stidhum stated on the record
8      that she is back on the
9      record)
10        MS. TROY:  Please mark
11     this as Plaintiff's Exhibit
12     3.
13     (Plaintiff's Exhibit 3 marked
14     for identification.)
15     Q.  Mr. Thanwalla, please read the
16  timestamp on the message.
17     A.  The message, it is October 9th,
18  of 2018 and it is 11:03 a.m.  It says ''Q40
19  customer is coming with a check and his
20  insurance.''
21     Q.  Was that from Leticia to you?
22     A.  Yes.
23     Q.  What comes after that?
24     A.  I said ''okay.''
25     Q.  Then, what happened after that?

Page 123

Ishaque Thanwalla

1
2      A.  I am not a good reader.
3         MS. TROY:  Mr. Kataev do
4      you want to read?
5         MR. KATAEV:  We are in the
6      process of producing the text
7      messages to you.  We may not
8      be able to produce them
9      during the deposition.  If
10     you want to take a break, I
11     will be able to produce it to
12     you so that it is easiest for
13     everyone.
14        MS. TROY:  That sounds
15     good to me. How much time do
16     you need?
17        MR. KATAEV:  10 or 15
18     minutes, and we will work as
19     quickly as possible.
20        MS. TROY:  Okay, that
21     sounds good.  That way we
22     don't have to read it into
23     the record.  I agree.
24        It is 1:50, when do you want
25  to come back?

Page 124

Ishaque Thanwalla

1
2         MR. KATAEV:  Let's come
3      back at 1:45.
4      (A discussion held off the
5      record)
6         MS. TROY:  The time is now
7      2:00 p.m. and we are back on
8      the record.  Actually, it is
9      2:07.
10     Q.  The text message that was just
11  sent to me by Emanuel Kataev is a document
12  that I'm going to mark as a PDF file and I'm
13  going to mark that as Plaintiffs 4.
14        MS. TROY:  Please mark
15     that as Plaintiffs 4.
16     (Plaintiffs Exhibit 4 marked
17     for identification.)
18        Plaintiffs 3 is going to
19     be text messages, plaintiffs
20     3 and then the PDFs that's
21     the WhatsApp, which we marked
22     as Plaintiff's Exhibit 4.
23     Q.  We were talking about the text
24  message before our break.  It's probably
25  going to be easier if we go in that order.

Page 125

Ishaque Thanwalla

1
2      Q.  I'm going to show you
3   Plaintiff's Exhibit 3 first, which is what
4   counsel just sent to me. Can you describe
5   how you obtained this photograph; did you
6   just use another phone and take a picture of
7   your phone?
8      A.  Correct.
9      Q.  How about the second page which
10  does not appear to be a text message, what
11  is that?
12     A.  This is a text message.  If it's
13  WhatsApp, I have no idea.  You have two
14  separate files, one is WhatsApp and one is
15  text messages.
16     Q.  Looking and drawing your
17  attention to page 2 of the text message
18  file, this --
19     A.  Looking at the text message
20  file, this is all from a single person, this
21  is from Leticia.
22     Q.  When you say ''Q40 customer is
23  coming with a check and his insurance,'' were
24  you the one who said ''okay?''
25     A.  Correct.

Page 126

Ishaque Thanwalla

1
2       Q.  Do you know where on your phone
3   it itemizes who is speaking when there is a
4   blue bubble versus the white bubble, what
5   that means?
6       A.  I have no idea.
7       Q.  The next line says ''Kaswayne K-
8   A-S-W-A-Y-N-E Bailey is the name,'' is that
9   correct?
10      A.  Correct.
11      Q.  Who is that from?
12      A.  That is from her.
13      Q.  Then, the next line says ''your
14  friend is nice.''  Is that from you?
15      A.  Yes.
16      Q.  Then it says ''yeah, yeah,
17  everyone is nice when they want a job lol.''
18  Who is Leticia referring to?
19      A.  I have no idea.
20      Q.  When do you speak next on this
21  text message?
22      A.  I would have to have my phone to
23  give that answer to that question.
24          MR. KATAEV:  We can't do
25          that because we are using

Page 127

Ishaque Thanwalla

1
2   this export.
3          MS. TROY:  It does not
4      appear that page 23, 2
5      through 23, it does not
6      appear to me to be
7      screenshots of the iPhone
8      text messages.  It looks like
9      something else, but I'm not
10     sure.
11          THE WITNESS:  If it's a
12     screenshot, when you push on
13     the side, this goes into a
14     PDF.
15      Q.  I believe it just doesn't have
16  who is speaking.
17      A.  I spoke very little, mostly
18  communications are by her and I answered
19  very little.
20      Q.  Then, what your attorney is
21  talking about, it doesn't have the date or
22  the time, correct?
23      A.  Right.
24          MS. TROY:  Emanuel, are
25          you working on the text

Page 128

Ishaque Thanwalla

1
2      messages to get the dates?
3          MR. KATAEV:  That is
4      correct.
5          MS. TROY:  You are also
6      working on the WhatsApp too?
7          MR. KATAEV:  Right now we
8      are focusing on WhatsApp.
9          MS. TROY:  Fine, how about
10     we come back to this in a
11     little bit. I'm going to ask
12     you a couple of questions
13     that do not require the text
14     messages. When your
15     attorney's office is finished
16     processing the messages with
17     the date stamp and time, we
18     will come back to it.
19          MR. KATAEV:  That is fine.
20      Q.  Mr. Thanwalla, did you at any
21  point in time find out that Ms. Stidhum was
22  pregnant?
23      A.  No.
24      Q.  Were you aware that she
25  announced her pregnancy at Hillside Auto

Page 129

Ishaque Thanwalla

1
2   Outlet?
3      A.  To my knowledge, she never
4   announced it.
5      Q.  Did she at any time tell you
6   personally about her pregnancy?
7      A.  No.
8      Q.  Did she bring a sonogram to
9   Hillside Auto Outlet?
10      A.  No.
11      Q.  Do you recall which day she
12  brought the sonogram to Hillside Auto
13  Outlet?
14      A.  I answered my question
15  previously, no. She did not bring it, not to
16  my knowledge,'' ever in front of me.
17      Q.  Were other Hillside Auto Outlet
18  employees aware that Ms. Stidhum was
19  pregnant, to your knowledge?
20      A.  To the best of my knowledge,
21  when I learned when I was in Pakistan. Mr.
22  Ali on WhatsApp said ''your daughter is
23  pregnant,'' which is on the WhatsApp app.
24  That was December 27th, if I recall, because
25  I just went there and why I recognized that

Page 130

1  Ishaque Thanwalla
2  date, I said ''which one?''  Because I call
3  every one of them my ''daughter.''  I treated
4  them like one.
5       My answer to you was I was the last
6  person to know, and that was my answer.
7  That was December 27th, according to my
8  knowledge, and she never announced it.
9  Never brought anything to the dealership.  I
10  don't think anyone was aware, maybe she got
11  close to Ali, so she may have told him.  She
12  may have told him about the pregnancy.
13       Q.  At that time was Ali at Hillside
14  Auto Outlet?
15       A.  I don't understand your
16  question.
17       Q.  At the time was Ali at Hillside
18  Auto Outlet?
19       A.  ''At the time?''  What do you mean
20  by ''at the time''?
21       Q.  At the time, during December,
22  December 27th of 2018, when you supposedly
23  received the text messages, on WhatsApp, was
24  he --
25       A.  Yes, he was working as my

Page 131

1  Ishaque Thanwalla
2  assistant.
3       MR. KATAEV:  Objection to
4       the form of that question.
5       Q.  Due to the fact that you have
6  multiple assistants, can you clarify whether
7  it was the sales manager, the office manager
8  or the finance manager; what is it?
9       A.  He was a sales manager and
10  Guzman as well as Guzman, because I always
11  needed two people to cover the hours.
12       Q.  When was Ali hired as your sales
13  manager?
14       A.  To the best of my knowledge, I
15  can recall that it was in December.
16       Q.  Was he hired in preparation for
17  your departure to Pakistan?
18       A.  No.  He was hired because I
19  needed help.
20       Q.  Besides Ali, did anyone else
21  communicate whether by text, verbal
22  communication or personal telephone to you
23  about Leticia's pregnancy?
24       A.  No.
25       Q.  To your knowledge, did Leticia

Page 132

1  Ishaque Thanwalla
2  get along well with the other Hillside Auto
3  Outlets?
4       A.  To the best of my ability, yes.
5       Q.  How about with yourself?
6       A.  Well, she did very well, yes.  I
7  treated her like my family.
8       Q.  In or around the month of
9  November of 2018, did you congratulate her
10  for selling many cars for the Hillside Auto
11  Outlet?
12       A.  I probably did, because she
13  probably did a good job.
14       Q.  At that time, did you discuss
15  potentially promoting her to the sales
16  manager position?
17       A.  Like I answered previously, no.
18  And, my answer is still no, and it still
19  remains no.
20       Q.  What was your reaction when you
21  found out that Leticia was pregnant?
22       A.  My reaction was the way that I
23  found out, I was in Pakistan when Ali texted
24  me -- not texting me, the WhatsApp,
25  WhatsApped me.  This was the only time I got

Page 133

1  Ishaque Thanwalla
2  that news.
3       Q.  Do you recall what your response
4  to Ali was?
5       A.  I mentioned my response to you,
6  ''I was the last one to know.''
7       MS. TROY:  Can we have
8       your office please provide
9       the WhatsApp between Ali and
10       Ishaque Thanwalla?
11       MR. KATAEV:  No problem.
12       MS. TROY:  So we don't
13       need him to read it into the
14       record.
15       Q.  To be clear Mr. Thanwalla, did
16  you communicate with Ali about Leticia on
17  What'sApp or also on text message?
18       A.  I know I never talked to him on
19  text message, only on WhatsApp.  I wasn't in
20  the country, and that's the only way you can
21  communicate over the WhatsApp.  It's an
22  international channel.
23       Q.  Let's go back for a second to
24  Plaintiff's Exhibit 2 that I am sharing on
25  the screen with you.  Please bear with me

Page 134

1        Ishaque Thanwalla
2  for one moment.
3        MS TROY:  For the record,
4      Plaintiff's Exhibit 2, pages
5      75 to 1179 are customer
6      dashboard logs that were
7      provided to us on the part of
8      the defendant's document
9      production.  We are now on
10     page 812 which corresponds to
11     defendant's document
12     production number 812.
13  Q.  My question for you, is as
14  follows: once you reviewed the document,
15  please tell me to slow down if necessary and
16  I will scroll through it.
17      (Ms. Troy is scrolling down)
18    Can you explain to me why this was
19  marked as "lost?"
20    A.  Jacquelyn Cleary was the first
21  BD agent, the second rep was Mikiael M-I-K-
22  I-A-E-L- and Andris Guzman.  If it was
23  Capital One source of the lead, when we do a
24  Capital One, mailer, it came in, and we
25  created, it just came in on 12/29 2018 at

Page 135

1        Ishaque Thanwalla
2  11:28 a.m.  There is also a serial number.
3  Please scroll down.
4  (Ms. Troy complies.)
5    A.  (Continuing) It says the
6  customer name, Ofelia O-F-E-L-I-A Fuentes F-
7  U-E-N-T-E-S.  Then, the second person took
8  on over, another BD agent ''changed from
9  Heewattie Prashad to Mikiael.
10    It always gives you all the information,
11  what day the lead came in. Can you scroll
12  back up to 1229?
13     (Ms. Troy complies)
14    A.  (Continuing) So, when you see
15  the dates, and please scroll back down to
16  520 of 2019, there was -- the deal was
17  closed because we couldn't get hold of the
18  customer.  It comes out of the system, and
19  after 90 days, that is when it comes out of
20  the system.
21    Q.  Is that the track system?
22    A.  That is what it says here, I
23  think we are both saying the same thing.
24  (The reporter speaks to Ms. Troy on the
25  record)

Page 136

1        Ishaque Thanwalla
2      MS. TROY:  Ms. Luckman has
3      a great point which is in
4      order for us to have a clear
5      record, please just wait
6      until I finish asking you the
7      question.  Then, you can jump
8      right in.
9       THE WITNESS:  I apologize
10      if I jumped in.
11      MS. TROY:  That is
12      perfectly fine.
13  Q.  My question for you is, because
14  the lead is marked as ''lost,'' is it possible
15  that for instance that this deal in fact
16  went through?
17    A.  I don't understand your
18  question.
19    Q.  Because this lead is
20  ''automatically marked as lost,'' after 90
21  days, is it possible that this lead went
22  through, meaning there was a sale on the
23  vehicle?
24    A.  When I can answer that question,
25  is maybe possible because the car was sold,

Page 137

1        Ishaque Thanwalla
2  and Leticia or Mikiael or anybody did not
3  manually put ''sold.''  There's a possible
4  chance yes, that that can happen.
5    Q.  Could it possibly be true that
6  sometimes lead was lost, but was not entered
7  into the system properly?
8    A.  Yes, it can be possible.
9    Q.  Is it generally the case that
10  customers who did not come through the BDC
11  with the amount, that those log-in customers
12  are generally speaking, not logged into the
13  system?
14    A.  They were logged into the system
15  by the salesperson as well as one of the
16  assistant managers.
17    Q.  Were there cases where they were
18  not logged in?
19    A.  It happens, it's like -- you get
20  a salesperson who is not doing his or her
21  job.  The manager is not doing their job,
22  and I can't keep up with everything.
23    Q.  You mentioned that there was a
24  system, what system was it?
25    A.  Vin V-I-N Solutions.

Page 138

Ishaque Thanwalla

1    Ishaque Thanwalla
2    Q. When you talked about Vin
3  Solutions, was the salesperson paid the
4  effective amount of bonuses?  In other
5  words, if the car was not logged into the
6  system, would they still get the bonus or
7  the commission, I'm sorry, on the car sold?
8    A. Let me understand your question
9  correctly. If the Vin Solutions does not
10  have any effect on their bonus over there,
11  that answer is no bonus, they got paid on
12  what they sold.  We have a complete file of
13  the customer and the salesperson provides a
14  commission sheet, like I mentioned in my
15  previous question that you asked me.  They
16  would write down the name of the customer,
17  and if the car had any bonus to it.  If it
18  could be a bonus of 25, $50 or 5 percent,
19  any kind of bonus.  They would write it down
20  because I have a different kind of bonus
21  structure, every -- it's different, every
22  time, it's is different every day.  So, no
23  salesperson would ever not get paid on a
24  deal that they delivered a car.
25    Q. Now we are looking at

Page 139

Ishaque Thanwalla

1  defendant's document production 249 and we
2  are still on that same set of documents,
3  with the customer dashboard log.  Page 249
4  of Plaintiff's Exhibit 2 corresponds to
5  defendant's document production 249.
6    I'm going to turn your attention to a
7  specific section on this particular log
8  pertaining to an individual Franklin Yanes
9  Y-A-N-E-S.
10    Specifically I'm going to turn your
11  intention to defendant's production 252 that
12  corresponds to page 252 of Plaintiff's
13  Exhibit 2.
14    Please turn your attention to the amount
15  of time that the showroom visit lasted.  Can
16  you explain that to me and can you tell me
17  what that shows?
18      MR. KATAEV:  Objection to
19      the form.  You can answer.
20    A. It's a very simple answer.
21  Leticia herself gave the answer for this
22  particular line at the last time at the
23  deposition.  You can look into it on her
24  deposition.  It was marked as an ''visit,''

Page 140

Ishaque Thanwalla

1    Ishaque Thanwalla
2  but nobody marked it until it was the second
3  day.  The customer was not sitting there for
4  22 hours, it is impossible, we are not even
5  open 22 hours straight.
6    Q. Is it accurate to say that in
7  fact the amount of time is the amount of
8  time it takes the BDC employee to log, for
9  instance the showroom visit as opposed to an
10  actual waiting time?
11    A. Mostly it is done by the
12  salesperson person.  What happens when the
13  salesperson does not do it, what happens is
14  that BDC person finds out, and they put the
15  visit in.  Like I said, that is controlled
16  by everybody, so they can do either a visit,
17  they can put it next to the look, it's not
18  the final record for the sale or for the
19  visit.
20      MS. TROY:  Let's go off
21      the record.
22      (A discussion was held off
23      the record)
24    Q. In terms of the wait time, can
25  you describe to me once the customer comes

Page 141

Ishaque Thanwalla

1    Ishaque Thanwalla
2  in, what do they need to wait for, what are
3  the different things that they need to wait
4  for in order to walk out with the car or
5  walk out without the car, for instance?
6    A. So, your question is how long it
7  takes to sell a car, is that what your
8  question is?
9    Q. Yes, with different components
10  broken down.
11    A. Different components broken
12  down, every situation is a different
13  situation.  Meaning when I say ''situation,''
14  that means I have customers and every deal
15  is different one next to the other.
16    Q. I'm going to follow-up for a
17  second.  If the customer does not require
18  any mortgage, what would the situation be?
19      MR. KATAEV:  Objection to
20      the form.
21    A. If it's a cash deal, it still
22  takes time, I still have to go through the
23  process of printing the paper, it's still a
24  process, for the DMV.  Sometimes in our
25  locations, our internet is not the greatest,

Page 142

Ishaque Thanwalla

1   Ishaque Thanwalla
2   and it can take a while.  Maybe the printer
3   is not working, maybe the DMV printer which
4   is a Dealer Track Management printer, you
5   have to look up for security purposes, it
6   sometimes does not go on.  Maybe the
7   customer has to wait 45 minutes for us to
8   print it because of the internet issues,
9   even in a cash deal, it can take time based
10  on that.  Then, once the process is
11  finished, if they can process it with the
12  Department of Motor Vehicles, we do all the
13  DMV in-house.
14      At that time, we are required to make
15  sure that our customer, the consumers have
16  the insurance and have a scanned copy, that
17  way we can scan it into the Department of
18  Motor Vehicles.
19      Everything is time consuming because it
20  is not a washing machine, where you just pay
21  a quarter and you put the washing machine
22  on.  You don't just walk out the door This
23  is an automobile, there are legalities which
24  have a lot of crossing your ''T's'' and
25  dotting your ''I's,'' because the Department

Page 143

1   Ishaque Thanwalla
2   of Motor Vehicle, it's a Government
3   department.  It takes time and we want to do
4   it the right way, not the wrong way, so we
5   have problems.
6       Q.  You mentioned doing it the
7   ''right way'' with the DMV, how long does it
8   take, roughly?
9       A.  Let me just say, when you say
10  ''the right way,'' we try our best to do the
11  right way.  I'm not sure if you get my
12  answer, we try our best.
13      Q.  My question is: how long does it
14  take?
15      A.  It can take between 30 minutes
16  to 2 hours or 3 hours.  I can't answer that
17  question 100 percent.
18      Q.  Let's talk about the different
19  types of customers, one that is essentially
20  the cash deal, the one you have to run the
21  credit score, how much additional time with
22  that additional factor that you just
23  described for me?
24      A.  It is different, it could be
25  between 1 hour to another 2 hours or 3hours.

Page 144

1   Ishaque Thanwalla
2       Q.  That 1 to 2 hours, is that all
3   for the customers so that he gets to walk
4   away with the car or --
5       A.  It could be, but it could not
6   be, because we are still waiting for the
7   bank to answer, for that answer.  Then, we
8   have to get the insurance and sometimes they
9   have no insurance, you have to have multiple
10  processes in the auto industry.  To give you
11  an example, there are some online seminars
12  from the FTC, the Federal Trade Commission,
13  and they are saying that if it requires that
14  long to sell a car, they even recognized it
15  because so many processes are involved.  It
16  can take between 2 hours to 6 hours and I
17  can't tell you how often.
18      Q.  On-average, how much time does
19  it take for customers to walk out with the
20  car; let's start with customers that are
21  doing a cash deal?
22          MR. KATAEV:  Objection.
23          Asked and answered but you
24          can answer again.
25      Q.  Between 2 and 4 hours.

Page 145

1   Ishaque Thanwalla
2       Q.  How about the customer that
3   requires some form of credit.
4       A.  Like I said, 2 to 4 hours, 6
5   hours maybe.
6       Q.  Can you describe how the
7   DealerTrak system works?
8       A.  The DealerTrak system, we put
9   the consumer's information, and that is what
10  we don't give a login and a password.
11  Everyone and anyone, we don't give it to
12  them, it's only the service people have it,
13  certain people.
14      You can put in consumer information in
15  there, then you send it to the bank.
16  Because we are a -- because we have a bank
17  hookup directly to the Dealertrak it goes to
18  the banker and notwithstanding, the analysts
19  will look at it, at the application.  It
20  depends on the bank how busy they are and
21  what kind of credit structure that is.  And,
22  if they have to calculate the LTD, which is
23  the loan to debt.
24      Have to make sure that they verify the
25  employment of whatever the requirement on

Ishaque Thanwalla

1
2  the analyst's side is sometimes they give
3  the answer in half an hour and sometimes it
4  can take three hours.  Sometimes it comes
5  back and asks for more paperwork.
6      They ask to come back maybe in half an
7  hour and we say ''okay.''  It may require on
8  this guy, maybe once you give the pay stub,
9  they provide me with the truth, with the
10  proof of the address, we are going to go
11  back to the consumer, and scan it.  It's a
12  different case, different thing.  Every time
13  is different, no 2 cases in your business
14  are the same.  That's the same thing with
15  us, there are no 2 customers that are the
16  same, everyone is different.
17      One takes 3 years to close the case and
18  one takes 3 months to close the case.  It's
19  like in your business.
20      Q.  Let's backtrack for a moment, in
21  November of 2018 who was running the dealer
22  log, who was running that?
23          MR. KATAEV:  Objection to
24          the form.  You can answer.
25      A.  I myself, and whoever was my

Ishaque Thanwalla

1
2  assistant.
3      Q.  Who would that be?
4      A.  I don't know who it may be, it
5  may be Guzman, it may be Jeanique.  I don't
6  know who was there, I can't recall who was
7  there at the time.
8      Q.  How about right before you left
9  for Pakistan, who was running the DealerTrak
10  system?
11      A.  Ali.
12      Q.  Besides Ali, anyone else?
13      A.  Yes, Guzman.
14      Q.  Anyone else?
15      A.  Serge has the power, he is the
16  finance manager and Louis had the power, he
17  is a finance manager.  That's about it,
18  that's what I can recall.  Maybe somebody
19  else, but I don't know.  I can't recall.
20      Q.  Is it accurate to say that Serge
21  and Louis were typically running the
22  DealerTrak for the customers just usually,
23  and would it be the sales manager who did it
24  as well?
25      A.  It's not typical.  It's not

Ishaque Thanwalla

1
2  typically.  I can't 100 percent answer that
3  to give you an example, let's just say it
4  was one day and Guzman is off and Ali is on
5  the shift, correct?  So what happens is Ali
6  has one file and the other salesman has
7  another customer.  Ali would say ''take this
8  to service to run the credit,'' or take it to
9  Louis to run the credit.  That typically
10  happens.
11      Q.  When you were out in Pakistan,
12  you usually did not run the DealerTrak
13  system, correct?
14      A.  Correct.  But, I have it on the
15  DealerTrack from back home.  I can look up,
16  I can look it up because I look at my
17  reports and I look at my things almost every
18  day.
19      I am hands-on, either when I was in the
20  country or either if I am out of the
21  country, either if on I'm vacation, even if
22  I'm not on vacation.  I am very hands on.
23  That's the only thing I have to say, this is
24  my baby and I work very hard all my life to
25  have something.

Ishaque Thanwalla

1
2      Q.  Understood.  The DealerTrak,
3  does it log out when the user logs in, as
4  well as the ICU location?
5      A.  It tracks the ICU location,
6  correct, as well as what not to allow if
7  they look at the credit, but I can run the
8  credit.
9      Q.  In other words you can tell who
10  was logging in where at what time using your
11  account and password?
12      A.  Yes.  Nobody else should get on
13  my log on password, nobody has it unless
14  somebody stole it.
15      Q.  We're going to go now back to
16  Plaintiff's Exhibit 2 for identification and
17  specifically, I'm going to have you take a
18  look at page 1281, which again corresponds
19  to defendant's documents production 1281 for
20  an individual that was identified as ''2.''
21      Mr. Thanwalla, you don't know the
22  individual, is it fair to say that each of
23  the pay stubs that were demarcated with an
24  ''2'' pertaining to an individual, the same
25  individual was marked as 2?

Page 150

```
1              Ishaque Thanwalla
2              MR. KATAEV:  Objection to
3       the form.  You may answer.
4              A.  I don't know.  I can't answer
5       that question because I don't know what 2
6       is.
7              MR. KATAEV:   I'm making
8              the representation to counsel
9              that I made an identification
10             marker on there, wherever 2
11             is listed by the ID number,
12             it's the same person.
13             Q.  Okay.  My follow-up question to
14      that is, for each of the different numbers
15      that were placed on the earnings statement,
16      those numbers for instance that say ''35,''
17      would they pertain to the individual 35?
18             MR. KATAEV:  If the
19             question is for the documents
20             labeled 35, it refers to the
21             same person and the answer is
22             yes.  I'll make the
23             representation that I made
24             the markers on this.
25             THE WITNESS:  I was aware
```

Page 151

```
1              Ishaque Thanwalla
2       of it.
3              MS. TROY:  That you were
4       aware?
5              THE WITNESS:  I was.
6              MS. TROY:  Can you
7       possibly move the speaker
8       closer to you?
9       (The witness complies)
10             MS. TROY:  So that it is
11      clear.  Emanuel, please do
12      that.
13      (A discussion was held off
14      the record)
15             MS. TROY:  We are back on
16      the record at 2:46.
17             Q.  Are you alleging now that
18      someone that had unauthorized access to
19      DealerTrak?
20             A.  I never alleged that, I never
21      said that.
22             Q.  Did you --
23             THE WITNESS:  I am not
24             done with my answer.
25             MS. TROY:  I'm sorry.  Go
```

Page 152

```
1              Ishaque Thanwalla
2       ahead.
3              A.  I said ''maybe somebody stole my
4       DealerTrak ID and password.''  I'm not aware
5       of that, just letting you know, just telling
6       you that I never alleged anybody having it,
7       no.  I wasn't giving it out, It's too much
8       of a privacy issue.
9              Q.  Let's backtrack for a moment to
10      the robbery, who was the robber?
11             A.  It was an employee we hired and
12      that was him.  I don't know.  He got caught
13      and he got punished for it.
14             Q.  Was that employee's name
15      Anthony?
16             A.  I think so, not 100 percent
17      recalling everything.
18             Q.  Did Andris Guzman have any
19      authority to discipline employees?
20             A.  Andris Guzman only takes orders
21      from me when I ask him to do.
22             Q.  So, please answer my question;
23      it's a yes or no question, did he have the
24      authority to discipline employees?
25             A.  Did he have any authority to
```

Page 153

```
1              Ishaque Thanwalla
2       discipline employees?  His job was to run
3       credit and make sure everything was
4       organized, not to my knowledge, he had
5       authority to discipline, no.  To my
6       knowledge, he had no authority to discipline
7       unless he came to me and I disciplined.
8              Q.  Has he ever come to you for you
9       to discipline an employee?
10             A.  Not really.  I never had issues
11      at my dealership, we run a good and happy
12      family, that's the way we work, that is the
13      way that I still work.  You can see by my
14      persona that's the way that I am, I'm very
15      happy and very loving and very caring.  I
16      will give the shirt off my back to my
17      people.
18             Q.  Did Andris Guzman have the
19      authority to hire employees?
20             A.  No.
21             Q.  How about firing employees?
22             A.  No.
23             Q.  How about to set schedules?
24             A.  Set the schedule? Yes.
25             Q.  Did Ali generally --
```

Ishaque Thanwalla

1
2     A. Ali, did all of that, the people
3  to get you the right answer, complete
4  answer. All of the people, do you mean all
5  the sales managers?
6     Q. The sales managers.
7     A. Sales managers yes, not my
8  finance manager.
9     Q. Did he set the schedule for the
10  salespeople only or for everyone?
11     A. When you say open "salespeople
12  only," and everyone, when you say
13  "everyone," I wouldn't say everyone because
14  he ran his -- his title was sales manager
15  and his department was sales. So, he only
16  managed the salespeople.
17     Q. Who decided which salesperson
18  should go to whom to run the credit through
19  the DealerTrak system?
20     A. Can you repeat your question?
21     Q. I --
22     A. Can you ask your question in a
23  different form, maybe where I can completely
24  answer it and comprehend it?
25     MS TROY: I'm going to

Ishaque Thanwalla

1
2     have the court reporter read
3     the question back. Let me
4     know if you understand it, if
5     not, I will rephrase it.
6     (The reporter reads back the
7     last question)
8     A. Let me understand this question,
9  which salesperson decided which salesperson
10  can go to which manager, is that the
11  question?
12     Q. To run the credit, yes.
13     A. It is based upon any salesperson
14  can go to any manager who is available at
15  the time. There is no preference, there is
16  no term, anyone can walk up to any manager.
17     Q. During Leticia's employment with
18  Hillside Auto Outlet, did she have you run
19  the credit from time to time?
20     A. The answer to that question is
21  yes, I ran credit, Guzman ran credit,
22  Jeanique ran credit, Ali ran the credit, and
23  sometimes we were all busy and she went to a
24  finance manager and read the credit. Did
25  that answer your question completely?

Ishaque Thanwalla

1
2     Q. Did there come a time when
3  Andris Guzman was new and he was learning
4  how to run the credit?
5     A. Guzman was my manager since a
6  very long time.
7     Q. I understand. When did he start
8  running the credit for Hillside Auto Outlet?
9     A. The day he started to work with
10  me.
11     Q. To be clear, what was that date?
12     A. I can't recall. I don't know.
13  I can't remember, but he knew it before he
14  came to work for me because he worked with
15  me at a previous location.
16     Q. Where was that previous
17  location?
18     A. Is that relevant?
19     MR. KATAEV: You have to
20     answer. Objection to
21     relevance, but you have to
22     answer.
23     A. Queens Auto Mall.
24     Q. You are saying that he ran the
25  credit at Queens Auto Mall also?

Ishaque Thanwalla

1
2     A. He worked for me over there,
3  yes, he did things for me, yes.
4     Q. The question specifically is:
5  did he run the credit at Queens Auto Mall?
6     A. Yes.
7     Q. Again, just as a reminder, it's
8  the same idea, nothing personal, please just
9  wait until I finish asking the question
10  before you jump in. That way we don't need
11  you to repeat yourself, understood?
12     A. Yes, understood, perfect.
13     Q. During Leticia's employment with
14  Hillside Auto Outlet, was she a dependable
15  employee?
16     MR. KATAEV: Objection,
17     but, you can answer.
18     A. When you say "dependable
19  employee," can you elaborate? Do you mean
20  was she on time every day, is that what you
21  are asking me?
22     Q. Let's start with that.
23     A. Yes. Sometimes she came late
24  and sometimes on time, she was dependable.
25  At times she went early, she left early.

Ishaque Thanwalla

1
2  That was when she wasn't feeling well or had
3  something else to do based on her ability
4  because she sold a lot of -- she spent a lot
5  of time, and I gave her leeway that she
6  needed.
7          Q.  Would you say that she was an
8  excellent employee?
9          A.  She was an excellent
10  salesperson.
11         Q.  At any point during her
12  employment, was she ever disciplined?
13         A.  I think maybe once, but I can't
14  recall what the reason was.
15         Q.  I know you cannot recall the
16  incident, do you recall maybe when that
17  happened?
18         A.  I cannot answer that, I really
19  can't remember, honestly.
20         Q.  At any point during her
21  employment with Hillside Auto Outlet, was
22  Leticia ever suspended?
23         A.  From Hillside Auto Outlet?
24         Q.  Correct.
25         A.  I don't think so.

Ishaque Thanwalla

1
2          Q.  Let's backtrack for a second,
3  were any car salespeople ever given a
4  written evaluation at any point between 2018
5  and 2019?
6          A.  They were given an evaluation
7  every month based on her or his sales.
8          Q.  That evaluation is the same or
9  different from the amounts of money that
10  they got?
11         A.  The amounts of money correlates,
12  the sales, equal amount of money.
13      The more sales that you make, you make a
14  lot of money, if you don't make a lot of
15  money -- if you don't make a lot of sales,
16  you don't make a lot of money.
17         Q.  I understand.  I just want to
18  know the written evaluation every month was
19  based on his or her sales; what form is that
20  report kept?
21         A.  I answered your question.  We
22  did evaluations, but not in writing.  I said
23  we did evaluations based on the sales that
24  they did, a good or great job.  We sat down
25  with them, ''good, now let's move on and do a

Ishaque Thanwalla

1
2  better job, you did a great job.  Next time
3  do a better job.''  We say ''are you going to
4  make another 20 sales this month?''  We're
5  going to do this extra so that we can make
6  more deals so that you can make more money.
7  We get more done for the bonuses, whatever
8  the bonuses were.
9          Q.  To be clear, was one of the ways
10  in which the number of cars sold per
11  salesperson tracked on a board with a name
12  and a tally?
13         A.  You got that right, yes.  We
14  used to have a board, but we don't any
15  longer have the board.
16         Q.  Is it accurate to say that when
17  you left for Pakistan that Leticia was
18  leading the board, meaning she was the top
19  saleswoman based on the tally?
20         A.  I can't answer that, I can't
21  recall that in my memory.
22      She was always first or second or third
23  in position.  So, there were three top
24  people at the time, one was Leticia, one was
25  -- I have a person Sean, and he was always

Ishaque Thanwalla

1
2  on top.  Or it was one was one month, one
3  was the second month and one was the third
4  month.  She was always first or second or
5  third on the position.  So, there were three
6  top people, one was Leticia, one was David
7  Parsons and the other one was Shane.  They
8  were always on the top of each other,
9  meaning one was one month, one the second
10  month, and one the third month.  They were
11  always first, second and third position,
12  usually.
13         Q.  When you talked about Shane,
14  what was Shane's last name?
15         A.  I can't remember his name, it's
16  an Arabic name and I can't pronounce it.
17         Q.  Is it Shane or Sean?
18         A.  Shane.  When I called him
19  ''Sean,'' he said ''don't call me Sean.''  He
20  said it is ''Shane.''
21         Q.  Do you recall Leticia being the
22  first, second or third; do you recall if she
23  was actually always the first before you
24  left for Pakistan?
25         Q.  Always the first one putting on

Page 162

Ishaque Thanwalla

1
2  the board, I said it was between the first,
3  second and third, all of them.
4      A.  Do you recall how many cars were
5  sold on-average by David Parsons?
6      They all averaged between 15 and 25 one
7  month, one is 15 the other, the other is 20,
8  22 or 25.  One did the next month 25 and the
9  other did 15.  It always varied, it's a
10  variable number in between those numbers.
11      Q.  When did David start to work at
12  Hillside Auto Outlets, do you remember the
13  month?
14      A.  I can't remember, but the year
15  would be 2018.  But, the month, I can't
16  answer that.
17      Q.  Do you recall what his base pay
18  was?
19      A.  I can't recall.
20      Q.  How about Shane, when did he
21  start working at Hillside Auto?
22      A.  The same year, 2018. He is still
23  there.
24      Q.  When did David Parsons end
25  working at Hillside Auto?

Page 163

Ishaque Thanwalla

1
2      A.  I can't recall.
3      Q.  Was the Shane that we were
4  talking about an African-American
5  individual?
6      A.  Shane is Arabic, Middle-Eastern,
7  I would say.
8      Q.  Was that the Middle Eastern
9  individual that you were talking about
10  working for Hillside Auto Outlet, was that
11  at the same time that Leticia was working
12  there?
13      A.  The same time as Leticia was
14  working there?
15      Q.  Correct.
16      A.  Yes.  Supposedly.  So, if that
17  person was working there, he would appear on
18  the earnings statement that were provided by
19  you to your attorney; is that correct?
20      A.  You have all of the documents.
21      MS. TROY:  Cutting to the
22          chase, if you could just
23          provide the unredacted
24          version of the documents,
25          because there is clearly some

Page 164

Ishaque Thanwalla

1
2      confusion as to who and what
3      or even if Mr. Parsons
4      actually was there.
5      MR. KATAEV:  Follow-up in
6          writing and we will respond
7          accordingly.
8      Q.  I'm going to turn your attention
9  to Leticia's pay stub Mr. Thanwalla.  We are
10  on page 1187, which corresponds with
11  defendant's document production 1187.
12      Mr. Thanwalla, does this comport with
13  your understanding in terms of the regular
14  wage rate that was provided to Ms. Stidhum
15  while she was a commissioned salesperson,
16  the regular $300 salary plus the commission?
17      A.  Yes.  That is people on this pay
18  stub, $1,080, but I don't understand minimum
19  wage.
20      Q.  Going to the next page we are
21  now on page 1188 which corresponds to
22  defendant's document production 1188.  Does
23  the $780 figure, the commission, meaning the
24  flat commission $150 per car sold plus a 5
25  percent bonus?

Page 165

Ishaque Thanwalla

1
2      A.  It can represent numerous
3  things.  Like, you can have 5 cars plus a
4  bonus car, or 5 cars plus maybe 1 car, 5
5  percent, 5 cars plus the weekend bonus.
6  There are a lot of -- there can be
7  variations here, this is not an exact thing
8  like I mentioned to you previously numerous
9  times, that we have different bonus
10  structures and that is why we cannot say
11  flat.
12      Q.  That bonus structure is sort of
13  laid out in the weekly deposits that I
14  demanded today, correct? That was filled out
15  by each car salesperson on a weekly basis?
16      MR. KATAEV:  Objection to
17          the form.  You can answer.
18      A.  I guess, yes.
19      Q.  Was that ever turned over by you
20  to us?
21      MR. KATAEV:  Objection to
22          the form.  You can answer.
23      A.  I have no idea.
24      MR. KATAEV:  If you want
25          to take a look, we can try to

Page 166

Ishaque Thanwalla

1             Ishaque Thanwalla
2     look and see if we can pull
3     that text.
4          MS. TROY:  That's fine.
5     The time is now 3:06 p.m. and
6     we will come back on the
7     record at 3:20.
8          MR. KATAEV:  Yes, 3:20.
9          MS. TROY:  You need that
10    much time?
11         MR. KATAEV:  Yes, to get
12    it printed and scanned.
13         MS. TROY:  Fine.  Let's
14    take that break.
15    (A recess was taken from 3:06
16    p.m. until 3:24 p.m.)
17        MR. KATAEV:  I represent
18    to you, Tiffany, that I have
19    sent you the WhatsApp
20    messages for the entire
21    meeting of Leticia's exchange
22    with the witness.  But, the
23    ones between Ali, that is
24    only for the relevant period
25    because the entirety of the

Page 167

Ishaque Thanwalla

1             Ishaque Thanwalla
2     other messages have very
3     sensitive financial
4     information that we object to
5     producing.  So, if we need to
6     deal with that objection, we
7     will deal with it with the
8     Court.
9         I'm just making a
10    representation to counsel
11    that nowhere else in the 18
12    pages of messages is Leticia
13    referenced or anything
14    related to this case. It is
15    mostly all financial
16    information and information
17    related to particular sales.
18        MS. TROY:  Is the message
19    pertaining to particular
20    sales related to sales that
21    Leticia may have done while
22    she was working at Hillside
23    Auto Outlet?
24        MR. KATAEV:  There is no
25    way to tell, I don't think

Page 168

Ishaque Thanwalla

1             Ishaque Thanwalla
2     so.  But, I don't know, the
3     final thing I want to say is
4     that you have the complete
5     regular text messages
6     exchanged between the witness
7     and your client, the
8     plaintiff.  That is in the
9     final email that I just sent.
10    I believe it says ''Leticia's
11    text messages.''  We will
12    Bate's stamp that when it is
13    time so that we don't have to
14    waste time and you can
15    proceed with the deposition.
16        MS. TROY:  Let's go off
17    the record.
18    (A discussion was held off
19    the record)
20        MS. TROY:  It is now 3:40
21    p. m. and I will review the
22    documents.
23        I'm going to mark the
24    exhibit, the document that
25    was sent again, text messages

Page 169

Ishaque Thanwalla

1             Ishaque Thanwalla
2     I believe using a Decipher
3     App, between Mr. Thanwalla
4     and Leticia that we're going
5     to mark now as Exhibit 5.
6     (Plaintiff's Exhibit 5 marked
7     for identification).
8        Exhibit 6 is his decipher
9     chat between Leticia and Mr.
10    Thanwalla on the WhatsApp
11    chat.  Then, exhibit 7 is
12    decipher chat conversations
13    page 5 of 18 between Mr.
14    Thanwalla and Ali.
15    (Plaintiff's Exhibit 6, and 7
16    now marked for
17    identification.)
18      Q. I'm going to show you various
19  exhibits and ask you a couple of questions.
20  We are now looking at exhibit 3 and my
21  question for you is: when were these
22  photographs taken?
23      A. I think yesterday or the day
24  before yesterday.
25      Q. Why were these photographs

Page 170

Ishaque Thanwalla
1
2   taken?
3       A.  Because I was messaging and I
4   wanted to put them into a file.
5       Q.  You believe that you may have
6   done it on Wednesday or Thursday, and you
7   were just putting a photograph of the text
8   message, correct?
9       A.  That's the only way that I knew
10  how to do it.
11      Q.  You took it on your phone or
12  some other person's phone?
13      A.  It's my second phone.
14      Q.  Did you text at all with Laticia
15  on your second phone, meaning the phone that
16  you used to take the pictures?
17      A.  I never texted to her, this is a
18  form, because too many customers were
19  calling or texting in the middle of the
20  night and I required a phone a few months
21  back and that is the phone.
22      Q.  Did you represent to me that
23  these messages were between you and Leticia;
24  if so, you are on the blue and Leticia on
25  the white, actually, on the gray?

Page 171

Ishaque Thanwalla
1
2       A.  Yes.
3       Q.  Is this an accurate
4   representation of the text messages just
5   that you sent and you received from Leticia?
6       A.  It's on the phone, that's
7   accurate on the phone that you are showing
8   me, yes.
9       Q.  Is that the same for the
10  entirety of the text messages, meaning all
11  23 pages that I am showing you on the screen
12  right now, is that accurate as far as you
13  can tell?
14      A.  Yes.
15      Q.  Next we're going to turn our
16  attention to exhibit 4, same question for
17  which is: when was the photograph of the
18  phone taken?
19      A.  Either yesterday or the day
20  before yesterday.
21      Q.  Why did you take these
22  photographs?
23      A.  I wanted to put in the
24  communications, the contents in the file,
25  our communications.

Page 172

Ishaque Thanwalla
1
2       Q.  To the best of your knowledge,
3   does the photograph accurately represent the
4   text messages that were from you to Leticia
5   and from Leticia to you?
6       A.  Yes.
7       Q.  I'm now going to scroll through
8   the 37 pages.  To be clear, the green
9   represents you and the white represents
10  Leticia, each bubble; is that correct?
11      A.  Yes.
12      Q.  Now, I'm showing you what your
13  attorney has provided to us which are
14  conversations between you and Leticia.
15  Again, the text messages, did you have a
16  chance to review the documents, those 11
17  pages.
18      A.  Yes.
19      Q.  To the best of your knowledge,
20  do the documents accurately represent the
21  text messages that you have sent to Leticia
22  and that you have received from Leticia?
23      A.  So far, to the best of my
24  knowledge.
25      Q.  Did you have a chance to compare

Page 173

Ishaque Thanwalla
1
2   this with your phone?
3       A.  No.
4       Q.  On the next break, please take
5   some time and compare it on your phone, and
6   the question after the break will be: Does
7   it accurately reflect what you see on your
8   phone?  I will also have some specific
9   questions about this exhibit.
10      A.  Go right ahead.
11      Q.  We are now on page 6, and I am
12  pointing to your attention to the text
13  message from November 20th of 2018 at
14  approximately 4:07 p.m.
15      This is a text message from Leticia that
16  says ''I got to talk to you about something
17  before it's blown up.''
18      Your response is ''you and your blowup.''
19  Can you explain what you meant by that, if
20  you know?
21      A.  Maybe she was talking to the
22  customers unprofessionally.
23      Q.  Drawing your attention to the
24  text message that is dated November 20th,
25  2018 at 5:40 p.m.  It says, from Leticia

Page 174

Ishaque Thanwalla

1
2 ''can I go home I have really bad cramps and
3 I can barely move why do you think I was
4 sitting in the back all day?''
5     Were you aware that Leticia at that time
6 was pregnant?
7         A.  No.
8         Q.  Let's go now to page 8.
9         A.  Okay.
10        Q.  Turning your attention between
11 pages seven and 8l.
12            Obviously we see the paper
13 format with the PDF in a black and white
14 photo. My question for you is: do you have
15 the actual video that is printed on the PDF?
16        A.  I don't think so. Everything is
17 printed, the only thing we are looking at,
18 that's what I have on my phone and I
19 provided 100 percent of what is in my phone.
20 100 percent, not 98 percent, 100 percent of
21 what I have.
22        Q.  If you could just turn your
23 attention to this video, 11-24-2018 at 5:47
24 p.m., my question is quite simple: are you
25 able to check on your phone and see an

Page 175

Ishaque Thanwalla

1
2 actual video or what is that?
3        A.  I can't answer that question,
4 because I haven't looked at it.  I gave them
5 to my attorney and he downloaded everything
6 and he gave it to you.
7            MS. TROY:  Mr. Kataev, it
8       appears that this is the
9       Decipher app, and it's a
10      black and white photograph of
11      the actual video.  My
12      question is, can you get me
13      the actual video?
14          MR. KATAEV:  I will see, I
15      will speak with my client and
16      you can make a request in
17      writing, please.
18        Q.  Do you have your phone with you,
19 Mr. Thanwalla?
20        A.  Yes.
21        Q.  Can you check your November
22 24th, 2018 conversation with Leticia
23 Stidhum, and there was a video, to see if
24 there is a video.
25          MR. KATAEV:  Let's go off

Page 176

Ishaque Thanwalla

1
2     the record.
3         (A discussion was held off
4     the record)
5         Let the record reflect
6     that I'm looking at November
7     24th of 2018, message at 5:47
8     p.m., and I'm looking at the
9     image.  I see that this is a
10    picture, but there's no way
11    to play a video.  In fact, on
12    the bottom I don't see it on
13    here, on the bottom of this
14    you can see there was like a
15    timestamp, and there is a
16    play button.  When you press
17    the play button, it's just an
18    image, and it is not capable
19    of being played back.
20        MS. TROY:  If the image is
21    black and white or in color -
22    -
23        MR. KATAEV:  It's in
24    color.  I will reprint it in
25    color and reproduce the color

Page 177

Ishaque Thanwalla

1
2     print.  We ran out of toner
3     and we could not print it.
4         MS. TROY:  That's fine.
5     When you look on it, does it
6     appear bigger or is it
7     smaller?
8         MR. KATAEV:  It's bigger.
9         THE WITNESS:  It is bigger
10    in the sense that you take
11    the image, it takes up the
12    full screen instead of just
13    showing you a portion. It's a
14    thumbnail, and --
15        MS TROY:  Can you provide
16    the thumbnail to me?
17        MR. KATAEV:  No problem.
18        MS. TROY:  Just produce
19    that to me at some point
20    during this deposition.
21    We're not going to waste any
22    more time on this.
23        MS. TROY:  I'm going to
24    ask you to print it out or
25    send it to me, whichever.

Page 178

1    Ishaque Thanwalla
2    Q.  I'm now going to turn your
3    attention to the message that follows here,
4    this is the message from November 25th of
5    2018 at 3:59 p.m.  ''I have so many solid
6    deals and it's just taking so long for no
7    reason.''
8    At that time first of all, to your
9    knowledge, did you become aware of Leticia's
10   pregnancy.?
11   A.  I can't recall.  I don't think
12   so, but I don't think she ever mentioned it,
13   somebody else mentioned it to me.
14   Q.  At that time had Leticia already
15   announced her pregnancy to either yourself
16   or other individuals at Hillside Auto
17   Outlet?
18   A.  I don't remember, nor can I say
19   that she ever told me.
20   Q.  Now, we are on exhibit 5 and I
21   will turn your attention to the message
22   dated November 25th of 2018 at 4:00 p.m.
23   A.  Okay.
24   Q.  It says ''okay I am not there at
25   7:00 every dealership work except me.''  What

Page 179

1    Ishaque Thanwalla
2    did you mean by that?
3    A.  That I am not there at 7:00,
4    every dealership -- I'm confused.  This is
5    Leticia writing -- no, it's --
6    Q.  Does this appear to be you
7    writing to her?
8    A.  I have to see the whole thing
9    for me to answer that question.
10   Q.  Then, on November 25th at 4:00
11   p.m. it says ''I have one 5,000 down QX60 the
12   other 2000 down Laredo, all 600+ credit.''
13   A.  Okay, I'm there.
14   Q.  Let me scroll up for you. This
15   is the entire thread.  Please read it and
16   let me know when you are ready to answer my
17   question.
18   A.  ''Okay.  I am not there at 7:00
19   every dealership work except me.''  I don't
20   write well, and maybe I was answering her
21   differently.  I am not there, and I said at
22   7 o'clock.  When I read, I don't read well,
23   and you can see why I write very limited.  I
24   have -- I am dyslexic when I am writing.
25   Q.  Is it fair to say that the

Page 180

1    Ishaque Thanwalla
2    November 25th, 2018, 359 message from
3    Leticia to you is a complaint?
4    A.  Where does it say "complaint?"
5    Q.  Sir, you can answer yes or no.
6    A.  I don't see a complaint at all,
7    no.
8    Q.  Turning your attention again on
9    page 8, November 25th, 2018 at 8:07 p.m.
10   text message, Leticia writes ''what's up I
11   was in the shower when you called.''
12   THE REPORTER:  I didn't
13   hear that answer.
14   MS. TROY:  Can you repeat
15   your answer?
16   A.  Can you repeat the question?
17   (The reporter read back the last question)
18   Q.  Can you describe the text
19   message for me, and then the court reporter
20   can just take down his answer.  I want him
21   to read back the question.
22   MR. KATAEV:  I don't
23   understand.  Instead of
24   having him redo his whole
25   answer, have him continue

Page 181

1    Ishaque Thanwalla
2    answering.
3    A.  What? You didn't ask me a
4    question.
5    Q.  Please relax, I will re-ask the
6    question. We were talking about the text
7    message at 8:07 p.m.  My question is: is
8    that when you usually called Leticia?
9    A.  Yes, if she had a customer that
10   she was not there, she called and said that
11   she would come in late, I would call to see
12   what was going on with the customer so that
13   I could handle the customer appropriately
14   for her.
15   She didn't lose her commission, I could
16   help her make the deal, she would get paid.
17   I was very generous with my employees, like
18   I said.
19   Q.  Is it fair to say that you
20   called Leticia more frequently than you
21   texted her?
22   A.  I can't answer.  I have called
23   every employee if they are not there, if I
24   have a customer, I call them, yes.
25   Q.  Earlier before we were cut off

Ishaque Thanwalla

1
2  by your attorney, didn't you say that you
3  called more frequently than you texted
4  Leticia Stidhum?
5      A.  That is not -- I said that I
6  called more frequently, everyone because I
7  don't text well.  You can see that I don't
8  make sense on my own wording.
9      Q.  Turning to the bottom of page 8,
10 the beginning of page 9 it is dated November
11 28th of 2018 at 8:09 p.m.  It says ''the call
12 keeps dropping.  I am going to call him
13 now.''
14     Is it fair to say that Leticia is
15 working outside of business hours?
16     A.  If it's her customer and she is
17 not at work, it's likely she did not show up
18 to work, not her day off.  If she could no
19 longer show up, I would call her, to call
20 the customer and she was supposed to be
21 there, and I would say ''you should show up
22 too.''
23     Q.  Is it fair to say that at the
24 time when she texted you at 8:09 p.m.,
25 during that time, that she called the

Ishaque Thanwalla

1
2  customer, that it was after store hours?
3      A.  Because she probably was
4  supposed to say that she is going to call
5  him, probably confirming.  It was probably
6  that if she says that she was going to go
7  home, it's a hard deal for her, why should
8  she lose money if she was going to call her
9  -- I probably said ''call him to remind her,
10 and there's nothing wrong with that.  I am
11 aggressive, and she is aggressive enough to
12 make every deal.  That's why I loved her,
13 she was a very good salesperson.
14     Q.  You are emphasizing that she was
15 a good salesperson as opposed to a good
16 employee.  To you, what is the difference?
17     A.  A good salesperson, she was my
18 employee.
19     Q.  What part of the employee role
20 did she play as a salesperson so that she
21 was a great salesperson --
22     A.  Meaning that she was a good
23 employee, simply put.
24     Q.  Let's take a look at the text
25 message on page 9 where it is dated November

Ishaque Thanwalla

1
2  30th, of 2018 at 3:17 p.m.  Leticia says ''I
3  am really not feeling well I feel nauseous
4  and I was trying to just hang out but I feel
5  hot and I feel my stomach turning.''
6      Is it fair to say that at this time you
7  knew about the pregnancy?
8      A.  Maybe not, I can't recall.  If
9  she was pregnant she would've texted someone
10 anyway, and if I saw any sales, if I saw
11 anything that's said that she was nauseous
12 ''I am pregnant,'' though I did not.  Nowhere
13 in her conversations have I ever seen her or
14 seen any messages that show, it says ''I am
15 nauseous because I am pregnant.''  She is
16 nauseous, and she has done that numerous
17 times.  I can't recall if she told me or she
18 did not tell me whether she was pregnant.
19     Q.  She did not tell you in person
20 that she was pregnant?
21     A.  I cannot recall that because I
22 don't think so.  I don't think she told me,
23 but I got awareness of this from somebody
24 else and I can't exactly recall it at this
25 time who told me.  Maybe her friend Joanna,

Ishaque Thanwalla

1
2  but I don't know.
3      Q.  Please turn your attention to
4  page 9, the text message dated December 3rd
5  of 2018 at um 11:21 a.m.  Then that shows
6  your response at 11:22 a.m.
7      A.  Okay.
8      Q.  When you said that ''in meeting
9  be there in 2 hours,'' where were you
10 meeting; was at Hillside Auto or somewhere
11 else?
12     A.  Maybe a meeting with my
13 partners.
14     Q.  By ''partners,'' do you mean 3
15 other individuals who you mentioned were
16 also shareholders?
17     A.  Yes.  Or, I could be in a
18 meeting with -- someone for a personal
19 meeting or maybe I am in a -- in my doctor's
20 office. I can't answer that question
21 exactly.
22     Q.  How often would you have
23 meetings with your partners?
24     A.  Once or twice a month.
25     Q.  What would those meetings touch

Ishaque Thanwalla

1  upon?
2
3      A.  Sales, how are we doing in
4  sales, because it's my job to make sure that
5  they are up-to-date about what is going on
6  there and my business.
7      Q.  As the general manager, did you
8  receive a salary?
9      A.  I received percentage, yes.
10     Q.  Meaning that you received a
11 percentage of the profits; is that correct?
12     A.  Yes.
13     Q.  Is that percentage the same or
14 different from 25 percent?
15     A.  25 percent is my partnership.
16     Q.  The question is how about for
17 the profits?
18     A.  It's my percentage, it's my
19 privacy not to answer that question,
20 Emanuel.
21         MR. KATAEV:  We are going
22         to object on the grounds of
23         confidentiality under Rule
24         30.  The plaintiff has
25         previously requested all

Ishaque Thanwalla

1
2  matters of financial
3  information, and the Judge
4  refused to comply with the
5  production of that
6  information.  So, I am
7  directing the witness not to
8  answer that question.
9      MS. TROY:  I am not asking
10 for financial information.  I
11 am asking for the percentage
12 of profits that were given to
13 him.  I am not asking about
14 the sales at Hillside Auto.
15     MR. KATAEV:  Objection
16 Asked and answered. You can
17 answer as to the percentage.
18     A.  I can't recall what the
19 percentage is, I was getting -- it's the
20 same percentage that I was getting today,
21 there is no difference between that day and
22 today's date.
23     Q.  Turning your attention to the
24 text message dated December 12th, 2018 at
25 6:04 p.m.

Ishaque Thanwalla

1
2  ''I am really not feeling well.  My
3  stomach is turning and I feel extremely
4  nauseous and I keep feeling like I need to
5  puke I can't stay any longer I need to lay
6  down.''
7      A.  You can see in her question that
8  she probably left because she is sitting
9  right in front of my window.  I said
10 probably ''go.''  But, anyway, you see no
11 mention of pregnancy.
12     Q.  Is it fair to say that at that
13 point you knew of Leticia's pregnancy?
14     A.  I cannot answer that question
15 because I don't recall anything she is
16 mentioning.  If she would've mentioned it,
17 she would've mentioned it in the text.  You
18 can see that she likes to turn everything --
19 put everything in writing, and she should
20 have mentioned something somewhere.
21     You can see from page 1 to whatever the
22 last page is, whatever you have 37 or 27,
23 you don't see anywhere in her conversations
24 that she is saying that she is pregnant.
25 So, no, I did not know if she had mentioned

Ishaque Thanwalla

1  it, I don't recall.
2
3      Q.  Is it your understanding, and
4  don't take this the wrong way, but is it
5  your understanding that a pregnant woman
6  needs to remind you of her pregnancy through
7  text?
8      MR. KATAEV:  Objection as
9  to argumentative.  You can
10 answer the question.
11     A.  She at least one minute -- once
12 she was pregnant, she never did say, so she
13 didn't need to remind me.  I don't think I
14 remember her mentioning to me that she was
15 pregnant.
16     Q.  Now let's turn our attention to
17 page 10 and take a look at the text message
18 dated December 12th, 2018 at 6:37 p.m.
19 Please read it and let me know when you are
20 done.  Please read it to yourself.
21 (The witness peruses).
22     MR. KATAEV:  The witness
23     has requested that I read the
24     message to him.
25     (Mr. Kataev read the text

Page 190

Ishaque Thanwalla

1
2        message as requested to the
3        witness)
4        Q.  There is also a text message on
5    12-12- 2018 at 6:39 p.m.
6            MR. KATAEV:  Let the
7        record reflect that I have
8        read the first text message
9        and let the record also
10       reflect that I am now reading
11       the second text message to
12       the witness.
13       A.  I --
14           MR. KATAEV:  There is no
15       question pending.
16       (The attorney reads it to the
17       witness.)
18       Q.  What is your response?
19       A.  Probably brought into my office
20   and said that I wanted to talk to her about
21   what seemed to be the trouble and then we
22   communicated.
23       Q.  Do you recall what that
24   conversation was like?
25       A.  I can't recall.  The only thing I

Page 191

Ishaque Thanwalla

1
2    can see from the content is it says that the
3    customer is rushing her, the customer or she
4    is  rushing the customer or the customer is
5    rushing her.  I said ''slow down the
6    customer.''  ''If you want to make the deal,
7    you have to slow down the customer.''  Then,
8    I wanted her to make the deal, to slow the
9    customer down and she said ''no rush.''
10   Everything is okay.  What happened, when you
11   do it fast, you cut corners and you make
12   mistakes.
13       Maybe I brought her into my office and
14   I told her, I disciplined her, like I
15   mentioned maybe one or two times I guess
16   that was one of the times that I disciplined
17   her. I told her ''you need to slow down the
18   customer, slow down yourself to make it the
19   right way of making the deal instead of
20   losing a deal.''
21       Q.  Is it correct that the
22   particular deal that was referenced in the
23   first text message went through?
24       A.  Yes.  I read that because I
25   disciplined her and told her to slow down

Page 192

Ishaque Thanwalla

1
2    the customer.
3        Q.  To your knowledge, did that
4    happen before or after the pregnancy
5    announcement, the alleged pregnancy
6    announcement?
7        A.  I don't recall her pregnancy
8    announcement, so I can't allege anything.
9        Q.  Besides telling her to slow the
10   customer down, do you recall what else was
11   said during that night on December 12th,
12   2018?
13       A.  I don't recall.
14       Q.  Turning your attention now to
15   the text message dated January 7th of 2019
16   at 4:13 p.m.  Leticia writes ''I left for the
17   day tomorrow we need to talk because this
18   place has been a shit show since you left.''
19   Your response to her at 10:17 a.m. which is
20   on page 10 continuing onto page 11 is
21   ''okay.''
22       A.  She asked me a question on the
23   7th, and I was probably into the flight or
24   getting out of the flight.  When you come
25   off of a 24-hour long flight, you sleep.

Page 193

Ishaque Thanwalla

1
2    You have jet lag, maybe my phone was shut
3    off.  And I can't answer that, I can't
4    recall everything.
5        Q.  Let's scroll down now to page
6    11.  I'm going to now draw your attention to
7    the text message from January 10th, 2019 at
8    1:24 p.m.  Please read it and let me know
9    when you are finished reading it.
10           (The witness peruses and
11       says, ''she's telling me that
12       she threw up and she can't
13       take the pressure in the car
14       business'')
15           MS. TROY:  Please read
16       back the question again.
17       (The reporter read back the
18       last question.)
19       A.  Okay.
20       Q.  Now that you have finished
21   reading it --
22           MR. KATAEV:  Do not
23       interrupt me.
24           MS. TROY:  What did you
25       say to the witness?

Page 194

Ishaque Thanwalla

1
2       MR. KATAEV:  Please let
3   the record reflect that my
4   instruction to the witness
5   was to listen to the
6   question, and if a question
7   is pending, to answer that
8   question.  If there is no
9   question, there is nothing to
10  be said.  Please proceed.
11      Q.  The question is: when you
12  received this text message from Leticia,
13  were you aware of her pregnancy?
14      A.  Like I said, I can't recall
15  that, I can't answer that question.  Nowhere
16  in that is mentioned that she was pregnant.
17  Maybe she mentioned it to me, and it went in
18  one ear and came out the other.  She was
19  probably talking while she was pregnant to
20  me, maybe I was really busy doing something
21  else when she mentioned it to me.  I can't
22  answer that question.
23      Q.  Please read the text message
24  from January 17th, of 2019 at 8:27 p.m. and
25  let me know when you are done.

Page 195

Ishaque Thanwalla

1
2       A.  You want me to read it?
3       Q.  You can read it to yourself.
4       A.  What was the question?
5       Q.  Let me know when you are done
6   and I will ask you a question.
7           MR. KATAEV:  Please read
8       it and tell her when you are
9       done reading it.
10          THE WITNESS:  Okay, I read
11      it.  What's your question?
12      Q.  Was that a complaint for $100 in
13  old wages?
14          MR. KATAEV:  Objection.
15      It assumes facts not in
16      evidence.  You can answer.
17      A.  Let me answer a complete answer.
18  We never hold a week's pay to begin with,
19  and according to my records, she left on the
20  10th.  Yes, it shows the date of the last
21  pay date was the 14th on ADP records,
22  according to my records, she left on the
23  10th and there was $300 salary that she was
24  supposed to get for the whole three.  She
25  did not work the whole week, so there was

Page 196

Ishaque Thanwalla

1
2   $100 short on her pay because we had an
3   employee that said how many days, they
4   worked and how much pay she was supposed to
5   get.  Based on that, it shows in her own
6   writing on my text message that we only took
7   $100 owed to her, a hundred back and we did
8   not.  Does that answer your question?
9       Q.  Please read the message from
10  January 17th of 2018 at 8:30 p.m. and let me
11  know when you are done.
12          (The witness peruses).
13      A.  Okay. It can't be -- it looks
14  like somebody coached her, it wasn't 1-17 at
15  8:30 p.m.  She bought a car for me, not
16  herself, her grandmother bought a car.  She
17  did not give me the complete documents.  We
18  didn't make any money because she didn't
19  give me any down payment.  She gave a down
20  payment, but not a complete down payment,
21  that's what I meant.  So, it looks like
22  somebody coached her, 60 hours and 7 days?
23  Whatever you can see, how many days she
24  called in sick or left early and had her
25  days off.

Page 197

Ishaque Thanwalla

1
2       Q.  Is it true that on days that she
3   would take off, she would make them up?
4       A.  I can't recall, she hardly did.
5       Q.  In other words, the question is,
6   if she took off for a day, would she make it
7   up on her free days and come to work at
8   Hillside Auto Outlet?
9       A.  She worked 7 days, which she
10  never did, she said she worked 7 days, but
11  she worked five days a week. Sometimes she
12  came to deliver a car to a customer, that
13  was on her prerogative because she was a
14  commissioned salesperson.
15      Q.  To be clear, the text message
16  that you are looking at does not say for
17  ''seven days,'' it says ''for seven months.''
18      A.  Whatever.  I told you that I am
19  dyslexic when I read.
20      Q.  That's okay.  We will either
21  have myself or Emanuel read it out for you,
22  how about that?
23      A.  Okay.
24      Q.  I'm going to show you
25  Plaintiff's Exhibit 7 which is the Decipher

Page 198

1        Ishaque Thanwalla
2 chat conversation with Ali.  First, can you
3 tell me, to the best of your knowledge if
4 this comports with your understanding in
5 terms of it being an accurate representation
6 of the WhatsApp conversation you've had with
7 Ali?
8        A.  Yes.
9        Q.  I'm going to show you
10 Plaintiff's Exhibit 7 which is the Decipher
11 chat conversation with Ali.  First, can you
12 tell me to the best of your knowledge, if
13 this comports with your understanding in
14 terms of it being an accurate representation
15 of the WhatsApp conversation you had with
16 Ali?
17        A.  Yes.
18        Q.  If you turn your attention to
19 this specific exchange, and I will read it
20 for you, this is from December 27th of 2018
21 at 11:05 a.m.  Ali texted ''your baby is
22 having a daughter,'' with two emojis.  Then,
23 you text him back ''which one?''  Then, he
24 texted you at 12:13 p.m. on 12-27 saying
25 ''Leticia.''  You texted him back saying ''I

Page 199

1        Ishaque Thanwalla
2 know.''
3        Do you recall this exchange having
4 happened, and it's a yes or no question?
5        A.  Yes.  May I give you a complete
6 answer?
7              MR. KATAEV:  Yes, you may
8        go ahead.
9              MS. TROY:  It is --.
10              MR. KATAEV:  He wants to
11        complete his answer.
12              MS. TROY:  It's a yes or
13        no question. He completed his
14        answer.
15              MR. KATAEV:  The answer is
16        not a yes or no.
17              MS. TROY:  You can follow
18        up with your direct.
19              THE WITNESS:  My complete
20        answer would be --
21              MS. TROY:  Fine, go ahead.
22        A.  (Continuing) My complete answer.
23 I told you that somebody mentioned that she
24 was on the call and said ''your daughter is
25 pregnant.''  Yes, at that time and then I

Page 200

1        Ishaque Thanwalla
2 probably followed up with it.
3              MS. TROY:  I appreciate
4        that additional content.
5        Just so that we are clear, it
6        is a courtesy to let you add
7        whatever you want to add.  If
8        it's a yes or no question, it
9        is complete when you say ''yes
10        or no,'' anyway. It's not that
11        big of a deal.  Let's take a
12        look now at Plaintiff's
13        Exhibit 6.
14        This one is the WhatsApp conversation
15 you've had with Leticia.  Can you just
16 confirm to the best of your knowledge if it
17 comports with your understanding that it is
18 true and accurate copy of your conversations
19 with Leticia on WhatsApp before the 4 pages?
20        A.  Four pages? Correct.
21              MS. TROY:  I believe your
22        attorney will read it and I
23        will scroll through it.
24              MR. KATAEV:  That will
25        help him answer the question,

Page 201

1        Ishaque Thanwalla
2        he has four pages in front of
3        him.
4              Please take a look through
5        the whole thing and see if it
6        is comports with your
7        conversation.
8        (The witness complies and
9        peruses)
10              THE WITNESS:  Nothing.
11              MR. KATAEV:  I said that
12        the witness is reviewing a
13        hard copy of the exhibit.
14        Q.  The question that is pending is
15 whether, to your understanding, this is an
16 accurate and complete representation?
17        A.  As to my ability, yes.
18        Q.  The question is whether it's an
19 accurate and complete representation of the
20 WhatsApp conversation that you had on your
21 phone.
22        A.  To the best of my ability, yes.
23        Q.  Is it fair to say that you and
24 Leticia have the WhatsApp conversation
25 because you were in Pakistan?

Ishaque Thanwalla

1
2    A.  I would say yes, I guess
3    December 20th.
4        Q.  I am now going to turn your
5    attention to page 2, specifically to the
6    text message that is from December 27th of
7    2018 at 8:30 p.m.  If you want, you can have
8    your attorney read it for you also as well.
9        THE WITNESS:  Emanuel?
10        MR. KATAEV:  Let the
11        record reflect that I am
12        reading this message to the
13        witness.
14        MS. TROY:  It's not this
15        part, it's the highlighted
16        part.
17        MR. KATAEV:  Let the
18        record reflect that I will be
19        reading the message time
20        stamped at 8:30 and 8:32 p.m.
21        to the witness, to Ishaque.
22        (The attorney complies.)
23        Q.  The question for you is: does
24    this refresh your recollection about
25    Guzman's treatment of Leticia while you were

Ishaque Thanwalla

1
2    out?
3        A.  This is a conversation about
4    Leticia, this is Leticia because Guzman,
5    there is no conversation that Leticia had a
6    problem with Guzman.  It looks like he was
7    talking about David, like she was
8    complaining about that.
9        Q.  The question for you is: does
10    this refresh your recollection about
11    Guzman's treatment of Leticia while you are
12    out?
13        A.  There is no conversation about
14    Leticia.  This is Leticia, previously,
15    because Guzman, there is no conversation
16    that Leticia had a problem with Guzman.
17    It's David, it looks like she talked about
18    David, like she's complaining about this.
19    About why Guzman took the Range Rover, and
20    maybe she didn't like that, that Guzman --
21    since Ali started, they probably -- I can't
22    answer that question.  Ali probably changed
23    her mind now and she is again Guzman, she
24    doesn't like that, and that is Guzman is
25    trying to do his job, it looks like that to

Ishaque Thanwalla

1
2    me because the one who had gotten the paper,
3    Ali should have gone and given it in order
4    for him, because he had seniority.  He's
5    trying to get everything organized and Ali
6    is sitting and she is just complaining.
7    That's what I understand in this message.
8        Q.  When you received this message,
9    did you respond or call Leticia?
10        A.  I have no idea.  I can't recall.
11        Q.  If you did call her, would it be
12    reflected on the WhatsApp?
13        A.  Yes, the chat room.  I don't
14    know if I called her because I was back home
15    and I probably didn't even see this message
16    until a day later.  I can't answer that
17    question.
18        Q.  Is it fair to say that this text
19    message that was just read aloud to you did
20    not just concern David but it concerned the
21    deal that Leticia had as well?
22        MR. KATAEV:  Objection.
23        You can answer.
24        A.  Does not look like it, it was
25    David's deal and he was trying to do the DMV

Ishaque Thanwalla

1
2    and the DMV takes time, as I mentioned
3    previously to you.  Then, they ran the
4    Carfax and I don't know what you call that
5    paper.  There is a lot addressed like I
6    said, nothing goes perfectly.  If you have
7    an internet, is if it's not up or it's slow,
8    maybe the DMV internet is down. Happens all
9    the time.
10        Q.  Did David Enrique from time to
11    time partner with Leticia?
12        A.  Sure, they went out and smoked
13    weed all the time. That's the problem that I
14    had with --
15        Q.  I don't mean partner in that
16    sense but I appreciate your answer.
17        Let's backtrack for a second, and when
18    the deposition is over and then after the
19    case is over, then we can talk about
20    whatever you want to talk about.
21        Right now, please focus on the question.
22    I mean partner in the sense of was he ever
23    partnered with Leticia in terms of any car
24    sales at Hillside Auto Outlet during her
25    employment with Hillside Auto Outlet?

| | Ishaque Thanwalla |
|---|---|
| 1 | Ishaque Thanwalla |
| 2 | A. Let me understand this |
| 3 | correctly. You are telling me that Leticia |
| 4 | would give half of her commission to David, |
| 5 | is that what you are asking me? |
| 6 | Q. No. I'm not asking you that. |
| 7 | I'm asking you, were there times when two |
| 8 | car salesmen would partner to sell a car; |
| 9 | it's a yes or no question. |
| 10 | A. It's not a yes or no question. |
| 11 | No, they would not partner up, sometimes on |
| 12 | occasion Leticia would give a complete |
| 13 | answer and sometimes in the situation, they |
| 14 | would deliver, Leticia's car and Leticia |
| 15 | would deliver David's car on his days off or |
| 16 | on her days off. They would do each other a |
| 17 | favor, not partner-up, they would do each |
| 18 | other a favor. |
| 19 | Q. Let's focus then on the part of |
| 20 | the text message where it says ''I got this |
| 21 | customer looking to pay cash for the number |
| 22 | 4 Carfax and we have no paper.'' |
| 23 | Is it accurate to say that you |
| 24 | understood that portion of the text message |
| 25 | when you received it to be that Leticia had |

| 1 | Ishaque Thanwalla |
|---|---|
| 2 | her own customer that was looking to pay |
| 3 | cash; it's a yes or no question? |
| 4 | A. It's not a yes or no question. |
| 5 | We may have ran (sic) out of paper and |
| 6 | Leticia was the salesperson she could have |
| 7 | opened the screen and showed the Carfax on |
| 8 | the computer screen and showed it to let the |
| 9 | customer see it while the customer was |
| 10 | looking at it. Somebody could have gone and |
| 11 | gotten the paper. It appears that the |
| 12 | customer had to go out and get the paper. |
| 13 | Q. When you talked about |
| 14 | partnering, was there a time when Leticia |
| 15 | would run the credit or David would run the |
| 16 | credit? |
| 17 | A. How can they run the credit when |
| 18 | they had no access to run the credit, nor |
| 19 | was she authorized to run the credit? It is |
| 20 | the manager's job, management's job which is |
| 21 | Guzman and Ali. Supposing if we could show |
| 22 | that Leticia did run the credit for David, |
| 23 | it's the customer I guess. |
| 24 | Q. Is it fair to say that on |
| 25 | December 27th of 2018 you were not in the |

| 1 | Ishaque Thanwalla |
|---|---|
| 2 | country? |
| 3 | A. What? |
| 4 | Q. In 2018, December 27th of 2018, |
| 5 | the same date as the text message. |
| 6 | A. Yes, I wasn't in the country. |
| 7 | Q. Is it fair to say that David |
| 8 | could not have run his own credit without |
| 9 | the help of Guzman or some other individual |
| 10 | who had the authority to access the |
| 11 | DealerTrak system? |
| 12 | A. Your question is could David |
| 13 | have run his credit? David could never run |
| 14 | a customer's credit, nor could Leticia, nor |
| 15 | could any other sales person could run a |
| 16 | credit. It is the manager's job, and I |
| 17 | would have more than two available -- if |
| 18 | they are not available, I'm going to take |
| 19 | the name Ali and Guzman. If they're both |
| 20 | busy or somehow for any reason, there is no |
| 21 | finance manager, they would have the |
| 22 | authority to do that. Does that answer your |
| 23 | question? |
| 24 | MR. KATAEV: Let's go off |
| 25 | the record. |

| 1 | Ishaque Thanwalla |
|---|---|
| 2 | (A discussion was held off |
| 3 | the record). |
| 4 | We are back on the record |
| 5 | at 4:39 p.m. |
| 6 | Q. Let's mark. Plaintiff's Exhibit |
| 7 | 8. |
| 8 | (Plaintiff's exhibit 8 marked |
| 9 | for identification). |
| 10 | MS. TROY: Plaintiff's |
| 11 | Exhibit 8 will be the |
| 12 | Verification of Ishaque |
| 13 | Thanwalla. |
| 14 | Q. I am going to show it on the |
| 15 | screen, Plaintiff's 8 for identification. |
| 16 | MR. KATAEV: I'm going to |
| 17 | print it. |
| 18 | MS. TROY: While you are |
| 19 | at it, you might as well |
| 20 | print the other stuff as |
| 21 | well. The responses to the |
| 22 | document request. |
| 23 | MR. KATAEV: Okay. |
| 24 | MS. TROY: Let's mark |
| 25 | plaintiff's 9 and 10 as well. |

Page 210

Ishaque Thanwalla

1
2       (Plaintiff's Exhibit 9 and 10
3       marked for identification)
4           MS. TROY:  Plaintiff's 9
5       is the Verified Response to
6       Interrogatories, the regular
7       Interrogatories.  Plaintiff's
8       10 is the final Supplemental
9       Responses.
10      Q.  While your attorney is doing
11   that, I'm just going to ask you some other
12   questions about Serge meaning Serge Zanan,
13   correct?
14      A.  Yes, something like that.
15      Q.  Back on Plaintiff's Exhibit 2,
16   this is the Declaration of Serge Zanan,
17   plaintiffs 2 and then on page 72, which is
18   the same as defendant's document production
19   72.
20      I'm going to ask you to read paragraph
21   one and ask you if this refreshes your
22   recollection as to when he started working
23   at Hillside Auto Outlet.
24          MR. KATAEV:  Just for the
25      record, I printed this and

Page 211

Ishaque Thanwalla

1
2       I'm going to give all of this
3       to the witness so that he has
4       the full set so that he can
5       read the whole thing.
6           Let the record reflect
7       that I have given the witness
8       the Declaration of Serge
9       Zanan, and I'm asking if he
10      could read the whole thing.
11          MS. TROY:  Let me know
12      when you are done reading it.
13      (The witness peruses)
14          MR. KATAEV:  I'm
15      confirming to him to read
16      everything that is stapled
17      here, all 4 of the boxes to
18      the Interrogatories and
19      document requests are in
20      front of the witness.
21          Do you want to repeat your
22      question? What was your
23      question?
24      Q.  My question is, however,
25   paragraph 1 of the Declaration, does it

Page 212

Ishaque Thanwalla

1
2   refresh your recollection as to when Serge
3   started to work at Hillside Auto was at the
4   end of 2018?
5       A.  Probably started in 2018.
6       Q.  Is that accurate to the best of
7   your knowledge?
8       A.  I can't answer, but it says so,
9   maybe it's accurate.
10      Q.  Was he a finance manager or a
11   finance and insurance representative?
12      A.  The finance manager which we
13   call finance and insurance because they do
14   sell warranties and that is why they call it
15   ''finance and insurance.''
16      Q.  So, finance and insurance
17   representative is the same as a finance
18   manager or is it different?
19      A.  Yes, the same.
20      Q.  When was your last contact with
21   Guzman?
22      A.  A couple of weeks ago.
23      Q.  During that contact, did you
24   talk at all about this case, the present
25   case?

Page 213

Ishaque Thanwalla

1
2           MR. KATAEV:  Objection
3       based on attorney/client
4       privilege.
5           MS. TROY:  How is it
6       attorney/client privilege if
7       it is between him and Andris
8       Guzman?
9           MR. KATAEV:  He learned --
10      if you didn't interrupt, you
11      would've heard me say that I
12      was present during that
13      conversation.  I am
14      instructing the witness not
15      to answer that question.
16      Please proceed.
17      Q.  When was the last contact you
18   had with Andris Guzman without your attorney
19   being present?
20      A.  Without my attorney being
21   present? I didn't have any -- I didn't have
22   any contact with him in a long time.
23      Q.  How about with Ronald M. Baron?
24      A.  A year-and-a-half ago or a year
25   ago.

Page 214

Ishaque Thanwalla

1
2    Q. How about Jory Baron?
3    A. I saw him about two or three
4  weeks ago.
5    Q. Was that in the presence of your
6  attorney or outside the presence of your
7  attorney?
8    A. He is my partner.
9    Q. The question is yes or no, was
10  it with your attorney or not with your
11  attorney?
12    A. Not with my attorney, not with
13  Jory.
14    Q. What did you talk to him about?
15    MR. KATAEV: Objection,
16      asserting a common interest
17      prejudice objection. Jory
18      Baron is one of the
19      witnesses, one of the
20      defendants in this case, and
21      if you discussed anything
22      about this case I am
23      instructing the witness not
24      to answer that question.
25    MS. TROY: You can answer

Page 215

Ishaque Thanwalla

1
2    that question subject to that
3    objection.
4    MR. KATAEV: In other
5      words, if you talked about
6      this case, don't answer. If
7      you talked about something
8      else, you can answer.
9    A. We talked about something else,
10  we did not talk about this case.
11    Q. What did you talk about?
12    A. Business.
13    Q. When you say ''business,'' do you
14  mean Hillside Auto Outlet specifically?
15    A. Correct. That is the only
16  business he owns with me.
17    Q. I'm showing you on the screen
18  the Verification to the Interrogatories, the
19  Supplemental Interrogatories which your
20  attorney has printed for you. Let me know
21  when to scroll down, it is one page.
22  (The witness peruses)
23    THE WITNESS: Okay.
24    Please back up a little bit.
25    MS. TROY: Okay.

Page 216

Ishaque Thanwalla

1
2    THE WITNESS: That is
3    good.
4    Q. The question I have for you is:
5  do you recognize your signature?
6    A. Yes.
7    Q. To the best of your knowledge,
8  is everything contained in the
9  Interrogatories and the Supplemental
10  Interrogatories correct and true?
11    A. Yes.
12    Q. When was this document signed?
13    A. I don't remember the date. It
14  says ''February of 2023.''
15    MR. KATAEV: I will make
16      the representation that it
17      was on the same day that you
18      received it.
19    Q. Prior to signing it, did you
20  review the Interrogatory Responses?
21    A. Yes.
22    Q. Did you have a conversation with
23  Deana Jennings?
24    A. Right.
25    Q. Did you have a conversation with

Page 217

Ishaque Thanwalla

1
2    her?
3    A. Yes.
4    Q. How long was that conversation?
5    A. I can't recall.
6    Q. When did that conversation take
7  place?
8    A. I don't remember her ever asking
9  me to have a conversation.
10    Q. I understand that your attorney
11  asked you to have the conversation. My
12  question is when?
13    A. Before signing of the paper.
14    Q. You had the conversation with
15  whom, with your attorney or with Deana
16  Jennings?
17    A. Your question was about
18  conversations with Deana Jennings and I said
19  ''yes.''
20    Q. You had a conversation with her
21  right before you signed or when?
22    A. Right before.
23    Q. What was the content of that
24  conversation?
25    MR. KATAEV: Objection.

Page 218

Ishaque Thanwalla

1
2        Based on the same objection,
3        the common interest privilege
4        objection.  To the extent
5        that you and Deana Jennings
6        discussed this case, I
7        instruct you not to answer
8        the question.  If you
9        discussed something else, you
10        may answer.
11        A.  We discussed the case.
12        Q.  Is it fair to say that any of
13   the Responses pertaining to Hillside Auto
14   Mall that you don't have personal knowledge
15   about that?
16        A.  This is a separate company, I am
17   not part of Hillside Auto Mall.  So I don't
18   know what goes on there, it's not my
19   business.
20        Q.  I understand that your
21   Interrogatories had information about
22   Hillside Auto Mall.  My question is: to the
23   extent that your answers included
24   information about Hillside Auto Mall, are
25   you saying that you did not have personal

Page 219

Ishaque Thanwalla

1   knowledge with respect to those?
2
3        A.  I have no interest in Hillside
4   Auto Mall, so I had no conversations on
5   Hillside Auto Mall.  My business is Hillside
6   Auto Outlet.  Anything pertaining to
7   Hillside Outlet is part of my answer.
8        Q.  Who is Susan Zhivo Z-H-I-V-O.
9        A.  She is my controller.
10        Q.  Susan Zhivo Z-H-I-V-O, is that
11   the Susan that you mentioned earlier that
12   you didn't remember her last name?
13        A.  Yes.  I call her Susan ''Z.''
14        Q.  Besides yourself, are there any
15   other individuals who are responsible for
16   determining the pay and the hours of
17   Hillside Auto employees?
18        A.  Hillside Auto or Hillside
19   Outlet?
20        Q.  We can do Hillside Auto Outlet
21   employees.
22        A.  Okay, what was your question
23   again?
24        Q.  Besides yourself, was anyone
25   else responsible for determining

Page 220

Ishaque Thanwalla

1
2   compensation or hours?
3        MR. KATAEV:  At Hillside
4        Auto Outlet?
5        MS. TROY:  We can start
6        from there.
7        A.  Hillside Auto Outlet, Susan is
8   my controller and she does the payroll.
9   Then, before Susan it was Deana and before
10   Susan, Deana Jennings, yes.
11        Q.  During the plaintiff's
12   employment with Hillside Auto Outlet, you
13   were saying that in addition to yourself,
14   Deana and Jeanique also determined the
15   compensation and hours?
16        A.  And Asha A-S-H-A as well.
17        Q.  Asha is the assistant office
18   manager, right?
19        A.  Correct.
20        Q.  In terms of the amount of time
21   it takes for Hillside Auto salespeople to
22   hear back from the lender once an
23   application was submitted, how long would
24   that timeframe be?
25        A.  Now you are questioning -- it's

Page 221

Ishaque Thanwalla

1
2   actually a different thing, you were talking
3   about do we play a role, are you asking
4   about the bank?
5        Q.  Yes.
6        A.  You changed subjects, I just
7   want to make sure we stay on the same path.
8   Your question was how long it takes for the
9   bank to reply back, is that your question?
10        Q.  Right, how much time?
11        A.  It all depends.
12        Q.  Do you have a range?
13        A.  The range is between 20 minutes
14   to an hour, hour-and-a-half or maybe two.
15        Q.  Is it true that most of your
16   customers do not have excellent credit?
17        A.  Most of our geographic location,
18   we do not have the greatest credit.
19        Q.  Do you recall your attorney
20   asking my client a question about racial
21   profiling of the customers; did that happen
22   at Hillside Auto Outlet?
23        A.  What do you mean by ''racial
24   profiling?''
25        Q.  Let's try to do this and address

Ishaque Thanwalla

1 Ishaque Thanwalla
2 it in the shortest way we can.  In terms of
3 the person who does not have good credit or
4 that person has good credit that happens on
5 your watch.
6          Let's look at it this way the
7 person that person does not have good credit
8 or that person has good credit, that happens
9 under your watch, right?
10          A.  Let me put it this way.  I have a
11 very extensive training in the car business.
12 One thing about me, I don't judge a book by
13 its cover.  We do not judge.  You can be any
14 color, any race, any religion, and we treat
15 them equally.  We don't have one -- only one
16 identity that we look at.
17          Q.  Is it true that you hold them to
18 the same standard?
19          A.  Yes, I do.  We only have one
20 identity.  I am very strong about that.
21          Q.  In terms of credit, no one is
22 just turned away because they look a certain
23 way, the credit has to be run, correct?
24          A.  Correct, the credit has to be
25 run if they want to buy on credit, if they

1 Ishaque Thanwalla
2 want to pay cash, we don't have to run it.
3 But, we still need to get the social
4 security for the tax form, but no.
5          Q.  You mentioned in your
6 Supplemental Interrogatories that you have a
7 secondhand dealer's license and certificate
8 of authority; is that correct?
9          A.  Secondhand dealer license, yes.
10          Q.  Do you also have a certificate
11 of authority?
12          A.  Authority for what?
13          Q.  I don't know, that's what you
14 wrote.
15          A.  An authority to issue DMV, yes.
16          MS. TROY:  Demand number
17          9, it will be the secondhand
18          dealer license and
19          certificate of authority for
20          161-10 Hillside Auto Avenue,
21          or for you personally.
22          MR. KATAEV:  I am going to
23          place that response in front
24          of the witness.
25          MS. TROY:  That is fine.

1 Ishaque Thanwalla
2          I am also asking or
3          requesting the Declaration of
4          Serge.
5          MR. KATAEV:  Should I read
6          this --
7          MS. TROY:  Not all
8          questions require him to read
9          that, but he can read it if
10          it helps him.
11          MR. KATAEV:  This is the
12          Supplemental Response and
13          Interrogatory number 9?
14          MS. TROY:  Correct.  You
15          can read it to him and let me
16          know when you are done
17          reading it.
18          (The witness peruses)
19          THE WITNESS:  Okay.
20          Q.  I am asking you if you
21 identified these documents, they have not
22 been turned over yet, please turn it over.
23 That is another demand.
24          MR. KATAEV:  Documents are
25          being requested.

1 Ishaque Thanwalla
2          MS. TROY:  The secondhand
3          dealer license and the
4          certificate of authority that
5          was mentioned and referred to
6          was never produced.
7          MR. KATAEV:  You never
8          made a demand for it,
9          MS. TROY:  I'm making a
10          post-demand request for it.
11          MR. KATAEV:  Put it in
12          writing and we will respond.
13          Q.  Mr. Thanwalla, can you just take
14 a quick look at the two other documents that
15 your attorney has printed for you, which is
16 the documents, it's document request
17 responses and the supplemental responses.
18 Please just take a look at the document and
19 can you just confirm for me that it is
20 accurate and complete to the best of your
21 knowledge.
22          A.  I've been through this document
23 previously, it's the same document, yes.
24          Q.  Just to confirm that both
25 document requests and responses as well as

Page 226

Ishaque Thanwalla

1    Ishaque Thanwalla
2    the supplemental responses, there were two
3    documents that you looked at, correct?
4              MR. KATAEV:  Let's go off
5         the record.
6         (A discussion was held off
7         the record)
8         A.  Okay, looking at the same
9    thing that I looked at yes.
10        Q.  Just to be clear, the document
11   production responses are the 38 page
12   document, that, and let's start with that,
13   you said that you reviewed the document and
14   it is complete, it is accurate to the best
15   of your knowledge, correct?
16        A.  To the best of my ability, yes.
17        Q.  Then, do you see the five-page
18   document?
19        A.  Yes.
20        Q.  Could you say the same for that
21   5-page document that it is true and complete
22   to the best of your knowledge?
23        A.  To the best of my knowledge,
24   yes.
25        Q.  Now, I'm going to show you this

Page 227

Ishaque Thanwalla

1    on the screen, and we are looking at
2    Plaintiff's Exhibit 10 for identification.
3         Q.  We are looking at plaintiff's
4    Exhibit 10 for identification.  I'm just
5    going to point your attention to a couple of
6    different sections and I will have a couple
7    of questions after I point your attention to
8    that section, okay?
9         A.  Okay.
10        Q.  Let's take a look, and if you
11   are looking on the paper it is page 3.
12   there's specific demand responses and we are
13   at number one.  Let me know when you are
14   finished reading demand number 17 and his
15   response.
16             MR. KATAEV:  It is cut off
17        on the screen.  I'm going to
18        ask him to read this.
19             MS. TROY:  Let me know
20        when you guys are done.
21        (The witness peruses the
22        document).
23             THE WITNESS:  What is your
24        question?

Page 228

Ishaque Thanwalla

1         Q.  The question is: is it accurate
2    to say that the weekly sales records were
3    not turned over as part of the Supplemental
4    Response?
5         A.  The weekly sales records were
6    not part of this part of the record.
7         Q.  Let me backtrack for a moment.
8    Do you recall earlier today that you
9    mentioned that there was a weekly record of
10   the sales of the cars as well as the
11   commission, and the bonuses, et cetera for
12   each car's salesman at Hillside Auto?
13        A.  Yes, yes.
14        Q.  The question was: was that
15   record  provided as part of the Responses
16   that are in 17, again, it's a yes or no
17   question?
18             MR. KATAEV:  Objection to
19        the form.  You can answer.
20        A.  Yes.
21        Q.  You are saying it was turned
22   over?
23        A.  Yes.
24             MS. TROY:  Please just

Page 229

Ishaque Thanwalla

1    turn that over.
2              MR. KATAEV:  Put it in
3         writing and I will respond.
4         Q.  Turning your attention to
5    question 21, a similar process.  Please read
6    over the question with your counsel, read
7    over the question and the response and let
8    me know when you are done because I will
9    have a question for you.
10             MS. TROY:  Does he want on
11        the screen or on the paper?
12             THE WITNESS:  I would like
13        it on the screen better.
14             MS. TROY:  Perfect, tell
15        me when I should scroll down.
16        A.  Okay.
17        Q.  If you don't mind, just read 39
18   and let me know when you are done with the
19   question and the response.
20        A.  Okay.
21        Q.  Is number 39, correct to the
22   best of your knowledge?
23        A.  Yes.
24        Q.  Read the request number 40, and

Page 230

Ishaque Thanwalla

1  let me know when you are done, the request
2
3  and the response.
4        A.  Okay.  What's your question?
5        Q.  My question is, is it correct to
6  say that there are no complaints for unpaid
7  wages from anyone, including your employees?
8        A.  You are telling me unpaid wages
9  that I am not paying someone, they have a
10  complaint?
11        Q.  Correct.
12        A.  I can't remember -- I have never
13  paid anyone lost wages, people I mostly paid
14  people.
15        Q.  The question is not about the
16  underlying facts, but the fact that the
17  complaint has the name, whether that was a
18  formal complaint in the Court or a non-
19  informal complaint.
20        My question is: did you turn over all of
21  the documents that you have in your
22  possession pertaining to any such
23  complaints?
24        A.  Yes, I have.
25        Q.  Earlier when you mentioned, when

Page 231

Ishaque Thanwalla

1  I asked you if you were a party to any
2  Action, do you recall that there was a New
3  York State Court Action against you for
4  wages?
5        A.  You bring that up, I respect
6  that you saw that, I only owed her a hundred
7  bucks.  A hundred bucks in wages.
8        Q.  My question is: as part of the
9  State Law Action, did you receive any
10  documents?
11        A.  Yes, probably, but I can't
12  recall 100 percent.
13        Q.  Let me just scroll down to
14  number 46.  Please read that request and
15  answer and let me know when you are done.
16        A.  47?
17        Q.  46, I said.
18        A.  46?  Okay, what's your question
19  on this.
20        Q.  Besides Leticia, who else was a
21  female car salesperson at Hillside Auto
22  Outlet?
23        A.  There was a lot of female
24  salespersons that worked for me in time, but
25

Page 232

Ishaque Thanwalla

1  I can't recall everybody's name.
2
3        Q.  Now, when Leticia was working,
4  Leticia was a female person --
5        A.  There was more than one, more
6  than one, but I can't recall everybody's
7  name.  I can't recall.
8        Q.  Do you recall receiving a
9  Complaint for sexual or pregnancy
10  discrimination from Lilly or anyone else?
11        A.  Never received anything from
12  Lilly.
13        Q.  How about overall in general
14  from anyone?
15        A.  Received it from Leticia and I
16  was stunned.  After she left, I generally --
17  in July and August we received some kind of
18  pregnancy discrimination, hourly rate, and I
19  was stunned, I was highly stunned.  She was
20  treated like family and she left because she
21  got a better job opportunity elsewhere.  I
22  really took it to heart, because I tried to
23  treat her as my own.  You can see that on
24  the text messages, 90 percent, close to
25  that, I have treated her like my family

Page 233

Ishaque Thanwalla

1  until she left, and she changed colors.  She
2  was coerced.  I don't know.
3        Maybe somebody did that coaching, the
4  only person, her parents or her mother or
5  her father.  They both were in the lawsuit,
6  maybe she was coached to do that, but I have
7  no idea.
8        MS. TROY:  Let's refrain
9            from personal attacks of
10            anyone's father or mother.
11            Let's just try to finish
12            this.
13        THE WITNESS:  I am saying
14            that they are both lawsuit
15            happy.
16        MS. TROY:  I appreciate
17            that, but --
18        THE WITNESS:  She's trying
19            now.
20        MS. TROY:  I appreciate
21            your feedback.  Let's focus
22            for a second on the topic.
23        A.  Yes.
24        Q.  So, question 47 and the
25

Page 234

1      Ishaque Thanwalla
2   response, can you read that question and
3   answer and let me know when you are done.
4         A.  Okay.
5         Q.  The question is, whether any
6   other investigations occurred after Leticia
7   complained, made the complaint?
8         A.  Not that I know of.
9         Q.  I'm going to turn your attention
10  to this portion that is highlighted in the
11  Response.  This portion of the Response says
12  that documents ''were previously withheld
13  solely for requests number 21, 34 43, 44, 45
14  (Angris Guzman only), 58, 75, 79, 80, 85,
15  89, 90, 91, and 92.''  Is that a correct
16  statement to the best of your knowledge?
17        A.  Is that what you requested
18  earlier?
19        Q.  Please focus on my question.
20  The question is: does this statement, is it
21  true to the best of your knowledge, the one
22  that I have highlighted?
23        A.  I can't answer that question yes
24  or no.  I can't, I don't think the question
25  is so in reality, and I am dyslexic.  Can

Page 235

1      Ishaque Thanwalla
2   you elaborate the question and I will answer
3   your question?
4         Q.  Sure.  So your attorney
5   mentioned that some of the Responses, some
6   of the other Responses, that there are
7   various objections, and the Judge, the
8   defendant, clarified that with respect to
9   some of the Responses.  This statement says
10  that there are documents that were not
11  provided because of the objections and then
12  listed the numbers.
13      So, my question for you is, is that
14  correct to the best of your knowledge?  If
15  you don't know, just say that you don't
16  know.
17        A.  I don't know.
18        MS. TROY:  So, if you
19      don't mind, just find out and
20      let me know when you have had
21      a chance to do so.  That
22      would be great.
23      I'm going to ask the
24      reporter to leave a blank
25      space in the transcript for

Page 236

1      Ishaque Thanwalla
2      that information.
3
4      (Insert)
5      MS. TROY:  That is the
6   last question, those are all
7   the questions I have for you
8   today, Mr. Thanwalla.  Thank
9   you.  I appreciate your time.
10
11  [Time noted 5:19 p.m)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 237

1      Ishaque Thanwalla
2   WITNESS      EXAMINATION BY           PAGE
3   Mr. Thanwalla    Mr. Troy          6
4      PLAINTIFF EXHIBITS
5   Number       Description           PAGE
6
7   Ex 1   ID (to be Deemed marked)       6
8   Ex 2   Termination letter       68
9   Ex 3   Text messages       122
10  Ex 4   What'sApp       124
11  Ex 5   Text messages sent using       169
12      Decipher App
13  Ex 6   Decipher chat on What'sApp       169
14  Ex 7   Decipher chat conversations       169
15  Ex 8   Verification of Ishaque       209
16      Thanwalla
17  Ex 9   Final Verified response to       209
18      Interrogatories
19  Ex 10   Final Supplemental Response       209
20
21
22
23
24
25

Page 238

1   Ishaque Thanwalla
2    REQUESTS
3 Number  Description  PAGE
4 1 MS. TROY: Demand No 1 79
5 Is: Provide the text
6  messages between Ishaque
7  Thanwalla and Stidhum.
8 2 MS. TROY: Demand No 2 is: 79
9 Provide WhatsApp messages
10  between Thanwalla and Leticia.
11 3 MS. TROY: Demand No 3 is: 79
12 Provide email exchanges
13  between Ishaque Thanwalla and
14 Stidhum.
15 4 MS. TROY: Demand No 4 is: 81
16 Provide the surveillance
17 footage.
18 5 MS. TROY: Demand No 5 is: 81
19 Provide police report, both
20 of which concerns the robbery
21 that took place at Hillside Auto
22 Outlet.
23 6 MS. TROY: Demand No 6 is: 118
24 provide the name as well
25 as the position for each of

Page 239

1   Ishaque Thanwalla
2 the individuals who the
3 witness identified as numbers
4 21,22,2,23,24,4,13,3,25,17,26
5 27,28,29,20,30,31,32,33,34,19,
6 35,36,38,39 and 37.
7 7 MS. TROY: Demand No. 7 is: 119
8 Provide written documents
9 containing the cars sold,
10 the name of the customer,
11 the bonus and commissions
12 received.
13 8 MS. TROY: Demand No 8 is: 120
14 provide any electronic files
15 or inputs by the office
16 manager or her assistant
17 regarding the same.
18 9 MS. TROY: Demand No 9 223
19 is: Provide the unredacted
20 version of the documents,
21 because there is clearly some
22 confusion as to who and what
23 or even if Mr. Parsons
24 actually was there.
25 10 MS. TROY: Demand No 10 is: 163

Page 240

1   Ishaque Thanwalla
2 Cutting to the chase,
3 if you could just provide
4 the unredacted version of
5 the documents, because there
6 is clearly some confusion as
7 to who and what or even if
8 Mr. Parsons actually was there.
9 11 MS. TROY: Demand No 11 is: 175
10 Mr. Kataev, it appears that
11 this is the Decipher app,
12 and it's a black and white
13 photograph of the actual video.
14 My question is, can you get me
15 the actual video?
16 12 MS. TROY: Demand No 12 is: 224
17 The secondhand dealer license
18 and the certificate of authority
19 that was mentioned and referred
20 to was never produced. I'm making
21 a post-demand request for it.
22 13 MS. TROY: Demand No 13 is: 42
23 (Insert)
24 14 MS. TROY: Demand No 14 is: 66
25 (Insert)

Page 241

1   Ishaque Thanwalla
2 15 MS. TROY: Demand No 15 is: 66
3 (Insert)
4 16 MS. TROY: Demand No 16 is: 74
5 (Insert)
6 17 MS. TROY: Demand No 17 is: 236
7 (Insert)
8
9
10
11
12
13 QUESTIONS MARKED FOR A RULING: PAGE/LINE
14 (None)
15
16
17
18
19
20
21
22
23
24
25

Page 242

```
1
2              ACKNOWLEDGMENT
3
4    STATE OF NEW YORK )
5                      )s.s.
6    COUNTY OF NASSAU  )
7         I, Ishaque Thanwalla, hereby
8    certify that I have read the transcript of
9    my testimony taken under oath in my
10   deposition of February 24, 2023; that the
11   transcript is a true, complete and correct
12   record of my testimony, and that the
13   answers on the record as given by me are
14   true and correct.
15
16        _____
17              ISHAQUE THANWALLA
18
19   Signed and subscribed before me
20   this _____ day of _____, 2023.
21
22
23   _____
24        Notary Public
25
```

Page 243

```
1              C E R T I F I C A T E
2    STATE OF NEW YORK   )
3                        )s.s.
4    COUNTY OF NASSAU    )
5
6         I, LYNN LUCKMAN, a Shorthand
7    Reporter and Notary Public within and for
8    the State of New York, do certify that:
9         THAT the witness whose deposition
10   is hereinbefore set forth, was duly sworn by
11   me, and that such deposition is a true
12   record of the testimony given by such
13   witness.
14         I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage; that I am in no way
17   interested in the outcome of this matter.
18         IN WITNESS WHEREOF, I have
19   hereunto set my hand this 8th day of
20   March, 2023.
21
22        _____
23              LYNN LUCKMAN
24
25
```

Page 244

```
1    Errata Sheet
2
3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
4    DATE OF DEPOSITION: 02/24/2023
5    NAME OF WITNESS: ISHAQUE THANWALLA
6    Reason Codes:
7         1. To clarify the record.
8         2. To conform to the facts.
9         3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25        _____
```