```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3              ----------------------------------------X

4              LETICIA FRANCINE STIDHUM,

5                                    Plaintiff,

6                  -against-            CASE: 21-CV-07163

7              161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
               AUTO OUTLET, and HILLSIDE AUTO MALL INC
8              d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
               JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,
9

10                                   Defendants.

11             ----------------------------------------X

12                                   March 09, 2023

13                                   10:08 A.M.

14

15                 VIRTUAL EXAMINATION BEFORE TRIAL of

16             ANDRIS GUZMAN, via Zoom, a Defendant herein,

17             held at the above-mentioned time and taken

18             before Lynn Luckman, a Notary Public and

19             Shorthand Reporter within and for the State

20             of New York.

21

22

23                      SANDY SAUNDERS REPORTING
                      254 South Main Street, Suite 216
24                        New City, New York 10956
                             (845) 634-7561
25
```

Page 2

```
 1      A P P E A R A N C E S :
 2
 3
 4      TROY LAW, PLLC
 5      Attorneys for the Plaintiff
 6      41-25 Kissena Boulevard, Suite 103
 7      Flushing, New York 11355
 8      BY: Tiffany Troy, Esq.
 9
10      MILMAN, LABUDA LAW GROUP, PLLC
11      3000 Marcus Avenue, Suite 3W8
12      Lake Success, New York 11042-1073
13      BY: Emanuel Kataev, Esq
14      emaanuel@milaborlaw.com
15
16      ALSO PRESENT:  Deana Jennings, Leticia
17      Stidhum and Ishaque Thanwalla (for one hour
18      only).
19
20
21
22
23
24
25
```

Page 3

```
 1                  FEDERAL STIPULATIONS
 2
 3              IT IS HEREBY STIPULATED AND AGREED by
 4      and between counsel for the respective parties
 5      hereto that all objections except as to the
 6      form shall be reserved to the time of trial.
 7              IT IS FURTHER STIPULATED AND AGREED
 8      that the sealing and filing of this deposition
 9      shall be hereby waived.
10              IT IS FURTHER STIPULATED AND AGREED
11      that this examination may be sworn to by the
12      witness being examined before a notary public
13      other than the notary public before whom
14      examination was begun examination was begun.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              Andris Guzman
 2              BY THE COURT REPORTER:
 3              The attorneys participating
 4              in this deposition
 5              acknowledge that I am not
 6              physically present in the
 7              deposition room and that I
 8              will be reporting this
 9              deposition remotely.  They
10              further acknowledge that, in
11              lieu of an oath administered
12              in person, I will administer
13              the oath remotely.  The
14              parties and their counsel
15              consent to this arrangement
16              and waive any objections to
17              this manner of reporting.
18                  MS. TROY:  I consent
19                  MR. KATAEV:  So
20              stipulated.
21
22
23                  *    *    *
24
25
```

Page 5

```
 1          Andris Guzman
 2          A-N-D-R-I-S G-U-Z-M-A-N, a
 3      Defendant herein, after having been duly
 4      sworn by a Notary Public of the State of
 5      New York, was examined and testified as
 6      follows:
 7
 8      BY THE REPORTER:
 9          Q.  Please state your full name
10      for the record.
11          A.  Andris Guzman.
12          Q.  Please state your present
13      address for the record.
14          A.  161-10 Hillside Avenue
15      Jamaica N.Y. 11432
16          Home address is 1230 30th Drive
17      Astoria, N.Y. 11102.
18
19              MS. TROY:  We are
20      going to for the record, we
21      are going to pause the record
22      and the witness is going to
23      show his ID.  Then we're
24      going to mark that as Exhibit
25      16.
```

Page 6

Andris Guzman

1
2    (Plaintiff's Exhibit 16
3    deemed marked for
4    identification)
5        MS. TROY:  The witness
6    will show his ID as per the
7    Judge's Order.
8    (The witness complies and
9    shows his ID).
10       MS. TROY:  That is fine.
11   [Time noted is 10:10 a.m.]
12       The recording is going back
13   on now.
14   EXAMINATION BY
15   TIFFANY TROY:
16       Q.  Mr. Guzman, the address that you
17   stated to the court reporter, is that your
18   business address?
19       A.  I'm sorry?
20       Q.  Was the address that you stated
21   your business address?
22       MS. TROY:  Emanuel, if you
23       don't mind adjusting the
24       volume so that we can hear.
25       MR. KATAEV:  I will put it

Page 7

Andris Guzman

1
2    all the way up.
3        A.  Yes, it is Hillside Auto Outlet.
4        Q.  Can you give me your residential
5    address as well?
6        A.  Sure.  1230 30th Drive, Astoria,
7    New York, 11102.
8        Q.  Have you ever been part of a
9    deposition before?
10       A.  No.
11       MR. KATAEV:  Let's go off
12       the record.
13       (A discussion was held off
14       the record)
15       MR. KATAEV:  Note for the
16       record that the plaintiff is
17       attending virtually.
18       Q.  In that case, I am going to
19   explain what a deposition is and lay down
20   some ground rules going forward; do you
21   understand?
22       A.  Yes.
23       Q.  First, this deposition is for me
24   to ask you questions and for you to answer
25   my questions about the subject matter of

Page 8

Andris Guzman

1
2    this lawsuit; do you understand?
3        A.  Yes.
4        Q.  Specifically, we are talking
5    about the pregnancy discrimination case
6    today and my questions will be focused on
7    the pregnancy discrimination case.  Also,
8    there is another separate wage rate and hour
9    case, but that is separate, do you
10   understand that?
11       A.  Yes.
12       Q.  Since the court reporter has to
13   take down everything that you say, I ask
14   that you give verbal responses, no shaking
15   or nodding of your head and no gestures; do
16   you understand that?
17       A.  Yes.
18       Q.  For the same reason, please
19   speak clearly and loudly when you answer a
20   question; do you understand?
21       A.  Yes.
22       Q.  The court stenographer can only
23   write down when one person is speaking at a
24   time.  Therefore, please don't start
25   answering one of my questions before I stop

Page 9

Andris Guzman

1
2    asking it.  Likewise, I will not start a new
3    question until you have finished answering
4    my last question; do you understand that?
5        A.  Yes.
6        Q.  If you need a break, for
7    example, to get a drink of water or to use
8    the restroom, please feel free to tell me
9    and I will call for a recess.  However,
10   there can be no break between one of my
11   questions and your answer to that question;
12   do you understand that?
13       A.  Yes.
14       Q.  From time to time, your attorney
15   may make objections to my questions.
16   Generally, however, unless your attorney
17   tells you not to respond, you will still
18   have to respond; do you understand that?
19       A.  Yes.
20       Q.  If you don't understand a
21   question, tell me and I'll rephrase it so
22   that you can.  If you don't hear a question,
23   tell me and I'll repeat it so that you do;
24   do you understand that?
25       A.  Yes.

Page 10

Andris Guzman

1
2      Q.  We are here today to gather
3  facts and not speculation.  If you don't
4  know the answer to a question, say so; do
5  you understand?
6      A.  Yes.
7      Q.  Do you understand that you have
8  taken an oath to tell the truth?
9      A.  Yes.
10     Q.  Do you understand that your oath
11 to tell the truth carries the same force and
12 effect as if you were testifying in Court
13 before a Judge?
14     A.  Yes.
15     Q.  Are you currently taking any
16 medications that could prevent you from
17 recalling the truth or testifying truthfully
18 today?
19     A.  No medications.
20     Q.  How about any physical or
21 emotional conditions, are you currently
22 under any physical or emotional conditions
23 that could prevent you from recalling the
24 truth or testifying truthfully today?
25     A.  No, no such conditions.

Page 11

Andris Guzman

1
2      Q.  Besides your attorney, did you
3  speak with anyone in order to prepare for
4  today's deposition?
5      A.  I spoke with my attorney.
6      Q.  Now, please listen to my
7  question carefully.  The question is:
8  besides talking with your attorney, did you
9  speak with anyone else in order to prepare
10 for today's deposition?
11     A.  No.
12        MR. KATAEV:  The
13     defendants object to the
14     plaintiff appearing without
15     going on the video.  We are
16     okay with the fact that she's
17     on the video, but if she
18     doesn't want to, then she has
19     to leave.
20        MS. TROY:  The witness has
21     a right to appear at the
22     deposition.  I am fine with
23     her showing her face to
24     verify that she is the only
25     person in the room.

Page 12

Andris Guzman

1
2        MR. KATAEV:  That is fine.
3        MS. TROY:  The witness is
4     allowed to be present in the
5     deposition.
6        Are you telling me that
7     you are asking her to leave
8     even though she is the
9     plaintiff?
10        MR. KATAEV:  We have asked
11     her to leave only if she
12     refuses to remain on the
13     video for the duration of the
14     deposition.  She can remain
15     on mute, but the video has to
16     be on.  Obviously, if she's
17     not, if she is busy with
18     something else and she has to
19     step out, that is fine.  But,
20     the video has to remain on.
21        MS. TROY:  Ms. Stidhum,
22     are you there?  Can you just
23     open your video feed and
24     maybe just make sure that you
25     are who you say you are.  You

Page 13

Andris Guzman

1
2     can do that and then you can
3     turn off the video.
4        This can also be off the
5     record.
6        MR. KATAEV:  On the
7     record, while we are waiting
8     for the plaintiff to join the
9     video, we have Deana
10     Jennings, the corporate
11     representative joining us.
12        Deana, if you can just
13     identify yourself and keep
14     the volume turned down.  That
15     would be great.
16        MS. JENNINGS:  That is
17     fine.
18        MR. KATAEV:  We have a
19     third party joining.  Let the
20     record reflect that Deana
21     Jennings is joining us by
22     video.  We are now waiting
23     for the plaintiff to join by
24     video and then we can resume.
25        Let's go off the record.

Page 14

Andris Guzman

1
2      (A discussion held was held
3      off the record)
4  Q. Let's go back on the record.
5      MS. TROY:  The time now is
6      10:29 and the record should
7      reflect the attendance of
8      Deana Jennings, who is the
9      corporate representative for
10     the two corporate defendants.
11         Ms. Jennings, I am
12     just confirming that there
13     was no one else in the room
14     with you.
15         MS. JENNINGS:  No, no one
16     else, just me.
17         MS. TROY:  Can you confirm
18     that throughout the duration
19     of this deposition, except
20     during on break, that there
21     will be no one else in the
22     room with you, Ms. Jennings?
23     MS. JENNINGS:  Yes.
24     MS. TROY:  We are now
25     ready to proceed.

Page 15

Andris Guzman

1
2  Q.  Without telling me the contents
3  of your communications, did you, yes or no,
4  talk to your attorney to prepare for today's
5  deposition.
6      A.  Yes.
7      Q.  Did you review any documents in
8  preparation for today's deposition?
9      A.  Yes.
10     Q.  What were those documents, can
11 you describe them for me?
12     A.  I don't remember specifically
13 the details of it.  But, I knew that it had
14 to do--- had to do with the situation at
15 hand.
16     Q.  Can you describe the type of
17 documents even if you don't recall the
18 specific details?
19     A.  Papers about the case.
20     Q.  ''By papers about the case,'' do
21 you mean the written documents that were
22 exchanged between the parties?
23     A.  Yes.
24     Q.  Did you review any documents
25 about the pay that Leticia Stidhum received?

Page 16

Andris Guzman

1
2      A.  No.
3      Q.  How about the pay that other car
4  salespeople received, did the documents that
5  you reviewed include such documents?
6      A.  No.
7      Q.  Did the documents that you
8  reviewed include any documents pertaining to
9  the sales of Hillside Auto Outlet?
10     A.  No.
11     Q.  Did you review any text messages
12 or phone records?
13     A.  At some point, yes.
14     Q.  Can you describe the text
15 messages for me?
16     A.  I don't know how off the top of
17 my head.
18     Q.  Do you recall who were the
19 parties in the text messages; in other
20 words, who sent text messages to whom in the
21 text messages that you did review?
22     A.  Repeat the question for me,
23 please.
24     Q.  Sure.  You said that you don't
25 know off the top of your head, you could not

Page 17

Andris Guzman

1
2  give a description of the text messages.
3      I am now asking you: do you recall
4  between which two people or which parties
5  the text messages were sent to and from?
6      A.  I was checking to see if there
7  was any communications to text messages,
8  through text message.
9      MR. KATAEV:  The question
10     was with whom, right Tiffany?
11     Q.  Specifically, did you have any
12 communications, and let's start from the
13 plaintiff; did you have any text message
14 communications with Leticia?
15     A.  Before, yes, when I used to work
16 at the dealership.  I meant when I used to
17 work at the dealership.
18     Q.  When did you stop working at the
19 dealership?
20     A.  Few years ago.
21     Q.  Do you recall which year?
22     A.  In 2019.
23     Q.  Do you recall which month in
24 2019?
25     A.  The summer, I believe, August, I

Page 18

1             Andris Guzman
2 would say.
3         Q. Right after Hillside Auto, where
4 did you work next?
5         A. I worked at another dealership.
6         Q. What was the name of that
7 dealership?
8         A. That was on Long Island, New
9 York Off Lease.
10        Q. After New York Off Lease, where
11 did you work next?
12        A. Victory Mitsubishi.
13        Q. Do you recall what year and what
14 month you started working at Victory
15 Mitsubishi?
16        A. It was around September of 2020.
17        Q. After Victory Mitsubishi, did
18 you work anywhere else?
19        A. No.
20        Q. Let's turn back to the text
21 messages between you and Leticia.  You said
22 that you checked if there were any text
23 messages; did you find any?
24        A. Yes, we did communicate through
25 text.

Page 19

1             Andris Guzman
2        Q. Have you produced those text
3 messages to your attorney?
4        A. Repeat the question.
5        Q. Have you sent over those text
6 messages to your attorney?
7        A. Yes, I did show him.
8        MR. KATAEV:  The
9           defendants will be producing
10           those messages shortly.
11        Q. When did you show those text
12 messages to your attorney?
13        A. While -- I don't remember the
14 exact time.
15        Q. Was it this year, last year, or
16 a few years ago?
17        A. This year, I believe.
18        Q. Do you recall which month of
19 this year you showed the text messages to
20 your attorney?
21        A. I don't recall if it was January
22 or February.  I don't have the exact time
23 and date exactly.
24        Q. Do you know who the defendants
25 are in this case, Mr. Guzman?

Page 20

1             Andris Guzman
2        A. Yes, I have an idea.
3        Q. Besides your text messages with
4 Leticia Stidhum, the plaintiff, did you ever
5 have any text messages with any of the
6 defendants?
7        A. With any other defendants,
8 meaning --
9        MS. TROY:  May the record
10           reflect that Mr. Kataev is
11           muted and somebody is on the
12           video and I don't know --
13        MR. KATAEV:  I moved my
14           screen over to the right so
15           that he could look at it.
16        Q. What was your response?
17        A. Repeat the question.
18        Q. It was a very simple question,
19 the question is; did you text with any of
20 the other defendants?
21        MR. KATAEV:  About
22           anything?
23        MS. TROY:  When you were
24           working at Hillside Auto.
25        MR. KATAEV:  About

Page 21

1             Andris Guzman
2           anything?
3        Q. Let's start from anything, and
4 then we will narrow it down.
5        A. Okay.  I mean I used to work,
6 absolutely, and we all communicated.
7        Q. By text message?
8        A. Calls or texts.
9        Q. Did some of the text messages
10 concern Leticia Stidhum?
11        A. I don't recall, it was awhile
12 back.
13        Q. When you were talking about how
14 you were checking to see if there were any
15 communications through text messages, did
16 you check to see if you had any text
17 messages, and let's start for instance, with
18 Ishaque Thanwalla?
19        A. No.  I just checked through, I
20 checked hers and I saw that the information
21 about her, she was the first person that was
22 being involved.  I didn't check anybody
23 else's.
24        MS. TROY:  Let's go off
25           the record.

Page 22

Andris Guzman

1
2    (A discussion was held off
3    the record)
4        MS. TROY:  Let's mark this
5    as Demand Number 9.  And I
6    will get to that in a moment.
7    Q.  Mr. Guzman, what is your phone
8  number?
9        A.  What is my phone number?
10   Q.  Yes, correct.
11       A.  You want the exact numbers?
12   Q.  Correct.
13   A.  347 749-0633.
14   Q.  Who is your service provider?
15       MR. KATAEV:  Objection as
16   to relevance.  You can
17   answer.
18       MS. TROY:  Emanuel, you're
19   going to have to figure out
20   your sound situation.
21       MR. KATAEV:  I said
22   ''objection as to relevance
23   but, you may answer.''
24       I just moved the
25   microphone maybe that will be

Page 23

Andris Guzman

1
2    better.
3        Q.  Please answer the question, who
4  is your service provider?
5        A.  I believe is T-Mobile.
6        Q.  Did you have the same phone from
7  2018 until the present day, the same phone
8  number?
9        A.  Yes.
10       Q.  What type of phone is it, do you
11 have an iPhone?
12       MR. KATAEV:  Objection to
13       the form of the previous
14       question.  You can answer the
15       question.
16       A.  iPhone.
17       Q.  Did you use the iPhone from 2018
18 to the present day with a different iPhone
19 but it was an iPhone?
20       A.  Did I have different phones?
21       Q.  Yes.
22       A.  Yes, I did have different
23 phones.
24       Q.  Were the different phones all
25 iPhones?

Page 24

Andris Guzman

1
2    A.  Yes.
3        Q.  During your time at Hillside
4  Auto Outlet, are you familiar with Deana
5  Jennings, the individual who is on the
6  screen?
7        A.  Yes.
8        Q.  During this time, were there
9  ever times when you would text with her?
10       A.  I don't recall.  I don't
11 remember.
12       Q.  During your time working at
13 Hillside Auto, were there times that you
14 would text with Ishaque?
15       A.  Yes.
16       Q.  How about Jory Baron?
17       A.  I don't recall.
18       MS. TROY:  Emanuel, when
19       will you be producing the
20       text messages between Andris
21       Guzman and Leticia Stidhum?
22       MR. KATAEV:  Right this
23       second, actually.
24       Let the record reflect
25       that the defendants have

Page 25

Andris Guzman

1
2    produced the text messages
3    between the witness and/or
4    the plaintiff, as well as the
5    conversation including the
6    witness and plaintiff and
7    other employees.
8        Let the record also
9    reflect that the defendants
10   produced voluntarily to the
11   plaintiff the text messages
12   between the plaintiff and the
13   witness, as well as a group
14   text message between the
15   witness and the plaintiff and
16   other individuals at the
17   dealership.  I have sent it
18   to you by email.
19       Q.  Mr. Guzman, do you have your
20 phone on you or near you?
21       A.  No.
22       Q.  Where is your iPhone?
23       A.  I actually forgot it on my way
24 here.
25       Q.  By ''forgot it on my way here,''

Page 26

Andris Guzman

1
2    what do you mean?
3         A.  I was running because I thought
4    I was going to be late.  So, I forgot it at
5    the house when I left.
6         Q.  Did someone instruct you to
7    leave your phone at home?
8              MR. KATAEV:  Objection to
9              the form.  That is
10             attorney/client privilege.
11             To the extent that any such
12             conversations were held
13             between yourself and myself,
14             I instruct you not to answer
15             that question.
16        Q.  Mr. Guzman, do you understand
17   that you are under oath to tell the truth;
18   is that correct?
19        A.  Correct.
20        Q.  When you said that you ''forgot
21   it,'' on your way here, is that true?
22        A.  Yes.
23             MR. KATAEV:  Objection.
24             Asked and answered.  Please
25             move on.

Page 27

Andris Guzman

1
2         Q.  Did you intentionally leave your
3    phone at your home?
4              MR. KATAEV:  Objection.
5              You are harassing the witness
6              and I instruct the witness
7              not to answer the question.
8              MS. TROY:  On what basis?
9              MR. KATAEV:  You can call
10             the Judge.  Stop harassing
11             the witness.
12        Q.  Do you know the answer to my
13   question?
14             MR. KATAEV:  Objection.
15             You are harassing the
16             witness, and --
17             MS. TROY:  Harassing the
18             witness is not a valid
19             objection.
20             MR. KATAEV:  Yes, it is
21             under rule 30.  Do you want
22             me to point to the specific
23             provision?  He answered your
24             question. Move on or call the
25             Judge.  I am instructing him

Page 28

Andris Guzman

1
2              not to answer.
3              MS. TROY:  We will call
4              the Judge.
5              MR. KATAEV:  That is fine.
6              Let the record also reflect
7              that the defendant Mr.
8              Thanwalla, will be leaving at
9              10:43 a.m.
10             (Mr. Thanwalla left the
11             deposition)
12             (A call was made to the Judge
13             at 10:43 a.m.)
14             MS. TROY:  I will put this
15             on the speaker.
16             (Ms. Troy complies)
17             ''MS. TROY:  Good morning,
18             this is Tiffany Troy, Your
19             Honor.  I have Lynn Luckman,
20             the court reporter with me
21             and Mr. Kataev and his
22             witness, Andris Guzman.  We
23             are doing a deposition right
24             now and he has instructed his
25             witness not to answer a

Page 29

Andris Guzman

1
2              question on the basis of
3              harassing the witness.  I
4              told him that that was not a
5              valid objection and that he
6              needed to respond.  He then
7              directed his client not to
8              respond.
9              THE COURT:  I'm going to
10             put you on hold for a moment.
11             MS. TROY:  To the
12             reporter, if you don't mind
13             taking this all down, again,
14             we're just going to need to
15             ask the Judge for her
16             permission.  If you don't
17             mind, please do me a favor,
18             Lynn and read back the last
19             question before all of the
20             colloquy.
21             (The court reporter
22             complies).
23             Please note for the record
24             that it is now 10:46. And
25             then it goes to 10:49 and

Page 30

Andris Guzman

1
2     that we are on the record
3     waiting for the Judge.
4         THE CLERK:  I'm going to
5     give you the number and the
6     code to get on the line.
7         MS. TROY:  What I'm going
8     to do is that, I'm going to
9     dial and we will just be on
10    speakerphone.
11        MR. KATAEV:  I'm just
12    going to mute myself here,
13    and I'm just going to be on
14    the phone.
15        MS. TROY:  That should be
16    fine.  You will hear it on
17    the speaker?
18        MR. KATAEV:  On the phone,
19    yes.  I'm going to mute
20    myself on the computer in
21    terms of that you are no
22    longer going to be able to
23    hear me.  I'm going to mute
24    my sound so that I don't hear
25    you guys.

Page 31

Andris Guzman

1
2         MS. TROY:  Let's go off
3     the record.
4     (A discussion was held off
5      the record)
6         MS. TROY:  Again, Your
7     Honor, we have the court
8     reporter, Ms. Lynn Luckman on
9     the call and she will be
10    taking down what is being
11    said.
12        THE COURT:  That is fine.
13    I'm still recording this and
14    I'm going to start the sound,
15    and my clerk will note your
16    appearances.
17        I will tell you that
18    this cannot keep happening.
19    You are coming to me with
20    other -- other cases were
21    scheduled, and I will tell
22    you now, this is not going to
23    get you any bonus points
24    calling in every week from a
25    deposition, okay?  You're

Page 32

Andris Guzman

1
2     going to have to figure out
3     how to deal with one another.
4         Just to let you know that
5     this is being recorded.
6         Please tell me the name of
7     the case and state your name
8     for the record.
9         MS. TROY:  Your Honor,
10    this is Tiffany Troy calling
11    from Troy Law.  This is case
12    21-CV-07163.
13        THE COURT:  I am just
14    going to tell you Ms. Troy
15    and Mr. Kataev, let the
16    record reflect that this
17    is not a scheduled
18    conference.  This matter
19    is something that I have
20    been contacted about
21    previously, regarding
22    previous matters in this
23    deposition.  The attorneys
24    have not been able to
25    resolve their disputes.

Page 33

Andris Guzman

1
2         Before we went on the
3     record, I did note that
4     this happened last week,
5     and that again, to have
6     brought a dispute the
7     following week definitely
8     is not scheduled and is
9     unacceptable.  I am not
10    going to continue to
11    babysit two attorneys who
12    can not get their business
13    done.
14        Ms. Troy and Mr.
15    Kataev, that is without being
16    told whose deposition it is
17    or what the problem is.  So,
18    who wants to put on the
19    record why I am being
20    contacted today?
21        MS. TROY:  I would like to
22    put on the record that this
23    is plaintiff's attorney
24    speaking.  We have Andris
25    Guzman as the witness today

Page 34

Andris Guzman

1
2      at plaintiff's deposition of
3      the defendant.  Andris Guzman
4      is on his phone and he has
5      text messages with Leticia
6      Stidhum, the plaintiff as
7      well as an issue, and not
8      withstanding that as well as
9      potentially other defendants
10     including text messages that
11     cover the period in question.
12     He testified that he left his
13     phone at home.  I asked him
14     why and he said ''I forgot
15     it.''  He stated that he
16     thought he was going to be
17     late and he said, ''I forgot
18     it at the house.''
19         I asked him if someone
20     told him to leave it at home,
21     and Emanuel interposed an
22     objection based on
23     attorney/client privilege to
24     the extent that there is any
25     such communications between

Page 35

Andris Guzman

1
2      himself and his client, and
3      he instructed the witness not
4      to answer.
5          Then, I asked if he said
6      that he forgot it and he
7      answered ''yes.''  I then asked
8      him ''did you intentionally
9      leave your phone at your
10     home?''  Then Mr. Kataev again
11     objected and instructed the
12     witness not to answer the
13     question.
14         I would just like to note
15     as well that in the previous
16     week with Jory Baron, the
17     witness also testified that
18     he forgot his phone at home
19     and that the phone contained
20     text messages that included -
21     -
22         THE COURT:  We can get the
23     business accomplished.  When
24     you were making your
25     Discovery demands of the

Page 36

Andris Guzman

1
2      defendants, did you request
3      any emails or text messages?
4          MS. TROY:  Yes, Your
5      Honor.
6          THE COURT:  Were they
7      produced?
8          MS. TROY:  No.  What
9      happened, Your Honor, was
10     that during the deposition of
11     Ishaque Thanwalla, Mr.
12     Thanwalla testified that he
13     had text messages and that is
14     when the defendant produced
15     the texts messages between
16     Leticia and Thanwalla.
17         Then, last week during
18     the deposition of Jory Baron,
19     Mr. Baron testified in fact
20     that he had text messages
21     with Leticia.  Then, when the
22     defendants produced his text
23     messages with Leticia again
24     today, it's the same issue,
25     which is that I asked the

Page 37

Andris Guzman

1
2      question ''are there any other
3      text messages,'' and then were
4      any produced, and I think he
5      said in January or February.
6      Then Mr. Kataev again just
7      turned over the text messages
8      between Mr. Guzman and
9      Leticia today during the
10     deposition.
11         THE COURT:  Stop talking.
12     Enough. I got the picture.
13     Mr. Kataev, you're going to
14     subject your client to
15     multiple depositions here by
16     not turning over these text
17     messages before the
18     deposition.  Why is that
19     going to be a good use of an
20     anyone's time or --
21         MR. KATAEV:  That is not
22     accurate.  Multiple
23     representations seem to be --
24         THE COURT:  I want you to
25     answer my question.  Did your

Page 38

Andris Guzman

1
2      client turn over their text
3      messages?
4          MR. KATAEV:  Yes, they
5      did.  And there are no
6      requests I have no document
7      requests.
8          THE COURT:  Mr. Kataev, I
9      don't have the document
10     request in front of me.
11     Certainly Ms. Troy is
12     entitled to any text messages
13     for the relevant time period.
14         MR. KATAEV:  I --
15         THE COURT:  Mr. Kataev, I
16     am tired of being interrupted
17     by you.
18         MR. KATAEV:  I apologize.
19         THE COURT:  So, the
20     dispute right now, as I
21     understand from Ms. Troy,
22     that we just went over Mr.
23     Guzman and she spoke about
24     it, but she said Mr. Guzman
25     left his phone at home and

Page 39

Andris Guzman

1
2      that he said that there are
3      text messages on that phone
4      that relate to this case.  Is
5      that something that you are
6      contesting, Mr. Kataev?
7          MR. KATAEV:  Not exactly
8      Your Honor, I provided --
9          THE COURT:  What do you
10     mean by "not exactly?" Is it
11     yes or no?
12         MR. KATEV:  I'm trying to
13     answer your question.  Please
14     allow me to.
15         THE COURT:  I am getting
16     very close to saying that I'm
17     not going to accept your
18     representation; do you
19     understand that?
20         MR. KATAEV:  I understand
21     that.
22         THE COURT:  Mr. Kataev, I
23     asked whether or not he has
24     text messages on his phone.
25     Please answer me, and if the

Page 40

Andris Guzman

1
2      answer is that he did not --
3          MR. KATAEV:  He answered
4      yes.  They have been produced
5      between himself and the
6      plaintiff, and that he has
7      voluntarily produced the
8      group text messages,
9      including the plaintiff's
10     witness and other witnesses.
11     She asked, ''do you have text
12     messages, for example, with
13     Ishaque?''  He said --
14         THE COURT:  Mr. Kataev --
15         MR. KATAEV:  Your Honor,
16     may I please finish what I am
17     saying?  I am done
18     interrupting you though, but
19     can I finish?
20         THE COURT:  Go ahead Mr.
21     Kataev.
22         MR. KATAEV:  While the
23     issue was that he was asked
24     ''did you ever have any text
25     messages?''  And he said ''yes.''

Page 41

Andris Guzman

1
2      She did not ask ''did you ever
3      have any text messages
4      provided --
5          MS. TROY:  I did.
6          THE COURT:  Mr. Kataev,
7      did not interrupt you.  Do
8      not interrupt him.
9          MR. KATAEV:  I believe the
10     fastest way to do this is to
11     have the court reporter read
12     the record --
13         THE COURT:  I am not going
14     to do that, that is
15     babysitting two attorneys who
16     cannot get along.
17         I am not going to indulge
18     the fact that he left the
19     phone at his home.  You were
20     saying all of his text
21     messages were produced.  We
22     are going to have to have
23     that in writing, and I'm
24     going to resolve it on what
25     the question and answers

Andris Guzman

1    were.
2          As far as asking Mr.
3    Guzman, Ms. Troy, whether or
4    not he left it at home on
5    purpose or he left it at home
6    because he was told to,
7    please leave that aside.  I
8    really don't care as long as
9    you get the information that
10   you need to get this case
11   litigated.
12         As far as what the
13   objection was about
14   attorney/client privilege, I
15   told you that we are on a
16   guideline on both sides of
17   this case of overdoing
18   everything.  I can't imagine,
19   I really can't imagine Mr.
20   Kataev that you told your
21   client to leave their phone
22   at home.  If you did, I will
23   tell you that that is not a
24   good idea.  If every

Andris Guzman

1    defendant that is called for
2    a deposition left their phone
3    at home on the day of the
4    deposition, that would be
5    something that would concern
6    the Court.  Do you understand
7    me, Mr Kataev?
8          MR. KATAEV:  Your Honor, I
9    understand.  That is not --
10         THE COURT:  Mr. Kataev, do
11   you understand that I have
12   other cases and that this
13   sort of dispute should not be
14   put to the Court?
15         MR. KATAEV:  I do
16   understand, but I did not --
17         THE COURT:  Do you
18   understand that part of this
19   is because again, that you
20   are telling me that he
21   produced all of his text
22   messages that have anything
23   to do with Ms. Stidhum, and
24   you're going to be held to

Andris Guzman

1    that, is that your
2    representation?
3          MR. KATAEV:  Yes, no --
4          THE COURT:  Ms. Troy, is
5    there anything, are there any
6    text messages that they
7    supplied to you but they
8    don't have to stipulate
9    between the defendant that
10   doesn't concern Ms. Stidhum,
11   what is your issue with that?
12         MS. TROY:  I agree with
13   that.
14         THE COURT:  What are we
15   going to do today?  Do you
16   want me to instruct Mr.
17   Guzman to return home to get
18   his phone so that you can
19   then look at his text
20   messages?  Do you want me to
21   ask him if he has the text
22   messages that they say they
23   produced to him, and you can
24   ask whether there are any

Andris Guzman

1    additional text messages that
2    have not been produced.  If
3    there are, you can make a
4    Motion to compel where they
5    should turn them over, and
6    you will have what you need
7    for a second deposition.  I
8    will consider that.
9          MS. TROY:  Understood.  We
10   will do the latter option.
11         THE COURT:  The latter
12   option?  You're going to ask
13   him whether he turned over
14   all the text messages that
15   concern Ms. Stidhum?
16         MS. TROY:  Yes.
17         THE COURT:  I will stay on
18   the line while you ask the
19   question so that I do not get
20   a call back.
21         MS. TROY:  Understood,
22   Your Honor.
23         THE COURT:  Now, you can
24   go back on the record Ms.

Page 46

Andris Guzman

1
2      Court reporter.''
3      Q. Mr. Guzman, are you here?
4      A. Yes, I am here.
5      Q. Besides the text messages
6  between you and Ms. Stidhum, as well as the
7  group message that your attorney just
8  emailed to me 30 minutes ago, are there any
9  other additional text messages, meaning
10 between yourself as well as the defendant
11 that concern Ms. Stidhum's employment at
12 Hillside Auto Outlet?
13     A. No additional text messages.
14     ''THE COURT: Is there
15     anything else that you need
16     to ask while I am on the
17     record, on the line Ms. Troy?
18         MS. TROY: No, Your Honor.
19     Thank you for your time.
20         THE COURT: Mr. Kataev, I
21     will tell you if any other
22     witnesses of yours forget
23     their phone, I will not be
24     pleased to receive a phone
25     call; do you understand?

Page 47

Andris Guzman

1
2         MR. KATAEV: I just want
3      to put one quick thing on the
4      record, Your Honor.
5         THE COURT: Yes.
6         MR. KATAEV: All of the
7      questions that were asked of
8      my witness were answered.
9      When the witness said that he
10     left his phone at home,
11     plaintiff's counsel reminded
12     him that he is under oath and
13     started to badger and harass
14     him.
15         THE COURT: Oh, please,
16     Mr. Kataev.
17         Look in the mirror when
18     you talk about badgering, the
19     two of you have to get along.
20     How many times do I have to
21     say it? I don't have time
22     for lawyers that make
23     themselves the center of the
24     litigation. Do I need to say
25     it to you again?

Page 48

Andris Guzman

1
2         MR. KATAEV: No. I'm just
3      representing on the record
4      that there was badgering of
5      the witness and it was
6      completely without any
7      authority.
8         THE COURT: That's great
9      to hear that Mr. Kataev. I
10     was in a conference when I
11     was interrupted with this
12     call. I was on another case
13     and I don't have to speak to
14     you about the other partners
15     at your firm.
16         I am not asking, I'm
17     not saying it's your fault.
18     I'm saying that the toxic mix
19     of you and Ms. Troy is more
20     than the Court can bear. It
21     is not a good use of
22     resources for the Court to
23     get these calls about these
24     issues. The parties should
25     be able to resolve these

Page 49

Andris Guzman

1
2      issues. Ms. Troy, do you
3      understand?
4         MS. TROY: Yes, Your
5      Honor. I understand.
6         THE COURT: Mr. Kataev, do
7      you understand?
8         MR. KATAEV: Yes, Your
9      honor.
10        THE COURT: This
11     deposition shall proceed.
12     Thank you. This matter is
13     now adjourned. Please note
14     for the record that it is now
15     11:22 a.m.''
16     Q. Mr. Guzman, during the break,
17 did you discuss your testimony with your
18 attorney; yes or no?
19     A. No.
20     Q. Have you ever been a party to
21 any civil proceeding?
22     A. Explain.
23     Q. Besides this case, were you a
24 plaintiff or a defendant in any other case?
25     A. Does a divorce count? I don't

Andris Guzman

1  know.  That's as close as I think --
2
3      Q.  Besides the divorce, have you
4  ever been a party to any other civil
5  proceeding?
6      A.  Not that I remember.
7      Q.  Have you ever been arrested
8  before?
9      A.  No.
10      Q.  When did you start working for
11  Hillside Auto?
12      A.  Beginning of 2018, I think.
13      Q.  Do you recall which month?
14      A.  The beginning of the year.
15      Q.  Besides the address that you
16  gave at the beginning of this deposition,
17  have you lived anywhere else in the past 5
18  years?
19      A.  No.  That has been my address.
20      Q.  What is your highest level of
21  education?
22      A.  Some college, I did go to the
23  college.
24      Q.  What was your position at
25  Hillside Auto when you began in 2018?

Andris Guzman

1
2      A.  Do you mean Hillside Auto
3  Outlet?
4      Q.  Right.  What was your position
5  there?
6      A.  Sales manager.
7      Q.  Did your position ever change
8  from the time you began working until the
9  end date, until the end of your employment
10  at Hillside Auto?
11      A.  I began as the sales manager,
12  then got promoted to general sales manager.
13      Q.  When were you promoted?
14      A.  It's been a few years, I'm
15  trying to remember -- I think it's towards
16  the end of the summer, I will say of the
17  same year, 2018.
18      Q.  What were your responsibilities
19  as the sales manager?
20      A.  What was my responsibilities?  Is
21  that the question?
22      Q.  Yes.
23      A.  I was making sure that I was in
24  charge of the sales that were being made at
25  the dealership.  Meaning, I used to make

Andris Guzman

1
2  sure that people bought cars and that they
3  went through the process.
4      Q.  How about when you were the
5  general sales manager?
6      A.  The general sales manager meant
7  that I was also involved in finance.
8      Q.  By ''finance,'' what do you mean?
9      A.  Working with the banks and
10  getting people approved for loans.
11      Q.  Does that include running the
12  credit for the customers?
13      A.  Running the credit for the
14  customers is part of purchasing a vehicle.
15      Q.  Did you run the credit when you
16  were the sales manager?
17      A.  Yes.
18      Q.  You continued running the credit
19  as the general sales manager; is that
20  correct?
21      A.  Every manager at the store has
22  access to running credit, it's part of
23  buying and getting all the stipulations
24  needed to get a loan and purchasing the
25  vehicle, right?

Andris Guzman

1
2      Q.  Besides what you just described,
3  were there any other additional
4  responsibilities that we have not discussed
5  yet?
6      A.  Aside from being in charge of
7  making sure people bought vehicles, no.
8      Q.  Do you recall how many cars were
9  sold by the dealership on a monthly basis?
10      A.  I don't recall exactly, it's
11  been a few years.
12      Q.  How about a range, let's start
13  from the busier months, how many cars would
14  Hillside Auto Outlet sell?
15      MR. KATAEV:  Objection.
16      Asked and answered, but you
17      can answer the question.
18      A.  I don't remember exactly, the
19  exact number.
20      Q.  Do you recall what the store
21  hours were at Hillside Auto?
22      A.  Not the specific times, no.  It
23  has been a few years, I don't.
24      Q.  Do you recall if the car
25  salespeople were working the same hours as

Page 54

Andris Guzman

1  the store hours?
2
3      A.  I do remember that everybody had
4  a schedule.  But, I don't remember what the
5  schedule was because it's been a while.  I
6  don't -- I don't remember the specifics.
7      Q.  Were there times when the car
8  salespeople needed to stay past their
9  scheduled hours in order to complete a deal?
10     MR. KATAEV:  Objection as
11         to relevance.  You can
12         answer.
13     A.  Can you repeat the question for
14  me?  I just want to make sure that I
15  understand it correctly.
16     MS. TROY:  Ms. Court
17         reporter, if you don't mind
18         reading back the last
19         question.
20     (The reporter read back the
21         last question)
22     A.  Yes.  You do not get to leave
23  before you complete the sale, I mean, the
24  sale has to get finished.  Once the sale gets
25  finished, then you go home.

Page 55

Andris Guzman

1
2      Q.  When the customer comes in, what
3  is the process for them to obtain a vehicle?
4      A.  Do you mean how the entire sales
5  process works?  Just so that I have a better
6  understanding.
7      Q.  Yes.  The entire sales process,
8  and around how much time each step of the
9  process takes.
10     A.  Everybody -- every individual
11  has different situations.  That is the
12  reason that you can never measure how long
13  it's really going to take for each client.
14  But, considering their purchase and car is
15  the second biggest purchase after you buy a
16  house, there is a lot that is involved in
17  getting a vehicle.
18     Initially, the customer would have to
19  decide after they come into the store what
20  vehicle they want to purchase, and that
21  entails checking different options to see
22  what the people like or don't like.  You
23  have to see if you have the inventory first,
24  you have to pick out a vehicle.  Then, you
25  will get to the next step if they want to

Page 56

Andris Guzman

1
2  buy the vehicle in cash or finance the
3  vehicle.  That is another step that they
4  would have to do.
5      After that, they decide what vehicle
6  they want to take, the next step will be
7  assuming that they either want to buy the
8  vehicle for cash or finance the vehicle.  If
9  they decide to go the finance route, then
10  they will have to complete an application, a
11  finance application.  After the customer
12  completes the financing application, they
13  will have to provide all their information
14  that is required for us to complete a
15  vehicle purchase and to get them approved
16  with the bank.  Of course, they have to go
17  through very different verifications for us
18  to be able to complete everything.
19     So, before we even check their
20  information, we have to verify the license,
21  the banks are requiring the pay stubs, most
22  of the time people don't even have a pay
23  stub with them.  They will be told to get
24  their pay stubs for us even after they get a
25  pay stub, we will have to verify to see if

Page 57

Andris Guzman

1
2  the pay stubs are legitimate.  There is a
3  lot of fraud involved, and that is the
4  biggest concern right now that people having
5  different kinds of access and we don't know
6  what is real or not.  There's a lot of
7  things that go into it when you come to
8  verify, to make sure that everything is
9  compliant.
10     Anything additional that the bank
11  requires, we will get all of that
12  information.  And then, that gets inputted
13  into the system, which is the system that we
14  have so that we can get the approval with
15  the bank.  That is when we actually go and
16  check the credit, we check the credit, and
17  we see if there are any additional
18  verifications.  There are times that you are
19  going to see, you're going to see more
20  recently, that there are a lot of fraud
21  alerts and if there is a fraud alert, that
22  means that extra verification that we have
23  to do and put that in place.
24     The client will get calls from the bank
25  to make sure that they are the ones

Andris Guzman

1
2  requesting it, they are the one requesting
3  financing.  It becomes tough when the
4  numbers from the credit does not match the
5  numbers that the customer is giving.  If the
6  number is not the same, they will have to
7  update it in the bureaus, and then it's like
8  TransUnion and that can take 24 to 48 hours
9  to update it.  Plus, they will be able to --
10 they will not be able to buy the vehicle on
11 the spot.  They will have to wait, and if
12 the numbers do match, then the bank still
13 has to call and verify everything with them.
14 There are guidelines, and it's during --
15 even when the bank is closed, they won't be
16 able to buy the vehicle on the spot.
17     We do not control the process; we are
18 not the ones financing the money.  Like I
19 said, there is a lot of variables that comes
20 in when you buy a vehicle.  But, assuming
21 everything goes through and you are able to
22 run the credit, you are able to verify
23 everything, get all the documentation that
24 you need so that you can process the loan.
25 Then, you send everything to the bank and

Andris Guzman

1
2  wait for their approval.  When the approval
3  comes in, then they will let us know if
4  there is any additional information that is
5  required.
6      Once we have the approval from the bank,
7  the customer is supposed to go to the office
8  to speak with the loan officer or the
9  finance manager.  At that point, then the
10 finance manager will let them know the
11 numbers based on the vehicle that they have
12 picked.  If by that point the customer
13 doesn't like the numbers, either if it's too
14 expensive or if they change their opinion,
15 they either have the option to chase the car
16 for a lower payment, they can either decide
17 that they don't want the vehicle anymore and
18 they could even actually walk out because it
19 is not guaranteed during the sale.  It is
20 not guaranteed that the customer is even
21 going to take the vehicle home with them.
22     We haven't even discussed insurance, and
23 everything else that comes after the money.
24 Sometimes they don't even have the money,
25 and they have to wait for Friday to get the

Andris Guzman

1
2  money.  They are not even able to get the
3  car and they have to wait longer for them to
4  be able to get the vehicle.
5      Those things, we don't control, people
6  have, whether people have the money or not,
7  or even if the car -- the credit, it's not
8  even for them to be able to get an auto
9  loan.  They will have to get a co-signer.
10 If they are not able to produce the co-
11 signer the right way, meaning that there are
12 times when the co-signer is not available
13 today and they will come back to the
14 dealership on Friday or next week or next
15 month.  We don't control those things.
16 After they decide that they want to get the
17 car, assuming everything went through the
18 bank, the approval, you look at the numbers
19 and you have to do the insurance.
20     You have to do the insurance, and that
21 is another step as well.  They have to
22 appraise the car and see what the value of
23 the vehicle is and so forth.
24     Then, the DMV part, everything has to be
25 in compliance with the insurance of getting

Andris Guzman

1
2  all the proper documentation so that we can
3  do the registration of the vehicle.  That is
4  also another step that you need in buying a
5  vehicle.
6      After everything gets done, then it's
7  printed and we have to put everything on
8  paper and the people have to sign the
9  contract.
10     The loan officer will go over all of the
11 information and make sure that the customer
12 understands all the numbers.  After they
13 agree, they will sign the document and at
14 the end, they will take possession of the
15 car.
16     But, to answer your question, sometimes
17 it could take 3 hours, 4 hours, 6 hours or
18 days depending on the situation.  We wish
19 the process was quicker, trust me.  But, we
20 are in the business of selling cars and we
21 want to make money.  We want to make sure
22 that everybody makes money at the end of the
23 day and we do not control and we cannot
24 guess or foresee who is going to come
25 through the door and what their situation

Page 62

Andris Guzman

1  is.
2  Q.  When you were working for
3  Hillside Auto, was Leticia the only female
4  car salesperson on the floor?
5  A.  I don't recall.
6  Q.  Are you familiar with the
7  Dealertrack system?
8  A.  Yes.
9  Q.  While you were the sales manager
10  and before your promotion to general sales
11  manager, did you run Dealertrack?
12  MR. KATAEV:  Objection to
13  form.  You can answer the
14  question.
15  A.  What do you mean by ''running
16  Dealertrack?''
17  Q.  Did you have access to
18  Dealertrack, did you run the credit for the
19  customers on the Dealertrack system?
20  A.  If I had access to Dealertrack
21  at that point?  Yes, I did have access to
22  Dealertrack.
23  Q.  Did you run the credit for the
24  customers on the Dealertrack system?

Page 63

Andris Guzman

1  A.  When you mean ''running the
2  credit,'' do you mean checking the people's
3  information for the purpose of getting a
4  loan?  Is that what you mean?
5  Q.  Correct.
6  A.  Yes.
7  Q.  In other words, you had both
8  Dealertrack access, as well as you checked
9  the customer's information from the
10  beginning of your employment with Hillside
11  Auto, right?
12  A.  I got employed as a manager.
13  So, as the manager, you get Dealertrack
14  access, correct.
15  Q.  Let's walk back for a second.
16  Are you familiar with Hillside Auto Mall?
17  A.  That is the store that is close
18  to ours, that is another store.
19  Q.  During your time as the sales
20  manager, did Ishaque Thanwalla ever tell you
21  that Hillside Auto Outlet employees, that if
22  they had to get a car, that they should try
23  to have the customer choose a car at
24  Hillside Auto Mall if they did not find a

Page 64

Andris Guzman

1  car that they liked at Hillside Auto Outlet?
2  MR. KATAEV:  Objection to
3  the form.  You can answer.
4  A.  We used to sell cars from our
5  lot at Hillside Auto Outlet, and correct me
6  if I am wrong, but you are able to purchase
7  vehicles from other dealerships.  Let's say
8  there is a car that a customer wants, and we
9  don't have the vehicle, we can buy the
10  vehicle from another dealership.  It is
11  allowed by the Department of Motor Vehicles
12  as a dealership.  The dealership can buy a
13  vehicle from different dealerships.
14  Q.  What is your understanding of
15  the relationship between Hillside Auto
16  Outlet and Hillside Auto Mall?
17  A.  My understanding is that maybe
18  there was a guy or two guys that they had in
19  common that owned the place.
20  Q.  Due to that common ownership or
21  partial common ownership, as you called it,
22  is it correct to say that there is a
23  preference that if there is a car that a
24  customer cannot find on your lot at Hillside

Page 65

Andris Guzman

1  Auto Outlet that you try to find it at
2  Hillside Auto Mall?
3  A.  What I am saying is that we can
4  buy any vehicle from any established
5  dealership.  That is allowed by the
6  Department of Motor Vehicles.
7  Q.  Yes, please answer my question.
8  The question was: was there a preference to
9  Hillside Auto Mall, versus the other
10  dealerships close by?
11  A.  We were able to get inventory
12  from other dealerships as long as they
13  provided us with the car.  No preference,
14  ma'am.
15  Q.  Between March and August of
16  2018, how many cars were sold per month at
17  Hillside Auto Outlet?
18  A.  I don't recall.
19  Q.  What about between September of
20  2018 and February of 2019, how many cars
21  were sold per month?
22  MR. KATAEV:   Objection.
23  Asked and answered.  You can
24  answer the question.

Andris Guzman

1
2       A.  I don't recall.
3       Q.  Are you familiar with Leticia
4    Stidhum?
5       A.  Repeat the question.
6            MS. TROY:  Ms. Court
7         reporter, if you don't mind
8         reading back the question.
9         (The reporter read back the
10        last question)
11      A.  Familiar as if she used to work
12   at Hillside Auto Outlet?
13      Q.  Right.
14      A.  Yes, she used to work at
15   Hillside Auto.
16      Q.  What is your opinion of her as a
17   car salesperson?
18           MR. KATAEV:  Objection.
19        Calls for opinion testimony.
20        You can answer the question.
21      A.  It has been a few years and I
22   don't remember all the details.  But, I
23   think she was good.
24      Q.  Who was the general sales
25   manager before you?

Andris Guzman

1
2       A.  Her name is Jeanique.
3       Q.  Before working at Hillside Auto
4    Outlet, did you work for Ishaque at another
5    dealership?
6       A.  We worked together before, yes.
7       Q.  From when to when?
8            MR. KATAEV:  Objection.
9         You can answer the question.
10      A.  It's been a few years.  It could
11   have been between 8 months to 10 months.
12      Q.  Do you recall what the name of
13   the dealership was that you worked with
14   Ishaque before Hillside?
15      A.  Queens Auto Mall, we used to
16   work together.
17      Q.  At that time, what was his
18   position at Queens Auto Mall?
19      A.  I don't recall the exact title.
20      Q.  Was he the owner or was he the
21   manager?
22      A.  More towards the manager, but I
23   don't recall what his specific role that he
24   played there was.  I don't know.
25      Q.  How about yourself, what was

Andris Guzman

1
2    your role that you played there?
3       A.  I used to do sales.
4       Q.  Were you a sales manager or a
5    salesperson?
6       A.  Salesperson, selling cars.
7       Q.  At the time when you were hired,
8    was there a bonus structure in place for the
9    Hillside Auto Outlet employees?
10      A.  I didn't handle the money part.
11      Q.  Who handled the money part at
12   Hillside?
13      A.  General manager.
14      Q.  Who was the general manager?
15      A.  Ishaque.
16      Q.  Who hired you as the sales
17   manager?
18      A.  Ishaque.
19      Q.  As the sales manager, did you
20   have the power to hire employees?
21      A.  The general manager was in
22   charge of hiring employees.
23      Q.  Did you have the power to fire?
24      A.  The general manager had the
25   power to fire.

Andris Guzman

1
2       Q.  Did you have the power to
3    discipline employees?
4       A.  General manager had the power to
5    discipline employees.
6       Q.  As the sales manager, did you
7    ever hire anyone?
8       A.  No.
9       Q.  How about firing anyone?
10      A.  No.
11      Q.  How about disciplining anyone?
12      A.  No.
13      Q.  While you were the sales
14   manager, did the salespeople have a fixed
15   break time?
16           MR. KATAEV:  Objection as
17        to relevance.  You can
18        answer.
19      A.  I don't recall when their break
20   was or what specific times they were -- it's
21   been a few years.
22      Q.  At the time, how were employees
23   times tracked?
24           MR. KATAEV:  Objection as
25        to relevance.  You can

Page 70

Andris Guzman

1
2     answer.
3         A.  I don't remember the exact
4     mechanics of it.
5         Q.  Earlier, you mentioned that you
6     may have had texts with Jory Baron.  To your
7     knowledge, what was his role at Hillside?
8             MR. KATAEV:  Objection to
9         form and assuming facts not
10        in evidence.  You can answer.
11        A.  Jory Baron, you mentioned, is
12    that right?
13        Q.  Yes.
14        A.  To my belief, he was one of the
15    owners at Hillside Auto Outlet.
16        Q.  How did you know that he was one
17    of the owners?
18        A.  I believe he did introduce
19    himself back in the day.
20        Q.  He introduced himself as the
21    owner; is that correct?
22        A.  I don't recall him specifically
23    directing that he was one of the owners.  But
24    I was able to, somewhere along the line, he
25    mentioned that he was the owner.  I don't

Page 71

Andris Guzman

1
2     remember if he told me that directly or not.
3         Q.  To your knowledge, did Jory
4     Baron have the power to hire employees?
5         A.  Ishaque was the general manager
6     of the store.  So, I believe Ishaque is the
7     person that has the power of hiring
8     employees.
9         Q.  Does Jory, also have the power
10    in addition to Ishaque?
11        A.  Ishaque was the person in charge
12    of the dealership.
13        Q.  Does Jory also have the power in
14    addition to Ishaque?
15        A.  Ishaque was the person in charge
16    of the dealership.  Meaning if someone had
17    to get hired, they had to go to Ishaque.
18        Q.  My question is: did Jory Baron
19    also have the power to hire?
20            MR. KATAEV:  Objection.
21        Asked and answered.  You can
22        answer.
23        A.  What was the question, if Jory
24    had the power to hire somebody?
25        Q.  Yes.

Page 72

Andris Guzman

1
2         A.  He was one of the owners.
3         Q.  Is that a ''yes?''
4         A.  I believe he can, but I believe
5     Ishaque was the person in charge of the
6     dealership.
7         Q.  How about the power to fire
8     employees, did he also have the power to
9     fire employees?
10            MR. KATAEV:  Objection.
11        You can answer.
12        A.  Like I keep mentioning, Ishaque
13    was the person that was running the
14    dealership, and to my knowledge, Jory was
15    one of the owners.  But the person that was
16    in charge was Ishaque.
17        Q.  Do you believe he could fire
18    employees, Jory?
19        A.  He was one of the owners.
20            MR. KATAEV:  Objection.
21        A.  He was one of the owners and has
22    the power to do so.
23        Q.  Do you know Deana Jennings, and
24    if so, how are you familiar with her?
25        A.  She was --- she worked at

Page 73

Andris Guzman

1
2     Hillside Auto Outlet.
3         Q.  Do you recall when she stopped
4     working for Hillside?
5         A.  I don't recall.
6         Q.  Did she stop working at Hillside
7     Auto Outlet before you left Hillside or
8     after you left Hillside?
9         A.  I don't recall the timeframe
10    either.
11        Q.  Do you recall what her position
12    was?
13        A.  I believe, if I'm not mistaken,
14    controller.
15        Q.  As the controller, what were her
16    responsibilities?
17        A.  I am not familiar with the term
18    of responsibilities.
19        Q.  Did you have any interaction
20    with her while you were the sales manager
21    and general sales manager at Hillside?
22        A.  Very few times we spoke, job-
23    related.
24        Q.  Was she at Hillside Auto Outlet
25    on a day-to-day basis?

Andris Guzman

1
2       MR. KATAEV: Objection.
3     Vague, you can answer.
4     A. I don't recall.
5     Q. Did she work for both Hillside
6 Auto Outlet and Hillside Auto Mall at the
7 same time?
8     A. I don't have that information
9 and I'm not able to answer that.
10     Q. When is your birthday?
11     A. My birthday?
12     Q. Yes.
13     A. You want the day, year, and
14 month, everything?
15     Q. Correct.
16     A. ███████████████████████.
17     Q. Are you familiar with David
18 Baron?
19     A. He was -- yes, yes.
20     Q. How are you familiar with him?
21     A. David Baron, he used to be one
22 of the owners.
23     Q. How about Josh Aaronson?
24     A. Josh Aaronson was one of the
25 owners as well.

Andris Guzman

1
2     Q. To your knowledge, did David
3 Baron have the power to hire employees?
4     A. I wasn't the person in charge of
5 the dealership when he came to operations,
6 he would be the person to hire that would
7 determine those positions.
8     Q. But, David Baron who passed
9 away, did he have the power to hire and fire
10 employees?
11     A. They were one of the owners, you
12 mean?
13     Q. I mean, how about Josh Aaronson,
14 is your answer the same which is that as one
15 of the owners he had the power to hire and
16 fire employees?
17       MR. KATAEV: Objection to
18     the form.
19     A. He was one of the owners also.
20     Q. Is that a yes?
21       MR. KATAEV: Objection.
22     You can answer.
23     A. Yes, yes.
24     Q. With regard to my previous
25 question about David Baron, is your answer

Andris Guzman

1
2 that he did have the power to hire and fire
3 employees, is that also a yes?
4       MR. KATAEV: Same
5     objection. You can answer.
6     A. Yes, he was one of the owners.
7     Q. While you were working at
8 Hillside, were you frequently at the podium?
9     A. At the podium? When you say
10 ''podium,'' is at the podium stage, that you
11 mean which is within the location at the
12 dealership?
13     Q. Yes.
14     A. Yes, yes. I am familiar with
15 the podium.
16     Q. During your time working at
17 Hillside, have you ever seen Ishaque provide
18 his Dealertrack password to Leticia?
19     A. No.
20     Q. Have you ever seen Ishaque train
21 Leticia personally on the Dealertrack
22 system?
23     A. Repeat that again. What was the
24 question?
25       MS. TROY: Ms. Court

Andris Guzman

1
2 reporter, if you don't mind
3 reading back the last
4 question.
5     (The reporter read back the
6     last question)
7     A. No.
8     Q. At any time, have you seen
9 Leticia use the Dealertrack system to help
10 run the credit for Hillside Auto customers?
11     A. No.
12     Q. Were there any other posters at
13 Hillside Auto?
14     A. What posters, what do you mean
15 by ''posters?''
16     Q. For instance, are there any
17 posters about the minimum wage?
18     A. Sure. I mean every business has
19 it, it's supposed to have a poster of
20 minimum wage. I don't remember where it
21 was, but I am pretty sure yes, we did.
22     Q. What type of posters are at the
23 store?
24     A. I don't know right now. I've
25 been out of the store a few years, so I

Page 78

1           Andris Guzman
2  don't know.
3           Q.  Do you currently work for any of
4  the individually named defendants?
5           A.  If I work for any of them?
6  Right?
7           Q.  Yes.
8           A.  No.
9           Q.  To your knowledge, did Hillside
10  Auto have any written policies regarding
11  discrimination?
12           A.  At that time I believe we did.
13           Q.  What was that policy?
14           A.  That discrimination is not
15  allowed.
16           Q.  Do you recall when Ishaque
17  traveled from the United States to Pakistan
18  in 2018?
19           A.  I don't have the exact dates.
20           Q.  Do you recall if Ishaque
21  continued to work at Hillside Auto, or did
22  he take a break before leaving to Pakistan
23  from the United States?
24           A.  I'm sorry.  What was that?
25  When?

Page 79

1           Andris Guzman
2           Q.  In 2018.
3           A.  (No response)
4           MR. KATAEV:  Let the
5       record reflect, and that
6       probably was not heard, but
7       the witness said ''I don't
8       understand the question.''
9           Q.  Without revealing the contents
10  of the communications with your attorney,
11  for how long did you speak with your
12  attorney in preparation for today's
13  deposition?
14           MR. KATAEV:  Asked and
15       answered.  You can answer the
16       question.  Objection to that.
17           A.  We met a few days ago.
18           Q.  The question is: for how much
19  time?
20           A.  I don't have any specific time.
21  I mean, it could have been 30 minutes, 1
22  hour or 2 hours.  I don't have the specific
23  time.
24           Q.  Have you ever interviewed any
25  prospective employees at Hillside Auto?

Page 80

1           Andris Guzman
2           A.  Not that I recall, I was not in
3  charge of hiring employees.  I was not the
4  general manager.
5           Q.  Are you familiar with a DMV
6  clerk named Lily?
7           MR. KATAEV:  Objection to
8       relevance.  You can answer.
9           A.  I can't recall.  It's been a few
10  years.
11           Q.  Do you recall in 2018 that the
12  DMV clerk Lily left Hillside Auto because
13  she was pregnant?
14           A.  I don't recall.
15           Q.  Do you recall Ishaque
16  disciplining Lily who was pregnant at the
17  time?
18           A.  I don't recall.
19           MR. KATAEV:  Objection as
20       to relevance to this entire
21       line of questioning.  You can
22       answer.  You already
23       answered.
24           Q.  Do you recall Lily's last name?
25           A.  I don't recall her last name.

Page 81

1           Andris Guzman
2           MR. KATAEV:  The witness
3       just told me that he needs to
4       use the restroom.
5           MS. TROY:  Sure.  Is 10
6       minutes good for you?
7           THE WITNESS:  Yes.  Just
8       to use the bathroom.
9           MS. TROY:  We can come
10       back at 12:20 and you guys
11       can also move to the
12       conference room.
13           MR. KATAEV:  Thank you.
14       (A recess was taken from
15       12:00 until 12:10 p.m.)
16           MS. TROY:  Ms. Court
17       reporter, can you read back
18       the last question.
19       (The reporter read back the
20       last question)
21           MR. KATAEV:  Are you
22       ready?
23           THE WITNESS:    Yes, I am
24       ready.
25           Q.  Do you recall a robbery that

Page 82

| | |
|---|---|
| 1 | Andris Guzman |
| 2 | took place at Hillside Auto? |
| 3 | A. I don't recall right now. |
| 4 | Q. What was Leticia Stidhum's |
| 5 | position, was it a salesperson? |
| 6 | MR. KATAEV: Objection to |
| 7 | the form. You can answer. |
| 8 | A. Yes. |
| 9 | Q. What were her responsibilities |
| 10 | as a car salesperson? |
| 11 | A. The responsibility is to sell |
| 12 | cars. |
| 13 | Q. Was she ever promised a sales |
| 14 | manager position? |
| 15 | A. I have no information of that. |
| 16 | Q. What was the relationship |
| 17 | between Ishaque and Leticia? |
| 18 | A. What do you mean by |
| 19 | ''relationship?'' |
| 20 | Q. Can you describe their working |
| 21 | relationship. |
| 22 | A. Ishaque was the supervisor, |
| 23 | meaning the manager, the person in charge, |
| 24 | and she was an employee. |
| 25 | Q. Did Ishaque ever call Leticia |

Page 83

| | |
|---|---|
| 1 | Andris Guzman |
| 2 | his ''daughter?'' |
| 3 | A. I don't recall the specifics of |
| 4 | that. |
| 5 | Q. Do you recall why you left |
| 6 | Hillside? |
| 7 | A. Pursuing better employment |
| 8 | opportunities. |
| 9 | Q. Do you recall how much car |
| 10 | salespeople were paid? |
| 11 | A. No. I was not in charge of the |
| 12 | money. |
| 13 | Q. Were they paid a wage along with |
| 14 | some amount of commission? |
| 15 | A. I don't recall their payment |
| 16 | structure. |
| 17 | Q. While you were working at |
| 18 | Hillside Auto, was there a board where the |
| 19 | car salespeople would tally the number of |
| 20 | cars that they sold for the month? |
| 21 | A. I don't recall. |
| 22 | Q. How did Hillside Auto verify the |
| 23 | pay for the car salespeople? |
| 24 | A. I don't remember the specifics |
| 25 | right now. |

Page 84

| | |
|---|---|
| 1 | Andris Guzman |
| 2 | Q. Do you recall how many cars |
| 3 | Leticia sold? |
| 4 | A. I don't recall how many cars she |
| 5 | sold. |
| 6 | Q. Did you run the credit for |
| 7 | customers back at Queens Auto Mall as well? |
| 8 | A. No. |
| 9 | Q. You began running the credit for |
| 10 | the cars, the customers at Hillside Auto; is |
| 11 | that correct? |
| 12 | A. When you say run the credit, |
| 13 | that means managers having access? |
| 14 | Q. Did -- |
| 15 | A. (Continuing) The managers were |
| 16 | the ones that could check people's |
| 17 | information and profile. |
| 18 | Q. You are talking about managers |
| 19 | who can check people's information and |
| 20 | profile. Who were those people at Hillside |
| 21 | Auto while you were working there? |
| 22 | A. Are you asking who were the |
| 23 | managers back then when I used to work, is |
| 24 | that the question? |
| 25 | Q. Yes, let's start from there, |

Page 85

| | |
|---|---|
| 1 | Andris Guzman |
| 2 | yes. |
| 3 | A. I remember it was me, there was |
| 4 | Ishaque, there was Serge, there was |
| 5 | Jeanique. I don't recall anyone else after |
| 6 | that. |
| 7 | Q. Did each of them actually check |
| 8 | the customer's information and profile on a |
| 9 | day-to-day basis? |
| 10 | A. What I remember is that |
| 11 | everybody had access to do so. |
| 12 | Q. How often would you use the |
| 13 | Dealertrack system to check customer's |
| 14 | information and profiles? |
| 15 | A. How often? |
| 16 | Q. Correct. |
| 17 | A. That was part of the job, it was |
| 18 | daily. It was Dealertrack, it was actually |
| 19 | what got used daily, meaning in the |
| 20 | dealership. |
| 21 | Q. Did Ishaque use Dealertrack |
| 22 | daily? |
| 23 | A. Every manager used Dealertrack |
| 24 | daily. |
| 25 | Q. Did Serge use Dealertrack daily? |

Andris Guzman

2   A.  Every manager used Dealertrack
3   daily, yes.
4       Q.  What about Jeanique as well,
5   before she left, correct?
6       A.  Correct.
7       Q.  At Hillside Auto, were car
8   salespeople given performance evaluations?
9       A.  I don't understand the question.
10      Q.  Were there performance
11  evaluations given to Hillside Auto car
12  salespeople?
13      A.  I don't recall right now the
14  specifics.
15      Q.  But, to your knowledge, were
16  they ever given?
17      A.  I don't remember a specific time
18  at this moment.
19      Q.  Do you recall if Leticia was a
20  top salesperson at the time?
21          MR. KATAEV:  Objection.
22      Asked and answered.  You can
23      answer the question.
24      A.  I remember she was good, but I
25  just don't recall the specific numbers.

Andris Guzman

2       Q.  Do you recall why Leticia
3   Stidhum left Hillside Auto?
4       A.  I don't know the specifics of
5   why she left the company.
6       Q.  At the time when she left
7   Hillside Auto, was she pregnant?
8       A.  I have no knowledge that she was
9   pregnant.  I don't recall.
10      Q.  Did she ever bring a sonogram of
11  her pregnancy to the dealership?
12      A.  I don't recall ever seeing a
13  sonogram.
14      Q.  Did she ever tell you that she
15  was pregnant?
16      A.  I don't remember being told that
17  she was pregnant.
18      Q.  Are you familiar with VIN
19  Solutions?
20      A.  That is the tool for customer
21  information, yes.
22      Q.  To your knowledge, does VIN
23  Solutions underreport the number of cars
24  that were sold at Hillside Auto?
25          MR. KATAEV:  Objection to

Andris Guzman

2       the form.  You can answer.
3       A.  What was the question?
4           MS. TROY:  Ms. Court
5       reporter, if you don't mind
6       reading back the question to
7       the witness.
8       (The reporter read back the
9       last question)
10          MR. KATAEV:  Objection.
11      Assumes facts not in
12      evidence, but you can answer.
13      A.  VIN Solutions, to my knowledge
14  does report customer information, and you
15  will have some record of people that bought
16  vehicles.  On how accurate it is, I'm not
17  sure.  I haven't used VIN Solutions in
18  years.
19      Q.  To your knowledge, does VIN
20  Solutions automatically mark leads as ''lost''
21  after a certain period of time?
22      A.  I don't recall.  I haven't used
23  VIN Solutions in years.
24      Q.  On the sales floor itself while
25  you were working as a general sales manager,

Andris Guzman

2   was it typically you and Ishaque who put in
3   the customer information into Dealertrack?
4       A.  Do you mean for us to get the
5   customer information and submit it to the
6   bank?
7       Q.  Right.
8       A.  Yes.
9       Q.  Go ahead.  Finish.
10      A.  What I'm saying is the
11  Dealertrack was a manager tool.  So,
12  whatever information that was needed to do
13  the deal, Dealertrack is the salesperson --
14  that will be in that information.
15      Q.  After the salespeople brought
16  the information back, who would enter it
17  into Dealertrack?
18      A.  The managers (indicating) we did
19  come at that time.
20      Q.  Who would be the people who
21  would enter it into Dealertrack?
22      A.  I was one of them or any of the
23  managers, they had access to do so.
24      Q.  Typically, was it you and
25  Ishaque?

Andris Guzman

1
2　　　A.  I would be involved in it a lot
3　of time, correct, yes.
4　　　Q.  Would Ishaque sometimes use the
5　Dealertrack to enter the information brought
6　back by the car salespeople as well?
7　　　A.  He had the access to do it.
8　　　Q.  Did he use the Dealertrack
9　because he had access to it?
10　　　A.  Yes.  He used Dealertrack, he
11　was the person in charge, and as the person
12　in charge, you have access to everything,
13　every tool to do everything.
14　　　Q.  Do you recall changing the
15　password to Dealertrack when Ishaque went
16　back to Pakistan in 2018?
17　　　A.  I don't recall.  Also, I just
18　want to add, I didn't even have that access,
19　you cannot just change people's passwords.
20　　　MS. TROY:  Let's take a
21　　　half an hour break and we
22　　　will come back at 1:10.
23　　　MR. KATAEV:  We're going
24　　　to be going out for lunch,
25　　　and it probably will take 45

Andris Guzman

1
2　　　minutes. I'm not sure if we
3　　　will make it back on time.
4　　　MS. TROY:  That is fine.
5　　　So, 1:20 or 1:25 is fine.
6　　　(A recess was taken from
7　　　12:40 p.m. until 1:24 p.m.)
8　　　Q.  To your knowledge, did Leticia
9　help with the license plates, meaning once
10　the customer got the car there was a license
11　plate registration?
12　　　A.  In what regard, because part of
13　the sales process is getting -- what's the
14　meaning of getting the plates?  It has to be
15　done by the Department of Motor Vehicles.
16　There is a process that the salesperson was
17　supposed to do to make sure that their
18　customer got plates.
19　　　Q.  Do you remember the process?
20　　　A.  Not only I, Leticia, everybody
21　was part of the sales process.
22　　　Q.  What was the sales manager's
23　role in that process for the license plates?
24　　　A.  Repeat the question.
25　　　Q.  You just described what the job

Andris Guzman

1
2　responsibilities are for the salesperson in
3　obtaining the license plates.
4　　　My question for you is: what is the
5　sales manager's responsibility for that
6　portion?
7　　　A.  We just make sure that the
8　vehicles get registered.  One of the things
9　gets issued by the Motor Vehicles, of
10　course.
11　　　Q.  Is there a division of labor
12　between the car salespeople and the sales
13　manager with respect to the registration of
14　the license plate with the DMV?
15　　　A.  I am not understanding your
16　question.
17　　　Q.  What are the responsibilities of
18　the car salespeople versus the sales manager
19　for the license plate registration with the
20　Department of Motor Vehicles?
21　　　A.  Collectively, we make sure that
22　we get all of the information that is
23　required so that the customer can be able to
24　purchase the vehicle, I registered the
25　vehicle that they are purchasing.

Andris Guzman

1
2　　　Q.  What would the sales managers do
3　that the car salespeople did not do with
4　regard to the car registration process?
5　　　A.  We would make sure that the
6　process is being done.
7　　　Q.  Are you familiar with Auto
8　Funds?
9　　　A.  Auto Funds is -- yes, I have
10　used Auto Funds before.  I have used Auto
11　Funds before but it's been a few years.
12　　　Q.  To your knowledge, what is Auto
13　Funds?
14　　　A.  Auto Funds is related to the
15　website.  It's a management tool for the
16　website, to my knowledge, of course.  I am
17　not too familiar with it; I haven't used it
18　in years.
19　　　Q.  Who has access to Auto Funds at
20　Hillside Auto?
21　　　A.  I don't recall to what extent we
22　did use it, I don't remember the details.
23　　　Q.  Do you recall if Leticia had
24　access to Auto Funds?
25　　　A.  I don't recall.

Page 94

Andris Guzman

1     Q. Besides texting with Leticia,
2 have you ever emailed her while you were
3 working as the sales manager or the general
4 sales manager at Hillside Auto?
5     A. I don't recall.
6     Q. Have you ever called her or has
7 she ever called you?
8     A. I don't recall any specific
9 conversations. I mean, we might have spoken
10 about work-related duties during the working
11 hours. But, I don't remember the specifics
12 of that.
13     MS. TROY: Demand Number
14       18 will be for the text
15       messages and emails and any
16       other written communications
17       between Andris Guzman and
18       Leticia Stidhum.
19     Demand Number 18 and the
20       period is May of 2018 through
21       January of 2019.
22     Demand Number 18 will be
23       for the call log of Andris
24       Guzman, and specifically the

Page 95

Andris Guzman

1 time would be again May of
2 2018 to January of 2019.
3     I'm asking for all of the
4       information other than the
5       calls placed to plaintiff,
6       the named defendants, the
7       named defendants and the
8       corporate representatives of
9       the corporate defendants can
10       be redacted. With respect to
11       the individual defendants as
12       well as the corporate
13       representatives, all
14       information prior to December
15       of 2018 can also be redacted.
16     Demand umber 19 would be
17       the text messages and email
18       communications between Andris
19       Guzman and any of the named
20       defendants, which includes
21       the corporate representatives
22       of the corporate defendants,
23       and it would be text messages
24       specifically by Leticia

Page 96

Andris Guzman

1 Stidhum on or about the terms
2       that were included in the
3       original document production
4       responses. Certainly,
5       pregnancy discrimination-
6       related text messages.
7     MR. KATAEV: Please
8       follow-up in writing. Thank
9       you.
10     Q. Mr. Guzman, during this
11 deposition, did you look at any notes or
12 papers to assist you in responding to any of
13 my questions?
14     A. No.
15     Q. During this deposition, except
16 during on break, did you communicate with
17 your attorney via text message or any other
18 means?
19     A. I don't have my phone with me.
20     Q. While you were answering
21 questions, from time to time you would look
22 away from the screen; what were you looking
23 at?
24     MR. KATAEV: Objection.

Page 97

Andris Guzman

1 You can answer the question.
2     A. Nothing specifically.
3     Q. During such time, were you
4 looking at any notes or any other written
5 text messages?
6     A. No.
7     Q. Do you agree that during the
8 remainder of this deposition, except for the
9 documents that I'll be showing you on the
10 screen, that you will not be reviewing any
11 notes?
12     A. Reviewing any notes? No. I
13 wouldn't, I'm not reviewing any notes
14 whatsoever.
15     MS. TROY: Ms. Court
16       reporter, let's mark the next
17       exhibit, which should be
18       Plaintiff's Exhibit 16.
19     Let's also mark Plaintiff 17
20       and Plaintiff's 18. Number
21       18 will be the text messages
22       between Andris Guzman and
23       Leticia Stidhum. It is
24       Defendants 1908 to 1961.

Page 98

Andris Guzman

1
2          (Plaintiff's Exhibit 17 and
3          18 marked for
4          identification.)
5          Q.  Mr. Guzman, do you recognize
6     what I am showing you on this screen right
7     now?
8          A.  Yes.
9          Q.  What do you recognize this to
10    be?
11         A.  These are conversations through
12    text.
13         Q.  You mentioned earlier that you
14    were looking at some messages.  Were these
15    included in the text messages that you
16    reviewed?
17         A.  Yes.
18         Q.  To your knowledge, is it true
19    and accurate?
20         A.  What part?
21         Q.  Let's start from is this a true
22    and accurate representation of the text
23    messages that you have on your phone between
24    yourself and Leticia?
25         A.  Based on what I see on the

Page 99

Andris Guzman

1
2     portion that I am being shown right now,
3     yes.  I am not able to see everything, so
4     I'm not able to answer.
5          Q.  Is this the first time that you
6     are seeing the text messages in the version
7     that I am showing you on the screen; in
8     other words as an extracted Decipher app?
9          A.  You are showing it to me in PDF,
10    if I'm not mistaken?
11         A.  Right.  The question is from the
12    phone, it's going to look differently.  So,
13    my question is: have you ever seen this PDF
14    format before?
15         A.  Not that I remember.
16         Q.  There are 13 pages to the text
17    message and I'm going to scroll down.  I'm
18    asking you to just take a look at it and let
19    me know after reviewing those 13 pages if it
20    is a full and accurate representation of the
21    text messages that you had between yourself
22    and Leticia Stidhum?
23         A.  Okay.
24         (The witness peruses)
25         MS. TROY:  Let's go off

Page 100

Andris Guzman

1
2     the record.
3          (A discussion was held off
4          the record)
5          MS. TROY:  I am showing
6          the witness pages 1 through
7          13 and I'm going to flip
8          through them.
9          Let the record reflect
10         that it is the first 13 pages
11         of this first exhibit Bates
12         stamped D1708 through 2910
13         and I am showing it to the
14         witness right now to review.
15         (The witness peruses)
16         Q.  Mr. Guzman, can you just review
17    those 13 pages and when you are done let me
18    know.
19         I'm just asking you, yes or no, does
20    this accurately reflect the text messages
21    between you and Leticia on your phone.
22         A. (The witness peruses)
23    Yes. This reflects the information on the
24    text messages.
25         Q.  Now, I am going to turn your

Page 101

Andris Guzman

1
2     attention to page 3 of Plaintiff's Exhibit
3     18 which is also marked as defendant's
4     document production D1910.
5          A.  Yes.
6          Q.  I'm going to draw your attention
7     to the text message with the date and time
8     of July 19th, 2018 at 11:39 a.m.
9          A.  Yes.
10         Q.  Does this refresh your
11    recollection about whether Leticia Stidhum
12    had access to Auto Funds?
13         A.  I'm not sure if she had access.
14    I know that I never gave anyone access to
15    the management tools.
16         Q.  To your knowledge, did she ever
17    have access or obtain access to Auto Funds
18    from you?
19         A.  Not from me.
20         Q.  How about anyone else?
21         A.  I wouldn't know.
22         Q.  I'm going to now direct your
23    attention to page 5 which was also marked as
24    defendant's document production D1912.
25    Specifically, the date and time is December

Page 102

Andris Guzman

1  23rd of 2018 at 2:35 p.m.  That was the last
2  message on the page.
3
4          A.  Yes.
5          Q.  It says ''do you want me to run
6  the credit while you finish up my question
7  for you?''  Does it refresh your recollection
8  about whether Leticia ever had access to
9  Dealertrack?
10         A.  I never gave Leticia access to
11  Dealertrack.  I would not give -- I did not
12  have the authority to give any management
13  tools to salespersons, to salespeople.
14         Q.  Isn't it true that Leticia
15  would've had to have access to Dealertrack
16  in order to run the credit of the customer?
17         A.  Run the credit of the customer
18  was part of the sales process of purchasing
19  the vehicle.  Only managers were supposed to
20  have access to Dealertrack.
21         Q.  Is it true that only the
22  managers are supposed to run the credit of
23  the customers through the Dealertrack
24  software?
25         A.  Correct, managers.

Page 103

Andris Guzman

1
2          Q.  Isn't it true that at least for
3  some time while you were working at Hillside
4  Auto Outlet that Leticia was given that
5  ability to run the credit on the Dealertrack
6  software?
7              MR. KATAEV:  Objection.
8          Asked and answered.  You can
9          answer it again.
10         A.  I never gave Leticia access to
11  Dealertrack.
12         Q.  Right, but please focus on my
13  question.  My question is not if you gave
14  Leticia access to Dealertrack personally.
15  My question is if she would've had access to
16  the Dealertrack system, if she had to have
17  access to the DealerTrack system to run the
18  credit of the customer.
19         A.  Not to my knowledge.
20         Q.  At any point, were you part of
21  the announcement that Leticia gave at
22  Hillside Auto announcing her pregnancy on
23  the sales floor?
24             MR. KATAEV:  Objection.
25         Asked and answered, you can

Page 104

Andris Guzman

1
2          answer it again.
3          A.  Can you repeat the question?
4              MS. TROY:  Ms. Court
5          reporter, can you read back
6          the last question.
7              (The reporter read back the
8          last question)
9          A.  I don't recall.  I never recall
10  ever hearing that she was pregnant.
11         Q.  When did you first find out that
12  Leticia was pregnant?
13             MR. KATAEV:  Objection.
14         Asked and answered.  You can
15         answer the question.
16         A.  I never got a confirmation that
17  she was pregnant.
18         Q.  When you say that you ''never got
19  the confirmation,'' what does that mean?
20         A.  You are saying while she was at
21  work, if I ever found out that she was
22  pregnant?  Was that the question?
23         Q.  Let's start from there, correct.
24         A.  That's what I'm saying, I never
25  got that information that she was pregnant.

Page 105

Andris Guzman

1
2          Q.  In other words, during your time
3  at Hillside Auto Outlet you never knew that
4  she was pregnant?
5          A.  Correct, I did not get that
6  information.  If anything, if I would -- it
7  wouldn't have made a difference, I would've
8  given her the same -- I would've given her
9  the same treatment.
10             MR. KATAEV:  When the
11         court reporter asks you to
12         repeat it, she wants just the
13         exact words, not an
14         explanation.
15         Q.  What would you describe your
16  treatment of Leticia Stidhum to be?
17         A.  Like everybody else, fair.
18         Q.  Was there ever a time when you
19  prioritized the other car salespeople's
20  information in terms of the financial
21  information to input it into the Dealertrack
22  system over Leticia's customers?
23         A.  I have always been fair when it
24  comes to distribution and how I approach the
25  customer.  It is first come, first serve

Page 106

Andris Guzman

1  basis, no preference.
2  Q.  Was there ever a time when you
3  prioritized other car salespeople's
4  customers over Leticia's?
5  A.  No.
6  MR. KATAEV:  Objection.
7  Asked and answered on that
8  one.
9  Q.  Was there ever a time when you
10  or Leticia were disciplined by Ishaque?
11  A.  Not that I recall.
12  Q.  Was there ever a time when
13  Leticia Stidhum's customers would walk out
14  as a result of a long wait time?
15  A.  I don't recall.
16  Q.  Do you recall if Leticia sold
17  less cars in December and January as a
18  result of the longer wait time?
19  A.  I don't recall the specific
20  numbers.  But, in this line of work, I'm
21  going to add something, in terms of
22  performance, in this line of work --
23  MS. TROY:  Let's just
24  focus on my question, please.
25

Page 107

Andris Guzman

1  Q.  My question is: between December
2  of 2018 and January of 2019, yes or no, did
3  Leticia Stidhum sell less cars?
4  A.  I don't recall, because people
5  do not sell the same amount of cars every
6  month.  Everything is subject to change such
7  as the holidays, the slower and faster
8  seasons, not everybody sells the same amount
9  of cars every month with the same numbers.
10  Q.  Between December of 2018 and
11  January of 2019, did Ms. Stidhum, Leticia
12  Stidhum constantly call your attention to
13  how long the customers would need to wait?
14  A.  I don't recall, but it was a
15  known fact that everybody had to wait
16  because there is a long waiting process to
17  purchase a vehicle.
18  Q.  At the time, did the car
19  salespeople include David Manrique, David
20  Parsons and Sean or Shane?
21  A.  I remember those names, they did
22  work at Hillside Auto.
23  Q.  Were you ever disciplined by
24  Hillside Auto Outlet?
25

Page 108

Andris Guzman

1  A.  I was never disciplined, no.  I
2  don't recall, but I used to do my job the
3  right way.  So, I did not.
4  Q.  As part of this litigation
5  process your attorney provided some
6  responses.  We're going to go over some of
7  those responses.
8  Before I do that, I just have a couple
9  of questions for you.  Number 1, did you
10  review the responses to the Interrogatories,
11  both the original and the supplemental
12  Interrogatories before you signed?
13  A.  Yes, I believe I reviewed them
14  with Deana.
15  Q.  When did you review them with
16  Deana?
17  A.  I don't remember the first time.
18  Q.  Was it this year?
19  MR. KATAEV:  Objection.
20  Asked and answered.  You can
21  answer the question.
22  A.  Sometime last year and I don't
23  remember the specific time.  I would be
24  lying to you, I don't remember.
25

Page 109

Andris Guzman

1  Q.  To your knowledge, is everything
2  in the Interrogatories and supplemental
3  Interrogatories correct?
4  A.  In the litigation documents, if
5  the answers that were provided -- if the
6  answers are correct, is that the question?
7  Q.  Yes.
8  A.  Based on my knowledge, what I
9  reviewed, the answers are correct on the
10  litigation.
11  Q.  Do you have any knowledge about
12  the ownership shares of Hillside Auto Outlet
13  and Hillside Auto Mall?
14  A.  Yes, it was included in the
15  documents.
16  Q.  What is your basis of that
17  knowledge?
18  MR. KATAEV:  Objection to
19  the form.  You can answer.
20  A.  The basis of the knowledge is
21  when the documents were shown to me, it had
22  information related to who were the owners
23  of the company.
24  Q.  In other words, did you review
25

Page 110

Andris Guzman

1    additional documents to ascertain the
2    responses that were given, if they were true
3    and accurate?
4        A.  Can you repeat that again?
5           MS. TROY:  Ms. Court
6           reporter, can you read back
7           the last question.
8           (The reporter read back the
9           last question)
10       A.  If I reviewed any additional
11   documents to make sure that it was accurate,
12   is that your question?
13       Q.  Yes.
14       A.  There was a lot of documents
15   that I saw, but I am not too specific.  I am
16   not too sure of the documents that you might
17   be looking for.  I don't know.
18      MS. TROY:  Let's mark Plaintiffs 19.
19          (Plaintiffs Exhibit 19 marked
20          for identification)
21       Q.  Mr. Guzman, do you recognize
22   this signature as yours?
23       A.  Yes.
24       Q.  As part of the responses that
25

Page 111

Andris Guzman

1    were provided, there were additional
2    responses called ''responses to document
3    production requests,'' as well as
4    supplemental responses to document
5    production requests. Did you review those
6    documents as well?
7        A.  Yes.
8        Q.  Did you review the documents
9    produced as part of the responses to the
10   document production requests?
11          MR. KATAEV:  Objection.
12          You can answer the question.
13       A.  If I reviewed the documents? I
14   reviewed some documents, yes.
15       Q.  As part of the documents that
16   you reviewed, did they include any pay stubs
17   of the plaintiff?
18       A.  Pay stubs?
19       Q.  Correct.
20       A.  I don't recall seeing pay stubs.
21       Q.  Do you remember seeing records
22   on a month-to-month basis of the dealerships
23   aggregate number of cars sold as part of the
24   documents?
25

Page 112

Andris Guzman

1        A.  I don't understand your
2    question.
3        Q.  So, do you recall that there was
4    a document produced, and my question is: do
5    you recall seeing the aggregate number of
6    cars sold on a monthly basis as part of the
7    documents that were produced; it's a yes or
8    no question?
9        A.  No, I don't recall seeing that.
10       Q.  How about the VIN Solutions
11   records, meaning the internal records kept
12   by the Business Development Center as well
13   as entered in by the car salespeople with
14   respect to the cars sold at Hillside Auto
15   Outlet; do you recall seeing those
16   documents?
17       A.  Not a specific document.
18       Q.  Do you recall if Ms. Stidhum was
19   owed any wages at the time when she left
20   Hillside Auto?
21       A.  I didn't control payments or the
22   money.
23          MS. TROY:  Mr. Guzman,
24          thank you very much for your
25

Page 113

Andris Guzman

1           time.  This deposition stands
2           adjourned.
3    [Time noted: 2:02 p.m.]

Page 114

```
1
2    WITNESS        EXAMINATION BY          PAGE
3    Mr. Guzman    Ms. Troy
                                              6
4              PLAINTIFF EXHIBITS
5    Number        Description              PAGE
6
7    Ex 16    Photo I.D.                     6
8            (Deemed marked)
9    Ex 17    (Text Messages)               97
10   Ex 18    Document Production D1910     101
11   Ex 19    Verification- Guzman         110
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 115

```
1
2                 REQUESTS
3    Number        Description              PAGE
4    18   Demand No. 18 is:                 94
5            MS. TROY: For the call
6            log of Andris Guzman, and
7            specifically the time would
8            be again May of 2018 to
9            January of 2019.
10           I'm asking for all of the
11           information other than the
12           calls placed to plaintiff,
13           the named defendants,
14           the named defendants and
15           the corporate representatives
16           of the corporate defendants
17           can be redacted.  With respect
18           to the individual defendants
19           as well as the corporate
20           representatives, all
21           information prior to December
22           of 2018 can also be redacted.
23   19   Demand No. 19 is:                 95
24   MS. TROY: The text messages
25            and email communications
```

Page 116

```
1
2            between Andris Guzman
3            and any of the named
4            defendants, which includes
5            the corporate representatives
6            of the corporate defendants,
7            and it would be text messages
8            specifically by Leticia Stidhum
9            on or about the terms that were
10           included in the original
11           document production responses.
12           Certainly, pregnancy
13           discrimination-related
14           text messages.
15
16
17
18
19
20
21
22
23
24
25
```

Page 117

```
1
2    QUESTIONS MARKED FOR A RULING:    PAGE/LINE
3    (None)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 118

1
2                    ACKNOWLEDEGMENT
3
4        STATE OF NEW YORK   )
5                            )s.s.
6        QUEENS COUNTY       )
7             I, ANDRIS GUZMAN, hereby certify
8        that I have read the transcript of my
9        testimony taken under oath in my deposition
10       of March 09, 2023; that the transcript is a
11       true, complete and correct record of my
12       testimony, and that the answers on the
13       record as given by me are true and correct.
14
15
16       _____
17                ANDRIS GUZMAN
18
19       Signed and subscribed before me
20       this _____ day of _____, 2023.
21
22
23       _____
24            Notary Public
25

Page 119

1
2                C E R T I F I C A T E
3        STATE OF NEW YORK   )
4                            )s.s.
5        COUNTY OF NASSAU    )
6
7             I, LYNN LUCKMAN, a Shorthand
8        Reporter and Notary Public within and for
9        the State of New York, do certify that;
10            THAT the witness whose deposition
11       is hereinbefore set forth, was duly sworn by
12       me, and that such deposition is a true
13       record of the testimony given by such
14       witness.
15            I further certify that I am not
16       related to any of the parties to this action
17       by blood or marriage; that I am in no way
18       interested in the outcome of this matter.
19            IN WITNESS WHEREOF, I have
20       hereunto set my hand this 20th day of March,
21       2023.
22                    _Lynn Luckman_
23       _____
24                LYNN LUCKMAN
25

Page 120

1    Errata Sheet
2
3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
4    DATE OF DEPOSITION: 03/09/2023
5    NAME OF WITNESS: ANDRIS GUZMAN
6    Reason Codes:
7        1. To clarify the record.
8        2. To conform to the facts.
9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25       _____