1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF NEW YORK

3      ----------------------------------------X

4      LETICIA FRANCINE STIDHUM,

5                       Plaintiff,

6         -against-      CASE: 21-CV-07163

7      161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
        AUTO OUTLET, and HILLSIDE AUTO MALL INC

8      d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
        JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

9

10                        Defendants.

11     ----------------------------------------X

12                    March 03, 2023

13                    10:00 A.M.

14

15         VIRTUAL EXAMINATION BEFORE TRIAL of

16     JORY BARON, via Zoom, a Defendant herein,

17     held at the above-mentioned time and taken

18     before Lynn Luckman, a Notary Public and

19     Shorthand Reporter within and for the State

20     of New York.

21

22

23              SANDY SAUNDERS REPORTING
           254 South Main Street, Suite 216

24            New City, New York 10956
               (845) 634-7561

25

Page 2

```
1
2        A P P E A R A N C E S:
3
4
5        TROY LAW, PLLC
6        Attorneys for the Plaintiff
7        41-25 Kissena Boulevard, Suite 103
8        Flushing, New York 13555
9        BY: Tiffany Troy, Esq.
10
11       MILMAN, LABUDA LAW GROUP, LLC
12       3000 Marcus Avenue, Suite 3W8
13       Lake Success, New York 11042-1073
14       BY: Emanuel Kataev, Esq
15       emanuel@mllaborlaw.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                FEDERAL STIPULATIONS
2
3            IT IS HEREBY STIPULATED AND AGREED by
4    and between counsel for the respective parties
5    hereto that all objections except as to the
6    form shall be reserved to the time of trial.
7            IT IS FURTHER STIPULATED AND AGREED
8    that the sealing and filing of this deposition
9    shall be hereby waived.
10           IT IS FURTHER STIPULATED AND AGREED
11   that this examination may be sworn to by the
12   witness being examined before a notary public
13   other than the notary public before whom
14   examination was begun examination was begun.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                 Jory Baron
2            BY THE COURT REPORTER:
3        The attorneys participating
4        in this deposition
5        acknowledge that I am not
6        physically present in the
7        deposition room and that I
8        will be reporting this
9        deposition remotely.  They
10       further acknowledge that, in
11       lieu of an oath administered
12       in person, I will administer
13       the oath remotely.  The
14       parties and their counsel
15       consent to this arrangement
16       and waive any objections to
17       this manner of reporting.
18            MS. TROY:  I consent
19            MR. KATAEV:    I
20       consent.
21
22
23            *     *     *
24
25
```

Page 5

```
1                Jory Baron
2        MS. TROY:  Mr. Kataev,
3    will you please have your
4    witness show his ID to me?
5        MR. KATAEV:  Why is this
6    necessary?
7        MS. TROY:  Because, it is
8    acceptable in a video
9    deposition; how else can I
10   know who it is?
11       MR. KATAEV:  I'll
12   represent to you that it is
13   Jory Baron.  Okay, please
14   proceed with your deposition.
15       MS. TROY:  For the record,
16   Mr. Kataev wanted to switch
17   the witnesses, he switched
18   the witness that I had
19   requested for today.  I asked
20   for the ID, and apparently
21   Mr. Kataev was advised that I
22   asked for his ID to be
23   presented today. I made a
24   request for him to bring his
25   ID to the deposition so that
```

Page 6

| | Jory Baron |
|---|---|
| 1 | Jory Baron |
| 2 | I could confirm who he is. |
| 3 | I'm going to make a demand |
| 4 | for Mr. Baron's driver's |
| 5 | license.  We're going to mark |
| 6 | that deemed marked as |
| 7 | Plaintiff's Exhibit 13. |
| 8 | (Plaintiff's Exhibit 13 was |
| 9 | deemed marked for |
| 10 | identification) |
| 11 | MR. KATAEV:  Please |
| 12 | follow-up in writing. |
| 13 | MS. TROY:  Please have him |
| 14 | go to his car to get his ID. |
| 15 | MR. KATAEV:  He is not |
| 16 | going to go to his car to get |
| 17 | his ID. |
| 18 | MS. TROY:  I need to have |
| 19 | his ID to confirm who he is. |
| 20 | MR. KATAEV:  I'll |
| 21 | represent it to you that he |
| 22 | is Jory Baron. |
| 23 | MS. TROY:  Please show me |
| 24 | his ID. |
| 25 | MR. KATAEV:  You can call |

Page 7

| | Jory Baron |
|---|---|
| 1 | Jory Baron |
| 2 | the Court and let's get a |
| 3 | decision on this. |
| 4 | MS. TROY:  All right.  We |
| 5 | are going to do that. |
| 6 | MR. KATAEV:  This is |
| 7 | harassment. |
| 8 | (A phone call was being made |
| 9 | to the Court at 10:03 a.m.) |
| 10 | MS. TROY:  I will put it |
| 11 | on the speaker so that you |
| 12 | can all hear. |
| 13 | (A call was made at 10:06 |
| 14 | a.m.) |
| 15 | And we are still waiting. |
| 16 | I've now put it on speaker |
| 17 | phone and I'm going to go |
| 18 | mute myself also.  Let's go |
| 19 | off the record. |
| 20 | (A discussion was held off |
| 21 | the record) |
| 22 | "MS. TROY:  Good morning, |
| 23 | Your Honor.  This is |
| 24 | plaintiff's counsel, Tiffany |
| 25 | Troy, and I'm appearing on |

Page 8

| | Jory Baron |
|---|---|
| 1 | Jory Baron |
| 2 | behalf of the plaintiff, |
| 3 | Leticia Stidhum. |
| 4 | MR. KATAEV:  Good morning, |
| 5 | Your Honor.  My name is |
| 6 | Emanuel Kataev and I am with |
| 7 | the law firm of Milman Labuda |
| 8 | Law Group LLC, for the |
| 9 | defendants. |
| 10 | THE COURT:  Good morning, |
| 11 | Ms. Troy and Mr. Kataev.  Let |
| 12 | the record reflect that this |
| 13 | is not a scheduled |
| 14 | conference, and you have now |
| 15 | called at the start of a |
| 16 | deposition for the defendant |
| 17 | Jory Baron. |
| 18 | Ms. Troy, I was told by my |
| 19 | law clerk, and I want to make |
| 20 | the record clear, I got the |
| 21 | reason for the call that Mr. |
| 22 | Kataev would not have his |
| 23 | witness produce any |
| 24 | identification; is that |
| 25 | correct? |

Page 9

| | Jory Baron |
|---|---|
| 1 | Jory Baron |
| 2 | MS. TROY:  Yes, Your |
| 3 | Honor. |
| 4 | THE COURT:  Mr. Kataev, |
| 5 | why won't Mr. Baron produce |
| 6 | his ID? |
| 7 | MR. KATAEV:  Good morning, |
| 8 | Your Honor.  The reason why |
| 9 | Mr. Baron, is not giving his |
| 10 | ID is because I've made a |
| 11 | representation to the |
| 12 | plaintiff that this is in |
| 13 | fact Jory Baron.  There is no |
| 14 | issue of mistaken identity or |
| 15 | -- |
| 16 | THE COURT:  Why won't he |
| 17 | produce his ID?  I'm asking |
| 18 | you the question, and he does |
| 19 | and Ms. Troy does not have to |
| 20 | take your representation. |
| 21 | Why won't he produce some ID? |
| 22 | MR. KATAEV:  I'm objecting |
| 23 | to the ID, I have authority |
| 24 | on my objection that she has |
| 25 | no right to -- |

Page 10

Jory Baron

1
2    THE COURT:  I am
3    overruling your objection,
4    Mr. Kataev.
5        MR. KATAEV:  Judge --
6        THE COURT:  Excuse me,
7    sir.  Please don't interrupt
8    me.  If we have to do this
9    in-person we will do that.
10   There is a fight between the
11   lawyers at every turn in this
12   case and I will not tolerate
13   that.  It is a waste of
14   everyone's time, and I've
15   been asked at the last minute
16   to effectuate a substitute,
17   Mr. Kataev, this morning and
18   I granted that wish to you as
19   a courtesy to you even though
20   it was objected to.
21       I am now telling you Mr.
22   Kataev, that he should
23   produce some ID to show that
24   he is Jory Baron.  That is my
25   ruling, do you understand?

Page 11

Jory Baron

1
2        MR. KATAEV:  I understand
3    the ruling, but I would still
4    like to make a record about
5    my objection.
6        THE COURT:  Again, sir,
7    this is a deposition and you
8    need to follow the Magistrate
9    Judge.  Your witness does
10   have to show that he is who
11   he says he is. What is this
12   about?
13       MR. KATAEV:  I will
14   explain to you if you'll
15   allow me to explain it, I am
16   entitled to have an
17   opportunity to be heard. This
18   is a case, a US District
19   Court case for the Northern
20   District of New York, CIV No.
21   1:15-CV-727.
22       Ms. Troy is asking for
23   the witness's identification,
24   and not withstanding that
25   there will be some numbers in

Page 12

Jory Baron

1
2    the Court, notwithstanding,
3    refusal to compel the witness
4    to do so on the grounds of
5    privacy, and this is a Zoom
6    deposition.
7        THE COURT:  Excuse me.
8    Excuse me, Mr. Kataev, my
9    time is valuable to me and I
10   am not telling him that he
11   has to produce his social
12   security number.  He is the
13   defendant in this case and it
14   is being conducted by Zoom.
15   Everything has been done as a
16   courtesy to your client, he
17   can produce the ID.  This is
18   the Order of the Court.  Do
19   you want to go up on Appeal
20   on this issue or do you want
21   to accept the Ruling of the
22   court?
23       MR. KATAEV:  I will accept
24   the Ruling.  I have one final
25   thing to say that this

Page 13

Jory Baron

1
2    deposition is being recorded
3    by Zoom, and I just want to
4    add that the ID can be
5    produced while the Zoom
6    deposition is not being
7    recorded.
8        THE COURT:  I'm sorry, I
9    don't really understand what
10   the issue is.  I understand
11   that people are entitled to
12   privacy about things like
13   social security numbers.
14   What is it that you are
15   trying to protect, Mr.
16   Kataev?  This is a named
17   defendant, and Ms. Troy is
18   just trying to verify that he
19   is who he says he is.  What
20   is it that you are really
21   trying to protect?  I don't
22   understand at all.
23       MR. KATAEV:  The driver's
24   license contains information
25   other than his identity, it

Page 14

Jory Baron

1. contains his home address,
2. his driver's license number
3. and contains other
4. information.  It is not
5. appropriate that the
6. plaintiff is entitled to
7. record that, and it's going
8. to be kept in plaintiff's
9. counsel's records and it is
10. required to produce.  All I
11. ask is that the plaintiff
12. stop the recording, he will
13. give that identification and
14. represent who it is.
15. MS. TROY:  Fine.
16. THE COURT:  I will stay on
17. the line and I will ask for
18. the record in the Zoom
19. deposition to stop. I will
20. stay on the record while this
21. happens.
22. Ms. Troy, is that going to
23. be okay for you?
24. MS. TROY:  Yes.  In fact,

Page 15

Jory Baron

1. even before the deposition,
2. we just asked for a scan of
3. the ID and Mr. Kataev said
4. that he wasn't going to
5. produce the ID without a
6. formal demand. Previously at
7. Friday's deposition last
8. week, at Mr. Thanwalla's
9. deposition, he agreed to
10. produce the ID later in the
11. day because the witness
12. supposedly left his ID in the
13. car.  Today, he says the same
14. thing, which is that his
15. witness forgot his ID in the
16. car.
17. So, we are fine with the
18. production of the redacted
19. version of the ID which is
20. what we asked for all along.
21. MR. KATAEV:  It's not, you
22. never asked for a redacted
23. version.
24. THE COURT:  Stop, stop.

Page 16

Jory Baron

1. She is entitled to verify
2. that the person she is
3. deposing is the person that
4. is identified and you don't
5. want plaintiff's counsel to
6. have his driver's license ID
7. number or to have his home
8. address.  That is fine with
9. me.
10. But, it is her right to
11. verify that the witness is
12. who he says he is and she
13. doesn't have to take your
14. word for it. It's ridiculous
15. for you to be citing one
16. reported case as the reason
17. that you are making that
18. call.
19. Can I just state that I
20. have 5 other cases and this
21. is not a reason to be
22. contacting the Federal Court.
23. Mr. Kataev and Ms. Troy, I
24. understand that you have not

Page 17

Jory Baron

1. had any goodwill between the
2. two of you but I will not
3. tolerate this level that
4. everything has to be brought
5. to the Court.  I will tell
6. you that you are doing
7. injustice, you are both doing
8. injustice service to your
9. client.  Again, Ms. Troy is
10. entitled to get some
11. verification of whoever the
12. witness was by virtue of the
13. ID, and as of last week, do
14. you understand me?
15. MR. KATAEV:  I am claiming
16. a redacted version would be
17. fine, but it is -- I need the
18. authority for the appropriate
19. certification that she's
20. entitled to some form of ID.
21. THE COURT:  I am her
22. authority and she's entitled
23. to that.  Is that enough for
24. you?

Page 18

Jory Baron

1
2        MR. KATAEV:  Yes, Your
3    Honor.
4        THE COURT:  Mr. Kataev, if
5    we have to do this on every
6    single point, Mr. Kataev, it
7    will not end up being useful
8    for you or for your client or
9    for Ms. Troy or her client.
10   We need to get through the
11   litigation here and you do
12   not need to raise every
13   single thing as another issue
14   to address the Court about;
15   do you understand?
16       MR. KATAEV:  I understand,
17   Your Honor.
18       THE COURT:  Mr. Kataev and
19   Ms.Troy, we stand by that the
20   fact that Mr. Baron is
21   directed to produce his ID.
22   You will then turn off the
23   recording right now and I
24   will stay on the line to make
25   sure that it doesn't become

Page 19

Jory Baron

1
2    an issue.
3        MS. TROY:  Recording
4    stopped, Your Honor.
5        MR. KATAEV:  He has
6    already gone downstairs.
7        THE COURT: Well, now we
8    have to waste my time waiting
9    for him to come back to give
10   Ms. Troy his ID so that I
11   don't get interrupted again.
12       MR. KATAEV:  I apologize,
13   Your Honor.
14       THE COURT:  Ms. Troy and
15   Mr. Kataev, please get your
16   focus back on the case and
17   don't make it about both of
18   you.  It will not be a
19   pleasant thing to have
20   lawyers at this pitch, do you
21   understand that?
22       MS. TROY:  Yes, Your
23   Honor.
24       MR. KATAEV:  Understood,
25   Your Honor.

Page 20

Jory Baron

1
2    [Time noted is 10:23]
3        THE COURT:  Ms. Troy is
4    being asked not to write down
5    the driver's ID number or the
6    home address.  Ms. Troy, I
7    assume that you have no
8    problem with that?
9        MS. TROY:  No, I don't
10   have a problem with that.
11       THE COURT:  Thank you.
12   So, the case does not --
13   there is no reason for
14   someone to prove who they
15   were at a deposition because
16   it was about a social
17   security number.
18       I am convinced that Ms.
19   Troy has no bad intent and
20   she just wants to verify that
21   Mr. Baron is who he says he
22   is, whoever the other witness
23   is.  I believe there will be
24   no further issue on this
25   case. Please make sure that

Page 21

Jory Baron

1
2    your witness comes prepared
3    to show ID, okay?
4        MR. KATAEV:  Your Honor, I
5    have to go to my office and
6    it will be one minute.
7    [Time noted: 10:32 a.m.]
8        MR. KATAEV:  I'm going to
9    show the ID.
10   (Ms. Troy peruses.)
11       MS. TROY:  That is
12   satisfactory.
13       THE COURT:  Is that
14   satisfactory?
15       MS. TROY:  Yes, it is.
16       THE COURT:  I don't
17   believe there will be any
18   other matters that needs the
19   Court's intervention?
20       MS. TROY:  No, Your Honor,
21   not from me.
22       MR. KATAEV:  No, Your
23   Honor, not from --
24       MS. TROY:  Not from the
25   plaintiff's side.

Page 22

| | |
|---|---|
| 1 | Jory Baron |
| 2 | MR. KATAEV:  Nothing |
| 3 | further. |
| 4 | THE COURT:  This matter is |
| 5 | now adjourned and I am going |
| 6 | to advise Ms. Troy and Mr. |
| 7 | Kataev to get on with the |
| 8 | deposition.  Thank you very |
| 9 | much. |
| 10 | MS. TROY:  Thank you, Your |
| 11 | Honor. |
| 12 | MR. KATAEV:  Thank you. |
| 13 | (The recording has stopped.) |
| 14 | [Time noted: 10:34 a.m.] |
| 15 | MS. TROY:  10:35 the |
| 16 | recording is back on.  Let's |
| 17 | get started. |
| 18 | [Time noted: 10:35 a.m.] |
| 19 | J-O-R-Y B-A-R-O-N, a Defendant herein, |
| 20 | after having been duly sworn by a Notary |
| 21 | Public of the State of New York, was |
| 22 | examined and testified as follows: |
| 23 | |
| 24 | BY THE REPORTER: |
| 25 | Q.  Please state your full name for |

Page 23

| | |
|---|---|
| 1 | Jory Baron |
| 2 | the record. |
| 3 | A.  Jory Baron. |
| 4 | Q.  Please state your present |
| 5 | address for the record. |
| 6 | A.  21 Wayside Lane, Huntington, New |
| 7 | York 11743. |
| 8 | EXAMINATION BY |
| 9 | TIFFANY TROY: |
| 10 | Q.  Good morning, Mr. Baron.  My |
| 11 | name is Tiffany Troy and I represent the |
| 12 | plaintiff in this matter, Leticia Stidhum. |
| 13 | Before we get started, have you ever been |
| 14 | deposed before? |
| 15 | A.  No. |
| 16 | Q.  In that case, I'm going to |
| 17 | explain what a deposition is and lay down |
| 18 | some ground rules going forward; do you |
| 19 | understand? |
| 20 | A.  Yes. |
| 21 | Q.  First, this deposition is for me |
| 22 | to ask you questions and for you to answer |
| 23 | my questions about the subject matter of |
| 24 | this lawsuit.  To be clear, this lawsuit is |
| 25 | about the pregnancy discrimination claims |

Page 24

| | |
|---|---|
| 1 | Jory Baron |
| 2 | brought by Leticia Stidhum.  There is also a |
| 3 | separate State Court Action that is about |
| 4 | the wage and hour claim, but we will be |
| 5 | addressing the pregnancy discrimination |
| 6 | claim today; do you understand? |
| 7 | A.  Yes. |
| 8 | Q.  Since the court reporter has to |
| 9 | take down everything that you say, I ask |
| 10 | that you give verbal responses; no shaking |
| 11 | or nodding of your head and no gestures; do |
| 12 | you understand that? |
| 13 | A.  Yes. |
| 14 | Q.  For the same reason, please |
| 15 | speak loudly and clearly when you answer a |
| 16 | question; do you understand? |
| 17 | A.  Yes. |
| 18 | Q.  The stenographer can only write |
| 19 | down one person speaking at a time. |
| 20 | Therefore, please do not start to answer one |
| 21 | of my questions before I stop asking it, |
| 22 | likewise I will not start a new question |
| 23 | until you have finished answering my last |
| 24 | question; do you understand? |
| 25 | A.  Yes. |

Page 25

| | |
|---|---|
| 1 | Jory Baron |
| 2 | Q.  If you need to take a break, for |
| 3 | example to get a drink of water or to use |
| 4 | the restroom, please let me know and I will |
| 5 | call for a break; do you understand? |
| 6 | A.  Yes. |
| 7 | Q.  The only exception is that there |
| 8 | can be no break in between one of my |
| 9 | questions and your answer to that question; |
| 10 | you must finish answering my question before |
| 11 | you ask for a break; do you understand? |
| 12 | A.  Yes. |
| 13 | Q.  From time to time your attorney |
| 14 | may make objections to my questions. |
| 15 | Generally, however, unless your attorney |
| 16 | tells you not to respond you will still have |
| 17 | to respond; do you understand? |
| 18 | A.  Yes. |
| 19 | Q.  If you don't understand a |
| 20 | question, tell me and I will rephrase it so |
| 21 | that you can.  If you don't hear a question, |
| 22 | tell me and I will repeat it so that you do; |
| 23 | do you understand? |
| 24 | A.  Yes. |
| 25 | Q.  We are here together for facts |

Page 26

Jory Baron

1
2  and not speculation.  If you don't know an
3  answer to a question, say so; do you
4  understand that?
5        A.  Yes.
6        Q.  Do you understand that you have
7  taken an oath to tell the truth today?
8        A.  Yes.
9        Q.  Do you understand that the oath
10  that you have taken to tell the truth
11  carries the same force and effect as if you
12  were testifying in Court before a Judge?
13        A.  Yes.
14        Q.  Are you currently taking any
15  medications that could prevent you from
16  recalling the truth or testifying truthfully
17  today?
18        A.  No.
19        Q.  How about any physical or
20  emotional conditions, are you currently
21  under any condition that could prevent you
22  from recalling the truth or testifying
23  truthfully and completely today?
24        A.  No.
25        Q.  Besides your attorney, have you

Page 27

Jory Baron

1
2  spoken with anyone to prepare for today's
3  deposition?
4        A.  No.
5        Q.  Without telling me the contents
6  of your communications with your attorney,
7  did you, yes or no, talk to your attorney to
8  prepare for this deposition?
9        A.  Yes.
10        Q.  Again, without telling me the
11  contents of the communications, for how long
12  did you speak with your attorney?
13        A.  A few hours.
14        Q.  In preparation for today's
15  deposition, did you review any documents?
16        A.  Yes.
17        Q.  What were those documents?
18        A.  All the documents that were
19  provided to me, the allegations set forth in
20  the case, the Interrogatories and other
21  documents that I signed.
22        Q.  Mr. Baron, what is your full
23  name?
24        A.  Jory Philip Baron.
25        Q.  How do you spell Philip?

Page 28

Jory Baron

1
2        A.  P-H-I-L-I-P.
3        Q.  Since this is a virtual
4  deposition, when you are on break, do you
5  affirm that you are not going to communicate
6  by email, chat, or instant message on your
7  phone or any other device?
8        A.  No.
9            MR. KATAEV:  Let the
10            record reflect that there is
11            no such device before him.
12        Q.  Do you agree that besides the
13  documents that I will be showing you on the
14  screen as exhibits today that you will not
15  be reviewing any notes on your computer,
16  cell phone or your notepad?
17        A.  Yes.
18            MR. KATAEV:  Same notation
19            for the record.
20        Q.  Have you ever been arrested
21  before?
22        A.  No.
23        Q.  Have you ever been a party to a
24  lawsuit besides this one in a State Court
25  Action?

Page 29

Jory Baron

1
2        A.  No.
3        Q.  During this deposition, I'm
4  going to be referring to 161-10 Hillside
5  Auto which is at 161-10 Hillside Avenue as
6  Hillside Auto Outlet; do you understand
7  that?
8            MR. KATAEV:  Objection to
9            the form.  The corporate
10            entity is 161-10 Hillside
11            Auto Ave.  It is Auto Avenue,
12            LLC d/b/a Hillside Auto
13            Outlet.  You can answer the
14            question.
15        A.  Yes.
16        Q.  I'm going to be referring to
17  Hillside Auto Mall, Inc. as Hillside Auto
18  Mall; do you understand?
19        A.  Yes.
20        Q.  Do you own the residence that
21  you gave at the beginning of this deposition
22  today?
23            MR. KATAEV:  Objection to
24            relevance.  You can answer.
25        A.  Yes.

Page 30

Jory Baron

1
2     Q.  In the past five years, have you
3  lived anywhere else?
4     A.  Yes.
5     Q.  Starting from the most recent,
6  where have you lived prior to your current
7  address?
8     A.  35 Woodland W-O-O-D-L-A-N-D
9  Street in Huntington.
10    Q.  Besides the 35 Woodland Street
11  address, have you lived anywhere else in
12  addition to the address that you gave at the
13  beginning of this deposition within the past
14  5 years?
15    A.  No.
16    Q.  What is your highest level of
17  education?
18    A.  College.
19       MR. KATAEV:  Objection to
20    that.
21    A.  (Continuing) Business
22  Management, Bachelor's of Science.
23    Q.  What school did you attend?
24    A.  Michigan and then Hofstra
25  University.

Page 31

Jory Baron

1
2     Q.  Are you familiar with the
3  company 161-10 Hillside Auto Avenue LLC.?
4     A.  Yes.
5     Q.  How are you familiar with it?
6     A.  I am a member/shareholder.
7     Q.  What is the percentage of shares
8  that you own?
9     A.  I am a 25 percent.
10    Q.  Do you recall when you began as
11  a member, the year and the month?
12    A.  I don't recall specifically, but
13  it was from the beginning of the business
14  when we opened.
15    Q.  How about do you recall when the
16  business opened?
17    A.  Approximately 5 years ago.
18    Q.  What is your role as the
19  member/shareholder at 161-10 Hillside Auto
20  Avenue LLC?
21    A.  My role is very minimal; I sign
22  checks and speak to Ishaque on a weekly
23  basis just to review where we are in the
24  month.
25    Q.  When you had the conversations

Page 32

Jory Baron

1
2  with Ishaque on a weekly basis, would that
3  be you and Isaac only or was it you,
4  Ishaque, and someone else?
5     A.  Typically, Ishaque and myself.
6       MR. KATAEV:  Let the
7    attorney finish her question.
8       THE WITNESS:  I apologize.
9       MR. KATAEV:  It's to make
10    the court reporter's life
11    easier.
12    Q.  When you say that you spoke to
13  Ishaque on a weekly basis, just to review,
14  on a weekly basis, can you describe what
15  kind of information you and Ishaque
16  exchanged during those conversations?
17       MR. KATAEV:  Objection as
18    to relevance. You can answer.
19    A.  It could vary on a weekly basis.
20  Sometimes it could be how many vehicles do
21  we have currently sold for the month?  How
22  was our cash position?  Certain general
23  questions just to get a general sense of the
24  health of the dealership at the moment.
25    Q.  Do you still have those weekly

Page 33

Jory Baron

1
2  meetings with Ishaque currently?
3     A.  It can vary.  I can come in
4  weekly, it could be every other week or as-
5  needed.
6     Q.  Let's start from the car sales,
7  did you discuss with Ishaque the number of
8  vehicles sold at Hillside Auto Outlet in
9  2018/2019?
10    A.  On a monthly basis, yes.
11    Q.  In 2018/2019, do you recall how
12  many cars were sold by the dealership on a
13  monthly basis?
14    A.  I cannot recall.
15    Q.  Can you give us a range?
16    A.  I would be guessing from 5 years
17  ago, but I would prefer not to.
18    Q.  Was the number of vehicles sold
19  in 2018 and 2019 more or less than the
20  number of vehicles sold on a monthly basis
21  currently?
22    A.  Again, unfortunately I cannot
23  recall every month, it varied.
24    Q.  How about the revenue generated
25  by the deals on a monthly basis, do you

Page 34

Jory Baron

1 recall that in 2018 and 2019, again, on a
2 monthly basis?
3
4          A.  I cannot recall.
5               MR. KATAEV:  Objection to
6          that one.
7          Q.  During those meetings, would you
8 ever discuss issues that may arise on the
9 human resources front?
10               MR. KATAEV:  Objection to
11          the form.  You can answer.
12          A.  No, that was not my position as
13 a shareholder at that time.
14          Q.  When you say ''at that time'' does
15 that mean in 2018 and 2019?
16          A.  Yes.
17          Q.  What is your position as a
18 shareholder currently, and I mean regarding
19 perhaps human resources discussed with you
20 currently?
21          A.  Ishaque handles the day-to-day
22 of the human resources aspect.  If I need to
23 get involved, he will call.
24          Q.  When was the most recent time
25 when he called you with respect to a human

Page 35

Jory Baron

1 resources issue?
2
3          A.  None.
4               MS. TROY:  Emmanuel, can
5          you do me a favor?  You
6          usually project pretty well,
7          but if you don't mind moving
8          the microphone closer to the
9          witness.
10               MR. KATAEV:  How is it
11          now?
12               MS. TROY:  No problem.
13               MR. KATAEV:  So the record
14          is clear, there is a shared
15          microphone on the table and
16          we just moved it closer to
17          the witness so that it is
18          clear.
19               MS. TROY:  I believe the
20          witness said ''none.''  We can
21          move on.
22               MR. KATAEV:  That is
23          correct.
24          Q.  From the beginning of the time
25 when you became the shareholder at Hillside

Page 36

Jory Baron

1 Auto Outlet five years ago until the present
2 day, has there ever been an occasion when
3 Ishaque called you regarding a human
4 resource issue?
5          A.  No.
6          Q.  Back in 2018 and 2019 what would
7 be a number of cars sold on a good month?
8          A.  I can't give you a specific
9 number.
10          Q.  What would be the number?
11               MR. KATAEV:  Objection.
12          Asked and answered for that
13          one.
14          Q.  How about in a slow month?
15          A.  I cannot recall, i can't give
16 you a specific answer.
17          Q.  Do you recall if there were
18 months or seasons when the car sales would
19 be slower?
20          A.  Yes.  The car sales can vary
21 from month-to-month depending on the time of
22 year and other factors.
23          Q.  What other factors would car
24 sales would depend on?
25

Page 37

Jory Baron

1          A.  It could be holiday times,
2 certain promotions, people know that deals
3 would be going on at the end of the year,
4 different things like that, weather, tax
5 returns, so on and so forth.
6          Q.  Let's go to holiday times, what
7 were the major holidays that would affect
8 car sales, and we are still talking about
9 Hillside Auto Outlet?
10          A.  Everything within the industry
11 can typically run hand-in-hand.  It would be
12 Memorial Day, President's Week, the end of
13 the year, vice-a-versa, major holidays can
14 adversely affect business.  Mother's Day,
15 Easter, Christmas.  They tend to be slow,
16 but again, it could vary.
17          Q.  What are the busier months at
18 Hillside Auto Outlet?
19          A.  I cannot recall what would be
20 the busiest months.
21          Q.  Are you familiar with Ishaque
22 Thanwalla?
23          A.  Yes.
24          Q.  How are you familiar with him?

Page 38

Jory Baron

1
2      A.  He is a partner of mine.
3      Q.  What is his role and exact title
4   at Hillside Auto Outlet?
5      A.  To manage day-to-day aspects of
6   the dealership throughout.
7      Q.  Is it fair to say that he has
8   the power to hire employees?
9      A.  Yes.
10      Q.  How about firing?
11      A.  Yes.
12      Q.  How about setting their
13   schedule?
14      A.  Yes.
15      Q.  How about setting their pay?
16      A.  Yes.
17      Q.  To your knowledge, what was the
18   work schedule at Hillside Auto Outlet in
19   2018/2019?
20      A.  I don't know.
21      Q.  How about the store hours, what
22   were the store hours at Hillside Auto Outlet
23   in 2018/2019?
24      A.  I cannot recall.
25      Q.  Do you, as a shareholder, have

Page 39

Jory Baron

1
2   the power to hire employees?
3      A.  That is not my role.
4      Q.  Please listen carefully to the
5   question.  The question is: do you have the
6   power or authority to hire employees?
7         MR. KATAEV:  Objection.
8      Asked and answered, but you
9      can answer the question
10      again.
11      A.  Again, it is not my role.
12   Ishaque is in charge of that aspect.
13      Q.  Do you have the power to --
14         MR. KATAEV:  Objection.
15      Asked and answered.
16         MS. TROY:  Mr. Kataev, if
17      you listened carefully, he
18      did not actually answer the
19      question which is why I am
20      asking the question again.
21      The question is ''yes or no,
22      do you have the authority to
23      hire employees?''
24         MR. KATAEV:  My objection
25      stands, and you can answer

Page 40

Jory Baron

1
2      the question again.
3      A.  That's Ishaque's role and I
4   don't have that power to do that.
5      Q.  How about to fire employees?
6      A.  No, that is Ishaque's
7   responsibility.
8      Q.  How about setting the schedule?
9      A.  No, that is not my
10   responsibility.
11      Q.  How about setting the pay?
12      A.  That was not my responsibility.
13      Q.  Do you know the payment
14   structure for the car salespeople at
15   Hillside Auto Outlet?
16      A.  No.
17      Q.  During the discussions about the
18   cash positions, and by discussions, I mean
19   discussions with Ishaque, did the cash
20   position involve payroll expenses?
21         MR. KATAEV:  Objection.
22      Vague, but you can answer.
23      A.  No.
24      Q.  When you talked about the cash
25   positions, what was being discussed

Page 41

Jory Baron

1
2   specifically?
3         MR. KATAEV:  Objection to
4      relevance.  You can answer.
5      A.  The amount of money needed to
6   operate a business successfully; just making
7   sure that again, there was enough money for
8   floor plans and different things like that.
9      Q.  When you discussed the cash
10   position, would you discuss the income as
11   well as the expenses?
12      A.  Can you repeat the question,
13   please?
14         MS. TROY:  Sure.  Let's
15      strike that last question.
16      Q.  During your discussions with
17   Ishaque, would you discuss the payroll
18   expenses at all?
19      A.  No.
20      Q.  Would he ever discuss with you
21   how much he was paying either a specific
22   employee who was working for Hillside Auto
23   Outlet or a certain position, for instance,
24   a car salesperson?
25      A.  No.

Page 42

Jory Baron

1
2     Q.  During all of your time as a
3  shareholder at Hillside Auto Outlet, have
4  you ever hired anyone?
5     A.  I have trouble hearing you. I'm
6  so sorry.  If you could just repeat that one
7  more time.
8     Q.  Have you ever hired anyone on
9  behalf of Hillside Auto Outlet?
10     A.  No.
11     Q.  How about firing people?
12     A.  No.
13     Q.  Besides 161-10 Hillside Auto
14  Avenue LLC, do you own any other company's?
15     A.  No.  Oh, I apologize.  We do
16  have Hillside Auto Outlet 2 that is down the
17  road.
18        MR. KATAEV:  Do you mean
19        the numeral?
20        THE WITNESS:  Yes.
21     Q.  What is the address of Hillside
22  Auto Outlet 2?
23     A.  179-10, I believe.  I would have
24  to double check, but I believe that is the
25  address.

Page 43

Jory Baron

1
2     Q.  Does Hillside Auto Outlet 2 also
3  sell cars?
4     A.  We store cars there and they can
5  sell them, but it's mostly for service of
6  vehicles.
7     Q.  Besides yourself, are there any
8  other shareholders of Hillside Auto Outlet
9  2?
10     A.  Yes.
11     Q.  Who are they?
12        MR. KATAEV:  Objection as
13        to relevance.  You can
14        answer.
15     A.  The Estate of David Baron and
16  Josh Aaronson, as well as Ishaque.
17     Q.  Is it fair to say that you each
18  have a 25 percent share?
19     A.  Yes.
20     Q.  Turning your attention back to
21  Hillside Auto Outlet, is it fair to say that
22  you and Josh Aaronson and the Estate of
23  David Baron as well as Ishaque, that you
24  each own 25 percent of the shares of the
25  company?

Page 44

Jory Baron

1
2     A.  Yes.
3     Q.  Are you familiar with Josh
4  Aaronson?
5     A.  Yes.
6     Q.  How are you familiar with him?
7     A.  He is a business partner.
8     Q.  Besides 161-10, Hillside Auto
9  Avenue, d/b/a, Hillside Auto Outlet, LLC and
10  Hillside Auto Outlet 2, are you business
11  partners with him and any other
12  corporations?
13     A.  Not at the moment.
14     Q.  What was his role or
15  responsibility at Hillside Auto Outlet?
16     A.  Shareholder.
17     Q.  As the shareholder, what did he
18  do?
19     A.  I don't know.
20        MR. KATAEV:  Who is ''he?''
21        MS. TROY:  Josh Aaronson.
22        MR. KATAEV:  Go ahead.
23     A.  (Continuing) I cannot speak for
24  his responsibilities.
25     Q.  Earlier you mentioned that you

Page 45

Jory Baron

1
2  had monthly back and forth in 2018 and 2019
3  and weekly meetings with Ishaque about
4  everything about Hillside Auto Outlet. Would
5  Josh Aaronson ever join the two of you at
6  any of those meetings?
7     A.  There were occasions where we
8  might have been on the phone together.
9     Q.  During those occasions, were the
10  same types of things discussed or was it
11  something different in those discussions?
12     A.  It could vary.
13     Q.  Let's turn your attention to the
14  late David Baron for a second.  At the time
15  when the company was formed, David Baron was
16  still alive; is that correct?
17     A.  Yes.
18     Q.  Let's backtrack, do you recall
19  what year and month he passed away?
20     A.  It would be 2 years in May.
21     Q.  Between 2018 and 2019, what role
22  or responsibilities did he have as the
23  shareholder of 161-10 Hillside Auto Avenue,
24  LLC?
25     A.  I cannot recall, nor was I

Page 46

Jory Baron

1
2  involved.
3      Q.  After 2021 when, essentially the
4  Estate of David Baron was the executor for
5  the late David Baron, what, if any
6  discussions were had between or amongst the
7  shareholders regarding anything related to
8  Hillside Auto Outlet?
9      A.  Can you please repeat that
10  question?
11     Q.  So, sure.  Sort of a similar
12  question that I had asked you with respect
13  to Josh Aaronson, but now we are talking,
14  I'm turning your attention to the Estate of
15  David Baron.
16     Did the Estate of David Baron ever
17  participate in shareholder meetings?
18     A.  I cannot recall, nor do I
19  remember.
20     Q.  When was the last meeting that
21  was attended either by the Estate of David
22  Baron or by the late Mr. Baron?
23     A.  I cannot remember.
24     Q.  Are you familiar with a company
25  called Hillside Auto Mall, Inc?

Page 47

Jory Baron

1
2      A.  If I may ask, familiar in what
3  way?
4      Q.  Do you know of the company?
5      A.  Yes.
6      Q.  How do you know of the company?
7      A.  They are down the block from
8  where we are.
9      Q.  Were there ever occasions from
10  your perspective as a shareholder, were
11  there ever occasions when Hillside Auto
12  Outlet employees would sell cars from
13  Hillside Auto Mall?
14     A.  They are 2 companies, they are 2
15  different businesses.
16     Q.  Let me just turn your attention
17  and focus on the question, which was: were
18  there ever occasions when Hillside Auto
19  Outlet's employees sold cars from Hillside
20  Auto Mall?
21     MR. KATAEV:  Objection.
22     Asked and answered. You can
23     answer the question.
24     A.  Throughout we could have
25  vehicles brought to Hillside Auto Outlet to

Page 48

Jory Baron

1
2  be shown.  But, every vehicle that gets sold
3  would be a Hillside Auto Outlet vehicle.
4  They could again have the vehicle brought to
5  be shown if the customer likes it, Hillside
6  Auto Outlet, we do that with other locations
7  where they can purchase the vehicles from
8  those stores and then try to sell them.
9      Q.  When you mentioned that the
10  vehicles could be brought to Hillside Auto
11  Outlet, I am going to follow-up on that and
12  ask you: were there occasions when the car
13  salespeople would bring customers down the
14  block to Hillside Auto Mall to sell cars at
15  Hillside Auto Mall?
16     A.  No, not that I'm aware of.
17     Q.  Are you familiar with the co-
18  defendant, Andris Guzman?
19     A.  I am familiar with his name,
20  yes.
21     Q.  Do you recall his position with
22  Hillside Auto Outlet?
23     A.  I cannot recall.
24     Q.  Do you recall if he had
25  managerial responsibilities?

Page 49

Jory Baron

1
2      A.  I cannot recall.
3      Q.  Do you recall what the hiring
4  process was like at Hillside Auto Outlet?
5      A.  That was not my responsibility,
6  so I cannot answer that.
7      Q.  To your knowledge, were there
8  any posters regarding Labor Law posted
9  within the store of Hillside Auto Outlet?
10     A.  Yes.
11     Q.  Where were those posters posted?
12     A.  I believe in the lunch area or
13  in the back area.  There is a kitchen,
14  that's where the kitchen is, if I remember
15  correctly.
16     Q.  Do you remember what the
17  contents on the poster was?
18     A.  I cannot remember specifically.
19     Q.  Do you recall if the poster was
20  there back in 2018/2019?
21     A.  Yes.
22     Q.  Do you recall how much in flat
23  commissions per car was given to Hillside
24  Auto Outlet employees?
25     A.  It was not my responsibility.

Jory Baron

1
2   So, again, I cannot recall.
3        Q.  Do you know what the bonus
4   structure was at Hillside Auto Outlet?
5        A.  That was not my responsibility,
6   so I was unaware.
7        Q.  Do you know if the bonus
8   structure was fixed or varied from time-to-
9   time at Hillside Auto Outlet?
10       A.  Again, that was not my
11  responsibility.  So, I'm unaware, I could
12  say it is not unusual for structures and
13  bonus structures to vary from time to time.
14       Q.  When you said that, are you
15  speaking generally in the industry?
16       A.  Yes.
17       Q.  Are you familiar with the
18  plaintiff Leticia Stidhum?
19       A.  Yes.
20       Q.  How are you familiar with her?
21       A.  I am familiar with her based on
22  this lawsuit.
23       Q.  Did you know of her prior to
24  this lawsuit?
25       A.  No.

Jory Baron

1
2        Q.  From time to time, did you visit
3   Hillside Auto Outlet as one of the
4   shareholders?
5        A.  I would visit there and it would
6   vary every so often.
7        Q.  Usually what time of day would
8   you visit?
9        A.  It could vary depending on my
10  schedule.
11       Q.  What was the earliest time of
12  the day when you would visit the store?
13       A.  After they opened, typically
14  around 10:30 in the morning would be the
15  earliest.
16       Q.  How about the latest time when
17  you visited?
18       A.  I would want to be out of there
19  by 2 o'clock due to traffic.
20       Q.  Would you visit weekdays as well
21  as on weekend days?
22       A.  Typically it would be within the
23  week.
24       Q.  Meaning Monday through Friday?
25       A.  Yes.

Jory Baron

1
2        Q.  What was Ishaque's title at
3   Hillside Auto Outlet?
4        A.  He was a shareholder/partner,
5   whichever you prefer, as well as the manager
6   of the store.
7        Q.  What are the responsibilities of
8   the finance manager, and specifically we are
9   talking about Hillside Auto Outlet?
10       A.  The finance manager would
11  receive credit, I should say they would
12  receive a folder from the salesperson once a
13  deal is formally agreed upon.  Then, their
14  job would be to run credit and submit credit
15  to the bank and then finalize the paperwork
16  with the customers.
17       Q.  To your knowledge, did any of
18  the car salespeople stay after the store
19  hours in order to finish a deal?
20       A.  It is not uncommon within the
21  industry for people to have to remain past
22  our set hours to complete a deal.
23       Q.  Specifically and typically, how
24  much longer would they stay past the set
25  hours to complete a deal after hours?

Jory Baron

1
2        A.  I cannot tell you that.  It
3   varied.
4        Q.  Can you give me a range?
5            MR. KATAEV:  Objection.
6            Asked and answered.  You can
7            answer the question.
8        A.  It completely varied.
9        Q.  Are you familiar with the
10  Dealertrack system?
11       A.  Yes.
12       Q.  Can you explain what that system
13  is?
14       A.  This is the system, this is our
15  dealer management system.  I call it like
16  the brain function of the store.  It is the
17  database that we use to operate the
18  dealership, they use the main database.
19       Q.  To your knowledge, were any
20  records kept for employee hours, and let's
21  start from the time clock; are you aware if
22  there was a time clock at Hillside Auto
23  Outlet?
24       A.  Not that I know specifically.
25       Q.  How about any written records

Page 54

Jory Baron

1
2  about employee's attendance?
3       A. That is not my responsibility
4  and I cannot answer that.
5       THE WITNESS:  Is it okay
6       if I have a sip of my
7       Gatorade?
8       MS. TROY:  Okay.  For the
9       record, you don't have to ask
10      for a drink.
11      THE WITNESS:  I just
12      wanted to make sure.
13      Q. How about a record of the
14  employee's pay; what records, if any, were
15  kept?
16      A. That was not my responsibility
17  and I cannot recall.
18      Q. Earlier you mentioned that you
19  learned of Leticia Stidhum through a
20  lawsuit.  Prior to this lawsuit, did you
21  have any communications with Ishaque about
22  Leticia?
23      A. So, to clarify then the first
24  knowledge of this lawsuit was a text message
25  that I received from Leticia.  That was the

Page 55

Jory Baron

1  first contact that I had with her.  But, no,
2  I did not have any conversations with
3  Ishaque about Leticia prior to any of the
4  legal ---
5       Q. Did you have conversations with
6  anyone about Leticia prior to this lawsuit?
7       A. Just to clarify, when you say
8  ''prior to this lawsuit,'' upon receiving a
9  text message from her, that is when the
10  conversations began about the matter that
11  day.  We did not have conversations until
12  this lawsuit began.
13      Q. To backtrack for a second, the
14  text message that you were referring to, was
15  that the text message that you received from
16  Leticia?
17      A. Yes.
18      MR. KATAEV:  Let the
19      record reflect that I
20      produced this morning those
21      text messages.
22      Q. Were those the text messages
23  from January 24th?
24      A. That is correct.

Page 56

Jory Baron

1
2       MS. TROY:  Let the record
3       reflect that D1905 to D1907,
4       I have however, it appears to
5       me that the text message was
6       cut off.  And that there is
7       another page.  This does not
8       represent the entirety of the
9       text messages.  But, there is
10      a message that was cut off.
11      Emanuel, are you going to
12      produce the full text
13      messages?
14      MR. KATAEV:  I'm sorry for
15      this.  If we have them, we
16      will produce it.  Please make
17      a formal demand. For what
18      it's worth,in my review with
19      the client, we believe that
20      the bottom portion of the
21      text message either says
22      ''thank you for your time'' or
23      ''thank you for your help.''
24      It was one of those two
25      things based on the client's

Page 57

Jory Baron

1
2       recollection.
3       I believe we can also
4       represent and confirm, and
5       it's accurate that we can
6       also represent that there are
7       no further text messages
8       after that one; correct?
9       THE WITNESS:  That is
10      correct.
11      Q. Let me just backtrack for a
12  second.  I will show it on the screen and
13  maybe that will be easier.  Just give me one
14  second.
15      I believe it's going to be easier if we
16  just use this same folder and we're just
17  going to name it as the next number.
18      MR. KATAEV:  That is fine.
19      But, when you say ''folder,''
20      what do you mean?
21      MS. TROY:  We're going to
22      mark this as Exhibit 14.
23      (Plaintiff's Exhibit 14
24      marked for identification)
25      Q. So, I'm going to show you what

Page 58

Jory Baron

1
2  we have just marked as Plaintiff's Exhibit
3  14, which is also D1905 to D1907.
4  First, what is your cell phone number?
5        MR. KATAEV:  Objection as
6     to relevance.  You can
7     answer.
8     A.  516 840-2524.
9        Q.  Since when have you used this
10 number?
11       A.  I can't remember the specifics,
12 but several years.
13       Q.  Is it fair to say that in 2019
14 you used the number, you were using this
15 number?
16       A.  Yes.
17       Q.  How did you obtain this text
18 message that I'm showing you on the screen
19 today?
20       A.  Leticia texted me.
21       Q.  How did you obtain this
22 screenshot of the text message?
23       A.  I screenshot it.
24       Q.  When did you screenshot it?
25       A.  Upon the allegations brought

Page 59

Jory Baron

1
2  forth, I thought that it may be relevant and
3  I went through my history of conversations.
4  I then screenshotted the text message.
5        Q.  Are you saying that you
6  screenshotted it back in 2019?
7        A.  No, I screenshotted it --
8  honestly, whenever the lawsuit came forth,
9  but I cannot say whether it was 2019 or not.
10       Q.  You did not screenshot that this
11 year or last year, but it was sometime
12 prior; correct?
13       A.  I cannot recall.  Again,
14 whenever the lawsuit was brought forth and
15 it was shortly thereafter.
16       Q.  Do you still use that 516 840-
17 2524 number today?
18       A.  I do.
19       Q.  Do you still have text messages
20 on your phone today?
21       A.  I would have to go back and I
22 don't know if my text messages are now set
23 to delete after a certain time period.  So,
24 I cannot answer.  I may have changed it
25 during the pandemic, the cell phone was

Page 60

Jory Baron

1
2  constantly being used.  I may have changed
3  the setting in terms of how long my text
4  messages were kept.
5        Q.  In other words, you use the same
6  number, and you had those text messages
7  before, but you are not sure if you have it
8  currently because the setting was changed to
9  possibly delete them after a certain period
10 of time?
11       A.  That is correct, I would have to
12 check.
13       Q.  When did you provide those
14 screenshots?
15       A.I produced those screenshots again
16 shortly after the allegations.
17       MR. KATAEV:  Objection.
18       Asked and answered.
19       Q.  I am now showing you the third
20 page of D1907.  Do you recall what, if
21 anything, followed the last text message
22 that appears to be cut off?
23       A.  From what I was told, I
24 confidentially received the text messages
25 and I took those text messages very

Page 61

Jory Baron

1
2  seriously and had a conversation with
3  Leticia about everything.  I told her that I
4  had to speak with Ishaque to discuss it, and
5  in fact if she was owed anything, if she was
6  owed anything, she would indeed get paid.
7  It showed that she quit, and I wanted to
8  discuss if any money to the penny was owed
9  as well as that was the complaint in the
10 text message.
11       I did then reach out to her again, and,
12 and she was unable to take my call as you
13 can see, she was at work.  I reached out
14 about my availability for the text message
15 and then said to her, sent her a text
16 message and she said, ''Nevermind.  I plan to
17 go a different route.''
18       So, the answer that I promised to call
19 her on the 28th is in fact incorrect as seen
20 based on this message.  There was no contact
21 after this text message and no promise of
22 it.
23       Q.  Let's backtrack for a second.
24 When you said that you took the text message
25 ''very seriously,'' can you take us and walk

Page 62

Jory Baron

1    us through what specifically the steps were
2    that were taken after you received this text
3    message?
4        A.  In regard to the first text
5    message, to clarify?
6        Q.  Right.  You were talking about
7    how you took it very seriously, et cetera.
8    Please walk us back to the first page after
9    you received this text message dated January
10    24th, which continues onto the second page.
11        A.  Yes.
12        Q.  What did you do?
13        A.  I called Leticia and I wanted to
14    speak to her to see what she had to say.  I
15    told her that I would have to speak with
16    Ishaque again, because I am not there
17    consistently, and the responsibility, again
18    it does not fall within my responsibility.
19    I had to find out from him in fact, if any
20    monies and so on and so forth was owed.  It
21    is not my practice to withhold money from
22    people, and indeed if it was owed to them.
23    Again, long story short, I just wanted to
24    speak to her and get her side and verify

Page 63

Jory Baron

1    with Ishaque.
2        Q.  When did you call her?
3        A.  So, I called her, I would say
4    almost immediately after this text message.
5    Shortly after the time stamp on this, and
6    then after speaking with her, I immediately
7    spoke with Ishaque.  Then, as seen by the
8    text, I tried to call her back, and I guess
9    going back an hour or so after our initial
10    conversation in which she then -- you can
11    see her response.
12        Q.  So, after you read the text
13    message, you did not text her back, instead
14    you called her; is that correct?
15        A.  Yes.  It is much easier to speak
16    over-the-phone.
17        Q.  Then, can you walk through with
18    me exactly what transpired during the
19    conversation; in other words, who spoke
20    first, who said what to whom and what was
21    said in response?
22        A.  So, the summary, I cannot recall
23    who spoke first except for the niceties of
24    ''hi, how are you?  I am Jory, I am Jory

Page 64

Jory Baron

1    Baron.''
2        Again, I had not spoken or met her
3    prior.  After the niceties are exchanged,
4    there was just an exchange of information in
5    terms of what was going on, what happened
6    ''let me try to get to the bottom of it and I
7    will speak to Ishaque to again see his side
8    of the case, to see if indeed the
9    allegations were correct that were brought
10    forth in her text
11        Again, upon hanging up the phone on that
12    conversation, I would have looked into it
13    and called her back and I spoke to Ishaque,
14    and I did team call her back.
15        Q.  Let's backtrack for a second.
16    What did she say to you during that
17    telephone conversation?
18        A.  That she had quit and they just
19    wanted to make sure if she got the pay for
20    the deals that she believes she was
21    potentially owed on.  That her reason for
22    quitting was due to her pay.
23        Q.  Did she say anything else to you
24    besides what you have already mentioned?

Page 65

Jory Baron

1        A.  Anything else?
2        Q.  Yes, during that telephone
3    conversation.
4        A.  In regard to anything else
5    pertaining to the above text, I can't recall
6    any other niceties or former exchanges.
7        Q.  During that conversation, you
8    said that you were going to check with
9    Ishaque.  Did you at that time tell her that
10    you were going to get back to her, call her
11    back or what did you say?
12        A.  Yes, I said ''I would like to
13    speak to Ishaque,'' and then I would call her
14    back.
15        Q.  So, now let's turn to what
16    happened next; what happened next after you
17    hung up with Leticia, how soon thereafter
18    did you call Ishaque?
19        A.  Immediately.
20        Q.  Then, you called Ishaque on his
21    personal phone or did you call him on the
22    Hillside Auto number?
23        MR. KATAEV:  Objection as
24    to relevance. You can answer.

Page 66

Jory Baron

1
2       MS. TROY:  If he knows.
3       A.  Most likely it would've been on
4   his cell phone but I can't recall
5   specifically. Ishaque's cell phone, yes.
6       Q.  Let's backtrack a second.  The
7   516 840-2524 number, what service provider
8   did you use, and let's start from back in
9   2018/2019?
10      A.  I know that the number -- the
11  carrier was Verizon and it is still Verizon.
12      Q.  From 2018 until the present day,
13  has it always been Verizon?
14      A.  It had been AT&T, but I don't
15  know what time I switched.
16      Q.  Turning your attention back to
17  this period of time which is roughly
18  speaking from 2019 in January, were you in
19  fact using Verizon or was it AT&T?
20      A.  I would again believe it was
21  Verizon.  But, I cannot exactly say.  I
22  can't confirm it exactly.
23      Q.  When you said that you called
24  Ishaque , was it from your 516 840-2524
25  number that you called him?

Page 67

Jory Baron

1
2       A.  Yes.
3       Q.  Just to clarify, the only
4   communications you had with Ishaque on this
5   day, which was January 24th, was by phone;
6   is that correct?
7       A.  I can't recall.  But, I do know
8   that I did speak with him via phone, though.
9       Q.  Let's take a look at the time
10  stamp 10:56 a.m.  Is that when you called
11  Ishaque?
12      A.  Shortly after receiving the text
13  message and after speaking with Leticia.
14          MS. TROY:  Emanuel, what
15      are you talking about with
16      your witness?  I see that you
17      are mumbling something.
18          MR. KATAEV:  I didn't
19      mumble anything.  I told him
20      that there was a question
21      pending and to wait for the
22      question.
23          MS. TROY:  If you are
24      going to talk with the
25      witness, it is going to have

Page 68

Jory Baron

1
2       to be part of the record.
3       For instance, if you have any
4       directions, please just
5       project so that the court
6       reporter can write it down,
7       your direction to the witness
8       on the record.  But, there
9       should not be any
10      communications between you
11      and the witness that the
12      court reporter does not take
13      down.
14          MR. KATAEV:  That is fine.
15      Q.  When you called Ishaque, can you
16  walk me through what was said during that
17  telephone conversation?
18      A.  He had indicated as the text
19  message that was received, it indicated, and
20  he then told me that she had quit and that
21  there was no money owed to her at that
22  point.  I did infer to him should we find
23  that there were any deals that we should
24  make sure that she got paid.  He agreed, but
25  at that time to his knowledge, there was no

Page 69

Jory Baron

1
2   money owed to her.  Then, I would then
3   communicate to her after speaking with him
4   that anything that she had, that she
5   would've had to follow-up with Ishaque.
6   But, I had no role in helping resolve any
7   issues.
8       Q.  What specifically did Ishaque
9   say to you besides what you have already
10  mentioned?
11      A.  Nothing that I can recall
12  specifically.  Again, most likely ''how are
13  you?''
14      Q.  When you said that he indicated
15  with regard to the text messages that you
16  received, did you at any point whether prior
17  or after or during the telephone
18  conversation screenshot the text messages
19  and send it to Ishaque?
20      A.  Not that I can recall.
21      Q.  What was the conclusion at the
22  end of the telephone call between you and
23  Ishaque?
24      A.  The conclusion that was most
25  likely no money was owed, but that we would

Page 70

Jory Baron

1
2  look into it and do our due diligence.  That
3  I would then call Leticia back, which I did,
4  to let her know the process that would take
5  place.  Again, she was unable to answer my
6  phone call in which she texted me back.  You
7  can see my text message responses, and she
8  no longer wanted to have communications with
9  me post that last attempt.
10      Q.  To clarify, after your one phone
11  call with Leticia, were there any subsequent
12  phone call conversations between you and
13  her?
14      A.  I had my initial phone call and
15  I attempted to call her back.  As I said, I
16  like to try to rectify these situations and
17  her response was even in the text message,
18  she said, I said ''can I call you?'' and I'm
19  paraphrasing a little bit.  I don't have the
20  text message in front of me.  But, that was
21  the last attempt to communicate with her
22  aside from the text message saying that I
23  would be available for about 10 minutes or
24  the following day.  Again, I never shut
25  anyone down if they have issues that they

Page 71

Jory Baron

1
2  want to try to resolve.
3      Q.  Going back to telephone
4  conversations you had with Leticia, did you
5  at any point tell her to ''stop?''
6      A.  To stop what?
7      Q.  Did you say the word ''stop'' at
8  all during that telephone conversation?
9      A.  No.  Most likely not at all.  I
10  like to hear everybody's point and then let
11  them speak. It's not in my nature to
12  interrupt or tell someone or tell them to
13  ''stop.''
14      Q.  Did you ever tell her to ''stop
15  ranting'' during that telephone conversation?
16      A.  No, I can hardly even remember
17  using the word ''rant'' in my life.
18      Q.  Did you in fact pay any amount
19  that Leticia alleged that she was owed to
20  Leticia?
21      A.  To the best of my ability,
22  Ishaque handled whatever monies were owed to
23  Leticia. That was to the best of my
24  understanding.
25      Q.  To the best of your

Page 72

Jory Baron

1
2  understanding, after the telephone
3  conversation between you and Ishaque, where
4  you both sort of concluded that she was not
5  owed any money, was any money paid to
6  Leticia?
7      A.  I cannot recall, nor confirm.
8  Again, I would just like to state that I had
9  a conversation with Ishaque to look into the
10  matter further and let him make the decision
11  from there.
12      Q.  Between January 24th when you
13  had this telephone conversation with Ishaque
14  until January 28th, did you and Ishaque have
15  any subsequent conversations either by phone
16  or in-person?
17      A.  Not recalling specifically.  I
18  cannot recall.
19      Q.  Subsequent to the January 24th
20  conversation between you and Ishaque that
21  you just mentioned, when was the next
22  conversation that you can recall between you
23  and Ishaque about Leticia?
24      A.  Can you please re-ask the
25  question?

Page 73

Jory Baron

1
2      Q.  Sure.  So, you had a
3  conversation on January 24th with Ishaque
4  about Leticia; is that correct?
5      A.  That is correct.
6      Q.  You said that you could not
7  recall whether subsequent conversations with
8  Ishaque took place.
9      Now, my question for you is: of the
10  conversations that you can recall, when was
11  the next conversation, the date?
12      A.  I can't recall a specific date.
13  But, as my business partner, we obviously
14  did speak at some point after January 24th.
15      Q.  Was that specifically about
16  Leticia?
17      A.  Again, I am sure that we did
18  have a conversation.  I don't know
19  specifically, but that was put into his
20  hands to handle.
21      Q.  Let's backtrack for a second: do
22  you recall besides Leticia Stidhum, if there
23  were any female, any other female car
24  salespersons at Hillside Auto Outlet at the
25  time?

Page 74

Jory Baron

1
2       A. I was not familiar with the
3   staff at the time.  So, I can't answer that
4   properly.
5       Q. Do you know who was the top car
6   salesperson at the time at Hillside Auto
7   Outlet?
8       A. I cannot recall, nor -- I said,
9   nor was I familiar with the staff at that
10  time.
11      Q. Now, turning your attention to
12  Leticia Stidhum, how was she as a car
13  salesperson?
14      A. I cannot speak to that.  Again,
15  that was not my responsibility on a daily
16  role.
17      Q. Turning your attention now to
18  again, the text message which was marked as
19  Plaintiff's Exhibit 14, to your knowledge,
20  did she sell 28 to 30 cars a month for
21  Hillside Auto Outlet?
22      A. I cannot answer that question.
23  Again, I was unaware of who sold what during
24  that time.
25      Q. How about the 5 percent on any

Page 75

Jory Baron

1
2   deal made that was over $3,000 or $3,500?
3       A. That was not my responsibility.
4   So, I was unaware of the pay plan.
5       Q. At any time during your
6   conversations with Ishaque, did you at any
7   point mention to Ishaque that Leticia said
8   that she sold 20 to 30 cars a month?
9       A. I cannot specifically recall
10  that, any amount of units that she said she
11  sold.
12      Q. How about that she was number
13  one for sales for a good seven to eight
14  months?
15      A. Again, I cannot remember
16  specifically her status as a salesperson;if
17  it was just in this phone call in relation
18  to the amount of vehicles that she sold.
19      Q. How about that Ishaque refused
20  to pay her her last check that allegedly was
21  addressed during the phone call?
22      A. That allegation was addressed,
23  again, because I take these text messages
24  seriously and I wanted to make sure that
25  there were no issues.

Page 76

Jory Baron

1
2       MR. KATAEV:  Can we take a
3   break?
4       MS. TROY:  We're going to
5   take a break in five minutes,
6   give or take.
7       MR. KATAEV:  I have to use
8   the restroom.
9       Q. How about 5 percent on any deal,
10  did you mention this during your
11  conversation with Ishaque?
12      A. I cannot recall.
13      Q. Did you mention that Leticia was
14  pregnant during your conversation with
15  Ishaque?
16      A. I was unaware that she was until
17  the text message, and I cannot recall if
18  that was discussed.
19      Q. The question is: during the
20  telephone conversation that you had with
21  Ishaque, did you mention just Leticia's
22  paycheck or was it Leticia as well as David
23  Manrique's paycheck?
24      A. I can't recall.
25      Q. How would you describe the tone

Page 77

Jory Baron

1
2   of the conversation, meaning between you and
3   Leticia; what was her tone?
4       A. I can't recall her tone.
5       MS. TROY:  Emanuel, do you
6   guys want to take 5 minutes
7   or 10 minutes or we can also
8   take lunch.  How much time do
9   you need?
10      MR. KATAEV:  Let's come
11  back at noon.
12      MS. TROY:  Let's just come
13  back at noon. And the time
14  now is 11:47.
15      We are going to try keep
16  this short, Emanuel.
17  (A recess was taken from
18  11:47 a.m. until 12:00 p.m.)
19      MR. KATAEV:  We are ready
20  when you are.
21      MS. TROY:  Demand Number 2
22  will be for the calls from
23  516 840-2524; the numbers
24  that were called from and
25  everything other than the

Page 78

Jory Baron

1
2     calls to Leticia including
3     any representative and
4     parties of this lawsuit,
5     including Ishaque Thanwalla
6     and plaintiff Leticia Stidhum
7     can be redacted.
8           MR. KATAEV:  Please
9           follow-up in writing.  Thank
10          you.
11          Q.  Mr. Baron, do you recall how
12    long the conversation was between you and
13    Leticia?
14          A.  I cannot recall.
15          Q.  Do you recall how long the
16    conversation between you and Ishaque was?
17          A.  I cannot recall.
18          Q.  Earlier during this deposition,
19    you mentioned that you had reviewed the
20    Interrogatories; is that correct?
21          A.  That is correct.
22          Q.  Did you review both the
23    Interrogatories and the Supplemental
24    Interrogatories?
25          A.  Yes.

Page 79

Jory Baron

1
2           Q.  To the best of your knowledge,
3     is everything contained in the
4     Interrogatories and the Supplemental
5     Interrogatories; correct?
6           A.  Yes.
7           Q.  How about for the document
8     production responses and the supplemental
9     document responses; to your knowledge, is
10    the information contained in both of those
11    documents; correct?
12          A.  Yes.
13          Q.  As to the document production
14    responses as well as the supplemental
15    document production responses that had to do
16    with the actual operations, as well as the
17    employment records at Hillside Auto Outlet
18    for that type of response, to the best of
19    your knowledge, did you, yourself have any
20    personal knowledge of that?
21          A.  Can you clarify or repeat the
22    question?
23          MS. TROY:  Sure, Ms.
24          Luckman.  If you don't mind
25          reading back the last

Page 80

Jory Baron

1
2     question.
3           (The reporter read back the
4           last question)
5           A.  I would be lying if I didn't say
6     that.  I was confused by the question.  If
7     you can repeat it one more time.
8           (The reporter read back the
9           requested question again)
10          A.  (continuing) Not -- I would have
11    to guess about the legal language, but I
12    apologize. To the best of my knowledge that
13    I can recall, again, there were certain
14    things that were not my responsibility and I
15    had to trust the people that provided those
16    said documents.
17          Q.  Who were the said people that
18    provided those documents; to clarify, let's
19    start with the employment records?
20          A.  So, Deana at that time.
21          Q.  How about documents like the
22    sales records, do you, yourself have any
23    personal knowledge about what documents
24    pertain to what response?
25          A.  That was not within my realm of

Page 81

Jory Baron

1
2     responsibility.
3           Q.  For those responses, you
4     basically relied upon Ishaque and Deana to
5     provide the appropriate responses; is that
6     correct?
7           A.  For those records, that is
8     correct.
9           Q.  Are you familiar with who was
10    given access to the Dealertrack system at
11    Hillside Auto Outlets?
12          A.  No.
13          Q.  If I were to show you paperwork
14    from Hillside Auto Outlet car salespeople,
15    would you be able to describe the pay stub
16    for me?
17          A.  I am not familiar with the pay
18    stub, just involved in relation to Hillside.
19          Q.  Do you know how to read a pay
20    stub, but you don't have specific personal
21    knowledge as to how employees were paid at
22    Hillside Auto Outlet; is that correct?
23          A.  Yes, that was not within the
24    realm of my responsibilities.
25          Q.  Are you familiar with a person

Page 82

Jory Baron

1
2  by the name of Jeanique?
3       A.  I am not familiar with that
4  person.
5       Q.  How many days of the week did
6  Hillside employees work?
7       A.  I'm not sure of employee's
8  schedule.
9       Q.  What is your birthday?
10      A.  My birthday?
11      Q.  Yes.
12      A.  ███████████.
13      Q.  Are you familiar with David
14  Manrique?
15      A.  I can't recall.
16      Q.  Do you recall when Ishaque
17  traveled to Pakistan at the end of 2018?
18      A.  I can't recall.
19      Q.  Do you recall if employees were
20  provided with a particular break time at
21  Hillside Auto Outlet?
22      A.  I cannot speak to the day-to-day
23  operations within the store.
24      Q.  What, if any, policies were in
25  place at Hillside Auto Outlet with respect

Page 83

Jory Baron

1
2  to discrimination?
3       A.  New York State Labor Law and all
4  of the laws had to be provided, and a poster
5  had to be provided.
6       Q.  Besides the poster, were there
7  any other policies that were in place?
8       A.  I cannot speak to the day-to-
9  day.
10      Q.  Have you ever interviewed any
11  potential hires for Hillside Auto Outlet?
12      A.  No.
13      Q.  How about for Hillside Auto
14  Mall?
15      A.  No.  I have nothing to do with
16  that store.
17      Q.  Are you familiar with an
18  employee by the name of Lily who is a DMV
19  clerk at Hillside Auto Outlet?
20      A.  No, I cannot recall.
21      Q.  Do you recall if said employee
22  made a complaint about losing her job
23  because she was pregnant?
24      A.  That was not part of my day-to-
25  day responsibilities and I cannot speak to

Page 84

Jory Baron

1
2  that.
3       Q.  Do you recall if there was a
4  robbery that took place at Hillside Auto
5  Outlet?
6       A.  I cannot recall.
7       Q.  Earlier you mentioned that you
8  recognize the name Andris Guzman.  What is
9  your knowledge as to Andres Guzman's role
10  within Hillside Auto Outlet?
11      A.  I am not familiar with nor was I
12  familiar with his role within the
13  dealership.
14      Q.  Understood.  You don't recognize
15  his name?
16      A.  I recognize it, I saw it in the
17  lawsuit.
18      Q.  So, you are only recognizing his
19  name because he is part of the lawsuit; is
20  that correct?
21      A.  I cannot recall his name prior.
22      Q.  Are you familiar with a program
23  called VIN V-I-N Solutions?
24      A.  Yes, VIN Solutions, I am
25  familiar.

Page 85

Jory Baron

1
2       Q.  To your knowledge, what is that
3  program?
4       A.  It is a program that is
5  predominantly used in the industry.
6            MR. KATAEV:  Let the
7       record reflect that the
8       plaintiff has now joined in
9       this virtual deposition by
10      and through her cell phone.
11      I'm just noting for the
12      record that the, she has just
13      come back onto the record at
14      12:13 p.m.
15      Q.  What is your knowledge of VIN
16  Solutions, is it used within Hillside Auto
17  Outlet?
18      A.  I'm not familiar with the day-
19  to-day usage within the store.
20      Q.  Is it fair to say that VIN
21  Solutions did not log, does not log all the
22  customers because the customers would
23  include walk-in customers?
24      A.  VIN Solutions is reliance on
25  certain salespeople's inputs.

Page 86

Jory Baron

1
2      Q.  In other words, VIN Solutions
3  required manual entries by the car
4  salespeople; is that correct?
5      A.  It does require manual entries
6  by the salespeople.
7      Q.  Is it accurate to say that VIN
8  Solutions typically understates the actual
9  number of cars sold?
10      MR. KATAEV:  Objection to
11      the form.  You can answer.
12      A.  There is a discrepancy between
13  the salesperson's input and the connection
14  to the DMS.  It is quite accurate for the
15  DMS.  It could also vary, but it is
16  typically quite accurate due to its
17  connection with the DMS.
18      Q.  What is your knowledge of
19  Leticia's performance at Hillside Auto
20  Outlet?
21      A.  I'm unaware of her sales
22  performance.
23      Q.  To your knowledge, was Leticia
24  ever disciplined?
25      A.  I cannot recall nor speak to

Page 87

Jory Baron

1
2  that.
3      Q.  Do you know if she was ever
4  suspended?
5      A.  Again, I was not involved in the
6  day-to-day, and I cannot speak to that.
7      Q.  During your time as a
8  shareholder of Hillside Auto Outlet, were
9  employees ever given written performance
10  evaluations?
11      A.  I was not responsible for the
12  day-to-day activities and I cannot speak to
13  that.
14      Q.  Are you familiar with an
15  individual by the name of David Parsons?
16      A.  Can you please repeat the last
17  name?
18      Q.  Parsons.
19      A.  I am not familiar with that
20  person.
21      Q.  How about an individual by the
22  name of Sean or Shane, was he ever a car
23  salesperson who worked at Hillside Auto
24  Outlet?
25      A.  No, I cannot recall any

Page 88

Jory Baron

1
2  familiarity with him.
3      Q.  To your knowledge, did Leticia
4  run the credit at Hillside Auto Outlet?
5      A.  I cannot speak to that due to my
6  lack of role in the day-to-day
7  responsibilities.
8      Q.  To your knowledge, besides the
9  January 24th phone call that you described
10  for us earlier, were there any other
11  conversations that you had with Leticia
12  subsequently?
13      A.  Not as shown in the text
14  messages.  She essentially -- she stated
15  that there was no further need to
16  communicate.
17      Q.  Do you recall what the time was
18  for that text message, when was that text
19  message received from Leticia?
20      A.  Which text message? From Leticia
21  to me or from me to Leticia?
22      Q.  From her to you.
23      A.  Everything took place within --
24      Q.  Let me just show you so that we
25  are clear.  We're going to take a lunch

Page 89

Jory Baron

1
2  break shortly and I just ask you to search
3  on your phone if you still have the text
4  messages and please give it to Emanuel and
5  Emanuel will be able to provide the text
6  messages to the office.  There are just some
7  questions with respect to the completeness
8  as well as other questions that are raised
9  with respect to the production in its
10  current form.
11      MR. KATAEV:  Hold on, I
12      have to say something.  The
13      witness will not, does not
14      have his phone with him.  We
15      will ask you to follow-up in
16      a written demand and we will
17      respond.
18      Q.  Mr. Baron, you don't have your
19  phone on you?
20      A.  No.  I did not want to be
21  distracted during today's deposition.
22      Q.  Where is your phone?
23      A.  It is currently at home.
24      Q.  Did someone tell you to leave
25  your phone at home for today's deposition?



Page 90

Jory Baron

1
2       A.  I have a secondary number that I
3   use for my work purposes, for messages.  So,
4   that's the phone that I typically carry.
5       Q.  Let's backtrack for a second.
6   So, you said that you have two phones?
7       A.  I am now stating yes, but it did
8   not come up before.  I have recently gotten
9   a secondary number this year, yes.
10      Q.  So, the secondary number is for
11  non-emergencies or emergencies?
12      A.  No, it's not emergencies, it's
13  the work phone.  So, if I need it for
14  messages or the contact with my wife.   And
15  it's okay,  not for contacts, just such as
16  for my wife, not customers.
17      Q.  Then you also have a work phone;
18  is that correct?
19      A.  Yes.  I wouldn't designate my
20  work phone, but I use the 840-2524 for work
21  due to privacy.
22      Q.  So, you have two phones, and one
23  is the 516 840-2524 phone?  That is the
24  phone that you use to text and call Leticia,
25  and you recently obtained a non-work phone,

Page 91

Jory Baron

1
2   which is basically for your family; is that
3   correct?
4       A.  Yes.  I was receiving calls and
5   texts at all hours of the day and it was
6   becoming quite annoying, to be honest.  A
7   secondary number gives me peace.
8       Q.  What you brought today is your
9   non-work phone and what you left at home was
10  your work phone?
11      A.  I would not designate it as a
12  work phone, I would designate it as a second
13  number, but yes.
14      Q.  When did you obtain your non-
15  work phone?
16      A.  A few months ago.
17      Q.  So, as to any conversations that
18  occurred via the phone with the plaintiff or
19  with any of the co-defendants with respect
20  to the present discrimination claim, the
21  pregnancy discrimination claim, that
22  would've occurred on your other phone and
23  not the phone that you brought today; is
24  that correct?
25      A.  That is correct.

Page 92

Jory Baron

1
2       MS. TROY:  Demand number 3
3       will be for the full and
4       complete text messages
5       between Jory Baron and
6       Leticia Stidhum.  The
7       timeframe will be essentially
8       from January of 2019 to the
9       present day.  But,
10          specifically, we are looking
11          for any messages that may
12          have been sent or received
13          after the third page, which
14          was cut off, and produced
15          only this morning.
16      Q.  Do you recall when you sent this
17  text message that is on the screen?  For the
18  record, we are looking on page 3 of
19  Plaintiff's Exhibit 14.  I am talking about
20  the message right after the gray message,
21  which is timestamped Thursday, January 24th
22  at 12:50 p.m.  The reply, that message does
23  not have a timestamp.
24      A.  So, I can only assume that it
25  was shortly after her 12:50 text.

Page 93

Jory Baron

1
2       Q.  How about the message that
3   happened after the gray message that begins
4   ''okay, give me a second to step out.''
5       A.  I can again only assume because
6   I was only available for 10 minutes and
7   responded immediately on the same day.
8   Then, as you can see she then wrote her
9   response thereafter.
10      Q.  Do you know what was the time
11  between the two gray messages?
12      A.  I cannot give you specifics.
13  But, I can tell you that it was not very
14  long.
15          MS. TROY:  Let's now just
16          take a quick lunch break from
17          now to what time is good for
18          everyone?
19          MR. KATAEV:  We're going
20          to go outside the building.
21          It's probably going to take a
22          little bit longer.
23          Let's come back then at
24          1:15.
25          (A recess was taken from

Jory Baron

1  12:30 p.m. until 1:16 p.m.)
2  MS. TROY:  It is now 1:16
3  and we are back on the
4  record.
5  Q.  Are you familiar with an
6  individual by the name of Ali A-L-I R-A-S-K-
7  E-S-N-I-A?
8  A.  To answer your question, no, I
9  am not familiar with that name.
10  Q.  How about Iris Serrano, S-E-R-R-
11  A-N-O?
12  A.  Iris?  No, I am not familiar
13  with that name.
14  Q.  Let's backtrack for a second.
15  Before the break you mentioned an individual
16  by the name of Jeanique.  For context,
17  Jeanique was the manager at Hillside Auto
18  Outlet, and let me just ask you again: are
19  you familiar with that individual?
20  A.  No, I'm not familiar with that
21  individual.
22  Again, sporadically again, maybe I
23  saw a face, but the name, no.
24  MS. TROY:  Let's mark

Jory Baron

1  Plaintiffs 15.
2  (Plaintiffs Exhibit 15 marked
3  for identification.)
4  Q.  I am now showing you Plaintiff's
5  Exhibit 15, a Verification.
6  A.  Yes.
7  Q.  Do you recognize your signature
8  on this page?
9  A.  Yes, I do.
10  Q.  Do you recall when you signed
11  this document?
12  A.  I can't give you the exact date.
13  But, it was not too long ago.
14  MR. KATAEV:  I can
15  represent for the record,
16  that it was the day that I
17  emailed to you, I think it
18  was February 3rd, Friday,
19  February 3rd I believe.
20  MS. TROY:  Okay.  For the
21  record, I still have not
22  received the Verification of
23  Deana Jennings and Andris
24  Guzman.

Jory Baron

2  MR. KATAEV:  I received
3  it, I have not forwarded to
4  you and I should have
5  Guzman's, you should have it
6  on Monday.  Also, maybe I
7  will stay with him today and
8  get his notarized and I'll
9  work on the others as well.
10  MS. TROY:  That is fine.
11  I have no other questions for
12  you.  Thank you for your
13  time.
14  THE WITNESS:  No problem.
16  [Time noted: 1:20 p.m.]

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Jory Baron | Ms. Troy | 23 |

PLAINTIFF EXHIBITS

| Number | Description | PAGE |
|---|---|---|
| EX 13 | Mr. Baron's driver's license | 6 |
| | (To be Deemed marked) | |
| EX 14 | D1905 to D1907 | 56 |
| EX 15 | Verification | 94 |

## Page 98

```
 1
 2
 3                    REQUESTS
 4    Number       Description           PAGE
 5      1    MS. TROY:  Demand No. 1 is,       6
 6           I'm going to make a demand
 7           for Mr. Baron's driver's license.
 8      2    MS. TROY:  Demand No. 2 is,      56
 9           Emanuel, are you going to
10           produce the full text messages?
11      3    MS. TROY:  Demand No. 3 is,      78
12           the calls from 516 840-2524.
13           The numbers that were called
14           from and everything other
15           than the calls to Leticia
16           including any representative
17           and parties of this lawsuit,
18           including Ishaque Thanwalla
19           and plaintiff Leticia Stidhum
20           can be redacted.
21      4    MS. TROY:  Demand No. 4 is,      92
22           for the full and complete
23           text messages between Jory
24           Baron and Leticia Stidhum.
25           The timeframe will be
```

## Page 99

```
 1
 2    essentially from January
 3    of 2019 to the present day.
 4    But, specifically, we are
 5    looking for any messages
 6    that may have been sent or
 7    received after the third page,
 8    which was cut off, and produced
 9    only this morning.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 100

```
 1
 2    QUESTIONS MARKED FOR A RULING:    PAGE/LINE
 3    (None)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 101

```
 1
 2                ACKNOWLEDGMENT
 3
 4    STATE OF NEW YORK  )
 5                       )s.s.
 6    COUNTY OF SUFFOLK  )
 7          I, JORY BARON, hereby certify that
 8    I have read the transcript of my testimony
 9    taken under oath in my deposition of March
10    03, 2023; that the transcript is a true,
11    complete and correct record of my
12    testimony, and that the answers on the
13    record as given by me are true and correct.
14
15
16          _____
17                JORY BARON
18
19    Signed and subscribed before me
20    this ____ day of _____, 2023.
21
22
23    _____
24          Notary Public
25
```

| | |
|---|---|
| Page 102 | Page 103 |

Page 102

1           C E R T I F I C A T E

2

3    STATE OF NEW YORK    )

4                    )s.s.

5    COUNTY OF NASSAU    )

6

7          I, LYNN LUCKMAN, a Shorthand

8    Reporter and Notary Public within and for

9    the State of New York, do certify that;

10          THAT the witness whose deposition

11    is hereinbefore set forth, was duly sworn by

12    me, and that such deposition is a true

13    record of the testimony given by such

14    witness.

15          I further certify that I am not

16    related to any of the parties to this action

17    by blood or marriage; that I am in no way

18    interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have

20    hereunto set my hand this 20th day of March,

21    2023.

22

23    _____

24          LYNN LUCKMAN

25

Page 103

1    Errata Sheet

2

3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC

4    DATE OF DEPOSITION: 03/03/2023

5    NAME OF WITNESS: JORY BARON

6    Reason Codes:

7      1. To clarify the record.

8      2. To conform to the facts.

9      3. To correct transcription errors.

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24

25        _____