1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NEW YORK

3        ----------------------------------------X

4        LETICIA FRANCINE STIDHUM,

5                              Plaintiff,

6            -against-          CASE: 21-CV-07163

7        161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
         AUTO OUTLET, and HILLSIDE AUTO MALL INC
8        d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
         JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

9

10                            Defendants.

11       ----------------------------------------X

12                              March 10, 2023

13                              10:00 A.M.

14

15            VIRTUAL EXAMINATION BEFORE TRIAL of

16       DEANA JENNINGS, via Zoom, a 30(b)6 witness

17       herein, held at the above-mentioned time and

18       taken before Lynn Luckman, a Notary Public

19       and Shorthand Reporter within and for the

20       State of New York.

21

22

23                  SANDY SAUNDERS REPORTING
                 254 South Main Street, Suite 216
24                   New City, New York 10956
                        (845) 634-7561

25

Page 2

1

2          A P P E A R A N C E S :

3

4

5          TROY LAW, PLLC

6          Attorneys for the Plaintiff

7          41-25 Kissena Boulevard, Suite 103

8          Flushing, New York 1355

9          BY: Tiffany Troy, Esq.

10

11         MILMAN, LABUDA LAW GROUP, PLLC

12         3000 Marcus Avenue, Suite 3W8

13         Lake Success, New York 11042-1073

14         BY: Emanuel Kataev, Esq

15         emaanuel@milaborlaw.com

16

17

18

19

20

21

22

23

24

25

Page 3

1                    FEDERAL STIPULATIONS

2

3               IT IS HEREBY STIPULATED AND AGREED by

4          and between counsel for the respective parties

5          hereto that all objections except as to the

6          form shall be reserved to the time of trial.

7               IT IS FURTHER STIPULATED AND AGREED

8          that the sealing and filing of this deposition

9          shall be hereby waived.

10              IT IS FURTHER STIPULATED AND AGREED

11         that this examination may be sworn to by the

12         witness being examined before a notary public

13         other than the notary public before whom

14         examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    Deana Jennings

2               BY THE COURT REPORTER:

3          The attorneys participating

4          in this deposition

5          acknowledge that I am not

6          physically present in the

7          deposition room and that I

8          will be reporting this

9          deposition remotely.  They

10         further acknowledge that, in

11         lieu of an oath administered

12         in person, I will administer

13         the oath remotely.  The

14         parties and their counsel

15         consent to this arrangement

16         and waive any objections to

17         this manner of reporting.

18              MS. TROY:  I consent

19              MR. KATAEV:    I

20         consent.

21

22

23                   *    *    *

24

25

Page 5

1                    Deana Jennings

2

3          D-E-A-N-A J-E-N-N-I-N-G-S, a

4     30(b)6 witness herein, after having been

5     duly sworn by a Notary Public of the

6     State of New York, was examined and

7     testified as follows:

8

9     BY THE REPORTER:

10         Q.  Please state your full name

11    for the record.

12         A.  Deana Jennings.

13         Q.  Please state your present

14    address for the record.

15         A.  49 Staghorn Drive Matawan

16    N.J. 07747.

17    EXAMINATION BY

18    TIFFANY TROY:

19         Q.  Good morning.  Mr. Kataev, for

20    the record, please have your witness show

21    her ID.

22    (The witness complies)

23       That's good.

24         MS. TROY:  Please, Ms.

25    Court reporter mark Exhibit

Page 6

Deana Jennings

1
2      20 as the ID, deem it marked.
3      (The court reporter
4         complies).
5      Q.  Good morning, have you ever been
6   part of a deposition before?
7      A.  No.
8      Q.  In that case, I'm going to
9   explain what a deposition is and lay down
10   some ground rules going forward.
11      First, this deposition is for me to ask
12   you questions and for you to answer my
13   questions about the subject matter of this
14   lawsuit; do you understand?
15      A.  Yes.
16      Q.  Since the court reporter has to
17   take down everything that you say, I ask
18   that you give verbal responses; no shakes or
19   nodding of your head and no gestures; do you
20   understand?
21      A.  Okay.
22      Q.  For that same reason, please
23   speak loudly and clearly when you answer my
24   question.
25      A.  Okay.

Page 7

Deana Jennings

1
2      Q.  The stenographer can only take
3   down one person speaking at a time.
4   Therefore, please do not start to answer one
5   of my questions before I stop asking it;
6   likewise, I will not start any question
7   until you have finished answering my last
8   question; okay?
9      A.  Okay.
10      Q.  If you have a particularly long
11   answer, please break in between sentences so
12   that the stenographer can note down your
13   responses and then you can continue.
14      A.  Okay.
15      Q.  If you need to take a break for
16   example, to get a drink of water or to use
17   the restroom, please let me know and I will
18   call for a recess.  However, there can be no
19   break in between one of my questions and
20   your answer to that question; do you
21   understand?
22      A.  Yes.
23      Q.  From time to time your attorney
24   may make objections to my questions.
25   Generally, however, unless your attorney

Page 8

Deana Jennings

1
2   tells you not to answer, you will still have
3   to respond; do you understand?
4      A.  Yes.
5      Q.  If you don't understand a
6   question, tell me and I'll rephrase it so
7   that you can.  If you don't hear a question,
8   tell me and I'll repeat it so that you do;
9   do you understand?
10      A.  Yes.
11      Q.  We are here today for facts and
12   not speculation.  Therefore, if you don't
13   know an answer to a question, say so.
14      A.  Okay.
15      Q.  Do you understand that you have
16   taken an oath to tell the truth?
17      A.  Yes.
18      Q.  Do you understand that your oath
19   to tell the truth carries the same force and
20   effect as if you were testifying in court
21   before a Judge?
22      A.  Yes.
23      Q.  Are you currently taking any
24   medications that could prevent you from
25   recalling the truth or testifying truthfully

Page 9

Deana Jennings

1
2   and completely today?
3      A.  No.
4      Q.  Are currently under any physical
5   or emotional condition that could prevent
6   you from recalling the truth or testifying
7   truthfully and completely today?
8      A.  No.
9      Q.  Do you agree that during this
10   deposition, except during on break, you are
11   not going to be communicating with anyone by
12   email, chat or instant message on your phone
13   or any other device?
14      A.  Yes.
15      Q.  Do you agree that besides the
16   documents that I will be showing you on the
17   screen as exhibits today that you will not
18   be reviewing any notes on your computer,
19   cell phone or any other device?
20      A.  Yes.
21      Q.  Do you have a cell phone on you
22   or near you?
23      A.  Not on me.
24      Q.  Where is your cell phone?
25      A.  I left it in the car.

Page 10

Deana Jennings

1
2      Q.  Why did you leave your cell
3  phone in the car?
4          MR. KATAEV:  Objection.
5      You were harassing.  You may
6      answer the question.
7      A.  I forgot to plug it in and I
8  wanted to be on time this morning.
9      Q.  Besides your attorney, did you
10  speak with anyone in order to prepare for
11  today's deposition?
12      A.  Yes.
13      Q.  With whom did you speak?
14      A.  We had a virtual meeting with
15  the other defendant.
16      Q.  Was your attorney present?
17      A.  Yes.
18      Q.  For how long did you prepare?
19      A.  I can't remember, it was more
20  than an hour but I honestly can't recall how
21  long it was.
22      Q.  Do you recall when it was?
23      A.  I can't remember for certain,
24  I'm sorry.
25      Q.  What did you do to prepare for

Page 11

Deana Jennings

1
2  your deposition today, and the caveat is,
3  don't tell me anything that you discussed
4  with your attorney?
5      A.  We went over the
6  Interrogatories, and that is pretty much it,
7  that's it.
8      Q.  Besides the Interrogatories, did
9  you review any other documents in
10  preparation for today's deposition?
11      A.  Yes, some of the evidence.
12      Q.  Can you describe what type of
13  evidence you reviewed?
14      A.  Yes, it was the text messages, I
15  saw some VIN Solutions printouts and a pay
16  stub or 2.  That is what I can recall.
17      Q.  Did you review any other
18  documents?
19      A.  I can't recall.
20      Q.  You mentioned that you had an
21  ''virtual meeting with the other defendant;''
22  was that yesterday?
23      A.  No.
24      Q.  By ''other defendants,'' can you
25  name which are the other defendants that

Page 12

Deana Jennings

1
2  were present?
3      A.  Am I allowed to say it?
4          MR. KATAEV:  Yes.
5      A.  It was Ishaque Thanwalla, Jory
6  Baron, Josh Aronson and Andris Guzman.
7      Q.  During that meeting, were there
8  any other documents that you reviewed
9  besides which you have described for me?
10          MR. KATAEV:  Objection.
11      Asked and answered.  You can
12      answer the question.
13      A.  From what I can recall, not sure
14  exactly.
15      Q.  Meaning you are not sure if --
16      A.  If there were more documents
17  besides those.
18      Q.  Please go ahead and complete
19  your response.
20      A.  That was it.
21      Q.  Have you ever been arrested
22  before?
23      A.  No.
24      Q.  Do you own the residence that you
25  gave at the beginning of this deposition?

Page 13

Deana Jennings

1
2      A.  No.
3          MR. KATAEV:  Objection as
4      to relevance.
5      A.  (Continuing) No.
6      Q.  Besides the address that you
7  gave at the beginning of this deposition,
8  have you lived anywhere else in the past 5
9  years?
10      A.  Yes.
11      Q.  Starting from the most recent,
12  where was the address that you lived prior
13  to the address that you gave at the
14  beginning of this deposition?
15      A.  Oh my gosh -- 10, Amber Court
16  Westbury, New York.
17      Q.  Have you lived anywhere else
18  within the past 5 years?
19      A.  No.
20      Q.  What is your highest level of
21  education?
22      A.  Some college.
23      Q.  Are you currently employed?
24      A.  Yes.
25      Q.  Who is your employer?

Page 14

Deana Jennings

1
2     A.  Hillside Auto Mall, Inc.
3     Q.  Besides Hillside Auto Mall,
4  Inc., do you have any other employer?
5     A.  No.
6     Q.  Currently how many days do you
7  work for Hillside Auto Mall, Inc.?
8     A.  Five.
9     Q.  Do you have a set schedule?
10    A.  Pretty much 10 to 5.
11    Q.  In what year did you begin
12 working for Hillside Auto Mall, Inc.?
13    A.  2008.
14    Q.  Have you worked for any other
15 employer at the same time that you worked
16 for Hillside Auto Mall?
17    A.  Yes.
18    Q.  Can you name that employer for
19 me, please?
20    A.  I worked part-time for Hillside
21 Auto Outlet, LLC.
22    Q.  Can you tell me what year you
23 began working at Hillside Auto Outlet, LLC?
24    A.  2018.
25    Q.  Besides Hillside Auto Mall and

Page 15

Deana Jennings

1
2  Hillside Auto Outlet, LLC, have you worked
3  for any other employer since 2008?
4     A.  No.
5     Q.  Can you give me the address for
6  Hillside Auto Mall Inc.?
7     A.  Hillside Auto Mall is 150-01
8  Hillside Avenue, Jamaica, New York, 11432.
9     Q.  How about Hillside Auto Outlet
10 LLC?
11    A.  They are located at 161-10
12 Hillside Avenue, Jamaica, New York, 11432.
13    Q.  What is your position with
14 Hillside Auto Mall, Inc.?
15    A.  I am the controller.
16    Q.  As the controller, what are your
17 responsibilities?
18    A.  I maintain the books, payroll,
19 bills, sales tax, facts, I do some DMV.
20    Q.  What about maintaining the
21 books, specifically what did you mean?
22    A.  I do the accounting.
23    Q.  Are you a certified public
24 accountant?
25    A.  No.

Page 16

Deana Jennings

1
2     Q.  Besides which you have already
3  mentioned, do you have any other
4  responsibilities as the controller at
5  Hillside Auto Mall, Inc?
6     A.  No.
7     Q.  What year did you stop working
8  for Hillside Auto Outlet LLC?
9     A.  I think currently, 2020.
10    Q.  Who hired you in 2008 at
11 Hillside Auto Mall, Inc?
12    A.  Josh Aronson.
13    Q.  Was your schedule 5 days a week
14 from 10:00 a.m. to 5:00 p.m. in 2008?
15    A.  Which store?
16    Q.  Let's start from Hillside Auto
17 Mall Inc.
18    A.  Yes, 10 to 5.
19    Q.  Was it 5 days per week at the
20 time when you were hired?
21    A.  Yes.
22    Q.  Is it fair to say that between
23 2008 and 2018 before you were hired by
24 Hillside Auto Outlet, LLC, that you worked 5
25 days a week at Hillside Auto Mall, Inc?

Page 17

Deana Jennings

1
2     A.  Yes.
3     Q.  Do you recall which month you
4  were hired by Hillside Auto Outlet LLC?
5     A.  I can't recall off the top of my
6  head.
7     Q.  Who hired you?
8     A.  Josh Aronson.
9     Q.  Between 2018 and early 2020, how
10 many days would you work for Hillside Auto
11 Mall Inc. and how many days would you work
12 for Hillside Auto Outlet LLC?
13    A.  Same time, I usually split up my
14 workload.
15    Q.  So, if there were 5 days a week,
16 how many days would you work between 2018
17 and early 2020 at Hillside Auto Mall, Inc?
18    A.  Hillside Auto Mall, Inc?
19    Q.  Yes.
20    A.  Five.
21    Q.  So, between 2018 and early 2020,
22 5 days per week, you would be working at
23 Hillside Auto Mall, Inc?
24    A.  Yes.
25    Q.  During that time, you would also

Page 18

Deana Jennings

1
2  maintain the books, payroll ,bills, sales
3  tax and DMV for Hillside Auto LLC as well?
4          A.  For Hillside Auto Outlet LLC,
5  everything mentioned minus the DMV.
6          Q.  Ms. Jennings, what is your
7  birthdate?
8          A.  ███████████.
9          Q.  You are here today as a 30(b)6
10 witness for 161-10 Hillside Auto Avenue LLC,
11 as well as Hillside Auto Mall Inc.  Do you
12 understand that your testimony will be
13 binding as to those corporate defendants?
14              MR. KATAEV:  Objection to
15              the form.  It calls for a
16              legal conclusion, you can
17              answer the question.
18          A.  Can you repeat the question
19 again? I'm sorry.
20              MS. TROY:  Ms. Court
21              reporter, will you please
22              read it back.
23              (The reporter read back the
24              last question)
25          A.  Yes.

Page 19

Deana Jennings

1
2          Q.  Earlier when you mentioned
3  Hillside Auto Outlet LLC, is that the same
4  or different from the 161-10 Hillside Auto
5  Avenue LLC?
6          A.  It's the same, it's the D/B/A.
7          Q.  Which one is the D/B/A?
8          A.  It is 161-10.  Hillside Auto
9  Avenue, LLC D/B/A Outlet, If I'm correct.
10         Q.  Would you work on-site for both
11 Hillside Auto Mall Inc. And 161-10 Hillside
12 Auto Avenue LLC?
13         A.  I have been at Hillside Auto
14 Outlet location.
15         Q.  Is that the same between 2018
16 and early 2020?
17         A.  Yes.
18         Q.  Was your position the same at
19 Hillside Auto Outlet as Hillside Auto Mall?
20         A.  Yes.
21         Q.  So, you were the controller for
22 Hillside Auto Outlet and Hillside Auto Mall?
23 The difference is that you would not do the
24 DMV for Hillside Auto Outlet; is that
25 correct?

Page 20

Deana Jennings

1
2          A.  Correct.
3          Q.  Besides the two companies that
4  you mentioned, did you work for any other
5  employers since 2008?
6          A.  No.
7          Q.  At the time when you began to do
8  work for Hillside Auto Outlet, in addition
9  to Hillside Auto Mall, what was said to you
10 by Josh Aronson?
11         A.  Can you repeat that again?
12              MS. TROY:  Ms. Reporter,
13              if you don't mind reading it
14              back.
15              (The reporter read back the
16              last question)
17         A.  He was opening up another store
18 and he wanted me to be the controller until
19 they found a full-time person for the
20 position.
21         Q.  Is it fair to say that you were
22 the controller for Hillside Auto Outlet on
23 or around when it began, meaning on or about
24 when it opened in 2018?
25         A.  Yes.

Page 21

Deana Jennings

1
2          Q.  You mentioned Josh Aronson.  How
3  are you familiar with him?
4          A.  Josh is a shareholder at
5  Hillside Auto Mall where I am employed, and
6  he is also a member of Hillside Auto Outlet.
7          Q.  While working for Hillside Auto
8  Mall and Hillside Auto Outlet between 2018
9  and early 2020, were there any people
10 working under you or for you?
11         A.  No.
12         Q.  Was there like an assistant,
13 meaning a controller assistant or an office
14 assistant, someone who helped you with the
15 job?
16         A.  At which location?
17         Q.  Let's start from Hillside Auto
18 Mall.
19         A.  No.
20         Q.  How about at Hillside Auto
21 Outlet location?
22         A.  No, not assistant, but they had
23 somebody that did the motor vehicle and a
24 bookkeeper here and there throughout the
25 year.

Page 22

Deana Jennings

1
2     Q.  You mentioned that you would do
3  the payroll for the Hillside Auto Mall as
4  well as Hillside Auto Outlet.  Can you
5  describe how the payroll would be done?
6     A.  At Hillside Auto Mall, I would
7  have one of our managers collect the
8  commission sheets and then I would just
9  tally it up.  Then, I would submit it to, I
10  believe it was -- I don't know which
11  company, possibly ADP.
12     Q.  How about for Hillside Auto
13  Outlet?
14     A.  Pretty much the same thing.
15  They would collect commission sheets and I
16  believe they would total everything and I
17  just submitted the information.
18     Q.  How would they transmit those
19  sheets; was it by email or in-person?
20     A.  Oh, I can't recall.
21     Q.  How would they submit those?
22     A.  Transmit.
23     Q.  Between 2018 and early 2020,
24  were you on the payroll for both companies?
25     A.  Yes.

Page 23

Deana Jennings

1
2     Q.  Besides hiring you, did Josh
3  Aronson hire anyone else, and let's start
4  from Hillside Auto Mall?
5     A.  No.
6     Q.  How about for Hillside Auto
7  Outlet?
8     A.  If Josh hired people?
9     Q.  Other than yourself.
10     The question is: did Josh Aronson hire
11  anyone else besides you for Hillside Auto
12  Outlet?
13     A.  No.
14     Q.  Did Hillside Auto Outlet own the
15  premises or did it lease it?
16     A.  I believe it's leased.
17     Q.  How about for Hillside Auto
18  Mall?
19     A.  Hillside Auto Mall is leased.
20     Q.  With respect to Josh Aronson,
21  what are his job responsibilities as a
22  shareholder for Hillside Auto Mall?
23     MR. KATAEV:  Objection as
24  to relevance.  You can
25  answer.

Page 24

Deana Jennings

1
2     A.  He is the operating member of
3  Hillside Auto.
4     Q.  As the operating member, what
5  are his responsibilities?
6     A.  Nothing much, Isaac handles all
7  that.
8     Q.  How about Hillside Auto Outlet,
9  what are his responsibilities?
10     A.  Whose responsibilities?
11     Q.  Josh Aronson.
12     A.  I thought you were asking me
13  about Hillside Auto Outlet with the previous
14  question.  I'm sorry.
15     Q.  What are Josh Aronson's
16  responsibilities at Hillside Auto Mall?
17     A.  He is our secretary, and he
18  doesn't have any responsibilities within the
19  dealership.
20     Q.  Earlier your response pertaining
21  to the operating member of Hillside Auto,
22  you were referring to his responsibilities
23  as related to Hillside Auto Outlet; is that
24  correct?
25     A.  Yes.

Page 25

Deana Jennings

1
2     Q.  So, Isaac who you saw yesterday
3  on the Zoom, how are you familiar with him?
4     A.  He is the general manager and
5  member of Hillside Auto Outlet.
6     Q.  Did Josh Aronson have the power
7  to hire and fire for Hillside Auto Mall?
8     A.  I would say yes.  Since he is an
9  owner, but we have managers that handle
10  those responsibilities within the
11  dealership.
12     Q.  How about for Hillside Auto
13  Outlet, did Josh Aronson have the power to
14  hire and fire?
15     A.  Again, he is a member, so I
16  would say he would have the ability to, and
17  again, he has a team of people to do that
18  for him.
19     Q.  Did you maintain the employee
20  records for Hillside Auto Mall?
21     A.  Yes.
22     Q.  How about for Hillside Auto
23  Outlet between 2018 and early 2020?
24     A.  Yes.
25     Q.  Earlier you mentioned the

Page 26

Deana Jennings

1
2  commission sheets. How are the commission
3  sheets kept?
4          A.  At Auto Outlet or Auto Mall?
5          Q.  Let's start from Auto Mall and
6  then we will move on to Auto Outlet.
7          A.  I would keep them in the
8  employee file.
9          Q.  That file, is that a paper file
10  or an electronic file?
11         A.  Paper.
12         Q.  When you say ''employee file,''
13  what category of employees are you talking
14  about?
15         A.  I just had a folder with the
16  employee's names and I would keep all of
17  their commission sheets in that folder.
18         Q.  Let me sort of try to clarify my
19  question.  My question is: what type of
20  employees would have an employee file with
21  the commission sheets, was that all the
22  employees or --
23         A.  Just the sale sales associates.
24         Q.  Would the business development
25  center people have any employee files as

Page 27

Deana Jennings

1
2  well?
3          A.  Yes.
4          Q.  Were employee files kept for
5  non-commission employees?
6          A.  I have an employee file for
7  them, yes.
8          Q.  Was that for each employee that
9  there is a separate file folder?
10         A.  Yes.  Whoever is hired, they get
11  a folder.
12         Q.  For how long are the records
13  kept?
14         A.  I think I still have them.
15         Q.  Between 2008 and the present
16  day, did you throw out any of the employee
17  files?
18         A.  No.
19         Q.  Were any of the employee files
20  missing or lost that you know of between
21  2008 and the present day?
22         A.  Not to my knowledge.
23         Q.  Let's turn our attention to
24  Hillside Auto Outlet. How are the employee
25  records kept there?

Page 28

Deana Jennings

1
2          A.  To the best of my knowledge,
3  it's the same way.  There is an employee
4  folder.
5          Q.  Let's turn our attention now for
6  a second to the car salespeople
7  specifically, what would be in a typical car
8  salesperson's employee folder?
9          A.  Driver's license, another form
10  of identification, their social security,
11  passport, the employee package.  That would
12  be the employee package, and they might have
13  had a folder for commission sheets, Hillside
14  Auto Mall had separate at that point.
15         Q.  You are saying that Hillside
16  Auto Mall would have two folders, if it's
17  for a car salesperson; one folder is with
18  the driver's license, ID and the employee
19  package and another folder is for the
20  commission sheets?
21         A.  Yes.
22         Q.  To your knowledge, were the
23  records ever lost or did you guys ever
24  discard any records between 2018 and the
25  present day?

Page 29

Deana Jennings

1
2          A.  No.  I think there was a law
3  that you have to hold documentation for at
4  least seven years before discarding it or
5  shredding it.
6          Q.  Let's focus on commission sheets
7  for a second.  The commission sheets are
8  filled out on a weekly basis; is that
9  correct?
10         A.  Correct.
11         Q.  The commission sheets that are
12  filled out on a weekly basis, would that
13  include what information, can you describe
14  it for me?
15         A.  For Auto Mall?
16         Q.  Let's start from Auto Mall and
17  then we will go to Auto Outlet.
18         A.  Okay.  For Auto Mall, we have a
19  sheet with the salesperson's name or the
20  BDC, rep's name.  It would list the amount
21  of time, it would be the customer's name,
22  possibly a partial VIN number, VIN number of
23  the car that they purchased. Sometimes the
24  date that it was sold.
25         Q.  Any other information that would

Page 30

Deana Jennings

1
2  be contained?
3       A.  That is pretty much it.
4       Q.  Would it include the sales price
5  and the commission that the car salesperson
6  would receive?
7       A.  Sometimes they would write it on
8  there for me.
9       Q.  If it was not written on there
10 for you, what would happen?
11      A.  I know their pay plan.
12      Q.  What was the pay plan for a
13 Hillside Auto Mall?
14      A.  Hillside Auto Mall is 250
15 salary, $250 salary and 100 commission.
16      Q.  Would that $100 commission be
17 per car?
18      A.  Yes.
19      Q.  Was there any bonus structure at
20 Hillside Auto Mall?
21      A.  No.
22      Q.  When you said that you would
23 tally up the numbers, you would tally the
24 number of cars sold and multiply it by the
25 commission, then add the salary; is that

Page 31

Deana Jennings

1
2  correct?
3       A.  On the sheet, I would just tally
4  up their commissions, and the salary was
5  just standard.
6       Q.  So, when you would tally up the
7  number, that would be the number of cars
8  sold?
9       A.  Yes.
10      Q.  Once you tallied up the number
11 of cars sold, you would then pass that
12 information to a third party, whether that
13 was ADP or some other company; is that
14 correct?
15      A.  Correct.
16      Q.  Now let's turn your attention to
17 Hillside Auto Outlet.  Are the commission
18 sheets the same or different from that of
19 Hillside Auto Mall?
20      A.  It was pretty much the same,
21 although they had a bookkeeper there and I
22 would print out the name and they would tell
23 me who gets paid this per week with the
24 commission, what it was and whatnot.
25          MR. KATAEV:  Can you hang

Page 32

Deana Jennings

1
2  on one second, Tiffany?
3          MS. TROY:  Yes.
4       (A recess was taken from
5       10:41 until 10:43)
6          MS. TROY:  Are you ready
7       to continue?
8          MR. KATAEV:  Ready to
9       continue. Thank you.
10         MS. TROY:  I believe your
11      client was responding --
12         MR. KATAEV:  I thought she
13      was done.
14      Q.  Did you finish what you were
15 saying?
16      A.  Okay.  I did not finish my
17 thought.
18      Q.  Perfect, go ahead.
19      A.  (Continuing) I have a printout
20 of the payroll screen with the employee's
21 names and they would write it for me to make
22 it easier.  They did 2 separate entries the
23 same day to make it easier for me.
24      Q.  What was the pay plan at
25 Hillside Auto Outlet?

Page 33

Deana Jennings

1
2       A.  The paid plan for Outlet was, I
3  believe 300 commission, 300 salary and 150
4  commission.
5       Q.  Was there a bonus structure of 5
6  percent at any time while you were working
7  as the controller?
8          MR. KATAEV:  Objection.
9       Vague.  You can answer.
10      A.  I believe they did have a bonus
11 structure at Outlet, Hillside Auto Outlet.
12      Q.  On the commission sheet for
13 Hillside Auto Outlet salespeople, what would
14 the tally look like?
15      A.  I can't recall that far back.
16 It's just should be just the full amount,
17 what the specific salesperson or employee
18 was getting paid that week.
19      Q.  To your knowledge, was Leticia's
20 folder like the two folders that you talked
21 about, are they still there at Hillside Auto
22 Outlet?
23      A.  I can't recall.
24      Q.  You mentioned that Isaac was the
25 manager for Hillside Auto Outlet; as the

Page 34

Deana Jennings

1
2 manager, did he have the power to hire and
3 fire?
4        A.  The general manager, yes, he had
5 the ability to hire and fire, yes.
6        Q.  Let's backtrack for second was
7 the pay for Hillside Auto Mall employees
8 only dependent upon the number of cars sold?
9        A.  Can you rephrase your question?
10       Q.  Sure.  How was the pay for
11 Hillside Auto Mall employees computed, and
12 I'm talking specifically about the car
13 salespeople?
14       A.  How was it recorded?
15       Q.  Yes, correct.
16       A.  I don't recall commission
17 sheets, might have had a blackboard in the
18 office, possibly a CRM.
19       Q.  Just so the record is clear,
20 what is an ''crm?''
21       A.  That is the platform and I don't
22 know exactly what it stands for.  But, the
23 platform for specific company, it could be
24 advertising or different companies.
25       Q.  You were talking about the

Page 35

Deana Jennings

1
2 Blackboard in the office, what would that
3 Blackboard contain, what information would
4 it contain?
5        A.  To my knowledge, it could have
6 had the salespeople's names and tally of how
7 many deals and that could be confusing,
8 Hillside Auto Mall.
9        Q.  Did either Hillside Auto Mall or
10 Hillside Outlet have its time clock?
11       A.  Hillside Auto Mall does not have
12 one, and I don't recall if Auto Outlet had a
13 time clock.
14       Q.  Did the salespeople's weekly
15 salary depend on the number of hours that
16 they worked?
17       A.  To the best of my knowledge, no.
18       Q.  Are you familiar with an
19 individual Susan Zhivo Z-H-I-V-O?
20       A.  Yes.
21       Q.  How are you familiar with her?
22       A.  She is the controller at
23 Hillside Auto Outlet.
24       Q.  Was she your successor?
25       MR. KATAEV:  Objection to

Page 36

Deana Jennings

1
2 the form on that one.
3        A.  Yes.
4        Q.  Do you recall when she began
5 working at Hillside Auto Outlet?
6        A.  I believe 2020.
7        Q.  To your knowledge, are her
8 responsibilities the same as yours?
9        A.  To my knowledge, yes.
10       Q.  Are you familiar with David
11 Barron, the late David Barron?
12       A.  Yes.
13       Q.  What were his responsibilities,
14 and let's start at Hillside Auto Mall?
15       A.  He is -- he was the Vice
16 President of Hillside Auto Mall, but no
17 responsibilities within the dealership.
18       Q.  How about at Hillside Auto
19 Outlet?
20       A.  David was a member of Hillside
21 Auto Outlet, same thing, no responsibilities
22 within the dealership.
23       Q.  Are you familiar with Jory
24 Baron?
25       A.  Yes.

Page 37

Deana Jennings

1
2        Q.  What are his responsibilities at
3 Hillside Auto Mall?
4        A.  Hillside Auto Mall?
5        Q.  Correct.
6        A.  Jory is not connected to
7 Hillside Auto Mall.
8        Q.  How about Hillside Auto Outlet?
9        A.  He is also a member.
10       Q.  What are his responsibilities?
11       A.  He would -- he does -- I
12 remember just maybe signing checks weekly,
13 nothing pertaining to like daily activities
14 within the dealership.
15       Q.  Did Isaac also have the power to
16 sign checks at Hillside Auto Outlet?
17       A.  No.
18       Q.  Besides Jory, is there anyone
19 else that has the authority to sign checks
20 for a Hillside Auto Outlet?
21       A.  To the best of my knowledge, I
22 believe Josh Aronson and David Barron.
23       Q.  Are you familiar with Raymond
24 Phelan P-H-E-L-A-N?
25       A.  Yes.

Page 38

Deana Jennings

1
2     Q.  What are his responsibilities at
3  Hillside Auto Mall?
4         A.  Raymond specifically is the
5  treasurer and he is pretty much like the
6  general manager.  He is at the dealership
7  every day and he oversees everything and he
8  hires and fires.
9         Q.  Does Ray Phelan have any
10  connection with Hillside Auto Outlet?
11         A.  No.
12         Q.  Is it fair to say that each of
13  the owners, meaning the late David Barron,
14  Josh Aronson, Jory Baron and Isaac Thanwalla
15  had the power to hire and fire at Hillside
16  Auto Outlet?
17              MR. KATAEV:  Objection.
18              Compounds and calls for legal
19              conclusion.  You can answer
20              the question.
21         A.  Can you repeat the names again,
22  please?
23              MS. TROY:  Sure.  Ms.
24              Court reporter, if you don't
25              mind reading back the last

Page 39

Deana Jennings

1
2  question.
3              (The reporter read back the
4              last question)
5         A.  Yes.
6         Q.  Is it fair to say that each of
7  the members, meaning Ronald, Baron, Ronald
8  Baron, the late David Baron, Josh Aronson
9  and Raymond Phelan had have or had the power
10  to hire and fire at Hillside Auto Mall?
11         A.  Yes.
12         Q.  Do you know who signed the lease
13  on behalf of Hillside Auto Outlet?
14              MR. KATAEV:  Objection to
15              relevance.  You can answer.
16         A.  I don't recall.
17         Q.  How about for Hillside Auto
18  Mall?
19         A.  Do you mean the original lease
20  back in 2008?
21         Q.  Yes.
22         A.  I wouldn't know that far back.
23         Q.  How about the current lease?
24         A.  The current lease for Hillside
25  Auto Mall was signed by Josh Aronson.

Page 40

Deana Jennings

1
2         Q.  Going to backtrack for a second,
3  who incorporated Hillside Auto Mall, Inc?
4         A.  I wouldn't know, I wasn't
5  employed there when they opened up.
6         Q.  When was that, was that in 2006
7  or --
8         A.  2005 or 2006.
9         Q.  Who filed the articles of
10  incorporation for 161-10 Hillside Auto
11  Avenue LLC?
12         A.  Who filed the articles of
13  incorporation?
14         A.  I wouldn't know that without my
15  records.
16         Q.  Are you familiar with whether
17  Hillside Auto Mall, whether at the time of
18  its incorporation, any attorneys were
19  consulted?
20         A.  When they first opened up
21  Hillside Auto Mall?
22         Q.  Correct.
23         A.  I was not employed at that time,
24  so I wouldn't know.
25         Q.  How about for 161-10 Hillside

Page 41

Deana Jennings

1
2  Auto Avenue LLC, at the time when that was
3  formed, did any member consult with an
4  attorney?
5         A.  I wouldn't know without my
6  records.
7         Q.  Do you know who was the signer
8  for the current lease of Hillside Auto
9  Outlet?
10         A.  No.
11         Q.  What is the name of the landlord
12  for Hillside Auto Mall?
13         A.  Hillside Auto Mall?
14         Q.  Right.
15              MR. KATAEV:  Objection as
16              to relevance.  You can
17              answer.
18         A.  Eldee E -L-D-E -E Auto Sales.
19         Q.  For Hillside Auto Outlet, who is
20  the landlord?
21         A.  I can't think of the name, I
22  believe to the best of my knowledge, the
23  Estate of Ezekiel E-Z-E-K-I-E-L Koeppel. K-O
24  -E-- P -P-E- L.  That is when I was employed
25  there and I don't know if they switched

Page 42

Deana Jennings

1
2     landlords from 2020 until now.
3         Q.  Who sets the pay plan or the pay
4     structure, and let's start from Hillside
5     Auto Mall?
6         A.  Majority of the time, it is
7     Raymond Phelan.
8         Q.  How about for Hillside Auto
9     Outlet?
10        A.  Isaac.
11        Q.  Were you ever present at sales
12    meetings between Jory Baron and Ishaque
13    Thanwalla?
14        A.  Sales meetings?
15        Q.  Or, like weekly or monthly
16    meetings.
17        A.  No.
18        Q.  To your knowledge, what, if any,
19    posters are posted at Hillside Auto Mall?
20        A.  We have the Labor Law posters,
21    we have the Consumer Affairs poster, we have
22    Covid posters until recently.  That is
23    pretty much what I can think of off the top
24    of my head.
25        Q.  The Labor Law posters, what was

Page 43

Deana Jennings

1
2     the year that it was first posted at
3     Hillside Auto Mall?
4         A.  I wouldn't know, I became
5     employed by Hillside Auto Mall in 2008.  So,
6     maybe 6 years after they opened.
7         Q.  Where is the Labor Law poster
8     posted?
9         A.  On the wall in the main trailer.
10        Q.  What does the Labor Law poster
11    look like?
12        A.  (It's a poster) and I don't know
13    how to describe it. It has the minimum wage
14    on it, and it is in blue, thus there is a
15    year Asha, there is the minimum wage and it
16    is Spanish and it is it also, and it is
17    laminated.
18        Q.  How about at Hillside Auto
19    Outlet, were there posters?
20        A.  Yes.
21           MR. KATAEV:  For the
22           record, your description was
23           pretty good.  Just joking.
24        Q.  For Hillside Auto Outlet, when
25    was the first time when the poster was

Page 44

Deana Jennings

1
2     posted?
3         A.  I can't recall the date that
4     they hung it up.
5         Q.  Was it the day when you started
6     working or sometime after?
7         A.  I can't recall.
8         Q.  Do you recall where it was
9     posted within the Outlet?
10        A.  If my memory serves me right, on
11    the wall in between the main trailer and the
12    office.  But, if my memory serves me right,
13    they might have moved them.
14        Q.  How many bank accounts did
15    Hillside Auto Mall have?
16        A.  What year?
17        Q.  Let's start from right now.
18        A.  Now, Hillside Auto Mall has 3.
19        Q.  Let's walk back to 2018, how
20    many bank accounts did it have back then?
21        A.  I believe in 2018, I think
22    probably 3 at that point as well, as far as
23    I can recall.
24        Q.  Do you recall at which bank?
25        A.  We have JPMorgan Chase & Co and

Page 45

Deana Jennings

1
2     TD Bank.
3         Q.  How about for Hillside Auto
4     Outlet, how many bank accounts does it have
5     currently?
6         A.  Currently, I wouldn't know.
7         Q.  Right before you left in 2020,
8     how many bank accounts did it have?
9         A.  I believe they had 4, might have
10    been 3 due to fraudulent transactions.
11    Maybe 3 or 4.
12        Q.  Which bank was it --
13        A.  In 2018 to 2020, I believe it
14    was just JPMorgan Chase.
15        Q.  Who had the authority to
16    withdraw money from Hillside Auto Mall's
17    bank account?
18           MR. KATAEV:  Objection as
19           to relevance.  Also, all of
20           these financial questions
21           were decided in the Motion,
22           and I instruct the witness on
23           the basis on that basis not
24           to answer the question.
25           MS. TROY:  The judge

Page 46

Deana Jennings

1
2    stated in a very specific
3    reason with respect to
4    discovery and financial
5    information.  If I can have
6    your commitment that because
7    of discovery, and I believe
8    it closes on March 24th, I
9    don't believe that this stage
10   of discovery is now
11   different.  If you are
12   instructing your witness not
13   to answer on the basis of the
14   order of the motion to
15   compel, maybe you are
16   subjecting your witness to a
17   second deposition.
18       MR. KATAEV:  I believe
19   that we should actually do
20   this off the record.
21       MS. TROY:  We can keep it
22   on the record, just this
23   portion.
24       MR. KATAEV:  Okay.  What I
25   think we can do is in the

Page 47

Deana Jennings

1
2    event that the judge decides
3    that the question was proper,
4    I am comfortable submitting
5    interrogatory responses
6    unless the court orders her
7    to come back for another
8    deposition.
9        MS TROY:  That is fine.
10       MR. KATAEV:  Thank you for
11   that.
12       Q.  Who had the authority to
13   withdraw money from Hillside Auto Outlet's
14   bank account?
15       MR. KATAEV:  Same
16   objection and same
17   instruction on that.
18       A.  (No response per her attorney)
19       Q.  Roughly how many cars on-average
20   does Hillside Auto Mall sell?
21       A.  It's a tough industry right now,
22   between maybe 30 and 50, depending on the
23   economy and the market.
24       Q.  Back in 2018 and 2019, how many
25   cars were sold?

Page 48

Deana Jennings

1
2        A.  I wouldn't know off the top of
3    my head without my records.  I'm sorry.
4        Q.  What records, if any, would
5    include the number of cars sold by the
6    dealership?
7        A.  Would it show how many cars were
8    sold by the dealership?
9        Q.  Correct.  For instance, for
10   Hillside Auto Mall, what records would show
11   the number of cars sold back in 2018 and
12   2019?
13       A.  Our computer system.
14       Q.  Is that computer system the same
15   or different from VIN Solutions?
16       A.  It's different.
17       Q.  Can you describe for me the
18   computer system, what type, what kind of
19   data is included?
20       A.  It is our operating system and
21   it has the deals for the vehicles that were
22   sold, that is the accounting and it has
23   vehicle information.
24       Q.  How about for Hillside Auto
25   Outlet, right before you left, how many cars

Page 49

Deana Jennings

1
2    were sold per-month?
3        A.  I wouldn't know offhand without
4    my records. I'm sorry.
5        Q.  Did you review at all the sales
6    records in preparation for today's
7    deposition, and specifically the sales
8    records for Hillside Auto Outlet between
9    2018 and 2019?
10       A.  I believe so.
11       Q.  When you say that you ''believe
12   so,'' do you mean yes, you did?
13       A.  I reviewed a lot of documents
14   and I can't recall if it was specifically
15   her information or her computer sheets.
16       Q.  Did you review her computer
17   sheets in preparation for today's
18   deposition?
19       A.  I can't recall if I saw them in
20   the documents that I reviewed.
21       Q.  On-average, how much would each
22   car sell for?
23       MR. KATAEV:  Objection.
24   Vague, but you can answer.
25       A.  I don't know what she sold the

Page 50

Deana Jennings

1
2 vehicles for, a lot goes into the year,
3 make, model and mileage.
4     Q.  How about on-average?
5     A.  I would not be able to come up
6 with a figure for that.
7     Q.  Are you familiar with the
8 working schedule for and let's start from
9 Hillside Auto Mall employees?
10     A.  Yes.
11     Q.  What was the working schedule?
12     A.  What year do you mean, going
13 back to when?
14     Q.  Let's start from 2017.
15     A.  The employees at Auto Mall
16 usually would work -- the schedule would
17 always change, but it used to be six days
18 with two days off per week and it would
19 rotate sometimes.  Now, we are down to maybe
20 they do probably five days, one day off,
21 rotating on Sundays, possibly and I don't
22 really handle scheduling.
23     Q.  Who handled scheduling for
24 Hillside Auto Mall?
25     A.  Raymond Phelan.

Page 51

Deana Jennings

1
2     Q.  Was the schedule the same in
3 2016?
4     A.  I can't recall that far back.
5     Q.  How about for Hillside Auto Mall
6 in 2018, was it also six days a week with
7 alternating Sundays off?
8     A.  I can't recall that far back.
9     Q.  What can you recall in terms of
10 the schedule at Hillside Auto Outlet?
11     A.  Auto Outlet?
12     Q.  Yes.
13     A.  Ishaque handled the scheduling,
14 so I don't know.
15     Q.  When was the start time for
16 Hillside Auto Mall employees?
17     A.  I wouldn't know, I didn't have
18 anything to do with the scheduling or what
19 time people started.
20     Q.  What about the end time, are you
21 familiar with the end time?
22     A.  No.
23     Q.  Are you familiar with start time
24 or end time at Hillside Auto Outlet?
25     A.  For the hours of actual

Page 52

Deana Jennings

1
2 operation or the salesperson's start and end
3 time?
4     Q.  Let's start from the salesperson
5 start and end time.
6     A.  I don't know how Isaac set their
7 schedule up.
8     Q.  Now, let's turn to the hours of
9 operation; what was the start and end time
10 for the hours of operation?
11     A.  If my memory serves me
12 correctly, it was 10 to maybe -- maybe 10 to
13 7 or 8.
14     Q.  Besides yourself and the
15 bookkeeper that you mentioned earlier, was
16 there anyone else who would calculate the
17 employee's pay at either Hillside Auto Mall
18 or Hillside Auto Outlet?
19     A.  Hillside Auto Mall was only me,
20 and Hillside Auto Outlet, I don't know if
21 anyone else tallied it up, but the
22 bookkeeper would give it to me and I would
23 assume she was the one that tallied up the
24 information in the computers for that week.
25     Q.  Is that bookkeeper that you

Page 53

Deana Jennings

1
2 mentioned, did that bookkeeper change?
3     A.  Yes.
4     Q.  What are the names of the
5 bookkeepers that you still recall the names
6 for?
7     A.  All I remember, one name is Asha
8 and the other two I don't know their names
9 without my records.
10         MS. TROY:  So, I'm going
11     to leave a blank for the two
12     names.
13
14     (Insert)
15
16     (Insert)
17     Q.  Can you give the name that you
18 recall right now?
19     A.  Asha A-S-H-A.
20     Q.  Do you have her last name?
21     A.  No.  Not without my records.
22         MS. TROY:  We will leave a
23     blank for you to look into
24     your records and fill in the
25     last name.

Page 54

Deana Jennings

1
2
3            (Insert)
4        Q. How many people work for
5    Hillside Auto Mall at any one time?
6        A. How many people work at Auto
7    Mall at any one given time? It varies.
8        Q. Let's take a day, let's say a
9    weekend day, how many people would be there?
10       A. Oh, I'm sorry.  I thought you
11   meant in general how many people were part
12   of the employment staff. You just mean
13   daily?
14       Q. Yes.
15       A. We could have all together the
16   sales people, me, a porter, 5 or 6.  Again,
17   we had more employees throughout the years,
18   some years we had less employees and I can't
19   give you an accurate answer on that one.
20       Q. How about back in 2006, how many
21   people would be working at Hillside Auto
22   Mall on any given day?
23       A. Giving an example, maybe 10 or
24   12 or 13.
25       Q. How about for Hillside Auto

Page 55

Deana Jennings

1    Outlet?  And let's start from 2018.
2        A. I wouldn't know without my
3    records.
4        Q. How about in 2020, right before
5    you left, how many people would be working
6    at Hillside Auto Outlet on any given day?
7        A. I wouldn't know without my
8    records.
9        Q. Besides yourself, did anyone
10   else work between Hillside Auto Outlet and
11   Hillside Auto Mall at the same time?
12       A. No.
13       Q. To your knowledge, if a car is
14   not in stock, it is not present at Hillside
15   Auto Outlet lot, would the car salespeople
16   come over to Hillside Auto Mall to show cars
17   there?
18       A. Very seldom did it happen, but
19   we had a few other car dealerships on
20   Hillside Avenue.  So, we had a variety and
21   we usually, if the customer wanted a
22   specific car, we would look and see who had
23   the car in inventory, Hillside Auto Mall or
24   Hillside Auto Outlet or previous dealerships

Page 56

Deana Jennings

1
2    around, such as auctions or dealerships out
3    of state.
4        Q. Are you familiar with the
5    plaintiff in this case Leticia Stidhum?
6        A. Yes.
7        Q. How are you familiar with her?
8        A. She was employed at Hillside
9    Auto Outlet.
10       Q. Do you have any knowledge about
11   her working schedule?
12       A. I do not.
13       Q. Do you have any knowledge about
14   her work performance?
15       A. From what I have heard, she was
16   a very good salesperson, maybe one of the
17   top salespeople, monthly.
18       Q. Where did you hear that from?
19       A. Probably Isaac.
20       Q. To your knowledge, was she ever
21   disciplined?
22       A. I wouldn't know, I wouldn't be
23   part of that.  So, I can't give you an
24   answer on that one.  I am not part of the
25   disciplinary action department.

Page 57

Deana Jennings

1
2        Q. Who was part of the
3    ''disciplinary action department?''
4        A. Isaac handled that.
5            MR. KATAEV:  Objection to
6            the form.
7        Q. Did Hillside Auto Mall and/or
8    Hillside Auto Outlet have any policies about
9    keeping track of employee performances?
10       A. I wouldn't know off the top of
11   my head.
12       Q. Were the employee photos that
13   you previously described for us, was there
14   ever a time there would be a performance
15   evaluation there in that set of records?
16       A. Hillside Auto Mall, no, Hillside
17   Auto Outlet, I wouldn't know.
18       Q. Are you familiar with a DMV
19   clerk who worked for Hillside Auto Outlet
20   whose first name is Lily?
21       A. No.
22       Q. Do you know that Lily left
23   Hillside Auto Outlet while pregnant and that
24   she believed that she was terminated as a
25   result of her pregnancy?

Deana Jennings

1
2      MR. KATAEV:  Objection as
3   to relevance and it's a
4   compound question.  You can
5   answer the question.
6      A.  I don't even recall who Lily
7   was.  So, I don't know anything about it,
8   really.
9      MR. KATAEV:  Also
10  objection to that as it calls
11  for a state of mind of
12  another person.
13     MS. TROY:  Let's go off
14  the record.
15     (A discussion was held off
16  the record).
17     Q.  You mentioned that the BDC also
18  had employees folders, was that one folder
19  or two folders at Hillside Auto Outlet?
20     A.  I don't recall.
21     Q.  Is it fair to say that if an
22  individual was at Hillside Auto Outlet that
23  that record would include, their records
24  would be in the employee files?
25     A.  Their employment package and

Deana Jennings

1
2   their application would be in there, in that
3   employee file.  I don't recall how they
4   filed commission sheets or how they kept
5   them in the folders or whatnot at Hillside
6   Auto Mall.  There were two separate folders
7   there.
8      Q.  To your knowledge, was there any
9   fixed break time for the employees at either
10  Hillside Auto Outlet or Hillside Auto Mall?
11     A.  No, they could just take a break
12  whenever they wanted.
13     Q.  Could you tell what type of
14  employee a person is by looking at a pay
15  stub and seeing how much that person had
16  made as a base wage as well as the flat
17  commission that you were talking about;
18  specifically, I'm talking about Hillside
19  Auto Outlet.
20     MR. KATAERV:  Objection to
21  the form, as its compound.
22  You can answer.
23     A.  That's a lot of question.  You
24  could see who is more veteran in the sales
25  department, and -- you could tell if

Deana Jennings

1
2   somebody just started, the top sales for the
3   company, it tells that, and then you really
4   can't gauge it precisely with numbers.
5      Q.  Were there any car salespeople
6   who were paid a base pay of $350 per week?
7      A.  I can't answer that without my
8   records.
9      Q.  How about a weekly pay of $500.
10     A.  That might have been -- again, I
11  wouldn't know the correct answer without my
12  records.
13     Q.  Are you familiar with an
14  individual known as Andris Guzman?
15     A.  Yes.
16     Q.  How are you familiar with him?
17     A.  He was employed at Hillside Auto
18  Outlet.
19     Q.  What was his performance as a
20  sales manager/or general sales manager at
21  Hillside Auto Outlet?
22     A.  I wouldn't know, but I heard
23  good things about him.
24     Q.  What did you hear?
25     A.  Professional, helping everybody

Deana Jennings

1
2   out, jumping in and got the job done.
3      Q.  Were you at Hillside Auto Outlet
4   when Leticia Stidhum brought in a sonogram
5   and announced that she was pregnant?
6      A.  No.
7      MR. KATAEV:  Objection.
8   Assuming facts not in
9   evidence.
10     Q.  When was the first day when you
11  heard that Leticia was pregnant?
12     MR. KATAEV:  Objection.
13  It assumes facts not in
14  evidence.  You can answer the
15  question.
16     A.  I can't recall that long ago.
17     Q.  Do you recall if at the time
18  when you found out that Leticia was
19  pregnant, if she was still employed by
20  Hillside Auto Outlet.
21     MR. KATAEV:  Same
22  objection.  You can answer.
23     A.  I believe she was pregnant and
24  still employed at Hillside Auto Outlet.
25     Q.  How did you find out?

Deana Jennings

1
2     A. About her pregnancy?
3     Q. Correct?
4     A. I can't recall. I don't know if
5  I heard it from her when I was there one
6  day, I don't recall.
7     Q. Besides yourself, who else knew
8  about her pregnancy?
9        MR. KATAEV: Objection.
10    Q. (Continuing) My timing is while
11 she was still employed at Hillside Auto
12 Outlet.
13       MR. KATEV: Objection.
14       Calls for a state of mind of
15       another person. You can
16       answer.
17    A. I don't know exactly who now,
18 who she told.
19    Q. Was Isaac aware?
20    A. I'm sure he was.
21    Q. Why do you say that?
22       MR. KATAEV: Same
23       Objection.
24    A. Because he was the general
25 manager. You just mentioned that she

Deana Jennings

1
2  brought in the sonogram to the dealership,
3  Isaac worked seven days a week.
4     Q. How about Andris Guzman, did he
5  know of Leticia's pregnancy, to your
6  knowledge?
7     A. I don't know if he was aware
8  when she became pregnant.
9     Q. Did you look at her sales or
10 commissions and compare her sales before and
11 after the pregnancy announcement?
12    A. No.
13    Q. I'm showing you a series of
14 documents, Plaintiff's Exhibit 2. It is
15 page 1251, and it's the 1099 compensation or
16 a week is $2,500. Do you know who this
17 individual is?
18    A. I can't recall.
19    Q. Do you know what position this
20 person is in?
21       MR. KATAEV: Objection as
22       to relevance. You can
23       answer.
24    A. No.
25    Q. We're on page 1252, this

Deana Jennings

1
2  individual was paid $650 a week. Do you
3  know what position this individual is in?
4     A. No.
5     Q. Now looking at page 1254, number
6  2, is it fair to say, and let's backtrack
7  for a second. My question is: what position
8  did this individual have?
9     A. I can't tell.
10    Q. How about this individual on
11 page 1255?
12    A. I can't tell from the picture.
13    Q. However the individual on page
14 1256 with a base salary of $200?
15    A. Again, I can't tell.
16    Q. The individual on page 1257 with
17 a base salary of 300?
18    A. I can't tell.
19    Q. Is there any individual for whom
20 you can tell which position the individual
21 is in just by looking at the pay stub?
22    A. Just the earnings? I can't tell
23 based on what is shown in the documents.
24    Q. Just for the record, Isaac
25 Thanwalla said during his deposition that he

Deana Jennings

1
2  was also unable to tell which position the
3  individuals were in, and the redacted
4  records that were produced for the
5  comparator of Leticia Stidhum. At the time,
6  he said that he would ask the accountant and
7  look at that and provide the information to
8  this office. To this day, no information
9  has been provided and we're now doing the
10 30(b)6 witness. It seems like the corporate
11 witness's representative, is also unable to
12 provide the information. But, with respect
13 to the comparators that were employed.
14       MS. TROY: Demand number
15       20 for the employee files of
16       Leticia Stidhum, including
17       the sales commissions sheet
18       that was previously requested
19       or not provided.
20       Demand number 21 is the
21       employee file for the DMV
22       clerk Lily, who was fired at
23       the time that she was
24       pregnant. We don't need all
25       the files, we just need

Page 66

Deana Jennings

1
2 anyone with information,
3 written documents relating to
4 her discipline as well as her
5 termination that is on file.
6 MR. KATAEV:  Please
7 follow-up in writing.
8 MS. TROY:  Also the last
9 name and her last name and
10 last known address.
11 MS. TROY:  Do you guys
12 want to take a 10 minute
13 break or do you want to take
14 a lunch break?  It's up to
15 you guys.
16 MR. KATAEV:  10 minutes is
17 fine.
18 MS. TROY:  Let's come back
19 in 10 minutes, let's come
20 back at 11:55.
21 (A recess was taken from
22 11:44 a.m. until 11:54 a.m.)
23 MS. TROY:  We are back on
24 the record at 11:54.  Let's
25 continue.

Page 67

Deana Jennings

1
2 Demand number 22 will be
3 the office records pertaining
4 to the number of cars sold at
5 Hillside Auto Outlet, and
6 specifically for Leticia
7 Stidhum and the other car
8 salespeople, and that would
9 be October, 2018 until
10 February of 2019.
11 MR. KATAEV:  Please put
12 those demands in writing.
13 Thank you.
14 Q.  Are you familiar with the
15 Dealertrak system?
16 A.  Yes.
17 Q.  To your knowledge, who has
18 access to the Dealertrak system at Hillside
19 Auto Outlet in 2018?
20 A.  To the best of my knowledge,
21 it's the manager, Isaac, the finance
22 managers, and Andris Guzman, Andris Guzman.
23 Q.  You were working for Hillside
24 Auto Outlet, were there times when you would
25 be present on the sales floor?

Page 68

Deana Jennings

1
2 A.  Passing through from the front
3 door to the office, not lingering or sitting
4 there?
5 Q.  Was there ever a time when you
6 would see Leticia Stidhum running the credit
7 on the Dealertrak system?
8 A.  No, not to my knowledge.
9 Q.  To your knowledge, was she ever
10 given access to Dealertrak by Isaac?
11 A.  I wouldn't know if Isaac gave
12 somebody access.  Again, the managers had --
13 I would say it's highly unlikely.
14 Q.  Did Isaac personally train
15 Leticia on how to run credit on the
16 Dealertrak system?
17 A.  I would have no idea.
18 Q.  The cell phone that you left in
19 your car, is that the same cell phone that
20 you used back in 2018 or 2019?
21 A.  No.
22 Q.  What is the phone that you used
23 back in 2018/2019?
24 A.  I don't know iPhone-something 8,
25 I believe.

Page 69

Deana Jennings

1
2 Q.  Do you use an iPhone currently?
3 A.  Yes, I do.
4 Q.  What is your phone number?
5 A.  732-858-2614.
6 Q.  Is that number back in
7 2018/2019?
8 A.  When did I change my number
9 last?  I believe so, but I can't remember.
10 I don't know exactly when I changed it.
11 Q.  While you were the controller of
12 Hillside Auto Outlet, did you communicate
13 with any of the named defendants or the
14 plaintiff by text?
15 A.  I'm sure I have.
16 Q.  Do you still have any of those
17 text messages?
18 A.  No.
19 Q.  Do you know why not?
20 A.  I don't like a long list of
21 messages on my phone.  I have OCD, and I
22 don't like having all of those names.  I try
23 to keep it to who I spoke to and -- on a
24 daily basis, and the list is short.
25 Q.  Were any of the text messages

Page 70

Deana Jennings

1
2  with the named defendants about Leticia
3  Stidhum?
4        A.  Do you mean current day?
5        Q.  Let's start from currently, and
6  then we will work our way back.
7        A.  No.  Possibly like for documents
8  for the case.
9        Q.  How about back in 2018 and 2019?
10       A.  Not that I can recall.  I don't
11  really have interaction with the salespeople
12  like that, usually something -- that's
13  something that the manager can help them if
14  they have a question or something where you
15  ask a manager to help you.
16       Q.  What was your email back then in
17  2018/2019?
18       A.  D-E-E 216456@aol.com.
19       Q.  Through your aol email address,
20  did you ever send emails to or from any of
21  the named defendants about Leticia?
22       A.  No, not back then.  Maybe
23  pertaining to the case.
24       Q.  Do you have a work email as
25  well?

Page 71

Deana Jennings

1
2        A.  No.  We had one, but I don't use
3  it and we didn't continue the subscription
4  for the Gmail account.
5        Q.  Are you familiar with Auto
6  Funds?
7        A.  To an extent.
8        Q.  To your knowledge, what is Auto
9  Funds?
10       A.  I believe it's the company that
11  feeds our inventory to our computer website.
12       Q.  To your knowledge, did Leticia,
13  would Leticia ever be given access to Auto
14  Funds?
15       A.  I wouldn't know the answer to
16  that question.
17       Q.  I'm now showing you on the
18  screen what was marked as Plaintiff's
19  Exhibit 2, and we are on page 2.  I'm going
20  to scroll down.
21            (Ms. Troy complies).
22       You recognize this document on page 2?
23       A.  It looks like maybe VIN
24  Solutions, but I really can't tell.  I don't
25  deal with the leads with respect to the

Page 72

Deana Jennings

1
2  dealership.  It looks like VIN Solutions.
3        Q.  Is it fair to say that VIN
4  Solutions understated the number of cars
5  sold?
6        MR. KATAEV:  Objection as
7        to the form.  There was no
8        evidence --
9        A.  I don't know if it's accurate,
10  but they do keep some of what a total for
11  the interaction of the sales customers with
12  the sales records.
13       Q.  Was the bookkeeper the same as
14  the assistant office manager at Hillside
15  Auto Outlet?
16       A.  I don't know.
17       Q.  Do you have the names?
18       A.  Yes, Asha.
19       Q.  Who else?
20       A.  Just her.  What was her
21  position, is it just bookkeeper?
22       A.  She was the bookkeeper and I
23  don't know If she had the title of office
24  manager.  They are mainly the same thing,
25  just bookkeeper, I would say.

Page 73

Deana Jennings

1
2        Q.  Are you familiar with an
3  individual whose name is Ali A-L-I?
4        A.  Ali used to work at Outlet.
5        Q.  What was his position?
6        A.  I think he was manager of some
7  sort.
8        Q.  Let's backtrack for a second: do
9  you have use of any social media platforms
10  like WhatsApp or Facebook Messenger to
11  checks with any of the named defendants?
12       MR. KATAEV:  Objection to
13       the assent that this was not
14       something that she can answer
15       in her capacity as a 30(b)6
16       witness.
17       A.  I don't really message people on
18  social media, I am more of a texter or
19  calling person.  So, I am pretty sure none
20  of them have -- I don't have social media
21  really, I don't have WhatsApp and I don't
22  keep that up.  Maybe my landlord uses that
23  for me, but that's it.
24       Q.  Did Leticia at any point to tell
25  you personally about her pregnancy?

Page 74

Deana Jennings

1
2     A.  Again, I don't recall how I
3  found out.  I think I remember knowing about
4  it and congratulating her, but I don't know
5  how I found out whether it's from her or
6  someone else, being aware that she was
7  pregnant at that time.
8     Q.  Do you recall if this was before
9  or after Christmas when you congratulated
10 her?
11     A.  I can't recall.
12     Q.  How about before or after
13 Thanksgiving?
14     A.  I can't recall.
15     Q.  Was it before or after New
16 Year's?
17     A.  I can't recall.
18     Q.  Do you recall when Isaac made
19 his trip to Pakistan in 2018, December?
20     A.  I believe it was -- there was a
21 few dates that he went.
22     Q.  I'm asking you about December of
23 2018.
24     A.  No, I just know it was the end
25 of December.  I believe he was gone for a

Page 75

Deana Jennings

1
2  couple of weeks.
3         MS. TROY:  Maybe now will
4      be a good time for us to take
5      a quick lunch break.  It is
6      now 12:10 and let's come back
7      at 12:55.
8         MR. KATAEV:  That should
9      be fine.
10        (A recess was taken from
11     12:10 p.m. until 12:55 p.m.)
12        MS. TROY:  We're back on
13     the record at 12:55
14     Q.  We are almost done.  Let's go
15 back on the record, and Ms. Jennings, can
16 you let me know who the CPA is for Hillside
17 Auto Mall?
18     A.  Hillside Auto Mall?
19     Q.  Right.
20        MR. KATAEV:  Objection.
21     You can answer.
22     A.  I would have to check my records
23 depending on the year, who should be the
24 accountant because it fluctuates.
25     Q.  How about for Hillside Auto

Page 76

Deana Jennings

1
2  Outlet?
3     A.  Pretty much the same thing. It
4  fluctuates depending on the year, which
5  owner decided to go with which company.
6     Q.  Do you recall in 2018/2019 who
7  the CPA?
8     A.  I can't recall without my
9  records that far back.
10        MS. TROY:  Demand number
11     23 will be documents
12     sufficient to establish the
13     name and address of the
14     accountants for Hillside Auto
15     Mall in 2018/ 2019.
16        Demand 24 will be for
17     documents sufficient to
18     identify the CPA for Hillside
19     Auto Outlet for 2018/2019.
20     Q.  Ms. Jennings, when were you told
21 to not bring your cellphone to the
22 deposition?
23        MR. KATAEV:  Objection.
24     With the caveat that if you
25     had any conversations with

Page 77

Deana Jennings

1
2      your attorney about the
3      subject, I instruct you not
4      to answer.
5     A.  (No response).
6     Q.  Did anyone besides your attorney
7  tell you not to bring this cell phone to
8  this deposition today?
9     A.  No.  I left it charging in my
10 car because I needed the navigation to come
11 here from New Jersey.  I did not unplug my
12 phone from my charger.
13     Q.  Are you aware that during the
14 break I made a request to your attorney for
15 you to bring your cell phone back to the
16 deposition at or before the end of the lunch
17 break?
18        MR. KATAEV:  Objection as
19     to attorney/client privilege.
20     I instruct the witness not to
21     answer the question.
22        MS. TROY:  I'm not asking
23     what was said between you and
24     her, I'm asking her if she
25     was aware that there was a

Page 78

Deana Jennings

1
2       demand that was made for the
3       cell phone to be brought back
4       from the car to the
5       deposition.
6           MR. KATAEV:  I'm going to
7       qualify my objection.  If you
8       have any independent
9       knowledge of that, you may
10          answer from your knowledge.
11          If your knowledge is based on
12          my conversations with you,
13          you may not answer.
14      A.  I am confused right now.  I
15  don't recall being notified about anyone's
16  cell phone, it is 30 degrees outside and I'm
17  not walking outside to get it.
18      Q.  Are you familiar with the sales
19  process at Hillside Auto Outlet?
20      A.  To an extent, yes.
21      Q.  What is the sales process, and
22  please break it down into the different
23  components with the approximate time?
24      A.  Well, customer comes in and they
25  proceed and they meet with the salesperson.

Page 79

Deana Jennings

1  I don't know how long it takes for them, but
2  they look at a vehicle that they are
3  interested in, and see if it's in their
4  price range.  Usually after they land a car,
5  the salesperson gives the sales manager or
6  the manager the corresponding application to
7  submit.  It could take between maybe 15 or
8  20 minutes to maybe 45 minutes to an hour.
9  There is a lot of qualifications and
10  verifications such as pay stubs, identity,
11  Asha, red flags.
12      After that is said and done, then it
13  goes to the finance manager and he will
14  submit everything to the bank.  Then, they
15  will wait for the bank to give them an
16  approval or not.
17      Q.  When you talked about the
18  salesperson would give the sales manager the
19  credit application to submit, is that where
20  the Dealertrak comes in?
21      A.  Yes.
22      Q.  Have you ever seen or do you
23  have knowledge of the fact that other car
24  salespeople's credit applications were

Page 80

Deana Jennings

1
2  prioritized over Leticia Stidhum's customers
3  credit applications?
4      A.  No.
5      Q.  Were you aware of any
6  communications between any of the named
7  defendants with the plaintiff, Leticia
8  Stidhum, about promoting her to a sales
9  manager position?
10      A.  Not that I was made aware of.
11      Q.  Backtracking for a moment, are
12  you familiar with whether customers of
13  Hillside Auto Outlet walked out as a result
14  of the long wait time?
15      A.  No.
16      Q.  Were you aware that Leticia
17  Stidhum complained about the longer wait
18  time?
19      A.  No, not until this case.
20      Q.  Are you a party to any other
21  civil proceeding besides this one?
22      A.  No.
23          MS. TROY:  I have no
24          further questions for you.
25          Thank you, Ms. Jennings.

Page 81

Deana Jennings
[Time noted: 12:54 p.m.]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82

| | WITNESS | EXAMINATION BY | | PAGE |
|---|---|---|---|---|
| 1 | | | | |
| 2 | WITNESS | EXAMINATION BY | | PAGE |
| 3 | Ms. Jennnings | Ms. Troy | | |
| 4 | | PLAINTIFF EXHIBITS | 6 | |
| 5 | Number | Description | | PAGE |
| 6 | | | | |
| 7 | 20 | ID - Deemed marked | | 6 |
| 8 | | | | |

Page 83

| | | REQUESTS | |
|---|---|---|---|
| 1 | | | |
| 2 | | REQUESTS | |
| 3 | Number | Description | PAGE |
| 4 | 22 | Demand No. 22 is: | 67 |
| 5 | | MS. TROY:  Will be | |
| 6 | | the office records | |
| 7 | | pertaining to the | |
| 8 | | number of cars sold | |
| 9 | | at Hillside Auto Outlet, | |
| 10 | | and specifically, for | |
| 11 | | Leticia Stidhum and the | |
| 12 | | other car salespeople, | |
| 13 | | and that would be October, | |
| 14 | | 2018 until February of | |
| 15 | | 2019. | |
| 16 | 23 | Demand No. 23 is: | 76 |
| 17 | | MS. TROY:  Will be | |
| 18 | | documents sufficient to | |
| 19 | | establish the name and | |
| 20 | | address of the accountants | |
| 21 | | for Hillside Auto Mall in | |
| 22 | | 2018/2019. | |
| 23 | 24 | Demand No. 24 is: | 76 |
| 24 | | MS. TROY:  Will be for | |
| 25 | | documents sufficient to | |

Page 84

1
2          identify the CPA for
3          Hillside Auto Outlet for
4          2018/2019.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 85

1
2    QUESTIONS MARKED FOR A RULING:    PAGE/LINE
3    (None)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 86

1
2                    ACKNOWLEDEGMENT
3
4      STATE OF NEW YORK    )
5                    )s.s.
6      COUNTY OF MIDDLESEX )
7          I, DEANA JENNINGS, hereby certify
8      that I have read the transcript of my
9      testimony taken under oath in my deposition
10     of March 10, 2023; that the transcript is a
11     true, complete and correct record of my
12     testimony, and that the answers on the
13     record as given by me are true and correct.
14
15
16     _____
17                  DEANA JENNINGS
18
19     Signed and subscribed before me
20     this _____ day of _____, 2023.
21
22
23     _____
24         Notary Public
25

---

Page 87

1
2              C E R T I F I C A T E
3
4      STATE OF NEW YORK    )
5                    )s.s.
6      COUNTY OF NASSAU     )
7
8          I, LYNN LUCKMAN, a Shorthand
9      Reporter and Notary Public within and for
10     the State of New York, do certify that;
11         THAT the witness whose deposition
12     is hereinbefore set forth, was duly sworn by
13     me, and that such deposition is a true
14     record of the testimony given by such
15     witness.
16         I further certify that I am not
17     related to any of the parties to this action
18     by blood or marriage; that I am in no way
19     interested in the outcome of this matter.
20         IN WITNESS WHEREOF, I have
21     hereunto set my hand this 21st day of March,
22     2023.
23                        Lynn Luckman
24     _____
25                   LYNN LUCKMAN

---

Page 88

1   Errata Sheet
2
3   NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
4   DATE OF DEPOSITION: 03/10/2023
5   NAME OF WITNESS: DEANA JENNINGS
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25              _____