UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

LETICIA FRANCINE STIDHUM,

                    Plaintiff,                **MEMORANDUM AND ORDER**
                                            21-CV-07163 (OEM) (LB)

      -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
and ANDRIS GUZMAN,

                    Defendants.
---------------------------------------------------------------x

ORELIA E. MERCHANT, United States District Judge:

       Plaintiff Leticia Francine Stidhum ("Plaintiff") commenced this action against Defendants 161-10 Hillside Auto, LLC ("Hillside Auto Outlet"), Hillside Auto Mall, Inc. ("Hillside Auto Mall"), and individual defendants Ishaque Thanwalla ("Thanwalla"), Ronald M. Baron,[1] Jory Baron ("Baron"), and Andris Guzman ("Guzman") (collectively, "Defendants"), asserting claims of employment discrimination on the basis of sex, pursuant to the Pregnancy Discrimination Act ("PDA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. 2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), NY Exec. § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL") NYC Admin. § 8-107.

       Before the Court is Defendants' fully briefed motion for summary judgment.[2]  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED in part.

---

[1] On May 18, 2023, the Court so ordered a Stipulation of Voluntary Dismissal with Prejudice, ECF 69, dismissing, Ronald M. Baron.  Accordingly, the Court *sua sponte* amends the caption of this case.
[2] *See* Defendants' Motion for Summary Judgment ("Defs.' Mot."), ECF 99; Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Mem."), ECF 100; Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Defs. 56.1"); Defendants' Affidavit/Declaration

## BACKGROUND[3]

### A. The Parties

Hillside Auto Outlet, a domestic limited liability company, was formed on June 12, 2017, under the laws of the State of New York, and is authorized to do business in New York. Defs. 56.1 ¶ 1. Hillside Auto Outlet is a used car dealership located at 16110 Hillside Avenue, Jamaica, New York, 11432. *Id.* ¶ 2. Josh Aaronson ("Aaronson"), Baron, The Estate of David Baron (the "Baron Estate"), and Thanwalla, each own twenty-five percent of Hillside Auto Outlet. *Id.* ¶ 3.

According to Defendants, each owner has different responsibilities within the dealership. Thanwalla is the only LLC member with the power to hire and fire employees and, as general manager, is the only member active in the dealership's daily operations. *Id.* ¶ 4-6. Defendants assert and Plaintiffs dispute that David Baron had no day-to-day responsibilities at the dealership before his death. *Id.* ¶¶ 7-8; Pl.'s Counter ¶ 8. Defendants assert that Baron's involvement at Hillside Auto Outlet was limited only to signing checks and maintaining the "financial health of the Dealership." Defs. 56.1 ¶ 11. David Baron's role did not include interacting with employees, hiring or firing employees, or overseeing employees, but was limited to managing finances. Pl.'s Counter ¶¶ 9-11. Defendants further assert that Aaronson had no responsibilities at Hillside Auto Outlet other than taking the occasional phone call with David Baron and Thanwalla, his co-members. Defs. 56.1 ¶ 12.

---

in Support of Motion for Summary Judgment, ECF 102; Defendants' Reply Memorandum of Law in Further Support of Motion for Summary Judgment ("Defs.' Reply Mem."), ECF 103; Plaintiff's Meemorandum of law in opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp."), ECF 105; Plaintiff's Affidavit/Declaration in Opposition to Defendants' Motion for Summary Judgment, ECF 106; Defs. 56.1; Plaintiff's Counter Statement of Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Counter"), ECF 106-13; Defendants' Reply to Plaintiff's Additional Material Facts, ("Defs.' Reply to Pl.'s Counter"), ECF 104.

[3] The following facts are drawn from the parties' respective statements of material facts and supporting exhibits. The facts are undisputed unless otherwise noted. *See* Examination of Leticia Francine Stidhum ("Pl.'s Dep."), Ex. K, ECF 102-11; Virtual Examination Before Trial of Andris Guzman ("Guzman's Dep."), Ex. J, ECF 102-10; Affidavit of Leticia Stidhum ("Pl.'s Aff."), ECF 106-1; Virtual Examination Before Trial of Ishaque Thanwalla ("Thanwalla's Dep."), Ex. I, ECF 102-9.

Defendant Guzman was a "sales manager" at Hillside Auto Outlet from the "beginning" of 2018 to the "end of the summer" in 2018.  Guzman Dep., Ex. J at 50:10-51:17.  Guzman was then promoted to "general sales manager," a position he held from 2018 through August 2019.  Defs. 56.1 ¶ 13.  As a sales manager, Guzman ensured that transactions were processed, and as a general sales manager, Guzman "work[ed] with banks, g[o]t customers approved for loans, and r[a]n[] credit for customers," but did not have the power to hire, fire, or discipline employees.  *Id.* ¶¶ 14-15.  Plaintiff disputes that Guzman did not have the power to fire, hire or discipline employees from the period of September 2018 to January 2019.  Pl.'s Counter ¶ 14.

Distinct from Hillside Auto *Outlet*, Hillside Auto *Mall* is a domestic business corporation that was formed on December 2, 2005, under the laws of the State of New York.  Defs. 56.1 ¶¶ 18-19.  Hillside Auto Mall is also a used car dealership, and is located at 15001 Hillside Avenue, Jamaica, NY 11432.  Defs. 56.1 ¶ 19.  Ronald Baron, Aaronson, Raymond Phelan ("Phelan"), and the Baron Estate own Hillside Auto Mall.  *Id.* ¶ 20.  Phelan was the general manager of Hillside Auto Mall (and owed no duties to Hillside Auto Outlet).  *Id.* ¶¶ 21, 146.

Although the two dealerships are located several blocks away from each other and have owners in common, Hillside Auto Outlet and Hillside Auto Mall "operate as two (2) separate automobile dealerships."  *Id.* ¶¶ 3, 20, 141-42.  The only employer who at times worked for both dealerships was Deana Jennings, a controller for Hillside Auto Mall.  *See id.* ¶¶ 152, 158.  Plaintiff never worked for Hillside Auto Mall, and Hillside Auto Mall never controlled Plaintiff's daily activities.  *Id.* ¶¶ 143, 147.  Hillside Auto Outlet at times purchased vehicles from other dealerships including Hillside Auto Mall, but did not prefer to purchase from Hillside Auto Mall.  *Id.* ¶ 159.

**B. Plaintiff's Hiring and Initial Tenure at Hillside Auto Outlet**

Plaintiff started working at Hillside Auto Outlet on May 22, 2018, after a brief interview with Thanwalla and a former manager named Jeanique, who is not a party to this case. Defs. 56.1 ¶¶ 23-25. Plaintiff was hired at Hillside Auto Outlet as a car salesperson. Defs. 56.1 ¶ 23. Her duties as a salesperson included showing customers cars, ascertaining whether a customer intended to use financing to purchase a car, helping customers complete credit applications, and asking a manager to run a "credit application." *Id.* ¶¶ 28, 44-47. Thanwalla trained Plaintiff on how to "(i) sell cars, how to meet and greet; (ii) take a credit application; and (iii) use VIN solutions, a lead management system." *Id.* ¶ 30.

Generally, Hillside Auto Outlet employed two assistant managers and two finance managers, who supervised salespeople and handled the financing for the car sale process. *Id.* ¶¶ 32, 48. Thanwalla, Guzman, and Jeanique supervised Plaintiff during her tenure at Hillside Auto Outlet. *Id.* ¶ 28. Defendants assert that sales managers, general sales managers, and finance managers were the only personnel authorized to run credit reports using "DealerTrack," the dealership management system which serves as a "liaison with banks that provide financing for vehicles." *Id.* ¶¶ 40-41, 47-48.

Plaintiff asserts that, in addition to her regular tasks as a salesperson, she was also responsible for "running and reading the credit of the customers" through her access to DealerTrack. Pl.'s Counter ¶ 27. Defendants assert that no salesperson, including Plaintiff, was authorized use DealerTrack. Defs. 56.1 ¶¶ 41, 46. Plaintiff disputes this assertion. Pl.'s Counter ¶ 46. According to Plaintiff, she was the only salesperson with access to DealerTrack. *See* Pl.'s Dep., Ex. K, 45:12-48:5. To access the platform, Plaintiff used Thanwalla's username and

password, which Thanwalla gave Plaintiff or "type[d] in [] himself" in Plaintiff's computer.  *See id.*  Thanwalla denies providing Plaintiff with his password.  *See* Thanwalla's Dep., Ex. I, 62:4-19.  Defendant Guzman denies any knowledge of Plaintiff ever having access to the DealerTrack system, and asserts that he never provided the DealerTrack log-in information to Plaintiff because he "did not have the authority to give any management tools to salespersons."  *See* Guzman Dep., Ex. J at 76:16-77:11; 102:5-103:19.

Defendants also assert that every car sale transaction is different and dependent on: whether the customer can locate a car they wish to purchase, whether the customer is paying cash or credit, and whether any delays arise when checking a customer's credit and financing eligibility.  Defs. 56.1 ¶¶ 43-44, 49.  Defendants assert that the process of "running" a customer's credit can be riddled with roadblocks that arise when verifying a customer's paystubs and employment, helping customers apply for credit from banks, and resolving inconsistent or conflicting information in a customer's credit report, such as fraud alerts.  Defs. 56.1 ¶¶ 49, 52-61.  Moreover, after the bank provides a credit offer, the customer must meet with a finance manager to go over the vehicle cost and the Dealership must verify that the paperwork complies with Department of Motor Vehicles regulations.  Defs. 56.1 ¶¶ 62, 67.  Defendants assert that many of these factors are out of the Dealership's control and that each of these roadblocks lengthens the credit application process.  Defs. 56.1 ¶¶ 49, 68-69; Pl.'s Counter ¶¶ 68-69.  Defendants also assert that the financing process could be delayed regardless of whether Plaintiff went to Thanwalla, Jeanique, Guzman, or a finance manager Serge Zanan ("Zanan") to process credit applications.  Defs. 56.1 ¶¶ 16, 49.

Plaintiff disputes that the verification process is subject to arbitrary delays, stating that "40 to 50 percent of the time" she was able to get customers "in and out of the door" within an hour or less when she had access to DealerTrack.  *See* Pl.'s Counter ¶ 43; Pl.'s Dep. at 46:2-13.  According

to Plaintiff, the verification process was "instantaneous," the sales managers did not have to contact the customer's employer for verification, and fraud alerts were "rare." Pl.'s Aff. ¶¶ 18-21. Ultimately, Plaintiff admits that even without delays "there was no guarantee she would make a sale because the customer could decide [they] no longer wanted a vehicle once qualified, or refuse to close on the deal because the monthly payment or down-payment required by the bank could be too high." Pl.'s Counter ¶ 50.

### C. Alleged Incidents at Hillside Auto Outlet Giving Rise to Plaintiff's Claims

#### 1. Plaintiff's Increased Wait Times After Pregnancy Announcement

According to Plaintiff, she announced her pregnancy to most employees at Hillside Auto Outlet, including Guzman, on November 23, 2018. Defs. 56.1 ¶ 80. Guzman denies he was present for the announcement and stated he was not aware Plaintiff was pregnant. *Id.* ¶ 91. Plaintiff does not know whether Thanwalla was present when she made her announcement. *Id.* ¶ 80.

After Plaintiff's announcement, in or around December 20, 2018, Thanwalla went on vacation. *Id.* ¶ 81; Thanwalla's Dep. at 64:3-16. Another sales manager was hired in mid-November to early December of 2018 to assist with the dealership during Thanwalla's absence. *Id.* ¶ 82. When Thanwalla left on vacation, Plaintiff lost access to DealerTrack, as Plaintiff had been using Thanwalla's password to access the program. *Id.* ¶¶ 83; Pl.'s Counter ¶¶ 173, 193-94. Plaintiff asserts that despite having previously had access to the platform, Guzman did not provide her with access when Thanwalla was on vacation. Pl.'s Counter ¶¶ 83-84, 193-94. Guzman admits that as a manager he had access to DealerTrack, but he disputes having the authority to change the password or to provide it to another employee. Defs. 56.1 ¶ 84; *see* Guzman's Dep., Ex. J, at 102:5-25.

Plaintiff did not have access to DealerTrack during Thanwalla's vacation, thus, Plaintiff, like other salespeople, had to ask Guzman to process customer credit applications. *See* Defs. 56.1 ¶¶ 81, 83. Plaintiff alleges that when she submitted applications to Guzman for processing, Guzman made her customers wait an unreasonable amount of time, causing many of her potential clients to walk out. *See* Pl.'s Counter ¶¶ 113, 196-99. Plaintiff alleges she was made to wait for extended periods of time only after she announced her pregnancy. *Id.* ¶ 85. Defendants assert that Guzman took longer than other managers to process applications even *before* Plaintiff announced her pregnancy, Defs. 56.1 ¶ 86, which Plaintiff admits, but only in relation to Guzman's training period in August 2018. Pl.'s Counter ¶ 86. Plaintiff attempted to have finance manager Zanan run customer credit applications instead of Guzman, however, Zanan told her he was busy, and "that she had to wait for Guzman." Defs. 56.1 ¶ 89.

Plaintiff confronted Guzman about the purported longer wait times "multiple times" and stated that Guzman would not respond but would "look at [her] with blank eyes." Pl.'s Counter ¶ 90. Plaintiff admits that Guzman never made any comments to Plaintiff about her pregnancy. *Id.* ¶ 94. Defendants assert that Plaintiff complained to Thanwalla about the longer wait times, without mentioning her pregnancy, and stated that Guzman "sucks" and that the dealership had been a "shit show" since Thanwalla went on vacation. Defs. 56.1 ¶ 88. Plaintiff also complained to Thanwalla about the wait times when he returned from vacation, and Thanwalla suggested they discuss the issue later. Pl.'s Counter ¶ 97. Defendants assert that Plaintiff "never complained of discrimination." Defs. 56.1 ¶ 101.[4] Plaintiff claims she sent emails and texts concerning the

---

[4] Plaintiff argues that she "complained of discrimination," but the testimony she cites in support is unclear. Pl.'s Counter ¶ 101 *citing* Thanwalla Dep. 232:8-233:8. Plaintiff cites Thanwalla's deposition. *Id.* However, the line of questioning in the deposition refers to a "Complaint" filed by an employee, while Plaintiff's response references "complain[ing]" to Thanwalla. Pl.'s Counter ¶ 101. It is unclear from Plaintiff's usage of the line of questioning whether Thanwalla's answers refer to Plaintiff's complaints about of the situation or Thanwalla's receipt of Plaintiff's legal complaint.

alleged discrimination but did not keep a record of her emails and texts because she changes phones "pretty often." Pl.'s Counter ¶ 111.

### 2. Plaintiff's Compensation

As a salesperson at Hillside Auto Outlet, Plaintiff received a $300.00 weekly salary, a $150.00 flat commission fee for each vehicle sold, and an occasional five percent bonus "of the profit of any vehicle which was sold that made in excess of $3,000.00 in profit." Defs. 56.1 ¶ 33. Hillside Auto Outlet gave Plaintiff a form to track the cars she sold and the payment she received. *Id.* ¶¶ 36-37.

Plaintiff asserts she suffered a decrease in income because Guzman waited too long to run credit checks and thus Plaintiff's would-be customers, tired of waiting, left Hillside Auto Outlet before Plaintiff could secure the sale. Pl.'s Aff. ¶¶ 25-28. Defendants provide a chart detailing Plaintiff's compensation history, showing Plaintiff's pay date, salary, commission, the number of cars she sold, and her approximate bonus. Defs. 56.1 ¶ 105. Defendants assert that "Plaintiff's average weekly commission before her pregnancy was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential." *Id.* ¶ 108. Defendants compare (a) Plaintiff's compensation from the start of Plaintiff's employment to immediately before Plaintiff's pregnancy announcement (Pay Dates 6/1/2018 to 11/23/2018) with (b) her compensation immediately after her pregnancy announcement, to the end of Plaintiff's employment (Pay Dates 11/30/2018 to 1/18/2019). *Id.* ¶ 105; *see also* Defs.' Mem. at 15-16. Plaintiff disputes the average numbers Defendants reference, stating that after her pregnancy she experienced a drop in average commissions of around 40 percent. *Id.* ¶¶ 105-08. Plaintiff provides a different chart detailing her compensation. Pl.'s Counter ¶ 106. However, unlike Defendants, Plaintiff does not use her pregnancy announcement as the point of comparison. Instead, Plaintiff

chooses seemingly arbitrary dates: she compares her pay for the period from September 4, 2018, to December 17, 2018, with her pay for the period from December 18, 2018, to January 14, 2019. *Id*. ¶¶ 106-08.  Plaintiff does not explain why she includes dates *after* she announced her pregnancy to calculate her pre-pregnancy announcement average weekly pay.

*{REST OF PAGE INTENTIONALLY LEFT BLANK}*

| Week | Pay Date | Salary | Commission | Cars Sold | Approx. Bonus |
|---|---|---|---|---|---|
| 1 | 6/1/2018 | $300.00 | $780.00 | 5 | $780.00 - $750.00 = $30.00 |
| 2 | 6/8/2018 | $300.00 | $425.00 | 2 | $425.00 - $300.00 = $125.00 |
| 3 | 6/15/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 4 | 6/22/2018 | $300.00 | $660.00 | 4 | $660.00 - $600.00 = $60.00 |
| 5 | 6/29/2018 | $300.00 | $615.00 | 4 | $615.00 - $600.00 = $15.00 |
| 6 | 7/6/2018 | $300.00 | $655.00 | 4 | $655.00 - $600.00 = $55.00 |
| 7 | 7/13/2018 | $300.00 | $0.00 | 0 | $0.00 |
| 8 | 7/20/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 9 | 7/27/2018 | $300.00 | $1,400.00 | 9 | $1400.00 - $1350.00 = $50.00 |
| 10 | 8/3/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 11 | 8/10/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 12 | 8/17/2018 | $0.00 | $0.00 | 0 | $0.00 |
| 13 | 8/24/2018 | $300.00 | $1,450.00 | 9 | $1450.00 - $1350.00 = $100.00 |
| 14 | 8/31/2018 | $300.00 | $1,200.00 | 8 | $0.00 |
| 15 | 9/7/2018 | $300.00 | $150.00 | 1 | $0.00 |
| 16 | 9/14/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 17 | 9/21/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 18 | 9/28/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 19 | 10/5/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 20 | 10/12/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 21 | 10/19/2018 | $300.00 | $700.00 | 4 | $700.00 - $600.00 = $100.00 |
| 22 | 10/26/2018 | $300.00 | $800.00 | 5 | $800.00 - $750.00 = $50.00 |
| 23 | 11/2/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 24 | 11/9/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 25 | 11/16/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 26 | 11/23/2018 | $300.00 | $1,375.00 | 9 | $1375.00 - $1350.00 = $25.00 |
| 27 | 11/30/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 28 | 12/7/2018 | $300.00 | $1,600.00 | 4 | $1600.00 - $600.00 = $1000.00 |
| 29 | 12/14/2018 | $300.00 | $825.00 | 5 | $825.00 - $750.00 = $75.00 |
| 30 | 12/21/2018 | $300.00 | $625.00 | 4 | $625.00 - $600.00 = $25.00 |
| 31 | 12/28/2018 | $300.00 | $500.00 | 3 | $500.00 - $450.00 = $50.00 |
| 32 | 1/4/2019 | $300.00 | $350.00 | 2 | $350.00 - $300.00 = $50.00 |
| 33 | 1/11/2019 | $300.00 | $825.00 | 5 | $825.00 - $750.00 = $75.00 |
| 34 | 1/18/2019 | $300.00 | $350.00 | 2 | $350.00 - $300.00 = $50.00 |
| | AVERAGE | $300.00 | $705.44 | 4.32 | $56.91 |
| | TOTAL | $10,200.00 | $23,985.00 | 4.30 | $1,935.00 |

Defendants' Chart Detailing Plaintiff's Compensation at Hillside Auto Outlet.  Defs. 56.1 ¶ 105.

| Week | Period | | Salary | Commission | Total Pay |
|---|---|---|---|---|---|
| 1 | 2018-05-22 | 2018-05-28 | $300.00 | $780.00 | $1,080.00 |
| 2 | 2018-05-29 | 2018-06-04 | $300.00 | $425.00 | $725.00 |
| 3 | 2018-06-05 | 2018-06-11 | $300.00 | $300.00 | $600.00 |
| 4 | 2018-06-12 | 2018-06-18 | $300.00 | $ - | $300.00 |
| 5 | 2018-06-19 | 2018-06-25 | $300.00 | $615.00 | $915.00 |
| 6 | 2018-06-26 | 2018-07-02 | $300.00 | $655.00 | $955.00 |
| 7 | 2018-07-03 | 2018-07-09 | $300.00 | $ - | $300.00 |
| 8 | 2018-07-10 | 2018-07-16 | $300.00 | $900.00 | $1,200.00 |
| 9 | 2018-07-17 | 2018-07-23 | $300.00 | $1,400.00 | $1,700.00 |
| 10 | 2018-07-24 | 2018-07-30 | $300.00 | $450.00 | $750.00 |
| 11 | 2018-07-31 | 2018-08-06 | $300.00 | $300.00 | $600.00 |
| 12 | 2018-08-07 | 2018-08-13 | | | $ - |
| 13 | 2018-08-14 | 2018-08-20 | $300.00 | $1,450.00 | $1,750.00 |
| 14 | 2018-08-21 | 2018-08-27 | $300.00 | $1,200.00 | $1,500.00 |
| 15 | 2018-08-28 | 2018-09-03 | $300.00 | $150.00 | $450.00 |
| 16 | 2018-09-04 | 2018-09-10 | $300.00 | $450.00 | $750.00 |
| 17 | 2018-09-11 | 2018-09-17 | $300.00 | $450.00 | $750.00 |
| 18 | 2018-09-18 | 2018-09-24 | $300.00 | $750.00 | $1,050.00 |
| 19 | 2018-09-25 | 2018-10-01 | $300.00 | $750.00 | $1,050.00 |
| 20 | 2018-10-02 | 2018-10-08 | $300.00 | $900.00 | $1,200.00 |
| 21 | 2018-10-09 | 2018-10-15 | $300.00 | $700.00 | $1,000.00 |
| 22 | 2018-10-16 | 2018-10-22 | $300.00 | $800.00 | $1,100.00 |
| 23 | 2018-10-23 | 2018-10-29 | $300.00 | $1,050.00 | $1,350.00 |
| 24 | 2018-10-30 | 2018-11-05 | $300.00 | $1,050.00 | $1,350.00 |
| 25 | 2018-11-06 | 2018-11-12 | $300.00 | $900.00 | $1,200.00 |
| 26 | 2018-11-13 | 2018-11-19 | $300.00 | $1,375.00 | $1,675.00 |
| 27 | 2018-11-20 | 2018-11-26 | $300.00 | $450.00 | $ 750.00 |
| 28 | 2018-11-27 | 2018-12-03 | $300.00 | $1,600.00 | $1,900.00 |
| 29 | 2018-12-04 | 2018-12-10 | $300.00 | $825.00 | $1,125.00 |
| 30 | 2018-12-11 | 2018-12-17 | $300.00 | $625.00 | $925.00 |
| 31 | 2018-12-18 | 2018-12-24 | $300.00 | $500.00 | $800.00 |
| 32 | 2018-12-25 | 2018-12-31 | $300.00 | $350.00 | $650.00 |
| 33 | 2019-01-01 | 2019-01-07 | $300.00 | $825.00 | $1,125.00 |
| 34 | 2019-01-08 | 2019-01-14 | $200.00 | $350.00 | $550.00 |

Plaintiff's Chart[5] Detailing Her Compensation at Hillside Auto Outlet.  Pl.'s Counter ¶ 106.

---

[5] The Court has reformatted this table for readability.

### D. Plaintiff's Resignation from Hillside Auto Outlet

Plaintiff resigned from Hillside Auto Outlet in January 2019.  Pl.'s Counter ¶ 116.  Plaintiff cites the following reasons for her resignation: (1) the longer wait times her customers were subjected to by Guzman, (2) the decrease in her income due to the longer wait times, and (3) Thanwalla's refusal to give Plaintiff a promotion he allegedly promised her before he left for vacation.  Pl.'s Counter ¶¶ 117-18, 120-24.  Plaintiff asserts that she left Hillside Auto Outlet because she was not making money, and was "blatantly ignored by Guzman when [she] had a customer" who needed credit.  *See id.* ¶¶ 117, 120; Pl.'s Dep., Ex. K at 232:4-14.  Additionally, Plaintiff asserts that Thanwalla promised her a promotion but when he returned from vacation and she asked to meet with him, he "told her he w[ould] discuss [it] with her later."  Pl.'s Counter ¶¶ 118-20.  Plaintiff stated that following Thanwalla's discuss it later comment, she felt "it was clear as day" that Thanwalla would not give her the promotion.  *Id.* ¶¶ 122-23.

Defendants claim Thanwalla never *told* Plaintiff he would not give her a promotion, which Plaintiff does not dispute, *id.* ¶ 123, and that Plaintiff did not follow up on the conversation regarding the promotion.  *Id.* ¶ 124.  Moreover, Thanwalla, disputes ever having promised Plaintiff a promotion in the first place.  Thanwalla Dep. at 83:21-25; 84:2-18.

Approximately ten days after Plaintiff quit, Defendants assert that Plaintiff contacted Baron to discuss her pay and did not mention her pregnancy or discrimination related to her pregnancy during that conversation.  Defs. 56.1 ¶¶ 125-26.  In response, Plaintiff contends that she complained about her pay and told Baron that she had been "sabotaged."  Pl.'s Counter ¶ 126.  Following Baron's discussion with Plaintiff, Baron discussed the payment issue with Thanwalla, and concluded that no money was owed to Plaintiff.  Defs. 56.1 ¶ 129.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that they are entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). Therefore, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

If the moving party meets its burden of demonstrating the absence of a disputed issue of material fact, then the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." FED.R.CIV.P. 56(e); *Sheet Metal Workers' Nat'l Pension Fund v. Accra Sheetmetal, LLC*, 993 F. Supp. 2d 245, 248 (E.D.N.Y. 2014). The nonmoving party cannot rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." *Anderson* 477 U.S. at 249-50 (internal citations omitted).

**DISCUSSION**

**A. Plaintiff's Title VII and NYSHRL Claims for Sex and Pregnancy Discrimination**

Defendants argue that Plaintiff's Title VII sex discrimination claim and Pregnancy Discrimination Act ("PDA") claim against Hillside Auto Outlet and Hillside Auto Mall "must be dismissed." Defs.' Mem. at 9. Likewise, Defendants argue that Plaintiff's NYSHRL sex discrimination claim should be dismissed against all defendants. *Id.* at 17.

Title VII of the Civil Rights Act of 1964 forbids a covered employer from "discriminat[ing] against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). The PDA "makes clear" that Title VII's prohibition against sex discrimination "applies to discrimination based on pregnancy." *See Young v. United Parcel Service, Inc.*, 575 U.S. 206, 210 (2015). The PDA states that employers must treat "'women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.' 42 U.S.C. § 2000e(k)." *See id.*; *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

Claims asserted under Title VII and the NYSHRL "are analyzed pursuant to the same standard; therefore, analysis of identical claims brought by an individual under both of these laws can be performed in tandem." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 832 (S.D.N.Y. 2013) (citations omitted); *accord Lenzi*, 944 F.3d at 107 n.7; *see Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 140-41 (2d Cir. 2006)) ("[T]he outcome of an employment discrimination claim made pursuant to the

NYSHRL is the same as it is under . . . Title VII.").  Therefore, the Court analyzes Plaintiff's Title VII and NYSHRL claims alleging sex discrimination concurrently.[6]

In cases where no direct evidence of discriminatory intent is available, courts analyze Title VII discrimination claims under the familiar *McDonnell Douglas* framework to "assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment."  *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024), *cert. denied*, 23-1346, 2024 WL 4426694 (U.S. Oct. 7, 2024); *accord Young*, 575 U.S. at 228 (an "individual pregnant worker who seeks to show disparate treatment through indirect evidence may do so through application of the *McDonnell Douglas* framework.").  Here, Plaintiff relies only on circumstantial evidence and thus application of *McDonnell Douglas* is appropriate.

The *McDonnell Douglas* framework requires a plaintiff to make out a *prima facie* case of discrimination by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under" Title VII.  *Young*, 575 U.S. at 228.  The burden of making this showing "is not onerous."  *Id.*  To establish a *prima facie* case of discriminatory treatment a plaintiff must show that "(1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Bloomberg L.P.*, 967 F. Supp. 2d at 833.

---

[6] Notwithstanding the impact that dismissal of Plaintiff's federal claims might have on the Court's decision regarding whether to exercise supplemental jurisdiction over Plaintiff's state law claims, in furtherance of judicial economy, the Court exercises jurisdiction over Plaintiff's NYSHRL claims, because the NYSHRL's legal standards are identical to Title VII's.  *See Maragh v. Roosevelt Island Operating Corp.*, 16-CV-7530 (JMF), 2021 WL 3501238, at *10 (S.D.N.Y. Aug. 5, 2021), *aff'd*, 21-2129, 2022 WL 14199384 (2d Cir. Oct. 25, 2022) (finding no abuse of discretion where the district court exercised supplemental jurisdiction over an NYSHRL claim because its standard is identical to the Title VII claim).

If the plaintiff establishes a prima facie case, "a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." *Id.*; *Lenzi*, 944 F.3d at 107-08. "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Lenzi*, 944 F.3d at 107-08. If the plaintiff cannot prove the presence of such a pretext by a preponderance of the evidence, then summary judgment for the defendant is appropriate. *Bloomberg L.P.*, 967 F. Supp. 2d at 833.

### 1. *Prima Facie* Case

The parties agree that Plaintiff satisfies the first two prongs of a *prima facie* case of discrimination. Defs.' Mem. at 10; Pl.'s Opp. at 7.[7] However, Defendants contend that Plaintiff has failed to establish the third and fourth prongs, i.e. that plaintiff has suffered an adverse employment action, that gives rise to an inference of discriminatory intent. Defs.' Mem. at 12-13.

### a. Adverse Employment Action

Plaintiff argues she suffered adverse employment actions in the form of (1) increased "wait times" for her customers' credit processing, which resulted in a "demotion evidenced by a decrease in her salary that she received[,]" (2) constructive discharge, and (3) failure to promote. *See* Pl.'s Opp. at 8-9, 11.

An adverse employment action is an action that imposes "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). The alleged adverse employment action must have left the plaintiff "worse off,

---

[7] During the incidents in this case, Plaintiff was a pregnant woman and thus a member of a protected class. *See Young*, 575 U.S. at 210. The parties also agree that Plaintiff was qualified for her employment. Defs.' Mem. at 10; Pl.'s Opp. at 7.

but need not have left her significantly so." *Id.* at 359. The decision in *Muldrow* overruled prior Second Circuit precedent which required that an adverse employment action be "*materially adverse with respect to the terms and conditions of employment.*" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam) (citation omitted); *see Back v. Hapoalim*, 24-CV-1064, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024). The "materially adverse" standard describes an action that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Davis*, 804 F.3d at 235.[8] The party asserting discrimination need not show that the harm was "'significant' . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar. 'Discriminate against' means treat worse, here based on sex. But neither that phrase nor any other says anything about how much worse." *Muldrow*, 601 U.S. at 355 (internal citations omitted). Following *Muldrow*, the party asserting discrimination must assert a harm or injury that, as Justice Thomas wrote, is "more than trifling". *Id.* at 360 (Thomas, J., concurring).

**(1) Wait Times**

Plaintiff argues that Guzman's "targeted and intentional delay in running and reading the credit applications" for her customers after her pregnancy announcement constitutes an adverse employment action because the longer wait times caused her to have "lower commissions and

---

[8] There is some disagreement among district courts as to whether *Muldrow* applies to Title VII cases outside of the context of involuntary job transfers. *See, e.g.*, *Rackley v. Constellis, LLC.*, 22-CV-4066 (GHW) (RWL), 2024 WL 3498718, at *21 (S.D.N.Y. June 17, 2024) ("It is uncertain whether the Supreme Court's 'some harm' standard . . . applies to discrimination claims beyond the involuntary transfer context."); *Cavanaugh v. Wal-Mart Stores E., LP.*, 22-CV-1908 (MEM), 2024 WL 2094010, at *4 (M.D. Pa. May 9, 2024) (declining to apply the "some harm" standard to a case where the plaintiff's alleged adverse employment action was not an involuntary transfer); *Anderson v. Amazon.com, Inc.*, 23-CV-8347 (AS), 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024) (applying the "some harm" standard outside the involuntary transfer context). The Second Circuit has not yet opined on this issue. *See Back*, 2024 WL 4746263 (applying 'some harm' standard in context of Title VII involuntary transfer case). However, this Court agrees that "Because the basis for the Supreme Court's decision was the express language of Section § 200e-2(a)(1), the some harm standard likely does apply outside the involuntary transfer context." *McCarthy v. Motorola Solutions, Inc.*, 21-CV-4020 (RER), 2024 WL 3965950, at *10, n. 3 (E.D.N.Y. Aug. 28, 2024).

lower wages." Pl.'s Opp. at 9. Defendants retort that "increased wait times" do not comprise an "'adverse employment action' within the meaning of the law." Defs.' Mem. at 11.

Courts in this Circuit have found that actions such as waiting for a locker or having to move to another floor to enter a patient's information in a work computer, are inconveniences and not sufficiently disruptive to constitute adverse employment actions. *See Paul v. Lenox Hill Hosp.*, 13-CV-01566 (CBA) (LB), 2016 WL 4775532, at *11 (E.D.N.Y. Jan. 15, 2016), *report and recommendation adopted*, 13-CV-1566 (CBA) (LB), 2016 WL 1271034 (E.D.N.Y. Mar. 29, 2016) (finding there was no adverse employment action where the employer did not assign Plaintiff a computer and thus she "was required to record patient notes on computers in the main office when her assigned floor did not have terminals available."); *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 266 (E.D.N.Y. 2012) (finding that a transfer to a workstation away from filing cabinets made plaintiff's job logistically more difficult but did not rise to the level of being materially adverse); *Batchelor v. City of New York*, 12 F. Supp. 3d 458, 473-74 (E.D.N.Y. 2014) (finding a four-week wait for a locker where there were no lockers available did not constitute an adverse action but a mere inconvenience).

Plaintiff argues that Guzman made her customers wait an unreasonable amount of time, causing many of her potential clients to walk out due to the long wait. Pl.'s Opp. at 10-11; *see* Pl.'s Counter ¶ 113. Defendants assert that Guzman took longer than other managers to process all salespersons' applications "*before*" Plaintiff announced her pregnancy. Defs.' Mem. at 4, 13; Defs. 56.1 ¶ 86. Plaintiff admits Guzman took longer with applications before her announcement, but insists that he only took so long during his training period in August 2018 and got faster after. Pl.'s Counter ¶ 86.

*Muldrow* prohibits treating someone worse with respect to a "condition of employment." 601 U.S. at 355.  Assuming Plaintiff's wait times increased, that increase likely only mirrors what other employees without DealerTrack access already experienced.  Longer wait times, while inconvenient and annoying, are so not harmful or injurious that they constitute "some harm" related to Plaintiff's employment.  Increased wait times have only an incidental and attenuated effect on Plaintiff's compensation.  They do not, however, reflect a change to the *conditions* of Plaintiff's employment itself.  The Court finds that waiting for a customer's credit application to be processed is like waiting for a locker, or having to move to another floor to enter patient information in a work computer, in that it is not more than trifling and does not rise above a mere inconvenience  in the workplace, particularly where Plaintiff's coworkers experienced roughly the same wait times as her[9] and a shorter wait time does not guarantee a customer will make a purchase.

Plaintiff argues that the increased wait times negatively affected her compensation and thus she suffered a "demotion evidenced by a decrease in [the] salary that she received."  Pl.'s Opp. at 8-9.  Plaintiff does not argue that her job title changed or that she was transferred to another position, but instead contends that she lost access to a tool that was previously available to her, and that the lack of access resulted in lower compensation. [10]  Defs.'s 56.1 ¶ 81; Thanwalla's Dep. at 64:8-16.

Courts in this Circuit have held that a demotion evidenced by a decrease in "wage or salary" or resulting in a less distinguished title constitutes an adverse employment action.  *See, e.g.,*

---

[9] Plaintiff argues against the idea that Guzman took the same time to process credit applications for all salespeople by arguing that the increased wait time, "decrease in car sales," and that "many coworkers who were car salesmen observed and commented upon the drastic decrease in numbers after Plaintiff's pregnancy announcement, which made other salespeople that didn't sell that many cars look successful" undermines this idea. Pl.'s Opp. at 14.  That Plaintiff sold fewer cars than before and other salespeople noticed has no bearing on whether Plaintiff was subject to the same wait times as other employees.

[10] Plaintiff's weekly compensation ($300) and commission rate ($150) are undisputed.  Defs.' 56.1 ¶ 33.

*Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (*Galabya*, 202 F.3d at 640.

The parties dispute whether Plaintiff suffered a decline in her income sufficient to rise to the level of an adverse employment action. Defendants argue Plaintiff's income did not decrease significantly after her pregnancy announcement. Defs.' Mem. at 15. Comparing the period from start of employment to pre-pregnancy announcement, to the period from post pregnancy announcement to Plaintiff's resignation, Defendants conclude that "[p]laintiff's average weekly commission before her pregnancy [announcement] was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential." Defs.' 56.1 ¶ 108; Defs.' Mem. at 15. Calculating her average pre-pregnancy wages based on her pay from "September 4, 2018 to December 17, 2018," Plaintiff concludes that her total pay decreased post-pregnancy by $363.75 per week or 31.8 percent, while her commission decreased by $338.75 or 40 percent. Pl.'s Opp. at 10; *see also* Pl.'s Counter ¶ 106.

The Court broadly agrees with Defendants; Plaintiff's salary largely stayed the same and her commissions throughout her tenure at Hillside Auto Outlet follow no discernible trend line or pattern connected to the date Plaintiff announced her pregnancy. Plaintiff's income fluctuated but the fluctuation is marginal and untethered to the announcement. As another court in this Circuit has held, "'an indirect and minor effect on commission income . . . is not sufficient to transform a [change in job responsibilities] into a demotion.'" *Szwalla v. Time Warner Cable, LLC*, 135 F. Supp. 3d 34, 51 (N.D.N.Y. 2015) (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)), *aff'd*, 670 F. App'x 738 (2d Cir. 2016). A reduction in commission earnings is unlikely to constitute an adverse employment action on the basis of discrimination because commission earnings are proportional to sales. *See Bristol-Myers Squibb Co.*, 85 F.3d at 274.

Therefore, an action from an employer that reduces an employee's sales and, by extension her commissions, would hurt the employer too, by reducing its profit. *Id.* By contrast a reduction in commission *rate* may constitute a demotion. *Id.* However, Plaintiff has not argued that her commission *rate* changed. It is undisputed that her commission rate remained the same. Defs. 56.1 ¶ 33.

Therefore, any increased wait times Plaintiff experienced do not constitute an adverse employment action under *Muldrow*.

### (2) Constructive Discharge

Constructive discharge is an adverse employment action. *See, e.g.*, *Walsh v. Scarsdale Union Free Sch. Dist.*, 375 F. Supp. 3d 467, 478 (S.D.N.Y. 2019). For a court to consider constructive discharge a plaintiff must show that the employer intentionally created a work atmosphere so intolerable that the employee is forced to quit involuntarily. *See Bloomberg L.P.*, 967 F. Supp. 2d at 835 (omissions in original); *see also Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003) (holding that allegations of constructive discharge as a whole must be so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign). However, "an employee's mere dissatisfaction with job assignments or criticism from a supervisor do not, alone, give rise to such a claim." *Bloomberg L.P.*, 967 F. Supp. 2d at 835.

Defendants assert that Plaintiff does not argue she was constructively discharged. Defs.' Mem. at 10. Plaintiff responds that she was constructively discharged because her resignation was "involuntary as a result of coercion and duress." Pl.'s Opp. at 8. In support, Plaintiff cites to Plaintiff's Counter Statement of Undisputed Material Facts, where Plaintiff contends that she was constructively discharged by stating: "in describing why she left employment at Hillside Auto Outlet, Plaintiff described the workplace as being 'intolerable' [and she was] 'pregnant, tired, and

not making any money' as a result of the pregnancy discrimination. (Plf Depo. 230:22-232:9)." Pl.'s Counter ¶ 117.  In the cited deposition, Plaintiff states her resignation was "because who wants to sit in a place for ten hours a day pregnant, tired and not making any money" as well as being "blatantly ignored" by Andris Guzman.  Pl.'s Dep. 231:22-232:9.

A reasonable jury could not find that Plaintiff's testimony demonstrates that her employer "intentionally create[d] a work atmosphere so intolerable that [the employee] [wa]s forced to quit involuntarily." *Bloomberg L.P.*, 967 F. Supp. 2d at 835.  Plaintiff's employer intentionally reduced her access to DealerTrack, consistent with the company's policies.  However, Plaintiff's testimony does not establish that her employer, by limiting her access to DealerTrack, created "working conditions would have been so difficult or unpleasant that a reasonable person in [Plaintiff's] shoes would have felt compelled to resign." *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001). Plaintiff laments that she was "not making any money," Pl.'s Dep. 231:22-232:9, but as her own compensation chart reveals, Plaintiff *was* making money.[11]  Thus, Plaintiff has not pointed to enough evidence to support a claim for adverse employment based on constructive discharge.

### (3) Failure to Promote

For purposes of an employment discrimination action under Title VII, a failure to promote can constitute an adverse employment action.  *See* 42 U.S.C.A. § 2000e–2(a)(1); *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. 2014).  To establish a *prima facie* case for discriminatory failure to promote, a plaintiff must demonstrate that "(1) she is a member of a

---

[11] As explained *supra* at 8-9, Plaintiff does not explain why she includes dates *after* she announced her pregnancy to calculate her pre-pregnancy announcement average weekly pay.  Without a reasoned basis for her calculations, the Court concludes that Plaintiff's pay only decreased on average by about $20—an amount that does not "compel" someone to resign.  "A *severe* reduction in pay may constitute a constructive discharge."  *See Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004) (emphasis added) (holding constructive discharge may be shown "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions").  A $20 reduction is not severe.

protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998).

Plaintiff alleges she was promised a promotion. Pl.'s Opp. at 11. When Plaintiff asked to discuss a promotion, Thanwalla asked her to wait to have the discussion. Pl.'s Counter ¶¶ 118-20. Plaintiff stated she felt "it was clear as day" Thanwalla would not give her the promotion because he made her wait. *Id.* ¶¶ 122-23. Plaintiff did not follow up on the conversation regarding the promotion, *id.* ¶ 124, and Defendants assert Thanwalla never told Plaintiff he would not give her a promotion, which Plaintiff does not dispute, *id.* ¶ 123.

Even considering the evidence in the light most favorable to Plaintiff, Plaintiff's opposition is devoid of any argument regarding whether she applied for the position or how she was qualified for the position. Normally, an application for the position is required to satisfy the second prong of the discriminatory failure to promote test. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004). There is a narrow exception to this requirement, where "a plaintiff can 'demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.'" *Bloomberg L.P.*, 967 F. Supp. 2d at 846. Plaintiff cites no evidence demonstrating there was a vacancy, nor does she cite evidence showing she was rejected for the position and has not shown there was a position open that remained open after she left. Thus, Plaintiff has not met the requirements to show an adverse employment action based on a failure to promote theory.

For the aforementioned reasons, Defendants' motion for summary judgment is granted in part. Specifically, Plaintiff's Title VII, and PDA claims against defendants Hillside Auto Outlet and Hillside Auto Mall and Plaintiff's NYSHRL sex discrimination claim against defendants Hillside Auto Outlet, Hillside Auto Mall, Thanwalla, J. Baron, and Guzman are dimissed.

### B. Plaintiff's NYSHRL Disability Discrimination and NYCHRL Pregnancy Discrimination Claims

Having dismissed Plaintiff's federal law claims, as well as the NYSHRL sex discrimination claims governed under the same standards as their federal counterpart, the Court declines to exercise supplemental jurisdiction over the remaining NYSHRL disability and NYCHRL claims. *See* 28 U.S.C. §§ 1367(a), (c) (giving district courts discretion to exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Courts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's NYSHRL and NYCHRL claims after dismissing all federal claims. *See, e.g.*, *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 37 (E.D.N.Y. 2015) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Bunting v. Gap, Inc.*, 714 F. Supp. 3d 152 (E.D.N.Y. 2024). Furthermore, "recognizing that the NYCHRL has a lower threshold of proof than its federal counterparts, comity suggests that the state courts should resolve these local law claims." *Thomas v. City of New York*, 953 F. Supp. 2d 444, 462 (E.D.N.Y. 2013) (citing *Mihalik v. Credit Agricole*

*Cheuvreaux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013).  Accordingly, Plaintiff's NYSHRL and NYCHRL claims are dismissed without prejudice to refiling in state court.

### C.  Plaintiff's Aiding & Abetting Claims

Plaintiff also argues that defendants, Guzman, Thanwalla, and Baron are liable under the NYSHRL and NYCHRL for aiding and abetting discriminatory conduct.  Pl.'s Opp. at 22-24.  The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is "virtually identical." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).  However, a plaintiff can maintain an aiding and abetting claim only when an underlying violation has taken place.  *See Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009).  Thus, where the employer is not found liable, no employee may be accessorial liable as an aider and abettor.  *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012).

Given dismissal of Plaintiff's NYSHRL and NYCHRL claims, there is no predicate violation under either statute.   Accordingly, Plaintiff's claim for aiding and abetting is also dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part, as to Plaintiff's federal law and NYSHRL sex discrimination claims and denied as to Plaintiff's NYSHRL disability discrimination claim and NYCHRL sex discrimination claim because the Court declines supplemental jurisdiction. Thus, Plaintiff's NYCHRL claims and NYSHRL disability discrimination claims are dismissed without prejudice to refiling in state court.

The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

/s/_____
ORELIA E. MERCHANT
United States District Judge

Dated: January 29, 2025
      Brooklyn, New York